1              IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MASSACHUSETTS
2

3      UNITED STATES OF AMERICA,            )
                                            )
4                  Plaintiff               )
                                            )
5           -VS-                            ) Civil No. 13-11530-PBS
                                            ) Pages 1 - 25
6      BRIAN MAHONEY,                       )
                                            )
7                  Defendant                )

8                           **MOTION HEARING**

9

10            BEFORE THE HONORABLE PATTI B. SARIS
              UNITED STATES CHIEF DISTRICT JUDGE
11

12
       A P P E A R A N C E S:
13
           PATRICK M. CALLAHAN, ESQ., Assistant United States
14     Attorney, Office of the United States Attorney,
       1 Courthouse Way, Room 9200, Boston, Massachusetts, 02210,
15     for the Plaintiff.

16         NELSON P. LOVINS, ESQ., Levins & Metcalf,
       Ten Cedar Street, Suite 22, Chestnut Green, Woburn,
17     Massachusetts, 01801, for the Defendant.

18     ALSO PRESENT:  Timothy G. Watkins, Esq.,
                       Federal Public Defender Office.
19

20                              United States District Court
                                1 Courthouse Way, Courtroom 19
21                              Boston, Massachusetts  02210
                                November 22, 2013, 3:24 p.m.
22

23                      LEE A. MARZILLI
                     OFFICIAL COURT REPORTER
24               United States District Court
                 1 Courthouse Way, Room 7200
25                   Boston, MA  02210
                       (617)345-6787

<u>P R O C E E D I N G S</u>

     THE CLERK:  Court calls Civil Action 13-11530, United States v. Mahoney.  Could counsel please identify themselves.

     MR. CALLAHAN:  Patrick Callahan for the United States, your Honor.

     THE COURT:  Thank you.

     MR. LOVINS:  Nelson Lovins, your Honor, for Mr. Mahoney.

     THE COURT:  All right, thank you.  And I see Mr. Watkins back there.  You all should stay seated.  Thank you.  And I note for the record that Mr. Mahoney is here.

     MR. LOVINS:  Your Honor, might I just mention to you that I have a little bit of a hearing problem.

     THE COURT:  Okay, I'll speak nice and loudly.  Okay, that sounds great.  And why don't you be seated, Mr. Mahoney.  Okay, thank you.

     Now, I've got a situation where Mr. Watkins has moved to withdraw, and I thought you had filed an appearance, but now you've moved to withdraw, so I am not quite sure what to do.  Let me first say, I have Mr. Mahoney here because the counsel issue is such a serious one.  Let me start off with the government and see if you can see your way through this, and then I'll turn to you, and I'll turn to Mr. Watkins, and then I'll talk to Mr. Mahoney.  All right?

     MR. CALLAHAN:  Your Honor, before I begin, I don't know that I can guide us through the counsel issue.  I don't

1   have a lot of details as to the reasons for the withdrawals.  I
2   did want to make one clarification relating following up on our
3   last status conference.  At one point in the status conference
4   when we were kind of wrangling with the competency/dangerousness
5   issue, you said, "What makes this person so dangerous?  Has he
6   been convicted of the rape of a child?"  And I said "No."  And
7   I was looking at my Risk Assessment Report attached as
8   Exhibit 1, and I said, "I believe it's aggravated rape."  And I
9   said, "But the convictions are listed in the Risk Assessment
10  Report."  It is actually not aggravated rape.  He was charged
11  with that and acquitted in 1983.  In the same paragraph, it
12  says that he was charged with assault to rape and was
13  incarcerated for six years.  I wanted to be clear.  I want to
14  apologize to the Court, to Mr. Mahoney, and counsel.  I said
15  that when Mr. Watkins was his attorney, but that was an error
16  on our part, and --
17          THE COURT:  Well, what does the report say with
18  respect to competency?  Does it address competency, the new
19  report?
20          MR. CALLAHAN:  The dangerousness report, your Honor,
21  in this 4246 case, the only report that's been submitted to the
22  Court is one on dangerousness by Dr. Channell.  Competency was
23  resolved on two occasions and affirmed by the First Circuit
24  based on the case coming out of Judge Laplante's.
25          THE COURT:  Right.  And then I remembered that

1    Mr. Watkins had asked for authority to have Dr. Reed look at

2    competency, which I permitted, but she's not yet done a report.

3    Is that right?

4            MR. CALLAHAN:  That's correct.  Based on the papers,

5    it sounds like she has not taken any substantial steps to

6    prepare a report.  However, there was some dissatisfaction with

7    that selection, as I understand it, based on the papers.

8            THE COURT:  Right.

9            MR. CALLAHAN:  And so Mr. Watkins has already filed a

10   motion to vacate the order appointing her, so I think that's

11   where things stand at this point.

12           THE COURT:  Thank you.

13           Now, from your point of view, sir, why do you want to

14   move to withdraw?  You just got into the case.

15           MR. LOVINS:  Judge, it's --

16           THE COURT:  Were you court appointed?  You weren't.

17   It's a privately retained lawyer, right?

18           MR. LOVINS:  Correct.  It's fairly clear to me that

19   Mr. Mahoney and I are on totally different pages, and I just

20   can't -- I can't continue in this case.  He and I are just not

21   seeing --

22           THE COURT:  Has he paid you any money?

23           MR. LOVINS:  He has, and I have to return some of it,

24   yes; and we've already had that discussion and come to an

25   agreement on that.

```
 1              THE COURT:  The reason that's relevant is, if he's got
 2    money, then I don't know why I'm appointing the Federal
 3    Defender.  Is it his money or his family's money?
 4              MR. LOVINS:  I don't know.  Well, no, actually,
 5    actually, I think I was told it was the family money.  I
 6    believe I was told that.
 7              THE COURT:  All right, thank you.
 8              So, now, Mr. Watkins, why do you want to withdraw?
 9    Was it just because a new attorney came in, or was it an
10    irretrievable breakdown?
11              MR. WATKINS:  At first, it was because a new attorney
12    came in, and the Court actually granted my motion to withdraw.
13              THE COURT:  Have I already granted it?
14              MR. WATKINS:  You did.
15              THE COURT:  Because there was a new attorney?
16              MR. WATKINS:  Correct, exactly.  By that point,
17    Mr. Lovins had filed his notice of appearance, and so the Court
18    granted that.  Out of an abundance of caution because I had
19    nominated Dr. Reed, and part of the reason why I understand
20    Mr. Mahoney to want to hire private counsel is because he
21    wanted someone other than Dr. Reed, so because there was a
22    court order directing her, that's why I filed --
23              THE COURT:  Did she ever do any analysis at all,
24    either with respect to dangerousness or competency?
25              MR. WATKINS:  She has done none.  She met with
```

1    Mr. Mahoney on the briefest of occasions, but that is all that

2    she did, no substantial steps towards an evaluation.

3          I did notify, expecting that Mr. Lovins might be

4    released from the case, there is now an additional reason why I

5    cannot continue to represent Mr. Mahoney, and that would be

6    where the conflict is.  It's not a breakdown in communications.

7    It's something that would require really mandatory withdrawal

8    if I were appointed and would prevent me from being appointed

9    to him now.

10          THE COURT:  Would it preclude the entire Federal

11   Defender Office?

12          MR. WATKINS:  Yes, it would.

13          THE COURT:  Does it have to do with another client you

14   represent?

15          MR. WATKINS:  It does not.

16          THE COURT:  Is this because he can afford, or you feel

17   not comfortable?

18          MR. WATKINS:  I'd prefer not to say.

19          THE COURT:  All right.  Let me ask you this:  For both

20   of you gentlemen who have worked with him, there's a threshold

21   issue that Mr. Watkins --

22          MR. LOVINS:  Sorry, I can't hear.

23          THE COURT:  I'm sorry.  I'm not loud enough.  There's

24   a threshold issue that Mr. Watkins wanted me to look at, which

25   is whether he was still incompetent.  As you know, a judge in

1    New Hampshire said he was incompetent.  The First Circuit

2    affirmed once or twice.  Mr. Watkins, whom I respect

3    enormously, had a question about whether that was still the

4    case because he deals with a lot of people with mental health

5    issues, so I respect his point of view.  I found some case law

6    that says you could continue to look at it because sometimes

7    people come into competency.  That said, I would like your view

8    as to whether or not you've been able to work with him, going

9    to not dangerousness but competency.

10            MR. LOVINS:  I can say two things, Judge.  First of

11   all, it's my understanding that Mr. Mahoney does not want to

12   pursue the competency issue in this court, number one.  Number

13   two, I don't believe I can continue to work with Mr. Mahoney.

14   We just -- we're just on totally different pages.

15            THE COURT:  So your irreconcilable conflict has to do

16   with the fact you disagree on what to do, not that he's

17   incompetent and can't help?  In other words, it's not that you

18   can't work with him because he's incompetent, or is it?

19            MR. LOVINS:  Well, I don't --

20            THE COURT:  Like, I have another case that's

21   completely different where the lawyer said to me, "Judge --"

22   this is not Mr. Watkins -- "Judge, I cannot work with my client

23   because he is so impaired that he can't help me in preparing a

24   defense."

25            MR. LOVINS:  Well, let me -- I understand, and I never

1    believe that I'm qualified enough to make that judgment.  I can

2    only say this:  It's very difficult, Judge, for me to

3    communicate with Mr. Mahoney.  Now, that may in fact rise to a

4    level of incompetency.  I don't know.  But I can say that I

5    find it extremely difficult, and it's just very difficult for

6    me to communicate with him.

7         THE COURT:  Because I'm thinking, I've got two

8    attorneys now.  I don't know what the issue is with

9    Mr. Watkins, but he usually can talk to anybody.  People that

10   amaze me he's been able to deal with.  And so now I'm worrying,

11   who am I going to find?  That's my concern, who am I going to

12   find if two people can't work with you?

13        So now I turn to you.  What do you want, Mr. Mahoney?

14        THE DEFENDANT:  Well, your Honor --

15        THE COURT:  Why don't you stand.

16        THE DEFENDANT:  I think at this point, this would be

17   the first impression for anybody who's been ruled incompetent

18   by a New Hampshire judge.  I think at this point, I think it's

19   almost imperative that I represent myself pro se.  I'm going to

20   fight for that issue.  There's a number of issues why I'm going

21   to fight for that, because I have attorneys and I have

22   prosecutors and I have the whole entire court system saying

23   that I was convicted of aggravated rape and kidnapping.  That's

24   not the case, Judge.  They've been chasing me since 1996.

25        THE COURT:  Well, excuse me, before I get into the

1    merits, I just need to do -- so as I understand it, you are not

2    asking me to appoint counsel for you?

3           THE DEFENDANT:  That's right.  I'm asking to go

4    pro se.  And I think you already appointed Timothy Watkins in

5    this case, and I'm not comfortable with him.  He was in the

6    *Wilkinson* case, which you probably might be aware of, I think

7    *United States v. Wilkinson*, where he was the lead attorney.

8    And the lead attorney in that case happened to be Magistrate

9    Judge Boal, who was the first assistant prosecutor, so --

10          THE COURT:  I don't know the *Wilkinson* case, or if I

11   do, I've forgotten it.  I'm an old judge.  I've been at it --

12          THE DEFENDANT:  Well, I'm supposed to be incompetent,

13   remember.  I'm supposed to not know the law at all and

14   understand the nature and the consequences of the charges.

15          THE COURT:  Excuse me.  I don't know that case.  So

16   I'm going through a series of questions.  You do not want

17   counsel appointed, and you want to go pro se, is that correct?

18          THE DEFENDANT:  That's correct.  I'm entitled to go

19   pro se.

20          THE COURT:  Do you understand that if you can't afford

21   an attorney, I would appoint one for you?

22          THE DEFENDANT:  Well, your Honor, I'm looking to go

23   pro se.  I just gave Mr. Lovins five grand, and I don't know

24   when I'm going to get that.  You know, I really want to get all

25   my money back, to be honest with you.  I've only met and talked

1   to him twice on the phone, and I had one visit with him,

2   really, so there really wasn't anything that he's ever done for

3   me at this particular point.  I've done all the motions myself.

4          THE COURT:  I need to do some legal research.  Maybe

5   Mr. Watkins knows the answer or the government does.  I think,

6   if someone's been deemed incompetent, I don't know if they have

7   the right to go pro se.

8          THE DEFENDANT:  Well, I think your Honor just stated

9   that I might be competent, and so, I mean, you just said that I

10  might be incompetent.  Am I incompetent or am I competent?

11         THE COURT:  Excuse me.  I have a ruling from a federal

12  judge affirmed by the First Circuit that you're incompetent,

13  and I have no evidence to the contrary.

14         Let me ask you this:  I seem to remember in the back

15  of my head that there is a case that says that if someone has

16  been deemed incompetent, I do not have to let him go pro se.

17  Does anyone remember?  We will look up this issue if --

18         THE DEFENDANT:  I've never heard of that in the First

19  Circuit, Judge.  As a matter of fact, it's never been heard.

20         THE COURT:  We need to do some legal research on this.

21  I do not see how I can proceed with someone who's incompetent

22  on a dangerousness hearing, so let me -- I've now heard your

23  wishes that that's what you want.  I will have to do some legal

24  research on it.  But let me ask you Point B:  I have here a

25  report from a Dr. --

1          THE DEFENDANT:  Probably it's Dr. Channell.

2          THE COURT:  C-h-a-n-n-e-l-l?

3          THE DEFENDANT:  That's correct.

4          THE COURT:  -- who basically says you're dangerous,

5     that your release to the community would create a substantial

6     risk of bodily injury to another person or serious damage to

7     the property of another as a result of mental illness; that you

8     score very high risk for violent behavior in the future; and

9     that you suffer from various things, including bipolar

10    disorder.  So it's a very serious issue.

11         THE DEFENDANT:  Bipolar is not serious, your Honor.

12    Millions of people have bipolar.  We're talking about major

13    severe mental illness, which is schizophrenia.

14         THE COURT:  Excuse me.  I'm just reading the report.

15         THE DEFENDANT:  Right.  Well, he made so many errors

16    in that report.

17         THE COURT:  I am simply saying, and I want you to

18    understand, how serious --

19         THE DEFENDANT:  It's not serious --

20         THE COURT:  Excuse me, excuse me.  There is a request

21    to civilly commit you for dangerousness.

22         THE DEFENDANT:  For the rest of my life for a charge

23    of aggravated rape now, Judge, where you got it from

24    Mr. Callahan.

25         THE COURT:  That's right.

```
 1              THE DEFENDANT:  Right, it's not aggravated rape,
 2    Judge.
 3              THE COURT:  It's very serious.  Do you want to be
 4    evaluated by a psychiatrist?
 5              THE DEFENDANT:  I don't want to be evaluated by
 6    anybody.  We're here --
 7              THE COURT:  Excuse me.  Someone of your own choosing,
 8    do you want that?
 9              THE DEFENDANT:  I'll have my own choosing that I
10    choose.  That's what's in the Constitution, Judge.
11              THE COURT:  Excuse me, excuse me.  Your own what?  I
12    didn't hear you.
13              THE DEFENDANT:  That's my own opinion.  I have the
14    right to choose my own examiner.  You have no say in that.
15              THE COURT:  So you do not want an examiner?
16              THE DEFENDANT:  I will pick my own examiner that I
17    want to pick.
18              THE COURT:  Whom do you want?
19              THE DEFENDANT:  Oh, I haven't researched that and
20    looked at it at this particular time.  I've had Julia Reed.
21    She's committed so many people in this First Circuit, more than
22    anybody that I have ever known; unlawfully, I might add.
23              THE COURT:  All right, would you please be seated.
24    Thank you.
25              So I've allowed Mr. Watkins out.  I think I've allowed
```

1    you out because I think --

2            MR. LOVINS:  Thank you, Judge.

3            THE COURT:  -- I need to appoint an attorney.

4            THE DEFENDANT:  I'm not going to talk to anybody,

5    Judge, so, I mean, you might as well just give me life right

6    now because I'm refusing to talk to anyone.

7            THE COURT:  Okay.

8            THE DEFENDANT:  I got a writ of mandamus in the First

9    Circuit.  I took this over your head.  Let the First Circuit

10   decide if I'm incompetent or not.  I don't know if you're

11   really paying attention, but I filed some great motions.  I

12   think I sent you a copy.  I'm not incompetent, Judge.

13           THE COURT:  All right, Mr. Mahoney, thank you.  I

14   think I need to appoint an attorney to figure out whether I can

15   allow someone who is deemed incompetent to represent himself

16   pro se on that threshold issue.

17           THE DEFENDANT:  I'm not going to speak to an attorney,

18   Judge, so I'll tell you that right now.  Don't even send them

19   up there, trust me.

20           THE COURT:  All right, thank you.  And I don't know

21   the answer.  There may be a very simple, straightforward

22   answer, or there may not be.

23           THE DEFENDANT:  It's aggravated rape, Judge.  I was

24   acquitted 29 years ago.

25           THE COURT:  All right, thank you.  And if I decide

1    you --

2           THE DEFENDANT:  That's what I'm being held for

3    dangerous for, aggravated rape.  Remember that.  That's in the

4    status conference when he lied to you.  This man, he lied to

5    this Court.  He can't take it back.

6           THE COURT:  Sir, I have to deal with the threshold

7    issue about, I do not want to deal directly myself with someone

8    who's been deemed incompetent.

9           THE DEFENDANT:  When somebody lies to you, what the

10   prosecutor says?

11          THE COURT:  Excuse me, excuse me -- with someone who's

12   been deemed incompetent.

13          THE DEFENDANT:  I think he's incompetent.  He said I

14   was convicted of aggravated rape.

15          THE COURT:  If you don't behave, I will not be

16   bringing you back in here until I resolve this.

17          THE DEFENDANT:  Well --

18          THE COURT:  So what I'm going to do is, we're going to

19   appoint counsel --

20          THE DEFENDANT:  I'm not going to speak to anybody,

21   Judge.

22          THE COURT:  -- at least as a friend of the Court to

23   address the very narrow situation, Ms. Molloy, unless there's a

24   clear-cut answer.

25          THE DEFENDANT:  I won't talk to anybody.

1          THE COURT:  Mr. Watkins, can you stay --

2          THE DEFENDANT:  I won't talk to anybody.  I won't talk

3     to anybody.

4          THE MARSHAL:  Judge, do you want him removed?

5          THE DEFENDANT:  As far as your authority goes, you

6     have no authority.  I won't talk to anybody.  You got

7     aggravated rape from this man.  I was acquitted, end of case.

8     Dismiss it and let me go free after 40 months, please.  I won't

9     speak to any attorney.

10          THE COURT:  You know what I think we'll do, we'll take

11     a brief recess, and then I'm going to talk to Mr. Watkins and

12     the other attorney.

13          THE DEFENDANT:  You stay the fuck out of this whole

14     thing.  Who are you calling a piece of shit saying I was

15     convicted of aggravated rape?

16          (Defendant removed from the courtroom.)

17          THE COURT:  Thank you.  All right, I would ask you

18     both to stay in and brainstorm for me for just one minute here.

19          MR. LOVINS:  Sorry, Judge.  I'm in the process of

20     getting a hearing aid, but I haven't --

21          THE COURT:  These are pretty good.  They're like for

22     theater, you know, the things that you -- I think they'll help.

23          MR. LOVINS:  Terrific.

24          THE CLERK:  Yes, hold on.  This one is not working.

25          MR. LOVINS:  By the way, you know that these hearing

1    aids cost about three thousand bucks apiece?

2              THE COURT:  Can you hear me?

3              THE CLERK:  So here's the volume, okay?  That's the

4    volume, so put them on your ears like that.

5              THE COURT:  Thank you.  So could you all stay here for

6    one second?  Can you?  There are so many of you.  I at least

7    need one of you.

8              THE MARSHAL:  Well, I'm here.

9              THE COURT:  All right.  I believe there's a Supreme

10   Court case that says that if somebody has been deemed

11   incompetent, I cannot let him go pro se.  On the other hand, he

12   was, for the record, very violent just now, very combative.  I

13   think he'd be very difficult for any attorney to deal with one

14   on one without some safety concerns.  It took five Deputy

15   United States Marshals to get him out of here.  He's now at

16   this point insisting that he will not have an attorney, he

17   won't speak to an attorney, and won't speak even to me, I

18   guess.  In a way, I could take that as the last thing.

19             So I'm trying to figure out a way forward.  I could

20   just commit him based on what I just saw.  On the other hand,

21   I'm a little worried about doing that.  At this point he

22   doesn't appear to be competent to proceed, although he

23   certainly knows who I am and knows who the prosecutor is and

24   knows who the defense attorney is, so it may just be mental

25   illness rather than competency.  That's very hard to figure

1    out, the lines.  So what I was thinking of doing is,

2    Mr. Watkins, is the conflict so profound that you couldn't do

3    that basic research?

4              MR. WATKINS:  I'm tempted to say, if it was a straight

5    legal issue -- and it is a bit of a law school exam because

6    complicating the issue, of course, is that this is not,

7    strictly speaking, a criminal matter.  It's a civil matter, and

8    that might even further complicate the analysis of whether he

9    has to have an attorney or not.  Putting that aside --

10             THE COURT:  Can I just stop for a minute.  I just for

11   the record note that he's absolutely screaming in the back

12   room.  And I don't know if he's violent because I can't see,

13   but he's clearly angry and out of control.  I make that

14   finding.  So I'm trying to figure out what to do here.  I could

15   appoint an attorney, but he's not going to deal with an

16   attorney.

17             MR. WATKINS:  Well, two points, your Honor.  One is, I

18   have met with him on several occasions at Devens.  My

19   observations is that he can be extremely loud as he is now.

20   There's never been an occasion, even in the confined space that

21   Devens has, where I have been concerned for my safety.  So I

22   would say at least that, that I believe, for want of a better

23   phrase, there's a lot of bluster there, but there is no bite in

24   my experiences with him.

25             As far as the legal issue, it would seem to make sense

1    that we could stay in.  I am concerned about the appearances at

2    some point of us being in the case, even to do a narrow legal

3    issue, given the nature of the conflict.

4         THE COURT:  Could you possibly consult with

5    Mr. Salsberg, who's the head of the CJ Panel, to see if there's

6    someone on the Panel with a specialty for mental health issues?

7         MR. WATKINS:  I will do that.

8         THE COURT:  That may be better.  I think this report

9    essentially documents enough, based on that and what I just

10   saw, for me to civilly commit him forever kind of thing.  That

11   said -- not forever but until he's well again, and he goes back

12   on his lithium or whatever he needs to go back on.  The one

13   thing I'm less sure about, while it seems very clear he's

14   mentally ill, I'm less clear on the competency because he

15   clearly knew who I was, he clearly knew who you were, and he

16   clearly knew who you were; the prosecutor lied in a very

17   specific way, geared right to what you just represented you

18   made a mistake as to; clearly knew who his two defense

19   attorneys were; clearly knew I was the judge and that he wanted

20   to represent himself and wanted to get his own psychiatrist.

21        So it isn't incompetent sometimes in the way that you

22   see where someone doesn't get the basic thing, and yet I have a

23   finding from a New Hampshire judge.  I at least would want to

24   know if I have to go with his wishes to go pro se.  And I

25   think, if you can't handle it within the Federal Defender's

1    Office, will you let me know, and I'll try and appoint someone

2    from the Panel with a specialty in mental health, and maybe --

3    I know next week is Thanksgiving -- maybe by the following week

4    let me know --

5              MR. WATKINS:  Yes.  I think sooner than that.

6              THE COURT:  -- whom we should appoint, and I'll

7    specially designate.  From the point of view of the government,

8    you may have specialists in this area, what you do when someone

9    has been found incompetent.

10             MR. CALLAHAN:  I can certainly ask, your Honor.

11             THE COURT:  -- but wants to go pro se.  I don't see

12   how, as a practical matter, I can have him in the courtroom

13   again without six U.S. Marshals.  I could have him shackled if

14   he's competent, but he's been deemed incompetent.  So I must

15   say, I'm trying to figure out the way forward here.  It said

16   somewhere in here that he wasn't taking his lithium?

17             MR. CALLAHAN:  There is a reference to that at the

18   time the report was written that he was refusing it, your

19   Honor, because he disagreed --

20             THE COURT:  I'm wondering whether he -- I don't know

21   if he's been -- you don't know.  Was he brought in from Devens?

22             THE MARSHAL:  Yes, brought in from Devens.  He's a BOP

23   inmate.

24             THE COURT:  He may need to -- are you allowed to

25   forcibly give someone --

1          MR. WATKINS:  The answer to that question I do know,

2     that the first step in that, he would have to be civilly

3     committed in order to have him restored to --

4          THE COURT:  There's clearly something wrong with him.

5     I mean, I could just do it based on that.  I mean, that's

6     another possibility -- I got the report, I have the way he

7     acted -- just commit him, put him back on the lithium, and then

8     get him to a point where he can challenge it next year.

9          So let's do this:  If you can do this on the basic

10    threshold issue, let me know.  If not, I'm happy to specially

11    appoint someone off the Panel if you call Mr. Salsberg.  You

12    need to start looking into it, and maybe I hold a status

13    conference without him in two to three weeks if --

14          (Discussion between the Court and Clerk.)

15          THE COURT:  No, there's no -- I don't know if there

16    are any statutory deadlines.

17          MR. CALLAHAN:  I'm not aware of any, your Honor.

18          THE COURT:  If anything, there's certainly, in the

19    interest of justice, he's not capable of handling a hearing

20    right now.  He clearly needs to go back on some sort of meds

21    and calm down.  I don't know if you can send that message back

22    to Devens how out of control he was.

23          THE MARSHAL:  We can't force medicate people.

24          THE COURT:  No, no, no, just send the message back

25    what he was like here.

 1          THE MARSHAL:  I'm not sure what that's going to do,

 2    but --

 3          THE COURT:  But Mr. Watkins said that he wasn't like

 4    that at Devens, so is this something -- was he like this with

 5    you?

 6          MR. LOVINS:  No, no.  I would say he was not as

 7    agitated as this.

 8          THE COURT:  I think why he got so angry is because I

 9    didn't --

10          MR. LOVINS:  Excuse me?

11          THE COURT:  I think the reason that he is so agitated

12    is because I didn't instantly say he could represent himself,

13    which is what he wants right now.  I cannot possibly see going

14    forward with someone in this shape.

15          MR. LOVINS:  I think that's probably correct, Judge.

16          THE COURT:  So --

17          MR. LOVINS:  I think it's probably correct that that

18    was the basis for his agitation.

19          THE COURT:  Yes.  At this point he's without

20    representation.  I've allowed both motions to withdraw.  And

21    I'm going to ask Mr. Watkins to either have a special

22    appearance, if that's permitted, or, if not, find someone that

23    I will designate, at least for purposes of this threshold issue

24    about whether he can proceed unrepresented.  I'd be inclined --

25    I don't see how I can possibly have him in a courtroom without

1    an attorney, or, frankly, even with an attorney, so I have to

2    think about what to do.  What I've done before in criminal

3    cases is, I have someone watch from back there on the video,

4    and that may be what we have to do here.  When I've had people

5    out of control, typically it's been the state court, not here,

6    but even once here, we have people watch from the video here if

7    he can't control himself.  I think we had that with one person.

8            THE MARSHAL:  It's been done.

9            THE COURT:  Yes, so we'll just have a --

10           (Discussion between the Court and Clerk.)

11           THE COURT:  When is the hearing scheduled?

12           THE CLERK:  January 17 at 9:00 o'clock.  I scheduled

13   that when Tim was in the case.

14           THE COURT:  Well, why don't we keep that date on,

15   hopefully for the new attorney to come in.  And if there's a

16   simple, easy answer about competency and pro se, maybe the

17   government could send me a quick little brief, and then I'll

18   appoint counsel for purposes of whether he agrees with it or

19   not, all right?  But we'll keep on the 17th just to keep this

20   on track.

21           MR. CALLAHAN:  And, your Honor, could I just ask for

22   clarification.  On the 17th, is that going to be -- because I

23   understood him to be saying now that at least Mr. Lovins -- I

24   don't know if it was before his motion was granted or not --

25   was only going to go forward on dangerousness, is it now still

1    competency and dangerousness, or is it one?  The government

2    obviously noted its objection that it should be just

3    dangerousness, but I understand that before today, it was both.

4              THE COURT:  It's at least on dangerousness.

5              MR. CALLAHAN:  Okay.

6              THE COURT:  It's at least on dangerousness.  On

7    competency, right now, as far as I'm concerned, the only thing

8    I have standing is a report from a United States District Court

9    Judge and on appeal that he's incompetent; and since he

10   declined to have Dr. Reed interview him, I have no other

11   evidence, so as far as I'm concerned, he's incompetent.

12             Now, at some point, as we all know, if he's brought

13   back into line with lithium or whatever once I've civilly

14   committed him, if that's what I end up doing, then maybe he

15   could challenge competency again, but right now he's

16   incompetent for purposes of the record, and that's all I'm

17   dealing with is dangerousness.  Okay?

18             I'll do a little note and mail it to him that the

19   hearing is on the 17th on dangerousness, and that I'll order

20   briefs within, say, two weeks on whether or not someone who is

21   incompetent can represent himself, so that he'll at least see

22   what the result is of this and get a written copy of it, and

23   then he can write to me.  I forget, have you all had access to

24   this report?

25             MR. CALLAHAN:  Yes.

1          THE COURT:  Have you seen this?

2          MR. LOVINS:  Yes, I have.

3          THE COURT:  He's viewed as highly dangerous, highly.

4          THE COURT:  On the risk assessment score, he scored 35

5    out of 40 with regard to risk factors.  Only 15 percent of

6    individuals scored more highly than he did.  And his past

7    record would be consistent with that:  armed robbery, assault

8    with a dangerous weapon, assault and battery with a dangerous

9    weapon, criminal possession of loaded firearms, third degree,

10   et cetera, so --

11         MR. WATKINS:  Just for the record, your Honor, I don't

12   think he was actually convicted of possession of a firearm.  I

13   think that might be a typographical mistake in Dr. Channell's

14   report, but --

15         THE COURT:  Oh, I see.  Okay.

16         MR. WATKINS:  But I should also note, the Court has

17   been through in the 4248 context some of these tools.  I think

18   the tools are actually somewhat inconsistent with each other.

19   I think some of them he scores low on the dangerous scale and

20   medium on the dangerous scale.

21         THE COURT:  Okay.  Well, that's why I need a lawyer to

22   walk me through it.  Thank you.  I don't see me doing this

23   without him.  I don't know what I do.  But actually this was

24   very helpful because seeing him myself, I see the scope of the

25   problem.  Thank you.  The 17th.

1                MR. CALLAHAN:  Your Honor?

2                THE COURT:  Yes.

3                MR. CALLAHAN:  And just one more clarification.  Just

4     to make it clear, as to the statement that the prosecutor lied,

5     in the midst of that discussion, you know, you had asked when

6     we were wrangling with these other issues, I was motioning to

7     the report trying to find what his conviction was for; and I

8     did say "I believe" and then sort of gave up and just pointed

9     to the report to say the convictions are described in the

10    report.  There was no intention to misrepresent what the record

11    was.  I don't think Mr. Watkins noted that that was incorrect

12    or correct at the time, but there was never an intention to

13    misrepresent that.  You know, we were talking about a different

14    issue, and I was just scrambling through the papers to find out

15    what it was.

16               THE COURT:  All right, thank you.  That's on record

17    now.

18               MR. CALLAHAN:  Thank you, your Honor.

19               THE COURT:  Thank you very much.

20               MR. LOVINS:  Thank you, Judge.

21               (Adjourned, 3:55 p.m.)

22

23

24

25

1                        C E R T I F I C A T E

2

3

    UNITED STATES DISTRICT COURT )
4   DISTRICT OF MASSACHUSETTS    ) ss.
    CITY OF BOSTON               )

5

6

7           I, Lee A. Marzilli, Official Federal Court Reporter,

8   do hereby certify that the foregoing transcript, Pages 1

9   through 25 inclusive, was recorded by me stenographically at

10  the time and place aforesaid in Civil No. 13-11530-PBS, United

11  States of America v. Brian Mahoney, and thereafter by me

12  reduced to typewriting and is a true and accurate record of the

13  proceedings.

14       Dated this 11th day of December, 2013.

15

16

17

18

19

20            /s/ Lee A. Marzilli
          _____

21            LEE A. MARZILLI, CRR
              OFFICIAL COURT REPORTER

22

23

24

25