<div align="center">

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

</div>

```
UNITED STATES OF AMERICA,          )
                                   )
              Petitioner           )
                                   )
         -VS-                      )  Civil No. 13-11530-PBS
                                   )  Pages 1 - 20
BRIAN MAHONEY,                     )
                                   )
              Respondent           )
```

<div align="center">

**STATUS CONFERENCE**


BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES CHIEF DISTRICT JUDGE

</div>

A P P E A R A N C E S:

    PATRICK M. CALLAHAN, ESQ., Assistant United States
Attorney, Office of the United States Attorney,
1 Courthouse Way, Room 9200, Boston, Massachusetts, 02210,
for the Petitioner.

    MICHAEL R. SCHNEIDER, ESQ., Good Schneider Cormier,
83 Atlantic Avenue, 3rd Floor, Boston, Massachusetts, 02110,
for the Respondent.

<div align="center" style="margin-left:auto">

United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts  02210
February 25, 2014, 9:21 a.m.

</div>

<div align="center">

LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 7200
Boston, MA  02210
(617)345-6787

</div>

P R O C E E D I N G S

1

2      THE CLERK:  Court calls Civil Action 13-11530, United

3  States v. Brian Mahoney.  Could counsel please identify

4  themselves.

5      MR. CALLAHAN:  Good morning, your Honor.  Patrick

6  Callahan for the United States.

7      MR. SCHNEIDER:  Good morning, your Honor.  Michael

8  Schneider for Brian Mahoney.

9      THE COURT:  Yes, and he's here.  That's great.  Thank

10 you very much.

11     MR. SCHNEIDER:  Thanks.

12     THE COURT:  So I received a status report from the

13 government, say yesterday or today.  I saw it this morning.  I

14 haven't received anything from you yet, Mr. Schneider.

15     MR. SCHNEIDER:  Yes, I thought it would be better for

16 me to be able to confer with Mr. Mahoney today in court and

17 then report to your Honor kind of where I think we stand.  I

18 did have an opportunity to meet with Mr. Mahoney out at Devens,

19 FMC Devens, where Mr. Mahoney has unfortunately been in

20 isolation or segregation for -- I think it's 83 days?

21     THE RESPONDENT:  Yes.

22     THE COURT:  83 days?

23     MR. SCHNEIDER:  Which I have to say I think is

24 compounding a lot of the problems here, and I think it may have

25 been part of the thing that resulted in the unfortunate

1    incident in November because, I mean, there's a lot of

2    document --

3              THE COURT:  Excuse me.  Was he in segregation before

4    that incident in November or as a result of it?

5              THE RESPONDENT:  I was just in isolation by

6    Dr. Channell.  There's no disciplinary report at all.  He just

7    took me out of segregation and put me into isolation.

8              MR. CALLAHAN:  Your Honor, I think, as of November 22,

9    he was not in isolation.  That's my understanding.

10             MR. SCHNEIDER:  I will check that.  If I'm wrong, I

11   will --

12             THE COURT:  I just want to know whether it was a

13   result of what happened in November or whether it was what led

14   to what happened in November.

15             MR. SCHNEIDER:  I just want to say as a general

16   matter, first of all, with Mr. Mahoney, kind of we apologize

17   for what went on that date.  I think that, you know,

18   Mr. Mahoney is an extremely intelligent man who understands the

19   law extremely well.  He understands the facts in his cases very

20   well, and he easily gets frustrated when other people report

21   things, things that he knows are untrue.  And I think that's

22   something that's kind of pervaded this case from his

23   perspective, and I think that that sort of triggered him on

24   that particular date.  But he does apologize.

25             I mean, you know, he is a little hard of hearing in

1    one ear, and I think that causes him to speak loudly.  He does

2    speak quickly.  He thinks very quickly and he speaks very

3    quickly, and I think that's been part of the problem.

4         THE COURT:  Can I interject for one second.  I know

5    people sometimes don't like using them, but we have these

6    amplifiers.

7         MR. SCHNEIDER:  You know what I think?  That would

8    actually be wonderful.

9         THE COURT:  Let's see if it works.

10        THE RESPONDENT:  I'm deaf in one ear, Judge, so --

11        THE COURT:  You know like when you go to the theater?

12        THE RESPONDENT:  Thank you, your Honor.

13        MR. SCHNEIDER:  Yes, yes.  And, your Honor, you know,

14   very often when people are hard of hearing, one of the things

15   that happens is, you tend to shout a little bit when you don't

16   need to, and I think that that may have been -- I think that's

17   been part of the problem when he's appeared in court, so this

18   will be interesting to try.

19        THE COURT:  See if it works.  Everyone uses it,

20   judges, jurors, witnesses.

21        MR. SCHNEIDER:  Is that good?  Excellent.  So

22   hopefully that will help.  And I do want to say that

23   Mr. Mahoney also has been a tremendous help in kind of getting

24   me ramped up on this case.  He knows the case law tremendously.

25   I mean, he's had some legal preparation courses at Suffolk

1   himself, so he really does understand the legal technicalities

2   here in a very interesting way.

3           I do want to report that I've also been in touch with

4   Attorney Andy Schulman, who's representing Mr. Mahoney up in

5   New Hampshire.  As the government indicated in its status

6   report, there is currently a motion to dismiss.  There is a

7   question that is being litigated up there or being decided up

8   there as to whether that will be with prejudice with respect to

9   this so-called federal SORNA charge that had been filed against

10  him, and that's a matter that probably will be decided in the

11  coming weeks.  I mean, really, that won't be very long.

12          There's also a motion to discharge Mr. Mahoney under

13  4247(h) -- I think I got that right --

14          THE RESPONDENT:  Yes, that's correct.

15          MR. SCHNEIDER:  -- a motion to discharge Mr. Mahoney,

16  and that's also something that will be decided up there.  So

17  certainly I think those issues probably should be decided up in

18  New Hampshire before anything necessarily needs to be rushed

19  here.  I am going to propose that we do set a date.

20          THE COURT:  Can I just check for a minute because I'm

21  not familiar with that.  4247 --

22          MR. SCHNEIDER:  (h), and I will check at the same time

23  myself.

24          THE COURT:  It's 18?

25          MR. SCHNEIDER:  18 U.S.C.  So it's basically, after a

1    person has been in confinement for 180 days, it raises the

2    question as to whether the defendant ought to continue to be

3    committed, and...

4         (Pause.)

5         THE COURT:  I don't know, as I'm reading it, whether

6    it applies or not.  It talks about an acquitted person.  It's a

7    longer provision I would just have to read.

8         MR. SCHNEIDER:  Sure.

9         THE COURT:  Because he hasn't been acquitted, right?

10        MR. SCHNEIDER:  No, there was a question as to whether

11   the government was going to nolle pros it as opposed to dismiss

12   the matter.  I think it's heading toward a dismissal at this

13   point, but, you know, whether or not a dismissal would count as

14   effectively an acquittal under these purposes, I don't really

15   know.  The one thing I would say --

16        THE COURT:  And I'm not clear who would decide.  I

17   would have to think about that a lot.  I'm happy to have

18   Judge Laplante decide.  That said, I don't know --

19        MR. CALLAHAN:  I believe, Judge, 4247(h) requires the

20   court that committed the individual.  At this point the court

21   that has Mr. Mahoney is the court in New Hampshire, so that

22   court would be dealing with the motion.

23        THE COURT:  Yes, okay, so he will be dealing with it,

24   okay.

25        MR. CALLAHAN:  If it comes to that, and given that

1    there's now a motion to dismiss with prejudice as a result, you

2    know, solely due to conditions related to his mental condition,

3    it's unclear right now whether the court will even need to rule

4    on that or will rule on that.

5         THE COURT:  Okay, so what I've got right now is a case

6    that's actually been on hold for longer than I would have

7    liked, partly because of the counsel issue; and I didn't know

8    where we stood on that because I very much would -- at least

9    Mr. Mahoney suggests that perhaps, if he had a chance to choose

10   the person, would want somebody to evaluate him, so that all

11   that I have isn't what the government's evaluation is, and I

12   didn't know where you were on all of that.

13        MR. SCHNEIDER:  So, yes, we discussed a lot of those

14   issues.  If I may just interject one point, then I'll get right

15   to that --

16        THE COURT:  Yes.

17        MR. SCHNEIDER:  -- which is that I know counsel in

18   New Hampshire for Mr. Mahoney was looking into the possibility

19   of whether or not civil commitment under New Hampshire state

20   law was something that was a possibility or likely to happen.

21   There's a Disability Rights Center there.  You know, this whole

22   section of statutes raises federalism issues that's front and

23   center in the *U.S. v. Comstock* case.  "Necessary and proper"

24   has generally historically been a pretty thin read

25   constitutionally to base an entire statute on.

1          THE COURT:  You know what my problem with that is,

2     which is in the sex offender area, which I know we're not

3     working under that area, I've tried that, and the state doesn't

4     want to take them, at least in Massachusetts.  So will

5     New Hampshire take people?

6          MR. SCHNEIDER:  Well, there is an issue there, and I

7     think there's very liberal civil commitment statutes up there,

8     and I know it's just a matter that Attorney Schulman was

9     looking into.

10         THE COURT:  Okay.

11         MR. SCHNEIDER:  I just wanted to bring that to your

12    Honor's attention.  I do think that to get to a 4246 hearing in

13    the first place, I think the government does need to make some

14    showing that the Attorney General made genuine efforts to make

15    sure that the state had indicated that it was actually

16    unavailable, and I think there may be some legitimate

17    federalism issues.

18         THE COURT:  Maybe Bridgewater would be willing to take

19    him.  What do you think?

20         MR. CALLAHAN:  Your Honor, as part of the government's

21    petition, there is a statement by -- and I'd have to look at

22    the papers -- but there's a statement that there's no suitable

23    facility that's willing to take Mr. Mahoney at this point.  And

24    that's attached to the petition.  And I know it's been an

25    issue, and in other cases District Courts have urged the

1    Commonwealth to -- you know, over which I guess in a proceeding

2    like this doesn't have any power because they're not a part of

3    this proceeding -- but they've urged the Commonwealth to, you

4    know, in some instances take custody of someone impaired with

5    mental health issues.  And I don't know how much luck they've

6    had, but what the courts have recognized is that they don't

7    have the ability to do that, at least in the context of a

8    proceeding like this.

9            THE COURT:  Right, and I've been unsuccessful, at

10   least in one other case.  But it's something to be tried, but

11   maybe New Hampshire would do it.  I don't know.  So, anyway,

12   but let's just get to this because I feel like I've been on

13   hold since November.

14           MR. SCHNEIDER:  So what I would say is this:  I think

15   it makes sense for us to try and pick a date.  I'm going to

16   suggest, because we have discussed the fact that we may want an

17   expert, if not to evaluate Mr. Mahoney because we think we know

18   what the true situation is and that we may not need someone to

19   directly evaluate him, and I'm not sure that Mr. Mahoney wants

20   that, but I think alternatively we may need an expert to

21   address some of the instruments that are used, the V-R-A-G, the

22   VRAG, and the HCR-20.  These are the actuarial and clinical

23   instruments that Dr. Channell was using to basically assert

24   that Mr. Mahoney had some likelihood of future dangerousness.

25   And I know that there have been some very serious questions

1    raised in the scientific community about the scientific

2    reliability and validity of these instruments.  And in fact

3    Judge Wolf in the *Joseph Smith* case, not that long ago, raised

4    some serious questions about the reliability of these sorts of

5    instruments under *Daubert*.  So we've been discussing that

6    issue, you know, kind of in terms of the technical legal issues

7    when we've met.  And also Judge Wolf raised some very serious

8    questions about Dr. Channell and his analysis --

9            THE COURT:  Was that a 42 --

10           MR. SCHNEIDER:  -- in the *Joseph Smith* case.

11           THE COURT:  Was that a 4246 dangerousness, or was that

12   a sex offender case?

13           MR. SCHNEIDER:  I believe that was a 4248 case, but --

14           THE RESPONDENT:  No, it was not, your Honor.  It was a

15   4246 dangerousness hearing only.

16           MR. SCHNEIDER:  Okay, I apologize.  But the fact is

17   that I think that Judge Wolf's -- and it was Mr. Mahoney who

18   alerted me to this case -- that Judge Wolf's reasoning in that

19   case is something that could be very well applicable in this

20   case once the evidence is developed.  So I would suggest by the

21   end of this hearing that we pick a date.  I would be looking

22   for a date no later than 60 to 75 days, just given my schedule

23   and the need for -- I want to make sure that we come in

24   equipped to properly address Dr. Channell's report, and I think

25   we are going to need, and I've already made initial inquiries

1    about an appropriate psychiatric expert who can address the

2    reliability under *Daubert* of these instruments, which I think

3    are a bit hokey and don't necessarily reflect in any kind of

4    real sense the likelihood of dangerousness on Mr. Mahoney's

5    part.

6        THE COURT:  So as you know -- let me just back up.

7    Mr. Mahoney has had two prior counsel.  He has wanted to

8    proceed pro se.  I had deep concerns about that under the case

9    law, whether or not someone who was adjudged by another court

10   incompetent could waive his right to counsel.  The government

11   submitted a brief on the topic.  We've done our own research.

12   And since there's a serious question of competency, I have

13   appointed you to represent him, and I just wanted to make sure

14   you knew that.  I mean, it's on the docket, but I hadn't seen

15   you since I did that, and so I'm glad to see you're working so

16   well together.  I really appreciate that.  And at least until I

17   hear otherwise, I will proceed on the basis that you will be

18   representing him at the dangerousness hearing.  And I wanted to

19   make sure:  You haven't filed anything?  I sort of asked you if

20   there were any cases that went the other way and --

21       MR. SCHNEIDER:  I haven't filed anything, and I think

22   maybe the time has come for me to file something.  But the

23   request I would make is this:  I feel like, and I know

24   Mr. Mahoney feels, he knows the facts incredibly well in his

25   case, and he also knows a lot about the law.  I'm obviously an

1    experienced lawyer and have been practicing for a while, and I

2    would suggest that there is actually a very appropriate way of

3    proceeding in which -- and I think Mr. Mahoney will agree,

4    hopefully, because I think it would make sense -- which would

5    be for me to basically take the lion's share of the initial

6    examination of the witnesses and cross-examine, and then --

7    perhaps it's a form of hybrid or not -- to at least allow

8    Mr. Mahoney either to allocute or to maybe ask his own specific

9    follow-up questions.  I certainly expect that Mr. Mahoney will

10   remain in the driver's seat while I'm conducting the

11   examination and will provide me with critical information that

12   I need to ask the right questions because he knows this case

13   better than anyone.

14        THE COURT:  Well, that's fine, but I at least just

15   wanted to make sure he knew because after the last hearing,

16   there was a question of law.  I have not received any -- we've

17   done our own independent research and the government has done

18   some research, and at least right now, I've appointed you to

19   represent him at the dangerousness hearing, but I do fully

20   appreciate that he cares a huge amount and will be deeply

21   involved at all stages.  So I'm happy to proceed on that basis.

22        So at this point you need to file -- okay, I'm going

23   to put it on you, not him, since I've appointed you and I'm

24   paying, you know, I provide the funding for an expert.  So if

25   you feel like you need an expert, you need to file the motion

 1    and maybe with a name on it.  I don't know whether you want two

 2    experts, one on the actuarial instruments and one on the --

 3              MR. SCHNEIDER:  The clinical?

 4              THE COURT:  -- the basic issue of dangerousness.  I

 5    don't know.  You'll have to figure that out, but could you do

 6    that within a week so we can get this going?

 7              MR. SCHNEIDER:  I believe that should be enough time.

 8              THE COURT:  Now, typically an expert takes a couple of

 9    months, and plus you're going to have the right possibly to see

10    the report.

11              MR. CALLAHAN:  We would like to have that, you know,

12    early on, particularly if there's going to be questions.  I

13    mean, this is the first we've heard of questions about the

14    instruments used in Dr. Channell's report, you know.

15              (Discussion between Mr. Schneider and the respondent.)

16              THE COURT:  So you'll talk with him, figure it out,

17    and then you'll file a motion for funds.

18              MR. SCHNEIDER:  Yes.

19              THE COURT:  And then the government has the right to

20    read the report, obviously, before we walk into a hearing.  So

21    just scripting it out, if you file something by, say, a week

22    from now.

23              THE CLERK:  That would be March 4.

24              THE COURT:  Yes, March 4.  Ideally speaking, you'll

25    have the name of an expert by then.  I've had incredible

 1    difficulties in other cases, not necessarily with getting the

 2    expert but then having them have time to do it within what you

 3    think the time framework should be.  So let's just say March,

 4    April, May, let's assume you will get a report to us by May,

 5    and we have a hearing sometime in June in the afternoon?  Does

 6    that make sense, or is that too --

 7         MR. SCHNEIDER:  Certainly no later than that.  I know

 8    that, you know, I mean, your Honor is well aware, we do want to

 9    move this forward.  I know your Honor wants to move this

10    forward.

11         THE COURT:  Let me say no later than that.  I mean,

12    let me just say this:  If you want to make it earlier and you

13    communicate with the expert and it's doable earlier, tell me.

14    I'm happy to do it earlier.

15         MR. SCHNEIDER:  So maybe what we should do is set a

16    date in early to mid-June, no later than that; and then if

17    there ends up being a problem with that and I discuss that with

18    Mr. Mahoney and we want to see if we can set this up earlier,

19    I'll file a motion to advance and continue the matter.

20         THE COURT:  Yes, you can move it up.  That's easy.

21    But I need to give the government enough time to read the

22    report and possibly respond.

23         MR. SCHNEIDER:  Sure.

24         THE COURT:  Do you think you'll want your expert, your

25    doctor to testify?

1          MR. CALLAHAN:  Dr. Channell?

2          THE COURT:  Yes.

3          MR. CALLAHAN:  Yes, in the dangerousness hearing,

4    absolutely.

5          THE COURT:  Yes.  And there's at least a chance of one

6    expert and possibly Mr. Mahoney, right?  It's not required by

7    any means.

8          THE RESPONDENT:  I won't be testifying in this case,

9    your Honor.

10          THE COURT:  You won't?

11          THE RESPONDENT:  I will not be testifying.

12          THE COURT:  All right, so maybe do you think two hours

13    will be enough?  Or is it a full day?  What do we think?

14          MR. CALLAHAN:  This is for the entire dangerousness

15    hearing, not any hearing on the underlying instruments?

16          THE COURT:  Well, I'm just going to do it all at once.

17          MR. SCHNEIDER:  I mean, a *Daubert* hearing and to be

18    followed, if we move to do it that way --

19          THE COURT:  I was going to do it all at once.  He

20    would testify.  You'd challenge the instrument, and if I -- I

21    don't know that -- and if we need a second day, we will.  So

22    what day?

23          THE CLERK:  I have two days that are open, June 4 and

24    5.

25          (Discussion between the Court and Clerk.)

 1          THE COURT:  How about June 4 all day, if we need to,

 2   at 9:00, unless I'm on trial, in which case I'll do it in the

 3   afternoon, but just block out the day?

 4          MR. SCHNEIDER:  So June 4 sounds great for me.  The

 5   one thing I did want to mention is, it's possible that we may

 6   be subpoenaing some family members.  Also, Mr. Mahoney had a

 7   very good relationship and had a very stable situation in the

 8   years prior to being picked up on these charges at a health

 9   center up in New Hampshire, the Avis Goodwin Center in

10   New Hampshire.  So it may be that I may want someone from that

11   center to come in and discuss how well Mr. Mahoney was doing

12   there.  I'm just letting you know.

13          THE COURT:  I mean, is it within the 100 miles?  I

14   don't even know whether -- where in New Hampshire is it?

15          THE RESPONDENT:  It's in Somersworth, your Honor.

16   It's 105 miles.

17          THE COURT:  Oh, that specific.  Okay, well, I don't

18   know that the subpoena power will go there, but perhaps they'd

19   come voluntarily, or let me just -- I don't know the answer to

20   this, whether the Rules of Evidence apply in a civil commitment

21   proceeding.  My guess is, it's more like a sentencing hearing,

22   in which case that would be appropriate for them to send in a

23   letter or affidavit or testify via -- like, we have these

24   fancy-shmancy video conferencing capabilities, so possibly that

25   they could testify from there, and, you know, we could hear

1    them here.  Okay, so --

2              MR. CALLAHAN:  Your Honor, could we --

3              THE COURT:  -- was there anything else that we need --

4    you did a very helpful punch list of the things we needed to

5    get done.  Is there anything else?

6              MR. CALLAHAN:  I think, as long as we have a date,

7    your Honor, and there's going to be some conclusion as to the

8    experts because I think this expert issue was raised long ago

9    after there was some objection to Julia Reid acting as the

10   expert, so if there's going to be an examiner, we would just

11   like to know who that is.

12             THE COURT:  Yes, by next week he'll know.

13             MR. CALLAHAN:  And then, in terms of the report, could

14   we just have some commitment that we would get that within

15   21 days of the --

16             THE COURT:  Sure.  By May 15?

17             MR. SCHNEIDER:  Sure.

18             THE COURT:  Does that seem satisfactory?  And then if

19   for some reason your expert can't get to it before then, you'll

20   just have to file the appropriate motion.  So, ideally

21   speaking, I would -- it's your call, of course, but I would

22   certainly authorize payment for two experts.  Maybe one person

23   could do the trick for both of them, or maybe you need two

24   separate ones.

25             MR. SCHNEIDER:  Okay, we'll discuss that and work that

1    through.

2           THE COURT:  Yes.  Okay, that sounds good.  And thank

3    you very much, Mr. Schneider.  Thank you.  This is a much

4    better hearing.  Do these things help?

5           THE RESPONDENT:  They do, your Honor, and they help in

6    a lot of senses that, you know, like they said, I think in the

7    last two status conference hearing report that we did have, I

8    just want to put it on the record, there was misleading and

9    accusations that were false and fraudulent in my records.  And

10   I think you mentioned an armed robbery, which never happened.

11   You mentioned in November 22, 2013, two gun charges.  I never

12   was ever charged with any gun charges.  I think the last five

13   cases that you said I was all acquitted of or it never

14   happened.  And I think that is very, very confusing because if

15   you're going to have an expert to come in, especially

16   Dr. Channell, and say, "Hey, I put the guns.  It was a

17   typographical error," which is what Mr. Watkins says -- Of

18   course, I talked to Mr. Schneider.  It was no typographical

19   error, and he said it was a typographical error, meaning one,

20   singular.  But when you use the English dictionary or the

21   English language, it's a fundamental tool to determine the

22   asserts and the intent of statutes and the regulations.  So

23   that's under *Kerry v. Stofford* (Phonetic).

24           But again, your Honor, you know, Mr. Watkins says I

25   was a very low risk of dangerousness; and when you take those

1    seventeen charges that Dr. Channell said I had, none of them

2    ever happened, nor was I ever convicted.

3            THE COURT:  Thank you.  And, you know, you have an

4    excellent attorney here.  I've seen him on several other cases

5    recently, and he fights for his people, and I'm very glad that

6    the two of you are getting along so well.

7            THE RESPONDENT:  Yeah.  No, we are, Judge, but, again,

8    it's been 40 months, I mean, to have a lawyer like

9    Mr. Schneider to come on and just all of a sudden, boof, I'm

10   going to take over a case that's been 40 months that I've lived

11   and I've been in isolation, and I have had to stay incarcerated

12   throughout this whole entire time.  I think, if you really look

13   at it, I looked at the case laws that you've done, and I looked

14   at one that was very interesting.  It's a Fourth Amendment

15   violation of already of what they done to me.  And I don't

16   think it's basically attorneys and taking shifts with attorneys

17   because I have that option to hire a private counsel, which I

18   did, but I think under the Fourth Amendment, you know, it's a

19   violation that I've been in now for a year and a half waiting

20   for a dangerousness hearing.  And you said it in the *United*

21   *States v. Shields*, you said it was the razor edge, because when

22   you are seized from the streets of Dover, I never had a public

23   indictment.  I never had a public trial, and I never had an

24   imposition of a sentence.  That's under *Delbert Smith v.*

25   *United States Supreme Court.*  And, you know, I have to get more

1     than what I'm getting, Judge, you know?

2            THE COURT:  Well, thank you.  Thank you for working so

3     well with Mr. Schneider and sort of expressing yourself.

4            So we're going to have a hearing.  We've got this

5     thing moving, and you're obviously knowledgeable, and you'll be

6     able to assist your attorney.  So thank you to everybody, and

7     we will stand in recess.

8            THE CLERK:  All rise.

9            (Adjourned, 9:45 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

UNITED STATES DISTRICT COURT )
4   DISTRICT OF MASSACHUSETTS    ) ss.
CITY OF BOSTON                )

5

6

7            I, Lee A. Marzilli, Official Federal Court Reporter,

8   do hereby certify that the foregoing transcript, Pages 1

9   through 20 inclusive, was recorded by me stenographically at

10  the time and place aforesaid in Civil Action No. 13-11530-PBS,

11  United States v. Brian Mahoney, and thereafter by me reduced to

12  typewriting and is a true and accurate record of the

13  proceedings.

14       Dated this 28th day of May, 2014.

15

16

17

18

19            /s/ Lee A. Marzilli
            _____
20            LEE A. MARZILLI, CRR
            OFFICIAL COURT REPORTER
21

22

23

24

25