```
1              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF MASSACHUSETTS
2

3      UNITED STATES OF AMERICA,          )
                                          )
4                 Petitioner              )
                                          )
5            -VS-                         )  Civil No. 13-11530-PBS
                                          )  Pages 1 - 200
6      BRIAN MAHONEY,                     )
                                          )
7                 Respondent              )

8
                    EVIDENTIARY HEARING - DAY ONE
9

10            BEFORE THE HONORABLE PATTI B. SARIS
              UNITED STATES CHIEF DISTRICT JUDGE
11

12
     A P P E A R A N C E S:
13

14       PATRICK M. CALLAHAN, ESQ., Assistant United States
     Attorney, Office of the United States Attorney, 1 Courthouse
15   Way, Room 9200, Boston, Massachusetts, 02210, for the
     Petitioner.
16
         MICHAEL R. SCHNEIDER, ESQ. and JEFFREY G. HARRIS, ESQ.,
17   Good Schneider Cormier, 83 Atlantic Avenue, 3rd Floor, Boston,
     Massachusetts, 02110, for the Respondent.
18
                                United States District Court
19                              1 Courthouse Way, Courtroom 19
                                Boston, Massachusetts  02210
20                              June 4, 2014, 9:31 a.m.

21

22

23                       LEE A. MARZILLI
                      OFFICIAL COURT REPORTER
24                 United States District Court
                   1 Courthouse Way, Room 7200
25                     Boston, MA  02210
                        (617)345-6787
```

1                            I N D E X

2    WITNESS                DIRECT    CROSS    REDIRECT    RECROSS

3    SHAWN CHANNELL

4        By Mr. Callahan:     18
         By Mr. Schneider:              99
5        By Mr. Callahan:                        181
         By Mr. Schneider:                                    190
6

7    EXHIBITS                      RECEIVED IN EVIDENCE

8    1-11, 13-20                          96

9    22                                  146

10   23                                  199

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              P R O C E E D I N G S

2          THE CLERK:  Court calls Civil Action 13-11530, United

3    States v. Brian Mahoney.  Could counsel please identify

4    themselves.

5          MR. CALLAHAN:  Patrick Callahan for the United States.

6          MR. SCHNEIDER:  Michael Schneider, and with me,

7    Jeffrey Harris for Brian Mahoney.

8          THE COURT:  All right, thank you.

9          THE CLERK:  You can be seated.

10         THE COURT:  So you have a witness today?

11         MR. CALLAHAN:  We do, your Honor.  We have Dr. Shawn

12   Channell who wrote the Risk Assessment Report and is going to

13   give his opinion on whether Mr. Mahoney qualifies under 4246.

14         THE COURT:  All right.  And do you have a witness here

15   today?

16         MR. SCHNEIDER:  Yes, your Honor.  We have Dr. Daniel

17   Kriegman, who also wrote a report and filed it with the court.

18         THE COURT:  All right, so I don't make these gentlemen

19   come back a second time, I'm just trying to make sure of the

20   scheduling.  I know that you have a launched -- can you hear?

21   Can you hear?

22         THE DEFENDANT:  Yes.

23         THE COURT:  Okay.  I understand that there's been a

24   *Daubert* challenge to the risk assessment tools.  The motion to

25   strike as delayed is denied.  That said, I would like to hear

1    from the doctors.  I don't know if they're essential.  So I'd

2    like to hear from the doctors on both sides, and then I'll make

3    a decision about whether I need this.

4         MR. CALLAHAN:  Okay, so, your Honor, we would be

5    prepared then to go through the three risk assessment

6    instruments.

7         THE COURT:  You can, but I would also propose, so that

8    we can get through all the witnesses, that we simply put the

9    expert reports from both doctors in the record, maybe I don't

10   know if you've premarked them already -- and I've read them

11   both -- and then you can put on whatever direct you want and

12   you can cross whatever you want, but at least it's in the

13   record.

14        MR. CALLAHAN:  We have discussed this before, your

15   Honor, and Dr. Channell has actually two risk assessment

16   reports.  There's a December, 2013 addenda.

17        THE COURT:  Yes.

18        MR. CALLAHAN:  And counsel and I have discussed it.

19   We have a number of government exhibits that we're moving in as

20   stipulated to with two exceptions:  a letter from the fellow

21   inmate of Mr. Mahoney's as well as a phone call that was

22   recorded on May 28 that we are prepared to play, and we have a

23   keeper of the records in case the Court requires that.  But

24   those are the only two exhibits, and there are twenty in the

25   government's exhibit binder, which you have a copy of.

1          THE COURT:  Finish your sentence.  The only two

2     exhibits that are contested?

3          MR. CALLAHAN:  That are contested.

4          MR. SCHNEIDER:  And I would be objecting specifically

5     to those two exhibits, but I'll raise my objections when the

6     time comes.

7          THE COURT:  Yes.  We tried to do a research analysis

8     of whether or not the Rules of Evidence apply.  I believe that

9     they do, but there's a dearth of case law.  I at least will

10    proceed on that basis unless you have case law that says that

11    the Rules of Evidence do not apply.

12         MR. CALLAHAN:  Your Honor, we're aware of one case,

13    the *Fanning* case where the Rules of Evidence were deemed to

14    apply to a 4246 hearing, and that was before Judge Gertner.

15    That was an unopposed motion.  I don't know whether the

16    government needed Rules of Evidence, but it was an unopposed

17    motion.  Judge Gertner held that they applied.

18         There are other cases, and I can give the Court

19    citations; *U.S. v. Wabol* where they said in a 4243 proceeding,

20    which is very similar to this, where the Rules of Evidence

21    didn't apply, and what they said was that -- and excuse me --

22    and also *United States --*"

23         THE COURT:  I'm not prepared to rule on it.  Until I

24    do, I'm going to apply them.  And then if there's something,

25    for example, that is critical -- I'm assuming this prisoner

 1    letter would qualify as hearsay unless it falls into an

 2    exception -- I would take it de bene, and I would have to make

 3    that ruling once I've done the research.

 4              MR. CALLAHAN:  Okay.  And the government would submit

 5    that that is just one of the types of things that an expert

 6    under Rule 703 would reasonably rely on and would be permitted

 7    to support his opinion.

 8              THE COURT:  Excuse me.  That may be true or not, but

 9    what isn't true is it get independently admitted.

10              MR. CALLAHAN:  Understood, your Honor.

11              THE COURT:  Okay.

12              MR. SCHNEIDER:  And I should make it clear, what I'm

13    not objecting to is, under Rule 702, the things that the

14    government is submitting is submitting as things that the

15    government's expert has relied on.  I'm not acquiescing to

16    their substantive admissibility, but it's something that

17    Dr. Channell has reviewed.  These aren't things that he can't

18    personally authenticate.

19              THE COURT:  Right, right.  So the issue would be

20    whether or not you're seeking to admit them for the substance,

21    or whether you're seeking to admit them just as something he

22    looked at.  And then typically you don't admit them.

23              But, in any event, at least right now, you may want to

24    sort of hand up the cites and give those to Mr. Schneider.

25    It's not something that was not briefed.  I didn't ask for

 1    briefing on it.  It occurred to me this morning, and we did a

 2    quick research project, and there was very little case law on

 3    it.

 4            MR. CALLAHAN:  Certainly, I can get the citation to

 5    Mr. Schneider.

 6            MR. SCHNEIDER:  I would just add for the record, the

 7    only case that I found on point is *United States v. Woods*, 970

 8    F. Supp. 711 -- it's a District of Minnesota 1997 case -- that

 9    also says, "The issue is not free from doubt, but the Court

10    finds that the Federal Rules of Evidence are applicable to this

11    proceeding."  That was also a 4246 proceeding.

12            THE COURT:  All right.  And you're saying you found

13    something called *Wabol*?

14            MR. CALLAHAN:  *Wabol*, your Honor.  It's 2006 Westlaw

15    3775978, where the admissibility of evidence was not limited by

16    the Federal Rules of Evidence in a 4243 case, which is a

17    similar standard.

18            THE COURT:  And who was the judge on that case?  Was

19    it in this district?

20            MR. CALLAHAN:  It was not.  It was in the Northern

21    District of Indiana, your Honor.

22            THE COURT:  So very little case law.  Okay, go ahead.

23            MR. CALLAHAN:  So we would call Dr. --

24            MR. SCHNEIDER:  I apologize.  I have just a couple of

25    very short preliminary things.  The first is, I know we made a

1    request through the courtroom clerk as to whether or not

2    Mr. Mahoney can wear a suit and tie today.  He does have a suit

3    and tie available that his brothers in the back have brought

4    for him, and I just raise that issue.  I know that there may be

5    some issues with the Marshal's Office, but I know that he would

6    very much like to dress like a human being.

7             THE COURT:  Well, I'm not going to stop now.  It's the

8    first I've heard of it, in terms of I didn't know it hadn't

9    been worked out.  I'm not going to take the time now.

10            (Discussion between the Court and Clerk.)

11            THE COURT:  Well, it's not worth taking the time now.

12   If we go into a second day, I'll hear argument on it.

13            MR. SCHNEIDER:  And then the only other issue that I

14   just want to clarify is, Dr. Kriegman is in the courtroom.  I

15   assume it would be beneficial to the Court for him to remain in

16   the court, and he's an expert.

17            THE COURT:  That's fine.  Both sides should hear each

18   other.

19            MR. SCHNEIDER:  Yes.  Does your Honor want the reports

20   formally filed now, or it doesn't matter?

21            THE COURT:  It doesn't matter.  I mean, don't I have

22   it in this binder?

23            MR. SCHNEIDER:  Yes, you do.

24            MR. CALLAHAN:  Yes, your Honor.

25            THE COURT:  Okay.  And I'm just going to deem

1    everything admitted except which two exhibits?

2           MR. CALLAHAN:  The two, and they're tabbed, your

3    Honor, Exhibits --

4           THE COURT:  What are the two exhibits that are not

5    agreed to?

6           MR. CALLAHAN:  Tab 12, so there's no Exhibit 12 as of

7    right now, your Honor.  I just have not put a sticker, but it's

8    under Tab 12 in front of you.  That is the letter from the

9    fellow inmate.

10          THE COURT:  I have that in here.

11          MR. CALLAHAN:  You do have that in there.  It's not

12   stickered with a -- we are not marking that with an exhibit

13   sticker just yet, but we will seek to.  And then Tab 20, which

14   is the May 28, 2014 phone call.  And at this point, we haven't

15   heard what the objection is to that phone call being played.

16   It is Mr. Mahoney speaking on the phone.  We have a keeper of

17   the records if your Honor deems it necessary, and Dr. Channell

18   has also listened to that phone call.

19          THE COURT:  Well, if that's his language, what's the

20   issue?

21          MR. SCHNEIDER:  Well, there are a couple of things,

22   your Honor.  First of all, we received it right after the close

23   of business yesterday for the first time, so that's kind of of

24   some concern, especially since we had discussed discovery would

25   be produced by May 15, 21 days in advance of the proceeding.

1    And then the other thing is, I guess there is an authentication

2    issue.  I have no doubt that the keeper of the records can

3    authenticate it as something that comes from the institution,

4    but in terms of who the voices are or who's speaking to whom,

5    I'm not sure that that can be determined just from the face of

6    the transcript.

7         THE COURT:  Well, if there's an agreement on the fact

8    that it is an authentic tape, can we let the keeper of the

9    records go?

10        MR. SCHNEIDER:  Yes.  I have no problem with that.

11        THE COURT:  So can he identify the voice?

12        MR. CALLAHAN:  He cannot identify the voice.

13   Dr. Channell will be able to identify the voice.  And, also, I

14   believe at one point in the call Mr. Mahoney identifies himself

15   because it's a collect call and he has to say who he is.

16        THE COURT:  And why was it produced last night?

17        MR. CALLAHAN:  Because it happened on May 28.  It was

18   uncovered at the end of the day on June 2.  And it was not

19   produced after the close of business.  It was produced in the

20   morning.  It was produced around 11:30.  I sent an e-mail with

21   the actual audio to Mr. Schneider at around 11:30 yesterday

22   morning.  That was as soon as I received it.  And then I sent a

23   transcript of it that we had done as quickly as we could last

24   night at 5:40.

25        THE COURT:  Okay, well, I'm inclined to allow it in if

1    it's authenticated in terms of what the voice is, but if

2    there's any prejudice from getting it at the last minute, we

3    could have a supplemental response to it or whatever so that it

4    isn't popped on Mr. Schneider in a way that it was hard to

5    prepare.  You know, he may have been in court.  I mean, it's

6    hard to get it the day before.

7              MR. CALLAHAN:  Right, your Honor, and we didn't get it

8    the day before.  The Bureau of Prisons couldn't get it to us

9    until -- it was only located on the 2nd, on June 2, and it was

10   a call that took place on the 28th.

11             THE COURT:  The letter is a completely different

12   thing.  I think you may have to subpoena in that inmate.  Even

13   if I said that the Rules of Evidence didn't apply, I haven't

14   read the letter, but I'm assuming it's those comments that were

15   so troubling.

16             MR. CALLAHAN:  That's correct, your Honor.

17             THE COURT:  And that were reported on.  If you want me

18   to take them on the substance of it, you'll have to bring him

19   in.

20             MR. CALLAHAN:  Okay, your Honor, understood.  Thank

21   you.

22             THE COURT:  Okay.  Are you planning to do that?

23             MR. CALLAHAN:  We were not intending to do that today,

24   your Honor.

25             THE COURT:  But you might if I exclude the letter, or

1    you're not going to?

2          MR. CALLAHAN:  We would consider what the result would

3    be, and then I would have to consult with BOP agency counsel

4    before doing that.

5          THE COURT:  All right.

6          MR. SCHNEIDER:  Does your Honor anticipate brief

7    opening statements?

8          THE COURT:  If you'd like to.  I've read both reports.

9    I don't need them, I think.

10          MR. SCHNEIDER:  I would just like to make a very brief

11    statement, if I could.

12          THE COURT:  Of course.  Do you want to say anything

13    briefly?

14          MR. CALLAHAN:  Yes, your Honor.  The overall goal of

15    the Bureau of Prisons is to make sure that Mr. Mahoney gets the

16    treatment and the medication he needs and that he's put in a

17    position to succeed when he's released to the community.  That

18    time has not come yet.  He suffers from a mental disease or

19    defect.  That's agreed upon by both experts in this case, and

20    much of this is agreed upon by both experts in this case.  And

21    that mental disease or defect causes a substantial risk that

22    his release would result in bodily harm to others.

23          And we're going to hear about agreed-upon facts such

24    as an extensive criminal history, a presentation that is

25    pressured at constantly presenting in an agitated manner.

1    We're also going to hear that he's had, you know, incredibly

2    troubling relationships with the women in his life that have

3    resulted in screaming, fighting, threatening; a long list of

4    criminal convictions, almost a dozen involving assault, assault

5    and battery, assault with a dangerous weapon, including knives,

6    pliers, and going back farther, assault with intent to rape

7    involving the use of a knife as well.

8             And we think that Dr. Channell will explain to your

9    Honor how Mr. Mahoney's mental illness affects his behavior,

10   affects his violence, how he doesn't have insight into that,

11   how he doesn't comply with his medication.  And after going

12   through the instruments, we'll also show that his release at

13   this point in time, because of his mental disease or defect,

14   causes a substantial risk of bodily harm if he were to be

15   released today.

16            THE COURT:  Thank you.

17            MR. SCHNEIDER:  Just very briefly, your Honor,

18   obviously you're going to be hearing from the two experts in

19   this case, Dr. Channell and Dr. Kriegman, and you're going to

20   hear two very different assessments, specifically assessments

21   with respect to the risk of future dangerousness that

22   Section 4246 requires.

23            It is uncontested that Mr. Mahoney suffers from

24   bipolar disorder.  He's been aware of that.  He's been aware of

25   it for years.  He knows that he needs medications to manage it

1    and that he needs counseling and treatment, and he's gone along

2    with that for the most part for many years.

3           You are going to hear certainly about a 55-year-old

4    man who's exuberant, who's animated, who's loud, who says

5    things that people take as sounding very aggressive, sounding

6    scary, as sounding threatening, and in some cases the courts

7    have found those to be in fact threats or assaults.  And you'll

8    hear about a number of prison incidents, but I do want your

9    Honor to remember the context in which those incidents occur.

10   They occur behind the walls in a scary federal prison where

11   things are really not like they are in the outside world.

12          You're going to hear of a man with a record.  He does

13   have a criminal history, and you're going to hear about

14   thirty-five, and you've seen the reports refer to them, but

15   very few of them really involve any kind of serious assaults.

16   Almost all of them are misdemeanors or district court cases.

17   In his entire record, when you look carefully at it, there is

18   only one major felony conviction.  That was a 1983 case when

19   Mr. Mahoney was 24 years old.  That's 30 years ago.  So I would

20   suggest that we look very carefully at the criminal record

21   because it's not nearly as extensive or not nearly as serious

22   and portent of future dangerousness as one might kind of

23   initially think when one takes an initial look.

24          You're going to hear about the three instruments that

25   Dr. Channell seems to rely quite heavily on and what their

1    purposes are, how they were scored, the level of subjectivity

2    involved in making some of these determinations.  And you'll

3    hear about the fact that they may be great research tools with

4    high levels of scientific or statistical significance, but that

5    ultimately that they are of very low predictive validity.  And

6    the danger is, if you go down that road, we're entering a road

7    where there are many false positives, and that's simply

8    something that the 4246 "clear and convincing evidence"

9    standard, you know, does not allow.

10        You'll also hear that people with bipolar disorder,

11   most of whom -- and there are many in the United States -- can

12   live a fine life controlling it with therapy and medication,

13   that they don't require hospitalization; and that for someone

14   like Mr. Mahoney, how he does outside the prison wall is really

15   a function of the kind of family support that he has, the

16   availability of a living situation, his willingness and

17   eagerness to seek counseling and medications, and things of

18   that order.

19        I do want to just point out because I know it's

20   something -- there are a number of things that certainly

21   agitate it Mr. Mahoney.  He has a very strong sense of justice

22   and fairness, and there are certain things that kind of feel --

23   there really are a number of both perceived and also very real

24   injustices that he feels, and I think those are things that

25   have, you know, led to some of these incidents in the past.

1    But I would suggest that given the kind of situation that he
2    seeks when he gets out, that he could very well kind of control
3    any sort of problematic behaviors.
4           Mr. Mahoney was picked up in February of 2011 --
5           THE DEFENDANT:  November 5, 2010.
6           MR. SCHNEIDER:  November 5, 2010, excuse me, and he's
7    been in custody for over 43 months.  Originally it was on a
8    federal charge, as your Honor well knows, out of New Hampshire,
9    a nonviolent felony where the charges ended up getting
10   dismissed.  I would suggest, at the end of the day, although we
11   may come into these proceedings with a certain idea of where
12   this thing should go, I know your Honor certainly will keep an
13   open mind, and I would suggest that at the end of this
14   proceeding, the government will not be able to prove by the
15   very high "clear and convincing evidence" standard that
16   Mr. Mahoney --
17          THE COURT:  Can I just stop you there.  So you're
18   thinking I can make a ruling at the end of today without going
19   through a *Daubert* challenge?
20          MR. SCHNEIDER:  Well, no, I would suggest that your
21   Honor will hear the *Daubert* challenge as part of our attack on
22   the instruments.  My understanding was that your Honor was
23   going to ask for post-hearing memos on the *Daubert* issue.
24          THE COURT:  I see, so that's how you think.
25   Procedurally, you were planning on putting on that attack.  I

1   had said to the government, because it came up so last minute,

2   that I would give them additional time to respond, and that may

3   or may not be live evidence or it may be briefing.

4         MR. SCHNEIDER:  I certainly plan on asking

5   Dr. Channell and Dr. Kriegman about the validity of the

6   instruments, which goes to the *Daubert* challenge.

7         THE COURT:  All right, and then we'll see what you

8   want to do afterwards.  I won't prejudice you on that.  I do

9   know that I was the first judge, to my knowledge, who dealt

10   with the challenges to the instruments in the context of sexual

11   dangerousness, and it took days, I mean, days of evidentiary

12   hearings and briefings.  It was huge.  So it's a complicated

13   matter, and let's just see where this goes to see what path we

14   should go down.  I'm not even sure as I was looking at them

15   that I looked at those three instruments.  I think I looked at

16   something else.  Do you know?

17         MR. CALLAHAN:  The three instruments that are in this

18   report are the three that were subject to the *Daubert*

19   challenge, your Honor:  the PCL-R, the HCR-20, and the VRAG.

20         THE COURT:  But did I look at those, do you know, in

21   the sexual dangerousness field?

22         MR. CALLAHAN:  Not that I'm aware of, your Honor, no.

23         THE COURT:  I think they're different.

24         MR. SCHNEIDER:  So your Honor is talking about the

25   *Jeffrey Shields* case.

```
 1              THE COURT:  Yes.

 2              MR. SCHNEIDER:  And I believe your Honor would have

 3    been looking, if anything, at the SORAG and the Static-99, I

 4    think was the focus of your Honor's attention.

 5              THE COURT:  I think that that's right, so I don't

 6    think it's something I've look at before.  I've certainly seen

 7    the first one, but I don't know if I've seen the revised one,

 8    it says.  So it's a big deal, and let's just see where we need

 9    to go, and I don't have to make that decision now.  All right.

10              MR. CALLAHAN:  So, your Honor, we will be putting on

11    evidence.  We just didn't want to open the door to its validity

12    by asking a lot of questions about it, but if your Honor wants

13    to hear what we have to say on that, we will present it.

14              THE COURT:  Well, let me just say this:  He's

15    challenged the validity, and your doctor has relied on it.

16    What's not clear to me is whether I need to rely on it.  I

17    don't know how close a call it is.  I believe the standard of

18    proof is clear and convincing evidence.

19              MR. CALLAHAN:  That's correct, your Honor.

20              THE COURT:  So if there's a challenge to the validity,

21    then I need to decide what to do with that, whether that's

22    essential to my decision.

23              All right, why don't you call the doctor, and we'll

24    get going.

25              MR. CALLAHAN:  Thank you, your Honor.  The United
```

 1    States calls Dr. Shawn Channell.

 2                         SHAWN CHANNEL

 3    having been first duly sworn, was examined and testified as

 4    follows:

 5              THE CLERK:  Could you please state and spell your name

 6    for the record.

 7              THE WITNESS:  Yes.  It's Shawn Channell, S-h-a-w-n

 8    C-h-a-n-n-e-l-l.

 9              MR. CALLAHAN:  Your Honor, if I may, could I hand

10    Dr. Channell a copy of the exhibit book so he can refer to it?

11              THE COURT:  Sure.

12    DIRECT EXAMINATION BY MR. CALLAHAN:

13    Q.   Good morning, Dr. Channell.  Could you introduce yourself

14    to the Court, please.

15    A.   Good morning.  I'm Dr. Shawn Channell.  I'm a forensic

16    psychologist employed at the Federal Medical Center in Devens,

17    Massachusetts.

18    Q.   As a forensic psychologist at Devens, were you asked to

19    evaluate the respondent, Mr. Brian Mahoney?

20    A.   Yes, I was.

21    Q.   For what purpose?

22    A.   Initially he was referred for restoration of competency

23    after being found not competent to stand trial, and that was my

24    initial contact with Mr. Mahoney.

25    Q.   Did you subsequently evaluate him to determine whether he

1    had a mental disease or defect, as a result of which his

2    release would cause a substantial risk of bodily harm or

3    serious property damage to another?

4    A.    Yes, I did.

5    Q.    And did you arrive at a conclusion regarding that

6    evaluation and that question?

7    A.    Yes, I did.

8    Q.    And what was your conclusion?

9    A.    My conclusion was that he suffers from bipolar disorder,

10   and as a result of his mental illness, his release would pose a

11   substantial risk of bodily injury to another person.

12   Q.    Now, could you tell us where you attended college.

13   A.    I did my undergraduate at West Virginia University in

14   psychology.  I have my master's degree and Ph.D. from Western

15   Michigan University in clinical psychology.

16   Q.    Are you a licensed psychologist?

17   A.    Yes.  I'm licensed in the state of Massachusetts.

18   Q.    For how long have you been licensed?

19   A.    I've been a licensed psychologist since approximately

20   2002.  Initially I was licensed in California and more recently

21   here in Massachusetts.

22   Q.    Are you board-certified?

23   A.    Yes.  I'm board-certified in forensic psychology by the

24   American Board of Professional Psychology.

25   Q.    Do you do any teaching?

A.    Yes.  I teach graduate-level courses at the Massachusetts

School of Professional Psychology in Newton.

Q.    And for how long have you done that?

A.    Four years.

Q.    Prior to becoming a forensic psychologist at Devens, can

you tell us where you worked and what you did.

A.    I did my internship at the Federal Medical Center in

Rochester, Minnesota.  After that, I was a staff psychologist

at the Metropolitan Correction Center in San Diego, California.

Then I went to the federal correctional institution in Waseca,

Minnesota, where I worked as a forensic psychologist, and then

I transferred out here to FMC Devens.

Q.    What were your responsibilities at those facilities prior

to arriving at Devens?

A.    Well, at FMC Rochester I was a pre-doctoral psychology

intern.  In San Diego I was a staff psychologist.  I primarily

did treatment, screenings, psychological testing, that type of

thing.  And then both at Waseca and at Devens, I've been a

forensic psychologist, where my primary duties are conducting

evaluations of competency to stand trial and criminal

responsibility.

      Since I arrived at Devens since 2006, I have chaired our

institution's risk assessment panel, which reviews inmates who

are civilly committed under 4243 or 4246, as well as screening

inmates who are currently inpatient at the hospital and have an

1    upcoming release into the community.  For the last three years

2    I've also been doing the majority of our competency restoration

3    cases.

4    Q.    What role do you play in the risk assessment panel?

5    A.    I chair the panel.

6    Q.    And what does a risk assessment typically involve under

7    the 4243 or 4246 scheme that you just described?

8    A.    Well, it would require a review of the information

9    pertaining to an individual's background, legal documents,

10   medical records, interviews with the individual being examined.

11   Often we'll use risk assessment instruments that are designed

12   to assist in risk assessment, so there's a lot of review of

13   records.  Also taking into consideration how the individual is

14   presenting, both during an interview and outside of the

15   interview in the institution, and then ultimately arriving at a

16   determination on whether or not they either continue to pose a

17   risk, if they're already committed, or if they would pose a

18   risk if released, if they're not yet committed.

19   Q.    How many times have you evaluated inmates who are either

20   coming up for release or who are found not restorable?

21   A.    Over 150 times.

22   Q.    And of those, how many did you petition for civil

23   commitment?

24   A.    We've petitioned for approximately thirteen civil

25   commitments during the time that I've been at Devens.

1   Q.   Have you testified in Federal Court before, Dr. Channell?

2   A.   Yes, I have.

3   Q.   How many times?

4   A.   I've testified about fifty-five times in a number of

5   different districts throughout the United States in Federal

6   Court.

7   Q.   Have you testified in federal dangerousness hearings

8   pursuant to either 18 U.S.C. 4243 or 18 U.S.C. 4246?

9   A.   Yes, approximately twenty times.

10  Q.   Has your opinion or part of your opinion ever been

11  excluded, a *Daubert* challenge?

12  A.   No, it hasn't.

13        THE COURT:  Have any of those cases involved

14  challenges to the risk assessment tools?

15        THE WITNESS:  No, your Honor.

16  Q.   When did you first meet Mr. Mahoney at Devens Federal

17  Medical Center?

18  A.   Actually, let me correct that last statement.  There was

19  one -- there was a case fairly recently where there were

20  some -- there was a challenge to the risk assessment

21  instruments, although the case never actually went to a

22  hearing.  We didn't have a *Daubert* hearing or a commitment

23  hearing in that case.

24        THE COURT:  So there was no judicial opinion that you

25  know of?

1            THE WITNESS:  There was no judicial opinion, no.

2    Q.    When did you first meet Mr. Mahoney at Devens Medical

3    Center?

4    A.    I first met with Mr. Mahoney in August of 2012.

5    Q.    And how many times have you met with or interviewed

6    Mr. Mahoney in the course from August, 2012, until today?

7    A.    I've met with him a number of times.  As far as formal

8    interviews, I've met with him approximately ten times over the

9    last two years for probably around seven hours in total.

10   Q.    And in addition to meeting with him, have you reviewed

11   records relating to him?

12   A.    Yes.  I've reviewed legal documents, a number of filings

13   that Mr. Mahoney has made, also a number of correspondence that

14   he sent to the court or to me personally, audio recordings of

15   his competency hearings, transcripts of his prior hearings,

16   medical records, the prior competency evaluations which have

17   been conducted in his case.  I've reviewed two phone calls that

18   he's made.  I testified at a competency hearing where he was

19   present.  I've reviewed a number of incident reports in

20   relation to his case, and I've talked to a number of

21   individuals within FMC Devens who have interacted with

22   Mr. Mahoney, as well as his prior attorneys and the Assistant

23   U.S. Attorney who is assigned to his commitment -- I'm sorry --

24   his competency criminal case.  So I've reviewed quite a bit of

25   information and have also spent a fair amount of time with

1    Mr. Mahoney.

2    Q.   In addition to that, are you regularly updated on

3    Mr. Mahoney's status or his progress at Devens Federal Medical

4    Center?

5    A.   Yes.  I tend -- we have a daily morning meeting basically

6    where we talk about the individuals who are currently being

7    placed at FMC Devens at the psychiatric facility, and I receive

8    updates on how he's doing there.  And I also review the medical

9    record, the electronic medical record that we keep on the

10   patients.

11          MR. CALLAHAN:  Your Honor, at this point the

12   government offers Dr. Channell as an expert in the field of

13   forensic psychology sufficient for him to testify as to whether

14   or not Mr. Mahoney has a mental disease or defect and whether

15   his release would cause a substantial risk of harm, bodily harm

16   to others or serious property damage.

17          MR. SCHNEIDER:  I have no objection to Dr. Channell

18   being qualified as a forensic psychologist with competency to

19   testify.

20          THE COURT:  Yes, I qualify him as an expert.  He may

21   render an opinion.

22          MR. CALLAHAN:  Thank you, your Honor.

23   Q.   In terms of documentation, approximately how many pages

24   did you review to prepare the two reports that are marked as

25   Exhibit 1 and 2 in the binder in front of you, Dr. Channell?

1    A.    I believe over 1,500 pages.

2    Q.    Did you also listen to audio recordings of various

3    hearings that Mr. Mahoney attended or partook in?

4    A.    Yes, I did.

5    Q.    Did you reach a conclusion as to Mr. Mahoney's present

6    psychiatric condition?

7    A.    Yes, I did.

8    Q.    And what did you conclude?

9    A.    That he meets the diagnostic criteria for Bipolar I

10   disorder.

11   Q.    Okay, anything else?

12   A.    He also meets the criteria for antisocial personality

13   disorder and cannabis use disorder.

14   Q.    I'd like to take those in order.  What is bipolar

15   disorder, and how does Mr. Mahoney meet the criteria for that?

16   A.    Bipolar disorder is a mood disorder that's characterized

17   by a history of manic episodes.  And manic episodes are

18   characterized by symptoms such as rapid speech, irritability,

19   an increase in behavior which would possibly be detrimental to

20   the individual; for example, aggressive behavior, drug use,

21   those types of things.  And Mr. Mahoney has a history of manic

22   episodes as well as fairly chronic hypomania, which while not

23   being quite as extensive as a full manic episode, is also

24   characterized by an abnormally elevated mood or irritability,

25   as well as the other characteristics that I described.

1   Q.   You also said Mr. Mahoney had a diagnosis of antisocial

2   personality disorder.  Can you tell us what that is and what it

3   is about Mr. Mahoney's presentation that meets that criteria,

4   in your view.

5   A.   Yes.  Antisocial personality disorder is basically a

6   longstanding pattern of disregard for or violation of the

7   rights of others, and that would be characterized by a number

8   of different characteristics, one of which would be repeated

9   arrests, another being deceitfulness, impulsivity,

10  irritability, aggressiveness, and lack of remorse for one's

11  prior behavior.

12  Q.   Does Mr. Mahoney's criminal history inform your opinion as

13  to his diagnosis of antisocial personality disorder?

14  A.   Yes.  That's one criteria of antisocial personality

15  disorder is a pattern of repeated arrests or criminal behavior.

16  Q.   And what types of repeated arrests or criminal behavior

17  would inform that, that Mr. Mahoney has been either arrested or

18  convicted of?

19  A.   Well, with regard to a diagnosis of antisocial personality

20  disorder, it could be, you know, really any type of arrest that

21  would be a repeated pattern.  I mean, what you're looking at

22  primarily is the rule-breaking or law-breaking component that's

23  involved in being arrested.  Certainly he has a number of

24  arrests in relation to assault charges, which also plays into

25  the history of aggressiveness, which is a characteristic of

1   antisocial personality disorder as well.

2   Q.   And does he also have a history of convictions relating to

3   larceny or knowingly receiving stolen property, and do those

4   have any impact or do they inform your opinion in any way as to

5   antisocial personality disorder?

6   A.   Yes.  Basically he has what's often referred to as

7   "criminal versatility," meaning that he commits a wide variety

8   of offenses that are not necessarily one type of offense but

9   involve offenses that involve violence, as well as property

10  offenses and other types of offenses like that.

11          THE COURT:  Let me ask, in your report you refer to

12  charges of this or charges of that.  Did you mean convictions,

13  or he was just charged?

14          THE WITNESS:  If I referred to it as a charge, it was

15  a charge unless I otherwise indicated he was convicted of it.

16          THE COURT:  So you relied on charges regardless of

17  whether or not there was a conviction?

18          THE WITNESS:  I don't know that I would say I relied

19  on them.  It's certainly information that I provided in the

20  report that those were charges.  Primarily what I rely on as

21  being a documented clear case of violence, for example, would

22  be a conviction.

23  Q.   And could I ask maybe just to follow up on that,

24  Dr. Channell, was he actually convicted of crimes such as

25  larceny, larceny over, knowingly receiving stolen property?

1   Was he charged and convicted of those?

2   A.   Yes.

3   Q.   Was he also charged and convicted with assault-type

4   offenses, including assault with a dangerous weapon, assault

5   and battery, assault with intent to rape?  Was he charged and

6   convicted of those crimes?

7   A.   Yes, he was convicted as far as I'm aware, based on the

8   criminal history that I reviewed, of approximately a dozen

9   violent offenses involving assault.

10  Q.   You also mentioned that he qualifies for a diagnosis of

11  cannabis dependence.  What is the criteria for that, and how

12  does Mr. Mahoney meet it, in your view?

13  A.   Well, he had reported to me that he began using marijuana

14  at a fairly young age and had used it regularly throughout his

15  life on a daily basis up until his arrest for the instant

16  offense back in 2011, I believe.

17  Q.   How many times daily was he using it, sir?

18  A.   I believe he told me two to three times a day.

19        MR. SCHNEIDER:  Objection, your Honor.  Just the term

20  "instance offense," there are no pending charges.

21        THE COURT:  Right.  That just was a misstatement.

22  Q.   And, I'm sorry, Dr. Channell, in terms of the frequency of

23  his use prior to being arrested in late 2010, how often was he

24  using cannabis daily?

25  A.   I believe he told me two to three times a day every day.

1    Q.   Aside from the diagnosis that you are offering here today

2    about Mr. Mahoney's mental disease or defect, can you describe

3    his mental health history going back ten years and the other

4    evaluators who have concluded that he suffers from a mental

5    disease or defect?

6    A.   Yes.  He's -- well, when I initially interviewed him with

7    regard to his history, he reported that he had experienced

8    hyperactivity as a child, although he was never formally

9    diagnosed with ADHD or any type of hyperactive disorder that

10   I'm aware of.  The first mental-health-related issues that I'm

11   aware of were in the late '70s when he attempted suicide by

12   cutting his fingers after he'd had a breakup with a girlfriend.

13   And the first time that he presented for mental health

14   treatment that I'm aware of was when he was 30 years old, and

15   what he reported to me was that he had been told he had rapid

16   speech and that his demeanor was overbearing.  And that

17   prompted him to seek mental health treatment, and he was

18   prescribed antidepressant medication at that time, although he

19   didn't take it for very long.

20        From 1989 to '94 he was participating in counseling, and

21   that was court ordered.  It was part of his sentence that he

22   participate in treatment while he was in the community.  And

23   then in '96 he was prescribed Valium, which is a benzodiazapine

24   medication, for the first time; and since then, he's taken some

25   type of benzodiazapine fairly consistently, whether it be

 1    Valium or Xanax or Klonopin.

 2         He was at MCI Concord in 2008 and 2009, and while he was

 3    there, they diagnosed him with ADHD, generalized anxiety

 4    disorder, mood disorder NOS, and a personality disorder called

 5    "borderline personality disorder."  And while he was there, he

 6    was prescribed Klonopin, which is also a benzodiazapine, and an

 7    antidepressant.

 8         After he got out, he was taking another antidepressant,

 9    Wellbutrin, and Adderall, which is medication for attention

10    deficit hyperactivity disorder, but he was not compliant with

11    those medications and didn't take them very long.

12         In 2009 he went to Avis Goodwin, and while he was there he

13    was put on Xanax and Seroquel, which have been medications that

14    he's fairly consistently taken since that time, either Xanax or

15    some other type of benzodiazapine and the Seroquel.

16    Q.   While he was at Avis Goodwin, was he given an official

17    diagnosis of bipolar disorder?

18    A.   Yes.  That's the first time I'm aware of that he was

19    diagnosed with bipolar disorder, and he was actually diagnosed

20    with bipolar disorder with psychotic features.  It was around

21    that time that he was noted to really begin perseverating on

22    his requirement that he register as a sex offender and

23    documentation which was related to him being a sex offender,

24    and that was known to be a significant preoccupation during the

25    time that he was treated there.

 1           THE COURT:  So what drug was it that he was taking for

 2    the bipolar?

 3           THE WITNESS:  He was taking Seroquel.  It's primarily

 4    an antipsychotic, but it is also approved for use as a

 5    treatment of bipolar disorder.

 6           THE COURT:  And is that the first time he received

 7    drugs specifically for the bipolar?

 8           THE WITNESS:  I believe it was.  I think prior to

 9    that, all he had taken were antidepressant medications.

10           THE COURT:  And how did he respond to the Seroquel?

11    Was it flattening out his bipolar cycles?

12           THE WITNESS:  Well, as far as I can tell based on the

13    record, he's continued to, you know, present as fairly

14    hypomanic or manic even while on the Seroquel.  In fact, while

15    he was at FMC Devens, his psychiatrist prescribed him lithium

16    in addition to the Seroquel because the Seroquel was

17    inadequately controlling his manic and hypomanic symptoms.

18           THE COURT:  And did the lithium control it?

19           THE WITNESS:  He didn't take it consistently for long

20    enough for us to really know what type of effect it had on his

21    presentation.

22    Q.   When he was being held at Strafford House of Corrections

23    in early 2011, what features or what mental disease was he

24    diagnosed with there?

25    A.   There they diagnosed him with depressive disorder or

1    depressive episode with a rule-out of bipolar disorder, and

2    also features of antisocial personality disorder.

3    Q.   Did there ever come a time where he reported a history of

4    hearing voices telling him to do certain things?

5    A.   He has in the past on a few occasions reported that he was

6    hearing voices.  I don't know that he said they were telling

7    him to do things, but I know he has reported hearing voices.

8    Q.   In 2011, was he evaluated by any evaluators at FMC Devens?

9    A.   Yes.  That was the first time he was sent to FMC Devens,

10   and he was evaluated by Dr. Kissin for competency to stand

11   trial.

12   Q.   And did she diagnose him with any mental disease?

13   A.   She diagnosed him with Bipolar II disorder.

14        THE COURT:  What's the difference between Bipolar I

15   and Bipolar II?

16        THE WITNESS:  Bipolar II would be a type of bipolar

17   disorder that is only characterized by hypomanic symptoms and

18   not by manic episodes, which would be considered a more severe

19   type of mood disorder.

20        THE COURT:  Which one is more severe?

21        THE WITNESS:  Mania is more severe than hypomania.

22   Hypomania basically means under-manic, less than manic, so

23   hypomanic symptoms are less detrimental and less pervasive than

24   full-blown manic episodes.

25        THE COURT:  So Dr. Kissin thought he was less

```
 1   seriously mentally ill than the prior diagnosis?
 2            THE WITNESS:  I suppose that's one way to put it, yes.
 3   Bipolar II disorder is less severe than Bipolar I disorder.
 4   Q.   Was Mr. Mahoney later evaluated by another physician at
 5   FMC Devens?
 6   A.   At FMC Devens?
 7   Q.   I'm sorry.  While he was the a FMC Devens, was he
 8   evaluated by another physician?
 9   A.   At that point in time?  Yes, he was.
10   Q.   Who was that?
11   A.   That was his treating psychiatrist.  I don't recall who it
12   was at that time.  And their diagnosis was bipolar disorder,
13   and he was taking a mood stabilizer then for Bipolar I
14   disorder, which was Trileptal.
15   Q.   Did there come an a time when --
16            THE COURT:  So Bipolar I or II?
17            THE WITNESS:  It was Bipolar I.
18   Q.   In terms of severity, where does Bipolar I fall in
19   comparison to Bipolar II, Dr. Channell?
20   A.   Bipolar I disorder would be a more severe diagnosis.
21   Q.   And is it correct that that's your opinion, the mental
22   disease or defect he suffers from as of today, correct?
23   A.   Yes.
24   Q.   What did Dr. Mart conclude based on Mr. Mahoney's
25   presentation?
```

1    A.    Dr. Mart was of the opinion that, as he said, the

2    terminology that he used was that he was "quite manic" and

3    diagnosed him with bipolar disorder not otherwise specified and

4    personality disorder not otherwise specified.

5    Q.    Can you describe what the "not otherwise specified" means.

6    A.    Well, basically it would mean that he diagnosed him with

7    bipolar disorder, but he didn't really clarify whether or not

8    it was Bipolar I or Bipolar II.

9    Q.    Throughout 2013, has he been noted or observed to be

10   agitated and manic throughout that period of time at FMC

11   Devens?

12   A.    Throughout 2013?  Yes.  Basically, you know, he's been

13   noted to be irritable and agitated for several years, easily

14   provoked, with periodic episodes that appeared consistent with

15   mania.

16   Q.    Is it fair to say that numerous clinicians and evaluators

17   have diagnosed Mr. Mahoney as bipolar?

18   A.    Yes, he's been diagnosed with bipolar disorder by several

19   clinicians who have done formal evaluations for the court, as

20   well as his treating psychiatrists, and his current treating

21   psychiatrist's diagnosis is also bipolar disorder.

22              THE COURT:  And what's the predominant view?  Is it I

23   or II?

24              THE WITNESS:  In my opinion, the predominant view has

25   been Bipolar I, and that he's been treated for Bipolar I fairly

1    consistently for the last two to three years.

2    Q.    Did you read Dr. Kriegman's report?

3    A.    I did, yes.

4    Q.    Do you know whether he agrees or disagrees with your

5    characterization of Mr. Mahoney suffering from bipolar

6    disorder?

7    A.    The report indicated that he also believed Mr. Mahoney's

8    diagnosis would be bipolar disorder.

9    Q.    Based on your evaluation of Mr. Mahoney, does he have

10   clear insight into his own mental illness?

11   A.    No, he doesn't.

12   Q.    What's the basis for your view in that regard?

13   A.    He's aware he has bipolar disorder.  He will acknowledge

14   that that's his diagnosis when asked, although he has

15   relatively poor insight into the way his bipolar disorder

16   manifests itself and the impact that it has on his interactions

17   with other people.  He generally tends to believe that his

18   symptoms are under control, when in fact they're not under

19   control.  You know, he agrees to take a benzodioxanes like

20   Xanax or Klonopin and Seroquel because he likes the effect of

21   those medications, but he's never really been compliant with

22   any additional medications which were added to the regimen to

23   try and control his ongoing symptoms.

24        He also, because he lacks the insight into the impact of

25   his behavior, even though he will attend, for example,

1    counseling or attend anger management groups, his lack of

2    insight prevents him from being able to apply those principles

3    to his own situation or benefit from the treatment that's being

4    provided.

5    Q.   And what's the significance of his limited insight into

6    his own mental illness?

7    A.   Well, the significance is that he continues to do as he's

8    done in the past and experience episodes of outbursts that at

9    times will escalate into threatening statements or physical

10   violence.

11           THE COURT:  What is the drug that you believe will

12   cure him or alleviate the symptoms?

13           THE WITNESS:  Well, there isn't any medication that

14   would cure his -- you know, he'll always have this condition.

15   There are medications that could perhaps better control his

16   symptoms.  I'm not a psychiatrist, so it would be inappropriate

17   for me to recommend any specific medication or dosage, but I do

18   believe that he requires additional medication or an adjustment

19   in his current medications in order to better control his

20   hypomanic and manic symptoms.

21           THE COURT:  So you don't have the expertise to say, if

22   he took, for example, the lithium, whether or not he would be

23   safe to go on the streets?

24           THE WITNESS:  Well, you know, any medication he would

25   be prescribed he would have to take for a period of time before

1    we would be able to make a determination on the impact of his

2    behavior.  Medications like lithium, for example, require blood

3    testing to demonstrate that the lithium has built up in the

4    blood system to a concentration which would be therapeutic; and

5    when he was taking it, he wouldn't accept the blood work, so we

6    were never really able to determine whether or not he was being

7    treated at a therapeutic level.

8            So what I could say is, any medication he would be

9    prescribed, I don't think anybody would be able to say whether

10   or not that would have an impact on his behavior to such an

11   extent he'd be appropriate for release until they saw how he

12   did on it.

13   Q.   Dr. Channell, have you reviewed notes or anything in

14   Mr. Mahoney's file indicating that psychiatrists believe he

15   should be taking something in addition to Seroquel?

16   A.   Yes.

17   Q.   What do you rely on?

18   A.   Well, I know since he stopped taking the Seroquel -- or

19   not Seroquel but the lithium, you know, his psychiatrist, after

20   he stopped taking it, on multiple occasions had suggested to

21   him that he go back on it, and he was unwilling to do that.  I

22   have talked to him about it personally and asked him, if his

23   psychiatrist would meet with him and talk to him about it and

24   work out a treatment regimen with it, if he would take it, and

25   he told me in no uncertain terms that he would not take the

1    lithium again.

2          THE COURT:  Why?  What did he say?

3          THE WITNESS:  He simply said he wouldn't take it.  He

4    didn't give me a reason.

5    Q.   Dr. Channell, could I ask you to turn to Exhibit 16 in the

6    book you have before you.  Do you have that before you,

7    Dr. Channell?

8    A.   Yes.

9    Q.   Who is Dr. Kambampati?

10   A.   Dr. Kambampati was Mr. Mahoney's treating psychiatrist at

11   this point in time.

12   Q.   In looking at Mr. Mahoney's file, did you come to any

13   conclusion about whether lithium was helping reduce his manic

14   episodes from the past, including Exhibit 16?

15   A.   Well, at that point in time he was denying having racing

16   thoughts, distractibility, irritable mood, euphoria, or

17   impulsivity.  Dr. Kambampati said that "He has likely benefited

18   from the addition of lithium -- but his compliance with med is

19   only fair and has poor compliance with monitoring," which would

20   have been the blood test, the lab work.

21   Q.   Was Dr. Kambampati one of the people who suggested that

22   Mr. Mahoney take lithium due to an inadequate response to other

23   drugs that he was on?

24   A.   Yes, he was.  In fact, he was the prescriber of the

25   lithium.

1    Q.    And how long has Mr. Mahoney been taking benzodiazapines

2    like Seroquel, Xanax, and Klonopin?

3    A.    Well, as I said earlier, he's taken one form or another at

4    certain points in time for many years.  I believe he's been on

5    Klonopin, he was on it when he was at Cheshire House of

6    Corrections in 2012, and then there was a period of time when

7    he was not receiving it at Devens, and then I think within the

8    last year he's been prescribed Klonopin again at Devens and has

9    been taking it since.

10   Q.    And while he's been on Seroquel and Klonopin -- are they

11   both benzodiazepines?

12   A.    No.  Seroquel is a mood stabilizer.

13   Q.    And while he's been on Seroquel and Klonopin, has he

14   continued to have outbursts within FMC Devens?

15   A.    Yes.

16   Q.    Has he continued to have disciplinary issues at Devens?

17   A.    Yes.

18   Q.    And can you provide some examples of those.

19   A.    Well, most recently there was an issue when he was at

20   Devens that he -- just early this year he was on suicide watch

21   for several days, primarily because he was angry that he hadn't

22   received a legal phone call; and while he was on the locked

23   unit -- this was in January -- he swore at and used some pretty

24   abusive language towards one of the mid-level practitioners,

25   PAs that we have who was providing him treatment, and basically

1   indicated to her that she was lucky that the door was between

2   himself and her.  So that would be one of the more recent

3   incidents that I could identify.

4   Q.   Okay.  And then going back to 2013, in March of 2013, late

5   March, were there any incidents where he became violent or

6   threatening while taking Seroquel and Klonopin?

7   A.   Yeah, he had started taking the Klonopin again in March of

8   2013, and there were notes then indicating that he was talking

9   a mile a minute, even while he was on the medication, and that

10   he was continuing to present as agitated.  There was an issue

11   when he got angry with another inmate -- this was in September

12   of 2013 -- over a TV, and from what I understand, basically

13   stormed out of the room; and while leaving the room, he slammed

14   the door, and the door hit the other inmate.

15      There was an incident, based on the transcripts that I

16   reviewed, while he was in court pertaining to this issue late

17   last year that he became extremely agitated and disruptive; and

18   those were all behaviors which occurred while he was taking the

19   Seroquel and the Klonopin.

20   Q.   Dr. Channell, I'd like to refer you to Exhibit 19 in the

21   book in front of you.  This is an incident report.

22          THE COURT:  But when he was on the lithium -- and I

23   understand that that was limited -- did it calm him down?

24          THE WITNESS:  According to his treating provider at

25   the time, it appeared to be having some benefit, but as he

1    indicated, there were -- you know, he was not particularly

2    compliant.  He would miss a number of doses, and they never

3    were able to get lab work to determine whether he was receiving

4    a therapeutic dose, but his impression was that it was having

5    some benefit.

6              THE COURT:  Does lithium have side effects?

7              THE WITNESS:  Yes.  I mean, all medications have some

8    type of side effects, and lithium does.  As I said, I'm not a

9    psychiatrist, so I'm not, you know, really in a position to be

10   explicit with regard to what the side effects are, but

11   certainly lithium does have side effects, and they can be quite

12   troublesome to some people.

13             THE COURT:  Like?

14             THE WITNESS:  Dry mouth, tremor, things like that.

15             THE COURT:  Is that pretty much the go-to drug for bad

16   symptoms of bipolar?

17             THE WITNESS:  Well, primarily bipolar disorder is

18   treated with something like Seroquel in addition to a mood

19   stabilizer like lithium, Depakote, Trileptal, those types of

20   medications.  And he's been tried on Depakote that I know of,

21   and I know he did develop a rash to that, so it was stopped.

22   He was on Trileptal, but I honestly wasn't able to identify any

23   information about how long he took that or whether it was

24   beneficial.

25             THE COURT:  Thank you.

1   Q.   And, Dr. Channell, referring you to Exhibit 16 in the book

2   before you, did there come a time in February -- you said his

3   compliance with lithium after he was prescribed it initially in

4   November of 2012 was spotty; is that correct?

5   A.   Yes.

6   Q.   And then in February, 2013, did there come a time when he

7   outright refused to take lithium or even have his blood levels

8   tested?

9   A.   Yes.  It was after he had learned that he'd been found not

10  competent and not restorable, and the reason he gave at the

11  time was that he was angry about that decision, and at me in

12  particular over the issue, and that he was not going to take

13  his medication.  There was also a period of time, several days

14  where he didn't take the Seroquel either, but he did restart

15  the Seroquel.  He never restarted the lithium.

16  Q.   He refused to take lithium after that?

17  A.   Yes.  He's not taken it since.

18  Q.   And he said that was due to his disagreement with the

19  opinion of the Court?

20  A.   At the time, yes.

21  Q.   Has he ever taken lithium from February, 2013, to today?

22  A.   No.

23  Q.   What's the significance, if any, of Mr. Mahoney's

24  compliance or lack of compliance with the drugs he's been

25  prescribed?

1    A.   Well, I think what -- you know, I think -- I don't think

2    an argument can be made that he's compliant.  I believe he's

3    partially compliant with the medications that he believes are

4    what are sufficient to treat his symptoms, like the Klonopin

5    and the Seroquel.  However, when his treatment providers

6    recommend additional medications, he has not been compliant

7    with them; and I think the record fairly clearly illustrates

8    that even while he's on these medications, he continues to

9    exhibit significant agitation and symptoms consistent with

10   either a hypomania or some episodes which appeared quite manic.

11   So I think it's fairly obvious that these medications do not

12   adequately control his symptoms and that he does need additional

13   medication.

14   Q.   When he's been on these medications, you talked about

15   other incidents he's had while at FMC Devens.  Could you turn

16   to Exhibit 19.

17   A.   Okay.

18   Q.   What is Exhibit 19?

19   A.   This is a discipline hearing officer report from -- the

20   date of the incident report was April 3, but the actual

21   incident had occurred on March 26, 2013.

22   Q.   And what's described in this incident report in terms of

23   Mr. Mahoney's behavior?

24   A.   It basically says that "While escorting Inmate Mahoney

25   from N5 to N1 --" this is on Page 2 in the box at the bottom,

1    third paragraph -- "While escorting Inmate Mahoney, Register

2    No. 12272049, from N5 to N1, he became verbally aggressive

3    toward staff while walking to N1.  Once inside of N1, he became

4    very aggressive and began kicking over trash barrels and

5    chairs.  We attempted to move Inmate Mahoney against the wall

6    to control his behavior.  However, he began resisting and

7    kicking backwards towards the escorting staff.  The inmate was

8    then moved to the ground and placed in leg irons."

9    Q.    Did Mr. Mahoney also have an incident the previous day, as

10   described in Exhibit 18 which is in the book before you?

11   A.    Yes.  Basically this was the incident that prompted the

12   officers having to move him to N1 in the first place.

13   Q.    Could you also turn to Exhibit 9.  What is Exhibit 9,

14   Dr. Channell?

15   A.    This is an inmate investigative report regarding

16   Mr. Mahoney, who was the assailant, and a second inmate who is

17   identified as the victim.

18   Q.    And what happened with this incident that you described in

19   your report?

20   A.    Basically what had happened was, an inmate, Mr. Mahoney,

21   was working in food service with another inmate, and they had a

22   disagreement.  I'm not exactly sure what the disagreement was

23   over.  And what the other inmate indicated was that

24   Mr. Mahoney, quote, "went nuts" and grabbed him around the

25   throat and tried to choke him, and then threw a bucket of water

1    on him.  And then the SIS investigation revealed a video that

2    did indicate he had done both of those things.

3    Q.   Are you aware or did you look at records of his time spent

4    at Cheshire in 2012, March and August of 2012?

5    A.   Yes.  The U.S. Marshals Service provided me a number of

6    incident reports in relation to his time there.

7    Q.   Could you please turn to Exhibit 5 in your book, please.

8    Is this one of the incident reports that you reviewed?

9    A.   Yes, it was.

10   Q.   And what happened in March, 2012, at the Cheshire House of

11   Corrections?

12   A.   This was an issue that involved Mr. Mahoney became upset

13   with a nurse, and during the incident -- he was described to be

14   very aggressive, seemed to be yelling directly at another

15   inmate, and then he aggressively struck the other inmate in the

16   face with an open hand.  And they reviewed a video, and

17   immediately after striking the first inmate, Mahoney turned

18   around and was noted to blind-side another inmate by striking

19   him while he was walking into his cell.

20   Q.   And was there another incident report from Cheshire in

21   2012 --

22           THE COURT:  Excuse me.  Is there any way of knowing in

23   these incidents what meds he was on?

24           THE WITNESS:  Well, I can tell you that this was in

25   March of 2012.  Let me look at my notes.

1          THE COURT:  You had said he was prescribed lithium --

2          THE WITNESS:  He was on Klonopin and Seroquel at that

3    point in time.

4          THE COURT:  On 3/3/12?

5          THE WITNESS:  Correct.

6    Q.   Is it correct that he was not on lithium at that time,

7    Dr. Channell?

8    A.   He was not on lithium, no.

9          THE COURT:  Although you had said he was first

10   prescribed in February of 2012, so how do you know he was or

11   wasn't on it?

12         THE WITNESS:  I have records from when he was at

13   Cheshire County indicating what medications he was on at that

14   point in time.

15         THE COURT:  Okay, thank you.

16   Q.   He was first prescribed lithium at FMC Devens on what

17   date?  Does November, 2012, sound accurate?

18   A.   He was first prescribed lithium, yes, in -- I believe it

19   was November of 2012.

20         THE COURT:  All right, so I have that wrong.

21   Q.   Could you also refer to Exhibit 6 in the book before you,

22   Dr. Channell.  What is that?

23   A.   This is another incident report from Cheshire County.

24   It's for March 5, 2012, and the incidents were disorderly

25   conduct and threatening any person.  And this was an incident

1    with a staff member when Mr. Mahoney was noted to square off

2    and told another -- told the staff member, "I will beat the

3    shit out of you," and then he later told him that he would stab

4    him.

5    Q.   And during these incident reports, do you know if he was

6    taking Seroquel at this time in March, 2012?

7    A.   He would have been on Klonopin and Seroquel.

8    Q.   I want to direct your attention to May of 2013.  Did you

9    become aware of any information about Mr. Mahoney's behavior at

10   a hearing in the District Court in New Hampshire?

11   A.   Yes.  I believe that was an incident where he -- in May,

12   2013 --

13   Q.   Can you refer to Exhibit 10 in the book before you,

14   Dr. Channell.

15   A.   Oh, okay, yes.  This was information which was provided to

16   me by the Assistant United States Attorney in New Hampshire in

17   relation to statements that Mr. Mahoney made during a hearing

18   there.

19   Q.   What did Mr. Mahoney say during that hearing?

20   A.   AUSA Huftalen indicated that Mr. Mahoney had accused him

21   of making false statements, and then in an agitated manner and

22   loud voice said, if I filed another presumably false pleading,

23   he would hit me in the head, and I would not get up.

24   Q.   At the beginning just a moment ago, you also referred to

25   an incident earlier this year in 2014.  Is that incident

1    described at Exhibit 11 in your book?

2    A.    Yes.  This was the incident with the mid-level

3    practitioner, the PA, while he was on the locked unit.

4    Q.    And if you'd look at Exhibit 11, Bates No. 961 down at the

5    bottom, is that a description of the incident?

6              (Witness examining document.)

7    A.    Yes.

8    Q.    And can you describe Mr. Mahoney's behavior.

9    A.    He was asking for a legal phone call, and the PA, when he

10   asked the PA for a legal phone call, she told him that she

11   didn't know if the individual who provides those calls, his

12   case manager, unit manager, was around that day, but if she saw

13   him, she would let him know that he was asking for a call.  And

14   then he became upset and said, "No.  You go and call him now

15   and tell him what I want."  He swore at her.  She said that he

16   then became explosive and threatening and stated, "You'd better

17   get away from this door, you dumb, stupid," quote, "fucking

18   cunt.  You're a beast.  You're lucky that this door is here."

19   And then he proceeded to make more derogatory statements to the

20   PA.

21   Q.    Did he do anything to his cell when he was escorted back

22   to his cell on that occasion?

23   A.    He was tearing things up in his cell and covered up his

24   cell window so we couldn't see them.

25              THE COURT:  What was happening here?

```
 1                THE WITNESS:  What was happening?

 2                THE COURT:  Yes.

 3                THE WITNESS:  As far as when this incident occurred?

 4                THE COURT:  I'm just trying to understand.  Was he not

 5      on any medications?

 6                THE WITNESS:  Yes, he was on medication.  This would

 7      have been -- he would have been on Klonopin and Seroquel at

 8      this time.

 9      Q.   Dr. Channell, during the time of all these incidents, was

10      he taking Seroquel that we just described?

11      A.   The recent incidents at FMC Devens, yes, and also the

12      issues at Cheshire County.

13      Q.   And he was not on lithium during any of these events; is

14      that correct?

15      A.   Not to my knowledge, no.

16      Q.   Is this one of the reasons why he was asked by his

17      psychiatrist to take lithium, because he's having an inadequate

18      response to Seroquel?

19      A.   Yes.  I mean, these are perfect examples of the types of

20      behavior he continues to exhibit, even while he's on his

21      present medications.

22      Q.   And his response to that suggestion and that prescription

23      was what?

24      A.   That he wouldn't take it.

25      Q.   Dr. Channell, I want to switch gears a little bit and ask
```

1   you about your basis for finding that Mr. Mahoney's mental
2   disease would create a substantial risk of bodily injury if he
3   were released.  What do you base that opinion on?
4   A.   Well, there are several, I mean, a number of different
5   factors that I would take into consideration prior to arriving
6   at that opinion.  Obviously, all of the information that I've
7   reviewed since I began working with Mr. Mahoney, his history of
8   violence in particular is concerning because of the number of
9   times that he has engaged in violent behavior.  It's fairly
10  apparent that to his way of thinking, that engaging in violence
11  is an acceptable way to deal with disagreements, or becoming
12  upset, that to become threatening or physically assaultive is
13  acceptable to him.  So, obviously prior behavior is one of the
14  things that we look at when we try to assess risk.  You know,
15  that's one of the only ways that we can have any level of
16  certainty that someone will perhaps go on to engage in similar
17  behavior is by past behavior which was consistent with that;
18  and I think in Mr. Mahoney's case, there's a pretty good
19  database of violent incidents that have occurred throughout his
20  life, certainly some very significant ones at an earlier age,
21  although his violence has been ongoing.  It's never really gone
22  away.  So his violence history is one issue that we take into
23  consideration, which shows an elevated risk.  It doesn't
24  necessarily show that the risk is due to a mental illness; but
25  I believe, when you take into consideration the fact that his

1    mental illness manifests itself with significant irritability,

2    agitation, being easily provoked, having a lack of insight into

3    both his symptoms and his behavior, those symptoms are clearly

4    ones that are associated with becoming aggressive, assaultive,

5    threatening in Mr. Mahoney's history.  So his mental illness,

6    his history of violence are significant factors which I

7    considered in coming to a conclusion that he would likely, in

8    my opinion, he would pose a substantial risk of bodily injury

9    to another person if he got out because of his present mental

10   condition, which, in my opinion, is not adequately treated.

11   Q.   And just to follow up on the question the Judge had, you

12   talked about a prior history of violence he's had.  You talk

13   about charges as well as convictions.  Just focusing on the

14   victims for now, approximately how many assaultive or assault

15   and battery type convictions does Mr. Mahoney have on his

16   record?

17   A.   When I looked at the history that I had, which was

18   provided to me by the United States Probation Office in

19   New Hampshire back when the competency evaluation was going on,

20   indicated that he had about twelve criminal convictions that

21   involved violence, and had led to approximately ten years on

22   and off of being incarcerated.

23   Q.   And some of those convictions occurred from the late '90s

24   into the early 2000s; is that correct?

25   A.   That's correct.

1    Q.   And in addition to that, he's been arrested on other

2    charges during that time, correct?

3    A.   Yes.

4    Q.   You also talked about a continuing pattern of violence.

5    What do you base that on?

6    A.   Well, I think, if you purely look at his criminal record,

7    it may appear that the violence stopped at a certain point in

8    time; but as clearly indicated by the number of incident

9    reports we've just gone over, and some others that we didn't

10   address, the behavior has continued in custody, and he has

11   received official sanctions and official incident reports in

12   relations to continued assaults and continued threatening

13   behavior while in custody.  And that would be the basis for my

14   opinion that his violent behavior has continued beyond that

15   indicated in his criminal history.

16   Q.   You were here for Mr. Schneider's opening comments,

17   correct?

18   A.   Yes.

19   Q.   Did you hear him describe FMC Devens as a scary world?

20   A.   Yes, I did.

21   Q.   Do you agree with that statement?

22   A.   Well, obviously, I work at FMC Devens, and I get to leave

23   every morning, so my perception is different than what an

24   inmate's would be.  But I have been there for many years, and I

25   have worked with hundreds of inmates at the facility, and I

1    couldn't name more than a handful of people who weren't

2    suffering from serious paranoia who felt that it was a

3    threatening environment.  I've worked in a number of prisons,

4    I've toured many prisons, and the idea that FMC Devens is a

5    scary prison compared to some of these others is clearly

6    inaccurate.  You know, most of the inmates that we have, when

7    they get transferred to somewhere that is a holding facility or

8    another facility, their goal is to try to get back to FMC

9    Devens.  So I would not characterize it as a scary prison.

10    Q.   Would you describe FMC Devens as being a controlled

11    environment of some type?

12    A.   Yes.  FMC Devens is basically a medical and psychiatric

13    hospital within a correctional setting, and it is a very

14    controlled environment.  It's the equivalent of, you know, a

15    mental health psychiatric hospital.  So it's one of the more

16    controlled types of settings that an individual could be placed

17    in.

18    Q.   And are there people there and procedures in place such

19    that if violence does begin, it's attempted to be stopped

20    quickly?

21    A.   Yes.

22    Q.   Are you aware of any plans that Mr. Mahoney conveyed about

23    what he would do upon his release in the materials that you

24    reviewed?

25    A.   Yes.

1    Q.    What was that?

2    A.    Well, I know that he has indicated that --

3            THE COURT:  Is this what he said to you?

4            MR. CALLAHAN:  And, your Honor, we're getting to the

5    letter that we described, the October, 2013 letter.

6            MR. SCHNEIDER:  I object, your Honor.  I mean, this is

7    clearly hearsay.  It's based on a statement of an out-of-court

8    declaration.

9            THE COURT:  I know the letter you're referring to

10   because I did read it in your second report, right?  Before we

11   go into the substance of that, did he ever say anything to you

12   that suggested a threat to a former counselor or a former

13   psychiatrist?

14           THE WITNESS:  Mr. Mahoney?

15           THE COURT:  Did you ever ask him about it?

16           THE WITNESS:  Yes.  I interviewed him about it, and he

17   denied it.  He denied having made the threat.  I interviewed

18   him after I received the letter.  So, no, he has never said

19   anything personally to me about -- that was threatening

20   towards --

21           THE COURT:  Did you ever hear anything that sounded

22   like a threat to hurt somebody in any of your interviews?

23           THE WITNESS:  I don't believe so.  Certainly if I had,

24   I would have documented it in the report, and, you know, I

25   don't recall him ever saying anything personally to me that --

1    I mean, he's voiced significant displeasure with a number of

2    individuals with me, but I haven't heard him say anything in

3    particular that I would construe as threatening to me

4    personally.

5           THE COURT:  Did you personally interview the inmate

6    who made the allegations about the threat?

7           THE WITNESS:  I did not, no.

8           THE COURT:  I don't see how I go into this.  Do you

9    believe that they were reliable?

10          THE WITNESS:  Based on the information that was in the

11   letter, a number of factors which I do not believe another

12   inmate could have been aware of without those having been

13   provided to them by Mr. Mahoney, it is my opinion that they are

14   credible.

15          MR. SCHNEIDER:  I would object and move to strike,

16   your Honor.

17          THE COURT:  Overruled.  So to the extent, I'm not

18   allowing in the letter separately.  So in your field, is

19   relying on a statement -- well, let me ask you, was this other

20   inmate mentally ill?

21          THE WITNESS:  No, he wasn't.  He was there for medical

22   reasons.  He was in the medical hospital, not the psychiatric

23   hospital.

24          THE COURT:  So in your field, do you feel that it is

25   reliable to take that kind of hearsay statement into account?

1          THE WITNESS:  I suppose it depends on the context.

2     Certainly in my opinion and in my experience, when you have an

3     individual who has repeated episodes that are documented of

4     threatening behavior, that another example of threatening

5     behavior does have a certain degree of credibility.  I mean,

6     obviously there are possible other motivations a person would

7     have to provide that type of report.  I'm not aware of any

8     clear secondary gain that this other individual specifically

9     asked for or obtained by providing this information; but in the

10    context of, for example, if we were reviewing an individual for

11    whether or not to recommend them for conditional release who

12    was already committed and we became aware of something like

13    this, it would be one piece of information we'd certainly

14    consider in our determination.

15         MR. CALLAHAN:  Your Honor, could I ask a few questions

16    just around this letter?

17         THE COURT:  Well, the problem is, without introducing

18    the inmate, I can't take the substance of it for the truth of

19    the matters asserted.  I understand that he'd use it as

20    somewhat corroborative of his point of view.  Maybe for that

21    limited purpose I can consider it, but not for the truth of

22    what the allegations are unless you're planning on bringing him

23    in.  It sounds like he didn't even meet with him, right?

24         THE WITNESS:  I did not meet with him, no.

25         THE COURT:  So you have no way of independently

 1    assessing.  So I don't know what else you were going to ask.

 2    You can ask the questions, and we can see if they draw an

 3    objection.

 4            MR. SCHNEIDER:  If I may also, I would object to your

 5    Honor even taking this information as corroborative of his

 6    point of view.  I think there's information about that inmate

 7    that suggests these are just sort of baseless accusations.

 8            THE COURT:  Well, I take that objection, but at this

 9    point, I wouldn't admit it for the truth of the matters

10    asserted, but an expert can rely on things.  I'm just not sure

11    it's even reliable without him having interviewed the inmate.

12    I mean, the inmate, do you know what he was in there for?

13            THE WITNESS:  I was made aware of it at one point in

14    time, but I can't recall, your Honor.

15            MR. CALLAHAN:  Your Honor, I'll move on to a separate

16    question.

17            THE COURT:  Is he still in custody?

18            THE WITNESS:  He is still in custody.  He's no longer

19    at FMC Devens.

20            THE COURT:  Do you know what the medical condition he

21    was in there for was?

22            THE WITNESS:  No, I don't.

23    Q.    Did you review a transcript of a November 22, 2013 hearing

24    in this courtroom where Mr. Mahoney was present?

25    A.    Yes.

1   Q.   If you turn to Exhibit 13 in the book in front of you,

2   that's a transcript of that hearing.  Did you review this?

3   A.   Yes.

4   Q.   Do you know if Mr. Mahoney expressed any displeasure, any

5   outbursts relating to Mr. Watkins, his former counsel?

6   A.   Yes, he did.

7   Q.   And is that described on Page 15 of the transcript?  I

8   would direct you to Line 10-16.

9   A.   Yes, it is.

10  Q.   What did he say?

11  A.   He said to Mr. Watkins, "You stay the fuck out of this

12  whole thing.  Who are you calling a piece of shit saying I was

13  convicted of aggravated rape?"

14  Q.   Do you know if Mr. Mahoney was removed from the courtroom

15  after his outburst?

16       MR. SCHNEIDER:  Objection, your Honor.  I think that

17  mischaracterizes who he's talking to in this.

18       THE COURT:  Well, the transcript --

19       MR. SCHNEIDER:  I think it's not at all clear from the

20  context who he's speaking to.

21       THE COURT:  Well, I don't know who he's speaking to,

22  but I will allow in the statement.

23  Q.   Dr. Channell, I'd like to ask you about Mr. Mahoney's

24  insight or lack of insight into his past incidents of violence.

25  Do you believe he has any?

```
1    A.    With regard to his --
2               MR. SCHNEIDER:  Objection.  Asked and answered.
3               THE COURT:  Overruled.  You mean apart from what he's
4    talked about already, all these documents?
5               MR. CALLAHAN:  Mr. Mahoney's own insight.  I'm asking
6    about Dr. Channell's opinion of Mr. Mahoney's own insight into
7    his past history of violence.
8               THE COURT:  Oh, I see.  Overruled.
9    A.    No, I do not believe he has any insight into his past
10   history of violence.
11   Q.    And what do you base that conclusion on?
12   A.    I've talked to him about it on several past occasions.
13   For example, I asked him at one point in time about the assault
14   to rape charge, and the way he described that to me was that he
15   asked a friend for oral sex, and when she refused, she walked
16   away.  And while I don't have specific information with regard
17   to what exactly happened, given the fact he was convicted of
18   the offense and received a fairly significant sentence, it's
19   hard to imagine that that adequately describes what had
20   occurred.
21              MR. SCHNEIDER:  Objection.
22              THE COURT:  Do you know whether or not -- have you
23   been able to review a plea colloquy or a trial transcript?
24              THE WITNESS:  No.  I've tried to obtain further
25   information but was never able to obtain anything else.
```

 1            MR. SCHNEIDER:  Objection and move to strike.  It's

 2    speculation as to --

 3            MR. CALLAHAN:  As to what portion?

 4            THE COURT:  Yes, as to what portion?

 5            MR. SCHNEIDER:  Could that be read back?

 6            THE COURT:  You mean the part, it must have been

 7    serious because he got six years?

 8            MR. SCHNEIDER:  Correct.

 9            THE COURT:  No.  I'll allow that testimony.

10    A.   When I've asked him about his violence in general, he's

11    indicated he's had a few small things in the past, like

12    assaulting a girlfriend.  I have asked him about the

13    restraining orders that he's received in the past, and the way

14    he described that was, "Restraining orders are very easy for a

15    woman to get."

16            THE COURT:  Did you ever review the record behind

17    those restraining orders?

18            THE WITNESS:  No, your Honor.

19    Q.   As to those restraining orders, how many restraining

20    orders did Mr. Mahoney have taken out against him?

21    A.   I believe he's had five restraining orders by three

22    different women.  I believe that's accurate.

23            THE COURT:  Do you know whether those were based on

24    that elevated speech, that pressured speech that someone

25    perceived as being scary, or whether it was actual physical

1   touching?

2         THE WITNESS:  I don't know one way or the other.

3   Q.   Dr. Channell, do you know if he was convicted of violating

4   any restraining orders taken out against him?

5   A.   Yes, he was.

6   Q.   And do you know if he was sent based on that violation?

7   A.   Yes, he was.

8   Q.   Has Mr. Mahoney ever told you that he's not dangerous at

9   all?

10  A.   Yes.  I've asked him if he's ever engaged in any type of

11  threatening behavior, for example.  He said "Never."  For

12  example, with regard to a threatening incident with

13  AUSA Huftalen, when I talked to him about that, he indicated it

14  wasn't threatening; it was just a misunderstanding.  With

15  regard to being violent in general, no, he indicated to me that

16  he's a very, very, very nice guy, as he said, and that he gets

17  along with everybody.

18  Q.   What is the significance, if any, of his inability to have

19  insight into his own history of violence?

20  A.   Well, I think his lack of insight into his history of

21  violence predisposes him to repeat his violent behavior because

22  he doesn't really learn from experience.  It's the combination

23  of both the lack of insight and the lack of empathy and a

24  failure to accept responsibility for his behavior, it's a

25  combination of things that make it difficult for him to prevent

 1  himself from engaging in that behavior again in similar

 2  circumstances.

 3  Q.   Given his lack of insight into his own history of

 4  violence, what does that say about his prospect for treatment

 5  going forward if he were released?

 6  A.   Well, lack of insight into one's mental illness

 7  predisposes a person to be less compliant or noncompliant with

 8  treatment because either they don't believe they have the

 9  illness or they don't believe that they have the symptoms which

10  their treatment provider believes that they do have.  So they

11  may be noncompliant completely, or they may be noncompliant in

12  part.  And, also, as I'd indicated earlier, you know,

13  medication is not the only type of treatment that could be

14  beneficial to someone with Mr. Mahoney's history.  Certainly

15  things like anger management and other types of psychotherapy

16  are helpful also; but in Mr. Mahoney's case, because of his

17  lack of insight and failure to accept responsibility, even

18  while participating in that type of treatment, it would be very

19  difficult for him to be able to apply those principles to

20  himself and benefit from the treatment.

21        THE COURT:  So is he undergoing no treatment at all

22  now, no psychiatric treatment?

23        THE WITNESS:  Well, he is taking the Seroquel and the

24  Klonopin now, and I know he has participated in some treatment

25  groups at FMC Devens.

1          THE COURT:  And is that standard, or should he be

2     receiving individualized treatment?

3          THE WITNESS:  I believe that as far as individual

4     therapy, counseling, I believe it would be beneficial for him

5     but only once his hypomania and manic symptoms are under

6     control.  You know, psychotherapy is not likely -- or is very

7     unlikely to have much benefit while somebody is actively

8     experiencing those symptoms.

9     Q.   Dr. Channell, just going back to FMC Devens, in your

10    experience having worked there, is violence within FMC Devens a

11    common occurrence?

12    A.   Violence occurs.  I wouldn't describe it as common.  It's

13    fairly infrequent.

14    Q.   You also used certain risk assessment tools in arriving at

15    your conclusion; is that correct?

16    A.   Yes.  I used two risk assessment instruments, and I also

17    administered the -- well, I didn't administer it -- I completed

18    a Psychotherapy Checklist-Revised.

19    Q.   Just starting with that, the Psychotherapy

20    Checklist-Revised, is that also referred to as the PCL-R?

21    A.   Yes, it is.

22    Q.   What is the PCL-R?

23    A.   It's an instrument that's designed to assist in evaluating

24    for the construct of what's called "psychopathy" to assist in

25    making a determination as to whether or not somebody would meet

1     the criteria for that construct.

2     Q.   And what is the purpose of the test?

3          MR. SCHNEIDER:  Your Honor, if I may object just for

4     this whole line of questioning.  We believe that the

5     instruments are unreliable.  I understand there's a *Daubert*

6     issue and your Honor is going to investigate.

7          THE COURT:  Well, so he's got to tell me what he's

8     relied on and what he knows about them, and then you'll

9     challenge them, and if I strike them, I strike them.

10          MR. SCHNEIDER:  Thank you.

11          THE COURT:  Thank you.  I'm sorry.

12    A.   I'm sorry, could you repeat the question.

13    Q.   Sure.  What does the PCL-R take into account?

14    A.   Well, it's an assessment of psychopathy.  It's a 20-item

15    scale, which each one of the items on the instrument is an item

16    which is believed to be an aspect of psychopathy.  And

17    psychopathy, it's not a personality disorder as far as an

18    actual diagnosis, but it is consistent with the idea of what a

19    personality disorder is, which is a kind of pervasive way of

20    perceiving the world and interacting with the world, which is

21    longstanding in nature; and basically the PCL-R is designed to

22    assess for that construct, psychopathy.

23    Q.   Who uses the PCL-R?

24    A.   Well, it's primarily used -- well, it would be used by

25    individuals who have been trained in its use.  It's used for

1    both clinical and research purposes.  It can be used for a

2    variety of reasons, but it is very frequently used in the

3    assessment of risk of violence or sexual violence.

4    Q.   How long has the test been used or in use?

5    A.   It's been used since approximately 1991.

6    Q.   And the revised checklist?

7    A.   2003.

8    Q.   How many times have you administered this device, this

9    tool?

10   A.   I don't know exactly.  Probably between thirty and forty

11   times.

12          THE COURT:  Has it been peer reviewed?

13          THE WITNESS:  Yes, it has.

14          THE COURT:  Do you consider yourself an expert in the

15   risk assessment tool itself?

16          THE WITNESS:  Well, I wouldn't characterize the PCL-R

17   as a risk assessment tool.  I mean, it is useful in the process

18   of risk assessment.  But with regard to the instrument, yes, I

19   do consider myself an expert.

20          THE COURT:  And just since there's been a challenge to

21   it, has the revised PCL-R been validated?

22          THE WITNESS:  Yes, it has.

23          THE COURT:  In a peer-reviewed journal?

24          THE WITNESS:  It has been peer reviewed.  There are a

25   number of research studies that have indicated that the PCL-R

1   is related to violent behavior in the community after release

2   from institutions.

3            THE COURT:  Have there been any challenges to it in

4   the field?

5            THE WITNESS:  Oh, I'm sure there have.  I couldn't say

6   specifically the cases, but absolutely, yes, there have been

7   challenges.

8            THE COURT:  Is it generally accepted by -- what are

9   you, forensic psychologists?

10           THE WITNESS:  It is generally accepted and is a widely

11   used instrument by forensic psychologists.

12           THE COURT:  Is that just in the federal system?

13           THE WITNESS:  No.  It's used across the board by

14   psychologists and psychiatrists.

15           THE COURT:  Not just in corrections institutes?

16           THE WITNESS:  Not just in corrections, no.

17           THE COURT:  So who else might use it?

18           THE WITNESS:  Well, it could be used in a broad

19   variety of settings.  It could be used in inpatient settings.

20   It's also used for research purposes.  It's often used -- in

21   certain statutes, it's a required component of the assessment

22   of sexual risk, of sexually dangerous persons.  For example, in

23   Texas they require the use of the PCL-R in those evaluations.

24           THE COURT:  And, to your knowledge, has it ever gone

25   through a rigorous *Daubert* proceeding?

```
 1            THE WITNESS:  Again, I can't speak to a specific case.
 2    I would be surprised if it had not.
 3            THE COURT:  You don't know, okay.
 4    Q.   And to get to the bottom line, has the PCL-R been accepted
 5    in the scientific community?
 6    A.   Yes, it has.
 7    Q.   Did you score the PCL-R for Mr. Mahoney?
 8    A.   Yes, I did.
 9    Q.   And what was the result?
10    A.   He got a score of 25 out of a total possible score of 40.
11    Q.   And can you explain the basis for that score.
12    A.   Yes.  Basically, I mean, primarily most of the literature
13    that discusses the PCL-R would use a cutoff of around 30 as an
14    indicator of someone who does in fact exhibit psychopathy.  So
15    Mr. Mahoney's score was below that, although it was an elevated
16    score, and it was elevated due to several different factors.
17    One is that he's an individual who's grandiose.  He has what I
18    would characterize as a grossly inflated view of his abilities
19    in certain areas.  When you talk to him, he will use a lot of
20    technical terminology, legal terminology, which while initially
21    it may appear fairly impressive, upon further review, it's
22    often incorrect or inaccurate in one way or the other.  He has
23    a history of deceitfulness, especially with regard to, as I've
24    experienced it, discussions with regard to his criminal
25    history, for example.  He has a lack of remorse or guilt with
```

1    regard to his behavior.  He shows a general lack of concern

2    about the consequences of the behavior that he has exhibited,

3    and often will view himself as the victim as opposed to the

4    other individuals, who in many of these cases were the actual

5    victims.  If he doesn't view himself as a victim in that

6    capacity, he will view himself as somebody who's had a basic

7    bad luck or had been unfairly prosecuted by an unfair criminal

8    justice system.  As I've discussed already, he has very poor

9    behavioral controls.  When he becomes agitated, he acts out.

10   He has a short temper, impulsive.

11        One of the other factors on the PCL-R is whether or not an

12   individual has a history of revocation of conditional release,

13   and Mr. Mahoney has violated supervised release and also

14   parole, I believe, at one point in time in the past.  And, as I

15   testified earlier, he has what's characterized as criminal

16   versatility, which would be a wide variety of different types

17   of offenses in his past.

18        Obviously, as I said, he did not score at a point where I

19   would characterize him as exhibiting psychopathy, and as a

20   result, there are several different areas that he didn't

21   exhibit risk factors, as based on the PCL-R.  And those would

22   be, he doesn't have a history of promiscuous sexual behavior,

23   and there's no documented history of juvenile delinquency that

24   I'm aware of.

25   Q.   Do you have an opinion of whether he demonstrated strong

1  psychotic tendencies based on your administration of the PCL-R?

2  A.    I believe there were some strong psychopathic tendencies

3  as they would relate to psychopathy, but I would not

4  characterize him as somebody who has the construct of

5  psychopathy.

6  Q.    You also said you used the HCR-20.  What does HCR-20 stand

7  for?

8  A.    HCR-20 stands for the History Clinical Risk-20.  Basically

9  it's a checklist of items that are used to assist in assessing

10  risk for violence.

11  Q.    And what approach does the HCR-20 take?

12  A.    Well, it's a measure of structured clinical judgment.  So

13  basically what it has are ten items that are dealing with the

14  person's history or past behavior.  The five items that are

15  assessed, their current presentation, which are the clinical

16  items, and then five items that are focused on risk management

17  or future types of items.

18  Q.    And the five and the five and the ten add up to the

19  twenty; hence, the name?

20  A.    Yes.

21  Q.    And how does it work?  How is it scored, or how is the

22  structured clinical judgment organized?

23  A.    Well, basically the items on the instrument are ones that

24  have been found through research to have a positive correlation

25  with violence, to be associated with violent recidivism

1    specifically; and the evaluator basically goes through the

2    items and makes a decision for each item as to whether or not

3    that particular item would apply to this individual, whether it

4    would not apply, or whether it would be partially present.  And

5    once completing the evaluation, even though you do arrive at a

6    total score, because this is a measure of structured clinical

7    judgment as opposed to strictly an actuarial type of

8    instrument, the evaluator would make a determination of whether

9    or not that individual posed a low, moderate, or high risk

10   based on the particular score that they received.

11             THE COURT:  What would you call this tool?

12             THE WITNESS:  What would I call it?

13             THE COURT:  Yes.

14             THE WITNESS:  It's a risk assessment instrument.  It's

15   a structured clinical judgment risk assessment instrument.

16   Q.   And, Dr. Channell, you said it was based on twenty

17   questions or twenty factors that have a correlation with

18   violence?

19   A.   That is correct.

20   Q.   And what's that correlation based on?

21   A.   It's based on empirical data, based on research studies

22   which have looked at individuals who have been released and

23   have gone on to reoffend violently, recidivism rates with

24   regard to violent behavior, and those factors which would have

25   been identified in that group of individuals.

1                THE COURT:  Is it peer reviewed?

2                THE WITNESS:  Yes, it is.

3                THE COURT:  And is it generally viewed as reliable in

4        your field of forensic psychology?

5                THE WITNESS:  Yes.  Well, there's been a good deal of

6        research done on the inter-rater reliability of the HCR-20, and

7        it tends to perform quite well with regard to reliability.

8        Q.    How long has the HCR-20 been in use, Dr. Channell?

9        A.    It began being used in 1997.

10       Q.    And who uses the HCR-20?

11       A.    It would be used by trained clinicians for the purpose of

12       doing a risk assessment evaluation for individuals with a

13       mental illness.

14       Q.    And is it supported by research?

15       A.    It is.  There's a broad foundation of research related to

16       the HCR-20.

17       Q.    Do you know if the HCR-20 has been used in courts across

18       the country?

19       A.    Yes.  There have been more than -- a recent study

20       identified more than twenty different cases in twelve different

21       jurisdictions where the HCR had been admitted as part of a

22       civil commitment proceeding.

23               THE COURT:  Do you know whether this has gone through

24       any kind of full-blown *Daubert* hearing in any court?

25               THE WITNESS:  I'm not aware of a specific *Daubert*

1  hearing in relation to the HCR-20.

2          MR. CALLAHAN:  Your Honor, there is briefing on that

3  in the government's motion to strike about the one challenge

4  that we were aware of.

5  Q.   Do you know if the HCR-20 has been used or cited in courts

6  within this district?

7  A.   Yes.  There have been several prior cases where the HCR-20

8  has been used in a civil commitment proceeding here in

9  Massachusetts.

10 Q.   Has the HCR-20 been tested?

11 A.   Well, there have been a number of studies that have

12 addressed the validity of the HCR-20 with regard to its risk

13 assessment capabilities, and that's a fairly detailed area.  I

14 don't know how much detail you want me to include.  And that

15 data indicates that it does a statistically significantly

16 better than chance with regard to prediction of risk outcome.

17 Basically -- I'll just try to be as basic and brief as I can.

18 You know, with regard to assessing validity as it would apply

19 to these types of risk assessment instruments, usually what's

20 utilized is something called "receiver operating

21 characteristics."

22 Q.   What are those?

23 A.   It's a method by which you would contrast the number of

24 what are called "true positive conclusions."  So, for example,

25 in this type of setting, if you were to come to a conclusion

1    that a person would engage in violent behavior and then they do

2    in fact go on to engage in violent behavior, that would be

3    considered a true positive.  So they will compare true positive

4    outcome to false positive outcome.  And a false positive would

5    be if an individual -- if the conclusion was that an individual

6    would engage in violent behavior and they in fact do not go on

7    to act violently, that's called a false positive.  And what you

8    would arrive with through the use of receiver operating

9    characteristics is a statistical measure known as an area under

10   the curve, or AUC.  And in a very basic way, what that is is a

11   number between zero and 1.  .5 would basically indicate chance

12   performance, meaning that instrument does no better than

13   flipping a coin, for example, in coming to a conclusion, all

14   the way up to 1, which would mean it would be a perfect

15   predictor, meaning that every time the conclusion was arrived

16   at that the individual would engage in violent behavior, they

17   would always engage in that violent behavior, and there would

18   be no false positives whatsoever.

19        So what you have basically is a number between zero and 1,

20   .5 kind of being the cutoff at which you would say that the

21   instrument has no real utility or validity for that purpose

22   because it doesn't do any better than chance.  And there have

23   been a number of studies that have looked at the HCR-20, and

24   the AUC that is often found in those studies ranges between .69

25   and .8.  So if you consider the idea that .5 would be a chance

1    outcome and 1 would be perfect, it's clear that it is obviously

2    not a perfect instrument, and that's an ideal that we would

3    likely never be able to meet, that we would never have a false

4    positive outcome with regard to violence risk assessment; but

5    it does perform much better than chance.  But obviously there

6    are false positives.  There are situations where you would

7    reach a conclusion which may in fact not be accurate as the

8    result of use of the instrument.

9    Q.   Has the instrument, the HCR-20, been accepted in the

10   scientific community?

11   A.   Yes, it has.

12   Q.   And is there a standard for the control of its application

13   or how it's used with a subject?

14   A.   Yes.  It has a detailed manual with regard to its use.

15   Q.   How many times have you used the HCR-20?

16   A.   I've used the HCR-20 very frequently.  You know, I

17   don't -- well, more than a hundred times.  It may be quite a

18   bit more than that.  I honestly don't know.  I use it quite

19   regularly.

20   Q.   Can you describe the twenty factors or focus on the key

21   factors within the twenty factors that you scored with

22   Mr. Mahoney and how he fared on them.  Actually, before we get

23   to that, did you apply this test to Mr. Mahoney?

24   A.   Yes, I did.

25   Q.   And what was your ultimate conclusion about where he fell

1    on the low-, moderate-, or high-risk category?

2    A.   My conclusion was that the number of risk factors which

3    were present for Mr. Mahoney indicated a high level of risk.

4           THE COURT:  Why would this test come out high, whereas

5    the other one came down below the cutoff?

6           THE WITNESS:  Well, the other instrument that I

7    described was not a risk assessment instrument.  That was a

8    measure -- it's more akin to what's called a diagnostic type of

9    instrument to help you identify whether or not the person has

10   psychopathy.  So that was not a risk assessment instrument.

11   And I wouldn't characterize the outcome as low on that

12   instrument.  It was below --

13          THE COURT:  Below the cutoff?

14          THE WITNESS:  It was below the cutoff for psychopathy,

15   but that's not necessarily equivalent to risk.  But the score

16   that he obtained wasn't a low one, even though it was below the

17   cutoff.

18   Q.   And just to clarify that, you used the PCL-R score in your

19   application or administering the VRAG, which is a test we'll

20   come up to later; is that correct?

21   A.   The PCL-R is actually a component both of the HCR-20 and

22   the VRAG, which is the primary reason that I use that

23   instrument, so that I could score those two instruments.

24   Q.   So you aren't relying specifically on the PCL-R by itself

25   in isolation; is that correct?

A.    No.  I didn't rely on any of these instruments in
isolation.

Q.    You said that there were ten historical, five clinical,
and five risk management factors in the HCR-20.  Can you take
us through the ten historical ones and how they apply to
Mr. Mahoney.

        THE COURT:  Do you have this instrument, a copy of it?

        MR. CALLAHAN:  The scoring sheets for it?  We do.  I
don't know if I have copies, your Honor.

        MR. SCHNEIDER:  I have copies, your Honor.  And I
would stipulate to them.

        THE COURT:  Do you have copies?  Do you have copies of
them?

        MR. SCHNEIDER:  Yes.

        THE COURT:  Let me ask you just on a timing, how much
longer do you think you have, Mr. Callahan?

        MR. CALLAHAN:  I think I have about fifteen minutes,
depending upon -- fifteen to twenty minutes.

        THE COURT:  I'm not sure -- I have a phone call I have
to take at about noon, and I was hoping to break then for,
let's say, half an hour or so.  What were you thinking,
Mr. Schneider?  Were you all prepared to go into the afternoon?

        MR. SCHNEIDER:  I was prepared to go into the
afternoon, yes.

        MR. CALLAHAN:  As was I, your Honor.

1          THE COURT:  We have a few quick Rule 16 conferences.

2          (Discussion between the Court and Clerk.)

3          THE COURT:  All right, thank you.

4          MR. CALLAHAN:  May I, your Honor?

5          THE COURT:  All right.

6   Q.   Dr. Channell, focusing on the historical factors, how did

7   Mr. Mahoney score on those ten factors?

8   A.   Well, you know, basically the way the instrument would be

9   conducted would be, take a look at each factor and decide

10  whether or not that factor was present for the individual; and

11  if it was, it would typically be a score of 2.  If it's not

12  present, it would be a score of zero.  In some cases it may be

13  partially applicable or partially present, and you would give a

14  score of 1.  The historical items that were significant with

15  regard to Mr. Mahoney were the violence history.  He had a

16  number of violent offenses, and the number of offenses that he

17  had alone would make his score a 2 on that instrument.

18          The other item would be young age at first violent

19  incident.  That's based on research that shows that the younger

20  individuals are at the point at which they engage in their

21  first violent episode of behavior, the more likely they are to

22  later go on to engage in future violent behavior.  The cutoff

23  for a score of 2 for the HCR-20 is under age 20, 20 or under;

24  and in Mr. Mahoney's case, he had an assault and battery when

25  he was 19, so he had a score of 2 on that item.

1       He does have a history of relationship instability, as

2   characterized by the multiple restraining orders that have been

3   placed against him by his prior women who he's been in a

4   relationship with.

5       His employment history, when I interviewed him, he

6   indicated that he had -- he described it as being laid off, but

7   he also indicated that in that field, that basically meant that

8   you were terminated; and he indicated that he was terminated

9   three to four times because he had an argument with his

10  supervisor.

11      Major mental illness, bipolar disorder which I've already

12  discussed.

13      He has a history of early maladjustment.  He reported to

14  me that he had behavioral problems in school, that he was

15  involved in fights and suspended from school and was combative

16  in school.  And he has a personality disorder, been diagnosed

17  with a personality disorder, which I discussed earlier.  And he

18  has a history of prior supervision failure, which I also

19  described earlier.

20  Q.  I'd like to take you through your application of the

21  HCR-20 with respect to the clinical risk factors described.

22  How did Mr. Mahoney score on those, and what was the basis for

23  the score that you gave him?

24  A.   Well, these are all -- so I'll be pretty brief -- these

25  are all factors which I've already discussed to some degree or

1   other:  his lack of insight, his impulsivity.  He has negative

2   attitudes as they apply to life in general, things like failure

3   to accept responsibility, a lack of empathy.  He continues to

4   exhibit active symptoms of mental illness, and he also has a

5   clear history of impulsivity.

6   Q.   What about the risk management or the future factors that

7   you described that are part of the HCR-20, how did Mr. Mahoney

8   score on those, and what's the basis for your scoring in that

9   regard?

10  A.   Well, the risk management items on the HCR-20 are, you

11  know, they're a very important part of risk assessment, which

12  is basically what type of setting and situation would the

13  individual be placed in once they left whatever environment

14  they're currently in.  Any level of risk can be mitigated by

15  certain types of circumstances.  Sometimes those circumstances

16  would be pretty severe things, like being placed in a locked

17  cell by yourself, but that still mitigates risk.  So you really

18  have to take into consideration release issues, risk planning

19  types of issues, and that's what these items are dealing with;

20  whether the person has a plan in place, whether or not that's a

21  realistic plan, whether or not the individual is likely to

22  comply with whatever plan is in place and how likely they are

23  to be exposed to stressors in the environment.

24       In Mr. Mahoney's case, as I've already testified, because

25  he continues to exhibit symptoms of bipolar disorder, he

1   automatically is in the situation where he would have

2   difficulty complying within treatment plans which are in place.

3   His lack of insight would potentially interfere with his

4   compliance with treatment.  Based on the information that I

5   have available to me, he does not have a good release

6   destination or a supportive place to live.  He will be exposed

7   to any number of stressors in the community, which he's

8   ill-equipped to deal with because of these continued symptoms.

9        A primary stressor for Mr. Mahoney for the past several

10  years has been his requirement that he register as a sex

11  offender, and even though the offense which initially brought

12  him into the federal system has been dropped, he will be

13  required to register as a sex offender again, so that continues

14  to be a stressor for him following his release.  There's been

15  information which I've become aware of recently which indicates

16  that he's already made statements suggesting he will not comply

17  with release conditions.

18  Q.   And what information did you become aware of?

19            MR. SCHNEIDER:  Objection, your Honor.

20            THE COURT:  What are you referring to?

21            THE WITNESS:  I'm referring to a phone call that

22  Mr. Mahoney made to his ex-girlfriend fairly recently.

23            THE COURT:  Could you show me where that is.  Is that

24  the transcript?

25            MR. CALLAHAN:  It's the transcript, and then we have

1   the actual call, your Honor.  The transcript was done quickly,

2   but we're prepared to play the call and --

3          THE COURT:  I don't think I need to hear it if you've

4   got the transcript.  Well, can I at least see what you're

5   referring to.

6          MR. CALLAHAN:  Sure, sure.  It's in the exhibit book,

7   your Honor, Exhibit 20.

8          THE COURT:  Exhibit 20?

9          MR. CALLAHAN:  Yes.

10          THE COURT:  What page?  Do you have it?

11          MR. CALLAHAN:  Exhibit 20 is the call, and the portion

12   that Dr. Channell can refer to in his book refers to what he

13   will do or what he won't do when he gets out.

14          THE COURT:  Page?

15          MR. CALLAHAN:  Let me find it.  One moment, your

16   Honor.

17          MR. SCHNEIDER:  Your Honor, this is the exhibit that I

18   was entering my objection to.

19          THE COURT:  Well, that's overruled.  I gave you a

20   chance to respond to it because you got it at the last minute.

21          MR. SCHNEIDER:  Right.

22          THE COURT:  This is the transcript of his statements

23   that he said he heard and it was his voice.

24          MR. SCHNEIDER:  If he authenticates it.

25          MR. CALLAHAN:  He stipulated to its authentication, to

1  the call's authentication.

2          MR. SCHNEIDER:  I stipulated to the fact that the

3  keeper of the record did not need to authenticate the fact that

4  the transcripts were generated from tapes that were kept in the

5  regular course of business at the institution, so there's no

6  need for the keeper of the records --

7          THE COURT:  I thought he testified it was his voice.

8  Did you say that?

9          THE WITNESS:  I did not, but it was clearly

10  Mr. Mahoney's voice.

11          MR. CALLAHAN:  That's why I wanted to play the tape,

12  so Dr. Channell could identify Mr. Mahoney's voice.  We have

13  that queued up and ready.

14          THE COURT:  I don't want to sit and listen to fifteen

15  minutes of tape right now.  Did you listen to it before you

16  walked in here?

17          THE WITNESS:  Yes.

18          THE COURT:  And did you recognize the voice?

19          THE WITNESS:  Yes.

20          THE COURT:  And whose voice was it?

21          THE WITNESS:  It was Mr. Mahoney's voice.

22          MR. SCHNEIDER:  The only thing I would --

23          THE COURT:  Has he heard it?  Does he say it's --

24          MR. SCHNEIDER:  We haven't had a chance to play it for

25  him, no.

1          THE COURT:  All right, so as I said, you'd have a
2  chance to rebut it later on if you think it wasn't his.  So
3  what page are we looking at?
4          THE WITNESS:  Well, the area that was concerning to me
5  with regard to his release starts on Page 5, and basically at
6  the bottom of Page 5, the woman with whom he was speaking, who
7  is the individual with whom he plans to live upon his release,
8  tells him that he can't actually live there.  And over the
9  course of the next few minutes, he talks about that he's aware
10 of that, but when Dr. Kriegman calls her, to be sure to tell
11 her that he can live there.  And then later on, if you'll give
12 me a moment just to find it --
13 Q.   Did he say anything, Dr. Channell, about his willingness
14 to take medication or be told what medication to take or where
15 to go?
16 A.   Yes.  That's what I'm trying to find, exactly where that
17 was.
18          (Witness examining transcript.)
19 A.   It's on Page 13.  He says, "I already told him that
20 they're not going to dictate where I go because I'm up in Dover
21 right now, and Dover gives me Xanax morning, noon, and night."
22 Q.   And does he continue after that to talk about whether he
23 can be told where to go, at Line 10 to 13?
24 A.   Yes, he does.
25 Q.   What does he say?

1    A.    Where are you?

2    Q.    On Page 13, Line 10 to 13.

3    A.    He says, "And that's a powerful drug," talking about the

4    Xanax.  "That's the one I'm wanting to go back on.  You know

5    what I mean?  And so nobody's going to tell me, like, where I

6    should go.  You're not going to tell me."  And she says, "Well,

7    no, they can't."  And he says, "Go to the Lynn Community

8    Center."

9    Q.    And this is information, Dr. Channell, that you became

10   aware of after scoring the HCR-20 and after providing your

11   first two reports at Exhibits 1 and 2?

12   A.    Yes.  I only became aware of this early this week because

13   the call was placed, I believe, last week.

14   Q.    And what impact does that have on your view of the five

15   risk management factors that are part of the HCR-20?

16   A.    Well, it indicates that even prior to being released, he's

17   already expressed an opinion that he is not going to be told

18   where he can go or what medication he will take, which is kind

19   of what I've indicated before, is that he believes that he

20   knows exactly what medication he needs, and that's what he's

21   going to take when he gets out, and nobody will tell him

22   otherwise, nor will they tell him where he's going to reside.

23   And also it indicates to me that he's not -- you know,

24   obviously there's some issue with regard to the validity of his

25   release plan to be able to live with the person with whom he

1    was talking.  She's clearly telling him he can't stay there,

2    yet the two of them have indicated that they will communicate

3    to anyone who calls to ask them if he can stay there, that he

4    would stay there.  That's deceitful and clearly not part of a

5    type of mindset that you'd like to have a person to have as

6    they were entering into a release plan.  You want them to be on

7    board with it.  That's the most likely way the plan will

8    succeed; and that they will remain in the community, that

9    they'll succeed, and that no one will come to harm in the

10   community; and this indicates to me that those things are not

11   in place at this point in time.

12   Q.   And did you come away from reading at the bottom of Page 5

13   that the female with whom he was speaking was telling him that

14   he can't really live with her?

15   A.   Yes.

16   Q.   You also used something called the Violence Risk Appraisal

17   Guide in arriving at your conclusion.  What is the Violence

18   Risk Appraisal Guide?

19   A.   The Violence Risk Appraisal Guide is also a risk

20   assessment instrument.  It is an actuarial instrument, and

21   basically what that means is that it deals with -- it

22   identifies empirically validated factors which have been found

23   to be correlated with violent recidivism, and the individual

24   is -- basically you score the instrument based upon whether or

25   not these certain characteristics are present for that

1    individual, and then you arrive at a score which provides

2    outcome data for the group of individuals on which the test was

3    validated, with which you can compare the individual in

4    question's overall risk.

5    Q.   Who uses the VRAG, as it's sometimes called?

6    A.   It would be the same types of clinicians who would be

7    using the HCR-20.  Basically it would be used by a clinician

8    who was interested in using an instrument which would assist in

9    their overall violence risk assessment.

10   Q.   How long has the VRAG been in use?

11   A.   Since 1993.

12   Q.   And is it supported by research?

13   A.   There is a large amount of research concerning the VRAG.

14   There's information relevant to its reliability indicating

15   that, you know, different clinicians who utilize the instrument

16   tend to arrive at comparable scores, and there is also

17   information which -- earlier when I talked about the area under

18   the curve, the zero, .5, and 1, with the .5 being a chance

19   prediction and 1 being perfect prediction, the AUC data that

20   applies to the VRAG is similar to the HCR-20.  The publishers

21   indicate that that tends to fall around .73 or .75, and there's

22   other data that indicates -- there are about thirty different

23   studies that indicate an AUC of about .72 for the VRAG as far

24   as its validity.

25   Q.   So the VRAG has been subject to some peer review?

1    A.    Yes.  Quite a bit.

2    Q.    Okay.  And it's been used in courts throughout the

3    country, to your understanding?

4    A.    Yes, it has.

5    Q.    Has it been used in courts within this district?

6    A.    Yes.

7    Q.    How many times have you administered the VRAG?

8    A.    The VRAG is also one that I rely on as part of an overall

9    risk assessment, so I've probably used it about fifty times.

10   Q.    And how does the VRAG work?

11   A.    Well, as I said, basically the way it was designed was,

12   there were fifty variables which the individuals who designed

13   the instrument considered.  And they assessed a number of men

14   who had been incarcerated or held in relation to a violent

15   offense, and then looked at their case again at a later point

16   in time -- in this case, seven years -- to determine whether or

17   not they had recidivated, whether or not they had committed

18   another violent offense.

19          THE COURT:  Is that how "recidivated" is defined, as a

20   violent offense?

21          THE WITNESS:  Well, violent recidivism would be a

22   violent offense.  I mean, recidivism can obviously also refer

23   to just criminal recidivism, but in these studies, it is

24   defined as the reoccurrence of another violent offense, yes.

25          So once they've identified the individuals who go on

1    to engage in violent behavior, they took a look at all these

2    factors and found the ones which were most strongly positively

3    or negatively correlated with violence, so ones that either

4    indicated the person was more likely to go on and engage in

5    violent behavior, or ones that made it less likely that they

6    would go on to engage in violent behavior; and those

7    instruments which had the strongest correlations are the ones

8    that ended up on the actual instrument.

9          And then for the evaluator who's using it, basically

10   you would consider these criteria, which are all static

11   criteria.  And what that means is, these are all historical

12   factors that will never change.  It doesn't matter whether the

13   person -- you know, how old they are at the present time or

14   whether or not they've been in treatment or any of these types

15   of things.  These are static factors that will remain the same

16   over time, and you look at those items.  There's a clear

17   description as to how these items --

18         THE COURT:  They don't take into account if you were

19   to put someone on the correct medications?

20         THE WITNESS:  No.  Something like the VRAG, the

21   primary difference between something like the VRAG and the

22   HCR-20 was, the HCR-20 does consider those variables.  Those

23   are called "dynamic variables," things that change.  The HCR-20

24   does consider that.

25         THE COURT:  So under this, he'll always --

1         THE WITNESS:  He will always score high on the VRAG,
2    always.
3         THE COURT:  So regardless of whatever I do, if you put
4    him on the right medications with the right treatment regimen
5    and the right housing situation, he's always going to score
6    this?
7         THE WITNESS:  Correct.
8         THE COURT:  Whereas in the other instruments, he moves
9    up, or I don't know what the right --
10        THE WITNESS:  Well, as those things are no longer a
11   concerning score would decrease on the HCR-20, yes.
12   Q.   Is there a reason why you use both the HCR-20 and the
13   VRAG, Dr. Channell?
14   A.   Well, there's a lot of -- there is disagreement in the
15   field about the different types of instruments which are used.
16   There are certainly a large number of clinicians and
17   researchers who would say that the best type of risk assessment
18   is to use an actuarial, and that you should use that as it is
19   and not adjust it in any way for factors like being on
20   medication.
21   Q.   And the VRAG is an actuarial instrument; is that correct?
22   A.   The VRAG is an actuarial instrument.
23        THE COURT:  But they stopped using those in the sex
24   offender area, right, because they wanted to take into account
25   the dynamic factors?

1          THE WITNESS:  Well, I mean, that's the debate.  I

2     mean, the Static-99 is an actuarial instrument, and it is very

3     widely used in the sex offender field.  They have stopped using

4     it, but there is certainly a large contingent of evaluators who

5     would argue that you should take into account dynamic risk

6     factors.

7          THE COURT:  So I believe when I would do them, I would

8     get both, right, in the sense of people would take into account

9     both?  In other words, whether you --

10         THE WITNESS:  I'm not aware in that specific instance,

11    but what I'm saying, in this case, that is why I use both.  I

12    use the VRAG because that is an actuarial instrument, and the

13    HCR-20 because it is a structure clinical judgment which takes

14    into account dynamic risk factors.

15         The data, the outcome data tends to be fairly similar

16    with regard to the predictive validity of the two instruments,

17    and they all tend to fall around .70, which is what I

18    indicated.

19         THE COURT:  For all three of these?

20         THE WITNESS:  Well, for these two, for the VRAG and

21    the HCR-20.  The PCL-R isn't technically a risk assessment

22    instrument.

23    Q.   Again, the PCL-R is something you used to inform or it was

24    one piece of many of the other two risk assessment tools you

25    used, the VRAG and the HCR-20; is that correct?

1  A.   That's correct.

2  Q.   When you applied the VRAG to Mr. Mahoney, what score did

3  he receive?

4  A.   He received a score of 15.  A score on the VRAG can range

5  anywhere from negative 26 up to 38.  His score fell into Risk

6  Category 7, and basically what that score indicates is that

7  among these individuals in that development sample that I

8  referred to earlier, individuals who were considered, looked

9  at, only 15 percent of them had a score that was higher than

10  that which was obtained here, and 85 percent of them obtained a

11  score which was lower.  Actuarial instruments like the VRAG

12  will provide a specific likelihood of recidivism as it applies

13  to that group data, and in this case it was 55 percent; and

14  that group went on to commit another violent offense within

15  seven years, and that 64 percent of them went on to commit a

16  violent offense within ten years.

17  Q.   Within an average of those years, an average of ten years

18  or an average of seven years?

19  A.   Yes.

20  Q.   Do you know whether a suitable state facility was willing

21  to accept Mr. Mahoney?

22  A.   I know one was not willing to accept him.

23  Q.   And is that identified at --

24       (Discussion off the record.)

25  Q.   Do you know whether a suitable state facility was willing

1   to take Mr. Mahoney into custody?

2   A.   No, there was no state facility willing to take him into

3   custody.

4   Q.   Okay.  And is that what's identified at Exhibit 3 in the

5   booklet in front of you, the letter from the New Hampshire

6   hospital?

7   A.   That's correct.

8           THE COURT:  Can I ask, are those pro forma -- I always

9   get that answer.  Maybe they just assume Uncle Sam has more

10  money.  But do you ever get a state saying, "We're willing to

11  take these people"?

12          THE WITNESS:  Almost never.  Never at this point in

13  the process, we never had a state that was willing to accept an

14  individual based on the interstate compact.  I think your

15  assertion is correct, most of the time is that they're taxed

16  with dealing with the people they already have in their

17  facilities and don't want to take on another individual when

18  they're already being provided care in the federal system.

19  Q.   And this Certificate of Dangerousness Due to Mental

20  Disease Or Defect, is that at Exhibit 21?  Do you have that in

21  front of you?  I'm just going to ask you, is that signed by the

22  warden at FMC Devens?

23  A.   Yes.

24  Q.   Just to touch briefly upon the prospect for a release plan

25  for Mr. Mahoney, if he were released today, would he be subject

1    to any period of supervised release?

2    A.    No.

3    Q.    Would there be any ability for authorities to monitor his

4    behavior or insure he was taking his medication, anything like

5    that?

6    A.    No.

7    Q.    Based on the materials you reviewed, do you have an

8    opinion of whether a condition of release is appropriate for

9    him at this time?

10   A.    I don't believe it is appropriate at this time.

11         THE COURT:  Is it lawful even?  In other words, do you

12   have the authority to release him to a halfway house?

13         THE WITNESS:  We could not place him in a halfway

14   house if he were to --

15         THE COURT:  Is that clinically or legally?

16         THE WITNESS:  Legally, because he has no standing with

17   regard to a halfway house.  We would place them in a group

18   home, is typically where we place the individuals.

19         THE COURT:  And they would still be within the BOP

20   jurisdiction?

21         THE WITNESS:  They would be under the jurisdiction of

22   the U.S. Marshal -- or the U.S. Probation at that point in

23   time.

24         THE COURT:  But he can't be because he's not on

25   supervised release?

1          THE WITNESS:  At this time there's nothing.  You know,

2     if he were civilly committed and placed under conditional

3     release, he would be under the supervision of U.S. Probation.

4          THE COURT:  If I civilly committed him, you would have

5     the ability, if he got better under the lithium, to put him in

6     a halfway house or a group home?

7          THE WITNESS:  A group home, correct, yes.

8     Q.   And what is your opinion that he is not appropriate for

9     conditional release at this point in time?  What is that based

10    on?

11    A.   Well, it's primarily based two reasons:  One, that his

12    symptoms are not well controlled at this point, and, two, that

13    clearly there's not a release plan in place that would be

14    likely to be successful for Mr. Mahoney.

15    Q.   Is that further supported in any regard by the phone call

16    that you listened to?

17    A.   Yes.

18    Q.   What would be the course of treatment for Mr. Mahoney if

19    he was placed in custody at Devens?

20    A.   We would continue to work with him to try and gain his

21    cooperation with regard to additional medication; and assuming

22    he would improve on the medication, we would also encourage him

23    to participate in individual counseling and attend treatment

24    groups.

25    Q.   What would be the goal for Mr. Mahoney if he was civilly

1    committed?

2    A.   The goal would ultimately be that he benefit from

3    treatment and that we could conditionally release him back to

4    the community.

5    Q.   In your opinion, does Mr. Mahoney presently suffer from a

6    mental disease or defect?

7    A.   Yes, he does.

8    Q.   In your opinion, as a result of that mental disease or

9    defect, would his release create a substantial risk of bodily

10   injury to another person or serious damage to the property of

11   another?

12   A.   It's my opinion that it would, yes.

13   Q.   Just looking at Exhibits 1 and 2, are these the two risk

14   assessment reports that you authored?

15             (Witness examining documents.)

16   A.   Yes.

17             MR. CALLAHAN:  The government would like to move those

18   into evidence as well as the uncontested exhibits in the

19   exhibit binder, Exhibits 1 to 21, with the exception of at this

20   point, with the exception of the October 2, 2013 letter, which

21   is Exhibit 12.  I think that's the letter that you were talking

22   about earlier, your Honor.

23             THE COURT:  I allow that.

24             (Exhibits 1-11 and 13-20 received in evidence.)

25             MR. SCHNEIDER:  And I have no objection insofar as

1     they go to the expert's testimony under Rule 702, but in terms

2     of the actual substantive admissibility of these other

3     documents, I would object.

4          MR. CALLAHAN:  And, your Honor, before we came in, we

5     agreed those would be stipulated to.  It wasn't until your

6     comment about the Federal Rules of Evidence applying.

7     Mr. Schneider agreed because he specifically objected to the

8     call, and he specifically objected to the October 1 letter that

9     he would not agree to.

10         THE COURT:  Is this a new position?

11         MR. CALLAHAN:  This is a new position based on what we

12    discussed this morning because he said -- if I could just

13    finish, your Honor -- he said the only two he was going to

14    object to was the October 1, 2013 letter from the inmate and

15    the call.  And I asked him what his grounds were for the

16    letter.  He said hearsay.  I asked him what the grounds were

17    for the call, and he said he was going to get back to me and

18    tell me about it.  But as to the others, we agreed, and that's

19    why we went ahead and put stickers on them, your Honor.  It

20    wasn't for identification purposes.  It was because they were

21    stipulated and they would be admitted.  And I agreed that he

22    could admit the --

23         THE COURT:  I actually thought I already admitted

24    them.

25         MR. CALLAHAN:  I just want to be clear.

1          THE COURT:  So I don't have time because I have a

2     twelve o'clock call.  You should confer.  But that is creating

3     a big issue.  If they didn't expect it, then I need to let them

4     come in and bring on witnesses, or decide whether I take them

5     in as public records or business records, these incident

6     reports.

7          MR. SCHNEIDER:  Well, your Honor, if I may, at the

8     very beginning of the hearing, all I said was that I had no

9     objection under Rule 702.  These are things that clearly the

10    expert uses, the basis for --

11         THE COURT:  I didn't hear that.  I heard that with

12    respect -- but the truth is that I've got to go upstairs right

13    this minute.  You should confer.  But then I'm going to have to

14    go through an elaborate briefing process as to whether they

15    qualify as public records, business records, whether I let him

16    bring in individual people who made the reports.  It complicates

17    things.  It complicates things.

18         So we will be back at -- why don't we take our lunch

19    break now, actually, and then we'll come back at 1:00.  We can

20    go till 3:00.  I'm assuming you'll finish the cross by 3:00.  I

21    don't know if I'm going to get to your doctor today.  We have a

22    couple of scheduling conferences, and then we can go back on

23    the record around 3:00.  In other words, around 3:15 you can

24    take a break, I can put him on, or we can defer it until we

25    figure out the *Daubert* issue.  So think about that, all right?

1          MR. CALLAHAN:  Thank you, your Honor.

2          THE COURT:  I mean, I've got just a few little minor

3    things this afternoon, so I'm planning to go till 5:00 with you

4    all.  I'm not sure we'll finish.  All right, thank you.

5          MR. CALLAHAN:  Thank you, your Honor.

6          (Noon Recess, 11:59 a.m.)

7          (Resumed, 1:17 p.m.)

8          MR. SCHNEIDER:  Thank you, your Honor.

9    CROSS-EXAMINATION BY MR. SCHNEIDER:

10   Q.   Good afternoon, Dr. Channell.

11   A.   Good afternoon.

12   Q.   So Mr. Mahoney has been at Devens since August of 2012; is

13   that right?

14   A.   Yes.

15   Q.   And you're aware that during that time, he was being held

16   there while a federal charge in New Hampshire District Court

17   was pending, right?

18   A.   Correct.

19   Q.   And that was a failure-to-register charge?

20   A.   Yes.

21   Q.   A nonviolent felony?

22   A.   Yes.

23   Q.   A nonviolent felony?

24   A.   Yes.

25   Q.   And you're also aware that that charge was just dismissed

1   in March of this year, just a few months ago?

2   A.    Yes.

3   Q.    And so he's only being held now on this 4246 matter?

4   A.    That's correct.

5   Q.    You're also aware that Mr. Mahoney was first arrested back

6   in November, 2010?

7   A.    Yes.

8   Q.    So he's been held over 43 months, right, at this point?

9   A.    Yes.

10  Q.    And that's for a charge that ultimately ended up being

11  dismissed?

12  A.    My understanding was, the charge was dismissed after he

13  was found not competent, not restorable, but, yes, the charge

14  was dismissed.

15  Q.    The charge was dismissed?

16  A.    Correct.

17  Q.    Now, you testified that since Mr. Mahoney has been at

18  Devens, that you've seen him approximately ten times; is that

19  right?

20  A.    That's correct.

21  Q.    For a total of what you estimated to be about seven hours?

22  A.    Yes.

23  Q.    So since August of 2012, about two years, you've seen

24  Mr. Mahoney only a total of seven hours that entire time?

25  A.    Formal contacts where we would have sat down in an office

1  together, yes.

2  Q.   Now, you've written several reports in this case, some of

3  which were referred to this morning, right?

4  A.   Yes.  I've written three reports, two in relation to the

5  46 issue and one in relation to the competency issue.

6  Q.   So the competency one was January 16, 2013, and that was

7  about the non-restorability issue?

8  A.   Correct.

9  Q.   And the 5/9 or 5/30 -- by the way, is there a difference

10  between the two reports because I've seen that one seems to be

11  labeled 5/9/2013 and the other is 5/30/2013?  Is there a

12  difference in those two reports?

13  A.   The initial 46 paperwork?

14  Q.   Correct, yes.

15  A.   Well, the initial 46 was ordered by the court in

16  New Hampshire.  It was ordered after the judge ruled that he

17  was not competent and not responsible.  So the initial report

18  was the one submitted to the judge in New Hampshire.  Because

19  we offered the opinion that Mr. Mahoney wouldn't meet criteria

20  for civil commitment, we have to file the report within the

21  jurisdiction where he's currently housed, which was

22  Massachusetts.  It's the same report.  It's basically, one was

23  filed initially with the court in New Hampshire, and then when

24  we filed the certificate here in Massachusetts, we filed the

25  second report.

1    Q.    I see.  So you essentially have the one report essentially

2    of May, 2013?

3    A.    Yes.

4    Q.    And the second report of December 13, 2013?

5    A.    Correct.

6    Q.    And that was your updated addendum?

7    A.    Yes.

8    Q.    And that's the most recent report that you filed in this

9    thing?

10   A.    That's correct.

11   Q.    So you haven't updated that report?

12   A.    No.  There have been no requests.  That was a request that

13   I believe was from the U.S. Attorney's Office that we provide

14   an addendum to the report.

15   Q.    So the last report that you filed in this thing is over

16   six months old at this point; is that fair to say?

17   A.    Close to that, yes.

18         THE COURT:  And have you checked to see whether or not

19   anything has changed in the intervening six months?

20         THE WITNESS:  I've reviewed all of his medical records

21   and any incidents which have occurred during those six months,

22   yes.

23         THE COURT:  And has anything materially changed your

24   diagnosis?

25         THE WITNESS:  No.

1      THE COURT:  Is he using any other drugs, or is it

2  still the Seroquel and the Klonopin?

3      THE WITNESS:  It's still the Seroquel and Klonopin.

4  Q.   And you've written the May and the December reports

5  basically to support your conclusion that Mr. Mahoney is

6  dangerous under Section 4246?  That's the purpose of those

7  reports?

8  A.   Yes.

9  Q.   By the way, when you see inmates like Mr. Mahoney in your

10 capacity of evaluating or testing, how many inmates are you

11 handling at any one time?

12 A.   Well, there are approximately, you know -- I'm not really

13 sure how to answer the question with regard to how many inmates

14 I'm handling.  I carry a fairly small forensic case load of

15 studies for competency and criminal responsibility, so I may

16 have ten of those cases at any given time.  And then we have

17 approximately sixty civilly committed guys.  My only role with

18 regard to them is reviewing their cases and interviewing them

19 for risk panel, and that happens over the course of a year.  We

20 meet every two weeks, so it's spread out over that period of

21 time.  I'm not sure if that answers your question or not.

22 Q.   Sure.  So over the course of a year, you do have to review

23 the case files of at least sixty inmates?

24 A.   Yes.

25 Q.   By the way, with respect to Mr. Mahoney, at what point in

1    your evaluation of Mr. Mahoney did you decide that he was

2    dangerous under Section 4246?

3    A.   It would have been after the court in New Hampshire

4    ordered the evaluation for a 4246, pursuant to 4246.

5    Q.   Did you have a feeling which way you were going to end up

6    on that before you proceeded to do that examination?

7    A.   No.  I hadn't really focused much on his violence history

8    at that point other than to report what I had available in the

9    records.  But that wasn't a referral issue, so at that point I

10   was primarily focused on the issue of competency.  I was aware

11   of a number of things that he had done and statements that he

12   had made, but I hadn't arrived at any type of opinion with

13   regard to --

14   Q.   Now, the prosecutor asked you this morning about a

15   statement I made in opening statements suggesting that Devens

16   can be a scary and dangerous place.  Remember that?

17   A.   Yes.

18   Q.   It's fair to say -- first of all, there's a general

19   population there, right?

20   A.   There's a small general population.

21   Q.   How large is the general population?

22   A.   A couple hundred inmates.  We have over a thousand there,

23   but I couldn't say exactly.

24   Q.   You have over a thousand --

25   A.   Inmates.

1    Q.    -- inmates?

2    A.    In general.

3    Q.    In general?

4    A.    That would include medical, psychology, mental health, and

5    there's also a sex offender management treatment program there.

6    Q.    So in the general population, I take it that occasionally

7    there are arguments and fights?

8    A.    Well, occasionally there are arguments and fights in all

9    of the populations there.

10   Q.    It's true of all prisons, right?

11   A.    Yes.

12   Q.    And there are disciplinary proceedings and there are

13   lockdowns and all that sort of stuff, right?

14   A.    We haven't had a lockdown in the almost ten years that

15   I've been there.

16   Q.    You haven't had any calls out where you've had to sort of

17   secure the facility and everyone had to stay in place while

18   some fight or other matter was being resolved?

19   A.    We've had those instances.  Those aren't lockdowns.

20   Lockdown would be a prolonged period of time where the

21   institution would be locked down basically.

22   Q.    The kind of incident I referred to, what would you call

23   it?

24   A.    Those would be called basically staff assistance, body

25   alarms.  They typically last, you know, fifteen minutes, half

1    an hour until it's resolved.

2    Q.   And how many times a week do they occur?

3    A.   Once or twice maybe, some weeks not at all, some weeks

4    more.  You know, I couldn't say.  It's not consistent.

5    Q.   Now, in the general population at Devens, there's a

6    mixture of both inmates who have been sentenced as well as

7    detainees awaiting trial; is that right?

8    A.   Yes.  The detainees awaiting trial would be the forensic

9    studies, but, yes, we have pretrial inmates and sentenced

10   inmates.

11   Q.   And many of them are actually housed together, correct?

12   A.   The inmate has the choice to either be housed with

13   convicted inmates or not; but if they state that they are okay

14   with that, they are housed together, yes.

15   Q.   So the inmate gets to choose whether they want someone who

16   has been convicted of a crime?

17   A.   If they're willing to be housed with convicted inmates,

18   yes.

19   Q.   And some actually choose that?

20   A.   Yes.

21   Q.   Are you aware whether Mr. Mahoney has actually been housed

22   with a sentenced inmate with convictions on his record for

23   homicide, for example?  Are you aware of that?

24   A.   I don't know if he's been housed with an inmate with a

25   conviction for homicide or not.  I know that he has been housed

1    with convicted inmates.

2    Q.    Are you aware that he has been housed with people that he

3    hasn't felt completely comfortable with?

4    A.    I'm sure he has, yes.

5    Q.    And when you're in an institution in Mr. Mahoney's

6    situation and the correction officers give you orders, you have

7    to obey them, right?

8    A.    Well, clearly you don't have to obey them because there

9    has been a number of instances where he's failed to obey them.

10   Q.    But if you don't obey them, then there are consequences

11   typically?

12   A.    Absolutely.

13   Q.    And the staff, too, can issue orders, right?

14   A.    Staff can issue orders?

15   Q.    Yes, the psychological staff, the psychiatry staff can

16   issue orders to inmates?

17   A.    Sure.

18   Q.    And the nurses?

19   A.    Sure.

20   Q.    And the inmates have to obey?

21   A.    Well, if they don't obey, there are consequences.  It's

22   their choice whether or not they obey.

23   Q.    Certainly, but it's a highly regimented setting?

24   A.    It's a controlled environment, yes.

25   Q.    When they tell you to take your medications, you take your

1    medications?

2    A.    Well, no.  I mean, we don't -- unless an inmate is court

3    ordered to take their medication, there's not a consequence if

4    they don't take their medication.

5    Q.    Yes, but isn't there a certain time of day when the nurse

6    has the medication cart and the inmates --

7    A.    Yes.  They have pill line when they're expected to show

8    up.

9    Q.    They can't just show up anytime they want to?

10   A.    No, they can't.

11   Q.    And there are specific periods when they have to decide

12   when to eat and when to shower, right?

13   A.    Uhm, primarily eating.  I mean, they have a lot more

14   freedom about when they're going to shower, but eating is a

15   very structured time.

16   Q.    These aren't the comforts of home or even a residential

17   home when you're at Devens, right?

18   A.    No.  It's a prison.

19         THE COURT:  I get that point.

20   A.    It's a psychiatric hospital within a prison.

21   Q.    Right.  And in addition to the general population, very

22   briefly, there's a segregated housing unit or a special housing

23   unit, a SHU?

24   A.    We have two special housing units.

25   Q.    And when you're in one of the special housing units,

1   you're in a cell with a metal door and a slit for food, right?

2   A.   Yes.

3   Q.   And you're alone 23 hours, 23-hour lock down?

4   A.   Yes.

5   Q.   And you have an open shower and toilet in your cell?

6   A.   Yes.

7   Q.   And so when guards come by, they can see you doing

8   whatever you're doing at the time?

9   A.   Yes.

10   Q.   And you're aware that Mr. Mahoney has been in the SHU for

11   a period of time?

12   A.   Certainly, yes.

13   Q.   And you're aware that Mr. Mahoney and you testified that

14   Mr. Mahoney was on suicide watch for a number of days?

15   A.   That's correct, earlier this year.

16   Q.   In suicide watch, the inmates are just given blankets and

17   ponchos?

18   A.   Some of them, yes.

19   Q.   They're specifically not given any clothing?

20   A.   That's decided on a case-by-case basis.

21   Q.   Well, are you aware that when Mr. Mahoney was on suicide

22   watch, he didn't have any clothing?

23   A.   I am, yes.

24        THE COURT:  When was he in suicide watch?

25        THE WITNESS:  That was in January of this year.

1          THE COURT:  For what?  What triggered that?

2          THE WITNESS:  What he indicated had triggered it was

3     that he was upset over a continuance in this legal matter.

4          THE COURT:  In this?

5          THE WITNESS:  That his hearing date had been

6     postponed, I believe.  And then as he was on suicide watch, he

7     wanted a legal call, and as I testified this morning, he was

8     demanding that.  He actually refused to eat for several days,

9     stating that he wouldn't eat until he got what he was requesting.

10    Q.   If I may, but in general, Mr. Mahoney has not complained

11    of suicidal ideation or homicidal ideation since he's been at

12    Devens; is that fair to say?

13    A.   He's never made any statements that I'm aware of to

14    indicate he was suicidal prior to that or since.

15    Q.   Now, would you agree with the notion that incarceration,

16    and especially isolation, can sometimes aggravate a mental

17    condition?

18    A.   Yes.

19    Q.   And can it aggravate someone suffering from bipolar

20    disorder?

21    A.   Yes.

22    Q.   Now, your diagnosis of Mr. Mahoney is that he now suffers

23    from Bipolar Disorder I?

24    A.   Yes.

25    Q.   And the previous diagnoses of Dr. Mart and Dr. Kissin were

1    that he was suffering from Bipolar II?

2    A.   Dr. Mart diagnosed him with bipolar disorder not otherwise

3    specified.

4    Q.   Not otherwise specified.  And the main difference, as you

5    testified to the Court, is that Bipolar I means that the

6    subject has had a full-blown manic episode?

7    A.   Yes, at any point during their life.

8    Q.   And at any point, once they've had that full-blown manic

9    episode, they're Bipolar I forever after?

10   A.   Yes.

11   Q.   And the fact is, his first diagnosis of Bipolar I came

12   only after he had been at Devens for a substantial period of

13   time?

14   A.   I believe that's correct, yes.

15   Q.   Now, you testified a little bit about the question of

16   insight.  You are aware that Mr. Mahoney is fully aware that he

17   suffers from bipolar disorder?

18   A.   He's aware that that's his diagnosis, yes.

19   Q.   And he's aware that he needs to take some medications to

20   keep him at least somewhat stable, right?

21   A.   Yes.

22   Q.   Now, with respect to generally the diagnosis of bipolar

23   disorder, many Americans live with it, I take it, without

24   hospitalization?

25   A.   Yes.

1    Q.   And without being in any residential setting, secured

2    residential setting?

3    A.   Yes.  I mean, the medications for bipolar disorder are for

4    the most part fairly successful with regard to treating

5    symptoms, and as long as individuals are compliant, the vast

6    majority of them are able to function well in the community.

7         THE COURT:  So would your prediction be, if he

8    followed the recommendation, say, of lithium, or whatever group

9    of medications, that he'd be able to function?

10        THE WITNESS:  It's hard to say in his case because,

11   you know, I've never -- I'm not aware of a sustained period of

12   time where he's taken those medications during which we would

13   have been able to see how he responded.  I mean, there are some

14   people who are treatment-resistant and even with medication

15   continue to exhibit symptoms.  I could certainly say I think it

16   would be more likely that he would be able to function

17   adequately if he were on an appropriate medication regimen.

18   Q.   But with respect to medications, so you testified that

19   he's now on Seroquel and Klonopin?

20   A.   Yes.

21   Q.   And he has been for some time?

22   A.   Yes.

23   Q.   And he willingly takes those?

24   A.   Yes.

25   Q.   And he's actually been quite compliant since maybe as far

1   back as March of 2013?

2   A.   Yes.

3   Q.   So that's over thirteen months, right?

4   A.   Yes.

5   Q.   And you testified that while lithium is a mood stabilizer,

6   Seroquel, in addition to being an antipsychotic, is also a mood

7   stabilizer?

8   A.   Yes.

9   Q.   Now, Mr. Mahoney, you had reviewed the Avis Goodwin

10  records?

11  A.   I did, yes.

12  Q.   And you are aware that at that time -- I think you

13  testified to it -- that Mr. Mahoney was on Xanax?

14  A.   Yes.

15  Q.   And that's also an anxiolytic?

16  A.   Yes.

17  Q.   And that's something that can be for certain individuals a

18  more powerful anxiolytic than Klonopin?

19  A.   Uhm, well, again, I'm not a psychiatrist.  I would

20  disagree with that characterization.  Xanax is a very

21  short-acting anxiolytic, whereas Klonopin is a longer-acting

22  medication that requires less -- you take a single dose, for

23  example, as opposed to having to take several Xanax over a

24  period of time.  So, you know, I can't agree to that statement,

25  but, again, I may not be the best person to ask that type of

1    question either.

2    Q.   Well, different individuals react differently to different

3    anxiolytic medications, right?

4    A.   Yes.

5    Q.   And if Mr. Mahoney reported that he felt calmer and

6    quieter and he actually had a more quiescent period in his life

7    outside of the prison wall while on Xanax, would it be fair to

8    say that Xanax would have been a more effective anxiolytic than

9    the Klonopin?

10   A.   Well, during the time that I've known Mr. Mahoney, there

11   have been a number of times he's indicated he felt calm and was

12   fine and wasn't having problems, only to shortly thereafter

13   have some type of outburst where he became very agitated and

14   upset.  So I guess -- I guess I couldn't completely agree with

15   that statement.  I mean, his perception may be that he was

16   doing fine while he was on it.  That doesn't necessarily mean

17   that he was doing fine while he was on it.

18   Q.   By the way, is Xanax something that's prescribed at

19   Devens?

20   A.   No.

21   Q.   Why not?

22   A.   In fact, Klonopin is a non-formulary medication.  Those

23   medications have a high propensity for addiction and abuse, so

24   they are rarely prescribed in a correctional setting.  They

25   made a non-formulary request in Mr. Mahoney's case in order to

1    provide him the Klonopin.

2    Q.   Are they truly addictive if someone needs them for

3    therapeutic reasons?

4    A.   They're addictive regardless.  Whether or not the person

5    actually abuses them or not is another question, but an

6    individual will develop tolerance to anxiolytic medications,

7    and by definition, they are addictive.

8            THE COURT:  What does "anxiolytic" mean?

9            THE WITNESS:  They're used to treat anxiety.

10            THE COURT:  So is treating anxiety the same as

11    treating bipolar?

12            THE WITNESS:  No.  I'm not familiar with individuals

13    who have successfully been treated for bipolar disorder with an

14    anxiolytic.  It may be beneficial in addition to other

15    medications but certainly not alone.

16    Q.   You mentioned the concerns about addiction.

17    A.   Yes.

18    Q.   But bipolar is a chronic condition?

19    A.   Bipolar disorder is a chronic condition.

20    Q.   Bipolar disorder.  So Mr. Mahoney is going to live with it

21    for the rest of his life?

22    A.   Yes.

23    Q.   He's going to have to be on some sort of medications for

24    the rest of his life if he wants to control it?

25    A.   He should be on medication, yes.  Yes, that's correct.

1    Q.   And if he needs an anxiolytic, it's going to be prescribed

2    for him whether it's addictive or not?

3    A.   Yes.

4    Q.   Now, you testified a bit about lithium and that

5    essentially you tried it on him or the institution did or the

6    team did between December of 2012 and the end of January of

7    2013.

8    A.   That's correct.

9    Q.   And it was your testimony -- it's in your report -- at

10   some point toward the end of January, after being somewhat

11   compliant, Mr. Mahoney refused it?

12   A.   That's correct.

13   Q.   So you started to go into a little bit of this this

14   morning.  Lithium does have side effects?

15   A.   Yes, it does.

16   Q.   And in fact a lot of people who are started on lithium

17   complain of side effects?

18   A.   Yes.

19   Q.   And you mentioned dry mouth?

20   A.   Yes.

21   Q.   It can also cause mental confusion for some?

22   A.   Yes.

23   Q.   It can also cause nausea?

24   A.   Correct.

25   Q.   And gastrointestinal bathroom-related issues?

1  A.   Correct.

2  Q.   And it also requires very periodic blood tests to

3  calibrate the level of lithium?

4  A.   That's correct.

5  Q.   And the reason is, lithium in fact is actually potentially

6  very toxic to the kidneys?

7  A.   Correct.

8  Q.   And one of the things that's unusual about lithium is that

9  the gap between therapeutic levels and toxic levels is actually

10  quite small?

11  A.   That's a level of specificity that, you know, is just

12  beyond my scope of competence.  I couldn't say.  I know that an

13  individual certainly can become toxic on lithium, so that it is

14  recommended that they have periodic blood tests.

15  Q.   And you're not aware of that because you're a psychologist

16  and not a psychiatrist?

17  A.   That's correct.

18  Q.   Now, there are other meds that are typically used to treat

19  mood instability and bipolar disorder?

20  A.   In addition --

21  Q.   In addition to lithium?

22  A.   Yes.

23  Q.   And in addition to Seroquel?

24  A.   Yes.

25  Q.   So Mr. Mahoney willingly tried the Depakote?

1    A.    He did try Depakote.

2    Q.    And it was discontinued because he complained of a rash?

3    A.    That is correct.

4    Q.    It's not unusual for people prescribed Depakote to have a

5    rash?

6    A.    That's correct.

7    Q.    So that was an appropriate judgment on his part to

8    discontinue it?

9    A.    Yes.  His psychiatrist, if he didn't stop it himself, his

10   psychiatrist would have discontinued it.

11   Q.    Do you know whether any other substitutes for lithium have

12   been tried with respect to Mr. Mahoney?

13   A.    He did take Trileptal at one point in time.  That would

14   have been --

15              (Witness examining document.)

16   A.    -- back in 2011, but I don't really know any information

17   other than that it was prescribed.  I don't know how compliant

18   he was or what the treatment effect was.

19   Q.    Would you agree that Trileptal and other drugs might be a

20   perfectly adequate substitute for lithium?

21   A.    Sure.  I mean, I'm certainly not advocating that lithium

22   is the only approach to Mr. Mahoney.  In fact, that would be

23   outside my role to even decide what to put him on.  I just feel

24   like, my opinion is that clearly his symptoms are not being

25   adequately controlled by the current medications.

1   Q.    And Mr. Mahoney has expressed an interest in trying other

2   medications that might actually work?

3   A.    I believe he has, yes.

4   Q.    He certainly hasn't refused that?

5   A.    What his treatment provider's opinion is is that lithium

6   would be the treatment of choice, and he has not -- he has

7   refused that.

8   Q.    And as a fallback, when someone has side effects from

9   something like lithium, doesn't it make sense to try some of

10  the other available alternatives?

11  A.    Yes.

12  Q.    Now, we were talking about the fact that most Americans

13  live with bipolar without hospitalization.

14  A.    Well, many people with Bipolar I disorder are hospitalized

15  at some point in time or another.  They're not necessarily

16  institutionalized, but hospitalization is not uncommon in

17  bipolar disorder.

18  Q.    And for the vast majority of their lives, they live

19  outside of an institution or hospital?

20  A.    With treatment compliance, yes, that's true.

21  Q.    Now, most persons with bipolar disorder are not psychotic?

22  A.    That's true, yes.

23  Q.    Most of them don't have command hallucinations?

24  A.    That's correct.

25  Q.    And most of them are not necessarily violent?

1    A.    That's correct.

2    Q.    Now, you reported a number of symptoms with respect to

3    bipolar disorder that you identified Mr. Mahoney as suffering

4    from.

5    A.    Yes.

6    Q.    And one of them includes loud, pressured speech?

7    A.    Yes.

8    Q.    And many people with bipolar disorder have it?

9    A.    Yes.

10   Q.    Now, you're also aware that Mr. Mahoney had a problem with

11   his left eardrum when a firecracker went off when he was

12   thirteen?

13   A.    Yes.

14   Q.    And that's made him hard of hearing?

15   A.    Yes.

16   Q.    Often people who are hard of hearing are also excessively

17   loud?

18   A.    Loud but not pressured, yes.

19   Q.    Loud?

20   A.    Yes.

21   Q.    And part of the way that Mr. Mahoney manifests this loud,

22   pressured speech is, he often blurts out things without

23   censoring his thoughts; is that fair to say?

24   A.    I don't know if -- if he has any intention of censoring

25   his thoughts or not.  I know he says many things which are

1    inappropriate.  Whether he cares enough about it to censor his

2    thoughts or not, I couldn't say.

3    Q.   Most people have those kinds of inhibitions about saying

4    things that are inappropriate?

5    A.   Yes.

6    Q.   And Mr. Mahoney tends to blurt out a lot of things?

7    A.   I guess I'm not comfortable that he blurts out things.  I

8    believe he does things -- it's a symptom of his illness that he

9    has very little impulse control and will say and do things

10   which are not only detrimental to others but to himself.

11   Q.   But he often says a lot of things that he doesn't

12   necessarily act out on?

13   A.   Again, I mean, he has said things that he doesn't act out

14   on.  I don't know that he doesn't always not act out on those

15   things, but he certainly has made threats, for example, to kill

16   people and things like that, and he has never done that.

17   Q.   And he's made threats to stab people, right?

18   A.   Yes.

19   Q.   Has he ever stabbed anyone?

20   A.   Not that I'm aware of.

21   Q.   Now, you mentioned one of the other symptoms was

22   grandiosity?

23   A.   Correct.

24   Q.   And I think in your report you refer to the fact that

25   sometimes he refers to himself as a brilliant lawyer, a smart

1    lawyer?

2    A.    Yes.

3    Q.    But when you sit down with him, you know that he's aware

4    that he doesn't have a Bar card?

5    A.    He knows he doesn't have a Bar card, yes.

6    Q.    And he knows that he's not really a lawyer?

7    A.    Yes, he knows he's not really a lawyer.

8    Q.    So, I mean, he sometimes is exuberant and overconfident

9    about his ability.  That comes with the territory, right?

10    A.    I don't believe he's delusional about, you know, his role.

11    I believe he does believe that he knows more than most

12    attorneys do and that he's better able to do the job of an

13    attorney than most of the attorneys that he's worked with, but

14    he knows that he in fact himself is not an attorney.

15    Q.    Well, he knows quite a bit about the law?

16    A.    Well, I suppose that's a matter of opinion about how much

17    he knows about the law.

18    Q.    He spends a lot of time in the law library?

19    A.    Yes, he does.

20    Q.    He spends a lot of time researching cases?

21    A.    Yes, he does.

22    Q.    You're aware that he took a 15-week legal preparatory

23    course at Suffolk?

24    A.    Yes.

25    Q.    And he's actually quite bright?

1    A.    Yes, he is.

2    Q.    Yes.  In fact, he also attended and is just some

3    undetermined number of credits shy of an associate's degree at

4    Wentworth Institute?

5    A.    That's what he's reported.  I've never seen any actual

6    documentation about it, but, yes, that's his report.

7    Q.    Did you ever make any efforts to obtain such documentation?

8    A.    No.

9    Q.    Now, you mention in your report, and you referred to it

10   this morning, that Mr. Mahoney can perseverate on certain

11   things?

12   A.    Yes.

13   Q.    And the word "perseverate" in psychological idiom means

14   what?

15   A.    It would mean that he becomes fixated on certain topics

16   and has great difficulty or almost no ability to move on to

17   other topics, to resolve a situation and move on to something

18   else, or to recognize that that issue is resolved or no longer

19   something that they have any control over and then to focus on

20   something else.

21   Q.    And there are a number of particular issues that I'm just

22   going to try to go through very quickly that you believe that

23   you've seen evidence that Mr. Mahoney perseverates on?

24   A.    Yes.

25   Q.    So are you aware that he perseverates on the fact that his

1   photograph was posted on a New Hampshire sexual offender

2   registration website for all the public to see all around the

3   world that said that he had committed aggravated, felonious

4   sexual assault?

5   A.   That's his report.  I've never actually seen that post.  I

6   don't know if it actually existed or not, but that's what he's

7   reported to me.

8   Q.   He's never shown you that document?

9   A.   No.

10  Q.   But you're aware that the only sexual offense in his

11  entire history was a 1983 assault with intent to rape charge?

12  A.   Yes.

13  Q.   So it's not true that he committed an aggravated sexual

14  assault; is that fair to say?

15  A.   I don't know if he committed one or not.  I know he wasn't

16  convicted of one.

17  Q.   Well, for legal purposes, whether he's convicted of one is

18  what counts here, right?

19  A.   The question was whether or not he had committed one.  I'm

20  simply saying that I'm not aware of any convictions with regard

21  to that.

22  Q.   So on occasion Mr. Mahoney has complained about being

23  labeled a sexually violent predator in at least one, if not

24  more, U.S. Marshal Service reports.  Are you aware of that?

25  A.   No.  That I'm not aware of.

 1          MR. SCHNEIDER:  May I approach the witness, your

 2  Honor?

 3          THE COURT:  Has anyone ever found the underlying

 4  documents for that 1983 conviction?  Have you?

 5          MR. CALLAHAN:  There's some evidence that exists, your

 6  Honor, but it's very challenging to find.  We've been --

 7          MR. SCHNEIDER:  I found us a copy of the indictment,

 8  your Honor.

 9          THE COURT:  Is it one of these barebones "tracks the

10  statute" kind of things?

11          MR. SCHNEIDER:  I think pretty much so, although off

12  the record, for the purpose of this, I guess what I would say

13  is that it does make clear it was an assault with intent rape,

14  and it was not an attempted rape, or which the U.S. Pretrial

15  Services report indicates that it was a rape attempted, and

16  it's not that.  It's an assault/intent to rape, unconsummated,

17  a threat, someone that he just had known previously and

18  eventually ended, and that was it.

19          THE COURT:  But we don't know what happened other than

20  that he pled guilty to whatever those elements are?

21          MR. CALLAHAN:  There was a jury trial, your Honor.

22          THE COURT:  Oh, it was a jury trial.

23          MR. SCHNEIDER:  It was a jury trial, yes.

24          THE COURT:  And we can't get the transcript of that?

25  The transcript doesn't exist?  Was there an appeal?

1        MR. CALLAHAN:  I don't know the answer to that, your

2    Honor.

3    Q.    So looking at that document that I just showed you, that's

4    a U.S. Marshal's Form 129?

5    A.    Yes.

6    Q.    That's an Individual Custody Detention Report?

7    A.    Yes.

8    Q.    And if you go down to "Special cautions and medical

9    remarks," about two-thirds of the way down the page, it does in

10   fact say that Mr. Mahoney is a sexually violent predator?

11   A.    That's what it says, yes.

12   Q.    But, to your knowledge, and with your expertise, it's fair

13   to say that one 1983 assault with intent to rape does not make

14   a person a sexually violent predator?

15   A.    He's never been civilly committed as a sexually violent

16   predator, and I didn't do an evaluation to determine whether or

17   not he was a sexually violent predator.

18   Q.    And you have no basis for even coming close to that

19   conclusion that he's a sexually violent predator?

20   A.    I wouldn't agree that there's no basis.

21   Q.    What's the basis?

22   A.    I don't have an opinion.

23   Q.    What's the basis?

24   A.    He has a violent sexual offense on his record.

25   Q.    And what year was that?

1   A.   1983.

2   Q.   And that was when he was 24 years old?

3   A.   Yes.

4   Q.   And he's now 55?

5   A.   That's correct.

6   Q.   And he hasn't had a single sexual reoffense since then?

7   A.   That's correct.

8   Q.   So have you done 4248 sexual offense evaluations?

9   A.   Yes, I have.

10  Q.   Would a single offense over 30 years ago typically trigger

11  an evaluation for being a violent sexual predator?

12  A.   It may trigger an evaluation.  It would rarely result in a

13  civil commitment.

14  Q.   So that's something that Mr. Mahoney has expressed his

15  concerns about, are you aware of that, the fact that he's been

16  labeled as a sexual offender or a violent predator?

17  A.   This is the first I have -- you know, he's made many

18  statements to me about the assault to rape charge over the

19  years.  This is the first time I recall seeing or hearing about

20  the sexually violent predator statement.

21  Q.   Now, another thing that has disturbed Mr. Mahoney is an

22  item in the February 4, 2011 Pretrial Service Report, which

23  indicated that when he was first arrested on the New Hampshire

24  District Court charge, that a Taser was used against him?

25  A.   Correct.

1  Q.   And you're aware from speaking with him, at least, that he

2  has reported that he didn't resist that arrest and that a Taser

3  was never in fact fired at him?

4  A.   Yes.

5  Q.   And you've never seen any evidence to suggest that it has

6  been?

7  A.   No.  I haven't seen anything other than that statement

8  with regard to that.

9  Q.   Now, Mr. Mahoney has also expressed concerns about the

10  fact that he is required to register as a sexual offender, a

11  sex offender?

12  A.   Yes.

13  Q.   And you're aware that, again, the 1983 case was the only

14  sex offense on his entire record?

15  A.   It's the only conviction, yes.

16  Q.   And the only other one was something of which he was

17  acquitted?

18  A.   Correct.

19  Q.   By a jury?

20  A.   Yes.

21  Q.   That the first Megan's Law in the country was 1993, ten

22  years after that, you're aware of that, requiring registration?

23  And that the federal law nicknamed SORNA wasn't enacted until

24  2006?

25          MR. CALLAHAN:  Your Honor, I would object.  It's just

1  beyond the scope.  He's not here to talk about the Sex Offender

2  Registry or when the laws were enacted.

3        THE COURT:  Yes, sustained.

4  Q.   So there are a number of things that Mr. Mahoney

5  perseverates about that you can see might actually be the basis

6  for someone being concerned that they've been falsely accused

7  of something that's not quite true?

8  A.   I would state that being concerned and perseverating are

9  separate issues, but, yes, obviously those are issues that

10  someone should be concerned about.

11  Q.   Now, you mentioned this morning that there were a number

12  of -- and it's in your report -- a number of Bureau of Prisons

13  house of correction incident reports?

14  A.   Yes.

15  Q.   And some of them involved some incredibly minor things?

16  A.   The ones that I discussed this morning -- I suppose I

17  would ask if you could be more specific.

18  Q.   You're aware that there are some reports for things like

19  theft of food trays?

20  A.   Yes.

21  Q.   He wanted an extra food tray one day?

22  A.   Right, yes.

23  Q.   That there's insolence and insubordination to officers and

24  nurses?

25  A.   Insolence can be a minor thing, or it can be a more

1    significant issue, so, you know, I don't know that I would

2    characterize that as a terribly minor issue.

3    Q.    But, of course, all of these things that occurred were

4    things that occurred in prison settings?

5    A.    It occurred in a correctional setting.  Those weren't

6    prisons.  Those were pretrial detainee facilities.

7    Q.    And in some cases, some of these incidents occurred where

8    sentenced inmates and detainees are actually housed together?

9    A.    Correct.

10   Q.    Now, you also testified to a couple of incidents, March 5,

11   2012, August 8, 2012, that involved some very aggressive

12   language or what were taken to be and found to be threats?

13   A.    I'm just looking at what those were.

14         (Witness examining document.)

15   A.    Correct, yes.  In March, 2012, he threatened to "beat the

16   shit out of a correctional officer," quote/unquote.  And what

17   was the other date?

18   Q.    August 8, 2012, the TV channel incident.

19   A.    Yes.  That was a situation with the another inmate over

20   the TV.

21   Q.    And in those two instances, there were threats made or

22   there were statements made, but nothing ever came of it, no

23   physical violence?

24   A.    There was no physical violence in relation to those

25   specific threats, no.

1   Q.   Now, you did testify also about a couple of specific

2   physical confrontations this morning?

3   A.   Yes.

4   Q.   The March 3, 2012 incident in Cheshire?

5   A.   Correct.

6   Q.   In which there were some blows exchanged with a couple of

7   inmates?

8   A.   I don't believe there were blows exchanged.  I think

9   Mr. Mahoney -- the way I read the incident was, he struck both

10  of those individuals unprovoked, and there was no retaliation

11  on their part.

12  Q.   Well, doesn't the report in fact say that --

13         THE COURT:  Which tab are we at now?

14         MR. SCHNEIDER:  So the problem is that I have it --

15         MR. CALLAHAN:  Tab 5.  Your Honor, if I may, could I

16  give the witness the binder?

17         THE COURT:  Yes.

18         MR. SCHNEIDER:  I just got the exhibit binder with

19  numbers this morning, so I'm operating off a different --

20         THE COURT:  Can I ask you this, Mr. Schneider:  How

21  long do you think you're going to be in your totality?

22         MR. SCHNEIDER:  I am really bad at estimating

23  cross-examination, but I would think another hour and a half,

24  maybe two.  An hour and a half, an hour.

25         THE COURT:  I'm just simply saying, we have, which is

```
 1   fine, take whatever you need, but I'm wondering whether -- it's

 2   up to you.  I just don't think we're going to get to your

 3   doctor today.

 4            MR. SCHNEIDER:  Right, yes, I think that's right.

 5            THE COURT:  Because those hearings in between --

 6            MR. SCHNEIDER:  Yes.

 7            THE COURT:  If he's allocated the day anyway, that's

 8   fine, and you want him to sit here.  I know I'm paying for it.

 9   So there it is, but I don't know if he -- he could probably

10   leave.  We're probably not going to get to him.

11            MR. SCHNEIDER:  I guess since -- I mean, I did want

12   him to hear the testimony, but he's heard the direct, so maybe

13   if he does have any other matters, I'll leave it to

14   Dr. Kriegman.

15            DR. KRIEGMAN:  When do you want me to come back?

16            THE COURT:  Well, that's going to be a big issue.

17   Possibly tomorrow.  No?

18            THE WITNESS:  I have two civil commitment proceedings

19   in the morning that I can't reschedule.

20            (Discussion between the Court and Clerk.)

21            THE COURT:  Monday morning?

22            MR. SCHNEIDER:  I'm going to be in Baltimore this

23   weekend, and --

24            THE COURT:  Then I don't know.  I'd have to flag it

25   through.  I'm busy for the rest of the week.
```

 1          MR. SCHNEIDER:  Monday morning is a possibility.

 2          THE WITNESS:  I'm not available.

 3          THE COURT:  No, you'll be done.  I'm not worried about

 4     you.  You're being finished today.

 5          (Discussion between the Court and Clerk.)

 6          THE COURT:  We have a Rule 11 at 10:30 which will not

 7     be very long.  We could do it tomorrow morning, since he'll be

 8     done.  Alternatively, we could probably do it Monday morning.

 9          DR. KRIEGMAN:  Tomorrow is better for me.

10          MR. SCHNEIDER:  You want to do it tomorrow?

11          THE COURT:  Well, or we can get back.

12          (Discussion off the record between attorneys.)

13          MR. SCHNEIDER:  I think the Monday would be better.  I

14     actually booked up about five, six phone calls of cases I've

15     been leaving to the side for this.

16          THE COURT:  Well, are you available Monday morning,

17     Dr. Kriegman?

18          DR. KRIEGMAN:  I'm supposed to baby-sit for my

19     grandchildren.

20          THE COURT:  Bring them.  How about -- let me just --

21     or you can try and move this along, and we could at least get

22     through his direct.  I don't see any way of finishing him

23     anyway, but it's a question of how much time --

24          MR. SCHNEIDER:  I think I'd rather put it off

25     altogether because I'm probably going to have some redirect as

1    well.

2           THE COURT:  Redirect?  Oh, of him.

3           MR. SCHNEIDER:  Of Dr. Kriegman.  I don't know if

4    there will be any recross of Dr. Channell.

5           THE COURT:  All right, can I see you all at sidebar.

6    You can stand and stretch for a minute because we do have to

7    figure out this scheduling thing.

8    SIDEBAR CONFERENCE:

9           THE COURT:  We could do it the 9th.

10          THE CLERK:  In the morning.  I could move it.

11          THE COURT:  Possibly even in the afternoon, right?

12          THE CLERK:  What time are you leaving?  Your flight

13   isn't until the 6th.

14          THE COURT:  I'm here all day on the 9th.

15          MR. CALLAHAN:  I could do that, your Honor.

16          THE COURT:  Listen, I could possibly -- here's the

17   issue, okay?  I could possibly do it on Thursday.

18          THE CLERK:  Tomorrow.

19          THE COURT:  I could move things around.  I can do it

20   on Monday.  I can move things around.  After that, I'm in D.C.

21   for most of the following week.

22          MR. SCHNEIDER:  I think my preference would be Monday.

23          THE COURT:  Can your doctor do it?

24          MR. SCHNEIDER:  Yes.

25          THE COURT:  And you can do it?

1          MR. CALLAHAN:  I can do it, yes.

2          THE COURT:  And the reason I wanted to come up here at

3    sidebar is because if we don't finish, one thing that worried

4    me, it took me aback, I don't remember who moved for a

5    continuance of that hearing, but if he went into suicide watch

6    because of that --

7          THE CLERK:  Tim moved it.  I remember, I remember.

8    But it was way back.  It was when we first got the case.  The

9    case was first brought, I remember it, and we appointed it

10   right away, and then it was an issue.  Anyway --

11         MR. CALLAHAN:  There was an issue with his

12   satisfaction with Mr. Watkins.

13         MR. SCHNEIDER:  Yes, the concern about the continuance

14   and Tim Watkins was a very different thing.  He just thought

15   that -- I think my client believed that Tim had moved a court

16   date so that his family couldn't be here.

17         THE COURT:  I see, so this is --

18         MR. SCHNEIDER:  So he's perfectly on board with

19   Monday.

20         THE COURT:  Let me just put one slight warning out

21   there.  So I'm Chief Judge of this Court, and we have a

22   brand-new judge in Springfield who was confirmed today.  I

23   think the swearing-in is going to be somewhere in here.

24   There's an off chance it could be here.  So I'll just have to

25   let you know.

1            MR. SCHNEIDER:  Okay, okay.

2            THE COURT:  Because I have to drive out to

3    Springfield.  That's not a quicky.  That's -- okay?  So I'm

4    just putting it right there, so I'm trying to juggle all this,

5    and I'm in D.C.

6            MR. SCHNEIDER:  What time would --

7            THE COURT:  So I'd like to do it and just try and give

8    you most of the day on the 9th, and we will play around with

9    some of these other things going on.  Okay?

10           MR. SCHNEIDER:  Could I just maybe ask that we

11   start -- would it work for your Honor to start at 10:00?  I'm

12   just going to be spending the weekend doing crazy traveling.

13           THE COURT:  Well, let me just put it this way:  That's

14   okay with me.  You're in control.  I just got a little unnerved

15   when I heard that he went into a tailspin.

16           MR. SCHNEIDER:  No, that was a very specific incident,

17   not something --

18           THE COURT:  All right, so we'll shoot for ten o'clock.

19           THE CLERK:  Ten on Monday?

20           MR. CALLAHAN:  Thank you, your Honor.

21           (End of sidebar conference.)

22           THE COURT:  Dr. Kriegman, good-bye.  See you Monday

23   morning.  Bring the kids.

24           Don't worry, you don't have to come back on the 9th.

25   We're finishing you today.  That part I will make sure happens.

1  BY MR. SCHNEIDER:

2  Q.   So, again, you had testified this morning about a couple

3  of physical confrontations while Mr. Mahoney was in the Bureau

4  of Prisons or in Cheshire?

5  A.   That's correct, yes.

6  Q.   You testified about the March 3, 2012 incident?

7  A.   Yes.

8  Q.   And you also testified about the January 20, 2013

9  incident?

10  A.   Yes.

11  Q.   Right?  The first one was the one where he supposedly hit

12  one or two inmates, and you just testified that there was no

13  retaliation?

14  A.   Well, that was incorrect.  He assaulted one inmate without

15  retaliation, and the other inmate did retaliate.

16  Q.   The other inmate hit him over the head with a chair?

17  A.   He threw a chair at him and struck him.

18         THE COURT:  He hit one without --

19         THE WITNESS:  Without provocation, yes.

20         THE COURT:  I see.  And then the other one retaliated?

21         THE WITNESS:  Correct.

22  Q.   And how do you know it was without provocation?

23  A.   There was nothing in the incident report to indicate that

24  the -- the other individual was simply standing there at the

25  pill line, and Mr. Mahoney was upset with the nurse, and the

1   other individual had nothing to do with his interaction with

2   the nurse, based on the incident report.

3   Q.   Are you aware from your medication charts and everything

4   else that that was the period where Mr. Mahoney was just being

5   put back onto Klonopin?

6   A.   Yes, I am aware of that.

7   Q.   And this confrontation started over a verbal discussion

8   with the nurse who was giving Mr. Mahoney his meds?

9   A.   Correct.

10   Q.   And you were aware that these other inmates kind of

11   intervened in that conversation and said, "Just listen to the

12   nurse"?  Are you aware of that?

13   A.   No, I'm not aware of that.

14   Q.   Have you ever talked about what actually occurred with

15   Mr. Mahoney?

16   A.   I've talked with Mr. Mahoney about it, yes.

17   Q.   So you're aware that he was outnumbered in this situation

18   two to one by these other guys?

19   A.   I'm aware of what Mr. Mahoney has described as being the

20   actual incident.  I don't know if that's actually the case or

21   not.

22   Q.   And he's described one of them as being a big guy?

23   A.   He never made that specific statement to me.

24   Q.   Well, did he ever tell you that Mr. Crivera was

25   six-foot-three?

1    A.    No.

2    Q.    And were you aware that these two guys, after intervening

3    in this discussion with the nurse, called him a sexual offender?

4    A.    No.

5    Q.    Now, no one was hospitalized as a result of that incident,

6    right?

7    A.    Not that I'm aware of.

8    Q.    Now, you also referred to the January 20, 2013 incident in

9    the dish service area at Devens?

10   A.    Yes.

11   Q.    And you've spoken to Mr. Mahoney about that incident?

12   A.    Yes.

13   Q.    And you're aware that Mr. Mahoney reported that the other

14   inmate, Mr. Dunston, before they engaged in a verbal

15   altercation, bumped him and was getting bossy and telling him

16   stuff to do?

17   A.    I don't recall that specifically.  I'm not stating that he

18   didn't tell me that, but I don't recall that information.

19   Q.    Now, at the time of the January 20, 2013 incident, you're

20   aware that that was reported to have been early in the morning?

21   A.    I don't recall the time of day.

22   Q.    So it's Government Exhibit 9.  So the interview occurred

23   with respect to that incident at 10:00 a.m.?

24   A.    Where are you referring to?

25   Q.    Bates No. 126.

1          (Witness examining document.)

2    A.    Yes.  That was a different day than the incident.

3    Q.    No, I'm sorry.  It's Bates No. 00126, not January 26.

4    A.    No, I understand.  The interview was --

5    Q.    Oh, it was a subsequent date, yes, that's right.  If you

6    look at Bates No. 00125 at the top, and it says that on

7    January 20, 2013, at approximately 6:45 a.m., the incident

8    starts to unfold.

9          (Witness examining document.)

10   A.    That was when he reported it, so it would have occurred at

11   some point prior to that.

12   Q.    Okay.  And you're aware that with the medication regime

13   that Mr. Mahoney is on, that he's very groggy and just a little

14   disoriented in the morning when he wakes up?

15   A.    I'm not aware of that, no.

16   Q.    Well, his prescription for Seroquel is -- I forgot what

17   the amount is, but it's HS, which means at bedtime?

18   A.    Yes.  Seroquel causes sedation.  It would be rare to take

19   it at anytime other than bedtime.

20   Q.    I see.  So sometimes people who are taking Seroquel are a

21   little woozy in the morning when they wake up?

22   A.    I suppose so, yes.

23   Q.    Now, with respect to the Dunston incident, are you aware

24   that Mr. Mahoney has reported that immediately after the

25   incident was over, he apologized to Inmate Dunston?

1    A.    I wasn't aware of that, no.

2    Q.    Now, in addition to your main bipolar disorder diagnosis,

3    you also diagnosed Mr. Mahoney as suffering from antisocial

4    personality disorder?

5    A.    Yes.

6    Q.    And you testified to some of the previous Axis II

7    diagnoses of Drs. Kissin, Mart, and a doctor at Avis Goodwin?

8    A.    Yes.

9    Q.    And it's fair to say that your diagnosis of full-blown

10   antisocial personality disorder was the first diagnosis that

11   you're aware of for that disorder?

12   A.    Yes, the actual disorder, that's correct.

13   Q.    And was the first time that you put that diagnosis of

14   full-blown antisocial personality disorder down in one of your

15   reports in 2013?

16   A.    I don't recall exactly when I listed that diagnosis, if it

17   was at the time of the competency evaluation or the 46

18   evaluation.

19   Q.    But you're aware that the 4246 evaluation, something like

20   a diagnosis of antisocial personality disorder is something

21   that might encourage a court to find someone dangerous?

22   A.    No.  Typically personality disorders are not a sufficient

23   basis for civil commitment.  An individual would have to be

24   suffering from a major mental illness as opposed to a

25   personality disorder.  So, no, I'm not aware of that.

1   Q.   And related to that, in a case like this, really, the

2   Court has to find that Mr. Mahoney's bipolar disorder is linked

3   causally to the substantial risk of causing bodily injury to

4   another or serious damage to property; is that fair to say?

5   A.   Yes.

6   Q.   It's not the personality disorder; it's the Axis I

7   disorder?

8   A.   Correct.

9   Q.   That's bipolar disorder.  Now, with respect to your

10  antisocial personality disorder diagnosis, the DSM-IV-TR, which

11  is the text revised version of the DSM-IV, that's what you were

12  using when you made that diagnosis?

13  A.   I believe so.  During the first report, yes.

14  Q.   Well, if it says it in all of your 2013 reports that

15  that's what you were using, I assume that's what you were

16  using, right?

17  A.   Yes.

18  Q.   And the DSM-V only came out and only became effective this

19  January?

20  A.   Uhm, no.  It was out before this January.

21  Q.   Do you remember when it was officially published?

22  A.   No.  I would have to look.

23  Q.   And I take it you haven't gone over any of your previous

24  diagnoses under the older versions, DSM-IV --

25  A.   There's been no substantial change with regard to

1  antisocial personality disorder.

2  Q.   Can you just state for the record what the significant

3  changes are in bipolar disorder from DSM-IV-TR to DSM-V.

4  A.   Well, the issue with regard to bipolar disorder, I'm not

5  aware of any significant changes with regard to the diagnostic

6  criteria for bipolar disorder based on DSM-V.

7  Q.   So it's your testimony that there are no changes in the

8  required criteria for making the diagnosis?

9  A.   It's not my testimony that there are no changes.  I'm

10  saying I can't recall there being significant changes.

11  Q.   And you haven't made a new diagnosis under DSM-V?

12  A.   No.

13  Q.   Now, in making the antisocial personality disorder

14  diagnosis, one of the things that's required, it's absolutely

15  required, is that there be conduct disorder before the age of

16  fifteen?

17  A.   No, that's not correct.

18  Q.   So your testimony is that conduct disorder is not one of

19  the required features of antisocial personality disorder?

20  A.   Yes, it is.  What's required is evidence of conduct

21  disorder, not that the individual meet actual diagnostic

22  criteria for conduct disorder.

23  Q.   So it's possible to diagnose someone as having full-blown

24  antisocial personality disorder without having full-blown

25  conduct disorder before the age of fifteen?

1   A.    Yes, it's possible.

2   Q.    That's your testimony?

3   A.    Yes, it is.

4   Q.    But, now, you're aware that Mr. Mahoney has absolutely no

5   juvenile record?

6   A.    Yes, I am.

7   Q.    Now, you rely heavily in your report and in your testimony

8   on Mr. Mahoney's criminal record?

9   A.    His criminal record is one piece of information I relied

10  on with regard to my opinion, yes.

11  Q.    And you point out in your report that from your standpoint,

12  he has a history, a lengthy history of criminal violence?

13  A.    Yes.

14  Q.    Now, you rely specifically in the History of Criminal

15  Violence section of your report on eleven convictions, and

16  you're welcome to go through your report if you want to check

17  that out.

18  A.    No.  I believe that's accurate.

19  Q.    Now, in your report of May 9, 2013, you stated that

20  Mr. Mahoney has a history of weapons-related offenses,

21  including armed robbery, assault, and two firearms offenses.

22  A.    Could you tell me what you want me to take a look at.

23  Q.    Sure.  Look at Bates No. 01689.

24        MR. CALLAHAN:  Just for the record, you're talking

25  about a report that I don't believe is before Dr. Channell.

1          MR. SCHNEIDER:  The May 9, 2013 report is not before

2     Dr. Channell?

3          MR. CALLAHAN:  Unless you've given it to him.  You're

4     talking about the May 30, 2013?

5          MR. SCHNEIDER:  Well, Dr. Channell has already

6     testified that there is no difference between the May 9 report

7     and the May 30 report.

8     A.   That report doesn't have any Bates numbers in this.  What

9     page of the report are you --

10    Q.   Well, look at -- I'm sorry, but there's no Bates numbers

11    on the government's exhibit that's been submitted, but if you

12    look at Page 18 of 18, the third full paragraph down, it says,

13    does it not, "As such, Mr. Mahoney also has a history of

14    weapon-related offenses, including armed robbery, multiple

15    counts of both assault with a dangerous weapon, assault and

16    battery with a dangerous weapon, criminal possession of loaded

17    firearms, third degree, and criminal possession of stolen

18    firearms"?

19    A.   Yes.

20    Q.   But you're aware that in fact Mr. Mahoney does not have

21    any firearms offenses listed on the Modified Pretrial Service

22    Report of February 4, 2011?

23    A.   I'd have to review the report.

24    Q.   I would ask you to do that.

25         THE COURT:  Do we have it?

1          MR. SCHNEIDER:  Is that listed in your --

2          May I approach the witness, your Honor?

3          THE COURT:  Yes.  I'd also like to see his criminal

4   history if we have a copy of it.  Great, I think we should mark

5   this as an exhibit.  This is the Pretrial Services history.

6   What's the next number?

7          THE CLERK:  22, 22.  I'll put a sticker on it.

8          (Discussion off the record.)

9          THE COURT:  I'm putting it in because it was hard for

10  me to figure out from the various reports what was a

11  conviction, what wasn't.  I think this is a Pretrial

12  Services -- I'll go with this over what else I've got in terms

13  of what the convictions are.

14         THE CLERK:  It's 22.

15         THE COURT:  Okay.

16         (Exhibit 22 received in evidence.)

17         THE COURT:  Okay, this is out of New Hampshire as of

18  February 4, 2011.

19  Q.   And you've had an opportunity to go through the record?

20  A.   Yes, I did.

21  Q.   Do you see one single firearms violation conviction there?

22  A.   No, I don't.

23  Q.   So when you said that he has a number of weapons-related

24  offenses, including armed robbery and criminal possession of

25  loaded firearms, third degree, and criminal possession of

1    stolen firearms, that's not true, right?

2    A.   Based on that Pretrial Services report, that is not true.

3    Q.   Well, based on your testimony about the documents that you

4    read, this was the only document that actually encapsulated

5    Mr. Mahoney's criminal history that you read?

6    A.   That's correct.

7    Q.   And you also mention in your May 30 report that

8    Mr. Mahoney also had armed robbery offenses on his record,

9    right?  That's also at Page 18, same paragraph.

10   A.   Yes.

11   Q.   And I ask you to go through, if you need to, this report

12   to see if there were any armed robbery convictions on

13   Mr. Mahoney's record at all.

14        (Witness examining document.)

15        MR. CALLAHAN:  Can I just object to this, your Honor,

16   as mischaracterizing what the report says.  He does list

17   offenses, and he distinguishes where there are convictions

18   within the report, but as to the --

19        THE COURT:  Well, at least for purposes of my

20   understanding it, when he says, "He also has a history of

21   weapon-related offenses" on Page 18, so I'd like to know which

22   ones are the convictions.

23        MR. CALLAHAN:  Your Honor, if you go through -- is

24   that a question to me, your Honor, or are you just asking

25   Dr. Channell?

1          THE COURT:  I don't care who, but when you go through

2     it, which ones of those are convictions, not --

3          THE WITNESS:  The weapons-related offenses that I'm

4     aware of at this point in time that are convictions are a 1977

5     offense for assault with a dangerous weapon, a knife.

6          THE COURT:  1977, I don't see that here in this

7     criminal history, so --

8          THE WITNESS:  This is based on the information that's

9     included in Dr. Kriegman's report, which I'm not exactly sure

10    where they obtained that information.

11         MR. SCHNEIDER:  For what it's worth, your Honor, I'll

12    clarify.  I made a mistake and sent -- there's been a problem

13    with the criminal records stuff.  I had obtained some Mass.

14    CORIs and sent them on to Dr. Kriegman.  So it turns out that

15    there are actually four Brian Mahoneys, two of whom I believe

16    had the same date of birth.  So I sent those two to Dr. Kriegman.

17    Dr. Kriegman I think originally when he compiled the report

18    based it on that, and then I subsequently sent him a copy of

19    the Modified Pretrial Services Report, which appears to be

20    somewhat more accurate, and it didn't contain that 1977

21    document.

22         THE COURT:  So just going through our court records,

23    which for the moment I'm going to rely on, I'm looking at it,

24    there's an assault with a dangerous weapon from Suffolk

25    Superior, which is No. 4, right?  And it looks like there was a

1    guilty.

2          MR. SCHNEIDER:  And it says the dangerous weapon is

3    pliers.

4          THE COURT:  Right, but it's one that's a dangerous

5    weapon, an assault with a dangerous weapon.  And then the

6    second one was the rape, the oral attempt issue.

7          MR. SCHNEIDER:  Which was an assault with intent to

8    rape, your Honor, if I may.

9          THE COURT:  Assault with intent, right, but it says

10   "Assault and battery with a dangerous weapon, to wit, a knife."

11   That's the one I'm talking about, No. 9, so that's a second

12   one.  And then while there are disorderlies and resistings and

13   assaults and batteries, those are the two that I'm seeing that

14   are assaults with a weapon.  Is that right?

15         THE WITNESS:  Yes.

16         THE COURT:  So I'm not seeing where all these firearms

17   are coming from, since we've got knives and pliers.  I'm not

18   saying that's fabulous, but I'm just -- so were you relying on

19   charges rather than convictions for those?

20         THE WITNESS:  No, your Honor.  At this point I'm not

21   exactly sure where the firearm statements are related -- where

22   they would have come from.

23         THE COURT:  Now, assume for me that there are two

24   assaults, one with a pliers, one with a knife, does that change

25   your risk assessment?

1           THE WITNESS:  No, it doesn't.

2    Q.   So on here you have listed not just -- you refer to

3    multiple counts of both assault with a dangerous weapon and

4    assault and battery with a dangerous weapon, but, in addition,

5    criminal possession of loaded firearms, third degree, and

6    criminal possession of stolen firearms, and armed robbery.  Do

7    you still believe that he basically has a history of

8    weapons-related offenses?

9    A.   Yes, he does have a history of weapons-related offenses.

10   Q.   Based on the fact that there were pliers allegedly

11   involved in one very old assault?

12   A.   Yes.

13   Q.   And a knife that was not in fact ever utilized, didn't

14   stab anyone, in the other incident?

15           MR. CALLAHAN:  Objection, your Honor, to the extent

16   he's representing what was used and how that was done.

17           THE COURT:  Sustained.

18   Q.   Well, you are talking about incidents that occurred over

19   thirty years ago, correct?

20   A.   Yes, but that is Mr. Mahoney's history.

21   Q.   So it's his early history?

22   A.   If that's how you'd like to characterize it, yes, it's his

23   early history.

24   Q.   Well, does the fact that an incident like that occurred

25   over 30 years ago rather than five months ago, two months ago,

1    yesterday, make a difference in your risk assessment?

2    A.    If you're asking if it changes my opinion, it does not.  I

3    mean, obviously I would be quite concerned if something like

4    that happened yesterday, but the fact that those occurred

5    thirty years ago does not change my opinion that he continues

6    to pose a substantial risk of bodily injury to others.

7    Q.    Now, this Modified Pretrial Services Report that we've

8    been looking at lists 67 charges and only 35 sets of

9    convictions?

10   A.    I don't have those numbers.  If that's the case, I

11   wouldn't dispute it.

12   Q.    I mean -- okay.

13   A.    I haven't added them.

14   Q.    If you look at the numbers before each of the convictions

15   and you look at the last page with respect to the list of

16   convictions, you'll see the number 35.  Shall we go through

17   that?

18   A.    You're asking me if we should go through that?

19   Q.    Well, it's fair to say that if number 35 on Page 01318 is

20   the last set of convictions listed, it probably means that

21   there were 35 convictions, correct?

22   A.    I'm not disputing that.  If that's the case, then that's

23   the case.

24   Q.    And if the number on Page 01320 adds up to including other

25   arrests that didn't result in convictions and it said 55, it's

1  fair to say that there would have been 55 convictions and

2  arrests?

3  A.   (No response.)

4  Q.   I'll move on.  So of the 35 convictions, when you just

5  quickly go through them, 35 were misdemeanor or district court

6  convictions?

7  A.   Again, I haven't added up how many misdemeanors or

8  district court convictions he had.  I focused on the violent

9  offenses.

10  Q.   And how many violent offenses have you identified?

11  A.   I identified -- I can tell you the number of violent

12  offenses I identified in his case:  an assault and battery with

13  a dangerous weapon for which he was convicted in 1983; an

14  assault to rape, during which he used a knife in 1983; an

15  assault and battery for which he was convicted in 1996; assault

16  and battery for which he was convicted in 1997.  Those would

17  have been the physical offenses, and then there were also

18  several threatening offenses or two threatening offenses.  One

19  threatening to kill in 1996 was a conviction; and threatening

20  bodily harm in 2003, that was a conviction; and intimidating a

21  witness in 1983, that was a conviction; and then in 2005,

22  criminal threatening, which was a conviction.

23  Q.   And, by the way, in none of these cases did you try to

24  obtain the underlying police reports?

25  A.   It wasn't that I didn't try to obtain them.  I was never

1    able to obtain any further information.  I had spoke to the

2    attorneys on these cases, but we were never able to identify

3    anything else that occurred other than what we had available.

4    Q.   So when you made the determination with respect to

5    Mr. Mahoney's history of so-called criminal violence based on

6    this report, you didn't go below the report by having in hand

7    copies of any police reports?

8    A.   As I said, I attempted to do so, but I did not have those

9    reports.

10   Q.   And you never obtained any of the indictments?

11   A.   I've never seen an indictment.

12   Q.   And you've never seen any of the applications for

13   complaint?

14   A.   No.

15   Q.   And you've never seen any transcripts?

16   A.   No.

17   Q.   Now, of the 35 convictions listed on that document, 27 of

18   them occurred before Mr. Mahoney turned age 45?

19            (Witness examining document.)

20   A.   Yes, that's correct.

21   Q.   And I take it that the literature suggests -- you're aware

22   of the fact that the literature suggests that as people age,

23   there tends to be a drop-off in recidivism?

24   A.   Yes, there is.

25   Q.   And Mr. Mahoney is now 55?

1    A.    That's correct.

2    Q.    Now, many, if not most, of the charges on Mr. Mahoney's

3    record have little to do with violence, and let me give you

4    some examples.  They're possessions of Class D, shoplifting, a

5    couple of criminal mischiefs, a disorderly, nine registration

6    and license violation related convictions.  Does that sound

7    right?

8    A.    Yes.

9    Q.    By the way, in terms of the validity of the information on

10   here, No. 6 indicates that Mr. Mahoney was convicted, possibly

11   pled guilty, to straight possession of marijuana, Class D.  Do

12   you see that?

13   A.    Yes.

14   Q.    And it indicates that on January 16, 2008, he was

15   sentenced to 20 months house of corrections, committed?

16   A.    Yes.

17   Q.    Do you have any idea whether that's even possible during

18   that period of time to have received 20 months committed on

19   straight possession of a Class D substance?

20   A.    I don't have any -- I don't have an opinion one way or the

21   other.  I don't know.

22   Q.    Now, just briefly in looking through this, if I said that

23   of the committed sentences, ten or less involved -- ten

24   involved less than commitments of 90 days?

25   A.    I don't know.  I don't recall exactly how long the

1    sentence was on the charges.

2    Q.   But there clearly are a number of sentences that are small

3    misdemeanor or district court sentences to houses of

4    correction?

5    A.   Yes.

6    Q.   And in fact, over this entire 37-year period there's, only

7    one state prison sentence?

8    A.   I believe that's correct, yes.

9    Q.   And that was the 1983 assault with intent to rape?

10   A.   Correct.

11   Q.   And Mr. Mahoney was 24 years old?

12   A.   Correct.

13   Q.   Over 30 years ago?

14   A.   That's correct.

15   Q.   So in his entire criminal history, obviously Mr. Mahoney

16   has had a number of scrapes with the law?

17   A.   Yes.

18   Q.   But as far as you know, no one was hospitalized as a

19   result of any of the altercations with Mr. Mahoney?

20   A.   I don't know one way or the other whether they were or

21   weren't.

22   Q.   As far as you know, there was never any serious injury

23   inflicted to any individual?

24   A.   As far as I know.  Again, I don't have any data on the

25   outcome to the victim at all.

1  Q.   And you have no reason to believe there was anything like

2  stabbings or shootings or anything like that committed by

3  Mr. Mahoney?

4  A.   Not based on the criminal record.  I didn't see anything

5  like that.

6  Q.   Now, you make some reference to this toward the end of

7  your report, but I take it that in assessing whether there is a

8  substantial risk of bodily injury to others or serious damage

9  to properties of others, that it's difficult to make accurate

10 predictions with respect to specific individuals?

11 A.   Yes, it is.

12 Q.   And that means that two people with a very similar profile

13 could behave quite differently?

14 A.   That's correct.

15 Q.   One with Mr. Mahoney's profile might recidivate and one

16 might not?

17 A.   It's certainly a possibility.

18 Q.   And you've acknowledged in your report that these kinds of

19 dangerousness predictions are of limited accuracy?

20 A.   Correct.

21 Q.   And that the relevant factors cannot all be known in

22 advance?

23 A.   That's right.

24 Q.   And people in your position, professional evaluators

25 looking at the same individual might come up with two different

1   opinions with respect to the same individual?

2   A.   Correct.

3   Q.   And that's happened here?

4   A.   Yes.

5   Q.   Now, you testified about three instruments that you used

6   in making your risk assessment?

7   A.   Yes.

8   Q.   The first one was the PCL-R, the Psychotherapy

9   Checklist-Revised?

10  A.   Correct.

11  Q.   And you acknowledge that that is not specifically a risk

12  assessment tool?

13  A.   Yes.

14  Q.   Its function is simply diagnostic?

15  A.   Correct.

16  Q.   To figure out whether someone fits within the criteria for

17  someone who's deemed to suffer from psychopathic personality?

18  A.   That's what the instrument was designed for, yes.

19  Q.   And the instrument itself, as we've seen, is really quite

20  a simple instrument?

21  A.   Uhm, well, I imagine that the author would argue against

22  the idea that it's a simple instrument.  It does require a good

23  deal of training in order to use it.

24  Q.   This is the author Robert Hare?

25  A.   Correct.

1    Q.    And, by the way, these are commercially available

2    instruments?

3    A.    Correct.

4    Q.    So he makes money off these things?

5    A.    Yes.

6    Q.    The instrument itself essentially has twenty questions on

7    it?

8    A.    That's correct.

9    Q.    And it's a really pretty straightforward scoring system?

10   A.    Well, like all of these instruments, it has a manual

11   that's associated with it that helps direct how to score the

12   items, correct.

13   Q.    Sure, but either you get a zero for "no," a 1 for "maybe,"

14   or a 2 for "yes"?

15   A.    That's right.

16   Q.    These aren't weighted?

17   A.    What do you mean by "weighted"?

18   Q.    So for each of the twenty items, there's no multiplier

19   before each item; you simply add up the total score?

20   A.    That's correct, yes.

21   Q.    So you get a 2 on glibness and superficial charm and a 2

22   on grandiose sense of self-worth, and that equals 4?

23   A.    That's right.

24   Q.    Now, when you do these PCL-Rs, you're the one who scores

25   the subject, correct?

1    A.    Typically, yes.  Sometimes I'll do it with an intern who's

2    in training, but generally I do it independently.

3    Q.    And this basically calls for a certain amount of judgment

4    on your part whether someone fits each of these twenty

5    criteria?

6    A.    That's correct, yes.

7    Q.    Now, you decided that Mr. Mahoney scored two points for

8    glibness, superficial charm?

9    A.    Correct.

10   Q.    Two points for pathological liar?

11   A.    Yes.

12   Q.    Two points for no remorse --

13            THE COURT:  Can you give an example of him lying?

14            THE WITNESS:  Well, as I testified this morning, his

15   characterization of how certain incidents have transpired that

16   is different than what the record would indicate; for example,

17   threatening AUSA Huftalen, for example, or asking if he's ever

18   threatened anybody and him telling me "no," he's never

19   threatened anybody, which is clearly inconsistent with his

20   record.

21   Q.    So Mr. Mahoney was scored on the MMPI-2?

22   A.    That's right.

23   Q.    And that's the Minnesota Multiphasic Personality

24   Inventory-2, correct?

25   A.    Yes.

Q.   And it's a whole bunch, hundreds of questions?

A.   Yes.  It's 567 questions.

Q.   And one of the issues that people are scaled for are essentially their honesty or whether they're malingering in answering the questions?

A.   It's -- well, first of all, I did not use the MMPI-2 as part of his risk assessment.  That was done with regard to the competency evaluation.  It doesn't measure lying.  It does measure whether or not somebody is exaggerating their mental health symptoms, but it doesn't address lying in other areas.

Q.   And in that context, there was no question that the MMPI-2 results for Mr. Mahoney indicated that he was not exaggerating or not lying about his symptoms?

A.   That's right.

Q.   You scored Mr. Mahoney two points for glibness and superficial charm.  That must be a subjective judgment.  No?

A.   That's based primarily on his glibness, being very verbally facile, basically that he will express knowledge in many areas and use technical terms and jargon when he -- in an effect to impress others.  That's glibness.  I would not argue that he has any superficial charm, but he does have a good deal of glibness.

Q.   So are all lawyers glib?

A.   Some lawyers are, yes.

Q.   You put down two points for --

1        THE COURT:  They all have superficial charm.

2        MR. SCHNEIDER:  There we go.

3  Q.    You also put down two points for criminal versatility?

4  A.    That's correct.

5  Q.    Now, at the time you scored this, did you believe that

6  Mr. Mahoney had on his record of convictions armed robbery

7  convictions and convictions for possession of firearms?

8  A.    I imagine I did, as that's what's reflected in my report,

9  yes.

10  Q.   So when you come up with these scorings, it's quite

11  possible another evaluator could score them differently than

12  you did?

13  A.    It is possible, yes.  Although the instrument does have

14  good inter-rater reliability, it's certainly possible that they

15  could score them differently.

16        THE COURT:  Let me just say this:  I have two

17  scheduling conferences at 2:30 and 2:45, and Mary Ellen has got

18  all the lawyers lined up, so this might be a good -- let me

19  know where a good place for a break is, either now or in a few

20  minutes.

21        MR. SCHNEIDER:  I'm happy to break here.  That's fine.

22        THE COURT:  Okay, so we'll take a break.  I typically

23  don't do these on the record, so Lee can take a break, and I

24  can get the civil attorneys out of here.  So why don't we take

25  a midafternoon break, and then I'll be back.

 1              MR. SCHNEIDER:  What time should we be back?

 2              THE COURT:  Like in fifteen, twenty minutes.

 3              (A recess was taken, 2:46 p.m.)

 4              (Resumed, 3:08 p.m.)

 5              THE COURT:  So hopefully you'll finish in the next --

 6    there will be some redirect probably, right?  What do you

 7    figure, an hour?

 8              MR. SCHNEIDER:  I'm hoping more like half an hour to

 9    40 minutes.  Well, maybe an hour.  I don't know.

10              THE COURT:  But we are finishing today.  I mean, I'm

11    going to start putting the pressure on.

12              MR. SCHNEIDER:  Yes, I understand.  I am kind of

13    getting through the instruments.

14              MR. CALLAHAN:  And, your Honor, before the respondent

15    comes in, we had talked about the binder, and with the

16    exception of the letter --

17              THE COURT:  You'd better not do this until he comes

18    in.

19              MR. CALLAHAN:  Okay, understood, understood.

20              (Respondent enters the courtroom.)

21              THE COURT:  Okay, Mr. Schneider.

22              MR. SCHNEIDER:  Your Honor, I did just want to make

23    one thing clear because I had some discussions with the

24    prosecutor.  So my objections with respect to the exhibits are

25    going to be focused on specifically that inmate letter, which I

```
1    think has no place being in the record, and -- is that the only
2    one?
3         THE COURT:  Right, and indeed my law clerk found a
4    case which the First Circuit resolved that actually -- we'll
5    get you the name of it, she's upstairs now -- that the Rules of
6    Evidence don't apply.  So we'll get you that.  It can be
7    briefed, but regardless of that issue, I do worry about the
8    inherent reliability of somebody whom no one has spoken to, I
9    don't know anything about.  He could be a jailhouse snitch, or
10   he could be telling truth.  I don't know.  But I'm not going to
11   rely on it.  If you want to bring him in, bring him in.
12        MR. CALLAHAN:  Understood, your Honor.  Thank you.
13        MR. SCHNEIDER:  And for the record, I would just like
14   to say, the inmate is someone who is serving a 15-year sentence
15   for an armed career criminal, and the letters on their face
16   basically say he was seeking substantial assistance.  He was
17   trying to cut a deal.
18        MR. CALLAHAN:  That is not accurate.
19        THE COURT:  Well, I made it a point not to read the
20   letter once there was an objection.
21        MR. SCHNEIDER:  Okay, okay.
22        THE COURT:  I read so much of the letter as was
23   included in the expert report.  And it certainly stood out,
24   that I'll give you, but I didn't go and read the letter once
25   you objected, so --
```

1           MR. SCHNEIDER:  Good.

2           THE COURT:  If the government wants to introduce him,

3    introduce him.

4           MR. SCHNEIDER:  And the corollary is that I'm not

5    objecting to the other items being introduced by the

6    government.  The last thing I think any of us need and

7    Mr. Mahoney needs is a delay of many months of these

8    proceedings just to get a keeper of records in to authenticate.

9    That would be kind of silly.

10          THE COURT:  Okay, all right.

11          MR. SCHNEIDER:  Are we beginning?

12   BY MR. SCHNEIDER:

13   Q.   So where we left off, Dr. Channell, was we were discussing

14   your scoring of the PCL-R, and you ultimately concluded that

15   Mr. Mahoney scored a 25 out of 40 on the instrument, right?

16   A.   Yes.

17   Q.   And that is five points below the cutoff score for

18   psychopathic personality?

19   A.   Yes.

20   Q.   And so instead you decided that you would label him not

21   suffering from psychopathic personality disorder or

22   psychopathic personality but that you would instead

23   characterize him as having psychopathic tendencies?

24   A.   Correct.

25   Q.   In none of the other psych evaluations done by Dr. Kissin

1    or Dr. Mart or anyone else at Avis Goodwin did they say he was

2    suffering from psychopathic tendencies; is that fair to say?

3    A.   That's correct.

4    Q.   And you're aware that by putting that down, it makes him

5    more likely to be found dangerous than not?

6    A.   I put that down because that's my opinion.  Whether or not

7    it has anything to do with him being more dangerous or not

8    would be up to the decision-maker.

9    Q.   But you think it might have something to do with whether

10   he's more likely to be found dangerous?

11   A.   I believe it elevates his risk, yes.  So I don't know how

12   much it has to do with him being found dangerous, but it does

13   contribute to my opinion that he would pose a danger.

14   Q.   Now, you reached that conclusion even though you

15   acknowledge that he doesn't have some of the critical

16   characteristics of someone with full -- who is a psychopathic

17   personality, correct?

18   A.   Yes.

19   Q.   So not sexually promiscuous?

20   A.   Correct.

21   Q.   No history of juvenile delinquency?

22   A.   Correct.

23   Q.   First offense in fact wasn't until age 19?

24   A.   That's right.

25   Q.   All right.  And you indicate that he's also not conning or

1   manipulative?

2   A.    That's correct.

3   Q.    And in fact, being conning and manipulative is actually

4   one of the features of someone suffering from psychopathic

5   personality?

6   A.    It's one of twenty features of somebody who's suffering

7   from psychopathic personality.

8   Q.    So, in your view, can someone be a psychopath if they're

9   not conning or manipulative?

10  A.    Certainly.

11  Q.    They can be?

12  A.    Yes.

13  Q.    Okay.  Now, it's also fair to say, though, that you've

14  also -- elsewhere in your report you describe Mr. Mahoney's

15  behavior as being impulsive and lacking in reflection and

16  forethought?

17  A.    Yes.

18  Q.    So a lot of his conduct is impulsive?

19  A.    Yes.

20  Q.    Not premeditated?

21  A.    Correct.

22  Q.    Now, let's take a quick look at your testimony about the

23  HCR-20.  That's also a fairly -- that's Defense Exhibit 2, your

24  Honor -- that's also a fairly straightforward single-page

25  scoring sheet, right?

1    A.    Yes.

2    Q.    It's got twenty items on it?

3    A.    Correct.

4    Q.    It's also a checklist?

5    A.    Correct.

6    Q.    And it can be scored or you did score it using -- it uses

7    a very similar -- you did score it, right?

8    A.    Yes.

9    Q.    And it uses a very similar scoring system to the PCL-R?

10   A.    Yes, it is similar.  Some items are different, but in

11   general, yes, zero, 1, or 2.

12   Q.    And it also, specifically in terms of just the numbers for

13   the scoring, it's a zero for "no" or "absent," 1 for

14   "partially" or "possibly present," and 2 for "yes" or

15   "definitely present," right?

16   A.    Correct.

17   Q.    Now, according to the manual and according to your

18   evaluations in this case, you're not really supposed to churn

19   out or it's not designed to churn out a numerical estimate of

20   risk?

21   A.    It is designed to, as you say, churn out a score, but it

22   does not churn out a numerical estimate of risk.  That would be

23   more consistent with an actuarial type of instrument like the

24   VRAG, so, yes, that's correct.

25   Q.    And ultimately this HCR-20 is what you would call -- what

1   you I believe did call a "structured clinical judgment"?

2   A.   That is correct, yes.

3   Q.   And it was your opinion on this that Mr. Mahoney was high

4   risk?

5   A.   It was, yes.

6   Q.   Now, by the way, you've read, obviously, in preparing this

7   the HCR-20 manual?

8   A.   Yes.

9   Q.   And you're aware that the manual says that it's extremely

10  hard to predict future violent acts of mentally disordered

11  persons?

12  A.   Yes.

13  Q.   And one reason for that, I take it, is that mental illness

14  may not be strongly, clearly, and directly associated with

15  violence?

16  A.   It may not, yes.

17  Q.   In fact, being mentally ill is not as good a predictor of

18  violence as simply being young, male, and low socioeconomic

19  status?

20  A.   Based on group data, that's true, yes.

21  Q.   And you're also aware that there is research that has

22  failed to demonstrate strong positive links between structured

23  criminal judgments and actual outcomes?

24  A.   There is research that has come to that conclusion.

25  There's also research that's come to a different conclusion,

1    but, yes, that is accurate.

2    Q.   And, in your view, you view this instrument and others

3    like it as being able to generate predictions better than

4    chance?

5    A.   I wouldn't say they generate predictions.  These are --

6    it's additional information to take into consideration with

7    regard to arriving at an ultimate opinion on the issue of risk.

8    There is research data that clearly demonstrates that

9    predictive validity is better than chance, and I have no reason

10   to disbelieve that there's a good deal of research in that

11   area.

12   Q.   Now, the third instrument that you used in this case is

13   the Violence Risk Appraisal Guide, the VRAG?

14   A.   Right.

15   Q.   And you describe that as an actuarial instrument?

16   A.   It is, yes.

17   Q.   And really what an actuarial instrument is is really a

18   mechanical instrument for grinding out an objective score?

19   A.   Uhm, yeah, I think that's a fair characterization.

20   Q.   And this particular instrument claims to predict the risk

21   of violent recidivism within specific time frames?

22   A.   Yes.  Well, it doesn't necessarily claim to predict it for

23   a particular individual, but it provides data from a sample

24   that can be compared to a particular individual with a certain

25   set of characteristics.

1    Q.   And when you make that point, you're suggesting, I take

2    it, that it can be dangerous to extrapolate from population

3    statistics to predictions about what a specific individual will

4    do?

5    A.   Yes.

6    Q.   And that's generally a problem with all these kinds of

7    instruments?

8    A.   That's correct.

9    Q.   Now, in the case of the VRAG, there's actually an updated

10   version of this instrument, correct?

11   A.   There's a fairly recent update.  It's not being widely

12   used at this point.  I think it's still in the research --

13   Q.   I'm sorry.  Are you aware that Quinsey, Harris, Rice and

14   Cormier, the authors of the VRAG, have published an article

15   indicating that they believe it's a more precise and accurate

16   instrument?

17   A.   That is true.  Like any new instrument, most --

18           THE COURT:  I've lost you.  What's a more precise and

19   accurate?  Which one?

20           MR. SCHNEIDER:  The VRAG-R, the revised VRAG, the new

21   version.

22   A.   There's a limited database available with regard to

23   whether or not their assertion in that case is accurate or not,

24   and often it's fairly common practice that evaluators will wait

25   for the research to arrive to support the use of a new

1    instrument, but, yes, there is a newer instrument available.

2    Q.   Now, was the VRAG filled out?  Did you fill out the VRAG

3    at the same time you filled out the HCR-20 and the PCL-R?

4    A.   I know I filled it out at the same time as the HCR-20.  I

5    would have done both after the PCL-R because I use that

6    instrument for these instruments, but I think they were all

7    contemporaneously around the same time.

8    Q.   So if the HCR coding sheet says it was filled out on

9    April 7, 2013, it's likely that you would have filled out the

10   VRAG also at that time?

11   A.   Yes.

12   Q.   So that's over 14 months ago or about 14 months ago?

13   A.   As I indicated, the VRAG is a static instrument, so it

14   really wouldn't have mattered when I did it.  The data is

15   unchangeable.  It's historical data.  But, yes, you're correct

16   on the date.

17   Q.   And in fact that's one of the criticisms of the VRAG, is

18   that it only focuses on static factors?

19   A.   Some researchers and evaluators criticize it for that

20   reason, and other evaluators believe that's its strength.

21   There's debate on that issue.

22   Q.   So theoretically you could have filled this out and gotten

23   these results ten years ago, and it would still be applicable

24   today?

25   A.   Well, I don't know if that's necessarily true because

1    things could have occurred between ten years ago and today

2    which would have elevated the risk.  The risk could never go

3    down.

4    Q.    So once someone is graded at high risk under the VRAG, is

5    it your opinion that that person's risk of violent recidivism

6    can never go down?

7    A.    The only way it would decrease would be the age at the

8    index offense; and as a person ages, that item would decrease

9    because of the data, as you indicated earlier, that as

10   individuals grow older, their risk decreases.  So the score can

11   go down based on that single item, but the other static items

12   would remain the same.

13   Q.    So you're aware that there's a literature about current

14   clinical factors that are considered, at least with respect to

15   the HCR and other structured clinical judgments?

16   A.    Yes.  That's why I used the HCR-20 in this case.

17   Q.    And you're aware that there's a literature about

18   protective factors?

19   A.    Yes.

20   Q.    The VRAG doesn't take account of protective factors, does

21   it?

22   A.    No, it doesn't.

23   Q.    And is it your opinion that protective factors simply

24   don't matter?

25   A.    No, that's not my opinion.

1    Q.    So an instrument that doesn't make any reference to

2    protective factors may be flawed for that reason?

3    A.    It's certainly a possibility, yes.

4    Q.    And in your opinion, in fact, that's true?

5    A.    I believe, in my opinion, that protective factors, as I

6    indicated this morning -- for example, relapse, prevention,

7    strategies, and risk prevention strategies -- are a very

8    important part of risk assessment.  So, yes, I believe that is

9    true.

10   Q.    So whether one is surrounded and supported by loved ones

11   when they're released, that can make a difference?

12   A.    It can.

13   Q.    Whether someone has adequate housing, that can make a

14   difference?

15   A.    Yes.

16   Q.    Whether someone is willing to seek a psychiatrist that

17   they trust, that can make a difference?

18   A.    Yes.

19   Q.    Whether they're willing to be compliant with medications,

20   that can make a difference?

21   A.    Yes.

22   Q.    And you've said that something like age or whether someone

23   has suffered a medical incident like Mr. Mahoney's heart

24   attack, is that something that you'd call a protective factor?

25   A.    In general I would, but not in Mr. Mahoney's case, as he

1    has continued to engage in violent behavior since the heart

2    attack, so I don't believe that would -- I wouldn't identify

3    that as a protective factor in his particular case.

4    Q.   And what's the most recent serious felony that he's

5    committed in the past ten years?

6    A.   The most recent serious felony?

7    Q.   Correct.

8    A.   I'm not aware of what the most recent serious felony is.

9    I know that he's engaged in a number of violent offenses while

10   in custody that if he were in the community would have resulted

11   in criminal charges.

12          THE COURT:  Why do you say it has to be a felony?

13   It's just physical harm, right?

14          MR. SCHNEIDER:  Under the standard, that's true.  I

15   was asking a more narrow question.

16   Q.   Now, with respect to the scoring of the VRAG, you scored

17   Mr. Mahoney at 15, correct?

18   A.   That was the score that was the result of my assessment,

19   yes.

20   Q.   And that assigned him a Category 7?

21   A.   That's right.

22   Q.   How many other categories are there?

23   A.   There are, I believe, nine categories on the VRAG.

24   Q.   And in principle, one can score as high as a 38 on the

25   VRAG?

1    A.    Yes, one can score as high as a 38.

2    Q.    And Mr. Mahoney scored a 15?

3    A.    That's right.

4    Q.    And that 15 includes four points for having scored

5    positively on the Hare Psychotherapy Checklist-Revised,

6    correct?

7    A.    Correct.  Well, that would be based on the score he

8    received.

9    Q.    Yes.

10   A.    Yes.

11   Q.    And it also includes three points for any personality

12   disorder?

13   A.    That's correct.

14   Q.    By the way, it's fair to say that since both the HCR-20

15   and the VRAG both rely on the scoring in the PCL-R, that

16   there's some duplication amongst these instruments?

17   A.    There is some overlap, yes.

18   Q.    So seven of Mr. Mahoney's 15 points came from the scoring

19   on the PCL-R and the fact that he has a personality disorder;

20   to wit, in your view, antisocial personality disorder?

21   A.    That's correct.

22   Q.    Now, in your report you indicated, and I think you

23   testified to it this morning, that the population data set that

24   was used to generate the VRAG, that 55 percent in that category

25   reoffended violently within seven years, correct?

1    A.    Correct.

2    Q.    And 64 percent reoffended violently within ten years?

3    A.    Correct.

4    Q.    Now, if my numbers are right -- and math is not my strong

5    point -- that means that 45 percent did not reoffend violently

6    within seven years?

7    A.    That's correct.

8    Q.    And it means that 36 percent did not reoffend violently

9    within ten years?

10   A.    Yes.

11   Q.    That's not an insubstantial error rate, is it?

12   A.    Well, that's not really the error rate.  What that's

13   saying is, in that group, these are the numbers that

14   reoffended.  It's not error.  It's just a fact that with that

15   score, this is the number of people who reoffended within that

16   period of time.

17   Q.    But it does provide us some information about the

18   predictive validity of these kinds of instruments?

19   A.    What it provides is the fact that among the individuals

20   who were given the VRAG and followed over that period of time,

21   55 percent of them reoffended within an average of seven years

22   and 64 percent within ten years.  You know, the purpose of

23   using this instrument is to provide additional information to

24   the decision-maker, and whether or not that information is felt

25   to be persuasive or not would be based on the reading of that

1    data.  That's what it says.  I'm not sure that it says anything

2    about predictive validity.

3    Q.   But you wouldn't rely on these instruments to predict

4    whether Mr. Mahoney is likely to reoffend within seven or ten

5    years?

6    A.   No.  It's one piece of information that informs my opinion

7    about his level of risk.

8    Q.   And you're aware that there are meta-analytic studies with

9    respect to instruments like the VRAG and the HCR?

10   A.   Yes.

11   Q.   And you gave us some information this morning about the

12   reporter operating condition and the area under the curve as

13   measures of the validity of these instruments?

14   A.   Receiver operating characteristics --

15   Q.   Excuse me.

16   A.   -- but, yes.

17   Q.   And another measure of the predictive validity of an

18   instrument is the correlation coefficient?

19   A.   That's true, although that's rarely used in a risk

20   assessment area, primarily because of how influenced it can be

21   by base rate of violent behavior.  The vast majority of

22   research in this area utilizes area under the curve and

23   receiver operating characteristics.

24          THE COURT:  Can I just say, the two of you are maybe

25   talking with each other with some level of comprehension.  I

 1    don't know what you're talking about.  So if this is important

 2    to me, you're going to have to cycle back and go in baby steps.

 3         MR. SCHNEIDER:  You know, I think most of this will be

 4    through Dr. Kriegman who will explain it.

 5         THE COURT:  Okay.

 6         MR. SCHNEIDER:  He's my expert, not me.

 7    Q.   But, in any event, these things are not designed to

 8    predict with any kind of specificity whether someone is going

 9    to go out and violently recidivate within a period of time?

10    A.   No.  You can't transfer that specific score over to any

11    particular individual.

12         THE COURT:  So why do I even need these?  Judges make

13    decisions all the time; risk of flight, risk of danger on a

14    bail, that kind of thing.  Are these instruments critical to

15    your point of view?

16         THE WITNESS:  No, they are not.  They are a means of

17    organizing information that relates to different characteristics

18    of individuals who engage in violent behavior.  What's important

19    are those predictive factors, not the instruments themselves.

20    What's important are things like history of violence, history

21    of failure to follow treatment recommendations, conditional

22    release violations, supervised release violations.  The

23    instruments are simply a way to organize that information and

24    provide further information as it relates to overall risk, but

25    you can talk about risk factors without talking about the

1    instruments.

2    Q.   Have you or anyone on your team made any efforts to

3    contact Mr. Mahoney's family?

4    A.   I don't believe I've ever spoken with anyone from

5    Mr. Mahoney's family, no.

6    Q.   Did you ever speak with his daughter Jessica?

7    A.   No, I didn't.

8    Q.   Did you ever make personal phone contact with the folks at

9    Avis Goodwin Mental Health Center up in New Hampshire?

10   A.   No.  We contacted them and asked for their records, but I

11   never spoke to anyone there.

12   Q.   Did you ever work with Mr. Mahoney on any kind of a

13   release plan?

14   A.   No, because we've never been in a position that a release

15   plan would have been on the table.

16   Q.   So based on your opinion of that, you didn't even make any

17   efforts to begin putting together a release plan for him?

18   A.   No.  We wouldn't put together a release plan until he was

19   civilly committed.

20   Q.   That's your requirement?

21   A.   Yes.

22   Q.   So you haven't made any calls to any kind of residential

23   group homes or halfway houses, or whatever it is that you're

24   able to send someone to if they're in the BOP system?

25   A.   That's correct.

1    Q.   In your opinion, what is the likelihood that if
2    Mr. Mahoney is actually civilly committed, that he's likely to
3    be released anytime in the near future, in your view?
4    A.   Well, that depends entirely upon his behavior and his
5    willingness to comply with treatment.  I think, if he were to
6    comply with treatment and not engage in threatening or violent
7    behavior, that he would be a good candidate for release.
8    Q.   So it's your opinion that he could end up staying at a
9    place like Devens for a long period of time?
10        THE COURT:  Well, let me ask you this:  If he went on
11   the lithium and that worked and he wasn't violent for six
12   months or a year, what happens?
13        THE WITNESS:  In that situation, I imagine we would
14   recommend him for conditional release, and we would begin
15   working on a conditional release plan.
16   Q.   And, in your opinion, is that likely to happen?
17   A.   It depends entirely on Mr. Mahoney.  Up until this point,
18   he has not done those things, although he also has not been
19   civilly committed; and the impact that that may have on his
20   willingness to take other medications and resist engaging in
21   disruptive or violent behavior may change.  I don't think he's
22   a long way away from being appropriate for conditional release.
23   I think there are a few things -- those two things in
24   particular would, if those were put in place, I think he'd be a
25   good candidate.

1    Q.    The two things are?

2    A.    The two things would be that he refrain from engaging in

3    any type of violent or threatening behavior and be compliant

4    with the medication that decreased his hypomanic symptoms.

5    Q.    And for you that's lithium?

6    A.    No, that's not my opinion.  As I said, I'm not qualified

7    to say what medication it would be.  I believe he needs an

8    additional medication, but whether or not it's lithium would be

9    an issue for his psychiatrist to make.

10            MR. SCHNEIDER:  May I just have one moment, your

11   Honor.

12            (Discussion between Mr. Schneider and the respondent.)

13            MR. SCHNEIDER:  Thank you, your Honor.

14            MR. CALLAHAN:  Redirect, your Honor?

15   REDIRECT EXAMINATION BY MR. CALLAHAN:

16   Q.    Dr. Channell, at the beginning you were asked about

17   updating or the fact that your last report, your most recent

18   report was from December, 2013.  Were you prepared to offer

19   your opinion last summer in August, 2013, regarding

20   Mr. Mahoney's meeting the criteria under 4246?

21   A.    Yes.  I've been prepared to offer my opinion since we

22   filed the certificate of dangerousness.

23   Q.    And there were a number of continuances that were

24   necessitated by Mr. Mahoney's changes in counsel and his

25   difficulties with counsel, correct?

1  A.    Yes.

2  Q.    And in December you filed -- you submitted a new report,

3  correct?

4  A.    That's correct, yes.

5  Q.    And since that time, have you been keeping up on

6  Mr. Mahoney's progress, whether it be from speaking with people

7  at Devens who treat him or participating in rounds where his

8  care is discussed?

9  A.    Yes.

10  Q.    Would your opinion today be the same regarding

11  Mr. Mahoney's mental disease and defect causing substantial

12  risk of bodily harm to another even if you'd never seen a

13  letter that was referred to, which I won't get into the

14  substance of, but a letter that was referred to earlier?

15  A.    Yes.  I had offered my opinion long before I ever saw that

16  letter.

17  Q.    Earlier you were talking about -- there was a suggestion

18  that Mr. Mahoney's age with some of these instruments, his age

19  might have a downgrading effect on what his score would be.  Do

20  you recall that testimony?

21  A.    Yes.

22  Q.    Is there research out there that describes that effect

23  that age has on someone's risk for future violent offenses?

24  A.    Yes.  In general, research suggests that as individuals

25  age, they become less violent.

1  Q.   And when you take that research and you look at

2  Mr. Mahoney's situation, what do you take away from that?

3  A.   Well, I think what you can take away from it is the fact

4  that he's continued despite his advanced age to engage in

5  violent behavior with regularity over the past several years.

6  So I don't believe it applies in this particular case.  As we

7  talked about earlier, you know, group data may not always apply

8  to an individual; and in Mr. Mahoney's case, I don't believe

9  that his age is a protective factor with regard to his risk for

10  violence.

11  Q.   There was also a lengthy discussion on your

12  cross-examination about the criminal history, Mr. Mahoney's

13  criminal history, and Page 18 of your initial report describing

14  the weapons charges.  Do you recall that?

15  A.   Yes.

16  Q.   Now, Dr. Channell, you go through at some length his

17  criminal history in the body of your report, do you not?

18  A.   Yes.  There is a criminal history section earlier in the

19  report.

20  Q.   Okay.  And anywhere in that section, the criminal history

21  section, which I imagine, is that what you relied on in

22  arriving at your conclusion?

23  A.   Yes, it is.

24  Q.   In anywhere there, is there a discussion of firearms

25  charges against Mr. Mahoney?

1    A.    No, there isn't.

2    Q.    Okay.  In the body of that, is there discussion about

3    offenses, convictions Mr. Mahoney had where a knife and pliers

4    were used?

5    A.    Yes.

6    Q.    And the only place that this, outside of the body of your

7    report, the only place where the weapons charges are described

8    are in the last paragraph, Page 18; is that correct?

9    A.    Well, the third paragraph, but, yes.

10   Q.    I'm sorry, the third paragraph.  Was that a scrivener's

11   error?

12   A.    I believe that was an error of probably something that had

13   been in a prior report which was transcribed over to this

14   report.

15   Q.    There was also reference to an incident from January 20,

16   2013, about the incident between Mr. Mahoney and Mr. Dunston in

17   the dish room.  Do you recall that?

18   A.    Yes.

19   Q.    There was some suggestion by Mr. Schneider, if you turn to

20   Exhibit 9, that during that incident or something that

21   precipitated that incident was Mr. Mahoney being bumped in some

22   way in the dish room.  Do you recall that?

23   A.    Yes.

24   Q.    If you look at this investigative report at Exhibit 9,

25   Mr. Mahoney was allowed to give his version, right, the

1  assailant's statements on Bates No. 126, Exhibit 9, correct?

2  A.   Correct.

3  Q.   Can you read what Mr. Mahoney said.

4        THE COURT:   What tab are we?

5        MR. CALLAHAN:   This is Exhibit 9, your Honor.   It's

6  the third page, Bates No. 126.

7  A.   He said, "Me and Dunston, an argument in the dish room.

8  He was being bossy, and we started arguing.   Inmate Mahoney was

9  asked additional questions about the incident but refused to

10 answer."

11 Q.   So contrary to the suggestion by Mr. Schneider, there's no

12 indication anywhere in this incident report that there was any

13 bumping by anyone other than Mr. Mahoney, correct?

14 A.   Well, yeah, I didn't see anything that said Mr. Mahoney

15 bumped him.   What it said is that he grabbed him around the

16 neck and throat and threw a bucket of water on him.

17 Q.   Right, and there's no indication that Mr. Dunston first

18 bumped into Mr. Mahoney.   There was just an argument, correct?

19 A.   Right, yes.

20 Q.   There was some discussion earlier also about what you call

21 "criminal versatility," and I think that came up in connection

22 with the discussion of the PCL-R?

23 A.   That's right.

24 Q.   And you were asked a number of questions about, well, what

25 about these charges, these weapons charges and gun charges that

1    are described in the third paragraph in the last page of your

2    report, that has to undermine your criminal versatility

3    analysis?  Do you remember that?

4    A.    I remember being asked those questions.  I don't remember

5    anything specifically being said about it undermining it,

6    but --

7    Q.    Can you describe to us what criminal versatility means.

8    A.    Criminal versatility would be a wide variety of different

9    types of offenses.  And the way it's defined by the PCL-R are

10   weapons-related offenses, not firearms versus pliers or knives

11   or those types of things.  So the fact that those firearm-related

12   charges were erroneous would not have changed his score on the

13   criminal versatility item.  He still exhibits criminal

14   versatility even without the firearms-related offenses.

15   Q.    So looking at the PCL-R work sheet, Defense Exhibit 3, you

16   would still have a 2 there; is that correct?

17   A.    That's correct.

18   Q.    And that would be based on what types of convictions from

19   his criminal record?

20   A.    It would be based on -- basically the way the PCL-R would

21   identify that would be to identify different classes of

22   offenses, and you would look at whether or not the individual

23   had a number of offenses across a broad variety of different

24   types of offenses.  So, for example, if all an individual ever

25   had were breaking-and-entering charges, they wouldn't have a

1    criminal versatility score.  It's individuals who would have

2    breaking and entering and violent-related offenses and

3    weapons-related offenses and property offenses, those different

4    types of things.  So you can look at Mr. Mahoney's criminal

5    record and see that he, you know, he has charges that include

6    the assault and batteries that we've already mentioned.  We

7    have the larceny convictions, breaking and entering at night

8    convictions, knowingly receiving stolen property, misuse of a

9    credit card, uttering a forged instrument.  There's a broad

10   variety of different types of offenses.  I won't go through all

11   of them, but those are examples of the different types of

12   offenses that he's had at one point in time or another.

13   Q.   You also know when you initially filled this out that --

14   you explicitly brought to the attention of whoever was reading

15   the report that there were symptoms that he didn't exhibit,

16   correct?

17   A.   That's correct.

18   Q.   And one of those was conning or being manipulative,

19   correct?

20   A.   That's correct.

21   Q.   And since you filled this out, you've also become aware of

22   the call that he had with the woman on the phone on May 28,

23   2014.  Would that affect your scoring of the PCL-R with respect

24   to conning and manipulating?

25             MR. SCHNEIDER:  I would just renew my objection, your

1    Honor.

2            THE COURT:  Overruled.

3    A.   Yes, I believe it would.

4    Q.   And I want to take you to that.  Would the statement -- if

5    you look at Page 5 and 6 of Exhibit 20, which is the transcript

6    of the call, when Mr. Mahoney is told at the bottom of Page 5,

7    "Well, no, no, because what I'm trying to tell you is, you

8    know, you can't actually live here.

9           "MAHONEY:  Right.  Well, I'm going to --

10          "FEMALE:  I mean, you --

11          "MAHONEY:  I'm going to live there for the time being just

12   to get temporary, and then I'm going to get to another place or

13   something, whatever I got to do just to get out.  I live here

14   with you.  That's all you have to say when you get there,

15   right?  When the doctor calls to say I'm living there."

16          How does that inform your opinion with respect to the

17   conning and manipulative factor on the PCL-R?

18   A.   Well, I believe what I take away from that is the idea

19   that the intention is to convince the doctor that he will be

20   living there, even though he won't be living there, which is

21   certainly an attempt to con, to use that word, that individual.

22   Q.   And just more generally with the PCL-R, again, you're not

23   of the view that this is a risk assessment tool in and of

24   itself, correct?

25   A.   That's correct.

1    Q.    And the PCL-R, while it is used in the VRAG and the

2    HCR-20, it's only used based on the score of the PCL-R,

3    correct?

4    A.    Correct.

5    Q.    So if a person gets a low score on the PCL-R, it's

6    factored in in a manner that is low on the VRAG and on the

7    HCR-20, correct?

8    A.    Yes.

9    Q.    And if he got a high score, over 30, over that cutoff, he

10   would be attributed with a high score on the VRAG or a high

11   score on the HCR-20, correct?

12   A.    Well, for that particular item, I mean, the difference

13   between a high score and a low score would be zero or 2.  So

14   the score would, for example, in his case on the HCR-20, his

15   score on the PCL-R resulted in a score of 1.  If it were

16   higher, it could potentially result in a score of 2.  If it

17   were lower, it could potentially result in a score of zero.

18   Q.    So you didn't score the HCR-20 and the VRAG, you didn't

19   score it as though he was a psychopath and got 30 or above,

20   correct?

21   A.    That's correct.

22   Q.    Is it the fact that you took into account that he got a

23   score that was below that, but that still informs the VRAG and

24   it still informs the HCR-20 to the extent of the score on the

25   PCL-R?

1   A.   Correct.

2        MR. CALLAHAN:  Your Honor, I have nothing further at

3   this time.  Oh, I actually do have one more question.  I

4   apologize.

5   Q.   Dr. Channell, was there a reason that you used both the

6   HCR-20 and the VRAG instead of just using one or the other

7   exclusively?

8   A.   Yes.  The reason was that the HCR-20 includes the current

9   clinical presentation as well as the release conditions that

10  could be put in place.  So the fact that it includes these

11  dynamic changeable factors I believe is important to a risk

12  assessment, and those are not captured in the VRAG and only in

13  the HCR-20.

14       MR. CALLAHAN:  Thank you, Dr. Channell.

15       MR. SCHNEIDER:  I just have a couple of questions, and

16  I think I mean it.

17  RECROSS-EXAMINATION BY MR. SCHNEIDER:

18  Q.   Mr. Callahan just asked you about the fact that your

19  report of May 30, 2013, incorrectly stated that Mr. Mahoney had

20  had firearms charges, loaded weapons charges on his criminal

21  record, and he was asking you whether or not that was simply

22  nearly a scrivener's error or something that was somehow just

23  left over from previous reports, right?

24  A.   Correct, yes.

25  Q.   Well, it's fair to say that your January 16, 2013 report

1   actually didn't include any information about there being

2   firearms or loaded weapons on Mr. Mahoney's record?

3   A.   That's correct.

4   Q.   So it's still your position it was simply a scrivener's

5   error?

6   A.   Yes, because when I wrote the second report, I did not

7   include those charges because it was an error in the first

8   report.

9   Q.   But when you included it in the May 30 report -- and

10  that's the one on which Warden Grondolsky issued his

11  certificate of dangerousness to this Court -- it indicated in

12  the third paragraph of the last page in the Opinions and

13  Recommendations section that there were weapons-related

14  offenses, including these firearms-related offenses?

15  A.   Yes.

16  Q.   In some ways the most important part of the entire report?

17          MR. CALLAHAN:  Objection.

18          THE COURT:  Overruled.

19  A.   I believe all the parts of the report are equally

20  important.  The ultimate opinion in the last paragraph is

21  probably the page a lot of people flip to before they read the

22  rest of the report, but I think it's all important information.

23  Q.   Now, you've had a chance to -- and Mr. Callahan asked you

24  about the phone transcript allegedly between Mr. Mahoney and an

25  unidentified woman asking whether she would say that she's

1   willing to give him a place to stay, if released, right?

2   A.   Yes.

3   Q.   And Mr. Callahan was asking you whether or not looking at

4   an early part in the transcript -- I think it's Page 5 --

5   A.   I'm sorry, I'm not on that tab anymore.  Could you --

6   Q.   Yes, the top of Page 6.

7   A.   What tab is it?

8   Q.   It's 20, I believe.  So he had you refer to a section

9   where Mr. Mahoney is saying that he really wants to get out,

10  and, you know, "I really want to live there, at least

11  temporarily," and then going to get another place, right,

12  essentially?

13  A.   That's what he says, yes.

14  Q.   Yes.  And he says, and when the doctor calls, to say that

15  he's living there, right?

16  A.   Yes.

17  Q.   And Mr. Callahan was trying to suggest that this somehow

18  seemed conning and manipulative to do, right?

19  A.   I believe he asked me if I thought that was conning and

20  manipulative, and I said I did, yes.

21  Q.   Yes.  But, now, when you read through the rest of this

22  transcript carefully, you realize that what you have is

23  Mr. Mahoney actually trying to persuade this woman to let him

24  actually stay there for a period of time?

25  A.   Well, I listened to the call, and what I heard when I

1  listened to the call was her saying to him, "You cannot live

2  here," and him saying, "Well, okay, but you need to let the

3  doctor know that I'm going to live there."

4  Q.   And toward the end on Page 15, for example, he ultimately

5  says to her, "So if I have to stay a little while there, I'll

6  leave early in the morning, come back late at night or

7  something like that, you know what I mean, just so I'll have a

8  place to stay, all right?"  And she says, "All right, okay."

9  A.   Yeah, I wouldn't characterize leaving early in the morning

10  and, you know, sleeping on the floor there at night as a place

11  to live.  That is just a place to sleep.

12  Q.   Well, it's a place to sleep as a way to start the process

13  of getting reintegrated back into the community?

14  A.   I would describe that as a pretty bad way to start

15  reintegrating to the community, but if that's how you read

16  that --

17  Q.   Well, no one has made any calls to try to help him locate

18  a residential facility.

19  A.   Is that a question?

20  Q.   Yes.

21  A.   No one at Devens has made any calls.  I don't know whether

22  you've made calls or anyone from your office has made calls.

23          MR. SCHNEIDER:  I have no further questions, your

24  Honor.

25          THE COURT:  All right, thank you very much.

1          THE WITNESS:  You're welcome.  Thank you

2          (Witness excused.)

3          THE COURT:  All right, so procedurally we're going to

4    come back here on the 9th unless that event occurs, in which

5    case I'll have to reschedule.  What do you anticipate having

6    happen, Mr. Callahan, at this point?  Will you be resting, or

7    are you putting on more evidence?

8          MR. CALLAHAN:  I believe we'll be resting, your Honor.

9          THE COURT:  All right.  And then from your point of

10   view, you're going to be putting on Dr. Kriegman?

11         MR. SCHNEIDER:  Yes.  He's my only witness.

12         THE COURT:  And that's going to be the challenge to

13   the instruments as well as his opinion?

14         MR. SCHNEIDER:  Correct, that's correct.

15         THE COURT:  Now, that gives you a little spare time.

16   Will you be rebutting at all with respect to -- I'm going to

17   sort of merge it with the *Daubert* situation.

18         MR. CALLAHAN:  Your Honor, in the motion we described,

19   we had asked for weeks to be able to do that.  I think we've

20   asked for four.  I understand your reluctance to provide that,

21   but a lot of time went into their *Daubert* challenge; and

22   Dr. Channell, if the motion is going to be considered, he would

23   have to do a literature search and a number of things to get up

24   to speed.

25         THE COURT:  Would Dr. Channell be your rebuttal

1  witness on the *Daubert*?

2           MR. CALLAHAN:  I believe at this point he would, your

3  Honor, but there is also -- I do have to consult with agency

4  counsel before I commit him to that.

5           THE COURT:  Because there might be somebody else who

6  would do the *Daubert* piece of it?

7           MR. CALLAHAN:  It could be.  I'd have to ask them,

8  your Honor.  And I apologize not to have an answer now, but we

9  didn't know where it stood.

10           THE COURT:  All right.  Well, I promised you that I

11  would give you time to respond to the *Daubert* challenge, so if

12  that's what you need.  What I'm hearing you say to me is, it's

13  unlikely you're going to have a witness on on the 9th.

14           MR. CALLAHAN:  To address the specific issues?  I

15  mean, I think Dr. Channell has described the validity and, you

16  know, the research underlying these tests.

17           THE COURT:  What is Dr. Kriegman -- I haven't really

18  spent as much time on the *Daubert* end as on the merits --

19  what's he going to say?  Is there literature to say that

20  they're not predictive?

21           MR. SCHNEIDER:  Yes.  So he makes a distinction

22  between the scientific -- that they're scientifically or

23  statistically significant, but that they have really quite low

24  predictive validity, really quite low.

25           THE COURT:  So he would disagree with the .7 analysis?

1          MR. SCHNEIDER:  Well, so that area under the curve can

2     also be translated into something called the "correlation

3     coefficient."  I didn't take college stats and I wish I had,

4     but that number, the correlation coefficient, or R, for these

5     instruments is somewhere in the neighborhood of .034, maybe as

6     high as .05-ish.  But the problem with that is that when you

7     also then take that number and square it, which is known as the

8     percent of the variance, that is the actual statistical number

9     that comes closest to giving you an accurate measure.  It's an

10    alternative way of describing the statistical information to

11    the receiver operating curve and the area under the curve --

12          THE COURT:  I have no idea what you just said, okay?

13    So I'm going to just sort of flat out say that.  So he's going

14    to have to teach me.  We did a little bit of this when I saw

15    the Static-99.  I mean, it's ringing a bell.  But I guess, at

16    the end of the day, regardless of these instruments, that's

17    sort of what I did in these other cases.  I mean, I have to

18    make an assessment, and it's something that I make all the

19    time:  I look at someone's past, and I view it as predictive of

20    the future.  And I listen to two psychiatrists, and it's clear

21    he's got a psychiatric disease or defect.  No one's denying

22    that.  And it's clear he can't go to New Hampshire.  So what's

23    left is, does he have a substantial risk of causing bodily

24    injury or property damage to another, focusing on bodily

25    injury, you know?  I don't think the property is as big a

1    focus.

2            MR. CALLAHAN:  I mean, I think we've been focusing on

3    the bodily injury.

4            THE COURT:  Yes, maybe some property but --

5            So at some level, it sounds as if a full-blown *Daubert*

6    hearing would not be resolved on the 9th.

7            MR. SCHNEIDER:  If I may, your Honor, even though

8    these concepts sound really complicated, it actually may not

9    be, and --

10           THE COURT:  Maybe.

11           MR. SCHNEIDER:  Dr. Kriegman has an affidavit to which

12   he has basically a didactic attachment.  It's really -- I had

13   him do it in that format just to simplify --

14           THE COURT:  All right, maybe if I read that, but I'm

15   just saying, I am going to give the government time to rebut

16   it.

17           MR. SCHNEIDER:  Understood.

18           THE COURT:  And also I have to write it up if it's

19   complex that way.  I have to understand it.

20           MR. SCHNEIDER:  Sure.

21           THE COURT:  And it takes a while.  I just want to make

22   sure that everybody is on the same page on timeline.  I don't

23   know whether you're planning on just preparing a rebuttal with

24   an affidavit on the record or you'd want to call someone back,

25   but I don't think we have to reach that milestone now.

1          MR. CALLAHAN:  Just to make sure we understand what

2     you'd be expecting on Monday, your Honor, that Dr. Kriegman

3     would provide testimony, we would cross him --

4          THE COURT:  On everything.  In other words, I'm not

5     going to bring Kriegman back a second time.  And then to the

6     extent that you feel as if you need to put on a rebuttal

7     expert, fair game, because typically we've all -- I mean, I

8     don't know if you have, but most people have done a *Daubert*

9     hearing before.  You typically have to put on the peer-reviewed

10    literature.  It's not whether I -- it's whether it's generally

11    accepted in the field; and if it is generally accepted in the

12    field, what's it generally accepted for and that sort of thing?

13         MR. CALLAHAN:  Understood, your Honor.

14         THE COURT:  And, as I understand it, if for some

15    reason you decide to bring in any lay witnesses, either one,

16    you should just give one another notice.  Like, you're not

17    bringing in the family members, are you?

18         MR. SCHNEIDER:  No.  I think we're content with the

19    way this is.

20         THE COURT:  And you're not bringing in the inmate?

21         MR. CALLAHAN:  We're not, your Honor.

22         THE COURT:  All right, so that's it.  So it's the two

23    experts dueling.  And then I will give you an opportunity,

24    whether it's a month or whatever, to research or rebuttal.  But

25    I don't want to bring back Dr. Kriegman a second time, so

1    whatever cross you do is going to have to be done, okay?

2          MR. SCHNEIDER:  And, of course, for what it's worth,

3    your Honor, I know your Honor is mindful of the fact that

4    Mr. Mahoney is sitting in custody now 43 months.

5          THE COURT:  I get that, but I also only just got it

6    myself, and we had a switch in attorneys.  And I'm very

7    appreciative that you took it, but it took you a while to get

8    prepared.  So fair enough, but I can only move so fast too.

9    I've got to understand the coefficient correlation and the R

10   squared and the other statistical issues.  All right?

11         MR. CALLAHAN:  Can I ask one housekeeping matter, your

12   Honor?

13         THE COURT:  Yes.

14         MR. CALLAHAN:  The audio of the transcript that is at

15   Exhibit 20 I'd like to move in as an exhibit.  It is the actual

16   call.  Just for the record, can I mark that also as Exhibit 20?

17   Should I mark it separately?

18         THE COURT:  Sure, sure.

19         THE CLERK:  22 is the last number.

20         MR. CALLAHAN:  Yes 22 is the last number, so it would

21   be 23.  Thank you.

22         (Exhibit 23 received in evidence.)

23         MR. CALLAHAN:  So barring an issue that I have on the

24   conflict that I flagged for you, it should be 10:00 o'clock on

25   9th.  And I'm blocking the morning for you, but do you think it

1    needs to go all day?

2          MR. CALLAHAN:  Much of it will be dictated by how much

3    Mr. Schneider does with Dr. Kriegman on direct.

4          MR. SCHNEIDER:  My guess is that I think Dr. Kriegman

5    can whip through it fairly quickly.  I mean, you know, I

6    think --

7          THE COURT:  Put it this way:  I would hope that you

8    wouldn't on direct be much longer than a couple of hours.

9          MR. SCHNEIDER:  I don't think I will be.  I think it

10   may be less than that.

11         THE COURT:  Then see where it is on cross.  It would

12   be fabulous to finish in the morning, but if not, we may have a

13   little time in the afternoon, but I also have other hearings.

14   Okay, thank you.

15         MR. CALLAHAN:  Thank you, your Honor.

16         MR. SCHNEIDER:  Thank you.

17         (Adjourned, 4:03 p.m.)

18

19

20

21

22

23

24

25

1                     C E R T I F I C A T E

2


3
    UNITED STATES DISTRICT COURT )
4   DISTRICT OF MASSACHUSETTS    ) ss.
    CITY OF BOSTON               )
5

6


7           I, Lee A. Marzilli, Official Federal Court Reporter,

8   do hereby certify that the foregoing transcript, Pages 1

9   through 200 inclusive, was recorded by me stenographically at

10  the time and place aforesaid in Civil Action No. 13-11530-PBS,

11  United States of America v. Brian Mahoney, and thereafter by me

12  reduced to typewriting and is a true and accurate record of the

13  proceedings.

14          Dated this 11th day of June, 2013.

15

16

17

18

19              /s/ Lee A. Marzilli
                _____
20              LEE A. MARZILLI, CRR
                OFFICIAL COURT REPORTER
21

22

23

24

25