Psychology, Public Policy, and Law
2012, Vol. 18, No. 3, 361–391
© 2012 American Psychological Association
1076-8971/12/$12.00   DOI: 10.1037/a0025834

# THE ROLE OF THE VIOLENCE RISK APPRAISAL GUIDE AND HISTORICAL, CLINICAL, RISK-20 IN U.S. COURTS: A Case Law Survey

Michael J. Vitacco
Georgia Health Sciences University

Steven K. Erickson
Private Practice, York, PA

Samantha Kurus
California State University, Fullerton

Brian N. Apple
Georgia Health Sciences University

In the landmark case *Barefoot v. Estelle* (1983), the United States Supreme Court held that behavioral scientists are not "incompetent to predict with an acceptable degree of reliability that a particular criminal will commit other crimes in the future, and so represent a danger to the community." The Court held to this opinion, even in light of evidence that mental health practitioners were incorrect in their violence predictions two out of three times. Although *Barefoot* focused on a death penalty case, the dicta of the decision was extensive and broadly implicated all types of risk assessment. The decision in Barefoot had a positive effect by focusing professional attention and research efforts on violence prediction. Eventually, specialized measures were developed to assist in violence prediction. Measures such as the Violence Risk Appraisal Guide (VRAG; Harris, Rice, & Quinsey, 1993) and the Historical-Clinical-Risk 20 (HCR-20; Quinsey, Harris, Rice, & Cormier, 1998) are now frequently used in clinical and forensic settings throughout the United States and Canada. This article presents case law data from 46 cases on the VRAG and/or HCR-20 found in a legal database search of published and unpublished court cases in Federal and State jurisdictions across the United States. A summary of these cases is presented along with legal and policy implications for using these specialized risk assessment instruments in various legal proceedings.

*Keywords:* risk assessment, legal proceedings, VRAG, HCR-20

The nature and focus of risk assessments has changed dramatically over the last 30 years. When initially conducting risk assessments mental health practitioners relied almost solely on clinical judgment when deciding whether an individual was likely to engage in future violence. Yet this approach left much to be desired in terms of sensitivity and specificity. Monahan (1981, 1984, 1998) wrote extensively about the perils and pitfalls associated with the exclusive use of clinical judgment when formulating risk probabilities. This early research led to the oft-cited statistic that clinicians, relying on clinical judgment, were incorrect

---

This article was published Online First February 6, 2012.

Michael J. Vitacco, Department of Psychiatry and Behavioral Health, GA Health Sciences University; Steven K. Erickson, Private Practice, York, PA; Samantha Kurus, Department of Psychology, California State University, Fullerton; Brian Apple, Forensic Services, East Central Regional Hospital, Augusta, GA and Department of Psychiatry and Behavioral Health, GA Health Sciences University.

Correspondence concerning this article should be addressed to Michael J. Vitacco, Assistant Professor of Psychiatry, Department of Psychiatry and Health Behavior, GA Health Sciences University, 997 Street Sebastian Way, Augusta, GA 30912. E-mail: mvitacco@georgiahealth.edu

two of every three times when attempting to predict an individual's future violent behavior. In the landmark case *Barefoot v. Estelle* (1983) the United States Supreme Court discussed the mental health expert's ability to render opinions regarding risk for future dangerousness. Rooted in a Texas death penalty appeal, Barefoot contended that,

> The use of psychiatrists at the punishment hearing to make predictions about petitioner's future conduct was unconstitutional because psychiatrists, individually and as a class, are not competent to predict future dangerousness. Hence, their predictions are so likely to produce erroneous sentences that their use violated the Eighth and Fourteenth Amendments (pp. 884–885).

Ultimately, the Court rejected these arguments, and although they acknowledged the inherent difficulties in predicting violence, they were generally supportive of the continued use of such experts to make predictions. The Court held,

> It is, of course, not easy to predict future behavior. The fact that such a determination is difficult, however, does not mean that it cannot be made. Indeed, prediction of future criminal conduct is an essential element in many of the decisions rendered throughout our criminal justice system. The decision whether to admit a defendant to bail, for instance, must often turn on a judge's prediction of the defendant's future conduct (p. 887).

The Court's decision was not an endorsement of a continuation of the status quo regarding violence risk prediction. The Court opined that if lay people (jurors) can make determinations of dangerousness then there is no logical reason to exclude mental health experts. Moreover, it was understood that just because expert testimony might often be wrong, that does not go to its admissibility but rather to its weight, which can be ferreted by vigorous cross-examination. That observation by the Court has led attorneys to seriously question predictions of future dangerousness by behavioral science experts. Likewise, mental health professionals have also realized the limitations of armchair speculations. Although not mandating a change in practice, the decision in *Barefoot v. Estelle* certainly increased the awareness about violence risk assessment practices and predictions.

While *Barefoot* was rooted in a death penalty appeal, the dicta of the decision focused on the issue more broadly as to whether expert testimony on future dangerousness may be admissible during the sentencing phase. Finding Justice Stevens majority opinion in *Jurek v. Texas* (1976) persuasive, the Court highlighted that predictions of future dangerousness are an inevitable and necessary function of everyday criminal justice. From determinations of bail to parole decisions an imposition of punishment requires decisions calculated on estimations of future risk. The Court also noted that such risk predictions were a hallmark within mental health law, which often necessitates the opinion of behavioral science experts and upon which the Court had previously held were permissible.

Likewise, despite enduring concerns about the capabilities of forecasting future harm, predictions of dangerousness are a legal reality that has been repeatedly endorsed by various Courts. For example, in *Simmons v. South Carolina* (1994), the Court held that "a defendant's future dangerousness bears on all

sentencing determinations made in our criminal justice system." The Court also embraced similar language in a variety of seminal mental health law decisions, ranging from traditional civil commitment of persons with severe mental disorders to upholding modern sexual predator commitment statutes. *Addington*, *Doe,* and *Donaldson* also have relevant language. Concerns about the validity of these predictions are likely to go unheeded as long as modern criminal justice policy strongly embraces deterrence and incapacitation as a primary distributive theory of punishment. Despite this deference, there has been a definitive movement away from using clinical judgment to make predictions of violence risk.

## Moving Away From Clinical Judgment to Statistical-Based Models of Prediction

Meehl (1954) long trumpeted the idea that actuarial (i.e., strict statistical approaches) would be superior to clinical judgment in predicting behavior. In a review of clinical judgment, Garb (2005) found high levels of errors evidenced across several decision-making domains when clinicians relied strictly on clinical judgment. A primary issue was the overreliance on invalid assessment and diagnostic procedures (see also Garb & Boyle, 2003). Not surprisingly, similar weaknesses were evidenced when clinicians attempted to predict violence using only clinical judgment (Monahan, 1981; Harris, & Rice, 2006; Hilton, Harris, & Rice, 2010). Empirical results regarding clinical judgment have demonstrated that although not completely lacking predictive power and being better than chance, it remained inferior to actuarial methodologies, although that difference was less than expected (Grove, Zald, Lebow, Snitz, & Nelson, 2000).

In moving away from clinical judgment for the purpose of violence risk assessments, two methods predominate: actuarial and structured professional judgment. Actuarial risk assessments are highly structured methods that base the risk for reoffense of violence on derived, statically generated models (Monahan et al., 2005). As noted by Jackson and Guyton (2008), items "chosen for inclusion in actuarial risk assessment schemes are based on their empirical relationship with the outcome of interest (i.e., violence). Items included are not assumed to 'cause' violence or serve an explanatory function" (p. 160). Actuarial instruments have proven reliable and demonstrate modest to strong validity in predicting institutional violence (Cunningham & Sorensen, 2006), recidivism among mentally disordered (Hickey, 2004; Monahan et al., 2005), and domestic violence offenders (Zoe, Harris, & Holder, 2008). Despite the fact actuarial instruments are far from infallible (see Hart, Michie, & Cooke, 2007 for a discussion on shortcomings of applying methods validated on groups to individual prediction), the use of these instruments has gained popularity as a way of minimizing errors associated with clinical judgment by comparing individuals to a group with known rates of violence (Harris & Rice, 2007). Measures such as the Violence Risk Appraisal Guide (VRAG) and Sex Offender Risk Appraisal Guide (SORAG; Quinsey, Harris, Rice, & Cormier, 2006) are two actuarial methods that are often used in clinical practice with the goal of predicting violence and sexual violence, respectively.

Structured professional judgment, on the other hand, consists of methodologies that are more flexible than their actuarial counterparts and more saturated with

dynamic variables. Structured clinical approaches have identified key risk and pro-
tective factors from the literature and integrated them into instruments designed to aid
the clinical process (Boer, Wilson, Gauthier, & Hart, 1997). As a result, a key
consideration of structured professional judgment is the potential integration with risk
management and treatment approaches aimed at the reduction of violence. For
example, measures such as the Historical, Clinical, Risk 20 (HCR-20; Douglas,
Webster, Hart, Eaves, & Ogloff, 2001) and the Sexual Violence Risk (SVR 20, Boer,
Hart, Kropp, & Webster, 2007; Hart & Boer, 2010) use structured guidance to predict
general violence and sexual violence, respectively.

Rogers (2000) stressed the need to evaluate dynamic (changeable) variables along
with static (historical) factors when making predictions of violence risk. An increasing
amount of research has demonstrated the validity of dynamic factors, found in
measures aimed to guide professional judgment, when making predictions of inpatient
violence (Vitacco et al., 2009; Wilson, Desmarais, Nicholls, & Brink, 2010), sexual
recidivism (Blacker, Beech, Wilcox, & Boer, 2011; Olver & Wong, 2011), general
recidivism (Jones, Brown, & Zamble, 2010), and recidivism with juvenile offenders
(Vincent, Chapman, & Cook, 2011). For instance, the Short-Term Assessment of Risk
and Treatability (START; Webster, Martin, Brink, Nicholls, & Desmaris, 2009)
considers both potential risk and protective variables.

However, integrating static and dynamic factors can be complex with high
potential for error. This is especially evident when historical and dynamic factors
conflict (Ansbro, 2010). Yet, it has been proposed that clinicians can work to
improve their violence risk accuracies by incorporating both actuarial and dy-
namic instruments in their assessments of violence risk (Doyle & Dolan, 2002).
Extant research (Douglas, Yeomans, & Boer, 2005; Kroner, Mills, & Reddon,
2005; Kropp & Hart, 2000) indicated improved predictive validity when using
both types of instruments. Mills and Kroner (2006) suggested that when the
results of static and dynamic instruments diverge, the evaluator should rely more
strongly on the actuarial or historical variables given their standardized adminis-
tration, scoring, and predictive strength.

Likewise, an additional challenge facing the widespread use of dynamic
factors is the fact that expert testimony about future dangerousness is cabined
within the framework of legal determinations that are conclusory. That is, by and
large, courts make decisions based on a defendant's risk of future dangerousness
as it is known at the time the legal decision is rendered. In very few contexts does
the court engage in ongoing monitoring of a defendant's risk, with the majority of
decisions arriving at a determination of a defendant's risk based on some certainty
about that risk transmuted into a final judicial decision. In present circumstances,
dynamic risk factors are most likely to be incorporated in postsentencing and
penalogical management approaches such as parole and probation.

## The Present Article

The goal of this article is to summarize and discuss ways in which two of the
most common risk assessment instruments, the VRAG and HCR-20, have been
introduced as evidence across United States' jurisdictions. These two instruments
were selected on the basis of their popularity among clinicians making violence
risk predictions and strong empirical support. This article will evaluate trends in

using risk instruments in legal proceedings that often become contentious because of the potential loss of liberties associated with judicial adjudications. Risk assessment instruments have been used in sentencing evaluations (Bonta, 2007; Kleiman, Ostrom, & Cheesman, 2007), sexually violent persons commitment proceedings (Doren, 2002; Scott, 2008), and death penalty litigation (Cunningham & Sorenson, 2006; Krauss, McCabe, & McFadden, 2009; Scalora, 2009).

Second, this article will evaluate various criticisms of violence risk assessments in light of their uses in court. Rogers' (2000) concern that the results of risk assessment instruments are accepted without critical review is especially relevant to the findings and warrants extended discussion. The relevance to the specific violence referral question can be evaluated and the reader can gain insight into the courts' responses to presented data and appropriateness of risk assessments in the courtroom. Two earlier legal case reviews (DeMatteo & Edens, 2006; Walsh & Walsh, 2006) focusing on the Psychopathy Checklist/Psychopathy Checklist-Revised (PCL, Hare, 1991; PCL-R, Hare, 2003) were highly informative and demonstrated both the promises and problems associated with introducing PCL instruments in court. DeMatteo and Edens' (2006) review was especially useful in describing problematic applications of the PCL in clinical-legal practice. Their review indicated that clinicians often made (1) statements regarding the PCL-R that were unsupported by research, and (2) made improper risk judgments with inappropriate levels of certitude (e.g., equating a PCL score with 100% probability of violence). In discussing three specific cases, these scholars stated, "of particular concern in each of these cases is the fact that the invalid (or at least highly questionable) inferences drawn by the examiners were presented to the courts as grounded in scientific research conducted using the PCL-R" (p. 216). In these cases it appears the results of the PCL/PCL-R were too readily accepted by courts and juries without critical review of noted limitations in predictive power and inappropriate generalizations of PCL-R instruments.

Several recent Supreme Court decisions have effectively put trial judges on notice that as gatekeepers of evidence, they must make relevant inquires into the reliability and validity of expert testimony. This includes testimony from psychologists and other behavioral science experts who rely on psychological tests and assessment procedures in formulating their opinions. (*Daubert v. Merrell Dow Pharmaceuticals*, 1993; see also *Kumho Tire Co., LTD v. Carmichael*, 1999). Additionally, attorneys have access to more information which could lead to them being savvier in their treatment of psychological testing and reports, partially because of primers authored by psychologists and psychiatrists (Ziskin & Faust, 1998) on the limitations of psychological testing and continuing legal education workshops focusing on limitations of psychological testing and effective cross examination techniques. In a recent review of objective and projective psychological testing, Vitacco, Lilienfeld, Erickson, and Wood (in press) point out several issues of test reliability and validity associated with problematic testing results that could lead to disqualification of expert testimony. A key aspect in holding behavioral science expert testimony inadmissible was found to be the misapplication of psychological tests. Similarly, as mentioned in *Barefoot*, admissible expert testimony is not necessarily credible testimony; effective cross-examination can undermine testimony tied to inappropriate use of psychological tests. As a result, mental health practitioners conducting forensic evaluations are

required to take even greater care in making sure their psychological testing and subsequent reports meet the highest evidentiary standards.

## Method

### Measures

**The Violence Risk Assessment Guide (VRAG).**    The VRAG (Quinsey et al., 1998) is a 12-item actuarial instrument developed with male mentally disordered offenders (Harris et al., 1993). It has demonstrated predictive validity for violent behavior among forensic patients, nonforensic psychiatric patients, sex offenders, and released prisoners (Harris et al., 2002, 2003, 2004), and male inmates (Hastings, Krishnan, Tangey, & Stuewig, 2011). Interrater reliability is consistently above acceptable levels (see Quinsey et al., 2006). Overall, the VRAG has evidenced adequate reliability and predictive validity.

**The Historical, Clinical, Risk −20 (HCR-20).**    The HCR-20 (Webster et al., 1997) is a structured checklist designed to assist in assessing risk for future violence. It contains 20 items: 10 items assess past behavior and are considered static items (Historical), five items assess current behaviors (Clinical), and five items examine future behaviors (Risk). The items are coded by a trained clinician on a three point scale: 0 indicates that the item does not apply, 1 indicates that the item may apply or partially applies, and 2 indicates that the item definitely applies. Though a total score can be calculated (a maximum score of 40 is possible), the clinician ultimately uses the items as a guide to arrive at a final determination of risk as low, moderate, or high. Like its actuarial counterparts, the HCR-20 has demonstrated predictive validity for violence across multiple samples (Dolan & Khawaja, 2004; Douglas, Ogloff, Nicholls, & Grant, 1999; Douglas & Reeves, 2010).

### Procedure

A Boolean search for "All CASES" containing the words "Violence Risk Assessment Guide," "VRAG," "Historical, Clinical, Risk," and "HCR-20" was conducted for this study through Westlaw, a computerized legal database. The search resulted in the retrieval of all reported and unreported federal and state cases from year 1658 through April 2010. Westlaw is an online proprietary database service for legal research. We began the search at 1658 to ensure no relevant case cites were excluded. Included was any case in which the VRAG and/or HCR-20 were cited, resulting in 46 cases meeting study inclusion. There were no additional inclusion or exclusion criteria. The cases were then evaluated and basic data (i.e., jurisdiction, year, court), and data related to outcome (i.e., how the instrument was used and holding) were extracted. A complete summary of all cases is presented in Table 1. This study reviewed both published and unpublished cases through Westlaw, and although unpublished cases generally have no precedent value, the trend has been to allow citation to unpublished opinions (c/f: F.R.C.P., 2011).

### Results and Discussion

The VRAG and HCR-20 are increasingly used by behavioral science experts to evaluate violence risk. The current review of 46 cases found 12 separate

Table 1
*Risk Assessment Evidence in Legal Proceedings in the United States*

| Case | Deciding court and citation | Instrument(s) | Findings of assessment | Holding |
|---|---|---|---|---|
| In re the COMMITMENT OF Peter KIENITZ. STATE of Wisconsin, Plaintiff-Respondent, v. Peter KIENITZ, Defendant-Appellant. 1998 | Court of Appeals of Wisconsin. 221 Wis.2d 275, 585 N.W.2d 609. | VRAG | 44% probability of recidivism within 7 yrs, 58% within 10 yrs. | Affirmed order of commitment as SVP. |
| In re the COMMITMENT OF Peter KIENITZ. State of WISCONSIN, Plaintiff-Respondent, v. Peter KIENITZ, Defendant-Appellant-Petitioner. 1999 | Supreme Court of Wisconsin. 227 Wis.2d 423, 597 N.W.2d 712. | VRAG #1<br><br>VRAG #2 | 44% probability of recidivism within 7yrs, 58% within 10 yrs<br>48% probability of recidivism within 10 yrs. | Affirmed petition to have sexual offender committed as SVP. |
| In re the DETENTION OF Abraham W. DEAN, Petitioner. 2000 | Court of Appeals of Washington, Division 3. 2000 WL 690142 (Wash.App. Div.3) | VRAG₃ | Probability to reoffend is somewhere around 35% at 10 years; Unable to say to a "reasonable psychological certainty" that appellant will more likely than not reoffend.<br>Separate doctor claimed that "accuracy of the VRAG in predicting sexual violence is 'barely better than chance. | Matter of status as SVP set for trial; Because of court's "difficulty" with testimony of the witnesses offering these testimonies, the court did not rely on these reports in decision. |

*(table continues)*

Table 1 (*continued*)

| Case | Deciding court and citation | Instrument(s) | Findings of assessment | Holding |
|---|---|---|---|---|
| In re The DETENTION OF Bernard THORELL, Respondent. 2000 | Court of Appeals of Washington, Division 1. 2000 WL 222815 (Wash.App. Div. 1). | $VRAG_{1,3}$ | Found recidivism rate at 76% after 7 yrs and 82% after 10 yrs. | Committed as SVP. |
| In re the Detention of Charles Lee JOHNSON, Appellant, v. STATE of Washington, Respondent. 2001 | Court of Appeals of Washington, Division 1. 2001 WL 508371 (Wash.App.Div. 1) | VRAG | 55% probability of violent reoffense within 7 yrs, 64% within 10 yrs. | Committed under SVP statute. |
| In re DETENTION OF Terry HAYES (The People of the State of Illinois, Petitioner, v. Terry Hayes, Respondent-Appellee- The Department of Human Services, Movant-Appellant. 2001 | Appellate Court of Illinois, Second District. 321 Ill.App.3d 178, 747 N.E.2d 444. 254 Ill.Dec 404. | $VRAG_{0,1}$ | Scored moderately high to high level; Substantial probability for recommitting a sexually violent offense in the future. | Found to be SVP; Committed to Department of Human Services. |
| STATE of Ohio, Plaintiff-Appellee, v. Thomas D. COOKINGHAM, Defendant-Appellant. 2001 | Court of Appeals of Ohio, Eleventh District, Ashtabula County. 2001 WL 848513 (Ohio App. 11 Dist.). | $HCR-20_{0,2,4,5,6}$ $VRAG_{0,2,4,5,6}$ | Presented high degree of risk for sexual recidivism. | Declared sexual predator. |
| In the Matter of the DETENTION OF Gordan Michael STRAUSS. State of Washington, Respondent, v. Gordan Michael Strauss, Appellant. 2001 | Court of Appeals of Washington, Division 1. 106 Wash.App. 1, 20 P.3d 1022. | $VRAG_{0,1,10}$ | More likely than not that defendant would commit a new sexual offense if not confined to secure facility. | Civilly committed as SVP to secure facility. |

Table 1 (continued)

| Case | Deciding court and citation | Instrument(s) | Findings of assessment | Holding |
|---|---|---|---|---|
| STATE of Ohio, Plaintiff-Appellee, v. Ernest D. ECKLIN, Defendant-Appellee. 2002 | Court of Appeals of Ohio, Eleventh District, Lake County. 2002 WL 31501859 (Ohio App.11 Dist.). | $VRAG_{0,2,4,5,6}$ HCR-20 | Scored 15 which falls within 55% chance to violently reoffend within 7 yrs, 64% within 10 yrs Appellant poses "definite and serious sexual and violent future risk." | Defendant declared SVP. |
| STATE of Ohio, Plaintiff-Appellee, v. Justin BOWMAN, Defendant-Appellant. 2002 | Court of Appeals of Ohio, Twelfth District, Butler County. 2002 WL 1964630 (Ohio App.12 Dist.). | $VRAG_3$ | Appellant score placed him in the 8th (out of 9) bin, indicating 76% risk of reoffense after 7 yrs, 82% after 10 yrs.. | Defendant declared sexual predator. |
| STATE of Ohio, Appellee, v. Michael HAMMERBERG, Appellant. 2002 | Court of Appeals of Ohio, Sixth District, Lucas County. 2002 WL 1376179 (Ohio App. 6 Dist.). | $VRAG_{2,4}$ | Scored a Category 8, which indicates 76%-82% chance of reoffending. | Defendant adjudicated sexual predator. |
| Brian D. GROSSINGER, Petitioner and Appellee, v. M.B.K. Respondent and Appellant. 2002 | Supreme Court of North Dakota. 639 N.W.2d 473. | $VRAG_{1,2,4}$ | 82% risk of committing violent offense within 10 yrs. | Committed as SDP. |
| In re the DETENTION OF Paul B. BOLTON (The People of the State of Illinois, Plaintiff-Appellee, v. Paul B. Bolton, Defendant-Appellee). 2003 | Appellate Court of Illinois, Fourth District. 343 Ill.App.3d 1223, 800 N.E.2d 128, 279 Ill.Dec.286. | $VRAG_{0,2,4,9}$ | Found substantial probability the defendant will engage in acts of sexual violence in future unless significant intervention has taken place. | Adjudicated SVP and committed to institutional care in secured facility; Reversed on appeal. |

(table continues)

370                    VITACCO,  ERICKSON,  KURUS,  AND  APPLE

Table 1 (*continued*)

| Case | Deciding court and citation | Instrument(s) | Findings of assessment | Holding |
|---|---|---|---|---|
| Roderick D. LEE, Appellant, v. STATE of Florida, Appellee. 2003 | District Court of Appeal of Florida, Second District. 854 So.2d 709 | VRAG[0, 2, 3] | Appellant at very high risk of reoffending without secure residential treatment. | Committed as SVP. |
| STATE of Washington, Respondent, v. Mitchell GAFF, Appellant. 2003 | Court of Appeals of Washington, Division 1. 2003 WL 22121048 (Wash.App.Div. 1). | VRAG | Appellant has 55% chance of reoffending over 7 yrs, 64% over 10 yrs. | Appellant will remain in custody at a commitment center. |
| The PEOPLE, Plaintiff and Respondent, v. Robert Lee ELSON, Defendant and Appellant. 2004 | Court of Appeal, Fourth District, Division 2, California. 2004 WL 1127184 (Cal.App. 4 Dist.) | HCR-20 | Scored high. | Commitment to Department of Mental Health extended. |
| In the Matter of the DETENTION OF Christopher C. RUDOLPH, Appellant. 2004 | Court of Appeals of Washington, Division 1. 2004 WL 1328673 (Wash.App.Div.1). | VRAG[0, 3, 4] | Found more likely than not to engage in predatory acts of sexual violence if not confined to secure facility. | Appellant committed as SVP. |
| In re COMMITMENT OF Stephen E. SIMONS. (The People of the State of Illinois, Appellant, v. Stephen E. Simons, Appellee). 2004 | Supreme Court of Illinois. 213 Ill.2d 523, 821 N.E.2d 1184, 290 Ill.Dec.610. | VRAG[0, 3, 4, 9] | Scored 20, which places defendant in category of 55% chance of reoffending within 7 yrs, 64% chance within 10 yrs. | Adjudicated SVP and civilly committed to custody of Department of Health and Human Services. |
| In re COMMITMENT OF Charles RODGERS. Charles Rodgers, Appellant, v. State of Florida, Appellee. 2004 | District Court of Appeal of Florida, Second District. 875 So.2d 737. | VRAG[0, 1, 2] | Used to prove future dangerousness. | Offender adjudicated SVP and committed to secure facility. |

Table 1 (continued)

| Case | Deciding court and citation | Instrument(s) | Findings of assessment | Holding |
|---|---|---|---|---|
| In re Application of Eileen CONSILVIO, etc., et al., Petitioners-Appellants, For a Subsequent Retention Order, etc., v. ALAN L., Respondent-Respondent. 2004 | Supreme Court, Appellate Division, First Department, New York. 7 A.D.3d 252, 776 N.Y.S.2d 33. | $HCR-20_2$ | Indicated severe psychopathology and high risk for reoffending. | Appellant retained in secure facility. |
| The PEOPLE, Plaintiff and Respondent, v. Ismael JORDAN, Defendant and Appellant. 2005 | Court of Appeal, First District, Division 5, California. 2005 WL 15432 (Cal.App. 1 Dist.). | $VRAG_{2,5}$ | "Probability of future violence over 7 yrs is less than 50–50[?] . . . which "the authors put at 17%" . . . "looking at 10 yrs goes up to 31%.". | Denied petition for release to community release program. |
| | | VRAG; 2nd Rater | Found risk of reoffending to be 35% at 7 yrs and 48% at 10 yrs; Rater testified that he/she "did not find the VRAG helpful in predicting the risk of reoffense." | |
| In the Matter of the Detention of Daniel AUDETT. State of Washington, Petitioner, v. Daniel AUDETT, Respondent. 2006 | Supreme Court of Washington, En Banc. 158 Wash.2d 712, 147 P.3d 982. | $VRAG_{0,3,4}$ | Likelihood of reoffending in future is greater than 50% over various time frames. | Committed as SVP. |

(table continues)

Table 1 (continued)

| Case | Deciding court and citation | Instrument(s) | Findings of assessment | Holding |
|---|---|---|---|---|
| In the Matter of the CIVIL COMMITMENT OF Todd Anthony FERNANDES. 2006 | Court of Appeals of Minnesota. 2006 WL 2947642 (Minn.App.). | $HCR\text{-}20_{1,3,4,6}$ $VRAG_{1,3,4,6}$ | Appellant has "higher risk to re-offend than other offenders and appellant meets criteria for SDP." | Appeal from indeterminate commitment as SDP denied. |
| In re the DETENTION of Keith W. ELMORE, Respondent/Cross-Appellant, v. STATE of Washington, Appellant/Cross-Respondent. 2006 | Court of Appeals of Washington, Division 2. 134 Wash.App.402, 139 P.3d 1140. | $VRAG_{0,4,6}$ | Suggested that defendant had 8% chance of violently recidivating within 10 years. | Committed as SVP. |
| In the Matter of the CIVIL COMMITMENT OF Michael Kenneth STRINGER. 2006 | Court of Appeals of Minnesota. 2006 WL 2129829 (Minn.App.). | $VRAG_{0,2,3,4,6}$ | Found that appellant scored 24 or category 8 (out of nine), indicating 76% risk of reoffense after 7 yrs, 82% after 10 yrs; "Highly likely to reoffend." | Indeterminately committed as SDP and SPP. |
| In the Matter of the CIVIL COMMITMENT OF Robert Leroy RUSTMANT. 2006 | Court of Appeals of Minnesota. 2006 WL 1738283 (Minn.App.). | $VRAG_{0,1,2,3,4}$ | Experts opined that appellant meets SDP criteria. | Committed as SDP and SPP. |
| The PEOPLE, Plaintiff and Respondent, v. Abraham GALINDO, Defendant and Appellant. 2007 | Court of Appeal, Third District, California. 2007 WL 4305537 (Cal.App. 3 Dist.). | $HCR\text{-}20_{2}$ | Identified as high risk. | Commitment extended 2 yrs. |
| In the Matter of the CIVIL COMMITMENT OF Ozhaawaskoo GIISHIG a/k/a Guy Israel Green. 2007 | Court of Appeals of Minnesota. 2007 WL 2601423 (Minn.App) | $HCR\text{-}20_{0,2,3,4,6,7,8}$ | "Reasonable degree of psychological certainty that appellant satisfies statutory criteria for commitment as SDP." | Commitment as SDP extended-Finding based more heavily on other assessments than HCR-20. |

Table 1 (continued)

| Case | Deciding court and citation | Instrument(s) | Findings of assessment | Holding |
| --- | --- | --- | --- | --- |
| In the Matter of the WELFARE OF J.B.S. 2007 | Court of Appeals of Minnesota. 2007 WL 447093 (Minn.App.). | VRAG | Scores fell within 76% of sample that reoffended in violent manner within 7 yrs, 82% within 10 yrs. | Affirmed that appellant qualifies for adult prosecution. |
| In the Matter of the CIVIL COMMITMENT OF Sean Patrick BRINKMAN. 2008 | Court of Appeals of Minnesota. 2008 WL 5058637 (Minn.App.). | HCR-20$_{0,2,3,4,6}$ | Appellant lacks power to control sexual impulses. | Affirmed commitment of appellant as SDP. |
| UNITED STATES of America, Petitioner, v. Jay ABREGANA, Respondent. 2008 | United States District Court, D. Hawai'i. 574 F.Supp.2d 1145 | VRAG$_{0,1,4}$ | Court found inclusion of VRAG not relevant. | Denied petition to civilly commit defendant as SDP. |
| William Williams, Petitioner, v. John C. MARSHALL, Warden, Respondent. 2008 | United States District Court, C.D. California. 2008 WL 3201227 (C.D.Cal.) | HCR-20$_2$<br><br>VRAG | Scored within low range of severity of risk of reoffense<br><br>Scored within low range of severity of risk of reoffense. | Found petitioner suitable for parole. |
| UNITED STATES of America, Appellee, v. Donald FELL, Defendant-Appellant. 2008 | United States Court of Appeals, Second Circuit. 531 F.3d 197 | HCR-20 VRAG | Defendant found to be high risk (and referred to as "psychopath"). | Assessments not called upon in court. |
| The PEOPLE, Plaintiff and Respondent, v. Scott E. GRAHAM, Defendant and Appellant. 2008 | Court of Appeal, Fourth District, Division 1, California. 2008 WL 2008879 (Cal.App. 4 Dist.). | HCR-20$_2$<br><br>VRAG$_2$ | Exhibited factors showing moderate risk for future violence. 17% of sample with similar score committed violent acts within 7 yrs, 31% within 10 yrs. | Extended commitment as MDO. |

*(table continues)*

Table 1 (*continued*)

| Case | Deciding court and citation | Instrument(s) | Findings of assessment | Holding |
|---|---|---|---|---|
| The PEOPLE, Plaintiff and Respondent, v. Danny Frederick ATTERBURY, Defendant and Appellant. 2008 | Court of Appeal, Third District, California. 2008 WL 684561 (Cal.App. 3 Dist.). | $VRAG_2$<br><br>HCR-$20_2$ | Scored 9; 58% chance of violent reoffense within 10 yrs. Scored 31, demonstrating "very significant risk." | Commitment to state hospital extended 2 yrs. |
| COMMONWEALTH of Virginia v. Frankie Lee SQUIRE. 2009 | Supreme Court of Virginia. 278 Va. 746, 685 *SE* 2d 631. | $VRAG_{3, 4}$ | Defendant scored + 16 which indicates moderate-high range and 55% probability of violent reoffense within 7 years, 64% probability within 10 years. | Denied common wealth's petition to civilly commit defendant as SVP. |
| In the Matter of the CIVIL COMMITMENT OF Eric Woods HALVORSON. 2009 | Court of Appeals of Minnesota. 2009 WL 2928442 (Minn.App.) | $VRAG_{0, 3, 4, 5}$<br>HCR-$20_{0, 3, 4, 5}$ | 55% probability of violent reoffense within 7 years, 64% probability within 10 years. High risk of reoffense. | Committed appellant as SDP. |
| In re Richard HAUGEN on Habeas Corpus. 2009 | Court of Appeal, Fourth District, Division 1, California. 2009 WL 1900387 (Cal.App. 4 Dist.) | HCR-20<br>VRAG | Scored in low range. Scored in moderate range. | Denied petition for habeas relief (from previous decision to overturn grant of parole). |

Table 1 (continued)

| Case | Deciding court and citation | Instrument(s) | Findings of assessment | Holding |
|---|---|---|---|---|
| David PEASLEE, Petitioner, v. John MARSHALL, Warden, Respondent. 2009 | United States District Court, C.D. California. 2009 WL 1505165 (C.D.Cal.). | HCR-20<br><br>VRAG | Scored at high end of low range of severity of likelihood to reoffend.<br>Scored within moderate range of likelihood to reoffend; 44% risk of recidivism within 7 years, 58% risk within 10 years. | Denied petition for habeas relief; Denied petition to stay denial proceedings. |
| James JOHNSON, Petitioner, v. John MARSHALL, Respondent. 2009 | United States District Court, C.D. California. 2009 WL 1286323 (C.D.Cal.). | HCR-20<br><br>VRAG | Scored in moderate range of risk for reoffense under historical; Low range of risk for reoffense.<br>Scored moderate range of risk of reoffense. | Denied petition for writ of habeas corpus. |
| In the Matter of the CIVIL COMMITMENT OF Thomas Ladon WEBBER. 2009 | Court of Appeals of Minnesota. 2009 WL 1119239 (Minn.App.). | $VRAG_{0, 2, 3, 4}$ | High likelihood of reoffense. | Affirmed order for indeterminate civil commitment of SDP and SPP. |
| In re Linda Lee SMITH, on Habeas Corpus. 2009 | Court of Appeal, Second District, Division 6, California. 171 Cal.App.4th 1631, 90 Cal.Rptr.3d 400. | HCR-20 | Suggests that probability of future offenses would fall below 5% over 3 year period. | Granted inmate's petition of habeas corpus, vacating governor's reversal of parole board's grant of parole. |
| In re Frank Joe BAUTISTA, on Habeas Corpus. 2009 | Court of Appeal, Sixth District, California. 2009 WL 1227958 (Cal.App. 6 Dist.). | HCR-20 & VRAG<br><br>HCR-20; 2nd rater | Moderate risk to public safety.<br>High risk of future violence. | Denied parole for one year. |

(table continues)

VITACCO, ERICKSON, KURUS, AND APPLE

Table 1 (*continued*)

| Case | Deciding court and citation | Instrument(s) | Findings of assessment | Holding |
|---|---|---|---|---|
| In re Ernesto Rangel JAUREZ, on Habeas Corpus. 2010 | Court of Appeal, First District, Division 2, California. 182 Cal.App.4th 1316, 106 Cal.Rptr.3d 648. | HCR-20$_2$ | Minimal concerns for future risk of dangerous behavior. | Granted petition for writ of habeas corpus. |
| Charles RILEY, Petitioner, v. John MARSHALL, Warden, Respondent. 2010 | United States District Court, C.D. California, Western Division. 2010 WL 702242(C.D.Cal) | HCR-20$_2$ VRAG$_2$ | Moderate scores for past violence, low scores for present and future violence. Moderate risk for violence in next 10 years. | Denied defendant's petition for writ of habeas corpus. |

*Note.* SVP = Sexually Violent Person; SDP = Sexual Dangerous Person; MDO = Mentally Disordered Offender; 0 = MnSOST/ MnSOST-R; 1 = RRASOR; 2 = PCL/PCL-R; 2 = SORAG; 3 = STATIC 99; 4 = Minnesota Multiphasic Personality Inventory-2; 5 = Sexually Violence Risk-20; 6 = Millon Clinical Multiaxial Inventory-II; 7 = Personality Assessment Inventory; 8 = Hanson and Bussiere Meta-analysis; 9 = Structured Risk Assessment 1999; 10 = LS/CMI.

jurisdictions citing the VRAG and HCR-20. Table 2 presents a listing for number of cases by jurisdiction. California had the largest number of citations (15) with Minnesota and Washington both having eight. As presented in Table 3, the most common cited use of the VRAG and HCR-20 risk assessment instruments occurred in sexual commitment hearings. The jurisdictional results are not surprising given that California, Minnesota, and Washington have laws allowing postincarceration commitment of sex offenders deemed to pose a substantial risk for committing another sex offense. Not only are these commitment laws "on the books," but states aggressively pursue civil commitment of sex offenders deemed to be at high risk for future sexual offenses. These cases often have intense litigation over individual commitments. Other uses of the VRAG and HCR-20 centered on violence assessments for potential parolees and for conditional release as well as one case dealing with an adolescent transfer to adult court and one death penalty case. As can be seen in Table 1, the highest number of risk assessment citations occurred in 2008 (6 citations) and 2009 (8 citations), while there was only one citation in 1998, 1999, and 2005.

## Appropriateness of the VRAG and HCR-20 for SVP Evaluations

The United States Supreme Court upheld the constitutionality of the civil commitment of sex offenders (*Kansas v. Hendricks*, 1997). This decision by the Supreme Court set off widespread controversy that remains present almost 15 years later. Commonly referred to as sexual predator or sexually violent person (SVP) laws, these evaluations place mental health experts in contentious roles. Scholars have criticized these laws as unconstitutional (La Fond, 2003; Turner, 1996), prohibitively expensive (La Fond, 2008; Schlank, 2006), and have pointed to problems diagnosing disorders that predispose individuals to committing future sexual offenses (Fabian, 2011; First & Halon, 2008; Morse, 2008; Zander, 2008). Morse (2008) described how the reintroduction of sexual predator laws has decreased the line between criminal and civil confinement and provides states

Table 2
*Number of Cases by Jurisdiction*

| State/jurisdiction | Number of cases |
| --- | --- |
| California | 15 |
| Federal Appeals-Second District | 1 |
| Florida | 2 |
| Hawaii | 1 |
| Illinois | 3 |
| Minnesota | 8 |
| New York | 1 |
| North Dakota | 1 |
| Ohio | 3 |
| Virginia | 1 |
| Washington | 8 |
| Wisconsin | 2[a] |

[a] Wisconsin case is cited twice at both the Wisconsin Court of Appeals and the Wisconsin Supreme Court levels.

Table 3
*Number of Cases by Type of Evaluation*

| State/jurisdiction | Number of cases | VRAG | HCR-20 |
|---|---|---|---|
| SVP | 28 | 25 | 6 |
| Parole hearing/Conditional release | 16 | 10 | 14 |
| Death penalty | 1 | 1 | 1 |
| Transfer to adult court | 1 | 1 | 0 |

with wide latitude in defining which mental disorders constitute a basis to argue that a continued threat of sexual offending exists.

On its face, the use of the VRAG and HCR-20 in SVP cases is a curious decision by evaluators, especially given the stated purpose of these instruments is to understand individual factors related to risk of general violence and not sexual violence or recidivism. Yet, there has been evidence that the two strongest predictors of sexual recidivism are sexual deviance and antisocial orientation/propensity for violence (Hanson & Morton-Bourgon, 2005; Quinsey et al., 2006). For instance, Harris et al. (2003) reviewed predictive power of four instruments with 396 sex offenders finding the VRAG was strongly predictive of sexual recidivism (see also Langton et al., 2007). Likewise, the VRAG has shown to be a good predictor of sexual recidivism in mental health patients with intellectual deficits (Camilleri, Westfield, & Quinsey, 2011). The HCR-20, although not having as robust a research base, was found to predict sexual violence in a sample of sex offenders from Germany (Stadtland et al., 2005).

As such, the decision to use these instruments, designed to identify individuals most at-risk for general violence, is on solid ground, provided that additional measures of sexual deviancy are included. As evidenced in Table 1, clinicians do not typically use the VRAG and HCR-20 in isolation in SVP evaluations. Clinicians typically used additional instruments associated with violence (e.g., PCL-R; Hare, 2003) and other actuarial measures designed to predict sexual-specific violence (Sex Offender Risk Appraisal Guide, SORAG; Quinsey, Harris, Rice, & Cormier, 2006).

### Appropriateness of the VRAG and HCR-20 for Release/Parole Evaluations

The second most common type of evaluation identified in our case review was the use of the VRAG and HCR-20 to assess violence risk in individuals petitioning for parole or conditional release. These evaluations made up almost 35% of the cases found in this review. This result is not surprising given that the VRAG and HCR-20 were specifically developed to understand and even quantify violence risk. Moreover, these types of predictions are highly supported by extant research. The VRAG and HCR-20 are uniquely suited for providing information if understanding risk for future violence is a relevant factor to consider for community reentry. Dozens of studies have supported the use of these instruments in matters of general violence prediction. Indeed, that is there central purpose and independent research has confirmed that they are reliable and valid measures for that purpose. For instance, Dernevik, Grann, and Johansson (2002) found the HCR-20 was predictive of inpatient violence, whereas Hastings et al. (2011)

found the VRAG was predictive of both misconduct and recidivism over the first year postrelease in male (but not female) inmates. McDermott, Sulan, and Scott (2011) reported significant findings for both the VRAG and HCR-20 Management scale in predicting inpatient violence, but somewhat better results for the Classification of Violence Risk in a sample of forensic patients. The HCR-20 has also evidenced good predictive power regarding community (Belfrage, Frannson, & Strand, 2000; Gray, Fitzgerald, Taylor, MacCulloch & Snowden, 2005) and institutional aggression (Belfrage, 1998; McKenzie & Curr, 2005).

Despite appropriateness of using the risk assessments for providing information beneficial to the decision-making process for conditional release and parole decisions, there are caveats and limitations that clinicians must consider. Clinicians must be cognizant of these limitations, even when using the measures in a manner consistent with their intended use. First, the VRAG and the Historical (H) section of the HCR-20 strictly evaluate variables that are static. As such, the VRAG and the H section make no allowance for potential treatment progress, which is most aptly measured by dynamic variables (Douglas & Skeem, 2005). Strictly actuarial measures and the H scale fail to incorporate treatment progress or consider developmental issues that could decrease violence likelihood. Second, as noted by Rogers (2000), when evaluators make predictions of risk they should use a balanced approach; this approach integrates both risk and protective factors (those that decrease risk). Clinicians using instruments saturated with historical items must specifically focus on whether empirically derived protective factors are also present (Loeber, Farrington, Stouthamer-Loeber, Moffitt, & Caspi, 1998; Suzuki, Geffner, & Bucky, 2009; Viljoen, McLachlan, & Vincent, 2010). Clinicians may improve information they provide when they evaluate and discuss risk and protective factors in their assessments to balance risk assessment evaluations to the extent possible. A key consideration that also warrants consideration when predicting violence risk is that risk assessment measures possess predictive validity insofar as the results inform evaluators about probabilities within a specific group of individuals and do not necessarily generalize (Skeem & Monahan, 2011).

## Potential Minefields in Using the VRAG and HCR-20 in Risk Assessment Evaluations

Two cases (*In the Matter of the Welfare of J.B.S. 2007*; *United States v. Fell,* 2008) reviewed in this study illustrate uses of the VRAG and HCR-20 fraught with potential pitfalls. These cases represent areas where either existing research lacked established norms, making accurate conclusions difficult, or existing legal doctrine is at odds with prevailing practices. Using instruments where established norms are absent is notoriously daunting and unwise because precise judgments cannot be made and the risk for erroneous conclusions is ever-present. Proper risk assessment is based on answering the salient legal question by focusing on relevant risk factors that are necessarily nested within the context and individual facts of each case. That is, good risk assessment uses techniques grounded in specific circumstances presented in each case with the goal of answering the legally relevant question. Unbridled speculation clothed in the semantics of statistical conclusions is as unhelpful and dangerous as pure armchair conjecture.

*United States v. Fell* (2008) presents a case where prevailing clinical wisdom and existing legal doctrine appear in tension. In *Fell*, a psychiatrist used the VRAG and the HCR-20 to conclude that the defendant posed a continuing threat of danger to society during the penalty phase of a death penalty case. Critics of this practice suggest that such determinations are erroneous because all jurisdictions which maintain the death penalty now provide for an alternative sentence of life without the possibility of parole (Cunningham & Vigen, 2002). As noted by Cunningham (2006), many variables previously linked to future violence after release from prison have been minimized by policy changes aimed at decreasing prison violence and ensuring early release is unavailable for individuals convicted for violent offenses. Moreover, the overall rate of violence is extremely minimal on death row, even when inmates have access to open areas (Cunningham & Vigen, 2002). Krauss, McCabe, and McFadden (2009) discussed the significant limitations associated with trying to make predictions of future violence in capital cases. Edens, Buffington-Vollum, Keilen, Roskamp, and Anthony (2005) suggested that predictions of future dangerousness in capital offenders are problematic insofar as capital inmates often have very low rates of institutional violence and thus, in their opinion, pose little risk for future dangerousness. Thus, if the relevant comparison group is exclusively other convicted offenders, then forecasting dangerousness becomes mired by diminutive base rates of institutional violence among capital convicts. Given this fact, it is argued that the relevant inquiry is whether the defendant is likely to pose a danger to other inmates and prison officials. If that is true, then predictions of future dangerousness using the VRAG and HCR-20 seem inappropriate given that these instruments do not contain norms for custodial inmates.

Legal precedent suggests otherwise, however. Several courts have held that the *legal* question is not whether the defendant poses a risk to *prison society* but whether the defendant poses a risk to *general society* (see, *Lovitt v. Commissioner*, 2000). Several explanations seem to justify this result. First, the relevant inquiry under the plain meaning of the pertinent statutes is not "whether [a defendant] *could* commit criminal acts of violence in the future but whether he *would*" (*Burns v. Commonwealth*, 2001). Indeed, of the six states which provide future dangerousness as an enumerated, aggravating factor (Idaho Code § 19–2515(9)(i); Okla. Stat. tit. Twenty-one § 701.12(7); Or. Rev. Stat. § 163.150(1)(b)(B); VA Code Ann. § 19.2–264.2; Wyo. Stat. Ann. § 6–2–102(h)(xi); Texas C.C.P. Art. 37.071), no court has held that such provisions should limit considerations to prison society. In fact, the weight of legal authority has urged the opposite finding (*State v. Douglas*, 1990; *McElmurry v. State*, 2002; *Muniz v. State*, 1993; *Lovitt v. Commissioner*, 2000). Likewise, even the mere possibility of escape or pardon has been held as sufficient grounds for considering the risk of future dangerousness in death penalty cases (*United States v. Allen*, 2001).

A more fundamental reason for this legal doctrine, however, rests on the fact that the future dangerousness inquiry is not based so much on public safety grounds but on retributive justifications. That is, what delineates death penalty eligible defendants from those who deserve life without parole is whether they theoretically pose a continuing danger to society compared to the general population. For those that do, they fulfill the aggravating, structured factors that the Supreme Court held as necessary under *Gregg v. Georgia* (1976) when it revived

the death penalty. Despite this legal landscape, clinicians might find it odd they could be asked to base their expert testimony on theoretical possibilities instead of factual probabilities. Yet that very issue was addressed by the Supreme Court in *Barefoot v. Estelle*, finding hypothetical questions permissible in arriving at expert conclusions.

An alternate challenge is identified in the case *In the Matter of the Welfare of J.B.S.* (2007). In this particular case, the VRAG was used by the expert in making a recommendation that a juvenile offender be transferred to adult court to face a potentially longer sentence. In *Kent v. United States* (1966), the United States Supreme Court afforded mandated legal protections to juvenile offenders who faced transfer to adult court. As part of this decision, the Supreme Court alluded to criteria drafted in a 1959 memorandum by a District of Columbia juvenile judge. These included three criteria that were deemed necessary for evaluation prior to transferring a juvenile to adult court (Witt, 2003). They included (a) the severity and nature of the offense, (b) the need to protect the community from future harm, and (c) the maturity and sophistication of the juvenile offender. Additionally, several recent Supreme Court cases have further elucidated the categorical difference of juvenile justice jurisprudence in ways significant to assessments of future dangerousness. In *Roper v. Simmons* (2005), the Court held that the application of the death penalty for juvenile defendants was an unconstitutional violation of the Eighth Amendment. Citing contemporary standards of decency as a hallmark test of cruel and unusual punishment, the Court held that progressive legislative prohibitions of certain punishments as evidence that a particular punishment had become unusual for Eight Amendment purposes. This, in addition to the infrequent use of the death penalty with juveniles in jurisdictions which authorized its use, was deemed sufficient evidence that society had determined that juveniles, as a class, were less culpable than adults, and therefore, application of the death penalty with juveniles was cruel for constitutional purposes. Likewise, in *Graham v. Florida* (2010), the Court maintained a similar analysis for imposition of life sentences without the possibility of parole juveniles convicted of nonhomicide crimes. The underlying theme within the court's juvenile justice jurisprudence centers on the notion that juveniles are less culpable because it is presumed that their capacities are not fully developed and unlawful conduct may reflect these undeveloped capacities rather than the matured abilities of adults (Kruh & Brodsky, 1997).

When considering how to conduct juvenile transfer evaluations, the use of risk assessment instruments that fail to account for protective and dynamic factors is disharmonious with the criteria outlined in *Kent* and embodied with the dicta of *Roper* and *Graham*. Brannen et al. (2006) evaluated *Kent* criteria through the responses of 331 juvenile judges and found dangerousness and sophistication were primary factors considered in the decision to transfer juveniles to adult court. It appears that dangerousness is often a function of the index offense and not necessarily based on what would constitute a continued risk to society. If one considers risk to be continuous from adolescence to adulthood (see Lacourse, Dupéré, & Loeber, 2008), measures such as the Risk, Sophistication-Maturity, and Treatment Amenability Instrument (RST-I; Leistico & Salekin, 2003) or the Structured Assessment of Violence Risk in Youth (Borum, Bartel, & Forth, 2005) are uniquely suited to be used in transfer evaluations and more closely map onto

the so-called *Kent* criteria Spice, Viljoen, Gretton, & Roesch (2010). This limitation is magnified in a measure such as the VRAG, where the only focus is actuarial measurement. Other constructs associated with risk, like psychopathy, have been criticized on the basis that they do not take into account developmental issues (Seagrave & Grisso, 2002; Vitacco & Vincent, 2006). These concerns readily apply to adult instruments of risk, which fail to account for dramatic developmental changes evidenced throughout adolescence (Van Der Put et al., 2011).

A possible rebuttal to this argument might suggest that despite the empirical reality of youth violence desistence, a conclusion drawn from probabilities misses the context of the legal inquiry. Legal determinations, by and large, are constrained by the requirement of legal conclusion. For instance, when a court makes a waiver decision, it must do so now; not on speculation that an adolescent might change in the future. That decision occurs at a specific point in time, and any predictions that are made must be done so with the available relevant information. The possibility of change is an insufficient ground for making judgments related to risk because the indeterminacies are speculative; the question is not one of potential for change but of existing risk. This bedevils the applicability of all dynamic risk assessment. Yet, at least with juveniles, *Roper* and *Graham* suggest that the change inherent in maturation is a relevant factor in criminal adjudication.

Extant research clearly demonstrates that many adolescents who engage in violent behavior do not continue to engage in violence in adulthood. This concept, referred to as discontinuity, has been discussed in several recent research and theoretical papers (Lussier, Farrington, & Moffitt, 2009; Lynam, Miller, Vachon, Loeber, & Southmaer-Loeber, 2009; Vitacco & Vincent, 2006) indicating how difficult it is for experts to accurately predict an adolescent's risk for violence on the basis of a single risk assessment. Vitacco, Salekin, and Rogers (2010) recommended making shorter-term risk predictions (e.g., 6 months) with adolescents given the propensity for significant change. As such, a sole focus on historical risk factors to the exclusion of dynamic factor is inconsistent with the criteria outlined in *Kent*. The consequences of inappropriate transfer are significant, and inappropriate risk assessment can foreclose the rehabilitative premise of juvenile courts.

## General Acceptance and Critical Review by Courts of the VRAG and HCR-20

A criticism of risk assessment evaluations has focused on the inclination of judges and juries to uncritically accept the findings of risk evaluations related to future dangerousness (Rogers, 2000). This criticism formed the basis for the constitutional challenge argued in *Barefoot v. Estelle* (1993). However, high concordance between evaluator's opinions and court decisions are also found in competency to stand trial and criminal responsibility cases (Warren, Fitch, Dietz, & Rosenfeld, 1991; Rogers & Shuman, 2005; Zapf & Roesch, 2009). Yet, in this review, there were instances where courts decided that the risk assessment instruments were not relevant to the psycholegal question (*U.S. v. Jay Abregana*, 2008) or denied the state's petition altogether (*Commonwealth of Virginia v.*

*Frankie Lee Squire,* 2009). The courts' acceptance or lack of acceptance of risk assessment instruments is an area of research ripe for further study.

Although there are instances in this review of the court acting as the "gate-keeper" of scientific evidence, it is clear that on whole the courts accepted the findings of the risk assessment instruments. Subsequent field and legal research is best suited for studying how risk instruments are used in clinical practice and ultimately, how they are accepted by courts. A real concern that has been introduced in the literature is partisanship by evaluators (Murrie, Boccaccini, Johnson, & Janke, 2008). Partisanship has had large effects on clinical results, especially evident in sex offender civil commitment evaluations. The review here did not allow for this type of conclusions. Finally, we must acknowledge a principal limitation of the current methodology is that most risk assessments completed by mental health practitioners are not reviewed by the courts. As such, this review was only able to focus on a very small percentage of actual risk assessment cases.

## Conclusions

This case review of the VRAG and HCR-20 presents data obtained through a review of 46 legal cases. Given these instruments were designed to aid in violence risk assessments it is not surprising they have been increasingly introduced in court proceedings. Results of this article can be summarized in three primary points. First, the VRAG and HCR-20 are most typically being presented in cases where the ultimate issue revolves around sexually violent person's commitment or potential release from a secure setting to parole. Forty-four of the 46 cases centered on these two issues. Given the VRAG and HCR-20 both have demonstrated predictive validity for community-based violence (Douglas & Reeves, 2010; Hastings et al., 2011), they would likely add incremental validity to clinical decisions focused on understanding risks of violence in these cases. The use of the VRAG especially, but also the HCR-20, in determining whether an individual is at high risk for committing future sexual violence is understandable given that deviant sexual behavior combined with a general risk for violence have shown utility in predicting sexual violence (Camilleri et al., 2011; Harris et al., 2003; Langton et al., 2007).

Second, there are potential pitfalls when using risk assessment measures. In the current review, we identified two specific areas of concern: use in death penalty case and in transferring a juvenile to adult court. When an expert uses a risk assessment instrument he or she should do so in a manner that is empirically justified and consistent with research. Continued scrutiny will lead to questions about the use of risk assessment instruments in legal proceedings. Clinicians have the responsibility to ensure the risk assessment instruments are being used consistent with empirical data, but also in a matter that is consistent with appropriate legal standards. Absent of appropriate use and abdications of clinical responsibility, the courts have the authority to disallow their admission and arrive at the appropriate legal decision.

Psychologists and psychiatrists only need to look to their respective ethics codes for guidelines on how to proceed with testing. For example, in Section 9.01 of the Ethics Codes of the American Psychological Association it is stated:

Psychologists base the opinions contained in their recommendations, reports, and diagnostic or evaluative statements, including forensic testimony, on information and techniques sufficient to substantive their findings.

As initially discussed by Heilbrun (1997) there are two models of risk assessment. The first focuses on assessment and the other on risk management. One such way to improve the ethics of risk assessment is a clear focus on risk management, while recognizing that there are clear instances where the court's primary question is only centered on risk probability. By including instruments evaluating dynamic variables, clinicians may be provided information on how to best work with individuals at ameliorating violence. In summary, this legal case review presents uses of the VRAG and HCR-20 in judicial proceedings. It is clear that although extant research is generally supportive of the use of these specialized instruments, each individual case warrants appropriate scrutiny. Attention is vital to ensure to the extent possible that risk assessments, like the VRAG and HCR-20, are completed consistent with appropriate clinical and ethical standards. Ethical risk assessment involves a balanced approach with consideration of protective factors, as well as dynamic factors that can be a focus of treatment. Future research endeavors are encouraged to further inform the field on appropriate uses of risk assessment instruments and how their use can most inform risk management strategies designed to reduce violence.

## References

Addington v. Texas, 441 U.S. 418 (1979).

Ansbro, M. (2010). The nuts and bolts of risk assessment: When the clinical and actuarial conflict. *Howard Journal of Criminal Justice, 49,* 252–268. http://dx.doi.org/10.1111/j.1468-2311.2010.00614.x

Barefoot v. Estelle, 463 U.S. 880 (1983).

Belfrage, H. (1998). Implementing the HCR-20 scheme for risk assessment in a forensic psychiatric hospital: Integrating research and clinical practice. *Journal of Forensic Psychiatry, 9,* 328–338. http://dx.doi.org/10.1080/09585189808402200

Belfrage, H., Fransson, G., & Strand, S. (2000). Prediction of violence using the HCR-20: A prospective study in two maximum-security correctional institutions. *Journal of Forensic Psychiatry, 11,* 167–175.

Blacker, J., Beech, A. R., Wilcox, D. T., & Boer, D. P. (2011). The assessment of dynamic risk and recidivism in a sample of special needs sexual offenders. *Psychology, Crime & Law, 17,* 75–92. http://dx.doi.org/10.1080/10683160903392376

Boer, D. P., Hart, S. D., Kropp, P. R., & Webster, C. D. (1997). Manual for the Sexual Violence Risk-20. The British Columbia Institute Against Family Violence.

Boer, D. P., Wilson, R. J., Gauthier, C. M., & Hart, S. D. (1997). Assessing risk of sexual violence: Guidelines for clinical practice. In C. D. Webster & M. A. Jackson, (Eds.), *Impulsivity: Theory, assessment, and treatment* (pp. 326–342). New York, NY: Guilford Press.

Bonta, J. (2007). Offender risk assessment and sentencing. *Canadian Journal of Criminology and Criminal Justice, 49,* 519–529. http://dx.doi.org/10.3138/cjccj.49.4.519

Borum, R., Bartel, P. A., & Forth, A. E. (2005). Structured assessment of violence risk in youth. In T. Grisso, G. Vincent, & D. Seagrave (Eds.), *Mental Health Screening and Assessment in Juvenile Justice* (pp. 311–323). New York, NY: The Guilford Press.

Brannen, D. N., Salekin, R. T., Zapf, P. A., Salekin, K. L., Kubak, F. A., & DeCoster, J. (2006). Transfer to adult court: A national study of how juvenile court judges weigh

pertinent Kent criteria. *Psychology, Public Policy, and Law, 12,* 332–355. http://dx.doi.org/10.1037/1076-8971.12.3.332

Burns v. Commonwealth, 541 S. E. 2d 872 (VA 2001).

Camilleri, J. A., & Quinsey, V. L. (2011). Appraising the risk of sexual and violent recidivism among intellectually disabled offenders. *Psychology, Crime & Law, 17,* 59–74. http://dx.doi.org/10.1080/10683160903392350

Cunningham, M. D. (2006). Dangerousness and death: A nexus in search of science and reason. *American Psychologist, 61,* 828–839. http://dx.doi.org/10.1037/0003-066X.61.8.828

Cunningham, M. D., & Sorensen, J. R. (2006). Actuarial models for assessing prison violence risk: Revisions and extensions of the Risk Assessment Scale for Prison (RASP). *Assessment, 13,* 253–265.http://dx.doi.org/10.1177/1073191106287791

Cunningham, M. D., & Vigen, M. P. (2002). Death row inmate characteristics, adjustment, and confinement: A critical review of the literature. *Behavioral Sciences & the Law, 20,* 191–210. http://dx.doi.org/10.1002/bsl.473

Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993).

DeMatteo, D., & Edens, J. F. (2006). The role and relevance of the Psychopathy Checklist-Revised in court: A case law survey of U.S. courts (1991–2004). *Psychology, Public Policy, and Law, 12,* 214–241. http://dx.doi.org/10.1037/1076-8971.12.2.214

Dernevik, M., Grann, M., & Johansson, S. (2002). Violent behaviour in forensic psychiatric patients: Risk assessment and different risk-management levels using the HCR-20. *Psychology, Crime & Law, 8,* 93–111. http://dx.doi.org/10.1080/10683160208401811

Dolan, M., & Khawaja, A. (2004). The HCR-20 and post-discharge outcome in male patients discharged from medium security in the UK. *Aggressive Behavior, 30,* 469–483 http://dx.doi.org/10.1002/ab.20044

Doren, D. M. (2002). E*valuating sex offenders: A manual for civil commitments and beyond.* Thousand Oaks, CA: Sage.

Doren, D. M. (2009). Actuarial risk assessments in USA courtrooms. In A. R. Beech, L. A. Craig, & K. D. Browne (Eds.), *Assessment and treatment of sex offenders: A handbook* (pp. 551–566). New York, NY: Wiley Ltd.

Douglas, K. S., Ogloff, J. P., Nicholls, T. L., & Grant, I. (1999). Assessing risk for violence among psychiatric patients: The HCR-20 violence risk assessment scheme and the Psychopathy Checklist: Screening Version. *Journal of Consulting and Clinical Psychology, 67,* 917–930. http://dx.doi.org/10.1037/0022-006X.67.6.917

Douglas, K. S., & Reeves, K. A. (2010). Historical-Clinical-Risk Management-20 (HCR-20) Violence Risk Assessment Scheme: Rationale, application, and empirical overview. In R. K. Otto & K. S. Douglas, (Eds.), *Handbook of violence risk assessment* (pp. 147–185). New York, NY: Routledge/Taylor & Francis Group.

Douglas, K. S., & Skeem, J. L. (2005). Violence risk assessment: Getting specific about being dynamic. Psychology, *Public Policy, and Law, 11,* 347–383. http://dx.doi.org/10.1037/1076-8971.11.3.347

Douglas, K. S., Yeomans, M., & Boer, D. P. (2005). Comparative validity analysis of multiple measures of violence risk in a sample of criminal offenders. *Criminal Justice and Behavior, 32,* 479–510. http://dx.doi.org/10.1177/0093854805278411

Doyle, M. M., & Dolan, M. M. (2002). Violence risk assessment: Combining actuarial and clinical information to structure clinical judgments for the formulation and management of risk. *Journal of Psychiatric and Mental Health Nursing, 9,* 649–657. http://dx.doi.org/10.1046/j.1365-2850.2002.00535.x

Edens, J. F., Buffington-Vollum, J. K., Keilen, A., Roskamp, P., & Anthony, C. (2005). Predictions of future dangerousness in capital murder trials: Is it time to disinvent the

wheel? *Law and Human Behavior, 29,* 55–86. http://dx.doi.org/10.1007/s10979-005-1399-x

Fabian, J. (2011). Paraphilias and predators: The ethical application of psychiatric diagnoses in partisan sexually violent predator civil commitment proceedings. *Journal of Forensic Psychology Practice, 11,* 82–98. http://dx.doi.org/10.1080/15228932.2011.521723

Federal Rules of Appellate Procedure § 32.1 (2011).

First, M. B., & Halon, R. L. (2008). Use of DSM paraphilia diagnoses in sexually violent predator commitment cases. *Journal of the American Academy of Psychiatry and the Law, 36,* 443–454.

Garb, H. N., & Boyle, P. A. (2003). Understanding why some clinicians use pseudoscientific methods: Findings from research on clinical judgment. In S. O. Lilienfeld, S. Lynn, & J. M. Lohr, (Eds.), *Science and pseudoscience in clinical psychology* (pp. 17–38). New York, NY: Guilford Press.

Garb, H. N., & Grove, W. M. (2005). On the Merits of Clinical Judgment: Comment. *American Psychologist, 60,* 658–659. doi:10.1037/0003-066X.60.6.658

Graham v. Florida, 130 S. Ct. 2011 (2010).

Grann, M., & Långström, N. (2007). Actuarial assessment of violence risk: To weigh or not to weigh? *Criminal Justice and Behavior, 34,* 22–36. http://dx.doi.org/10.1177/0093854806290250

Gray, N. S., Fitzgerald, S., Taylor, J., MacCulloch, M. J., & Snowden, R. J. (2007). Predicting future reconviction in offenders with intellectual disabilities: The predictive efficacy of VRAG, PCL-SV, and the HCR-20. *Psychological Assessment, 19,* 474–479. http://dx.doi.org/10.1037/1040-3590.19.4.474

Gregg v. Georgia, 428 U.S. 153 (1976).

Grove, W. M., Zald, D. H., Lebow, B. S., Snitz, B. E., & Nelson, C. (2000). Clinical versus mechanical prediction: A meta-analysis. Psychological Assessment, *12,* 19–30. http://dx.doi.org/10.1037/1040-3590.12.1.19

Hanson, R., & Morton-Bourgon, K. E. (2005). The characteristics of persistent sexual offenders: A meta-analysis of recidivism studies. *Journal of Consulting and Clinical Psychology, 73,* 1154–1163. http://dx.doi.org/10.1037/0022-006X.73.6.1154

Hare, R. D. (1991). *Manual for the Psychopathy Checklist-Revised.* Toronto: Multi-Health Systems.

Hare, R. D. (2003). *Manual for the Psychopathy Checklist-Revised (2nd ed.).* Toronto: Multi-Health Systems.

Harris, G. T., & Rice, M. E. (2007). Characterizing the value of actuarial violence risk assessments. *Criminal Justice and Behavior, 34,* 1638–1658. http://dx.doi.org/10.1177/0093854807307029

Harris, G. T., Rice, M. E., & Camilleri, J. A. (2004). Applying a forensic actuarial assessment (the Violence Risk Appraisal Guide) to nonforensic patients. *Journal of Interpersonal Violence, 19,* 1063–1074. http://dx.doi.org/10.1177/0886260504268004

Harris, G. T., Rice, M. E., & Cormier, C. A. (2002). Prospective replication of the Violence Risk Appraisal Guide in predicting violent recidivism among forensic patients. *Law and Human Behavior, 26,* 377–394. http://dx.doi.org/10.1023/A:1016347320889

Harris, G. T., Rice, M. E., Quinsey, V. L., Lalumiere, M. L., Boer, D., & Lang, C. (2003). A multisite comparison of actuarial risk instruments for sex offenders. *Psychological Assessment, 15,* 413–425. http://dx.doi.org/10.1037/1040-3590.15.3.413

Hart, S. D., & Boer, D. P. (2010). Structured professional judgment guidelines for sexual violence risk assessment: The Sexual Violence Risk-20 (SVR-20) and Risk for Sexual Violence Protocol (RSVP). In R. K. Otto & K. S. (Eds.), *Handbook of violence risk assessment* (pp. 269–294). New York, NY: Routledge/Taylor & Francis Group.

Hart, S. D., Michie, C., & Cooke, D. (2007). Precision of actuarial risk assessment instruments: Evaluating the 'margins of error' of group v. individual predictions of violence. *British Journal of Psychiatry, 190,* s60–s65. http://dx.doi.org/10.1192/bjp.190.5.s60

Hastings, M. E., Krishnan, S., Tangney, J. P., & Stuewig, J. (2011). Predictive and incremental validity of the Violence Risk Appraisal Guide scores with male and female jail inmates. *Psychological Assessment, 23,* 174–183. doi:10.1037/a0021290

Heilbrun, K. (1997). Prediction versus management models relevant to risk assessment: The importance of legal decision-making context. *Law and Human Behavior, 21,* 347–359. http://dx.doi.org/10.1023/A:1024851017947

Hickey, N. (2004). Actuarial risk prediction for future violence amongst mentally disordered offenders. *Issues in Forensic Psychology,* 550–561.

Hilton, N., Harris, G. T., & Rice, M. E. (2006). Sixty-Six years of research on the clinical versus actuarial prediction of violence. *The Counseling Psychologist, 34,* 400–409. http://dx.doi.org/10.1177/0011000005285877

Hilton, N., Harris, G. T., & Rice, M. E. (2010). Implementing actuarial risk assessment. In N. Hilton, G. T. Harris, & M. E. Rice (Eds.), *Risk assessment for domestically violent men: Tools for criminal justice, offender intervention, and victim services* (pp. 107–126). Washington, DC: American Psychological Association. http://dx.doi.org/10.1037/12066-006

Jackson, R. L., & Guyton, M. R. (2008). Violence risk assessment. In R. Jackson, (Ed.), Learning forensic assessment (pp. 153–181). New York, NY: Routledge/Taylor & Francis Group.

Jones, N. J., Brown, S. L., & Zamble, E. (2010). Predicting criminal recidivism in adult male offenders: Researcher versus parole officer assessment of dynamic risk. *Criminal Justice and Behavior, 37,* 860–882. http://dx.doi.org/10.1177/0093854810368924

Jurek v. Texas, 428 U.S. 262 (1976).

Kansas v. Hendricks 521 U.S. 346 (1997).

Kent v. United States, 383 U.S. 541 (1966).

Kleiman, M., Ostrom, B. J., & Cheesman, F. (2007). Using risk assessment to inform sentencing decisions for nonviolent offenders in Virginia. *Crime & Delinquency, 53,* 106–132. http://dx.doi.org/10.1177/0011128706294442

Krauss, D. A., McCabe, J. G., & McFadden, S. (2009). Limited expertise and experts: Problems with the continued use of future dangerousness in capital sentencing. In R. F. Schopp, R. L. Wiener, B. H. Bornstein, & S. L. Willborn, (Eds.), *Mental disorder and criminal law: Responsibility, punishment and competence* (pp. 135–157). New York, NY: Springer Science.http://dx.doi.org/10.1007/978-0-387-84845-7_6

Kroner, D. G., Mills, J. F., & Reddon, J. R. (2005). A coffee can, factor analysis, and prediction of antisocial behavior: The structure of criminal risk. *International Journal of Law and Psychiatry, 28,* 360–374. http://dx.doi.org/10.1016/j.ijlp.2004.01.011

Kropp, P., & Hart, S. D. (2000). The Spousal Assault Risk Assessment (SARA) Guide: Reliability and validity in adult male offenders. *Law and Human Behavior, 24,* 101–118. http://dx.doi.org/10.1023/A:1005430904495

Kruh, I. P., & Brodsky, S. L. (1997). Clinical evaluations for transfer of juveniles to criminal court: Current practices and future research. *Behavioral Sciences & the Law, 15,* 151–165. http://dx.doi.org/10.1002/(SICI)1099-0798(199721)15:2<151::AID-BSL267>3.0.CO;2-U

Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137 (1999).

Lacourse, E., Dupéré, V., & Loeber, R. (2008). Developmental trajectories of violence and theft. In R. Loeber, D. P. Farrington, M. Stouthamer-Loeber, & H. White, (Eds.),

*Violence and serious theft: Development and prediction from childhood to adulthood* (pp. 231–268). New York, NY: Routledge/Taylor & Francis Group.

La Fond, J. Q. (2003). Outpatient commitment's next frontier: Sexual predators. *Psychology, Public Policy, and Law, 9,* 159–182. http://dx.doi.org/10.1037/1076-8971.9.1-2.159

La Fond, J. Q. (2008). Sexually violent predator laws and the liberal state: An ominous threat to individual liberty. *International Journal of Law and Psychiatry, 31,* 158–171 http://dx.doi.org/10.1016/j.ijlp.2008.02.005

Langton, C. M., Barbaree, H. E., Seto, M. C., F. E. Peacock, E. J., Harkins, L., & Hansen, K. T. (2007). Actuarial assessment of risk for reoffense among adult sex offenders: Evaluating the predictive accuracy of the Static-2002 and five other instruments. *Criminal Justice and Behavior, 34,* 37–59. http://dx.doi.org/10.1177/0093854806291157

Leistico, A. R., & Salekin, R. T. (2003). Testing the reliability and validity of the Risk, Sophistication-Maturity, and Treatment Amenability Instrument (RST-i): An assessment tool for juvenile offenders. *The International Journal of Forensic Mental Health, 2, 101*–117.

Loeber, R., Farrington, D. P., Stouthamer-Loeber, M., Moffitt, T. E., & Caspi, A. (1998). The development of male offending: Key findings from the first decade of the Pittsburgh Youth Study. *Studies on Crime & Crime Prevention, 7,* 141–171.

Lovitt v. Commissioner, 537 S. E. 2d 866 (Va 2000).

Lussier, P., Farrington, D. P., & Moffitt, T. E. (2009). Is the antisocial child father of the abusive man? A 40-year prospective longitudinal study on the developmental antecedents of intimate partner violence. *Criminology: An Interdisciplinary Journal, 47,* 741–780.

Lynam, D. R., Miller, D. J., Vachon, D., Loeber, R., & Stouthamer-Loeber, M. (2009). Psychopathy in adolescence predicts official reports of offending in adulthood. *Youth Violence and Juvenile Justice, 7,* 189–207. http://dx.doi.org/10.1177/1541204009333797

McDermott, B. E., Dunlan, I. V., & Scott, C. L. (2011). The predictive validity of the Classification of Violence Risk (COVR) in a forensic psychiatric hospital. *Psychiatric Services, 62,* 430–433. http://dx.doi.org/10.1176/appi.ps.62.4.430

McElmurry v. State, 60 P. 3d 4 (Ok 2002).

McKenzie, B., & Curr, H. (2005). Predicting violence in a medium secure setting: A study using the historical and clinical scales of the HCR-20. *The British Journal of Forensic Practice, 7,* 22–28.

Meehl, P. E. (1954). *Clinical vs. statistical prediction: A theoretical analysis and a review of the evidence.* Minneapolis, MN: University of Minnesota Press. http://dx.doi.org/10.1037/11281-000

Mills, J. F., & Kroner, D. G. (2006). The effect of base-rate information on the perception of risk for reoffense. *American Journal of Forensic Psychology, 24,* 45–56.

Monahan, J. (1981). The clinical prediction of violent behavior. *Crime & Delinquency Issues: A Monograph Series,* ADM 81–921.

Monahan, J. (1984). The prediction of violent behavior: Toward a second generation of theory and policy. *American Journal of Psychiatry, 141,* 458–471.

Monahan, J. (1988). Risk assessment of violence among the mentally disordered: Generating useful knowledge. *International Journal of Law and Psychiatry, 11,* 249–257. http://dx.doi.org/10.1016/0160-2527(88)90012-X

Monahan, J., Steadman, H. J., Robbins, P., Appelbaum, P., Banks, S., Grisso, T., & Silver, E. (2005). An actuarial model of violence risk assessment for persons with mental disorders. *Psychiatric Services, 56,* 810–815. http://dx.doi.org/10.1176/appi.ps.56.7.810

Morse, S. J. (2008). Vice, disorder, conduct, and culpability. *Philosophy, Psychiatry, & Psychology, 15,* 47–49. doi:10.1353/ppp.0.0157

Muniz v. State, 851 S. W. 2d 238 (Tex Crim. App. 1993).

Murrie, D. C., Boccaccini, M. T., Johnson, J. T., & Janke, C. (2008). Does interrater (dis)agreement on Psychopathy Checklist scores in sexually violent predator trials suggest partisan allegiance in forensic evaluations? *Law and Human Behavior, 32,* 352–362. http://dx.doi.org/10.1007/s10979-007-9097-5

O'Connor v. Donaldson, 422 U.S. 563 (1975).

Olver, M. E., & Wong, S. P. (2011). A comparison of static and dynamic assessment of sexual offender risk and need in a treatment context. *Criminal Justice and Behavior, 38,* 113–126. http://dx.doi.org/10.1177/0093854810389534

Quinsey, V., Harris, G., Rice, M., & Cormier, C. A. (1998). Violence Risk Assessment Guide. In *Violent Offenders: Appraising and Managing Risk* (p. 237). V. L. Quinsey, G. T. Harris, M. E. Rice, & C. A. Cormier (Eds). American Psychological Association: Washington DC.

Quinsey, V. L., Harris, G. T., Rice, M. E., & Cormier, C. A. (2006). Criticisms of Actuarial Risk Assessment. In V. L. Quinsey, G. T. Harris, M. E. Rice, C. A. Cormier (Eds.), *Violent offenders: Appraising and managing risk* (2nd ed.). (pp. 197–223). Washington, DC: American Psychological Association. http://dx.doi.org/10.1037/11367-009

Rogers, R. (2000). The uncritical acceptance of risk assessment in forensic practice. *Law and Human Behavior, 24,* 595–605. http://dx.doi.org/10.1023/A:1005575113507

Rogers, R., & Shuman, D. W. (2005). *Fundamentals of forensic practice: Mental health and criminal law.* New York, NY: Springer Science.

Roper v. Simmons, 543 U.S. 551 (2005).

Salekin, R. J., & Grimes, R. D. (2008). Clinical forensic evaluations for juvenile transfer to adult criminal court. In R. Jackson, (Ed.), *Learning forensic assessment* (pp. 313–346). New York, NY: Routledge/Taylor & Francis Group.

Scalora, M. J. (2009). In R. Schopp, R. Wiener, B. Bornstein, & S. Willborn (Eds.), Quagmire ahead!: The sticky role of behavioral science in capital sentencing. New York, NY: Springer Science.

Schlank, A. (2006). The civil commitment of sexual offenders: Lessons learned. In W. L. Marshall, Y. M. Fernandez, L. E. Marshall, & G. A. Serran, (Eds.), *Sexual offender treatment: Controversial issues* (pp. 45–60). New York, NY: Wiley Ltd.

Scott, R. (2008). Risk assessment and sentencing of serious sex offenders. *Psychiatry, Psychology and Law, 15,* 188–201. http://dx.doi.org/10.1080/13218710802132584

Seagrave, D., & Grisso, T. (2002). Adolescent development and the measurement of juvenile psychopathy. *Law and Human Behavior, 26,* 219–239. http://dx.doi.org/10.1023/A:1014696110850

Simmons v. South Carolina, 512 US 154, 162 (1994).

Sjöstedt, G., & Grann, M. (2002). Risk assessment: What is being predicted by actuarial prediction instruments? *The International Journal of Forensic Mental Health, 1,* 179–183.

Skeem, J. L., & Monahan, J. (2011). Current directions in violence risk assessment. *Current Directions in Psychological Science, 20,* 38–42. http://dx.doi.org/10.1177/0963721410397271

Spice, A., Viljoen, J. L., Gretton, H. M., & Roesch, R. (2010). Psychological assessment for adult sentencing of juvenile offenders: An evaluation of the RSTI and the SAVRY. The *International Journal of Forensic Mental Health, 9,* 124–137. http://dx.doi.org/10.1080/14999013.2010.501846

Stadtland, C., Hollweg, M., Kleindienst, N., Dietl, J., Reich, U., & Nedopil, N. (2005). Risk assessment and prediction of violent and sexual recidivism in sex offenders:

Long-term predictive validity of four risk assessment instruments. *Journal of Forensic Psychiatry & Psychology, 16,* 92–108.

State v. Douglas, 800 P. 2d 288 (Org. 1990).

Suzuki, S. L., Geffner, R., & Bucky, S. F. (2008). The experiences of adults exposed to intimate partner violence as children: An exploratory qualitative study of resilience and protective factors. *Journal of Emotional Abuse, 8,* 103–121. http://dx.doi.org/10.1080/10926790801984523

Turner, L. S. (1996). Sex offender statutes: Society's need for protection versus an individual's constitutional rights. *Law & Psychology Review,* 20263–274.

United States v. Allen, 247 F. 3d 741 (8th Cir. 2001).

Van Der Put, C. E., Dekovi, M., Stams, G. M., Van Der Laan, P. H., Hoeve, M., & Van Amelsfort, L. (2011). Changes in risk factors during adolescence: Implications for risk assessment. *Criminal Justice and Behavior, 38,* 248–262. http://dx.doi.org/10.1177/0093854810391757

Viljoen, J. L., McLachlan, K., & Vincent, G. M. (2010). Assessing violence risk and psychopathy in juvenile and adult offenders: A survey of clinical practices. *Assessment, 17,* 377–395. http://dx.doi.org/10.1177/1073191109359587

Vincent, G. M., Chapman, J., & Cook, N. E. (2011). Risk-needs assessment in juvenile justice: Predictive validity of the SAVRY, racial differences, and the contribution of needs factors. *Criminal Justice and Behavior, 38,* 42–62. http://dx.doi.org/10.1177/0093854810386000

Vitacco, M. J., Lilienfeld, S. O., Erickson, S. K., & Wood, J. (in press). Challenging personality testing: Objective and projective instruments. In J. Ziskin, (Ed.). *Coping with Psychiatric and Psychological Testimony.*

Vitacco, M. J., Salekin, R. T., & Rogers, R. (2010). Forensic issues for child and adolescent psychopathy. In R. T. Salekin, D. R. Lynam, R. T. Salekin, & D. R. Lynam (Eds.), *Handbook of child adolescent psychopathy* (pp. 374–397). New York, NY: Guilford Press.

Vitacco, M. J., Van Rybroek, G. J., Rogstad, J. E., Yahr, L. E., Tomony, J. D., & Saewert, E. (2009). Predicting short-term institutional aggression in forensic patients: A multi-trait method for understanding subtypes of aggression. *Law and Human Behavior, 33,* 308–319. http://dx.doi.org/10.1007/s10979-008-9155-7

Vitacco, M. J., & Vincent, G. M. (2006). Applying adult concepts to youthful offenders: Psychopathy and its implications for risk assessment and juvenile justice. *International Journal of Forensic Mental Health, 5,* 29–38.

Walsh, T., & Walsh, Z. (2006). The evidentiary introduction of Psychopathy Checklist-Revised assessed psychopathy in U.S. Courts: Extent and Appropriateness. *Law and Human Behavior, 30,* 493–507. http://dx.doi.org/10.1007/s10979-006-9042-z

Warren, J. I., Fitch, W., Dietz, P. E., & Rosenfeld, B. D. (1991). Criminal offense, psychiatric diagnosis, and psycholegal opinion: An analysis of 894 pretrial referrals. *Bulletin of the American Academy of Psychiatry & the Law, 19,* 63–69.

Webster, C. D., Douglas, K. S., Eaves, D., & Hart, S. D. (1997). HCR-20: Assessing risk for violence (version 2). Burnaby, British Columbia, Canada: Mental Health, Law and Policy Institute, Simon Fraser University.

Webster, C. D., Martin, M. L., Brink, J., Nicholls, T. L., & Desmarais, S. L. (2004). Manual for the Short-Term Assessment of Risk and Treatability (START). British Columbia Mental Health and Addiction Services.

Wilson, C. M., Desmarais, S. L., Nicholls, T. L., & Brink, J. (2010). The role of client strengths in assessments of violence risk using the Short-Term Assessment of Risk and Treatability (START). *The International Journal of Forensic Mental Health, 9,* 282–293. http://dx.doi.org/10.1080/14999013.2010.534694

Witt, P. H. (2003). Transfer of juveniles to adult court: The case of H. H. *Psychology, Public Policy, and Law, 9,* 361–380. http://dx.doi.org/10.1037/1076-8971.9.3-4.361

Zander, T. K. (2008). Commentary: Inventing diagnosis for civil commitment of rapists. *Journal of the American Academy of Psychiatry and the Law, 36,* 459–469.

Zapf, P. A., & Roesch, R. (2009). Evaluation of competence to stand trial. New York, NY: Oxford University Press.

Ziskin, J., & Faust, D. (1998). *Coping with psychiatric and psychological testimony*. Los Angeles, CA: Law and Psychology Press.

Received May 10, 2011
Revision received August 19, 2011
Accepted August 29, 2011 ■

## New Editors Appointed, 2013–2018

The Publications and Communications Board of the American Psychological Association announces the appointment of 5 new editors for 6-year terms beginning in 2012. As of January 1, 2012, manuscripts should be directed as follows:

- *Journal of Experimental Psychology: Learning, Memory, and Cognition* (http://www.apa.org/pubs/journals/xlm/), **Robert L. Greene, PhD,** Department of Psychology, Case Western Reserve University
- *Professional Psychology: Research and Practice* (http://www.apa.org/pubs/journals/pro/), **Ronald T. Brown, PhD, ABPP**, Wayne State University
- *Psychology and Aging* (http://www.apa.org/pubs/journals/pag), **Ulrich Mayr, PhD,** Department of Psychology, University of Oregon
- *Psychology, Public Policy, and Law* (http://www.apa.org/pubs/journals/law/), **Michael E. Lamb, PhD**, University of Cambridge, United Kingdom
- *School Psychology Quarterly* (http://www.apa.org/pubs/journals/spq/), **Shane R. Jimerson, PhD,** University of California, Santa Barbara

**Electronic manuscript submission:** As of January 1, 2012, manuscripts should be submitted electronically to the new editors via the journal's Manuscript Submission Portal (see the website listed above with each journal title).

Current editors Randi C. Martin, PhD, Michael C. Roberts, PhD, Paul Duberstein, PhD, Ronald Roesch, PhD, and Randy W. Kamphaus, PhD, will receive and consider new manuscripts through December 31, 2011.