1                    IN THE UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF MASSACHUSETTS
2

3        UNITED STATES OF AMERICA,            )
                                              )
4                    Petitioner               )
                                              )
5            -VS-                             )  Civil No. 13-11530-PBS
                                              )  Pages 3-1 - 3-134
6        BRIAN MAHONEY,                       )
                                              )
7                    Respondent               )

8                       **EVIDENTIARY HEARING - DAY THREE**

9

10                  BEFORE THE HONORABLE PATTI B. SARIS
                     UNITED STATES CHIEF DISTRICT JUDGE
11

12
         A P P E A R A N C E S:
13

             PATRICK M. CALLAHAN, ESQ., Assistant United States
14       Attorney, Office of the United States Attorney,
         1 Courthouse Way, Room 9200, Boston, Massachusetts, 02210,
15       for the Petitioner.

16           MICHAEL R. SCHNEIDER, ESQ., Good Schneider Cormier,
         83 Atlantic Avenue, 3rd Floor, Boston, Massachusetts, 02110,
17       for the Respondent.

18                                    United States District Court
                                      1 Courthouse Way, Courtroom 19
19                                    Boston, Massachusetts  02210
                                      August 5, 2014, 9:20 a.m.
20

21

22

23                            LEE A. MARZILLI
                            OFFICIAL COURT REPORTER
24                        United States District Court
                          1 Courthouse Way, Room 7200
25                            Boston, MA  02210
                               (617)345-6787

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|

SHAWN E. CHANNELL, PH.D.

    By Mr. Schneider:          3-10
    By Mr. Callahan:                   3-66
    By Mr. Schneider:                         3-83

| EXHIBITS | RECEIVED IN EVIDENCE |
|----------|----------------------|

48-83                       3-65

1-11, 13, 24, 28-29,       3-65
32, 35, 37, 40

P R O C E E D I N G S

1

2       THE COURT:  Mr. Schneider, could you please come over.

3   I want to tell you something before I bring Mr. Mahoney out

4   because I'm going to ask this question.  I will ask the

5   U.S. Marshal to repeat -- no, don't bring him in.

6       THE MARSHAL:  No, ma'am, I wasn't the one who told

7   him.

8       THE COURT:  Okay, all right.  All right, so I got the

9   following report from the U.S. Marshals Service just now.  Why

10  don't you go ahead.

11      THE MARSHAL:  Your Honor, he --

12      THE COURT:  Why don't you state your name for the

13  record.

14      THE MARSHAL:  Oh, Robert Larkin, Deputy U.S. Marshal.

15  He threatened to spit on us, made threats to the attorney, and

16  was kicking the back of the cell and slamming the door, and

17  said that he'll spit on us and so forth, pretty much.

18      THE COURT:  So I'm torn about what to do here because

19  during the last hearing, he was fine, but during the hearing

20  before that, he totally lost his calm before you were

21  appointed.

22      MR. SCHNEIDER:  Right.  He's actually been good for

23  the last two hearings.  He's been wonderful, a real gentleman.

24      THE COURT:  So I don't know what's happening here, and

25  I don't want to jeopardize -- I've authorized the U.S. Marshals

```
 1    Service to keep him in leg irons, but they were also

 2    suggesting -- and I'm asking you, Mr. Schneider because -- have

 3    you spoken to him this morning?

 4         MR. SCHNEIDER:  Yes, I have.

 5         THE COURT:  So, I mean, at the risk of being blunt,

 6    they've suggested a spit shield because he's threatened to

 7    spit.  Isn't that right?

 8         THE MARSHAL:  That's correct.

 9         THE MARSHAL:  Yes, Judge.

10         THE COURT:  And I want to make sure that everyone in

11    the courtroom is protected, is what I want, but I don't know

12    because he's apparently now calmed down a little bit.  Is that

13    right or not?

14         THE MARSHAL:  That is correct.

15         THE COURT:  What's your name for the record?

16         THE MARSHAL:  Paul Barton, Deputy U.S. Marshal.  I

17    came up and spoke with him, and I said, "Listen, are you going

18    to give us a hard time?"  And I think he might be projecting

19    the suit onto my fellow deputy here.  And he said, "I'm just a

20    dumb guy.  I'm just going to take you out there.  You know, are

21    you going to be okay with us?"  And he said "Yes," but then he

22    started to get very angry again, so he --

23         THE MARSHAL:  He has stated to me, Judge, that he

24    wants to get rid of his attorney, and that as soon as he comes

25    out, that he's having words with you and not his attorney.
```

```
 1              THE COURT:  So I want to put this on the record
 2    because, A, I want to make sure you're okay and we've discussed
 3    the security restraints; and, B, one possibility, he's never
 4    said to me that he wants to discharge you, but also I've seen
 5    him, as you say, twice fairly calm and once totally out of -- I
 6    saw him once totally out of control where it took several, four
 7    or five people to take him out of here.  So I wanted to know
 8    what your insights were right now.
 9              MR. SCHNEIDER:  So I would say a couple of things.  I
10    mean, first of all, I had an attorney-client privilege
11    conversation with him, and I don't want to violate the
12    privilege or the confidence because we had some very
13    substantive -- a substantive topic that we were discussing
14    earlier.  Obviously, as long as I've known Mr. Mahoney, he
15    raises his voice, and that's not atypical, and I will say also
16    that he -- I didn't take what he said to me to be a threat.  He
17    has -- there is an indication that he may want to testify, and
18    there is an indication that he may want to take over his own
19    representation at this point.  I think that's a possibility.
20              THE COURT:  You did hear that from him?
21              MR. SCHNEIDER:  I heard him say something to that
22    effect, that that is what he was going to ask your Honor, and
23    that he may want to testify.  And the only thing I will say --
24    well, so, you know, I'm prepared to begin resuming my --
25              THE COURT:  Well, if we put him there and then you're
```

```
1   there, you'd be safe enough.
2           MR. SCHNEIDER:  Yes, I don't even want to suggest that
3   I would be unsafe here by any means, but -- and maybe if I had
4   another opportunity to go in --
5           THE COURT:  Do you want to go back and talk to him?
6           MR. SCHNEIDER:  I'd like to go back and talk to him.
7           THE COURT:  Could you?
8           MR. SCHNEIDER:  Yes.
9           THE COURT:  Because I will go forward today with
10  Dr. -- it's taken so long to schedule this in between
11  everyone's vacation and my trial.  I just don't want to kick it
12  again, and I certainly don't want to have to reschedule
13  Dr. Channell again.  So one possibility is, we could go
14  forward, if he's completely out of control, with Dr. Channell,
15  and then send him a transcript.  But I'd rather not do that.
16  It creates all these issues.  How long do you think you're
17  going to be with Dr. Channell?
18          MR. CALLAHAN:  I think, your Honor, the way that you
19  had suggested doing it today was that we submitted his
20  affidavit, which is his direct, at your suggestion, and
21  Attorney Schneider was going to cross him.
22          MR. SCHNEIDER:  And I had a fairly brief cross, and
23  then I had a 40-minute closing argument planned.
24          MR. CALLAHAN:  And I have something probably shorter
25  than that to close.  I think you had asked for some summations.
```

```
 1          THE COURT:  And we don't know whether Mr. Mahoney
 2   wants to take the stand.  I mean, this is not a criminal case,
 3   so -- it's not a criminal case, so, I mean, it wouldn't be
 4   surprising if he wanted to take the stand.  I don't know.  But
 5   I think what the safest bet is for you to go back with a lot of
 6   protection, make sure that he's under control and that you feel
 7   safe.  I mean, another way is, we could keep him in his chair
 8   here, which he would be surrounded, and then I could have a
 9   witness take the stand right here.
10          MR. SCHNEIDER:  I totally understand your Honor's
11   concerns.  It's not going to feel right to him, and the
12   appearance of him being sort of caged separately in the
13   courtroom is something that I'd like to try and avoid, if we
14   can.
15          THE COURT:  I think your suggestion is the best.  Why
16   don't you go back.  He's your client.  You'll be back there
17   with him.  I mean, I have a sense that I'm not wrong that this
18   is -- sometimes he's like this and sometimes he's not, and it's
19   hard to predict.  So go ahead back with him.  We'll take a --
20          MR. CALLAHAN:  Your Honor, as to Mr. Mahoney taking
21   the stand, if he is, I mean, Mr. Schneider just informed me of
22   that.  They did rest.  They said that they were happy.  They
23   said that they weren't going to put any testimony on.  I
24   understand the situation, and it's not a normal one.  I just
25   wanted to put that on the record.
```

1             THE COURT:  It's just not normal.

2             MR. CALLAHAN:  Understood.

3             THE COURT:  Okay, go see what you can do.

4             (A recess was taken, 9:27 a.m.)

5             (Resumed, 9:45 a.m.)

6             THE CLERK:  Court calls Civil Action 13-11530, United

7       States v. Brian Mahoney.  Could counsel please identify

8       themselves.

9             MR. CALLAHAN:  Patrick Callahan for the United States,

10      and with me is Patrick Ward from the Bureau of Prisons.

11            THE COURT:  Thank you.

12            MR. SCHNEIDER:  And Michael Schneider for Mr. Brian

13      Mahoney, and Mr. Mahoney is obviously here today.

14            THE COURT:  All right, thank you.  You may be seated.

15      I believe that the protocol that we were going to follow is

16      that Dr. Channell -- did I pronounce that correctly.

17            MR. CALLAHAN:  Channell, your Honor.

18            THE COURT:  Channell -- Dr. Channell will submit his

19      testimony through an affidavit.  Is that right?

20            MR. CALLAHAN:  That's correct, your Honor.

21            THE COURT:  And then Mr. Schneider will be there to

22      cross-examine.  Is that right?

23            MR. SCHNEIDER:  That's correct, your Honor.

24            THE COURT:  All right, so why don't we do that.

25            MR. SCHNEIDER:  And then I would ask for at least

```
 1   40 minutes or so for closing arguments.

 2            THE COURT:  Yes.

 3            MR. SCHNEIDER:  I just also wanted to make sure before

 4   we begin that, it was my understanding that Dr. Kriegman's

 5   report, his CV and the report in support of the affidavit had

 6   previously been admitted into evidence.

 7            THE COURT:  I don't remember, but they could be.

 8            MR. SCHNEIDER:  I want to formally move them into

 9   evidence if they weren't.

10            MR. CALLAHAN:  And, your Honor, we don't have an

11   objection to Dr. Kriegman's first report, which was the only

12   one that was missing from evidence, being moved.  And the

13   government would also, just to make sure it's all in the

14   record, Mr. Schneider and I went over the exhibits at the end

15   of the last hearing, and that for the government's side --

16            THE COURT:  Can I make a suggestion?  Let's just get

17   going.

18            MR. CALLAHAN:  Sure.  I just want to move in those

19   exhibits.  That's all.

20            THE COURT:  Just submit a list to Maryellen.  All

21   right, Dr. Channell, please come up.

22                         SHAWN CHANNELL

23   having been first duly sworn, was examined and testified as

24   follows:

25            THE CLERK:  Doctor, could you please state and spell
```

1    your name for the record.

2         THE WITNESS:  Shawn Channell, S-h-a-w-n

3    C-h-a-n-n-e-l-l.

4         THE CLERK:  Thank you.

5    CROSS-EXAMINATION BY MR. SCHNEIDER:

6    Q.   Good morning, Dr. Channell.

7    A.   Good morning.

8    Q.   So on July 25, 2014, you submitted a report that is being

9    admitted by the government today as your essentially direct

10   testimony on rebuttal; is that right?

11   A.   That's correct, yes.

12   Q.   And do I take it that -- I see that you signed your

13   report, correct?

14   A.   Yes.

15   Q.   And I take it then that everything in this report is sworn

16   to under the pains and penalties of perjury?

17   A.   Well, there is an addendum which I filed in relation to

18   this report which corrects some information in there, but

19   beyond that information, that is correct.

20   Q.   So I take it that both of these reports, the original of

21   July 25 and the corrected addendum of August 1, 2014, both of

22   those are your sworn statements under oath?

23   A.   That is correct.

24   Q.   In terms of the original rebuttal, what portions of that

25   were drafted by you, and what portions of it were drafted by

1    the U.S. Attorney?

2    A.    The vast majority was drafted by me.  There were some

3    suggestions from the U.S. Attorney which he asked me to review

4    before I placed them into the report, but that would have been

5    a small portion of the information.

6    Q.    So I take it that things like the legal footnotes and the

7    recitation of the case law relating to admissibility of the

8    various instruments, those were things that the prosecutor

9    drafted and submitted for your review?

10   A.    There was some information with regard to the

11   admissibility of the instruments that I had obtained from

12   research articles, but there was some other information which

13   was supplied by the government, yes.

14   Q.    But, for example, things like the discussion of the *Stitt*

15   case and United *States v. Felz*, was that based on your own

16   research, or was that something --

17   A.    That was provided to me by the U.S. Attorney.

18   Q.    So a fair portion of this was actually, at least

19   initially, drafted by the U.S. government?

20          MR. CALLAHAN:  Objection.  It mischaracterizes the

21   witness's testimony.

22          THE COURT:  Sustained.

23   Q.    Now, in your rebuttal you describe some of the features of

24   the Violence -- the VRAG and the HCR-20; is that right?

25   A.    Yes.

1    Q.   And in your rebuttal, as you've done previously, you

2    discuss some of the limitations of each of these tools?

3    A.   Yes.

4    Q.   So, for example, the VRAG, one of the issues, one of the

5    things that its detractors tried out is the fact that it's a

6    static instrument?

7    A.   Correct.

8            THE COURT:  That it's what?

9            MR. SCHNEIDER:  It's a static instrument.

10   A.   Yes.  Well, I wouldn't use the term "static."

11   Q.   Well, in fact you say that, for example -- well, have you

12   not seen in the literature a discussion of the fact that it

13   only focuses on static factors?

14   A.   Correct, yes.

15   Q.   As opposed to dynamic factors?

16   A.   That's correct.

17   Q.   As opposed to clinical factors?

18   A.   Well, there are clinical factors contained within the VRAG

19   but not dynamic factors.

20   Q.   Okay.  And so it doesn't include protective factors?

21   A.   It does not, no.

22   Q.   And you actually say in your report on Page 4 that the

23   VRAG by its very nature is not changeable, even after

24   significant interventions.  You say "with interventions,"

25   correct?

1    A.    That's correct.

2    Q.    So, for example, if a patient who suffers from bipolar

3    disorder took Trileptal and Xanax and a painkiller and that had

4    substantial effects in improving their mood stability, the VRAG

5    would not necessarily take that into account?

6    A.    It would not take that into account, that's right.

7    Q.    At all.  With respect to protective factors, if a patient

8    had brothers and an ex-girlfriend who were willing to provide

9    support for a patient, and there was a community health center

10   near where the patient lived, and that person was willing and

11   decided to regularly attend counseling sessions and receive

12   medical treatment, that too would not be taken into account by

13   the VRAG; is that fair to say?

14   A.    Yes.  That is accurate.

15   Q.    The VRAG also treats only age at the time of the first

16   offense and not the current age of the offender as relevant to

17   its risk assessment; isn't that right?

18   A.    Yes, that is right.

19   Q.    And that would mean that it would not treat any

20   differently someone who otherwise had the same profile who was

21   20 years old or who was 80 years old at the time that the VRAG

22   was administered to them, it wouldn't treat them any

23   differently?

24   A.    There is one item that relates to age at the index offense

25   that would be different, but beyond that, you are correct.

1    Q.   And if they both had committed the index offense at the

2    same age -- let's say 19 -- the 20-year-old would still be

3    treated the same as the 80-year-old in terms of the violence

4    assessed by the instrument?

5    A.   That's true.

6    Q.   And it's fair to say that there are a large number of

7    criminological/psychological studies that indicate that, as a

8    general matter, the propensity to recidivate decreases with

9    age?

10   A.   There is some data to indicate that, and, as I indicated

11   in my rebuttal, there's also data to indicate that it's not

12   necessarily age that is related to recidivism as it is

13   propensity to antisocial behavior.

14   Q.   So in that connection, you're thinking specifically about

15   the Robert Hare study which indicated that somebody who meets

16   the criteria for psychopathy, that age may not make a

17   difference?

18   A.   Actually, I was referring to the -- there is a study by

19   Hare that does indicate what you're stating, but there is also

20   a study by Harris and Rice which looked specifically at the

21   issue of age at release, which indicates it's the propensity

22   towards antisocial behavior that is the delineating factor, not

23   psychopathy.

24   Q.   And we'll get into this a little further, but just to

25   clarify, Rice and Harris are two of the designers of the VRAG?

1    A.   They're the authors of the VRAG.

2    Q.   The authors of the VRAG.  And they're proponents of its

3    use, it's fair to say?

4    A.   Yes.

5    Q.   The other thing about the VRAG -- and we discussed this a

6    little bit, and you mentioned it in your report -- is that it's

7    sample-dependent?

8    A.   Yes.

9    Q.   Can you explain to the judge what sample-dependent means.

10   A.   Well, it would mean that the data which is collected is

11   from a specific sample group, and that the more the individual

12   you're evaluating would deviate from that group, the less it

13   may be applicable to that individual.

14   Q.   And in the case of the VRAG, the Rice-Harris sample that

15   they originally used to develop the instrument involved 618

16   inmates?

17   A.   Well, they were all in a psychiatric facility.  Some of

18   them were there for an evaluation.  There were several hundred,

19   300 or so, that were there for pretrial purposes, and 600 or so

20   who were committed.

21   Q.   Right.  And half of them were committed after being found

22   not guilty by reason of insanity?

23   A.   There was a large number of --

24   Q.   It's fair to say that's an unusual population in certain

25   respects, isn't it?

1    A.    In certain respects, yes.

2    Q.    So to the extent that Mr. Mahoney is not currently serving

3    a sentence for a pending offense, and to the extent that he's

4    not been found not guilty by reason of insanity, those are

5    already two traits that don't match up with Mr. Mahoney?

6    A.    That's correct.

7    Q.    Now, with respect to the HCR-20, that too, as you've

8    discussed, has some limitations?

9    A.    Yes.

10   Q.    One of them is that unlike the VRAG and actuarial

11   instruments, it doesn't provide any rules in which top weight

12   and combine the various factors?

13   A.    I wouldn't say that that's true.

14   Q.    So there are 20 different items on the HCR-20?

15   A.    Correct.

16   Q.    Ten historical?

17   A.    Yes.

18   Q.    Five clinical?

19   A.    Yes.

20   Q.    Five risk assessment, risk management?

21   A.    Yes.

22   Q.    Each of those 20 simply get a 0, 1, or 2 number when you

23   do the initial scoring on the right-hand side?

24   A.    They obtain a 0, 1, or 2 based on criteria from the HCR-20

25   manual.

1    Q.    But unlike things, for example, like the PCL–R or the

2    VRAG, there is no different weighting for each of the items in

3    the HCR–20?

4    A.    There's no specific weighting.  I wouldn't call that a

5    weakness of the instrument.

6           THE COURT:  I don't understand.  When you say 0, 1, or

7    2, is that a weighting?

8           THE WITNESS:  Well, I believe what's being addressed

9    is the idea that some items are given larger scores; for

10   example, on the VRAG based on their correlation with violence.

11   Whereas on the HCR–20, they would only obtain a score of 0, 1,

12   or 2.  It is a weighting.  I mean, a 2 is more significant.

13          THE COURT:  It's weighted more?

14          THE WITNESS:  Correct, that's correct.

15   Q.    But the HCR–20 is basically not treated like an algorithm

16   in the way that the VRAG scores are?

17   A.    That's correct, but, again, that's not a weakness of the

18   instrument.  I believe that's the strength of the instrument.

19   Q.    Well, some people view that as the limitations, that it

20   doesn't provide any transparent rules of combining the various

21   elements into a final score that is then comparable from

22   individual to individual or across populations, across samples?

23   A.    I'm not sure that I would agree with that statement.

24   Q.    Well, at the end of the day, the final score is not meant

25   to be a final number with cutoffs in the way that the various

1  cutoff numbers and risk categories are for the VRAG?

2  A.   That's correct.

3  Q.   And ultimately, at the end of the day, the designers of

4  the HCR-20 want clinicians to essentially exercise their own

5  clinical judgment based on the various factors that are

6  elicited by the HCR-20?

7  A.   There is a measure of clinical judgment within the HCR-20

8  which would not be available with a strictly actuarial

9  instrument like the VRAG.

10  Q.   Okay.  And you're aware of the studies that show that

11  while the inter-rater reliability ratings for each of the

12  specific factors in the HCR-20 may be fairly high, the ultimate

13  inter-rater reliability numbers for the final judgment by the

14  clinician just reviewing the factors, that that's quite a bit

15  lower?

16  A.   Yes.  I included that in my --

17  Q.   And you mention it's about 0.68?

18  A.   Yes.

19  Q.   As opposed to some studies --

20       THE COURT:  Walk me through that more slowly.

21  Q.   So could you explain to the Court what the significance of

22  an inter-rater reliability rating is.

23  A.   Well, inter-rater reliability would be a measure of the --

24  a comparison between separate evaluators using the instrument

25  and how closely their scores resemble one another.

 1          THE COURT:  I understand that, and I thought that was

 2     high with this instrument.

 3          THE WITNESS:  There are a number of different measures

 4     of inter-rater reliability for the HCR-20.  The total score

 5     inter-rater reliability is high; but when it comes to making a

 6     judgment with regard to low, moderate, or high risk, the

 7     inter-rater reliability is not as high.  And that's primarily

 8     due to the fact that there may be a single factor, for example,

 9     that causes an evaluator to judge an individual's risk as high

10     despite the fact their score on the instrument may be low.  For

11     example, if someone were to report to an evaluator that they

12     had plans to harm somebody immediately or soon, even though

13     that would not be reflected on the overall score, that

14     evaluator would still rate their risk as high.  Do you

15     understand that?

16          THE COURT:  Yes, but on the actual factors that are

17     being measured --

18          THE WITNESS:  The inter-rater reliability on the

19     actual items, on the items that you score on the HCR-20, are

20     high.  The inter-rater reliability for that is consistently

21     good.  It's when you get to the overall judgment, after you've

22     taken all of that information into consideration, as well as

23     any other information that the evaluator might think is

24     relevant, the overall decision about whether that poses a low,

25     moderate, or high risk, the inter-rater reliability is not as

1    good among evaluators.

2              THE COURT:  What is it?  Do you remember?

3              THE WITNESS:  It's .68.

4              THE COURT:  As opposed to factor by factor, what is

5    it?

6              THE WITNESS:  In looking at the different areas, it

7    will vary depending on the study, but it's pretty consistently

8    between .7 or .9.

9              THE COURT:  Thank you.

10   Q.   So ultimately the significance of that is, when in your

11   May 30 report you indicate a final judgment of high risk of

12   violence based on your scoring of the HCR-20, that's the final

13   score that has a lower inter-rater reliability than each of the

14   individual components?

15   A.   That would be a judgment, not a score, but, yes.

16   Q.   And what it reflects essentially is that different

17   clinicians at a somewhat higher rate come to different overall

18   conclusions based on their use of the HCR-20?

19   A.   That's true.

20   Q.   And it's also true and I think you or one of the authors

21   that you cite said that "Integrating static and dynamic factors

22   can be complex with high potential for error," and that's in

23   the HCR-20?

24   A.   I'm sorry, could you repeat the question.

25   Q.   So it's fair to say that integrating -- one of the

1    problems for the HCR-20, one of the reasons perhaps that the

2    inter-rater reliability of the final score is relatively lower

3    is because integrating static and dynamic factors, especially

4    where they conflict, can be a complex process, and it has a

5    high potential for error?

6    A.    There is certainly more potential for error when you

7    include dynamic factors than if you're using a strictly

8    actuarial instrument, yes.

9    Q.    So each of these instruments has its plusses and its

10   minuses?

11   A.    That's correct.

12   Q.    Okay.  So on Page 8 and 9 of your rebuttal, your original

13   rebuttal, you spend some time talking about the benefits of

14   receiver operating characteristic curves and the

15   area-under-the-curve analysis?

16   A.    That's correct.

17   Q.    And that was in the area that was originally developed in

18   the signal detection field, correct?

19   A.    Correct.

20   Q.    And the purpose is essentially to pick out signal from

21   noise?

22   A.    That's one way of putting it, yes.

23   Q.    And that, too, there are benefits of using the ROC/AUC as

24   opposed to other means of looking at correlations between tests

25   and outcomes, correct?

1    A.    Correct.

2    Q.    And you have some discussion about comparing that to the

3    use of correlation coefficients in Cohen's d?

4    A.    Correct.

5    Q.    Now, one of the benefits of the ROC/AUC that researchers

6    like especially is that the number that you get for the area

7    under the curve is independent of base rates?

8    A.    Correct.

9    Q.    And what that means is that it allows you to compare the

10   effect sizes of different instruments?

11   A.    That's correct.

12   Q.    And it allows you also for a given instrument to look at

13   the trade-offs between the true positive rate and the false

14   positive rate for different thresholds?

15   A.    That's correct.

16   Q.    Can you just explain to the Judge what it is I just asked

17   you.

18   A.    Well, basically what the area under the curve allows you

19   to do is to determine, well, when it's higher, higher numbers

20   reflect the idea that an individual who you use the instrument

21   on and you came to a conclusion that they would be violent, are

22   more likely to go on to be violent than individuals who obtain

23   a lower score; and overall it's indicating that your higher

24   scores are more likely to violently recidivate than individuals

25   who obtain lower scores.

1    Q.   And it also means that if you increase the threshold, the

2    cutoff that you're using for your test cutoff, that you are

3    actually -- you may be picking up more true positives, but you

4    may also be picking up or more likely to pick up more false

5    positives as well?

6    A.   Depending on the overall base rate, that's true.

7    Q.   Now, it's true that, as a general matter, these ROC/AUC

8    curves have something that's called an "ideal test point"?

9    A.   That's correct.  That would be the ideal score that

10   separates those two groups.

11   Q.   And the idea behind an ideal test point is, if an

12   instrument is really that good, it will pick up all true

13   positives and no false positives?

14   A.   Ideally, yes.

15   Q.   Now, I call your attention to the graph on Page 9.

16   A.   Yes.

17   Q.   So, first of all, looking at the X and Y axis, technically

18   speaking, you have the Y axis as being true positives.  It's

19   actually the true positive rate, correct?

20   A.   Correct.

21   Q.   And you say false positives, and that's technically the

22   false positive rate, correct?

23   A.   Correct.

24   Q.   On your graph you have an ideal test point in the upper

25   left-hand corner?

```
 1    A.    That's correct.
 2    Q.    On this graph, you basically are saying that the ideal --
 3          THE COURT:  It would be helpful for everyone if you
 4    just put it up on the document camera.
 5          MR. SCHNEIDER:  Oh, I'm sorry.
 6          THE COURT:  You can see it, can't you, Mr. Mahoney?
 7          THE RESPONDENT:  I have a copy.
 8          THE COURT:  Everyone's got it?
 9    Q.    So in the upper left-hand corner, you have the ideal test
10    point, correct?
11    A.    Yes.
12    Q.    So this graph actually is not completely accurate, is it?
13    A.    I'm not sure what you're indicating.
14    Q.    Well, on your graph you've got --
15          THE COURT:  What graph are we talking about?
16          MR. SCHNEIDER:  This is the ideal test point.
17          THE COURT:  No, but which test are you referring to?
18          MR. SCHNEIDER:  This is a standard ROC/AUC curve, and
19    what I think it's designed to show is that for a ROC/AUC of
20    0.70 or something in that vicinity, you will have a curve that
21    looks like what's called the actual test, and in addition --
22    this is meant to be kind of general background to the
23    explanation of the ROC.
24          THE COURT:  Not targeting a particular test?
25    Q.    Not targeting a particular test; is that right,
```

1    Dr. Channell?

2    A.    Yes.

3    Q.    And so you actually have the ideal test point as yielding

4    a hundred percent true positives and a hundred percent false

5    positives, and that's not right.

6    A.    Yes, I see what you're saying.  The numerals on the false

7    positives should be going up rather than down.

8    Q.    And so this graph is not accurate?

9    A.    The numerals on the Y axis are incorrect.

10   Q.    And you didn't actually make any -- you didn't correct

11   this when you submitted a recorrected addendum?

12   A.    No.  I didn't recognize at that point that the numbers

13   were reversed.

14          THE COURT:  Which ones?  The Y axis you said?

15          THE WITNESS:  Going across the false positive.

16          THE COURT:  It's the bottom that's wrong?

17          THE WITNESS:  Correct.

18   Q.    Right, because, actually, with axes like these, and there

19   are some diagrams, the curve actually goes from 0 on the X axis

20   all the way up to 100 on the Y axis?

21   A.    The curve is correct on this axis.  It's the numbers that

22   are incorrect.

23   Q.    But there are diagrams that show it with this kind of 100

24   to 0 as you have it, but it's simply the X axis is really then

25   listed as the sensitivity of the instrument?

1   A.    Sensitivity -- I'm not following your question.

2   Q.    Do you know what the sensitivity of an instrument is,

3   Doctor?

4   A.    Yes, I do.

5   Q.    What's the mathematical --

6   A.    The sensitivity of an instrument will be the true positive

7   rate.

8   Q.    Which is 1 minus the false positive rate?

9   A.    That would be the specificity.

10  Q.    Okay.  But the bottom line is that this particular graph

11  is not correct, and you haven't amended it, right?

12  A.    That's -- well, I don't know if that's the bottom line.

13  If that's the question that you're asking, that's correct.

14  Q.    Now, in your rebuttal report, you discuss the use and the

15  admissibility of the HCR-20 and the VRAG?

16  A.    Correct.

17  Q.    And you cite several articles.  One in particular is

18  Vitacco, et al, which is Exhibit 51.

19  A.    All right.

20  Q.    So if you go to Page 19 of -- at Page 19 you talk about

21  the admissibility of the VRAG?

22          THE COURT:  Now you're looking at the article or at

23  his --

24          MR. SCHNEIDER:  Right now I'm just looking at his

25  rebuttal report.

1   Q.   And at Page 25 you talk about the admissibility of the

2   HCR-20?

3   A.   Yes.

4   Q.   With respect to the HCR-20, you cited 20 cases in 12

5   jurisdictions that you say that instrument was used during the

6   course of civil commitment hearings?

7   A.   Correct.

8   Q.   And with respect to the VRAG, you cite 39 cases in 12

9   jurisdictions in which the instrument was typically used in

10  civil commitment litigation.   That's at Page 19.

11  A.   That's the Vitacco article, yes.

12  Q.   But when you like at the Vitacco article, which is at

13  Page 18 --

14          THE COURT:  Page 18 of what?

15          MR. SCHNEIDER:  Of the Vitacco article, which is

16  appended as Exhibit 51.

17          THE COURT:  I have it, but the pages are like

18  Page 361.  I mean, they're not --

19          MR. SCHNEIDER:  I'm sorry.  It's Page 378.  It's

20  Document 109-2.

21          THE COURT:  All right.

22  Q.   Page 378, the article indicates that in fact these

23  instruments were almost all used in sexually violent predator

24  and parole cases, correct?

25  A.   Correct.

1  Q.   And one death penalty case?

2  A.   Yes.

3  Q.   And one juvenile transferred to adult court?

4  A.   Yes.

5  Q.   So the article and your research doesn't indicate any

6  cases in which these instruments were specifically used and

7  subject to *Daubert* challenges in federal civil commitment cases

8  under Section 4246?

9  A.   No, and I hadn't identified that it had.

10  Q.   With respect to Table 2 of that same exhibit, which is on

11  the prior page, the article also indicates that most of these

12  cases came out of California, Minnesota --

13         THE COURT:   I don't understand the point you just

14  made.  So it says here -- I'm catching up with you.  I'll get

15  to the page.  It says, "The VRAG and HCR-20 are uniquely suited

16  for providing information if understanding risk for future

17  violence is a relevant factor to consider for community

18  reentry.  Dozens of studies have supported the use of these

19  instruments in matters of general violence prediction."

20         So that seems to support the government's case.  What

21  are you saying doesn't?

22         MR. SCHNEIDER:   What I'm saying is that the rebuttal

23  report specifically indicates that these instruments were used

24  frequently in civil commitment proceedings, and I am pointing

25  out that the types of proceedings, as Table 3 of the Vitacco

1    article indicates, the type of proceedings that they were used

2    in were not these kinds of cases.  They were SVP cases and

3    parole determinations.

4         THE COURT:  So what you're saying is, it may be a

5    valid instrument in certain settings but not in this one?

6         MR. SCHNEIDER:  I'm not even necessarily going that

7    far, but I think that may be an implication in my question.

8    I'm certainly pointing out, it's not civil litigation, civil

9    commitment generally.  Specifically the instruments were used

10   in the context of SVP and parole hearings overwhelmingly and an

11   occasional death penalty case and a juvenile transfer case.

12   Q.   Now, one of the things that you spend time on in your

13   rebuttal report and in the addendum is, you provide some

14   area-under-the-curve data with respect to both the VRAG and the

15   HCR-20.  And just to be clear, even though you scored the PCL-R

16   in this case, the two instruments you were primarily using as

17   risk assessment instruments are the HCR-20 and the VRAG?

18   A.   That's correct, yes.

19   Q.   And, as we've discussed, each of these tools has its

20   proponents and its detractors?

21   A.   Correct.

22   Q.   With respect to the VRAG, in discussing the various AUC

23   numbers, you attach to your rebuttal nine articles from Rice,

24   Harris, and Quinsey?

25   A.   That's correct.

1    Q.   And they're proponents of the VRAG?

2    A.   Yes, they are.

3    Q.   They're the authors of the VRAG?

4    A.   Yes, they are.

5    Q.   So they like it a lot.  They're not the detractors?

6    A.   No, they aren't.

7    Q.   With respect to the HCR-20, you cite four articles

8    authored by either Webster or Douglas?

9    A.   Correct.

10   Q.   And, similarly, they're the authors of the HCR-20,

11   correct?

12   A.   Yes.

13   Q.   And they're proponents of the HCR-20?

14   A.   Yes, they are.

15   Q.   Now, you're also aware of the fact that, in general, the

16   authors of instruments tend to give their instruments, when

17   they do their own validation studies, higher ROC/AUC ratings

18   than other researchers?

19   A.   I wouldn't say that they give them that.  They do identify

20   higher numbers.  There is data to indicate that there is an

21   allegiance effect for the authors of instruments, yes.

22   Q.   Right.  So statistics show that there is in fact an

23   authorship effect or an allegiance bias?

24   A.   Correct.

25   Q.   With respect to the VRAG then, you cite three particular

1    articles, Rice and Harris articles, Exhibit 61, Exhibit 72,

2    Exhibit 75, in which they estimate that the ROC/AUC for the

3    VRAG is 0.73 to 0.76?

4    A.   Correct.

5    Q.   But you also note that others, including those who have

6    done meta-analytic studies of seventeen other studies, have

7    come up with a significantly lower ROC/AUC?

8    A.   I note that there are other studies, one in particular

9    that found an AUC of .68.

10   Q.   Right, and that's the Yang, Wong, and Coid article?

11   A.   That's correct.

12   Q.   And that's a meta-analytic study?

13   A.   Yes.

14   Q.   And that means it's a study that looks at quite a number

15   of other studies and combines all that data together to see

16   what the average ROC/AUC is?

17   A.   Correct.

18   Q.   Do you know whether that study actually included in its

19   analysis any of the what might be outlier numbers from the

20   authors or designers of the study?

21   A.   I'd have to go back to check.  I'm not sure.  I would

22   imagine it did because they've done a lot of that research, but

23   I'm not certain.

24   Q.   So it's possible, if you were to completely exclude the

25   Rice/Harris numbers, you might even come out with a lower

1    ROC/AUC?

2    A.    It's possible.  I don't know.

3    Q.    Now, similarly, with respect to the HCR-20 validity, you

4    also cite some ROC/AUC numbers?

5    A.    Yes.

6    Q.    And in that case, you specifically cite three Douglas,

7    et al studies, Exhibit 54 -- this is for the record --

8    Exhibit 60 and Exhibit 81?

9    A.    That's correct.

10   Q.    And you say that there's an AUC, an average AUC total of

11   about 0.69 for the total score?

12   A.    Correct.

13   Q.    A range of final judgment between 0.64 and 0.91?

14   A.    That's correct, yes.

15   Q.    So given all these things, you have decided to use in your

16   presentation of approximate data here a ROC/AUC value of 0.70?

17   A.    As an example, yes.

18   Q.    Now, with respect to these instruments, you and

19   Dr. Kriegman obviously have some differences of opinion,

20   correct?

21   A.    I'm not sure that we have a difference of opinion with

22   regard to the caution which needs to be exercised when

23   utilizing the instruments.  I believe we do have a difference

24   of opinion about whether or not they have any value whatsoever.

25   Q.    So you have some serious cautions about using these

1    instruments?

2          MR. CALLAHAN:  Objection, mischaracterizes the

3    witness's testimony.

4          THE COURT:  Sustained.

5    Q.    You have cautions about using these instruments?

6    A.    Absolutely, yes.

7    Q.    Can you explain what those cautions are.

8    A.    Well, the cautions are, as I've explained in the rebuttal,

9    is that simply identifying the idea that they have a high, for

10   example, AUC data to support their use doesn't necessarily mean

11   that you will not still perhaps have error.  Basically what you

12   have are a number of false positives, and that's one of the

13   examples I included were to demonstrate that depending on the

14   error rate -- I'm sorry -- depending on the base rate of the

15   group that you're looking at, you could end up, even with a

16   very good test, with a large number of false positives in

17   contrast to a relatively small number of true positives; and I

18   think it's important that anyone who uses the instrument or

19   relies upon the instrument be aware of that as a potential

20   limitation.

21   Q.    So it could present a danger if a court were to decide

22   that they were going to rely heavily or primarily on one of

23   these instruments to predict a particular individual's future

24   dangerousness?

25   A.    I believe if they were unaware of those limitations and

1    relied on that primarily as the means to which they were to

2    make the decision, yes, that's correct.

3    Q.    Now, you also have some differences with Dr. Kriegman with

4    respect to the scoring of the particular instruments.

5    A.    That's right.

6    Q.    And in your initial testimony, though, you did acknowledge

7    that there is some subjectivity in scoring the instruments?

8    A.    There is.

9    Q.    And different clinicians might come up with different

10   scores for different items?

11   A.    That's true.

12   Q.    Now, in your rebuttal you say that generally the VRAG and

13   the HCR, at least the historical component of the HCR -- strike

14   that.  The HCR and the VRAG both have fairly high inter-rater

15   reliability, and you've just explained that to the Judge, but

16   you're also aware, and some of the articles that you cite in

17   your rebuttal also indicate, that there is substantial examiner

18   bias when you look at how given examiners actually score the

19   instruments?

20   A.    That's correct.

21   Q.    So, for example, the DeMatteo article which is Exhibit 64

22   indicates that with respect to the PCL-R, prosecution experts

23   typically scored the PCL-R for given individuals seven points

24   higher than defense experts?

25   A.    That's correct.

1   Q.   So differences in opinion in scoring between experts is
2   not really uncommon, especially in an adversarial setting?
3   A.   That's correct.
4   Q.   Now, you had some specific differences in opinion, and I'm
5   not going to go through most of them, but one of them, for
6   example, with respect to the VRAG Item 10, which involves
7   personality disorders, you indicate that Mr. Mahoney suffers
8   from antisocial personality disorder, and because that's a
9   personality disorder, that deserves a positive score?
10  A.   Yes, my opinion was that he does have antisocial
11  personality disorder, and it's been a pretty consistent finding
12  over the years that he does have some type of personality
13  disorder.  In fact, he's been diagnosed twice before with a
14  personality disorder.
15  Q.   Well, as you say "consistent," you were the first
16  clinician to ever diagnose Mr. Mahoney as actually suffering
17  from antisocial personality disorder?
18  A.   That's correct, but he was previously diagnosed with
19  borderline personality disorder and personality disorder NOS,
20  both of which would score positively on --
21  Q.   But you would agree that some clinicians, including
22  Dr. Kriegman, might view the symptoms contained by those
23  personality disorders as being fully encompassed within the
24  bipolar disorder diagnosis?
25  A.   I believe that would be a difficult conclusion to come to

1    accurately based on his history.

2    Q.   But you're aware that the DSM-III all the way up through

3    IV, IV-R, IV-TR, and currently V, all say to clinicians that

4    you are to base a diagnosis on Axis I criteria, and you don't

5    need to go further into the DSM into Axis II, which is

6    personality disorders, unless you need to essentially?

7    A.   I mean, obviously if you need -- I mean, that's a -- if

8    you need to go into that, then you need to go into that.  I

9    guess I don't disagree with that statement.

10   Q.   Now, with respect to the VRAG Item 12, that deals with a

11   an individual's score on the Hare Psychotherapy

12   Checklist-Revised, correct?

13   A.   Correct.

14   Q.   And you originally scored Mr. Mahoney a 25?

15   A.   That's right.

16   Q.   But based on the late-breaking submission of a telephone

17   transcript, you knocked him up more recently to a 26?

18   A.   That's right.

19   Q.   Because you thought that that was indicative of conning

20   and manipulative behavior?

21   A.   That's correct.

22   Q.   And you obviously have heard Dr. Kriegman testify and you

23   saw him write in his report that he would come out with a

24   dramatically different score?

25            MR. CALLAHAN:  Objection, your Honor.  That's not in

1    Dr. Kriegman's report anywhere.  That mischaracterizes the

2    evidence.

3            THE COURT:  Well, do you agree that that's the

4    evidence?

5            THE WITNESS:  I've never seen Dr. Kriegman talk about

6    the PCL-R in a report.  Neither of his reports address the

7    PCL-R.

8    Q.   If I'm not mistaken, didn't you hear Dr. Kriegman during

9    his testimony testify that he would have scored the PCL-R lower

10   than you did?

11   A.   Are you asking about his reports, or are you asking about

12   testimony?

13           THE COURT:  What he said last time.

14   A.   Yes, I recall him saying he would score that differently.

15   Q.   And you're aware that the difference between a 25 or 26

16   and 24, which is only one or two points, would result in a

17   score of four points lower on the VRAG?

18   A.   Yes, I'm aware of that.

19   Q.   And that would put Mr. Mahoney into a different risk

20   category than you ultimately ended up assigning him?

21   A.   That's correct.

22   Q.   Now, in your original rebuttal at Pages 7 to 15, you have

23   a fairly lengthy discussion of base rates.

24   A.   Yes.

25   Q.   And in that you criticize Dr. Kriegman's use of a

1    22 percent base rate?

2    A.   I don't know that I criticize it.  I indicated that it was

3    based on -- that there are more recent and more relevant data

4    than that which was used.  That base rate was accurate at that

5    point in time.

6    Q.   But in fact you indicate that there were more applicable

7    and most applicable base rates that differed quite

8    substantially from Dr. Kriegman's in your original report?

9    A.   In the original report, yes.

10   Q.   And in your original report you indicated that the most

11   applicable base rate to Mr. Mahoney was actually 86.5 percent,

12   which would have led to only three false positives for every 69

13   true positives; is that right?

14   A.   That's right.

15   Q.   But on Friday late afternoon, you submitted an addendum to

16   your report --

17           THE COURT:  I'm not sure I've seen that.  It's up

18   here?  I'm not sure I've read it then.

19           MR. CALLAHAN:  Your Honor, we have an extra copy if

20   you want it.

21           MR. SCHNEIDER:  Let me just go back and put on the

22   screen --

23           THE COURT:  Whatever I read is what I had when I left

24   here on Friday at noon.  So where is it?  This came in late

25   Friday, is that it?

1          MR. CALLAHAN:  Friday afternoon.

2          THE COURT:  So there was a lot that went on here, and

3    I just got off trial, so walk me through again.  What did you

4    mean by base rate, and what did you change?

5          THE WITNESS:  Well, what base rate is is basically the

6    number of individuals in this context who would be released

7    from prison or being in custody who would go on later to commit

8    another violent act, and the data that I presented in the

9    original report was based on Bureau of Justice Statistics --

10          THE COURT:  Which was the 80 percent number?

11          THE WITNESS:  Correct, where I had -- I included a

12    table in the addendum where I had incorrectly identified a

13    number of violent offenders who went on to commit a violent

14    offense, when in fact those individuals were simply being

15    identified as recidivating in general.  It may have been a

16    violent offense; it may not have been a violent offense.  So

17    it's not an accurate base rate because all it's indicating is

18    that these were individuals who had a history of violence who

19    were released and went on to commit another criminal act, which

20    obviously we're not concerned about in this context.  We're

21    concerned about going on to commit a violent behavior.  So that

22    data was incorrect.

23          There are data from that article which do specifically

24    relate to individuals who have a history of violence who do go

25    on to commit a violent act, and that base rate was

1   33.1 percent, I believe.

2   Q.   So your original report said that the most applicable base

3   rate was 86.5 percent, and in fact in your addendum when you

4   corrected -- and that's a mistake based on a misreading of the

5   DOJ article?

6   A.   It's Bureau of Justice Statistics, but, yes, that's

7   correct.

8   Q.   Which is a subunit of the Department of Justice?

9   A.   Yes.

10   Q.   And that was based on a mistake of reading that article?

11   A.   Well, I misread the table, yes.

12   Q.   The Durose Table 10 and 11?

13   A.   Correct.

14   Q.   Okay.  And that's a substantial difference, quite a come-

15   down, 86.5 percent down to 33.1 percent?

16   A.   It is a significant difference, yes.

17   Q.   Now, you say that this involved people who were in custody

18   who upon release went on to commit another offense?

19   A.   The 86 percent.

20   Q.   And also ultimately the number that you finally come down

21   to, the corrected figure of 33.1 percent, that also is people,

22   prisoners who were released who went on to commit another

23   offense within five years?

24   A.   No.  That number is prisoners who went on to commit

25   another violent offense.

1  Q.   A violent offense within five years.  When you say went on

2  to commit another violent offense, in fact the figures are for

3  those who are arrested for another violent offense within five

4  years?

5  A.   That's correct, yes.

6  Q.   So not even necessarily those who were convicted?

7  A.   No.  It's for arrests.

8  Q.   And the sample population involved those who were

9  currently serving a sentence who were released, correct?

10        THE COURT:  Just so I'm catching up with this because

11  I didn't see this thing filed on Friday, so let me just catch

12  up with you.  So what does Mr. Mahoney qualify as in Table 11?

13        THE WITNESS:  Table 11?

14        THE COURT:  In other words, what would his -- it said

15  prior arrest history and most serious commitment offense, so

16  what would he be?

17        THE WITNESS:  Well, prior arrest history would be

18  violent.

19        THE COURT:  No, it would be four fewer?

20        THE WITNESS:  Well, originally I had indicated it

21  would -- I mean, he would fall under the ten or more which

22  would go on to commit another offense within five years of --

23  that 85 percent of those would go on to commit another violent

24  offense.  However -- or, I'm sorry -- go on to commit another

25  offense.  However, it would not be a violent offense, or may

1    not be a violent offense.

2         THE COURT:  Right under that it says -- this is what

3    I'm not understanding -- it says "Violent, 85.6 percent in five

4    years."

5         THE WITNESS:  That's correct.  That would be

6    individuals who had ten or more prior arrests, the most serious

7    of which was violent, and the number who went on to commit

8    another offense within five years.

9         THE COURT:  Is 86 percent.  But what you're saying is,

10   maybe it's drugs, maybe it's property, maybe it's violence.

11   It's just you don't know what it is?

12        THE WITNESS:  Correct.

13        THE COURT:  And then you gave me a 33 percent rate

14   that would go on to commit violent offenses.  Where does that

15   show up?

16        THE WITNESS:  That would be on the prior page,

17   Table 10.

18        THE COURT:  I see, that's the prior page.

19        THE WITNESS:  And that identifies the number of

20   individuals with their most serious commitment offense by type

21   of post-release arrest charge.  So these would have been

22   individuals whose most serious commitment offense would have

23   been violence who went on to commit another violent offense.

24        THE COURT:  What we don't have is, people with ten or

25   more prior offenses that are violent, how many of those would

1    commit violence within five years?

2              THE WITNESS:  That is correct.

3              THE COURT:  We don't have that number?

4              THE WITNESS:  That is correct.

5              THE COURT:  All right.

6    Q.   And in fact the number that you do have, that 33.1 on

7    Table 10 in this BJS article, Bureau of Justice Statistics

8    article, those are the percentage of released prisoners who are

9    currently serving a sentence who were arrested within five

10   years for a violent offense?

11   A.   That's correct.

12   Q.   So to the extent that all the rest don't necessarily pan

13   out, that number might be actually overstating the base rate?

14             MR. CALLAHAN:  Objection.

15             THE COURT:  Sustained.

16   Q.   Now, on Page 3 of your amended rebuttal statement dated

17   August 1, 2014, you essentially chart out something very

18   similar to the 2-by-2 contingency tables measuring true

19   positives, false positives, true negatives, false negatives

20   that Dr. Kriegman submitted in his report?

21   A.   That's right.

22   Q.   And looking at the bottom of that page, you actually -- so

23   what you've done is, you've submitted essentially a contingency

24   table in a slightly different form using what you describe as

25   the more applicable base rate, more applicable as opposed to

1    Dr. Kriegman's 22 percent?

2    A.    That's right.

3    Q.    And you're assuming an instrument, an area under the curve

4    of 0.70?

5    A.    Correct.

6    Q.    Correct?  And that's because in general you're taking as

7    the example that the average median AUC of both the VRAG and

8    the HCR are somewhere in the vicinity of 0.70?

9    A.    That's correct, and it also corresponds to the correlation

10   coefficient example which was given by Dr. Kriegman.

11   Q.    And that was Dr. Kriegman's number of r equals 0.34?

12   A.    Correct.

13   Q.    And actually some of your Quinsey and Rice studies show

14   that those are essentially comparable effects, effect sizes?

15   A.    Yes.

16   Q.    Can you describe to the Judge how you used the AUC of 0.70

17   to churn out the numbers under "Instrument Outcome."

18   A.    Yes.  Basically what you would be doing is identifying --

19   you're using the base rate.  So here I'd be using the base rate

20   of 33, which indicates that, for example, out of every 100

21   individuals who would be released, 33 of those would go on to

22   commit another violent offense, and 67 of them would not go on

23   to commit another violent offense.  And the sensitivity and

24   specificity are measures of the number of true positives that

25   you've identified in your group as well as the number of true

1    negatives, which here what we're talking about is the inverse

2    of the false positive rate, 1 minus 3 basically.  So you have

3    .7 for both of those numbers, for the true positive and true

4    negative.  And then by using those base rates and your true

5    positive and true negative rate, you're able to identify how

6    many true positives and how many false positives you would

7    obtain by using this instrument; and from that, you're able to

8    obtain the positive predictive value, which is the proportion

9    of the individuals predicted by the instrument to be violent

10   who actually turned out to be violent.

11   Q.    But with respect to the AUC number of 0.7, that is a

12   number that obtains with respect to the instrument across a

13   series of thresholds, correct?

14   A.    That is correct.

15   Q.    That's the area under the curve?

16   A.    Correct.

17   Q.    And at each different threshold, you get a different

18   correlation between false positives and false negatives as you

19   go up the curve and to the right?

20   A.    Depending on where you set your cutoff, yes.

21   Q.    So what cutoff on the VRAG or the HCR are you using to get

22   sensitivity and specificity of 0.7?

23   A.    This is based on the overall AUC.  It's not based on a

24   specific instrument.

25   Q.    But with respect to a given instrument, shouldn't there be

1  virtually an infinite series of continuing contingency tables

2  as you move up the ROC/AUC curve?

3  A.   In theory, yes.

4  Q.   So you pick one particular one across the entire curve for

5  these instruments, and my question is:  The t value, the cutoff

6  value, what is the cutoff value here?

7  A.   This would be using a cutoff value where you would obtain

8  a true positive rate of 7 and a false positive rate of 3.

9  Q.   So did you pick that sensitivity and specificity number

10  out of the air?

11  A.   No.

12  Q.   So the VRAG, for example, as an instrument uses integers

13  from minus 26 up to 38 for scoring?

14  A.   That's correct.

15  Q.   And within that, it separates nine different categories or

16  zones of risk?

17  A.   Correct.

18  Q.   Mr. Mahoney was deemed to be in Category 7 by your

19  scoring, correct?

20  A.   Correct.

21  Q.   And for that, he was supposed to, according to the VRAG

22  instrument, there was a 55 percent chance within seven years

23  that someone in that category would recidivate violently?

24  A.   Well, what the VRAG identifies are the actual numbers of

25  individuals who went on to commit a violent offense within that

1    category based on their sample size, their sample.

2    Q.   And, again, commit a violent offense means be arrested for

3    a violent offense?

4    A.   You're right, correct.

5    Q.   But there in fact should be at least nine, theoretically

6    nine different contingency tables for using those different

7    scoring ranges or categories or cutoff scores when you look at

8    something like the VRAG?

9    A.   I'm sorry.  I'm not understanding your question.

10   Q.   You portray it to be extremely easy just to move from the

11   ROC/AUC of 0.70 to this particular contingency table for both

12   of these instruments?

13   A.   Correct.

14   Q.   And all I'm asking is, you acknowledged just a few seconds

15   ago that there are in principle an infinite number of potential

16   contingency tables for each instrument depending upon the

17   t value, the cutoff score?

18   A.   What I'm demonstrating here --

19        THE COURT:  I don't understand what you're talking

20   about, so if this is important to me, you need to --

21        THE WITNESS:  What I'm trying to demonstrate here is

22   an optimal cutoff with the data that we had available; that is,

23   a true positive rate of 7 and a false positive rate of 3.

24   Ideally we would have a true positive rate of 100 percent, we

25   would always be correct, but that is not an attainable --

1    Q.   Can you tell the Court, for example --

2         THE COURT:  I don't understand the point you're

3    driving home with contingencies.

4         MR. SCHNEIDER:  I mean, to be honest, it's that I'm

5    not sure that you can simply take the 0.7 from the ROC/AUC and

6    churn out these particular numbers simply by using it as a

7    multiplier or to set the sensitivity and specificity.  I think

8    it's a more complicated process than that.

9         THE WITNESS:  Well, that .7 is not the AUC.  This is

10   the optimal cutoff, which would be a true positive rate of 7

11   and a false positive rate of 3.

12   Q.   And how does that optimal cutoff relate to what you might

13   deem to be the cutoff for scoring on the VRAG for Category 7?

14   A.   You would have to look at that specific instrument to

15   identify that optimal cutoff.

16   Q.   So your numbers don't in fact relate to Mr. Mahoney's

17   actual score on the VRAG?

18   A.   These are examples to -- what I'm trying to demonstrate

19   here is that you would not want to believe that simply because

20   the test has an AUC of .7, for example, that that necessarily

21   means that you're really getting seven true positives and three

22   false positives; that actually you're identifying more false

23   positives than that.  This is an example --

24        THE COURT:  In other words, you're trying to explain

25   to me there are limitations to the test?

```
 1              THE WITNESS:  Yes, that there are limitations to the
 2   test, and that the outcome of the test will vary based on the
 3   base rate that you utilize for the example.  This is not a
 4   specific number that I've identified for the HCR-20 or the
 5   PCL-R or the VRAG.  This is just an example of an optimal
 6   cutoff score on those instruments where you're identifying
 7   seven true positives and three false positives but how that
 8   would actually play out based on the base rate.
 9   Q.   So, in other words, you've chosen to churn out these
10   numbers based on a more applicable base rate of 33.1 percent,
11   but you haven't gone to the trouble of figuring out what a more
12   applicable sensitivity/specificity would be for a particular
13   point on either the HCR-20 or the VRAG ROC curves?
14              MR. CALLAHAN:  Objection.  That mischaracterizes what
15   the testimony was.
16              THE COURT:  No, it didn't.  Is that --
17   A.   I've identified in the rebuttal multiple AUCs which have
18   been reported for the VRAG and the HCR-20 as an example.
19   Q.   But you haven't correlated those to the specific cutoffs.
20   We know there was a cutoff used in the VRAG for Mr. Mahoney,
21   correct?
22   A.   Yes.  That's identified in my report.
23   Q.   Basically that bottom number for Category 7?
24   A.   Correct.
25   Q.   And that generates a certain probability of recidivism for
```

1    those who meet that profile?

2    A.    Correct.

3    Q.    Now, let me just backtrack.  But even if your numbers are

4    essentially in the ballpark or essentially correct, you still

5    identify a positive predictive value of 0.53, or 53 percent,

6    correct?

7    A.    Correct.

8    Q.    And that means that for every 43 individuals who are

9    predicted violent, only 23 of them are true positives?  Only 23

10   actually turn out to be arrested for a violent offense?

11   A.    At that base rate, that's correct, yes.

12   Q.    And at that base rate, as many as 20 individuals have been

13   falsely predicted to be positive, to recidivate, but in fact

14   don't?

15   A.    That's correct.  That's the entire reason I included this

16   as an example was to demonstrate that that can occur.

17   Q.    And I appreciate the fact that you've kind of corrected

18   that 85.6 number because that led to a whopping positive

19   predictive value of 0.95, or 95 percent.

20   A.    Correct.

21   Q.    And these ballpark numbers are kind of just closer to

22   chance, right?

23   A.    Yes.

24   Q.    A little over 0.50.  And you had previously said --

25             MR. CALLAHAN:  Objection.

1          THE COURT:  Overruled.  I mean, is that basically what

2     you're saying?  If you have a 50/50 chance, you're saying the

3     instrument only has limited use for me?

4          THE WITNESS:  Well, it does have limited use, without

5     question, to both the Court and to an evaluator.  Again, I

6     would not say that it is not useful at all, but it does -- it

7     provides a certain amount of information.  How helpful it is

8     will vary depending on the group from which the individual is

9     being drawn, and that's where we're coming into the idea of

10     base rate.  Base rate will affect the outcome of an instrument.

11          THE COURT:  Well, what's his base rate coming back --

12          THE WITNESS:  Well, it's hard to identify.  I believe

13     that it's certainly not lower than 33.  There are other base

14     rates which have been identified which are higher.  Base rate

15     is very difficult to identify for an individual because they

16     have specific characteristics which might not be reflected in

17     those groups.  These are groups that we have known outcome data

18     on and --

19          THE COURT:  But if we don't know what his base rate

20     is -- assuming these are the best tests in the world for some

21     people, if we don't know what his base rate is and the best you

22     can tell me is 50/50, should I use them?

23          THE WITNESS:  Well, I believe that his base rate is

24     likely higher than 33 based on some of the other research which

25     is out there and identified in the rebuttal, but it's certainly

1    important for you to be aware that depending on the base rate,

2    the usefulness of the instruments will vary.  The higher the

3    base rate, the more true positives you'll have and the fewer

4    false positives you have.  The lower the base rate --

5              THE COURT:  Is that true for all the instruments, the

6    VRAG --

7              THE WITNESS:  It's true for any instrument, no matter

8    how good the instrument is.  An excellent instrument will still

9    result in a large false positive rate when you have a very

10   rarely occurring event or a low base rate.

11             THE COURT:  I'm just wondering why we're doing this

12   hearing.  So what is the instrument you think gives you the

13   best predictive force, given the fact we don't know what his

14   base rate is?

15             THE WITNESS:  Well, I believe the instrument which is

16   most helpful is the HCR-20, which I've identified as one that

17   takes into consideration both historical and clinical factors

18   that are specific to Mr. Mahoney and can be tailored

19   specifically to his current situation, as opposed to something

20   like the VRAG, for example, which is more static in nature.

21             THE COURT:  And with respect to the HCR-20 -- maybe

22   I'm just getting confused -- do you need to know base rates or

23   any things like that?

24             THE WITNESS:  Well, ideally we would always know the

25   base rate, but we don't have -- you know, people are very

1    individualized, so we don't know specifically what an

2    individual's -- if we could predict perfectly, we wouldn't be

3    here, obviously.  It's impossible to know --

4         THE COURT:  I understand, but I'm here, and I'm stuck

5    doing this because that's what the statute tells me to do, so

6    I'm just trying to figure out what I'm supposed to do.  So you

7    would say, because we don't know the base rates, from your

8    vantage point, the most predictive is, because it includes the

9    dynamic factors, is the HCR-20?  Is that what you're saying?

10        THE WITNESS:  I don't know that I would say it would

11   be the most predictive.  I find it the most useful with regard

12   to determining a person's risk and being able to formulate

13   release conditions in situations where the person would be less

14   likely to, again, be violent.

15        THE COURT:  So you think he's high risk, but is that

16   validated?  Is that just clinical judgment, or is that

17   validated by any of these numbers?

18        THE WITNESS:  Well, I believe he's high risk based on

19   a totality of the information which I've had available to me,

20   and that includes, you know, information about his history,

21   which are correlated with violent recidivism, as well as the

22   outcome on these instruments, which support the idea that he's

23   at elevated risk.  The VRAG, for example, is not designed in a

24   way that you would go back and -- it provides a specific

25   example of the group that they looked at.  We know how many of

1    those individuals went on to violently recidivate because they

2    used a sample, and in that group, for example, they're

3    identifying that this percentage went on within so many years

4    to engage in another violent behavior, and this group went on

5    to engage in that similar type of behavior in this number of

6    years.  So that information is what it is, however you

7    determine that that's useful.  What I've tried to indicate in

8    this rebuttal is that it's important to be aware that there are

9    limitations to the instruments.  We don't have a perfect

10   instrument.

11          THE COURT:  I get that.  I'm just wondering why I'm in

12   this *Daubert* hearing if you're basically -- you're just using

13   them as backstops.

14          THE WITNESS:  I use them as further information in

15   addition to the -- you know, at the end of the evaluation, I'll

16   use them to gather further information and to compare them to

17   other groups.

18          THE COURT:  Like corroborative for you rather than

19   what you've relied on or not?

20          THE WITNESS:  Well, I would say I rely on them but not

21   in isolation.  I rely on them in addition to the other

22   information which I have available, which is history as it

23   applies to Mr. Mahoney.

24   Q.   With respect to the HCR-20 --

25          THE COURT:  Can I ask you this:  I mean, we've already

 1   just spent an hour and a half here doing this.  There are no

 2   articles that discredit these in this context, but they've put

 3   limits on them.  In other words, it's not -- as I understand,

 4   they're commonly used in courts and across the country, and

 5   you've not pointed to one which says I can't use it.  It's just

 6   that they're very limited.  Is that what you're trying to tell

 7   me?

 8           MR. SCHNEIDER:  Well, what I am trying to tell you,

 9   your Honor, is that these instruments are of extremely low

10   predictive validity.  For criminal justice purposes, for

11   putting someone's liberty at risk, the error rates, the error

12   rates, the false positive rates are so high, and the patina of

13   science that these instruments imbue the expert with when they

14   testify to them is so great that they're prejudicial.

15           THE COURT:  That's true.  It depends what the base

16   rate is.  So for some groups it's very predictive is what I'm

17   hearing.  For other groups it's less predictive.  It's not that

18   the instrument is wrong.  It's just that for certain cohorts,

19   perhaps for Mr. Mahoney, it's not as predictive because we

20   don't know what his base rate is.

21           MR. SCHNEIDER:  No, I don't think that that --

22           THE COURT:  Then I don't understand why I'm -- I guess

23   I'm just trying to -- I get it:  Your point is that for his

24   base rate, it's 50/50.

25           MR. SCHNEIDER:  And it isn't just a matter of base

1    rates.  It's that everyone agrees -- I mean, now I'm making

2    argument under *Daubert*, but everyone agrees that these

3    instruments have gotten better since *Barefoot v. Estelle* and

4    since the mid-'80s when everyone said this is just a little

5    better than chance.  And for research purposes and clinical

6    purposes, my argument is that the instruments are getting

7    better; but there is literature that suggests that these kinds

8    of instruments, including these fancy actuarial instruments,

9    actually may reach a ceiling of predictive validity and may not

10   get us any further.

11         THE COURT:  Well, to some extent it's argument, but

12   you haven't given it to me then.  We haven't found it.

13   Dr. Kriegman didn't cite it for me.  We're getting into

14   argument, but I feel a little frustrated because as far as I

15   can tell what's happening is, you're sort of agreeing between

16   you.

17         MR. SCHNEIDER:  Well, he's made my point, I think,

18   which is that these instruments have extremely low predictive

19   validity.

20         THE COURT:  No.  They have limited utility, and I

21   should understand those limitations, that I can't just rely on

22   it.  It's at best another piece of a puzzle, at best.

23         How much longer do you have?

24         MR. SCHNEIDER:  I really was just about to wrap up.  I

25   have a few specific questions, and I just wanted to ask those,

1    and I'm happy --

2              THE COURT:  I know there were differences in scoring.

3              MR. SCHNEIDER:  There were differences in scoring, and

4    I've already brought out that that just happens and that

5    there's an examiner bias that goes with these differences,

6    defense side and prosecution side.

7              THE COURT:  Right, I hear that.

8    Q.   So I just had a couple of questions.  One of them -- and

9    these are just small things that I note would be good to

10   clarify -- are you aware that even the DSM-IV indicates that in

11   some cases, things that we perceive as antisocial behavior,

12   when it occurs in a prison context by a prison inmate, should

13   not necessarily be viewed in determining whether someone is in

14   fact antisocial?

15   A.   I'd have to see that specific reference.  I don't recall

16   that off the top of my head, no.

17   Q.   Well, if I told you that the DSM-IV at Pages 702 to 706

18   indicated that antisocial behavior in prison can be a means for

19   survival, and that one ought not to use that --

20             THE COURT:  Why don't you show it to him.

21             MR. SCHNEIDER:  Unfortunately --

22             THE COURT:  Put it up on the screen.

23             MR. SCHNEIDER:  This is actually a very good point

24   that Mr. Mahoney brought to my attention.  I don't have the

25   DSM-IV with me.

1          THE COURT:  Aren't we up to the V?

2          THE WITNESS:  It is a V now, yes.

3   Q.   And when you did this scoring, mostly you were using

4   DSM-IV or DSM-IV-TR, correct?

5          THE COURT:  I thought it was III.

6   A.   The previous edition was DSM-IV-TR, which was still in use

7   when I evaluated Mr. Mahoney.

8          THE COURT:  I thought some of these instruments went

9   way back.

10         THE WITNESS:  Well, we're talking about the DSM

11  Manual, the Diagnostic Manual For Mental Disorders, which is

12  different than the instruments.  Some of the instruments do go

13  way back, and the DSM goes way back, but it's had a number of

14  revisions over the years.

15         MR. SCHNEIDER:  This is just argument, but I think

16  that some of the references to the DSM-III was that even more

17  recent versions of some of these instruments were using the

18  older DSM-III criteria because they dealt with a different

19  constellation of symptoms; for example, in schizophrenia.

20  Q.   In any event, I just have a couple more very, very

21  specific questions.  In your report on Page 29 -- and you've

22  indicated that you've made an effort to correct some of -- that

23  you made some errors, and you made an effort to correct the

24  major error with respect to the base rate issue, but on Page 29

25  you indicate that on May 6, 2013, Mr. Mahoney threatened the

1    AUSA in a certain way saying certain things.  Are you aware of
2    the fact that the last time that Mr. Mahoney had been in that
3    court was actually in February of 2013 and that he didn't in
4    fact appear in court on May 6?
5    A.   I don't recall the specific dates.  The issue that I was
6    referring to was information which was provided to me by the
7    Assistant U.S. Attorney from New Hampshire, but I don't recall
8    the specific dates.
9            MR. CALLAHAN:  Objection to that.  The e-mail where he
10   conveys the information is dated May 6.  It happened earlier
11   than that, but the e-mail in which it was conveyed was May 6
12   when the U.S. Attorney provided that information.
13   Q.   That's the date of the e-mail but not the date of this
14   so-called incident, correct?
15   A.   Again, I don't recall, but, I mean, if that's -- that's
16   certainly a possibility, yes.
17   Q.   And just one other very specific point.  You indicate at
18   the top of that same page, Page 29, that in 2004 Mr. Mahoney
19   was incarcerated for violating an abuse prevention order,
20   correct?
21   A.   Yes.
22   Q.   Are you aware of the fact that there was a new trial
23   motion that was subsequently granted in that Malden District
24   Court case?
25           MR. CALLAHAN:  Objection, your Honor.  It assumes

1   facts not in evidence.

2           MR. SCHNEIDER:  I'm just asking if he's aware of it.

3           THE COURT:  That what?

4           MR. SCHNEIDER:  Whether he's aware that the

5   so-called -- that the 209A violation referenced at the top of

6   Page 29 where it says that Mr. Mahoney was incarcerated for

7   violating an abuse prevention order.

8   Q.   Are you aware that that case, the charge was -- that there

9   was a new trial motion that was granted in that charge?

10          MR. CALLAHAN:  Objection, your Honor.  It assumes

11   facts not in evidence.

12          THE COURT:  Well, do you know anything about that?

13          THE WITNESS:  No.

14          MR. CALLAHAN:  Is there a copy of the motion I can

15   look at?

16          MR. SCHNEIDER:  Yes.

17          MR. CALLAHAN:  Your Honor, this wasn't produced to the

18   government before today.

19          THE COURT:  Excuse me.  While he's looking, will you

20   be having any redirect?

21          MR. CALLAHAN:  I will, your Honor.

22          THE COURT:  How long?

23          MR. CALLAHAN:  I hope to be less than 25 minutes.

24          THE COURT:  We'll probably take a break, and then I

25   have to leave here at 1:00.

```
 1            MR. CALLAHAN:  Understood, your Honor.

 2            THE COURT:  And it was too hard to find this date, so

 3    we need to finish this morning.  Do you have another witness?

 4            MR. CALLAHAN:  The government does not, your Honor.

 5            THE COURT:  Do you have another witness?

 6            MR. SCHNEIDER:  At this point I'm not anticipating it,

 7    but I guess that's for -- Mr. Mahoney and I are going to have a

 8    brief conversation before making that --

 9            THE COURT:  You're right.  I am simply saying, I need

10    to leave here at 1:00, and it was hard to find a date.  When

11    this one's available, the doctor's -- so, I mean, I'd love to

12    try and finish it this morning if humanly possible, and if not,

13    we'll find another date, but it just will prolong it.  And

14    that's fine, but I don't want this doctor to come back.  We'll

15    at least finish him.

16            MR. SCHNEIDER:  I'm having difficulty finding the new

17    trial motion.

18    Q.   Well, let me at least back up and say, by the way, with

19    respect to that 2004 case, you haven't seen any police reports

20    with respect to that case, have you?

21    A.   No.  I tried for a couple years to obtain some police

22    reports, and I haven't been able to obtain a number of police

23    reports that --

24    Q.   And you haven't seen any transcripts of that case?

25    A.   No.
```

1    Q.   And you know that sometimes a violation of Chapter 209A

2    can simply be someone violating a stay-away order, correct?

3    A.   I don't know a whole lot about --

4         THE COURT:   You know what, I was a state court judge

5    for a long time.  I know 209A.

6         MR. SCHNEIDER:   Okay, I think the point was made.  I

7    know my client has one more question he'd like me to ask.

8         MR. CALLAHAN:   Is there an order?  Do you have the

9    order that you suggest --

10        MR. SCHNEIDER:   I don't have that.

11        THE COURT:   Well, I'm not going to take it into

12   account unless they come up with one, so --

13        MR. SCHNEIDER:   I don't have that.

14        (Pause.)

15   Q.   Now, on Page 29, about a little over halfway down, you

16   say, "On March 26, 2013, Mr. Mahoney was given two incident

17   reports for assaulting corrections staff," and you say that "He

18   stiff-armed a female corrections staff member and later began

19   kicking prison staff as they tried to escort him to a different

20   unit."  And there you cite Government Exhibit 18, which are

21   these two reports for that alleged incident.  Do you see that?

22   A.   I'm sorry.  Where are you?

23   Q.   I'm talking about Page 29 of your main rebuttal report,

24   the uncorrected one.

25   A.   Correct.

1    Q.    About a little over halfway down you say, "On March 26

2    Mr. Mahoney was given two incident reports for assaulting

3    corrections staff."

4    A.    Yes, I see that.

5    Q.    And it says that "He stiff-armed a female corrections

6    officer staff member and later began kicking prison staff as

7    they tried to escort him to a different unit," correct?

8    A.    Correct.

9    Q.    Are you aware that in that report it indicates that

10   Mr. Mahoney specifically stated that he never touched the

11   corrections officer?

12   A.    Could I see the report or --

13   Q.    Sure.  If you could look at Government Exhibit 18, the

14   first page, Bates No. 1726 --

15            THE COURT:  I have a really odd question.  What

16   exactly do you understand "stiff-armed" to mean?

17            THE WITNESS:  Pushed by the officer by using his arm

18   to get by her.

19            THE COURT:  So it's pushing by?

20            THE WITNESS:  Correct.

21            THE RESPONDENT:  No, your Honor.  I'm making physical

22   contact to the face, that's what the report was.  That's what

23   the stiff-arm was, what he was insinuating.  And he's also

24   stated I kicked several staff members.  So he can't be mistaken

25   on that.  Those are two blatant lies of this man.  In his

1    rebuttal report --

2              MR. CALLAHAN:  Objection, your Honor.  Objection to

3    the testimony.  He's not on the witness stand.  He's not under

4    oath.  He shouldn't be testifying at all.  It's the question to

5    Dr. Channell, and that's it.

6              THE DEFENDANT:  I'm just letting the Judge aware about

7    what she meant by stiff-armed.  I have the right to mention

8    that.

9              THE COURT:  Yes.

10             THE RESPONDENT:  It means making contact to her in the

11   face, your Honor, striking her with physical assault.  Assault

12   means to strike and make contact.

13             THE COURT:  All right, thank you.

14   Q.   So you're aware by looking at that report that Mr. Mahoney

15   specifically denied touching her?

16   A.   I understand that he denied touching her, yes.

17   Q.   And can you show me where in this report it said that he

18   actually kicked anyone?

19   A.   You're on Tab 18?

20   Q.   Tab 18.

21   A.   Well, it indicates that he began resisting and kicking

22   backwards towards the escorting staff.

23   Q.   So he didn't actually kick anyone, did he?

24   A.   It doesn't state that.

25   Q.   Right.  So that what you wrote on Page 29 is simply false?

```
 1    A.    It's inaccurate.

 2              MR. SCHNEIDER:  Your Honor, I have no further questions.

 3              THE RESPONDENT:  Thank you for being honest.  It's

 4    inaccurate, thank you, lies.  Thank you very much,

 5    Dr. Channell, for letting the Judge know.  He lied, Judge.

 6              THE COURT:  All right, do you want to take a break now

 7    till 11:30?

 8              MR. CALLAHAN:  Certainly, your Honor.

 9              THE CLERK:  All rise.

10              THE COURT:  Why don't you go --

11              (Discussion between the Court and Clerk.)

12              (A recess was taken, 11:09 a.m.)

13              (Resumed, 11:36 a.m.)

14              MR. CALLAHAN:  Thank you, your Honor.  Your Honor,

15    before we begin, we just wanted to move in Exhibits 48 through

16    83, which are the reports and the exhibits by Dr. Channell.  We

17    formally move those into evidence.

18              (Exhibits 48-83 received in evidence.)

19              MR. CALLAHAN:  And also the exhibits that have been

20    moved in so far on the government's side is 1 to 11, 13 to 24,

21    28, 29, 32, 35, 37, and 40, and that's on the list that's been

22    provided to the Clerk and to Attorney Schneider.  Thank you,

23    your Honor.

24              (Exhibits 1-11, 13-24, 28-29, 32, 35, 37, and 40

25    received in evidence.)
```

1    REDIRECT EXAMINATION BY MR. CALLAHAN:

2    Q.    Dr. Channell, I want to ask you about a couple questions

3    you received in your cross-examination from Mr. Schneider.

4          THE COURT:   Now you need to speak up so we can all

5    hear you.

6          MR. CALLAHAN:   Right, sure.

7          THE COURT:   All right, just belt it out.

8    Q.    You were asked a question about the HCR-20 and the fact

9    that it doesn't use an algorithm.   Do you remember that?

10   A.    Yes.

11   Q.    And there was a suggestion by Attorney Schneider that that

12   was a weakness.   You said it was a strength, or it can be

13   viewed as a strength.   Can you explain why.

14   A.    Because, as I indicated earlier, it can be more directly

15   applied to a particular individual as opposed to having to

16   compare them to a specific group sample.   It also allows the

17   evaluator the flexibility to come up with an overall conclusion

18   with regard to risk which takes into account factors which may

19   not be included on the instrument.

20   Q.    And with respect to the HCR, it's not just a single

21   scoring sheet that's used for the test, correct?   Is there also

22   a manual that goes with it?

23   A.    Yes, there is.

24   Q.    Did you use that manual and have you used that manual in

25   the past when using the HCR instrument?

1    A.    Yes.

2    Q.    Did you use it in this case?

3    A.    Yes.

4    Q.    Now, sticking with the HCR, you were asked some questions

5    about a word I'm going to confuse but inter-rater reliability.

6    Do you recall that?

7    A.    Correct.

8    Q.    And there was some suggestion that the inter-rater

9    reliability for the HCR-20, there were some scores on it that

10   were lower than the other scores.  Do you recall that?

11   A.    Yes.

12   Q.    And what Mr. Schneider was asking you about was the

13   inter-rater reliability for the final judgment where you say

14   whether someone is at low risk, moderate risk, or high risk to

15   reoffend in the future, correct?

16   A.    Yes.

17   Q.    But there's also an inter-rater reliability that goes by

18   the score one receives on the HCR, the raw score at the end of

19   the scoring sheet, correct?

20   A.    Correct.

21   Q.    What's the inter-rater reliability for that that you

22   reported?

23   A.    I would have to look to be -- I don't recall exactly.

24   It's significantly higher than the inter-rater reliability for

25   the overall score.  Just one second.  I have it right here.

1   The average or median was .85.

2           THE COURT:  Point?

3           THE WITNESS:  .85.

4   Q.   .85?  And that refers to the score, and if you look up

5   here at Exhibit 4 which is on the screen, do you see the score

6   34 out of 40?

7   A.   Correct.

8   Q.   That was Mr. Mahoney's score?

9   A.   Correct.

10  Q.   Okay.  And you make a judgment based on that score and

11  other things, but that's the numerical score that he received,

12  correct?

13  A.   That is the numerical score that he received, yes.

14  Q.   And it's that numerical score that has an inter-rater

15  reliability of -- did you say .85?

16  A.   Correct.

17  Q.   And in terms of what the literature says about an

18  inter-rater reliability score of .85, what do the articles say?

19  A.   That would be considered a good to excellent inter-rater

20  reliability score.

21          THE COURT:  And what did Dr. Kriegman score him on

22  this?  Did he, the HCR-20?

23          MR. CALLAHAN:  Dr. Kriegman didn't score any of the

24  instruments, your Honor.

25          THE COURT:  I understand that, but did he critique any

1    of this?

2          THE WITNESS:  He critiqued some individual items,

3    although I don't recall him giving a total score.

4    Q.   There was also a question, Dr. Channell, about authors of

5    the VRAG and authors of the HCR talking about the AUC rates or

6    area-under-the-curve rates.  Do you recall those questions?

7    A.   Yes.

8    Q.   Are there also authors besides the authors of the actual

9    instruments who describe area-under-the-curve rates for the

10   VRAG and the HCR-20?

11   A.   Yes, there are.

12   Q.   And did you include those numbers in your rebuttal report

13   for the Court?

14   A.   Yes.  I did not all of them but obviously some examples.

15   Q.   And you were asked some questions about the VRAG being

16   used in civil commitment proceedings by Mr. Schneider.  Do you

17   recall that?

18   A.   Yes.

19   Q.   Have you relied on the VRAG in civil commitment

20   proceedings here, in 4246 proceedings within this district?

21   A.   Yes, I have.

22   Q.   Approximately how many times?

23   A.   I don't recall exactly.  Several times.

24   Q.   And I'm putting up on the screen the government's motion

25   to strike the expert report of Mr. Kriegman.  Does this refresh

1    your recollection of the instances in which you've relied on

2    the HCR-20 or the VRAG?

3    A.    Yes.

4    Q.    *United States v. Jose Madrigal*?

5    A.    Correct.

6    Q.    And did you use it in that case?

7    A.    Not the VRAG, but I used the HCR-20.

8    Q.    And did you use the HCR-20 in United States v. Clyde

9    *Fanning*?

10   A.    Yes, I did.

11   Q.    And then did you use the VRAG and the HCR-20 in *United*

12   *States v. Arthur Plummer*?

13   A.    Yes, I did.

14   Q.    And the same with respect to *United States v. Michael*

15   *Jackson*?

16   A.    Yes.

17   Q.    And the same with respect to *United States v. Andre*

18   *Johnson*?

19   A.    Yes.

20   Q.    In those cases, did you rely on the VRAG and the HCR as

21   well as other factors?

22   A.    Yes.

23   Q.    And in those cases, were the respondents committed under

24   4246?

25   A.    Yes, I believe they all were.  I'd have to look at the

1    list again, but I believe they were all committed.

2    Q.   You were also asked questions about whether or not

3    Mr. Mahoney has a personality disorder and how that might

4    affect the HCR-20 score as well as the VRAG score.  Do you

5    recall those questions?

6    A.   Yes.

7    Q.   Is it required that Mr. Mahoney have antisocial

8    personality disorder in order for you to score a 3 on the VRAG?

9    A.   No.  It would be any personality disorder.

10   Q.   So would borderline personality disorder allow you to

11   score that as a 3?

12   A.   Yes.

13   Q.   And would narcissistic personality disorder allow you to

14   score that as a 3?

15   A.   Yes.

16   Q.   So here on Defendant's Exhibit 5, if you look at the

17   screen, where it says "Meets DSM-III criteria for any

18   personality disorder," there are a variety of disorders that

19   would qualify and support the score of 3; is that correct?

20   A.   Yes.  As it says, it would be any personality disorder.

21   Q.   And has Mr. Mahoney in the past been diagnosed with a

22   personality disorder?

23   A.   Yes.  He's been diagnosed in the past with personality

24   disorder not otherwise specified by Dr. Mart in 2011 and with

25   borderline personality disorder at MCI Concord in 2009.

1    Q.   And did Dr. Kriegman during his direct testimony say that
2    Mr. Mahoney could be diagnosed with personality disorders?
3    A.   Yes, he did.
4    Q.   Which ones?
5    A.   I believe it was narcissistic or borderline personality
6    disorder.
7    Q.   You were also asked a number of questions and there was a
8    lot of back-and-forth about base rates.  Do you recall that
9    testimony?
10   A.   Yes.
11   Q.   And you talked about base rates that were higher than the
12   base rate of 22 percent that Dr. Kriegman had discussed,
13   correct?
14   A.   Correct.
15   Q.   And I'm just putting on the board your rebuttal addendum
16   which describes using Dr. Kriegman's base rate of 22 percent,
17   correct?  And there's an AUC of .70 that you use?
18   A.   That would be an AUC of .70 for that example, yes.
19   Q.   And the base rate that's used on this example, which is up
20   on the board from your rebuttal report, is actually taken from
21   Dr. Kriegman; is that right?
22   A.   Yes.  That was the 22 percent.
23   Q.   Okay.  Are you aware of base rates higher than the
24   22 percent that Dr. Kriegman used?
25   A.   Yes.

1  Q.   And are you aware of any base rates higher than the

2  33 percent that are identified in the Durose article that you

3  cited?

4  A.   Yes.

5  Q.   Which ones?  Which base rates are you aware of that are

6  higher than the 22 percent that Dr. Kriegman used and the

7  33 percent that's identified in the Durose article?

8  A.   There are two base rates which were identified by Rice and

9  Harris in their revalidations of the VRAG.  Once in 1995 when

10  they did the ten-year revalidation, the base rate there was

11  43 percent over a ten-year opportunity to recidivate; and in a

12  2013 article, they looked at the sample over the course of

13  20 years with a base rate of 50 percent who had recidivated

14  violently over the course of 20 years.

15          THE COURT:  So just I'm losing this point.  So the

16  base rate, the highest base rate you've seen is 50 percent,

17  right?

18          THE WITNESS:  Well, it's not the highest base rate

19  I've seen.

20          THE COURT:  Fifty percent go out and recidivate?

21          THE WITNESS:  Of that group, yes.

22          THE COURT:  Of that group, and that group is a violent

23  group?

24          THE WITNESS:  Correct.

25          THE COURT:  So just so I understand, so that still

 1  means 50/50?

 2          THE WITNESS:  It means 50 out of that group.  It

 3  doesn't mean necessarily that the instrument would only

 4  identify 50/50.

 5          MR. CALLAHAN:  Your Honor, if I could take

 6  Dr. Channell through an example, it might clarify.

 7          THE COURT:  Yes, because I'm still seeing 50/50.

 8  Q.   Okay, using a 50 percent base rate, Dr. Channell, so

 9  50 percent base rate --

10          MR. SCHNEIDER:  Your Honor --

11          THE COURT:  What's your --

12          MR. SCHNEIDER:  -- I object because in his rebuttal

13  testimony, he never used a base rate other than the

14  33.1 percent, which he defines as the most applicable base

15  rate.

16          THE COURT:  Overruled.  I want to understand this.  I

17  in my gut don't have it yet.  So a 50 percent base rate means

18  50 percent of the people in this pool go out and recidivate

19  over five years in a violent way?

20          THE WITNESS:  Correct.

21  Q.   So, Dr. Channell, going through the flow chart --

22          THE COURT:  So why isn't that -- all right, go ahead.

23  Q.   Sorry.  Going through the flow chart that you used, that

24  would mean that 50 percent violently recidivate and 50 percent

25  do not, correct?

1    A.    That's correct.

2    Q.    And when you use the AUC, the AUC that you're using, the

3    area under the curve would be .70?

4    A.    Approximately, yes.

5    Q.    That's what you used?

6    A.    For an optimal cutoff.

7    Q.    And just let me ask.  There are AUCs that are reported in

8    the literature that are actually higher than .70, correct, .72,

9    .74, .76 for the VRAG; is that correct?

10   A.    That's correct, yes.

11   Q.    You're using .70, which is conservative in light of those,

12   correct?

13            THE COURT:  And what does that represent, the .70?  I

14   know it's area under the curve.  That's the predictive power of

15   the instrument in this group?

16            THE WITNESS:  It would represent the number of -- it

17   would represent in general that the individuals who obtain a

18   higher score on the instrument go on to commit a violent

19   offense, and individuals who obtain a lower score on the

20   instrument do not go on to commit a violent offense.

21            THE COURT:  Out of this pool?

22            THE WITNESS:  Well, out of whomever you're using the

23   instrument with.

24            THE COURT:  All right, but out of a pool that's 50/50,

25   as it turns out --

1           THE WITNESS:  Well, that's what we're going through,

2    is to demonstrate how it would play out.

3    Q.   So, Dr. Channell, if the AUC value is what you used and

4    Dr. Kriegman used, .70, correct?

5    A.   That's not the AUC value.  That would be an optimal

6    cutoff.  So that would be where an individual would be -- for

7    example, in these cases where we identify seven true positives

8    for every three false positives.  I mean, ideally we would go

9    higher than that, but that's pretty unrealistic with the types

10   of instruments that we have available.

11   Q.   And so the .7 is based on what, Dr. Channell?

12   A.   That would be identifying seven true positives for every

13   three false positives.

14   Q.   Okay.  And then I'm going to ask you to do a little bit of

15   math here, but if you looked at the true positive, it would be

16   .7 times 50?

17   A.   That's correct.

18   Q.   And do you know what that would come out to?

19   A.   Well --

20   Q.   I should be able to do this, but I can't.

21   A.   I should be able to do it as well, but I will calculate

22   it.  (Pause.)  35.

23   Q.   So there would be 35 true positives.  How many false

24   negatives?

25   A.   False negatives would be 15.

1   Q.   And conversely, with the specificity, how many true

2   negatives would there be using that same .70 cutoff for the

3   AUC?

4   A.   The numbers would be the same because we have the same --

5   it was 50/50, so you would still be 35 for true negative and 15

6   for your false positives.

7   Q.   So with a base rate of 50 percent and an AUC of .70 that

8   you use, the true positives would be 35?

9   A.   Correct.

10  Q.   And the false positives would be 15, correct?

11  A.   Correct.

12  Q.   And if you did the positive predictive value, which is

13  what you describe in your rebuttal report, the true positives

14  would be 35, correct?

15  A.   Correct.

16  Q.   The true positives plus the false positives would be the

17  denominator there, correct?

18  A.   Correct.

19  Q.   And that would be true positive, 35; false positive of 35

20  would be 50, correct?

21  A.   Uh-huh.

22  Q.   What would be the positive predictive value for that

23  instrument?

24  A.   It would be .7, seven out of ten basically.

25  Q.   And that's significantly higher than the conclusion that

1   Dr. Kriegman came to when he used a base rate of 22 percent,

2   correct?

3   A.   Well, yes.  Basically what it's indicating, which is true,

4   it makes sense, as the number of -- as it becomes more likely

5   that the group that an individual is a part of, as they become

6   increasingly more violent, for lack of a better word, the test

7   becomes more accurate.  Your true positives will increase and

8   your false positives will increase the higher your base rate.

9            THE COURT:  And how do you know what an individual

10   falls in, whether it's the 33 percent, the 22 percent, or the

11   50 percent?

12            THE WITNESS:  Well, what you have to do is try to

13   identify the group to which they're most comparable.

14            THE COURT:  And have you done that?

15            THE WITNESS:  Well, there are a range of groups that,

16   you know, he would be comparable to.  Because I used the VRAG

17   on Mr. Mahoney, I believe that he is comparable to the VRAG

18   sample, so I believe that the VRAG base rate would be

19   applicable in his case.

20            THE COURT:  Which is the 50 percent?

21            THE WITNESS:  Which would be 50 over the course of 20

22   years.

23   Q.   And the VRAG sample, what exhibit is that from?  When

24   you're looking at a base rate, what exhibit or what article are

25   you referring to with respect to the VRAG?

1  A.   That article is a Harris and Rice 2013 article.  I'm not
2  sure what --
3  Q.   And what about the VRAG sample, is that the Harris Quinsey
4  1993 article, Exhibit --
5  A.   That was one of the sample -- basically all of their
6  research has been done using the same sample, looking at it
7  over longer periods of time.  This data comes from a 2013
8  article by Harris and Rice.
9  Q.   Okay.  And what if you took the base rate from the Harris
10  article from 1993 describing the VRAG?
11  A.   The base rate -- well, I don't recall exactly what the
12  base rate was in '93.  The base rate in '95 was over a shorter
13  period of time, and that was 43 percent for 10 years.
14  Q.   And what if we did that example?  43 percent would mean
15  that 43 are violent?
16  A.   Correct.
17  Q.   And 57 are not?
18  A.   Correct.
19  Q.   And this would still be .70, correct?
20  A.   Yes.
21  Q.   And the true positives there would be 43 times .7?
22  A.   It would be 30.
23  Q.   The false negatives would be what?
24  A.   13.
25  Q.   And on the flip side, the true negatives would be?

1    A.    40 and 17 for the false positives.

2    Q.    And so the true positives or the positive predictive value

3    would be having a numerator of 30, correct?  Is that correct,

4    Dr. Channell?

5    A.    That's correct.

6    Q.    And what would the denominator be, the true positive

7    versus the false positives?

8    A.    It would be a double number of positives, so it would be

9    47.

10   Q.    So using a base rate of 43 percent, what would the

11   positive predictive value be?

12   A.    .63.  So it would be six -- for every six true positives

13   you would have four false positives essentially.

14   Q.    So is it fair to say that there are base rates for someone

15   like Mr. Mahoney that are higher than the 22 percent that

16   Dr. Kriegman used in his example?

17   A.    Yes.

18   Q.    And you've described some of those just now, correct?

19   A.    Correct.

20   Q.    With respect to the HCR-20, are you aware of any cases

21   where that's been excluded when it's used to predict or to come

22   to a conclusion about the risk for violence?

23   A.    I'm not aware of any, no.

24   Q.    The HCR-20, has it been peer reviewed?

25   A.    Yes, it has.

1  Q.   Has it been subjected to many studies since it was first

2  released?

3  A.   Yes.

4  Q.   All right.  Is it generally accepted in the field?

5  A.   Yes, it is.

6  Q.   And with respect to the VRAG, how long has it been in use?

7  A.   The VRAG has been in use I believe since around '90 -- the

8  early '90s.  I can't recall the exact year it was published.

9  Q.   And the HCR-20, how long has that been around?

10  A.   It's also been around since the '90s.

11  Q.   And the HCR-20, has it been subjected to peer review?

12  A.   Yes, it has.

13  Q.   Is it generally accepted in the field?

14  A.   Yes.

15       MR. CALLAHAN:  No further questions at this point,

16  your Honor.

17       MR. SCHNEIDER:  I just have a couple questions.

18       MR. CALLAHAN:  One moment.  Should I mark these?  Can

19  I mark these two sheets as Government's Exhibit 85?

20       THE COURT:  Can I ask a question before he gets going.

21  Are you aware of anyone who's held a *Daubert* hearing on most of

22  these, on these?

23       THE WITNESS:  Well, I submitted some articles that

24  indicated where it had been accepted.  I don't recall if there

25  was a *Daubert* hearing.  I'm not aware of any *Daubert* hearing in

1    the federal system with regard to use of these instruments

2    for violence risk assessment.

3            MR. CALLAHAN:  Your Honor, with respect to the HCR-20,

4    it has been subjected to a *Daubert* hearing, and that was

5    *People v. Williams*.  That's a case from the California Court of

6    Appeals, and in that case the *Daubert* -- it was actually not

7    even a *Daubert* hearing.  It was on the more rigid standard

8    under *Frye*, which is general acceptance.  There the court said

9    it was generally accepted in the field.  So it has been, and it

10   was rejected.

11           THE COURT:  Yes, one state court case but no federal

12   cases that anyone knows of?

13           MR. CALLAHAN:  Correct, your Honor.  And just if

14   you're asking, your Honor, with respect to the PCL-R, it's been

15   subjected to nineteen challenges, according to the exhibit that

16   the government has provided; and Dr. Channell describes that in

17   his rebuttal report, and it's been used 348 times.

18           THE COURT:  I know how many times, but has it been

19   federal, federal challenges?

20           MR. CALLAHAN:  The majority of those were state, your

21   Honor, as far as I can recall.

22           THE COURT:  We don't know if there have been federal?

23           MR. CALLAHAN:  I don't know if there are any federal.

24           MR. SCHNEIDER:  My understanding from the article that

25   the government submitted is that the vast majority are state

1    cases from California, Minnesota, and the state of Washington,

2    and that there are really one or two --

3            THE COURT:  I myself have held a *Daubert* hearing on

4    the Static-99, but I don't think any of these three tests were

5    part of that.

6    RECROSS-EXAMINATION BY MR. SCHNEIDER:

7    Q.   I just have a few questions because I don't want to beat a

8    dead horse here.  So I understand that you just presented the

9    Court on the fly with a couple of analyses involving a

10   50 percent base rate or a 43 percent base rate.  Where did you

11   get those numbers again from?

12   A.   Those were from articles by Rice and Harris.  43 percent

13   was from a '95 article, and the 50 percent was from a 2013

14   article.

15   Q.   Right, and they're the authors and designers of the VRAG?

16   A.   They are, yes.

17   Q.   And they're proponents of using these kinds of instruments

18   in court?

19   A.   Yes, they are.

20   Q.   Okay.  In your rebuttal, you had an opportunity to present

21   the Court with the most applicable base rates that you thought

22   made sense in applying to Mr. Mahoney, correct?

23   A.   Yes.

24   Q.   And ultimately you initially made the mistake of choosing

25   85.6 percent as the most applicable base rate?

1   A.   Correct.

2   Q.   And then you backed off that, and you ultimately said that

3   the most applicable or more applicable base rate was something

4   like 33.1 percent?

5        MR. CALLAHAN:  Objection.  That mischaracterizes the

6   testimony.

7        THE COURT:  Is that what you said?

8   A.   I can find the addendum to the corrections based on the

9   Durose data, which is where the 33.1 percent came from.

10  Q.   Right.  And your language in your addendum was that the

11  more applicable base rate was 33.1 percent?

12  A.   Yes.  That was more applicable than the 22 percent.

13       THE COURT:  Wait.  So I understand, so you think 33 is

14  better than any of the other base rates that you've seen?

15       THE WITNESS:  No, that's not my testimony.

16       THE COURT:  I'm trying to understand where you're

17  getting the 50 percent or the 33 percent or the 43 percent.

18  How do you decide what the most applicable base rate is?

19       THE WITNESS:  The 33 percent comes from Bureau of

20  Justice Statistics data for inmates released from thirty

21  prisons in 2005.  So these would be inmates who may or may not

22  have a mental illness, who had a violent offense, who were

23  released and went on to commit another violent offense.

24       THE COURT:  Right.  And then the VRAG is who?  Who is

25  in the 50 percent?

1          THE WITNESS:  That would include individuals who have

2     a history of violence and a mental illness.

3          THE COURT:  And that's why you think that's more

4     applicable?

5          THE WITNESS:  And I believe that's more applicable to

6     this case because of that specifier.

7     Q.   Well, you've had since June 12, the last hearing in this

8     case, to put together both your rebuttal and your amended

9     rebuttal?

10          MR. CALLAHAN:  Objection.  That's not true.  There was

11     nothing to rebut before a month ago.

12          THE COURT:  Sustained, sustained.

13     Q.   You've had time to put together your rebuttal and your

14     amended rebuttal since we were last in court, correct?

15     A.   Yes.  I did both of them between that period of time.

16     Q.   And you had an opportunity to put in what you thought was

17     the most applicable base rates?

18          MR. CALLAHAN:  Objection.

19          THE COURT:  Overruled.

20     A.   Yes, I had that opportunity.

21     Q.   And you didn't put in anywhere that you thought the most

22     applicable base rate was 43 percent or 50 percent; is that fair

23     to say?

24     A.   As I indicated, I clarified the error from the original --

25     the original rebuttal in my addendum.

1    Q.   And I assume that you were trying to be as sort of

2    scientifically cautious and appropriate in picking --

3              THE COURT:  What error?  What error?

4              THE WITNESS:  The error was that, as we discussed

5    earlier, I had assumed that those individuals who had four

6    offenses or ten or more offenses actually went on to commit a

7    violent offense from the Department of Justice Statistics.

8              THE COURT:  Right, so that throws the 86 in the

9    wastebasket, but at that some point you're now telling me -- as

10   you sit here today, you're telling me 50 percent?

11             THE WITNESS:  Yes, I am.  I'm telling you 50 percent

12   from the Rice and Harris data.

13   Q.   And is it your testimony now that that is the best, most

14   applicable base rate to Mr. Mahoney?

15   A.   It's the most applicable base rate I've been able to

16   identify.

17   Q.   But you didn't put that in either your rebuttal or your

18   addended rebuttal, amended rebuttal.  So you went through an

19   exercise on the fly with Mr. Callahan taking, for example, a

20   50 percent base rate which you pulled from an article by Harris

21   and Rice, right?

22   A.   Correct.

23   Q.   And to arrive at the true positives and the false

24   positives and the positive predictive value, you simply picked

25   cutoffs in which you assumed that there was a sensitivity of .7

1    and a specificity of .7?

2    A.   Well, I didn't assume it.  I identified a cutoff where

3    that was the specificity.

4    Q.   So and that cutoff does not -- what curve -- can you show

5    me a curve drawn from either the VRAG or HCR ROC analysis from

6    which that cutoff actually falls on a curve?

7    A.   Well, I could but --

8    Q.   Would you do that.

9    A.   I can't do it at this point in time.

10   Q.   And it's your testimony, if these numbers -- these items

11   are going to get marked into evidence.  Your testimony is that

12   you are using a completely accurate way of calculating the

13   number of false positives and the number of true positives

14   simply by picking an arbitrary .7 and .3 cutoff?

15        MR. CALLAHAN:  Objection.  That mischaracterizes the

16   witness's testimony.

17        MR. SCHNEIDER:  I'm asking him.

18        THE COURT:  I'll allow him to answer.

19   A.   These are simply examples of how the base rate will affect

20   the outcome of an instrument when you use those cutoffs.

21   Q.   But those cutoffs don't come from any curve relating to

22   either the VRAG or the HCR-20?

23   A.   This data that I'm discussing right now is not specific to

24   any particular instrument.  I'm talking about an instrument

25   that has an area under the curve of approximately .7 and using

1    these data of --
2            THE COURT:  Well, does the VRAG have the sensitivity?
3            THE WITNESS:  Well, there are certainly studies which
4    indicate, as I've indicated in my rebuttal, that the AUC --
5    that have identified an AUC of approximately .7 for the VRAG.
6    Q.   So are you saying that an AUC of .7 automatically produces
7    a sensitivity of .7 automatically?
8    A.   No.  That's not my testimony.
9    Q.   So can you guarantee that a sensitivity of .7 and a
10   specificity of .7 would actually appear on an actually existing
11   0.70 ROC and AUC curve?  These numbers are arbitrary, aren't
12   they?
13   A.   You can move the --
14           THE COURT:  I have no idea what you just said.  I
15   mean, let me just put it right out there.  I'm finally getting
16   to the point where I get the base rates.  I understand area
17   under the curve, and is that the same as the sensitivity rate?
18           THE WITNESS:  You can move the sensitivity and
19   specificity around however you want on this example, and it
20   will show you your positive predictive value.  You could set
21   the sensitivity at three true positives for every seven false
22   positives if you wanted, and you would end up which the numbers
23   which indicated the positive predictive value of that data.
24   I'm simply providing an example where you have -- you've set
25   your cutoff of the instrument to identify seven true positives

1    for every three false positives.

2    Q.    So, I mean, you're kind of loading into your assumptions

3    what the answer is going to end up being at the end of the

4    road, right?

5    A.    No.

6    Q.    Well, does this number relate in any way to an actually

7    existing VRAG in general, and specifically the cutoffs that are

8    relevant to Mr. Mahoney?

9    A.    Depending on where you would set your cutoff, absolutely,

10   yes.

11   Q.    Well, didn't the VRAG in fact set a cutoff for Mr. Mahoney

12   at whatever the score is comparable to Risk Category 7?

13   A.    The VRAG, you would set your cutoff dependent on wherever

14   you want -- however many false positives you want to identify

15   in correlation to the number of true positives you want to

16   identify.

17   Q.    But for the ROC curve relevant to the VRAG in particular

18   as applied to Mr. Mahoney, there is a specific cutoff or

19   t threshold value somewhere along that curve that corresponds

20   to Mr. Mahoney's score on the VRAG?

21   A.    Wherever you set the cutoff, as I've said several times,

22   wherever you would set the cutoff to identify seven true

23   positives for every three false positives would be the example

24   that I'm giving here.

25   Q.    And the VRAG itself sets a cutoff for Mr. Mahoney using

1    its nine categories?

2    A.   You're talking about apples and oranges.  They're not the

3    same.

4         THE COURT:  All right, could you just say to me in

5    plain English, what does the VRAG do?

6         THE WITNESS:  Well, the VRAG identified based on

7    Mr. Mahoney's score, of the sample size that was -- of the

8    sample that they used, the individuals who obtained a score

9    similar to Mr. Mahoney's, it identifies the percentage that

10   would go on to recidivate within I believe seven years and ten

11   years.

12        THE COURT:  And that was?

13        THE WITNESS:  That was, I believe, 55 percent.  I need

14   to look back at my notes to see.

15        THE COURT:  Within seven years, is that it?

16        THE WITNESS:  Something like that.  I have to look

17   back to see exactly.  Just give me one moment.

18        THE COURT:  So it's a little better than even?

19        THE WITNESS:  55 percent in seven years and 64 percent

20   within ten years out of that sample, of those individuals who

21   had a score similar to Mr. Mahoney's.

22   Q.   Which means, as we've said before, that within seven

23   years, 45 in that population do not, 45 percent?

24   A.   Correct.

25   Q.   And it means that 36 out of 100 do not over the course of

1    ten years?

2    A.    Correct.

3    Q.    That therefore sets some actually existing upward limits

4    on the predictive validity of the VRAG?

5    A.    Well, basically those are the base rates of that sample.

6    The base rate in that sample was, 64 percent of them went on to

7    recidivate in ten years, and 36 percent of them did not.

8    Q.    Now...

9             THE COURT:  You know, we're never going to have your

10   oral argument.

11            MR. SCHNEIDER:  Yes, you know what, I think that we've

12   beaten this over -- I think I'm going to rest.

13            THE COURT:  Anything else?  I think that that's the

14   re- -- I can't even remember where we are at this point.  So

15   you crossed essentially, you redirected, you recrossed.  Thank

16   you very much.

17            THE WITNESS:  Thank you, your Honor.

18            (Witness excused.)

19            THE COURT:  You rest.  Do you want to talk to your

20   client for one minute?

21            MR. SCHNEIDER:  Sure.  So I just want to understand,

22   if we did proceed to closing arguments, we should be able to

23   get this done today.

24            THE COURT:  Not if you want 45 minutes.  The

25   government has a right to a closing too.

1          MR. SCHNEIDER:  But if we did half and --

2          THE COURT:  So I'm going to just make 20 minutes for

3   you or 25 minutes for you and whatever it takes for the rest.

4          (Discussion between Mr. Schneider and Mr. Mahoney.)

5          MR. SCHNEIDER:  All right, so I think we're prepared

6   to rest.

7          THE COURT:  You rest?

8          MR. SCHNEIDER:  We rest.

9          THE COURT:  You rest?

10         MR. CALLAHAN:  We rest, your Honor.

11         THE COURT:  Okay, so 25 minutes each.

12         MR. CALLAHAN:  Your Honor, could I just have the -- I

13   have slides that we're just going to hand up and I've provided

14   the defense.

15         THE CLERK:  Are these all the same?

16         MR. CALLAHAN:  They are.  If I could ask the Clerk if

17   we could just have the hookup be brought to Attorney 2.

18         THE CLERK:  Okay.

19   CLOSING ARGUMENT BY MR. CALLAHAN:

20         MR. CALLAHAN:  Your Honor, the purpose of the statute

21   is clear.  The intent of the 4246 statute is to provide a

22   safeguard to the general public and avert public danger, and

23   it's also to assure that mentally ill people who are dangerous

24   receive the proper treatment.  So the inquiry here is a narrow

25   one, whether Mr. Mahoney has a mental disease or defect such

1    that his release would create a substantial risk of bodily harm
2    to another person, and here's what the courts have said about
3    what a substantial risk means.  "A substantial risk under 4246
4    may be based on any activity that evinces a genuine possibility
5    of future harm to persons or property."
6           So that's the lens through which we look at everything
7    that Dr. Channell has considered in his opinion, including the
8    tests, his past violent history, and his criminal conduct.  And
9    it's notable because there's been a suggestion that there needs
10   to be overt acts of violence.  The cases say overt acts of
11   violence are not required to prove dangerous, your Honor.
12          Your Honor, at the beginning of this hearing you said
13   we're going to have dueling experts, and I actually don't think
14   that's quite accurate because while there are plenty of
15   disagreements, the experts agree on quite a bit, four major
16   areas:  Number one, they agree that Mr. Mahoney has a mental
17   defect, bipolar disorder.  He at least has that.  He's had it
18   for some time.  It presents itself in a variety of ways:  He's
19   hypomanic.  He's manic at times like he was in the courtroom
20   here in November, 2013, like he was earlier today according to
21   what the marshals told us.  He's impulsive.  He perseverates.
22   He presents with loud and pressured speech.  And in
23   Dr. Kriegman's words, if you remember back to his testimony, he
24   said his agitation was never far from the surface.  During his
25   interview with him, he said it was impossible to direct him to

1   the issue at hand.  So it's undisputed Mr. Mahoney has a

2   serious mental disease or defect.

3          THE COURT:  And for you, that's bipolar?

4          MR. CALLAHAN:  It's bipolar, and it's also the

5   personality disorders that have been discussed by Dr. Channell

6   and have been identified even by Dr. Kriegman, narcissistic

7   personality disorder and borderline personality disorder.

8          THE COURT:  And what did you say, borderline?

9          MR. CALLAHAN:  Borderline personality disorder.  So

10  there are three, but everyone agrees that bipolar disorder

11  applies.

12         Point number two of their agreement, your Honor:

13  Mr. Mahoney is a troubled man who's had a troubled upbringing

14  and who has been involved with troubled relationships with the

15  women in his life, has been characterized -- and this is

16  straight out of Dr. Kriegman's report, your Honor -- has been

17  characterized by screaming, threatening, and fighting.  Those

18  troubled relationships led to people taking out six restraining

19  orders against Mr. Mahoney by four different women, one of

20  which is still pending, another of which resulted in his

21  incarceration for two years.  And one of the restraining orders

22  was taken out by Karen DePinto, his former girlfriend, who

23  Dr. Kriegman has suggested will provide some support out in the

24  community.  And we'll talk more about that later, but

25  Ms. DePinto has been the victim of Mr. Mahoney's violence in

1    the past, and you see that from Dr. Kriegman's testimony.

2           Number three, the third point of agreement, and this

3    is in Dr. Kriegman's words again:  Mr. Mahoney has an extensive

4    history of acting out, arrests, incarcerations, and he's right,

5    Mr. Mahoney is a convicted felon.  He's been forced to register

6    as a sex offender.  He has 35 convictions, including

7    convictions for violent and threatening behavior, like

8    threatening bodily harm, witness intimidation, threatening to

9    kill, assault and battery, assault with a dangerous weapon,

10   assault and battery with a dangerous weapon; and going back

11   further, your Honor, assault with the intent to rape involving

12   the use of a knife.  And this last violent crime that we talked

13   about, the assault with the intent to rape, resulted in him

14   receiving an eight- to ten-year prison sentence.

15          And what's important to keep in mind, your Honor,

16   every time he was convicted of these offenses, he came back and

17   he offended again, every single time.  Sometimes it wasn't

18   violent, sometimes it was, but what we know is, he always

19   reoffended.  And this pattern of violent conduct, it didn't

20   stop when Mr. Mahoney was incarcerated, and we know that from

21   all the incident reports that we covered with both experts.

22   From the time he was incarcerated on his failure-to-register

23   charge, his most recent failure-to-register charge in October,

24   2011, until just this past year, he's had eleven different

25   incidents, and we have them on a timeline here, your Honor:

1    October 20, 2011, he threatened to head butt his own attorney.

2    March 3, 2012, he received a major disciplinary action for

3    aggressively striking another inmate in the face and then

4    blind-siding a second inmate.  It caused a lockdown of the

5    entire unit in the Cheshire Correctional Facility.

6            Just a few days later, March 5, 2012, major

7    disciplinary action for threatening bodily harm.  He dragged

8    paperwork off the table of a corrections staff, and with his

9    fist clenched, your Honor, he came around using abusive

10   language, and to the correction staff said, "I'm going to beat

11   the shit out of you.  You're a piece of shit.  I'm going to

12   fucking stab you.  You're a fucking punk.  I'm not taking that

13   write-up."  He immediately started kicking the door and

14   screaming threats of bodily harm at the corrections staff.

15           October 24, 2012, unprovoked, he became

16   confrontational and angry with his psychiatrist, calling her an

17   Indian piece of shit, spitting at her, and throwing his shoes

18   at the cell door that was separating the two.

19           We speed up to December 5, 2012, again reported as

20   being highly belligerent when he was told that the law library

21   was closed, and what he told the woman:  "No one yells at me

22   and gets away with it, bitch."  Additional corrections staff,

23   your Honor, had to be brought in to calm Mr. Mahoney down, at

24   which case he was still agitated according to the incident

25   report, and the exhibits are all described here.

1          January 20, 2013, just a month later, Mr. Mahoney, in

2     addition with another inmate, grabs him by the throat, attempts

3     to choke him, and threw a bucket of water at him.  According to

4     the other inmate, he said, "He went nuts.  He attacked me,

5     grabbed me around the throat and tried to choke me."  When

6     Mr. Mahoney was given the opportunity to say what happened, he

7     said, "We just had a disagreement, and the guy was being

8     bossy."  That is what's in the incident report.  That's what he

9     told the corrections staff.

10         March 26, 2013, two separate incident reports.  After

11    stiff-arming one female corrections staff, he was then being

12    escorted; and whether he kicked them or whether he was kicking

13    towards them, he was being escorted into a new unit, your

14    Honor, and he's resisting, he's kicking over trash barrels out

15    of control.

16         May 6, 2013, just a few months later is when the

17    e-mail came in from the AUSA in New Hampshire saying that in

18    open court previously in that case on the failure-to-register

19    charge, in open court he said to the AUSA in New Hampshire, "If

20    you file another motion, I'll hit you in the head, and you

21    won't get up."

22         November 22, 2013, right here, your Honor, right in

23    this courtroom, Mr. Mahoney was totally out of control.  As you

24    noted on the record, he was very violent, very combative,

25    totally out of control.  It took on the record five deputy

1    marshals to get Mr. Mahoney under control, and even after that,

2    as you noted on the record, he was screaming from below.

3            January 28, 2014, this Exhibit 11, threatens a female

4    staff member telling her, "You better get away from this door,

5    you dumb, stupid, fucking --" and I won't say the next word.

6    "You are lucky this door is here."  He started banging the cell

7    door, said, "Get the fuck away from my door, you such and such,

8    you dumb, stupid such and such."

9            Your Honor, there are more.  These are the more

10   serious ones, but there are more.  He doesn't follow rules.

11   That's not his way.  As Dr. Channell testified, these instances

12   just show that Mr. Mahoney thinks the normal way to deal with

13   everyday disagreements is to act violently and to threaten

14   people.

15           And another thing that's important to keep in mind

16   when we look at all these incident reports that are up on this

17   timeline is that they're happening in a controlled environment.

18   They're happening here in this courtroom.  They're happening in

19   a prison.  They're happening in the Federal Medical Center.

20   These are places where there's always federal marshals around,

21   corrections staff around.  People can intervene and stop it

22   from escalating somewhere else.  That's not the way it is in

23   the community, your Honor.  There's not a federal marshal in

24   Ms. DePinto's house.  There's not corrections staff at the

25   public library, a bus stop, or any other public place that

1    Mr. Mahoney might find himself if he's released from here.  You

2    can't lock down an entire community the way you can lock down

3    the correctional facility at Cheshire.

4         And what we hear in response from Attorney Schneider

5    and Dr. Kriegman, he said, "Oh, well, no one went to the

6    hospital," so I guess we should forget about it, but that's not

7    the standard.  And when you pressed Dr. Kriegman on the

8    standard, you said, "Well, going to a hospital isn't the

9    standard.  It's bodily harm, the future risk of bodily harm."

10   And what he finally said is, "These incidents --" and he said

11   it at Page 35 and 36 of his testimony, your Honor -- he said,

12   "These incidents in prison, are they significant enough to meet

13   the standard?  I think they are."  And that's Page 35-36 of

14   Dr. Kriegman's testimony.

15        And that's the problem:  They all apply the wrong

16   standard.  Dr. Kriegman's report talks about truly troubling

17   violence, serious violence, dangerous violence.  He doesn't

18   identify what those mean.  He doesn't define them.  What he

19   does say in his report -- and this is directly from his

20   report -- "It's quite possible that the risk of quote/unquote

21   'serious violence' is not substantial."  So what does that tell

22   us?  Absolutely nothing.  He changes the standard from bodily

23   harm to serious violence, and then he says it's quite possible

24   that he won't engage in that, not probable, not likely, quite

25   possible; and that doesn't provide the Court with any useful

```
 1    information.

 2              Remember, it's important to keep in mind with respect

 3    to these incidents and his past history of violence, overt acts

 4    of violence are not required, which brings us to the

 5    instruments, your Honor.  And, again, we've talked a lot about

 6    them, and should you consider them?  You should consider them,

 7    your Honor, in the same way that Dr. Channell considered them.

 8              THE COURT:  Does the case law require me to consider

 9    them?

10              MR. CALLAHAN:  I'm not aware of any case law that

11    does, your Honor, but I could come back and brief that.  But,

12    your Honor, the point of it is, we should consider it the same

13    way Dr. Channell considered it, which was in the totality of

14    the circumstances.  You look at those instruments after looking

15    at the criminal history, after looking at the history of

16    violence, after looking at his mental health problems, his lack

17    of insight into his own mental illness and his history of

18    violence, his lack of compliance with the medication he's

19    prescribed, and the presence of stressors outside in the

20    community.  I mean, one of the things that sets Mr. Mahoney off

21    is his requirement to register as a sex offender.  As

22    Dr. Kriegman said, that's not changing.  When he walks out,

23    that's going to be there again, and we're going to be faced

24    with this same stressor when he gets out of here, if he gets

25    out of here.
```

```
 1          But Dr. Channell told you, after looking through all
 2   of those things, your Honor, that's when he went to the tests.
 3   And he said -- and this is a quote from his earlier testimony
 4   from days ago -- he said, "The instruments aren't as --"
 5          THE COURT:  Do you need a minute?  Do you need a
 6   minute?  Are you okay?
 7          MR. SCHNEIDER:  Oh, yeah.  No, we're just discussing a
 8   legal strategy issue.
 9          THE COURT:  Oh, all right.
10          MR. CALLAHAN:  Your Honor, I'll try to wrap up, but
11   the instruments aren't as important as the predictive factors
12   that are included in them.  What he said was that these
13   instruments all talk about predictive factors that have been
14   studied extensively, and people have associated them to some
15   degree with an elevated risk of violence.  And that's one of
16   the benefits of the tests, your Honor.  It allows us to do the
17   things we did here today.  It allows Dr. Channell to organize
18   all these predictive factors and come to a conclusion based on
19   those, and to make sure that he clicks through all of them and
20   considers all of them, both the ones that help Mr. Mahoney and
21   suggest that he might not be violent and the ones that show
22   that he might have an increased risk for violence.  So it's one
23   piece of the puzzle, your Honor, and that's what Dr. Channell
24   said when he was testifying about these.
25          And as to all these -- I'm not going to go into all
```

1    the nitty-gritty.  We've talked about these tests, but the

2    bottom line for them are:  They're valid.  They've been

3    extensively studied --

4          THE COURT:  Yes, but here's my issue.  Here's my

5    issue:  To write this up on a *Daubert* challenge for three

6    separate instruments with this number of articles that were

7    cited and very complex statistics, I'm trying to understand

8    whether or not I have to do it or whether you believe as a

9    matter of law I can rely simply on the agreed-upon mental

10   disease and defect and the history of violence, both

11   disciplinary and criminal.  In other words, if I have to, I

12   have to.  That could take me months, months.

13         MR. CALLAHAN:  Your Honor, I understand, and that's a

14   great point.  The issue with the instruments, as a *Daubert*

15   matter, we think they are admissible.

16         THE COURT:  I know you do, but do you know what it

17   takes me to get there --

18         MR. CALLAHAN:  I understand, your Honor.

19         THE COURT:  -- if I get there?

20         MR. CALLAHAN:  And the weight of the instruments is a

21   matter, your Honor can weigh them however you'd like, but we

22   can't let a *Daubert* challenge go by and not address them

23   because these are generally accepted in the field.  They're

24   extensively studied.

25         THE COURT:  I understand that.  When I did the

 1   Static-99, it took me six months to get through the materials.

 2   It's a big deal, and now there's a challenge to three

 3   instruments, and I am not convinced that I need to even look at

 4   them.  And that is the question that I have.

 5           MR. CALLAHAN:  Right.  Your Honor, I don't think

 6   there's anything requiring that you look at them or requiring

 7   that you give them any weight.  One of our major issues -- we

 8   think it's, again, one piece of a very large puzzle.  One of

 9   our major issues is, we do not believe that they're admissible,

10   and that's -- we don't want to say you don't have to look at

11   them because they're inadmissible.  If your Honor wants to give

12   them a lot of weight or a little weight, that's your Honor's

13   prerogative.

14           THE COURT:  You know of no case law that says whether

15   or not an instrument is required to be looked at?

16           MR. CALLAHAN:  Not for a 4246 that I'm aware of, your

17   Honor.

18           THE COURT:  All right, thank you.

19           Why don't we get to you, and let me just ask,

20   Mr. Schneider -- did you need to finish up because I need to

21   have him --

22           MR. CALLAHAN:  I understand.  Just two more minutes on

23   the release plan, your Honor, because I think it is very

24   important, and that is, they agree he needs a release plan,

25   your Honor.  They agree that it requires at least proper

1    medication, and they agree that it requires at least support in

2    the community.  But what we know is, he doesn't have any of

3    that.  He doesn't have support in the community.  The one

4    option he has as someone he's going to live with was

5    Ms. DePinto, and we heard what they said in their conversation,

6    which is here at Exhibit 20.

7         THE COURT:  And that was the lithium that he refuses

8    to take?

9         MR. CALLAHAN:  He refused to take the lithium or even

10   consider any other mood stabilizers as of February -- as of

11   February, 2013, he wouldn't even consider another mood

12   stabilizer besides Seroquel, and I can show you that exhibit,

13   your Honor.  But as to his living situation, the only person

14   that's identified as providing any support is Ms. DePinto, and

15   she said in this transcript of the call, "What I'm trying to

16   tell you is, you know, you can't actually live here."

17        And we can't blame her, your Honor.  She's been the

18   victim of assaults of his in the past.  He's struck her, he's

19   threatened her, and she took out a restraining order against

20   him.  So the option that Dr. Kriegman identified, which is the

21   only one that's been identified thus far, isn't an option at

22   all.

23        And as to the medication, to get to your point, your

24   Honor, as we can see here in Exhibit 15, he was prescribed

25   lithium in November, 2012, because of an inadequate response to

1  quetiapine.  He acknowledged that the lithium helped, but he

2  refused to take it.  He didn't want to have his blood drawn,

3  and he refused to have even his lithium lab levels looked at.

4       And then what we also know is that later on in

5  February, 2013, he thinks the best medication for him is

6  Seroquel and Klonopin.  He has been refusing lithium, and this

7  is important:  He does not want to consider another mood

8  stabilizer.  He won't consider another mood stabilizer, your

9  Honor.  And it's important to take into account, all those

10 incident reports he went through?  He was on Seroquel at that

11 time.  Dr. Kriegman testified to it.  It's reflected in the

12 notes.  He was already taking Seroquel.

13      So what is he talking about?  What is his plans if

14 he's ever released?  Well, you see it in this report.  He said,

15 "No one's going to dictate where I go because I'm in Dover --"

16 and this is Exhibit 20 "-- I'm up in Dover right now, and Dover

17 gives me Xanax morning, noon, and night.  And that's a powerful

18 drug," he says, "and so nobody's going to tell me, like, where

19 I should go.  You're not going to tell me to go to a Lynn

20 Community Health Center.  I go back to where I go because I get

21 Xanax in New Hampshire like it's candy."  That's what he said.

22      And then he goes on to talk about other medications

23 further in that call, your Honor, and this is still Exhibit 20

24 at Page 15.  He says, "So I got to get them.  Then I got to get

25 that on.  Then I got to get on Medicare, and then I got to get

1    my doctor's pills back on.  And then I got to get to my Klon,

2    my Klon, Xanax on, and then I got to get my OxyContin on again.

3    You know what I mean?"

4         Your Honor, OxyContin and Xanax, there's no indication

5    in these calls, which are his plans for his release, about

6    taking Seroquel, about taking lithium, about considering

7    another mood stabilizer, nothing like that, or finding a

8    psychiatrist.  All it is is OxyContin, your Honor.

9         So we just submit that the government has met its

10   burden.  The release plan that Dr. Kriegman has identified is

11   no release plan, your Honor.  It's a recipe for disaster.  It

12   does not safeguard the public.  Thank you.

13        THE COURT:  Mr. Schneider.

14   CLOSING ARGUMENT BY MR. SCHNEIDER:

15        MR. SCHNEIDER:  Thank you, your Honor.  So I would

16   submit on behalf of Mr. Mahoney -- and it has been a privilege

17   of mine to be representing him these last few months -- that

18   the government hasn't come close to meeting its burden of

19   proving by clear and convincing evidence that his release would

20   create a substantial risk of bodily injury to another.  As you

21   know, legally it's a very demanding standard.  It requires high

22   probability of confidence in the facts that underlie it.

23   Mr. Mahoney has now spent 45 months in custody for charges that

24   were dismissed, and I would suggest that at the end of the day,

25   despite any preconceptions any of us may have come in here with

1   that Mr. Mahoney represented some sort of threat based on his

2   record or prison incidents or whatever, that I would submit the

3   government really hasn't come close to proving by that high

4   standard that his release would create any kind of risk to

5   anyone.

6        Undisputed that Mr. Mahoney suffers from bipolar

7   disorder, pressured speech.  They call it grandiosity.  I think

8   it's just self-confidence.  He's a very smart plan.  Extreme

9   agitation sometimes.  He knows he gets triggered.  He's

10  bipolar, he's been bipolar for years, and he's known it for

11  years.  But I would submit we've heard that bipolarity does not

12  equal violence.  Most people live with the disease, are not

13  hospitalized, certainly are not incarcerated, and it's

14  something that he certainly can conquer.

15       Now, no question that Mr. Mahoney can get extremely

16  agitated.  He knows how to raise his voice.  He sometimes

17  yells, and he sometimes says things that sound scary and that

18  other people may take to be threats.  But I would suggest,

19  first of all, we need to look at some context for some of this.

20  And I actually think Dr. Kriegman in an effort to kind of

21  empathetically look at where Mr. Mahoney is coming from, you

22  know, recognizes that he does nurse some anger and some hurt

23  from his childhood, but he's also someone -- and you've had a

24  chance to see it -- he has a keen sense of justice and

25  injustice.  And as Dr. Kriegman indicated, there really are a

1    number of things in his background that he may have some very

2    legitimate, justifiable grievances about.

3         For example, he's being asked years after the fact to

4    register as a sex offender for a 1983 case.  It's now over 30

5    years ago.  He thinks -- and he has a legal basis for making

6    the claim, and if he is released, I think he'll challenge it

7    legally using the appropriate legal procedures because he is a

8    very good legal mind and he is capable of working with an

9    attorney to do that.  I think that's something that he should

10   continue to challenge.  There are some real issues there.

11        He also we pointed out, you know, that he was listed

12   as a sexually violent predator in various U.S. Marshal's

13   reports, when one incident over the course of 35 years of

14   adulthood simply does not add up to a sexually violent

15   predator.  Similarly, the New Hampshire SORB on their Web

16   marked him down as an aggravated felonious --

17        THE COURT:  The New Hampshire what?

18        MR. SCHNEIDER:  The New Hampshire SORB, the Sexual

19   Offender Registry Board in New Hampshire put up on its website

20   a picture of Mr. Mahoney indicating that he was guilty of

21   aggravated felonious sexual assault, when there's nothing on

22   his record that bears that out.

23        There's some other injustices, and I think it's

24   something that also kind of betokens some measure of -- there

25   are some errors, there are some mistakes that Dr. Channell has

1     made over the years that I know deeply concerns Mr. Mahoney,

2     and they're understood.  The original report, May 30, 2013,

3     says that Mr. Mahoney was convicted of armed robbery, that he

4     had a history of loaded weapons and firearms charges; simply

5     not true, simply not true, and it's something that I would

6     submit legitimately, you know, gets Mr. Mahoney going, and it's

7     something I think that will aggravate a lot of us.

8           Just to pick one other example, in court it was said

9     that Mr. Mahoney was convicted of an aggravated rape.  Again,

10    simply not true.  There was a 1983 assault with intent to rape,

11    and that was it, but there was no aggravated rape charges, any

12    on his record.

13          So as Dr. Kriegman said, he had some legitimate

14    grievances.  He had some difficulties in childhood growing up,

15    a difficult environment for any of us to grow up in, and he

16    does have some perceived senses of injustice that are not

17    coming out of nowhere.

18          No question also, as I indicated, that Mr. Mahoney

19    sometimes speaks too loud.  He speaks we know from his -- the

20    bipolarity, one of the symptoms is pressured speech.  He can be

21    loud; he can be scary.  We also know, though, that he had some

22    problems with his eardrum as a result of an early childhood

23    firecracker incident, and I think that's partly it.  And you

24    got a chance to see, your Honor, how quickly Mr. Mahoney calmed

25    down the minute he was given headphones in court at the first

1   time that I was with him in court before your Honor.  But I

2   would suggest that the yelling and the screaming and the scary

3   things that he does say and has said do not amount to a pattern

4   of recent actual physical violence, and they certainly don't

5   outside of the prison context, which is the context that

6   matters here.  There are things that to others may sound like

7   threats.  There are cases where he's even been convicted of

8   threats, but the fact of the matter is that those threats are

9   not typically or not ever, as far as I can tell, carried out.

10          With respect to Mr. Mahoney's record, yes, there were

11   65 or 67 sets of convictions, but we started to go through that

12   on cross-examination of Dr. Channell, and we went over the

13   modified pretrial service report that indicates what the

14   convictions really were for and what they weren't.  There

15   certainly weren't -- glaringly missing were weapons offenses,

16   armed robbery or firearms offenses that Dr. Channell relied on.

17   And in fact when pushed, we can see that there were only two

18   things relating to any kinds of weapons charge.  One was a 1983

19   assault with intent to rape in which a knife was allegedly

20   brandished, and a 1979 --

21          THE COURT:  Well, it was a conviction.

22          MR. CALLAHAN:  Objection, your Honor.

23          MR. SCHNEIDER:  There was a conviction, I'm sorry,

24   there was.  I apologize if I made a mistake on that, but there

25   was a conviction.  And assault dangerous weapon in 1979 with

1    pliers.  Assault dangerous weapon, not assault and battery

2    dangerous weapon.  So, again, threat maybe.  Weapons offenses,

3    really?  Not at all.  I would suggest that's simply not here.

4    And to the extent that there were, we're talking about things

5    that occurred 30 or 35 years ago when he was in his 20s, and

6    he's now a 55-year-old man.

7         Now, Dr. Channell talks a lot about some of the

8    assaults and threats on his record, and we've gone over some of

9    what I would submit are some very specific limitations and

10   errors that may have been in the record; but ultimately, when

11   you look at this record, yes, there was some clustering of

12   things back in his earlier years, and, yes, there was a violent

13   state felony that he was convicted of, but that was in 1983.

14   It's the only state felony, the only state prison charge in his

15   entire career, and, again, that was when Mr. Mahoney was 24,

16   over 30 years ago.

17        Also, I don't know about -- I wouldn't necessarily use

18   the word "troubled" relationship.  Mr. Mahoney is still

19   technically married, and he's had relationships, including

20   periods of real stability with girlfriends; but, yes, there

21   have been some restraining orders, and, yes, he's had some

22   complicated relationships.  I would point out that of the

23   restraining orders, most of them, almost all, maybe all except

24   for two, were ten-day restraining orders; that the 1995

25   restraining order involving Ms. DePinto involved Mr. Mahoney

1    slapping her, which of course is not something that one should

2    do in a relationship like this, but, of course, unfortunately,

3    sadly, that's something that occurs too often in relationships

4    on both sides.  So I would submit that there is less there in

5    the restraining order history than meets the eye.

6            I think one thing that is certainly noticeable, which

7    is that despite the government's data dump of material in this

8    case, incident reports of all kinds and so on, there are no

9    applications for a complaint except for the 1983 incident.

10   There were no police reports being presented.  There are no

11   indictments, no transcripts, no live witnesses about what

12   occurred in each of those incidents.  If there really was

13   something violent that occurred in those incidents, I think we

14   probably should have heard from the government, which

15   obviously, you know, AUSA Callahan did a wonderful job from the

16   government's perspective presenting an extremely strong case

17   from its perspective; but look at all these holes, all these

18   things that one would expect and simply aren't there.

19           We also know from what we've heard, there's no

20   evidence ever been presented that Mr. Mahoney ever stabbed

21   anyone, ever shot anyone, or ever caused anyone's

22   hospitalization.  I'm not saying that's the standard, but it is

23   something that your Honor should certainly be taking into

24   account.

25           As Dr. Kriegman explained, this man is a large man.

1   He's a very strong man.  He keeps himself in good shape despite

2   having had a heart attack.  And it's significant that he's not

3   actually hurt anyone, or at least there's no evidence that he's

4   actually hurt anyone, because he certainly could have if he

5   wanted to, and I would submit that's just not the kind of man

6   that he is.

7          Now, Dr. Channell also refers to and the U.S. Attorney

8   referred to a number of prison incidents.  Certainly there were

9   a number of incidents involving aggressive language and

10  aggressive behavior with other prison inmates, and also with

11  prison guards, with corrections officers.  We looked at the

12  March 26, 2013 incident and the March 5, 2013 incident, both of

13  which occurred during a period shortly after Mr. Mahoney's

14  medication was just being changed and he was going back onto

15  Klonopin, and we heard some evidence about things that might

16  have triggered him under those circumstances, you know, and the

17  extent to which he was, you know, kind of alone dealing with

18  either the people in authority or with other inmates that

19  outnumbered him.

20         We heard about an incident in January of 2014 when he

21  was on suicide watch, and, you know, had to use some probably

22  we would say foul language, probably not uncommon maybe among

23  some of the friends that Mr. Mahoney grew up with, you know, in

24  his childhood, but used concededly foul language.  But those

25  again were aggressive language, insolence, you know, language

1    that sounded ugly but that critically didn't result in any kind

2    of actual physical injury.

3            There were two physical incidents involving two

4    physical altercations.  One was the so-called dish room

5    incident, but even there, the disciplinary hearing officer,

6    after listening to all the evidence, said that Mr. Mahoney

7    briefly grabbed the other inmate Dunston's neck; and there was

8    information in that incident report, Exhibit 9, in which

9    Mr. Mahoney had reported that he had been provoked by Dunston,

10   which is something that happens to happen a fair amount in

11   prison context.

12           Similarly, the March 3, 2013 incident, which the

13   hearing officer ultimately describes as a minor assault, again,

14   with other inmates, outnumbered two to one.  Mr. Mahoney was

15   agitated at the time about a change in medications.

16   Critically, all of these prison incidents -- and I think this

17   is really important -- occur in a prison context.  We know that

18   Devens may not be a scary prison environment like some prisons

19   and that it's just a controlled regimen or a controlled

20   environment, but as Dr. Kriegman pointed out, these incidents

21   took place in a difficult controlled environment where

22   Mr. Mahoney feels trapped and cornered.  And that's not

23   something that he necessarily would be experiencing, not likely

24   would be experiencing if he were appropriately released.  These

25   incidents are not indicative of what his behavior in the

1    community would look like, and I would ask your Honor to

2    essentially disregard them.

3           And that would hold true of -- and, again, there were

4    some mistakes made in characterizing the incident involving

5    AUSA Huftalen up in New Hampshire.  We know that, at the very

6    least, the timing of that allegation was wrong; and whether the

7    underlying facts were true or not, that's for your Honor to

8    determine based on the evidence presented.

9           And, similarly, the incident in court, the outburst,

10   which was I think an expression -- I've seen it.  I mean, I

11   have a very nice relationship with Mr. Mahoney myself, but I've

12   seen the outbursts, and, again, these are outbursts.  These are

13   words that he cannot sometimes control himself from saying.

14   It's something that he does when he feels cornered and trapped

15   in the context of an adversarial system; but I would suggest

16   that these are not his natural inclinations when he is out in

17   the community where he has a chance to be with friends and

18   loved ones and his girlfriend and prospective, potentially, a

19   daughter that very much wants to get back involved with him.

20          Now, there are two specific concerns for Dr. Channell

21   that I'd like to address.  One is that Mr. Mahoney seems to

22   indicate a lack of insight, and the other is that he is

23   unwilling to go on lithium or other mood stabilizers.

24          With respect to this lack-of-insight issue, and I know

25   Dr. Kriegman addressed it, Mr. Mahoney clearly recognizes and

1    knows for a long time that he has bipolar disorder, that he's

2    easily agitated.  He knows that he needs medications to help

3    him calm himself down.  That's his perception.  He knows he

4    gets agitated, and he needs medications, and he needs

5    counseling.  He has taken anger management classes.  He has

6    undergone counseling at various points.  He's had a relatively

7    good period with Avis Goodwin from 2004 up through 2010.  And

8    he did actually proactively go out and seek treatment for

9    himself, something that people with these kinds of mental

10   health issues don't, 24 years ago, and Dr. Channell

11   specifically mentioned that.

12        And we also know that he's been willing to take

13   medications and has been taking a regimen of Seroquel and some

14   benzodiazapine -- previously it was Xanax -- now it's

15   Klonopin -- as well a painkiller, which he initially got from

16   Avis Goodwin, I think in 2009 initially, and he's been

17   essentially compliant with that regimen.  And, yes, maybe there

18   are some additional medications that would assist.

19        And so here's where we get into the lithium issue.  We

20   have a man who is willing to take meds, knows he's got a

21   problem, wants to take a mood stabilizer.  He's been taking

22   Seroquel, which doubles as both an antipsychotic, but in this

23   case it's a mood stabilizer.  We know that he has tried and

24   been willing to try other mood stabilizers like Trileptal and

25   Depakote.  In fact, we know that he took Depakote for a period

1    of time, but that had to be discontinued because he got a rash,

2    which is one of the typical counter-indications of Depakote.

3         We also know that he tried lithium.  It's not as

4    though he didn't try it.  He tried lithium for several months,

5    at some point in November of 2012 to end of January/early

6    February, 2013.  And why did he stop?  I know he may have said

7    various things to his medical providers, but ultimately there

8    were side effects.  Dr. Channell acknowledges that side effects

9    can be quite troublesome for lithium for many; that it has

10   extremely high toxicity, potentially damage to kidneys; that

11   the quantities have to be carefully titrated -- it requires

12   frequent blood work -- and that common side effects include

13   confusion, nausea, and gastrointestinal upset.  And a lot of

14   people who are on lithium simply don't tolerate it well, and

15   that can't be the preferred drug of choice.

16        So the other thing I'd ask your Honor to take into

17   account with respect to the testimony about lithium is that

18   there were indications, that Dr. Channell agreed was the case,

19   that he reported that he was calmer when he was on Xanax.

20   Xanax is a shorter-acting, for some a more potent form of a

21   benzodiazapine, that his experience was --

22        THE COURT:  One of the questions I have is, with the

23   Seroquel and the Klonopin and maybe Xanax, we've seen such high

24   agitation, it's at least clear that it's not completely

25   working.  And so I know he doesn't like the lithium, but in a

1    way that creates a problem.  He feels like he has side effects

2    from the lithium.  The Seroquel and the Klonopin aren't

3    working.  Depakote he has a rash on.  So it gives me some

4    concerns about what is going to bring down the proclivity

5    towards threats and violence and that sort of thing.

6               MR. SCHNEIDER:  I'm not sure that there is a

7    proclivity there in the first place, but to the extent that he

8    needs to be calmed down and knows he wants to be calmed down,

9    he's already given us a possible recipe for a way out of this,

10   which is to add to the Seroquel the Xanax, which he from his

11   perspective --

12              THE COURT:  I thought he was taking Xanax.

13              MR. SCHNEIDER:  He was taking Xanax, but he's not

14   allowed to by Devens.  Devens won't do it because of its

15   so-called addictive properties.  And one of the issues I

16   brought out --

17              THE COURT:  Well, it's true.

18              MR. SCHNEIDER:  And one of the things that I brought

19   out from Dr. Channell is, Mr. Mahoney's bipolarness, his

20   bipolarity is something he's going to live with the rest of his

21   life, and he knows that.

22              THE COURT:  But it needs to be controlled.

23              MR. SCHNEIDER:  He needs something to calm himself

24   down, and he knows that.

25              THE COURT:  But it's not working, whatever --

1          MR. SCHNEIDER:  So one of the things is, should he be

2     held responsible for the fact that Devens doesn't allow him

3     Xanax, which in his experience made him more calm?  Should he

4     be prevented from taking something that is admittedly

5     addictive, OxyContin?

6          Now, let's get to that OxyContin thing because I know

7     it sounds something scary and weird, but it's not at all.

8     Mr. Mahoney in 1995 -- Mr. Mahoney had a work history as an

9     iron construction worker.

10          THE COURT:  Is this in the evidence?

11          MR. SCHNEIDER:  Yes.

12          MR. CALLAHAN:  The iron construction worker is.  I

13     don't know if anything else is.

14          MR. SCHNEIDER:  What have I said that's not?

15          THE COURT:  What you're about to say I think he's

16     worried about.

17          MR. SCHNEIDER:  He thinks what I'm about to say, which

18     is why he keeps standing, but, in any event, so there was

19     evidence that he reported to Dr. Kriegman -- it's in

20     Dr. Channell's report as well -- that in 1995 while working on

21     the job, he fell 53 feet and had loss of consciousness -- one

22     of the medical charts indicates this -- for over 24 hours.  I

23     think he was actually in something like a coma for three days,

24     and he was prescribed painkillers because of serious back

25     injury.  So there was a period you may recall where

1    Dr. Kriegman was trying to explain to you the importance of

2    painkillers for Mr. Mahoney and why that might be something

3    additional and really serious.  For Mr. Mahoney, his experience

4    was --

5              THE COURT:  I'm not so worried about the OxyContin.

6    I'm worried about the fact that he's not taking anything that

7    seems to control his outbursts, which are in everyone's words,

8    everyone's, scary.

9              MR. SCHNEIDER:  So what I was suggesting was -- and

10   I'm equally concerned about the lithium issue because my

11   concern is that what the folks at Devens have done is, they

12   have essentially said, "We are not even going to proceed to

13   work with you in a serious way toward a release plan unless you

14   go along with us and take the lithium, whether you can --"

15             MR. CALLAHAN:  Objection.  That is not what the record

16   reflects, your Honor.

17             MR. SCHNEIDER:  Your Honor, this is closing argument.

18             MR. CALLAHAN:  But he's saying what evidence is and

19   what they intend.  That's not in the record.

20             THE COURT:  You know what?  I have ten minutes.  I

21   have ten minutes, and I have to leave.  So this is a closing.

22   So it is of concern to me, one of the things is that he's not

23   taking what they're prescribing, and whatever he's taking is

24   not affecting these violent incidents.  That's of concern to

25   me.

```
 1          MR. SCHNEIDER:  Well, first of all, I've tried to
 2    point out that some of these incidents are inmate-on-inmate
 3    stuff that happens in prisons outside of a community context,
 4    which is what your Honor is really concerned with.  That may
 5    even be true of some of these incidents involving the
 6    corrections officers.  These are highly regimented, controlled
 7    prison settings, and, you know, survival, you know, gets people
 8    to do things that they might not do in other circumstances.
 9          But I just wanted to point out, I'm concerned about
10    the lithium and that that's being used as a sine qua non to
11    proceed to a real release plan, which is really the issue here
12    because my contention is that your Honor ala Judge Wolf in the
13    U.S. v. Smith case could figure out a way of ordering him
14    released pending some kind of -- could order him released; and
15    if the government has any concerns, there is some way that he
16    could be released to some kind of a setting with conditions
17    that would assure that he explore with an appropriate
18    psychiatrist appropriate medications that would work for him.
19    There have been some in the past that seemed to have worked
20    better.  That's my only point.  And, you know, because Devens
21    doesn't allow for the Xanax, because he can't tolerate lithium,
22    they haven't found anything else.  He's willing to try other
23    things and has been.  So my concern is that lithium is --
24          THE COURT:  We just need to move quickly on the
25    Daubert.
```

1          MR. SCHNEIDER:  I'm going to try to move quickly.

2          THE COURT:  I'm torn here because as far as I can

3     tell, all these actuarial instruments have been accepted by the

4     community and been introduced, used even by Dr. Kriegman until

5     very recently.  I think they have limitations, and that goes to

6     the weight that I put on them.  I don't know that they go to

7     the admissibility.  They've been so generally accepted, all of

8     them.

9          MR. SCHNEIDER:  So let me just sort of very briefly

10    address that issue because I don't want to get bogged down --

11         THE COURT:  I get the point on how limited they are in

12    terms of 50/50 and how you try and figure out which population

13    you belong to.  I get the point that you can have disputes

14    about scoring them.  I heard that play out.  But to say they're

15    not generally accepted by the field, I mean, I haven't got one

16    article in America that says that.

17         MR. SCHNEIDER:  Well, let me just quickly address

18    that.  I am not disputing the fact that they were peer

19    reviewed.  I'm not disputing the fact that the theories and the

20    overall methodology are consonant with scientific methodologies

21    in the field, and to that extent, the theories and methodology

22    have been generally accepted as science.  I understand that

23    there have been efforts to increase and they have improved

24    quite a bit the reliability, which is one of the *Daubert*

25    criteria.

1          But I would also suggest, and I think *Daubert* in

2     writing this, the Supreme Court not being scientists, although

3     they are the ultimate arbiters of the law here and thus

4     infallible, the Supreme Court I think was folding over into the

5     reliability concept something that's equally important, which

6     is validity.  An instrument can be reliable.  I mean,

7     astrologists may use the same scoring charts to figure out

8     whether someone is a Pisces, but whether that actually predicts

9     something in real life is a whole other matter, and that's

10    validity.  And my point that I tried to sort of focus --

11          THE COURT:  Why isn't that reliability?

12          MR. SCHNEIDER:  Reliability is whether the same

13    researcher or two different researchers come up with the same

14    results using accepted standards.  That's reliability.

15    Validity --

16          THE COURT:  I was trying to think through the mental

17    puzzle because you're just saying, well, it's a 50 percent

18    error rate; but it's accurate that it's a 50 percent error

19    rate.  The instrument itself says that.  So that's the

20    limitation of it.

21          MR. SCHNEIDER:  So I would say at some point, your

22    Honor, an instrument is of such low validity, and I think -- my

23    guess is, if you started looking at the results for polygraphs,

24    which have kind of an uncertain trajectory -- I know the Ninth

25    Circuit treats things a little bit differently now -- but

1    polygraphs have an even higher level, higher ROC/AUCs than

2    these instruments do.  So at some point --

3             THE COURT:  I thought they were at .7 and .8.

4    Everybody, everybody uses these; judges, psychiatrists,

5    prisons, everybody.

6             MR. SCHNEIDER:  And the question is, really the issue

7    is, admissibility for what use?  That's really ultimately the

8    issue.

9             THE COURT:  I agree with that.

10            MR. SCHNEIDER:  I don't think any of these cases have

11   said that these things can be independently relied on to

12   predict future violence in the context of a civil mental

13   commitment in Federal Court.  I don't see a case that's ever

14   said.  Now, I may be wrong, and the prosecutor can stand up and

15   make a counterargument to that.  I don't see that case, and

16   there's a reason for it, and the reason is --

17            THE COURT:  But why would it be any different -- why

18   wouldn't that be one of the things that you might want to

19   consider for a civil commitment, future recidivism in a violent

20   way?

21            MR. SCHNEIDER:  Well, I would suggest that it makes

22   sense to do it in the way that Dr. Kriegman now uses it.  He

23   used to use it, as he testified to, when he thought these were,

24   wow, new and shiny, lovely looking instruments.  And then he

25   started reading about the low validity scores, and he decided,

1    "I can't use it for that purpose."  So what does he use it for

2    now?  He uses it to screen out, to confirm that someone

3    represents no risk.

4         THE COURT:  Right, it's exactly right.  It's a

5    backstop.  Sort of it goes -- but, you know, you -- it's just

6    one thing.  It's not the dispositive thing.

7         MR. SCHNEIDER:  So maybe this is my grand concession.

8    If your Honor wants to say that these instruments do not screen

9    out definitively Mr. Mahoney as low risk, one could use it for

10   that purpose.  I won't actually dispute that.  If one wants to

11   use it as a rule-out mechanism, fine.  But to use it with

12   instruments that have such low predictive validity -- I mean,

13   if you relied on them, you'd be detaining two people for every

14   one that would go ahead and commit a crime.  That's not clear

15   and convincing evidence.  You know, we're talking about

16   someone's liberty at stake.  And your Honor understands that,

17   so I'm not going to go into that in great deal.

18        THE COURT:  I get that.

19        MR. SCHNEIDER:  And I'm not going to go into the

20   stats, the 55 percent and 54 percent.  We've gone over all of

21   that this morning.

22        And I just wanted to again -- I think it's very

23   important.  You know, Mr. Mahoney's family has actually been

24   here in court, and your Honor has had a chance to see them.

25        THE COURT:  Yes, thank you.  I think I can tell who

1    they are.  There's some family resemblance.

2            MR. SCHNEIDER:  Yes, the two brothers, Mr. Mahoney's

3    nephew, and Mr. Mahoney's Uncle Jackie.

4            THE COURT:  I recognize at least a few of them from

5    the last hearing.  I'm not sure everybody was here, but --

6            MR. SCHNEIDER:  Yes, he's got some very faithful

7    family, and that, by the way, is one of the protective factors

8    that I think it's very important to take into account.

9            THE COURT:  But let me just add, none of them are

10   taking him in, right?

11           MR. SCHNEIDER:  Well, if you're asking me, we don't

12   have evidence of that.  If you want me to address that --

13           THE COURT:  No, but I'm saying I have no evidence.

14   It's the girlfriend he was supposed to be living with, right?

15           MR. SCHNEIDER:  What the evidence there is, and I

16   think it's complicated -- well, I mean, potentially I have a

17   gentleman here who would address the issue of whether he's

18   willing to take him in.

19           THE COURT:  Yes, but the evidence is closed at this

20   point.

21           MR. SCHNEIDER:  But, in any event, I think the record

22   of that transcript when you look at it closely is, yes, you

23   have Mr. Mahoney saying, "Please, I want to stay temporarily at

24   your place.  Please, you know, I want you to let the doctors

25   and the lawyers know that you're willing to let me stay

1    temporarily."  He makes a couple of sort of flirtacious passes

2    at her, and she says, "Cut it out.  I'm not going to do it.  We

3    can't do this."  And I think it's a little bit unclear what

4    actually happens.  I don't think it's -- my own perspective

5    when I read it, it's not conning and manipulative failure.

6    It's a former boyfriend saying, "Help me out."  And she's also

7    the mother of his daughter.  "Help me out.  You know, I really

8    need a place to stay.  Would you at least let me stay there

9    temporarily while I'm getting my legs back from under me?"  I

10   don't think there's anything ultimately all that pernicious in

11   the thing.

12          Let me just see if I can briefly go over some things.

13   I have five minutes.  I'm going to try to get through this and

14   go over the things that count.  You know, we pointed out there

15   is some dispute over antisocial personality disorder and

16   psychopathic traits in the scoring of the instruments.

17   Remember, Dr. Channell is the first person to score Mr. Mahoney

18   as antisocial personality, and Mr. Mahoney has seen quite a

19   number of psychologists and psychiatrists over the years, so

20   that says something.

21          Remember that the PCL-R is not a risk assessment tool

22   in and of itself, and Dr. Channell is not using it that way.

23   And, critically, Mr. Mahoney was below the cutoff score of 30,

24   so I think that's something that you need to take into account.

25          There were differences about whether Mr. Mahoney is a

1    pathological liar.  Dr. Kriegman said, no, what he's doing is,

2    he's minimizing and denying certain things in an adversarial

3    context.  But that's not pathological lying.  That's not what

4    psychopathy really envisages.  In fact, if anything,

5    Mr. Mahoney is standing on principle for these last 45 months

6    to prove that he's right.  He was insistent.  I mean,

7    ultimately he took the court up in New Hampshire to the brink

8    because he wanted a trial on the sex offender registration

9    charge, and he wanted to prove that he was right as a matter of

10   law, and that's why he did it.  It's a matter of principle to

11   him.

12          We've gone over some of the scoring dispute things.

13   We've talked about the low predictive validity.  I think those

14   numbers should be extremely troublesome to this Court, so let

15   me get to more of a wrap-up mode here.

16          So, again, despite a data dump -- I mean, the

17   government has done a beautiful job in, you know, presenting

18   its side of the story and piling on large amounts of data for

19   your Honor to consider, but, again, except for the 1983

20   incident, there are no police reports.  There are no

21   transcripts.  We don't know the details of what actually

22   occurred in any of those cases that are on his February, 2010

23   criminal record, and so that's something that's not nothing

24   where the government has an obligation to prove something by

25   clear and convincing evidence.

1           Going back to Dr. Kriegman, again, this is not
2    Dr. Kriegman saying there's nothing that a judge in your
3    position can ever use to assess risk.  He said there in fact
4    is, but he just doesn't see it here.  Is there a pattern of
5    recent violence, recent physical injury?  When you look at his
6    record, depending upon how you evaluate, what constitutes an
7    act of physical injury, the last act of physical injury that's
8    sort of embedded in his criminal record is either ten or
9    seventeen years ago.  That's a long time.  Again, only one
10   state prison felony when he was 24 years old, and he's now 55.
11   No evidence, according to Dr. Kriegman, of the kind of
12   repetitive violence, especially at age 55, that one would look
13   at and say, "Aha, this person over the past year has done X, Y,
14   and Z," hurting someone and doing this repeatedly; nor is there
15   any kind of specified threat that there's any likelihood
16   that he's going to act on.  Those are the kinds of things that
17   a judge -- and your Honor has been doing this for many years --
18   would certainly consider if someone were coming before you on a
19   preventive detention issue or on a commitment issue, I would
20   imagine.
21           So ultimately my real concern is, there's been too
22   much concern on lithium as the way out.  There hasn't been
23   enough focus on the protective factors, on putting together a
24   release plan, on the fact that there are brothers and an uncle
25   who care deeply about him and are potentially available to

```
 1    provide support --

 2               MR. CALLAHAN:  Objection, your Honor.  There's no

 3    evidence of that in the record.  The opportunity was given.

 4    There's been no evidence put in on that.

 5               THE COURT:  Yes, I agree with that.

 6               MR. SCHNEIDER:  Well, I would suggest listen to the

 7    words that I use, but, in any event --

 8               THE COURT:  No, I understand, the potential.

 9               MR. SCHNEIDER:  Yes.  And, similarly, whether or

10    not -- there hasn't been enough evaluation to find a community

11    health center that would allow him back into the community.

12    The reason we impose this kind of clear and convincing evidence

13    standard is to make it more difficult for the government to

14    take someone's liberty away, and there should be a default

15    here --

16               THE COURT:  Are you meaning asking the state if the

17    state is willing to take them?

18               MR. SCHNEIDER:  Well, I certainly think that there is

19    an issue as to whether -- you know, it's unfortunate --

20               THE COURT:  Do you have to do that under statute like

21    the sex offender statute?

22               MR. SCHNEIDER:  Grondalski certified in his --

23               THE COURT:  That he tried?

24               MR. SCHNEIDER:  -- 2013 that there was an attempt

25    made.  Of course, we haven't heard the evidence about what the
```

1    extent of that attempt --

2         THE COURT:  Besides, why would he want to go to

3    Bridgewater anyway?

4         MR. SCHNEIDER:  -- really involved.  Well, except that

5    something that allowed him to be in the community and to

6    receive the kind of psychotherapy and attention to the meds

7    that would actually work for him --

8         THE COURT:  You mean an outpatient community health

9    center then?

10         MR. SCHNEIDER:  That would certainly be my preference,

11    and I know it would be his.  I mean, that's why I'm asking you

12    to release him today, and as a fallback, certainly release him

13    with conditions that would require him, to the extent your

14    Honor could fashion something like this, that would allow him

15    to be out and to seek regular medical and psychiatric

16    attention, which is what he was doing when he was at Avis

17    Goodwin.

18         THE COURT:  Okay, you need to wrap up.

19         MR. SCHNEIDER:  So my final sentence, final sentence,

20    which is, my real concern here is that committing Mr. Mahoney

21    today is going to create the risk that his bipolarity is going

22    to get worse, that his symptoms are going to get worse.  We've

23    heard testimony from both of the experts that prison, and even

24    the lovely environment at Devens, may have a way of doing that

25    kind of thing to people.  And I'm concerned that if he's

1    committed as a result of these proceedings, he's not going to

2    see the streets again, and I don't think that would be fair.  I

3    don't think that's what 4246 requires, and that's my real

4    concern, that there is essentially no path to making this work

5    for him.

6              THE COURT:  Thank you.  Did you have a --

7              MR. CALLAHAN:  Just as to the recent violence, that

8    just flies in the face of everything that the cases say.

9              THE COURT:  I know that, but let me ask you this:  On

10   the lithium point, he says that Xanax is a replacement.  Do you

11   remember what the record says on that?

12             MR. CALLAHAN:  Your Honor, lithium is not a --

13             THE COURT:  No, Xanax with the Klonopin and the

14   Seroquel.

15             MR. CALLAHAN:  Right.  So the issue with that is "no."

16   He's taking Klonopin and Seroquel now.  He's refused to take

17   lithium, but he's also, importantly, as Exhibit 40 shows, he's

18   refused to consider another mood stabilizer.  He won't consider

19   any other mood stabilizer as of February, 2013, and that's

20   what's critical.  He won't work with other psychiatrists to

21   find another one.

22             THE COURT:  All right, thank you.  All right, thank

23   you very much.  I will take this under advisement.  Thank you,

24   Mr. Schneider, for taking this case.  I very much appreciate

25   it.  And I don't know the extent to which I'm going to get into

1    all these articles submitted on the *Daubert*.  I do feel as if

2    it's a bit overwhelming.  That said, I think there's been some

3    common ground here, at the very least.  These have been

4    commonly accepted across the psychiatric, legal, and prison

5    worlds, but just as a backstop.  Everyone is agreeing that you

6    can't just treat this as dispositive.  It is what it is, input.

7    Whatever the input is, whatever the scoring is, there are

8    limitations on the weight that you can give it in certain

9    circumstances, so it will likely be one piece but no means the

10   key piece.  So we will stand -- yes?

11        MR. SCHNEIDER:  Your Honor, if it's not too late, I

12   don't know, you know, whether it would be appropriate, but I

13   certainly could submit a letter from Mr. Mahoney's uncle

14   addressing the question of whether he would be willing to take

15   Mr. Mahoney in.

16        MR. CALLAHAN:  Your Honor, we object to that.  This

17   has been going on forever.  And Dr. Kriegman testified to this.

18   He said that they have other obligations, so I don't know who

19   talked with whom, but it's too late.

20        THE COURT:  The answer under oath was "no," and so

21   unless there's something under oath that changes dramatically,

22   not a letter.  At this point I'm standing in recess, and the

23   record right now stands that that wasn't available.  Thank you.

24        THE CLERK:  All rise.

25        MR. SCHNEIDER:  Thank you, your Honor.

```
 1            (Adjourned, 1:07 p.m.)

 2                  C E R T I F I C A T E

 3


 4
     UNITED STATES DISTRICT COURT )
 5   DISTRICT OF MASSACHUSETTS    ) ss.
     CITY OF BOSTON               )
 6

 7

 8            I, Lee A. Marzilli, Official Federal Court Reporter,

 9   do hereby certify that the foregoing transcript, Pages 3-1

10   through 3-134 inclusive, was recorded by me stenographically at

11   the time and place aforesaid in Civil Action No. 13-11530-PBS,

12   United States of America v. Brian Mahoney, and thereafter by me

13   reduced to typewriting and is a true and accurate record of the

14   proceedings.

15        Dated this 18th day of August, 2014.

16

17

18

19

20            /s/ Lee A. Marzilli
              _____
21            LEE A. MARZILLI, CRR
              OFFICIAL COURT REPORTER
22

23

24

25
```