**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

```
                                )
UNITED STATES OF AMERICA,       )
                                )
                Petitioner,     )
                                )
        v.                      )        CIVIL NO. 13-11530-PBS
                                )
BRIAN MAHONEY,                  )
                                )
                Respondent.     )
                                )
                                )
```

**MEMORANDUM AND ORDER**

October 14, 2014

SARIS, Chief Judge.

## I. INTRODUCTION

The government seeks to civilly commit respondent Brian Mahoney under 18 U.S.C. § 4246, which provides that a person due for release from prison may be hospitalized if the Court "finds by clear and convincing evidence" that the person is "presently suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to the property of another."

A hearing was held on June 4, 2014, and continued on June 12 and August 5. Two court-appointed expert witnesses testified: forensic psychologist Dr. Shawn Channell of the Federal Medical Center in Devens, MA, on behalf of the government, and psychologist Dr. Daniel Kriegman on behalf of the defense.

Respondent was represented by court-appointed counsel. After a review of the record, the Court orders Mr. Mahoney civilly committed.

## II. PROCEDURAL HISTORY

In 2010, Mr. Mahoney was arrested in New Hampshire and charged with Failure to Register as a Sex Offender, in violation of 18 U.S.C. § 2250(a). In April 2011, the District of New Hampshire ordered that Mr. Mahoney be evaluated for competency to stand trial. He was evaluated at the Federal Medical Center ("FMC") in Devens, Massachusetts, and the evaluator issued the opinion that he was competent. However, a second court-ordered evaluation in October 2011 reached the opposite conclusion, and after a hearing in April 2012 the court in New Hampshire held that he was incompetent to stand trial. Mr. Mahoney was returned to FMC Devens for restoration of competency, but after a second competency hearing in February 2013, the court found that his condition had not improved and he remained incompetent. The charges against Mr. Mahoney were dismissed. Because Mr. Mahoney was in custody in Massachusetts, the government subsequently filed a petition in this Court seeking to have Mr. Mahoney civilly committed pursuant to § 4246.

### III. FACTS

**A. Personal History**[1]

Mr. Mahoney was born on May 23, 1959, the eldest of five siblings. When he was six years old, his father was convicted of a triple homicide, for which he would spend twenty-seven years in prison. Mr. Mahoney's upbringing was otherwise stable. He had positive relationships with his mother and siblings, and did not report experiencing any physical abuse.

Mr. Mahoney had some difficulty in school, as he displayed "combative" behavior such as fighting with peers and throwing chairs. He was suspended at least once, possibly several times, and was placed in special education as a result of his behavioral problems. He dropped out of school in the ninth grade, and moved out of his mother's home around the same time. Mr. Mahoney received his GED while incarcerated at age nineteen. He reported that he took classes toward an Associate's Degree in building construction and technology, but fell several credits short of completion. Mr. Mahoney also stated that he completed a fifteen-week legal preparation course at Suffolk Law School.

Mr. Mahoney reported that he was employed as an iron worker from age sixteen onward, and that he was "laid off" from three or

---

[1] Because Mr. Mahoney did not testify at the evidentiary hearing, the facts in this section are drawn from the Forensic Risk Report by Dr. Channell (Dkt. 7, Ex. A), which describes the information Mr. Mahoney self-reported about his background.

four jobs for arguing with his foreman. He began receiving Social Security Disability ("SSDI") benefits in 1995 after sustaining an injury in a workplace fall. Apart from an unsuccessful attempt to return to and maintain work in 1999, Mr. Mahoney continued to receive SSDI until his arrest in 2010.

At ages seventeen and eighteen, Mr. Mahoney had two children with two different women, and in 1993 he had a daughter with Karen Dipinto. Mr. Mahoney has had several romantic relationships, and has been married once. While he denies any history of violence toward romantic partners, four different women have filed restraining orders against him, including his wife (from whom he is not legally divorced), and Ms. Dipinto.

Mr. Mahoney currently experiences hearing problems in his left ear due to an injury to his eardrum at age thirteen. He has a history of abusing marijuana, has consumed alcohol, and has twice used cocaine.

**B. Offense History and Convictions**

According to the Modified Pretrial Services Report, Mr. Mahoney has an extensive criminal history, with thirty-four adult criminal convictions and nearly twenty other arrests. Ex. 22. His longest period of incarceration was for six years, and he has also been sentenced to numerous several-month stints in houses of corrections over the last thirty-five years. Id.

Five of Mr. Mahoney's criminal convictions involved acts of

violence. In 1978, he was convicted of assault and battery, and the following year he was convicted of assault with a dangerous weapon (pliers) and assault and battery, along with breaking and entering at night. Id. at 01311. In 1983, Mr. Mahoney was found guilty of assault with a dangerous weapon, a knife, with intent to rape. Id. at 01313. For this charge, Mr. Mahoney served six years in prison and is required to register as a sex offender. Id. Mr. Mahoney's two most recent violent offense convictions occurred in 1996 and 1997, and both were for assault and battery. Id. at 01315.

Apart from his convictions for acts of violence, Mr. Mahoney has been convicted numerous times for threatening violence: In 1996, he was convicted of threatening to kill, in 2003 he was convicted of threatening bodily harm, and in 2005 he pled guilty to criminal threatening. Id. at 01315-16. Further, Mr. Mahoney had six restraining orders filed against him by four different women between 1995 and 2003. Id. at 01320-21. While the first five orders were allowed to expire, the most recent one remained active as of February 2011 and Mr. Mahoney was found guilty of violating it in 2005. Id. at 01317, 01320-21.

Mr. Mahoney's remaining convictions occurred almost without interruption from 1979 to 2008, and include a variety of charges, among them: larceny, knowingly receiving stolen property, breaking and entering, shoplifting, criminal mischief, criminal

trespassing, harassment, resisting arrest or detention, disorderly conduct, operating a motor vehicle after revocation, driving while intoxicated, and failure to register as a sex offender. See generally Ex. 22.

## C. Mental Health History

### 1. Diagnoses and Treatment

Mr. Mahoney reported to Dr. Channell that he exhibited hyperactivity as a child, but was not treated for it. Dkt. 7, Ex. A at 6. He stated that he attempted suicide in 1978 following a break-up with a girlfriend. Id.

Mr. Mahoney first received mental health treatment in 1989 after he was released from prison and was told that his demeanor and rapid speech were "overbearing." Id. A psychiatrist at Massachusetts General Hospital prescribed him the antidepressant Zoloft, and later Wellbutrin. Id. He discontinued both after a short period of time. He continued to see the psychiatrist until 1994, as required by the parole board, and later returned to the doctor after his workplace injury in 1996. At that time, Mr. Mahoney was prescribed a sedative, Valium, but stopped treatment after six months. Id.

While incarcerated at MCI Concord between 2008 and 2009, Mr. Mahoney was diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD"), General Anxiety Disorder ("GAD"), Mood Disorder Not Otherwise Specified ("NOS"), and Borderline

Personality Disorder. Id. at 6-7. He was treated with Klonopin, an anxiolytic, and Celexa, an antidepressant. Id. at 7. After his release in 2009, Mr. Mahoney became depressed and was prescribed Wellbutrin and the stimulant Adderall, but did not comply with the treatment protocol. Id. He later received weekly counseling at the Avis Goodwin Community Health Center in New Hampshire, and reported anxiety, chronic pain, emotional trauma, sleep problems, and ADHD. Id. He was prescribed Xanax, Celexa, and the mood stabilizer Seroquel. Id.

In 2010, Mr. Mahoney reportedly became upset after learning that a website publicly identified him as a sex offender. Id. At the time, an evaluating clinician at the Avis Goodwin Center suggested that Mr. Mahoney might suffer from Bipolar I Disorder, "with possible psychotic features or schizoaffective disorder." Id. He continued to take Seroquel. Id.

While detained at the Strafford County House of Correction in 2011, Mr. Mahoney sought a mental health evaluation due to increased depression and anxiety about his legal situation. Id. He had stopped taking Xanax and Seroquel since his arrest, but requested to restart them along with Klonopin and responded with hostility when refused. Id. He was instead prescribed Depakote, another mood stabilizer, but discontinued it after two weeks due to side effects. Id. He was diagnosed with Depressive Episode, possible Bipolar Mood Disorder, and features of Antisocial

Personality Disorder. Id.

From April to May 2011, Mr. Mahoney was evaluated for competency at FMC Devens. Id. There, Dr. Miriam Kissin noted that he exhibited pressured speech, said he felt "hyper" and "depressed," and reported hearing "voices telling him to harm himself and assuring him his charges were unfair." Id. Dr. Kissin diagnosed him with Bipolar II Disorder, Hypomaniac, Moderate, and prescribed the mood stabilizer oxcarbazepine. Id.

After Mr. Mahoney returned to Strafford, Dr. Eric Mart noted that he "appeared quite manic." Id. Mr. Mahoney was evaluated for competency a second time in October 2011 by Dr. Mart. At the time of the evaluation, he was not on any medication. Id. at 8. Dr. Mart diagnosed Mr. Mahoney with Bipolar Disorder NOS and Personality Disorder NOS. Id.

Mr. Mahoney was transferred to the Cheshire House of Corrections in November 2011, and prescribed Klonopin and Seroquel. Id. He was evaluated again by Dr. Mart, and was noted to exhibit "pressured speech, flight of ideas, loose associations, and possible delusional beliefs." Id.

At a hearing on Mr. Mahoney's competency, the District of New Hampshire court observed that he presented in a "very agitated state," and ultimately found that Mr. Mahoney was not competent, but might be restorable with proper treatment. Id.

Mr. Mahoney returned to FMC Devens for restoration of

competency, and was observed to have an understanding of his situation and to be "pleasant and cooperative with intake evaluation procedures." Id. at 9. However, he also exhibited loud, pressured, and rapid speech, "though he was interruptible and redirectable." Id. He complained of sleep problems, but otherwise reported no issues and demonstrated a "relevant, logical, organized, and goal-directed" thought process. Id. Dr. Channell, who treated and evaluated Mr. Mahoney at FMC Devens, noted that Mr. Mahoney would perseverate on legal matters and frequently made statements that did not make sense or were untrue. Id. Mr. Mahoney also frequently made grandiose statements regarding his legal abilities, "often presented as irritable," and became agitated if confronted or challenged about his statements. Id.

In October 2012, Mr. Mahoney continued to exhibit "extremely agitated" and angry behavior toward staff at FMC Devens. At that time, he agreed to an increase in his medication, Seroquel. Id. Afterward, he "continued to present with rapid, pressured, and difficult to interrupt speech," but was otherwise more appropriate. Id. In November 2012, he complained of racing thoughts, irritability, and anxiety, and he was prescribed lithium "due to inadequate response to quetiapine [Seroquel]." Id. at 9-10; Ex. 16.

Mr. Mahoney was not compliant with the change in his

medication. Ex. 16. On February 1, 2013, Mr. Mahoney saw Dr.
Vikram Kambampati, his treating psychiatrist, and Dr. Kambampati
noted that Mr. Mahoney had "likely benefitted from the addition
of lithium," because he reported that it had decreased his racing
thoughts, distractibility, euphoria, irritability, and
impulsivity. Id. However, Mr. Mahoney had missed four out of
fourteen doses at the end of December 2012, and two or three
doses a week throughout January 2013. Id. Mr. Mahoney refused to
have blood drawn so that his lithium levels could be checked, and
indicated that he would discontinue the medication "due to his
disagreement with [the] opinion of his competence by [the]
forensic psychologist." Id. On February 8, 2013, Mr. Mahoney
refused to consider an alternative mood stabilizer, and stated
his belief that Seroquel and Klonopin were the best medications
for him. Ex. 40. Dr. Kambampati noted that Mr. Mahoney was
irritable, and demonstrated impulsive thinking, poor insight, and
poor judgment. Id. Mr. Mahoney's impulsivity was noted to be
worsening. Id. Mr. Mahoney remained compliant with Seroquel, but
continued to refuse lithium through the remainder of the month.
Dkt. 7, Ex. A at 10.

During March 2013, he was prescribed clonazepam (Klonopin),
an anti-anxiety medication, and still refused to take lithium.
Id. at 11. By April 2013, Mr. Mahoney reported that his mood
stability, impulsivity, and pressured speech had improved since

starting clonazepam. Id. However, by August 15, 2013 he was again observed to be "agitated and manic," exhibiting "pressured and continuous" speech that did not respond to redirection. Dkt. 58 at 3.

In October 2013, FMC Devens staff reported that Mr. Mahoney became agitated, exhibited loud and pressured speech, and made "paranoid statements" about his legal situation during an encounter with them. They stated that Mr. Mahoney "exhibits a pervasive pattern of disregard to social conventions and laws as evidenced by his numerous arrests and criminal charges . . . [and] within [his] history there is evidence of impulsivity, reckless disregard for the safety of self or others, irritability and aggressiveness, lack of remorse and consistent irresponsibility." Id. Later that month, in a meeting with Mr. Mahoney's psychologist, Mr. Mahoney acknowledged that he acted inappropriately.

Mr. Mahoney saw his treating psychiatrist in November 2013, at which time he again refused to consider taking a mood stabilizer such as lithium or Depakote, noting that they produced unpleasant side effects. Id. In January 2014, Mr. Mahoney reported that he had been placed on suicide watch. Ex. 11.

## 2. Incident Reports

During his time at Strafford in 2011, the Cheshire House of Corrections in 2012, and FMC Devens from late 2012 until the

present, Mr. Mahoney has had numerous disciplinary problems which were recorded in incident reports. As a result, he has spent time in and out of locked segregated housing units. At least four of the reported incidents involved acts of violence, and two involved threatening.

### a. Violent Incidents

On March 3, 2012, Mr. Mahoney received an incident report at Cheshire for two instances of "assault on any person, by any means." Ex. 5. The report states that he "struck [another inmate] in the face with an open hand," and then "struck [a second inmate] with his right fist." Id. In response, the second inmate threw a chair at Mr. Mahoney, and Mr. Mahoney attempted to retaliate by doing the same. Id. The staff member who reviewed security footage of the incident noted that before the situation escalated to violence, Mr. Mahoney had been yelling at the first inmate and exhibiting "very aggressive" body language." Id.

On January 20, 2013, at FMC Devens, Mr. Mahoney reportedly grabbed another inmate by the neck and attempted to choke him, and then threw a bucket of water on him. Ex. 9. Mr. Mahoney stated that the incident occurred because the other inmate was "being bossy." Id.

On March 26, 2013, Mr. Mahoney reportedly committed attempted assault while being escorted through FMC Devens. Ex. 18. The incident report states that he initially "became verbally

aggressive" toward staff, and then "began kicking over trash barrels and chairs." Id. When staff attempted to restrain him, Mahoney reportedly resisted and kicked toward the staff members. He was ultimately placed in leg irons. Id.

On the same day, Mr. Mahoney received a separate incident report, which states that he "stiff-armed" a staff member who attempted to speak with him during rounds. Ex. 19.

### b. Threatening Incidents

On March 5, 2012, at Cheshire, Mr. Mahoney received an incident report for "disorderly conduct" and "threatening any person." Ex. 6. According to the report, an officer had been interacting with Mr. Mahoney regarding a separate disciplinary issue, and Mr. Mahoney approached the officer and "started yelling abusive language." Id. With clenched fists, Mr. Mahoney then began yelling, among other things, "I will beat the shit out of you." Id. When the officer told Mahoney to either lie on the ground or return to his cell, Mr. Mahoney began to returning to his cell while yelling, "You're a piece of shit I'm gonna fucking stab you, you fucking punk I'm not taking that write-up." Id.

On August 8, 2012, at Cheshire, Mr. Mahoney received an incident report for "threatening any person." Ex. 7. He reportedly became agitated because another inmate had changed the channel while Mr. Mahoney was watching television. Id. A staff member attempted to calm and redirect him, but he remained

"verbally aggressive." Id. He said to the other inmate, "I will get you on second when he is gone," [sic] which the observing staff member interpreted as "a direct threat to another inmate." Id.

On December 5, 2012, at FMC Devens, Mr. Mahoney received an incident report for "Threatening another with bodily harm, Being in an unauthorized area without staff authorization." Ex. 8. When a staff member in the facility's library ordered Mr. Mahoney to provide his identification card, Mr. Mahoney reportedly yelled "No one yells at me and gets away with it, bitch!" Id. However, upon review of the incident, the Disciplinary Hearing Office concluded the his remarks "did not warrant a threatening charge," but were "disrespectful and insolent." Id.

### c. Other Incidents

On August 4, 2011, at Strafford, Mr. Mahoney reportedly spit on an inmate's face. Ex. 11. At FMC Devens on January 28, 2014, Mr. Mahoney reportedly behaved insolently toward a staff member who was performing medical rounds. Id. He asked the staff member about the possibility of making a legal phone call, and when he was not immediately satisfied by the staff member's response, he began banging on his cell door and yelling abusive language. Id. The staff member reported that Mr. Mahoney, "in an explosive and threatening fashion," yelled "you better get away from this door you dumb, stupid, fucking cunt . . . ." Id. He later stripped

naked and began throwing pieces of wet toilet paper around his cell and covered the window of his cell door, saying, "you want a war[,] well you got it." Id.

Dr. Channell's evaluative report mentions another incident from October 2012, when Mr. Mahoney was being interviewed by his treating psychiatrist. Dkt. 7, Ex. A at 9. He reportedly "became very angry, began yelling derogatory comments, spit at his cell window, and threw his shoes at the door." Id. The incident report for this occurrence is not in the evidentiary record.

### 3. Courtroom Conduct

Mr. Mahoney has repeatedly had inappropriate outbursts at court hearings regarding his case in New Hampshire and the instant § 4246 petition. The Assistant United States Attorney involved in Mr. Mahoney's New Hampshire case reported that during a hearing, Mr. Mahoney accused him of making false statements and threatened him, saying "in an agitated manner and in a loud voice, that if I filed another [presumably false] pleading he would hit me in the head and I would not get up." Ex. 10. Dr. Channell testified that Mr. Mahoney later described this as not threatening, and "just a misunderstanding." 6/4/14 Hrg. Tr. 62:11-14.

At a November 2013 hearing in this Court, Mr. Mahoney also exhibited out of control behavior. While correcting the government's inaccurate statement that he had been convicted of

aggravated rape, he began shouting (it was unclear at whom) and was ultimately escorted from the courtroom. 11/22/14 Hrg. Tr. 15:13-16. The Court found that "[h]e was . . . very violent just now, very combative. . . . It took five Deputy United States Marshals to get him out of here." Id. at 16:11-16. After his removal, the Court noted, "He's absolutely screaming in the back room. And I don't know if he's violent because I can't see, but he's clearly angry and out of control." Id. at 17:11-13.

## IV. DISCUSSION

### A. Legal Standard

An individual due for release from custody is subject to civil commitment if, after a hearing, the Court "finds by clear and convincing evidence that the person is 1) "suffering from a mental disease or defect" and, 2) "as a result of which [disease or defect], his release would create a substantial risk of bodily injury to another person or serious damage to the property of another." 18 U.S.C. § 4246. Courts consider a wide range of factors to assess whether a respondent poses a "substantial risk," among them his history of significant violent behavior, past compliance with medication protocols, drug or alcohol abuse, whether he has named any targets of violent behavior, and his previous use of weapons. See, e.g., United States v. Smith, 964 F. Supp. 2d. 167, 171-72 (D. Mass. 2013); United States v. Ecker, 30 F.3d 966, 970-71 (8th Cir. 1997); United States v. Sahhar, 917

F.2d 1197, 2000 (9th Cir. 1990).

The "clear and convincing evidence" standard is high, and "is met only when a party can place the ultimate factfinder in abiding conviction that its factual contentions are highly probable." Smith, 964 F. Supp. 2d at 171, quoting Colorado v. New Mexico, 467 U.S. 310, 316 (1984) (internal quotation marks omitted).

## B. Expert Opinions

Two psychologists evaluated Mr. Mahoney, prepared forensic risk reports on him, and testified at the evidentiary hearings. Dr. Shawn Channell, the government's expert, has been a licensed psychologist since 2002, and is board certified in forensic psychology by the American Board of Professional Psychology. 6/4/14 Hrg. Tr. 21:16-24. Dr. Channell testified that he met with Mr. Mahoney numerous times between August 2012 and June 2014, for approximately ten formal interviews spanning seven hours. Id. at 24:4-9. Dr. Daniel Kriegman, who was appointed by the court for the defense, has a Ph.D. in Clinical Psychology and has been a licensed psychologist since 1981, but is not board certified in forensic psychology. 6/12/14 Hrg. Tr. 2-84:12. He was the Chief Psychologist at the Massachusetts Treatment Center for the Sexually Dangerous Offender from 1977 to 1986. He interviewed Mr. Mahoney at FMC Devens for approximately three hours on April 4, 2014. Id. at 2-17:25-18:1; Dkt. 81. Each doctor also reviewed Mr.

Mahoney's medical and other records. I find both experts are qualified.

**1. Mental Disease or Defect**

**a. Bipolar Disorder**

Dr. Channell and Dr. Kriegman agree that Mr. Mahoney suffers from some form of Bipolar Disorder. In his forensic risk report, Dr. Channell diagnosed Mr. Mahoney with Bipolar I Disorder using the Diagnostic and Statistical Manual of Mental Disorders-Fourth Edition-Text Revision ("DSM-IV-TR"). Dkt. 7, Ex. A at 12. Dr. Channell described the disorder as follows:

> [T]he essential feature of Bipolar I Disorder is a clinical course characterized by one or more Manic Episodes, which are defined as distinct periods during which there is an abnormally and peristently elevated, expansive, or irritable mood lasting for at least one week. The mood disturbance must be accompanied by at least three additional symptoms including inflated self-esteem or grandiosity, decreased need for sleep, pressure of speech, flight of ideas, distractibility, increased involvement in goal-directed behavior or psychomotor agitation, and excessive involvement in pleasurable activities. Manic episodes are sufficiently severe to cause marked impairment in occupational functioning or in usual social activities or relationships with others, or to necessitate hospitalization to prevent harm to self or others.

Dr. Channell based his diagnosis on Mr. Mahoney's history, and on his observations of Mr. Mahoney during evaluation. Dr. Channell testified that Mr. Mahoney "has a history of manic episodes as well as fairly chronic hypomania," which is not as extensive as a full manic episode, but is "also characterized by abnormally elevated mood or irritability." 6/4/14 Hrg. Tr. 26:21-25. He also

18

reported that Mr. Mahoney exhibits symptoms such as "lack of insight, irritability, grandiosity, and impulsivity." Dkt. 7, Ex. A at 18.

Dr. Kriegman wrote in his report that "the best fit diagnosis" for Mr. Mahoney "appears to be some form of Bipolar Disorder." Dkt. 81 at 5. He did not make a conclusion about precisely what type of Bipolar Disorder Mr. Mahoney has. He based his diagnosis on his evaluative interview with Mr. Mahoney, and on the fact that the diagnosis was "the most common one in the record." 6/12/14 Hrg. Tr. 2-32:1-2.

### b. Personality Disorders

Dr. Channell also diagnosed Mr. Mahoney with Antisocial Personality Disorder ("APD"), which is characterized by "a pervasive pattern of disregard for and violation of the rights of others occurring since age 15 years." Dkt. 7, Ex. A at 12. Dr. Channell arrived at this diagnosis largely on the basis of Mr. Mahoney's lengthy criminal record and self-reported problems in school. Id.

Dr. Kriegman disagreed with Dr. Channell's diagnosis of APD, and testified that once an individual's symptoms are accounted for by a diagnosis of Bipolar Disorder, further diagnoses of personality disorders are inappropriate. 6/12/14 Hrg. Tr. 2-32:24-2-33:3. However, Dr. Kriegman also suggested that Mr. Mahoney may fit the criteria for hyperactivity, and either

narcissistic or borderline personality disorder. Id. at 2-31:23-25. Based on the testimony of Dr. Channell and the entire factual record, I find by clear and convincing evidence that Mr. Mahoney has Bipolar I Disorder and Antisocial Personality Disorder.

## 2. Substantial Risk of Bodily Injury or Property Damage

Dr. Channell and Dr. Kriegman disagree about whether Mr. Mahoney's release would create a substantial risk of bodily injury to another or damage to the property of another, as a result of his mental disorder. Dr. Channell has concluded that Mr. Mahoney's release would create such a risk, and has recommended that he be civilly committed. Dkt. 7, Ex. A at 18. Dr. Kriegman, on the other hand, has expressed the opinion that no one can predict with certainty whether or not Mr. Mahoney will violently recidivate if released. 6/12/14 Hrg. Tr. 2-34:6-16.

### a. Dr. Channell

Dr. Channell based his opinion on several factors, including Mr. Mahoney's history of violence, his tendency to minimize that history, his lack of insight into his behavior, and his continued symptoms of Bipolar Disorder coupled with the refusal to take alternative medications to control those symptoms. Dr. Channell also took into account Mr. Mahoney's results on several risk assessment instruments, discussed at greater length below. In his report, Dr. Channell wrote that "the symptoms of [Mr. Mahoney's] illness, including lack of insight, irritability, grandiosity,

20

and impulsivity are directly related to his history of violent and threatening behavior. He has repeatedly exhibited an inability to control his behavior, even in circumstances where his aggressive behavior is damaging to his own circumstances (e.g. court hearings)." Dkt. 58 at 8.

Dr. Channell testified that he observed a "continuing pattern of violence" from Mr. Mahoney's criminal convictions to the numerous violent incidents that have occurred while he has been in custody. 6/4/14 Hrg. Tr. 53:4-15. There was one problem with Dr. Channell's assessment on this subject: A paragraph in the conclusion of Dr. Channell's forensic risk report erroneously refers to Mr. Mahoney as having "a history of weapons-related offenses, including: Armed Robbery; multiple counts of both Assault with a Dangerous Weapon and Assault and Battery with a Dangerous Weapon; Criminal Possession of Loaded Firearms 3rd Degree; and Criminal Possession of Stolen Firearms." Dkt. 7, Ex. A at 19. While Mr. Mahoney has been charged with armed robbery and convicted of assault and battery with a dangerous weapon, he has in fact never been charged with or convicted of any firearms-related offense. See Ex. 22. In testimony, Dr. Channell attributed the reference to scrivener's error, and noted that it did not appear in the body of his report, which correctly recites Mr. Mahoney's criminal history and which Dr. Channell relied upon for his recommendation. 6/4/14 Hrg. Tr. 183:16-184:13. In any

event, Dr. Channell testified that even without the mistakenly referenced firearms offenses, his assessment of Mr. Mahoney's risk of recidivism does not change. Id. at 149:23-150:1.

During an interview with Dr. Channell, Mr. Mahoney reportedly "demonstrated very limited insight into his mental illness," and indicated that he believed he was doing well. Id. He also "demonstrated no insight into his violence history and grossly minimized his history," denying that he was ever convicted for a weapons-based charge, and stating that his assaults of ex-girlfriends were "small things." Id. He asserted that he "never caused anyone bodily injury." Id.

Dr. Channell believes that Mr. Mahoney's lack of insight and failure to accept responsibility for his behavior will "make it difficult for him to prevent himself from engaging in that behavior again in similar circumstances." 6/4/14 Hrg. Tr. 62:20-25. Further, the lack of insight "predisposes" him to continue noncompliance with treatment plans. Id. at 63:6-8. Dr. Channell suggested that if Mr. Mahoney attended therapy or anger management courses upon release, his lack of insight would make it "very hard for him to . . . apply those principles to himself and benefit from the treatment." Id. at 64:12-20.

Regarding the impact of medication on Mr. Mahoney's risk of engaging in violent behavior, Dr. Channell testified that "even while he's on [Seroquel and Klonopin], he continues to exhibit

significant agitation and symptoms consistent with either a
hypomania or some episodes which appeared quite manic. . . .
[T]hese medications do not adequately control his symptoms and .
. . he does need additional medication." <u>Id.</u> at 44:7-13. While
Dr. Channell testified that he was not qualified to recommend a
particular medication because he is not a psychiatrist, he did
note that Mr. Mahoney's treating psychiatrist suggested he take
lithium due to his inadequate response to other drugs. 6/4/14 Tr.
38:11-20; 39:21-25.

### b. Dr. Kriegman

To assess future dangerousness, Dr. Kriegman considers an
individual's "age, the recency of [violent] behavior, the context
in which it occurs, and the compulsivity, [or] the repetitiveness
of the behavior despite sanctions or interventions." 6/12/14 Hrg.
Tr. 2-28:2-5. Dr. Kriegman believes that "it is quite possible
that the risk of serious violence is not substantial if [Mr.
Mahoney] is released." Dkt. 81 at 6. In support of his opinion,
Dr. Kriegman cited Mr. Mahoney's history, "the decreasing
incidence (especially outside of prison) of truly troubling
violence, his advanced age (which is highly correlated with
decreasing violence), and his established history of willingness
to take psychotropic medications (when he is able to have input
and work with a psychiatrist he trusts)." <u>Id.</u>

Dr. Kriegman testified that Mr. Mahoney is "pretty

compulsively verbally abusive and scary," but did not demonstrate a pattern of "repetitive violence in recent years." 6/12/13 Hrg. Tr. 2-28:5-7. Dr. Kriegman attributes Mr. Mahoney's most recent acts of violence to the context of a psychiatric facility within a correctional setting, rather than to his Bipolar Disorder. Dkt. 81 at 5. He observed that at FMC Devens, Mr. Mahoney has felt "unfairly treated,""cornered,""hopeless," "continuously under assault and chronically in need of self-defense." Id. at 4-5; 6/12/14 Hrg. Tr. 2-37:16-19. Accordingly, Dr. Kriegman expressed the opinion that while the recent violent outbursts might meet the standard of causing bodily injury, "it's not clear . . . that they would occur outside of prison." 6/12/14 Hrg. Tr. 2-36:1. Dr. Kriegman wrote that "it is not at all clear that [Bipolar Disorder] makes him likely to attack someone if released from the prison environment." Dkt. 81 at 5.

Dr. Kriegman perceived Mr. Mahoney's pattern of violence as ending with his 1983 conviction for assault with intent to rape. Id. However, he agreed with Dr. Channell that Mr. Mahoney engaged in "a lot of denial and minimization" about his history of violence. 6/12/14 Hrg. Tr. 2-26:5-6.

Dr. Kriegman testified that Mr. Mahoney might have some form of support in the community if released, possibly from former girlfriend Karen Dipinto. Id. at 2-36:24-25.

24

### c. Risk Assessment Instruments

Dr. Channell used three prediction tools in assessing Mr. Mahoney's risk of violent recidivism. The instruments were the Psychopathy Checklist-Revised ("PCL-R"), the Historical Clinical Risk Management-20("HCR-20"), and the Violence Risk Appraisal Guide ("VRAG"). The PCL-R is technically not a risk assessment instrument, but rather checklist of factors "developed to assess psychopathic personality." Dkt. 7, Ex. A at 15. However, because psychopathy can be predictive of violence, its results are included in both the HCR-20 and VRAG. Id. The HCR-20 is a "Structured Professional Judgment" instrument involving a checklist of risk factors for violent behavior, while the VRAG is "an actuarial instrument designed to predict the risk of violence within a specific time frame following release for violent, mentally disordered offenders." Id. at 16-17.

Mr. Mahoney challenged the admissibility of Dr. Channell's use of the instruments. Under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) and Fed. R. Evid. 702, the Court must assess "whether [an] expert's testimony both rests on a reliable foundation and is relevant to the task at hand" before admitting it, and "may evaluate the data offered to support an expert's bottom line opinions to determine if that data provides adequate support to mark the expert's testimony as reliable." Daubert, 509 U.S. at 597. Several factors may guide

that inquiry, including: 1) whether the theory or technique can be and has been tested; 2) whether the technique has been subject to peer review and publication; 3) the technique's known or potential rate of error; 4) the existence and maintenance of standards for the implementation of the methodology; and 5) the level of the theory's or technique's acceptance within the relevant discipline. Id. at 593-94. The list of factors is non-exhaustive. Id. at 594.

On Mr. Mahoney's behalf, Dr. Kriegman asserts that the VRAG, HCR-20, and PCL-R are not sufficiently reliable predictors of future dangerousness. Specifically, he argues that the VRAG and HCR-20 have low validity, which essentially means that both instruments yield too many false positives to be appropriate for use in predicting Mr. Mahoney's actual risk of recidivism. He further contends that the PCL-R "has not achieved general acceptance as a measure of future dangerousness (although it has for research purposes)." Dkt. 82, at 5.

The government responds that all three instruments are admissible, as they have been peer reviewed and are generally accepted in the field. In support of this argument, they submitted a binder full of articles, one of which was also cited by Dr. Kriegman and was particularly helpful. It stated that "[t]he use of risk assessment tools has become an accepted standard of forensic risk assessment practice." Min Yang et al.,

26

<u>The Efficacy of Violence Prediction: A Meta-Analytic Comparison of Nine Risk Assessment Tools</u>, American Psychological Association, 741 (2010). The tools included the VRAG, PCL-R, and the HCR-20. The authors of the study acknowledged that "[e]ven with a moderately accurate method of prediction, predicting low- or very-low-frequency events, such as serious violence (e.g. mass murder, serial killing, or predatory child abuse) will inevitably result in a high false-positive error rate, that is, identifying many people who are deemed violent but in fact are not." <u>Id.</u> (citation omitted). As such, the authors concluded: "All risk assessment instruments . . . included in the study predicted violent recidivism moderately well, and their predictive efficacies were not significantly different. Because of their moderate level of predictive efficacy, they should not be used as the sole or primary means for clinical or criminal justice decision making that is contingent on a high level of predictive accuracy, such as preventive detention." <u>Id.</u> at 761.

The respondent failed to produce any peer reviewed articles challenging the reliability or validity of the instruments. Respondent has also failed to cite any cases in which they were excluded based on a <u>Daubert</u> challenge. Quite to the contrary, numerous articles and cases indicate that courts throughout the United States frequently use the PCL-R, VRAG, and HCR-20 to help assess the risk of violent recidivism. <u>See, e.g.</u>, <u>United States</u>

v. Barnett, 211 F.3d 803, 815 (4th Cir. 2000) (in the sentencing phase of a capital case, rejecting limited Daubert challenge to the PCL-R because evidence indicated only a disagreement between professionals as to its reliability); see also David DeMatteo et al., Investigating the Role of the Psychopathy Checklist-Revised in United States Case Law (2013); Michael Vitacco et al., The Role of the Violence Risk Appraisal Guide and Historical, Clinical, Risk-20 in U.S. Courts: A Case Law Survey 366 (2012) ("The VRAG and HCR-20 are increasingly used by behavioral science experts to evaluate violence risk.").

Further, while case law on Daubert challenges to the instruments is extremely limited, several state courts have admitted the VRAG and the PCL-R after rejecting challenges under Frye, which requires the scientific principles underlying expert testimony to be generally accepted by members of the relevant field. Frye v. United States, 293 F. 1013 (D.C. Cir. 1923); see, e.g., In re Commitment of Simons, 821 N.E.2d 1184, 1192 (Ill. 2004) (upholding the use of actuarial risk assessment instruments, including the VRAG, after Frye challenge in sexual dangerousness case); In re Detention of Rudolph, No. 48744-2-I, 2004 WL 1328673, at *1 (Wash. Ct. App. Jun. 14, 2004) (same); In re Commitment of Rodgers, 875 So.2d 737, 739 (Fl. Dist. Ct. App. 2004) (same); Lee v. State, 854 So. 2d 709, 712 (Fl. Dist. Ct. App. 2003) (affirming trial court's admission of VRAG and PCL-R

evidence under <u>Frye</u> in sexual dangerousness case); <u>In re</u>
<u>detention of Strauss</u>, 20 P.3d 1022, 1026 (Wash. Ct. App. 2001)
(affirming lower court's denial of a <u>Frye</u> hearing on the VRAG in
sexual dangerousness case because "the relevant scientific
community generally accepts" the instrument).

In sum, the government produced evidence that the tools have
been tested, subject to peer review and publication, and that
standards for implementation have been maintained. Dr. Kriegman
has acknowledged their widespread acceptance at least as research
tools. <u>See</u> 6/12/14 Hrg. Tr. 2-54:12-21. The key dispute concerns
the tools' known rates of false positives in predicting an
individual's risk of recidivism, but the evidence demonstrates
that the rates of error are well-understood and can be taken into
account when Courts determine how much weight to assign their
results. Moreover, Dr. Kriegman himself has relied on actuarial
instruments (such as the Static 99[2]) in dozens of cases until
recently. <u>Id.</u> at 2-130:25-25. Accordingly, I find that the VRAG,
PCL-R, and HCR-20 are admissible under <u>Daubert</u>. However, the
respondent's criticism that the instruments have limitations and
predict the risk of recidivism of a group of offenders with
certain characteristics, not of individuals, is well-taken, and
the Court takes their results into consideration as only one

_____

[2] This Court admitted expert testimony on the Static 99
after a <u>Daubert</u> challenge in <u>United States v. Shields</u>, Civ. No.
07-12056-PBS, 2008 WL 544940, at *1-*2 (D. Mass. Feb. 26, 2008).

factor. See Smith, 964 F. Supp. 2d at 174 (discussing the difficulty of using a VRAG score to extrapolate from population data to predict behavior in an individual).

In addition to a broad challenge to the instruments, Dr. Kriegman also challenges the scoring of several items as applied to Mr. Mahoney. Those challenges are discussed below.

### i. PCL-R

In Dr. Channell's forensic risk report, Mr. Mahoney scored a 25 out of a possible score of 40 on the PCL-R. Dkt. 7, Ex. A at 15. Dr. Channell later revised the score to 26 after Mr. Mahoney demonstrated behavior that the doctor felt was "conning/manipulative," which is a category assessed on the instrument.[3] 6/4/14 Hrg. Tr. 188:3. Dr. Channel noted in his original forensic report that "[r]esearch indicates that a score above 30 is a strong predictor of violent recidivism and represents a personality structure consistent with psychopathic personality. Although Mr. Mahoney did not score in the psychopathic range, he demonstrated strong psychopathic tendencies." Dkt. 7, Ex. A at 15.

Dr. Kriegman testified that he would have scored Mr. Mahoney as a 21 on the PCL-R, as he disagreed with Dr. Channell's scoring

---

[3] The doctor relied upon a recorded phone call in which Mr. Mahoney spoke with Karen Dipinto and asked her to lie to his doctors by telling them she would allow Mr. Mahoney to stay with her if he were released. Ex. 23.

on the items addressing "glibness/superficial charm" and "pathological lying." 6/12/14 Hrg. Tr. 2-64:8-65:5. More broadly, he disagreed with the conclusion that Mr. Mahoney exhibits psychopathic tendencies. Id. at 2-65:13.

### ii. HCR-20

The HCR-20 is "a checklist of risk factors for violent behavior which consists of items organized around historical, clinical, and risk management issues," including previous violence, major mental illness, relationship instability, personality disorder, employment problems, lack of insight and impulsivity, active symptoms of mental illness, exposure to destabilizers and stress, prior supervision failure, negative attitudes (procriminal sentiments), and early maladjustment. Dkt. 7, Ex. A at 15-16. The HCR-20 does not provide a numerical score, and instead allows for an individual to be adjudged as a low, moderate, or high risk of future violence. Id. at 15. Dr. Channell found that Mr. Mahoney fit the "high risk" category based on the totality of the factors described. Id. at 16-17.

Dr. Kriegman testified that he disagreed with Dr. Channell's scoring on certain items regarding employment problems, psychopathy, personality disorders, and lack of insight. 6/12/14 Hrg. Tr. 2-79:9-80:16.

### iii. VRAG

On the VRAG, Mr. Mahoney received a total score of 15, which

is assigned to Risk Category 7. Dkt. 7, Ex. A at 17. "Among offenders in the development sample for the VRAG, . . . approximately 55% within Mr. Mahoney's category reoffended violently within an average of 7 years (64% within an average of 10 years) after release." Id.

Dr. Kriegman disagreed with Dr. Channell's scoring on the VRAG items that addressed personality disorders and schizophrenia. 6/12/14 Hrg. Tr. 2-67:22-69:24. His re-scoring would have placed Mr. Mahoney into a lower risk category in which 44 percent of offenders in the development sample recidivated, and 56 percent did not. Id. at 2-77:19-21. However, Dr. Kriegman also testified that he has never scored an individual on the VRAG himself, and has only ever "gone over other people's scores." Id. at 2-108:10-12.

## C. The Court's Finding

The Court finds that the government has proven by clear and convincing evidence that Mr. Mahoney suffers from a mental disorder as a result of which his release would create a substantial risk of bodily injury to another person or damage to the property of another.

The experts in this case agree that Mr. Mahoney suffers from a form of Bipolar Disorder, and I find this diagnosis to be credible. I also find that he has Antisocial Personality Disorder. On the question of substantial risk of bodily injury, I

take several factors into account: First, I rely on Mr. Mahoney's extensive criminal history and his disciplinary records from Cheshire and FMC Devens, which demonstrate a clear, ongoing, recent pattern of violent and threatening behavior. While living in the community, Mr. Mahoney was repeatedly convicted for assault, sometimes with dangerous weapons, and for threatening others with bodily harm. The incident reports from his time in custody indicate that his out-of-control conduct has not abated, even as he has aged, as he has consistently been aggressive, confrontational, and violent with both staff and other inmates.

Second, I rely upon my own observations of Mr. Mahoney in this Court and reports of his behavior in another court. Here, he was angry and combative, and could only be subdued and removed from the courtroom with the aid of no less than five U.S. Marshals. Outside the courtroom, he could still be heard screaming, and was clearly not in control of his behavior. He has also threatened an Assistant United States Attorney.

Third, I take into account Mr. Mahoney's scores on the PCL-R, VRAG, and HCR-20. With respect to Dr. Kriegman's specific challenges to Dr. Channell's scoring of the instruments, some of the points might be debatable. For example, raters could disagree on whether Mr. Mahoney has "glibness/superficial charm" or is "conning/manipulative." However, Dr. Channell's scores were reasonable, and Dr. Kriegman conceded in testimony that he has

not been trained to score the instruments and had never done so prior to testifying. Although Dr. Channell did initially have an inaccurate criminal record of Mr. Mahoney's previous violence, the correct record also supports his scoring of that factor.

I recognize the pitfalls of using actuarial data in order to make risk assessments. However, risk assessment tools are widely used in the field, have been peer reviewed, and have been generally accepted in court. Accordingly, while I do not rely solely on the risk assessment tools, I do consider them to corroborate other available information. In this case, there is clear and convincing evidence of a substantial risk of bodily harm based on the long list of violent attacks and threats in the record, which is consistent with the risk assessments.

Finally, I give greater weight to the clinical judgment of Dr. Channell, who evaluated Mr. Mahoney over the longest period of time. Dr. Channell expressed the belief that Mr. Mahoney's symptoms of Bipolar Disorder – his irritability, his impulsiveness, his grandiosity – make it likely that, if released, Mr. Mahoney will continue to behave violently toward other people. Perhaps most disturbingly, Dr. Channell has reported that Mr. Mahoney continues to exhibit symptoms of his illness and behave violently while taking Seroquel, yet he refuses to comply with alternative medication plans that might better control his symptoms. In the past he has been inconsistent

in complying with treatment protocols. In the absence of a feasible working treatment plan, it is clear that Mr. Mahoney's behavior will not improve on release even with family support,[4] and that he will continue to pose a substantial risk of bodily injury to others in the community.

### ORDER

The Court **ALLOWS** the Government's petition to civilly commit the Respondent under 18 U.S.C. § 4246 (Docket No. 1). It shall submit a form of judgment within 20 days.

/s/ PATTI B. SARIS
PATTI B. SARIS
United States District Judge

---

[4] After the hearing, Mr. Mahoney's family offered to provide housing.