```
 1                 IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF MASSACHUSETTS
 2

 3        UNITED STATES OF AMERICA,            )
                                               )
 4                    Petitioner               )
                                               )
 5             -VS-                            )  Civil No. 13-11530-PBS
                                               )  Pages 1 - 131
 6        BRIAN MAHONEY,                        )
                                               )
 7                    Respondent               )

 8
                        EVIDENTIARY HEARING - DAY ONE
 9

10                  BEFORE THE HONORABLE PATTI B. SARIS
                    UNITED STATES CHIEF DISTRICT JUDGE
11

12
          A P P E A R A N C E S:
13
               PATRICK M. CALLAHAN, ESQ., Assistant United States
14        Attorney, Office of the United States Attorney,
          1 Courthouse Way, Room 9200, Boston, Massachusetts, 02210,
15        for the Petitioner.

16             MARK W. SHEA, ESQ., Shea & LaRocque,
          Suite 103, 929 Massachusetts Avenue, Cambridge, Massachusetts,
17        02139, for the Respondent.

18

19                                    United States District Court
                                      1 Courthouse Way, Courtroom 19
20                                    Boston, Massachusetts  02210
                                      January 26, 2017, 9:22 a.m.
21

22

23                         LEE A. MARZILLI
                        OFFICIAL COURT REPORTER
24                   United States District Court
                     1 Courthouse Way, Room 7200
25                       Boston, MA  02210
                          (617)345-6787
```

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| DAVID L. HOFFMAN, M.D. | | | | |
| By Mr. Shea: | 11 | | | |
| By Mr. Callahan: | | 46 | | |
| By Mr. Shea: | | | 99 | |
| SHAWN CHANNELL | | | | |
| By Mr. Callahan: | 114 | | | |

| EXHIBITS | RECEIVED IN EVIDENCE |
|---|---|
| 134 | 56 |
| 133 | 58 |
| 107 | 73 |
| 136 | 78 |
| 110 | 83 |
| 111 | 84 |
| 137 | 85 |

```
1                    P R O C E E D I N G S

2          THE CLERK:  This is Civil Action No. 13-11530, United

3    States v. Brian Mahoney.  Court is in session.  Please identify

4    yourself for the Court and for the record.

5          MR. CALLAHAN:  Good morning, your Honor.  Patrick

6    Callahan for the United States.

7          MR. SHEA:  Good morning, your Honor.  Mark Shea for

8    Mr. Mahoney.

9          MR. MAHONEY:  Good morning, your Honor.  Brian

10   Mahoney, Petitioner.

11         THE COURT:  All right, thank you.  You may be seated.

12   Let me just say that Maryellen Molloy, who's my normal

13   Courtroom Deputy, is sick with bronchitis, and so I'm very

14   happy to have Mr. Hohler filling in.  That said, I'm not sure

15   if I missed some email or something because I was surprised to

16   see this huge set of binders show up, and I was not familiar

17   with what was going to be happening today, so it may have

18   fallen through the cracks.  Maybe the government could give me

19   a sense about what you're expecting.

20         MR. CALLAHAN:  Sure, your Honor, and it will depend in

21   some part, at least, on what Mr. Mahoney and Mr. Shea decide to

22   do today, but we're here today on their motion to discharge

23   Mr. Mahoney with no conditions, as I understand it.  The

24   burden, of course, is on them to show by a preponderance of the

25   evidence that his release will no longer pose a substantial
```

1    risk of bodily injury to another person, so that's their

2    burden.  They're going to put on some testimony, as I

3    understand it from Mr. Shea, to try to meet that burden.

4         The government did present these binders.  It has

5    exhibits because it is here today with Dr. Channell from the

6    Bureau of Prisons, so we need --

7         THE COURT:  So you're expecting to put on

8    Dr. Channell?

9         MR. CALLAHAN:  If we need to, and if the Court

10   believes that Mr. Mahoney has met his burden of showing that

11   he's no longer a danger, then we will put Dr. Channell up, and

12   we will have a number of materials to go through.  And what we

13   would like to do, your Honor, if we go that way, is to bring

14   your Honor up to speed from where we have come since the last

15   time we were before your Honor in August, 2014.

16        THE COURT:  So you have an expert witness who's here

17   this morning?

18        MR. CALLAHAN:  Correct, your Honor.

19        THE COURT:  And what do you have, Mr. Shea?

20        MR. SHEA:  Good morning, Judge.

21        THE COURT:  Good morning.

22        MR. SHEA:  What I have is Dr. Hoffman, and I want to

23   be clear because I think there was a little --

24        THE COURT:  Is Dr. Hoffman here?

25        MR. SHEA:  Yes.

```
 1              THE COURT:  Okay, because we kept scrounging around
 2     trying to -- I know that Mr. Mahoney kept referencing
 3     Dr. Hoffman, and we don't have a separate report from him.
 4              MR. SHEA:  No.  There's a two-page letter essentially
 5     denying Mr. Mahoney DMH services that was penned by
 6     Dr. Hoffman, and then there is a nine-page decision.  So when
 7     Dr. Hoffman said that Mr. Mahoney didn't qualify for DMH
 8     services, Mr. Mahoney appealed that to DMH to a fair hearing
 9     and requested a fair hearing.  He was given a hearing, which
10     was taped and for which a transcript was made.  I believe it's
11     Exhibit 135 within the government's materials, and I brought
12     that tape today and the transcript.
13              THE COURT:  I was just handed, not to put too fine a
14     touch on it, about five minutes ago this.
15              MR. SHEA:  Right, so --
16              THE COURT:  So no one gave it to me in advance.  I
17     have not read it.  Mr. Mahoney sent me a letter, and I read
18     what he sent me.  I read the reports from the government,
19     Dr. Channell and the supplemental report.  There were two back
20     to back which came to different conclusions.  And, of course,
21     I've read the initial reports from way back.  So I'm sort of
22     catching up to you all.
23              MR. SHEA:  Okay.  Well, just so we're clear on how
24     much was just dropped on you by Mr. Mahoney, the smaller
25     99-page transcript is what I'm introducing into evidence along
```

1    with the disk.  That --

2         THE COURT:  Well, let me ask you this:  Dr. Hoffman, I

3    did not have a chance to read the transcript.  I started

4    reading upstairs while we were waiting for Mr. Mahoney to get

5    up here, and I got, like, a few pages into it.  And I know he's

6    not your expert, right?

7         MR. SHEA:  That was the point I was about to get to.

8    He is not my expert, meaning he works for the Department of

9    Mental Health.  He has in no way been compensated for his

10   opinion.  He was not sought by us.  To be frank, you know,

11   under 4246, 4248, that whole, Mr. Mahoney is supposed to

12   petition the state for services, meaning he can leave Devens

13   and go to the state facility if the state finds him to have the

14   same mental illness that Dr. Channell had found him to have.

15        THE COURT:  Has he actually read the reports from

16   Dr. Channell and the Bureau of Prisons?

17        MR. SHEA:  I believe he has, and I --

18        THE COURT:  Do you know that?  Well, let's ask him

19   that.

20        MR. CALLAHAN:  We're about to hear from Dr. Hoffman,

21   but I don't believe that's the case, your Honor.

22        THE COURT:  Because what might make the most sense

23   is -- well, I don't know if Dr. Hoffman -- it might inform his

24   decision if we hear Dr. Channell first and let Dr. Hoffman hear

25   that.  I've often been worried that Department of Mental Health

```
 1    doesn't take our people, if you will, because that's supposed
 2    to be the first line of care, but maybe he didn't have full
 3    information.
 4            MR. SHEA:  I know that he, in the transcript you
 5    haven't had a chance to see -- and I apologize for that -- he
 6    certainly says he has a different opinion and a different
 7    diagnosis than Dr. Channell, and I know that he reviewed some
 8    of the BOP documents because those were sent to him by
 9    Mr. Mahoney, and I think he also had access to some, I believe,
10    because he went up to Devens to interview Mr. Mahoney.
11            MR. MAHONEY:  He did an evaluation.
12            THE COURT:  Well, how do you want to proceed?
13            MR. SHEA:  Well, I guess it would get to one of the
14    issues that the government and I have in terms of burden of
15    proof.
16            THE COURT:  You have the burden of proof.
17            MR. SHEA:  I believe the courts -- I'm not disagreeing
18    that the First Circuit, in interpreting sexually dangerous
19    person statutes, has said that we have the burden.  Of course,
20    this is somewhat different, although --
21            THE COURT:  Excuse me.  You know, let's just start
22    there because the First Circuit, whether they're right or
23    wrong, is where I go.  They're my bosses.  So we'll go with
24    that.  I'm happy to put Dr. Hoffman on now, but I think what
25    might be more useful is to put on Dr. Channell as to what those
```

1   opinions are, and then let Dr. Hoffman see if he would need

2   further consideration.  I don't know if he's got all morning.

3   I've got all morning for you.  I also have tomorrow.  I mean,

4   this is important, so I'm giving it the time to try and figure

5   it out.

6         MR. CALLAHAN:  Your Honor, if I may, just two points

7   from the government's perspective?  All the reports have been

8   provided to your Honor from Dr. Channell.  There are four risk

9   assessment reports.  Your Honor has gotten those as they've

10  been issued by the Bureau of Prisons over the last three years.

11  We have provided extra copies of those in that binder in

12  addition to exhibits that we thought we might need to use here,

13  but all the reports have been submitted to the Court, number

14  one.

15        Number two, as far as Dr. Hoffman being able to listen

16  to Dr. Channell, we don't think that would be appropriate at

17  this point.  It is their burden.  They ought to go first.  When

18  you talk about incomplete information, that is an issue the

19  government has with Dr. Hoffman's opinion, which is what

20  they're relying on.

21        THE COURT:  Well, can I tell you, just beyond on all

22  that, am I right in remembering the statute, that we're

23  supposed to first ask the state if they're willing to provide

24  services, and only then do we go to the federal government?

25  And I've done that seriously in a bunch of my civil commitment

1    proceedings, both the sex offenders and for mental health, and

2    I don't ever remember them taking anyone, and I don't

3    understand why that is.  We commit them, and then they don't

4    take them in the state.  So I would like to know.  Maybe they

5    don't get complete information.

6         MR. CALLAHAN:  And, your Honor, I mean, that may be a

7    question that you can ask Dr. Hoffman when he's on, but

8    Dr. Hoffman looked at -- this is the sum total of what he

9    looked at when he made his decision.

10        THE COURT:  Can I just say something?  I'm trying to

11   do justice here.

12        MR. CALLAHAN:  Understood.

13        THE COURT:  And not game-playing.  It's possible that

14   he would come to a different conclusion if he read that last

15   report of Dr. Channell.  I'm not here to play gamesmanship.  I

16   don't know if he saw that last report.  I don't know whether he

17   saw all the four reports.  I don't know what he has seen.

18        So perhaps you know that.  Do you know that, Mr. Shea?

19        MR. SHEA:  I don't know that, meaning I don't -- I

20   believe he hasn't read the last reports, for sure.  I don't

21   know what he had read before appearing at the fair hearing.

22   I've discerned some things that he read based on his testimony.

23        THE COURT:  Well, why don't we --

24        MR. CALLAHAN:  Could I make one suggestion, your

25   Honor?

 1           THE COURT:  Yes.

 2           MR. CALLAHAN:  And the only reason I say this is

 3   because to put Dr. Channell up there and then to have

 4   Dr. Hoffman come up with his own new additional views that

 5   we've never had notice of before --

 6           THE COURT:  Well, I've never had notice of anything.

 7   I was two days ago calling everybody, is there a Hoffman

 8   report?  I've been trying to find a report by the defendant --

 9   I'm sorry, I keep calling you that and that's wrong -- by

10   Mr. Mahoney.  I've been trying to find what Mr. Shea was

11   relying on, and I think I just got it this morning, so I don't

12   even know what his views are.

13           So why don't we do this:  We'll call up Dr. Hoffman,

14   and then we may have to call him back if he hasn't seen all the

15   relevant information.  We may take a break and give him all the

16   relevant information and then see what his opinion is.

17           MR. SHEA:  That's fine.

18           THE COURT:  Okay, let's call him up.  Let's go.

19           MR. SHEA:  Can I make two just legal points before?

20           THE COURT:  Yes.

21           MR. SHEA:  I'll try and be quick.  I hear you're

22   following the First Circuit.  I won't make argument on my point

23   here, but I just want to object to the burden being on the

24   defendant.  I can make a record on it some other --

25           THE COURT:  It would have been useful to have briefed

1   the point because standard -- I think it's *Wetmore* -- says that

2   the person who has been civilly committed bears the burden of

3   showing he's no longer dangerous.  But, regardless, I'm not

4   going to hang this thing on a burden of proof.  I am trying to

5   figure out what's going on here because I got the first

6   government report which suggested he could be discharged with

7   conditions, and the second one was really troubling.  And then

8   I hear Mr. Hoffman, which was amazing to me because I thought

9   there was no clearer case of someone with a serious mental

10  disease or defect, saying that he didn't have one.  So I was

11  astounded actually, but he maybe didn't have the information.

12  So let's call him up.  Let's go.

13          MR. SHEA:  Okay, Dr. Hoffman.

14                  DAVID L. HOFFMAN, M.D.

15  having been first duly sworn, was examined and testified as

16  follows:

17  DIRECT EXAMINATION BY MR. SHEA:

18  Q.   Good morning, Dr. Hoffman.  Could you please state your

19  name for the record, spelling your last name.

20  A.   David Lloyd Hoffman, H-o-f-f-m-a-n.

21  Q.   And where are you employed, sir?

22  A.   Department of Mental Health, Commonwealth of

23  Massachusetts.

24  Q.   And in what capacity are you employed there?

25  A.   I'm the medical director for the Metro Boston area of the

1    Department of Mental Health.

2    Q.   And are you a psychiatrist?

3    A.   Yes.

4    Q.   And what training do you have in psychiatry?

5    A.   I completed a residency.  I'm a board-certified

6    psychiatrist.

7    Q.   And how long have you been a practicing psychiatrist?

8    A.   About 29 years.

9            THE COURT:  So where did you go to med school?

10           THE WITNESS:  Boston University.

11           THE COURT:  And did you come right out and practice

12   psychiatry?

13           THE WITNESS:  No.  I did a residency at Harvard

14   Medical School, Massachusetts Mental Health Center.

15           THE COURT:  But always in mental health?

16           THE WITNESS:  Yes.

17           THE COURT:  Yes, mental health.  Okay, and did you

18   have a private practice?

19           THE WITNESS:  Well, my capacity here is with DMH.  I

20   was subpoenaed.  I'm not an expert today.  I'm just --

21           THE COURT:  I just want to hear your opinion.  Have

22   you been a practicing psychiatrist?

23           THE WITNESS:  Yes.  I've treated patients, I've

24   treated inpatients, outpatients; was the medical director of a

25   state hospital, two state hospitals; and now I oversee several

1    hospitals, outpatient clinics, et cetera, in the Boston area.

2           THE COURT:  All right, thank you.

3    Q.   Where were you the medical director?  Which state

4    hospitals?

5    A.   They're all closed now.  Medfield State Hospital, Quincy

6    Mental Health Center.

7    Q.   Okay, thank you.  Part of your responsibilities is to

8    determine eligibility for DMH services?

9    A.   We now call it "service authorization criteria," but, yes,

10   that is one of my responsibilities.

11   Q.   Okay, meaning you review applications for people who apply

12   for services from DMH?

13   A.   Correct.

14   Q.   Okay.  And fair to say that Brian Mahoney did such an

15   application?

16   A.   Yes.  It was unusual because I got a letter referencing

17   this *Ecker* case.  It wasn't a usual application, and I didn't

18   know anything about that.  I had to speak with the chief

19   counsel for DMH about what that was about.  But, I mean,

20   ultimately, you know, *Ecker* aside, it came down to my

21   determining whether he met the clinical criteria for DMH

22   services.

23   Q.   Okay.  And in making that decision, what did you review

24   to start out?  I know eventually you interviewed Mr. Mahoney,

25   correct?

1    A.   Yes.

2    Q.   But that was after your initial determination; is that

3    fair to say?

4    A.   That is correct.

5         THE COURT:  And what did you initially rely on?

6         THE WITNESS:  A lot of records from his time at

7    Devens, reports including a report from 2014, I believe,

8    from -- Dr. Channell, Dr. Tillbrook, and Dr. Kissin all signed

9    the report; various notes, including assessments by a Jonathan

10   Gorham.  That was from 2016.  I mean, there's a lot more

11   material, you know, a lot of notes from the Bureau of Prisons,

12   sort of ongoing mental status assessments during his time

13   there.

14        THE COURT:  So you had open access to everything that

15   Devens had up until 2014?

16        THE WITNESS:  Yes.

17   Q.   Was it beyond --

18   A.   And beyond 2014, but the report was a 2014 report.

19   Q.   So you reviewed those records, and you wrote a two-page

20   letter, is that fair to say, meaning you made a determination

21   of whether --

22   A.   There was an initial determination.  It's sort of a

23   tripartite process.  There's an initial application that goes

24   to the clinicians at the Service Authorization Unit.  They

25   review them.  Sometimes they talk to me, but I don't do a

1    formal, full assessment.  They felt he did not meet the

2    criteria.  Then there was an appeal to me.  Then I review

3    everything on paper; occasionally in person, but usually it's a

4    paper process.  At that point I wrote that two-page letter

5    summarizing my conclusions based on what I had read.  At that

6    point there was the request for the fair hearing.  That's when

7    I went, reviewed some additional records that were available

8    since the process had begun, and interviewed Mr. Mahoney in

9    person.

10   Q.   Okay.  And where did you interview Mr. Mahoney?

11   A.   At the Devens Medical Center, or whatever exactly it's

12   called.

13   Q.   Okay.  And then eventually did you have a hearing up at

14   Devens?

15   A.   Yes, we had a hearing.  A fair hearing is what it's called

16   with a hearing officer, Mr. Mahoney, the DMH attorney, myself,

17   and that -- I forget the exact date, but that happened maybe

18   six months ago or something.

19   Q.   Okay.  September 28 sound about right?

20   A.   Yes.

21            THE COURT:  Of 2016?

22            MR. SHEA:  2016, yes.

23            THE COURT:  Is the hearing?  So do you think, to your

24   knowledge, you had all the records up until September 28, 2016?

25            THE WITNESS:  To my knowledge, but I don't know if

1    anything existed from the time I went out there and did my

2    face-to-face till the time, except for a couple of

3    communications.  I think Mr. Mahoney sent me some outpatient

4    records at some point.  I don't know if that was before or

5    after I did my face-to-face assessment.

6              THE COURT:  So you didn't see either of the November

7    assessments?

8              THE WITNESS:  This November?

9              THE COURT:  Yes, November, 2016.

10             THE WITNESS:  No.  That was after the process had been

11   completed.

12   Q.   Now, that hearing we just referenced, was that part of the

13   tripartite process?

14   A.   Yes.  That's the last part of it.

15   Q.   Okay.  Now, part of what you're looking for, is it fair to

16   say, you're in the second and third phase, meaning that your

17   letter is kind of the second of the two parts, correct?

18   A.   Yes.

19   Q.   And the third part was the hearing.  Both of those areas,

20   you're looking for a qualifying diagnosis; is that fair to say?

21   A.   There are three things that we ultimately look for.  The

22   first is a qualifying diagnosis.  The second is a level of

23   severity, and then that severity has to be primarily as a

24   result, a direct result of the primary diagnosis.  So, you

25   know, just for example, if someone had a primary problem

```
 1    because of a head injury or a personality disorder and also had
 2    an anxiety disorder, but clearly what was causing them to have
 3    their major functional impairments in life was due to that
 4    other stuff, even if they had an anxiety disorder, which in
 5    theory is a qualifying diagnosis, they would not be found to
 6    meet the service criteria.
 7    Q.   And then the second criteria kind of is if DMH offers the
 8    appropriate services?
 9    A.   If we have an appropriate service available for a person
10    who meets the other criteria.
11    Q.   Okay, so --
12         THE COURT:  When you talk about appropriate services,
13    is that everything from outpatient treatment to inpatient
14    treatment?  What are you talking about?
15         THE WITNESS:  Well, I mean, actually, since the
16    Governor Weld era, DMH is not really an outpatient provider.
17    They provide case management, but anything that's payable
18    through third-party insurance like Medicaid, including acute
19    hospitalization, outpatient psychotherapy, outpatient
20    psychopharmacology, is not any longer a DMH service.  We
21    provide long-term state hospitalization, which is not acute.
22    We provide residential placement for some people who really
23    have very severe disabilities, case management, a limited
24    number of day programs.  I believe the service he was initially
25    requesting was inpatient state hospitalization.
```

1           THE COURT:  And would that be a covered service?

2           THE WITNESS:  That would be a covered service if it

3    were necessary.

4    Q.   And when you saw Mr. Mahoney, he's at an inpatient medical

5    center, correct?  Is that fair to say?

6    A.   Uhm, well, it felt very much like a forensic medical

7    center, but it was at Devens, yes.

8    Q.   Okay, meaning it was locked?  There was security, right?

9    A.   Yes.

10   Q.   In fact, it was somewhat difficult to set up the hearing

11   at different points, right, because of different restrictions

12   the facility had, correct?

13   A.   Something about a tape recorder access, but --

14   Q.   Yes.  But the point is, so when you're saying Mr. Mahoney

15   was requesting inpatient services, there's a certain logic, in

16   that he found himself in a locked inpatient setting within the

17   federal system, correct?

18   A.   Correct.

19   Q.   Okay.  Now, one of the other things you did in your

20   evaluation was, you had a conversation with a Ms. Finch-Hall,

21   correct?

22   A.   Correct.

23   Q.   Okay.  And she was a social worker at Devens?

24   A.   That's my understanding.

25   Q.   Okay.  And your conversation with her didn't change your

1  opinion regarding Mr. Mahoney's diagnosis, correct?

2  A.    No.

3  Q.    And you eventually determined that Mr. Mahoney didn't meet

4  the requirements for DMH services, correct?

5  A.    Correct.

6  Q.    And that was based on kind of the phase one of a

7  qualifying diagnosis; is that fair to say?

8  A.    I -- I think it really -- it's partly qualifying

9  diagnosis.  It was really more primary diagnosis.  Once again,

10  you know, as one of the notes here summarizes, I believe, by

11  Jonathan Gorham, Mr. Mahoney has had -- and this is very often

12  the case -- you know, at least a dozen or more diagnoses in the

13  course of his interaction with the judicial and mental health

14  system, and that's not unusual at all.  So, you know,

15  reasonable people can disagree.  Someone might say this is

16  bipolar; someone might say it's not.  For me, what was more

17  important is really the level of impairment primarily due to a

18  qualifying diagnosis, and, you know, that was really the basis

19  of my decision, which I think was summarized in the transcript.

20  I'm happy to, you know, review that if you would like.

21  Q.    Well, so that you say he didn't qualify under a primary

22  diagnosis because -- and I'm summarizing here -- there had been

23  around a dozen different opinions as to his primary diagnosis.

24  Is that a fair summation?

25  A.    That's not why.  I mean, my opinion was that -- I mean,

1   there was mood lability.  There was impulsivity.  There was

2   agitation at times, very reactive agitation.  The documentation

3   of a sustained period of what we would define as mania was

4   really not present, although Mr. Mahoney has sort of a very

5   pressured, agitated personality style, which some people might

6   say seems hypomanic.  But, I mean, he has attention deficit

7   disorder as a diagnosis.  He has a significant head injury with

8   loss of consciousness for over 24 hours; has a diagnosis, clear

9   history of multiple antisocial behaviors; and, in my opinion,

10  also significant narcissistic personality disorder, which I

11  believe are the primary causes of the functional impairments he

12  has experienced in his life, as opposed to a Bipolar II

13  disorder, which I am not convinced exists, but even if it did,

14  I still would have found that he did not meet the criteria

15  because I feel that the primary causes of the functional

16  impairments he has are those other factors which I just

17  outlined.

18  Q.   Okay, so let me take you through a couple of those, see if

19  we can --

20          THE COURT:  Well, can I just say, as I'm reading the

21  first report, Devens thinks he has Bipolar I disorder.

22          THE WITNESS:  Right, I saw that.

23          THE COURT:  So you disagree with that?

24          THE WITNESS:  Based on my review of the records, I do

25  disagree with that.

1          THE COURT:  All right, so when you have a situation

2     where a psychiatrist who's been treating him for a long time

3     comes up with a diagnosis and it's been adopted by a trial

4     court and an appellate court, what weight does that take in

5     your mind?

6          THE WITNESS:  What I'm looking for is some

7     documentation, a medical record that there was a true manic

8     episode, and I never saw that.  So all that other stuff is of

9     secondary importance to me.  I'm looking for documentation.  He

10    was being observed all the time.  If someone documented that

11    there was true mania on an ongoing basis for at least a week

12    and that was in the medical record, that would be very

13    significant; but just seeing a diagnosis written down without

14    that clinical support, which could be nurse's notes, could be

15    correctional officer notes, but something that really documents

16    that that is indeed what was happening.

17         MR. SHEA:  I think I'll get to where you want to be,

18    Judge.

19         THE COURT:  Okay, but your problem with me is, I

20    haven't had time to read the hearing, so I don't actually even

21    know what his opinion is, so you have to take me through baby

22    steps.

23         MR. SHEA:  I'll try and do that.  If I'm failing at

24    that, you can --

25         THE COURT:  No, I'm just saying, I don't even know

 1    what his opinion is.

 2              MR. SHEA:  Well, I'll try and get us there.

 3              THE COURT:  Okay.

 4              MR. SHEA:  And if I'm leaving you confused, jump in.

 5              THE COURT:  All right, go ahead.

 6    Q.   So you mentioned primary diagnosis, and you had mentioned,

 7    say, antisocial personality disorder, I believe, correct, as

 8    one of the things?

 9    A.   I mentioned, yes.

10    Q.   Did you reach a conclusion as to what your primary

11    diagnosis was of Mr. Mahoney?

12    A.   I don't think that's the right question.  Like I just said

13    before, you have attention deficit disorder.  You have a severe

14    head injury with loss of consciousness.  You have antisocial

15    personality disorder.  You have narcissistic personality

16    disorder, possible Bipolar II.  You know, there is mention of

17    anxiety disorder --

18              THE COURT:  When you say Bipolar II, does that mean

19    bipolar --

20              THE COURT:  Bipolar II is a milder form of bipolar

21    disorder where you don't have frank mania.  You have a less

22    intense type of mania called "hypomania."  It's not as serious.

23    In and of itself, it would rarely cause someone to be severely

24    impaired to need DMH services, unless, Bipolar II disorder

25    actually you could have very, very severe depressions because

1   depression comes with Bipolar Disorder II.  Depression in

2   Bipolar II disorder could be severely disabling, but that

3   wasn't -- is this water?

4           THE COURT:  Yes, go for it.  But -- but hold on.  Too

5   many people end up with a lap full of water, so be very

6   careful.  Keep it --

7           THE WITNESS:  Better a lap full of water than a lap

8   full of Coca-Cola.

9           THE COURT:  All right, there we go.

10  Q.   So when asked about primary diagnosis, you listed a few

11  different things, so I want to just take you through those.  So

12  is it fair to say that ADHD would not be a diagnosis that would

13  lead to someone receiving DMH services?

14  A.   Not as an adult.

15  Q.   Okay.  Antisocial personality disorder?

16  A.   No.

17  Q.   Okay, head injury?

18  A.   No.

19  Q.   Was there one other that you listed?

20  A.   Narcissistic personality disorder.

21  Q.   Narcissistic personality disorder?

22  A.   No, no.

23  Q.   Okay.  And those, besides Bipolar II which you just

24  described, those are things that you came up with in a

25  grouping, I guess, as somewhat your primary diagnosis of

1   Mr. Mahoney; is that fair to say?

2   A.   Well, you know, once again, diagnosis is often very

3   pigeonholing.  He's a complex individual.  I should say as an

4   aside, that diagnosis has nothing to do with dangerousness or

5   commitability.  You know, that's a whole other issue.  But

6   diagnosis is messy.  He has all of these different elements

7   based on his history, and, you know, to say, "Well, this is the

8   one that really is impairing as opposed to this," it's really a

9   combination of all of those issues that's led him to, you know,

10  the situation he finds himself in.

11  Q.   But if you had found that the primary diagnosis, the

12  primary mental health problem that he had was Bipolar I, he

13  would have qualified for DMH services, correct?

14  A.   Possibly.  Let me just point out, DMH has 24,000 clients

15  in Massachusetts, and that's all diagnoses:  schizophrenia,

16  bipolar disorder, schizoaffective disorder.  In the general

17  population, one percent of all people have schizophrenia.  One

18  percent of all people have bipolar disorder.  If we round off

19  and say Massachusetts has 7 million people, that means that

20  just among people with bipolar disorder and schizophrenia, in

21  Massachusetts we have 140,000 individuals.  24,000 people, some

22  of whom have different diagnoses, receive DMH services, the

23  point being that a lot of people with these diagnoses are able

24  to manage their illnesses, get treatment with a psychiatrist,

25  with a therapist, without needing DMH services.  DMH services

1    are for people whose illness is so severe, regardless of the

2    diagnosis, that they need these additional services, like

3    chronic hospitalization, like intensive residential services

4    that they could not receive elsewhere.

5    Q.   Do you recall testifying at the hearing before the hearing

6    officer up at Devens that Mr. Mahoney certainly did not suffer

7    from Bipolar I disorder?

8    A.   If that's what it says in the transcript, then I said

9    that.  I certainly found no evidence in my review of the

10   records and in my additional and subsequent contact with

11   Mr. Mahoney that was indicative of a Bipolar I disorder.

12   Q.   Okay.  Now, please explain for the Court why -- why don't

13   we start with, how do you go about assessing if someone has

14   Bipolar I disorder?

15   A.   Usually, you know, in my situation, since I'm not working

16   on an acute psychiatric unit where someone was just admitted

17   off the streets in a full-blown manic episode, I'm usually not

18   seeing people when they're symptomatic, which is a

19   disadvantage.  That's why, as I was saying before, I have to

20   rely on the medical record.  And I review a lot of these

21   applications, and I'm looking for documentation, either at the

22   beginning of an acute hospitalization or later on, or by an

23   outpatient treater that has longitudinal experience that

24   clearly documents that the diagnostic criteria for whatever

25   disorder I'm being presented with in fact exists.  And I can't,

1   you know, I can't just assume because I see a diagnosis in some

2   record, which often follows someone then for the next

3   20 years, that that diagnosis actually exists unless I see,

4   yes, the patient was hospitalized; they slept two hours a night

5   for the first two weeks of hospitalization; they finally

6   started taking medicine and they started to calm down; they

7   weren't screaming anymore; they weren't agitated.  You know,

8   whatever it is, that would rule in a bipolar diagnosis.  But

9   just seeing it in a record without any supporting material that

10  someone thinks that diagnosis exists when I'm not -- you know,

11  I'm walking in when someone's not symptomatic usually, you

12  know, what else do I have to go on?

13  Q.   I'm not asking that.  What I'm asking is, what are you

14  looking for?  When you're determining -- when you reach an

15  opinion and you're willing to testify under oath that he

16  doesn't have Bipolar I disorder and you disagree with

17  Dr. Channell, you've made that assessment based on some

18  criteria of what you think you should be finding to diagnose

19  Bipolar I.

20  A.   Right.  So, I mean, first of all, I'm saying, in my

21  opinion, I see no evidence in the record or in my examination,

22  which is a tiny slice of time, that there's a bipolar disorder.

23  So I'm looking for, you know, a period of at least a week with

24  clearly elevated mood, goal-directed activity, grandiosity, a

25  mood-congruent psychosis; you know, I mean, basically the

1    laundry list in the DSM.

2    Q.   Well, why don't you, because we're just lay people here,

3    why don't you take us through what you're looking for based on

4    what the DSM tells you.

5           THE COURT:  So we all agree that the DSM is at least a

6    starting point?

7           THE WITNESS:  It is a starting point.  And, you know,

8    I don't have the whole thing committed to memory, but the

9    things I was just saying about a period of at least a week --

10          THE COURT:  Does it say that in the DSM?

11          THE WITNESS:  Yes.

12          THE COURT:  One week.

13   Q.   The other thing I noticed just from your testimony was,

14   you referenced sleep and that Mr. Mahoney wasn't having any

15   problems with sleep.  Why is that significant on bipolar?

16   A.   Well, during a manic episode, not a depressive episode,

17   it's extremely rare, if ever, that someone is going to be

18   sleeping, as he reported, up to twelve hours a day when you're

19   having a manic episode.  But, once again, the fact that he

20   wasn't having a manic episode when I evaluated him is almost

21   neither here nor there.  It certainly means he wasn't manic at

22   that point.  There were no reports of long periods where he was

23   sleeping for a short time.  When I saw him, he was sleeping

24   twelve hours a day.  There's nothing in the record that he was

25   having extended periods where he didn't need much sleep at all.

1    That's an important symptom present during a manic episode.

2    Q.    All right.  Well, let's break it down then.  In the

3    records that you reviewed, did you see a problem with sleep?

4    A.    No.

5    Q.    Okay.  In the records that you reviewed, did you see the

6    kind of manic, clearly elevated mood going on for days?

7    A.    What I saw, which, as I sort of indicated earlier, some

8    people might look at as a manic symptom, was periods of

9    agitation, reactivity, anger, raised voice, pressured speech.

10   And then, you know, there are references to psychosis, and, you

11   know, my take on that is that, you know, he has this obsession

12   which I think is -- you know, it's based on his personality

13   structure, his narcissism, the idea that he has been somehow

14   falsely convicted of a sexual crime, very distressing, and he

15   is, you know, focused obsessively on that as an injustice and a

16   narcissistic injury for a long time.  And some people might

17   say, well, that rises to the level of psychosis, it's just so

18   crazy the way he goes on about that.  But that's not

19   necessarily a psychosis, but that's something else that was in

20   the record that, you know, I don't see as a true psychosis; I

21   see, you know, as a distortion, a narcissistic obsession,

22   which, you know, has made his life a lot more difficult than it

23   needs to be.

24   Q.    Okay.  And, similarly, for instance, this case, meaning

25   his commitment as having Bipolar I and being held at Medical

1    Center Devens, that's one of the things he kind of obsesses on,

2    is that fair to say, meaning he gets agitated about and thinks

3    about, right?  Correct?

4    A.    Yes.  That's my understanding.

5    Q.    And that's one of the things that he could actually be --

6    that people have at times chocked up to mania, but your view is

7    that it's not necessarily psychotic or manic so much as a way

8    that he -- his narcissistic personality disorder or antisocial

9    personality disorder?

10   A.    Well, you know, and fueled by his attention deficit

11   disorder.  And, once again, there's just an unknown.  When you

12   take a 50-foot fall and have a head injury and lose

13   consciousness for -- I've read anywhere between 24 and 72

14   hours -- the second sequelae to that type of an injury

15   certainly might be playing a role.  I just can't say for sure.

16   Q.    And is it fair to say that sometimes -- I believe you

17   testified also that at times he's agitated due to environmental

18   factors.  Can you spell that out a little more.

19   A.    Well, my understanding is that, you know, there are

20   confrontations with other inmates/patients at Devens, which,

21   you know, I mean, altercations in those types of settings are

22   not uncommon.  And also the social worker pointed out that

23   often for a week or two before a hearing, he'll tend to get

24   more agitated, which, you know, is not that unusual either

25   because, you know, there's a lot at stake when he has a

1    hearing, or, you know, is having a dangerousness assessment or

2    something like that.

3    Q.   And is it fair to say that if you feel that an injustice

4    is being visited on you, meaning as part of your illness, and

5    you're locked away in a place that daily reminds you of that

6    injustice, it's likely to play into your illness?

7    A.   Uhm, it's certainly -- certainly possible.

8    Q.   So you ruled out Bipolar I.  You've mentioned Bipolar II,

9    though you've said, I believe, that you're not even certain

10   that he has Bipolar II.  Let me just break this down.  On

11   Bipolar II, if that were his primary diagnosis, would he

12   qualify for DMH services?

13   A.   No, unless, like I said before, there was a psychotic

14   depression that was totally debilitating, but the hypomania of

15   Bipolar II, which is treatable and episodic, is not of

16   sufficient severity that DMH services are provided.  I'm not

17   saying never, but, I mean, that would be incredibly unusual.

18   Q.   And in his decision, Hearing Officer Gervasi said that

19   "After meeting with BEM," meaning Brian Mahoney, "Dr. Hoffman

20   expressed doubts that Mahoney even meets the criteria for

21   Bipolar II disorder."  Is that a fair summation, his sentence?

22   A.   Yes.

23   Q.   And why after meeting with Mr. Mahoney did you have doubts

24   that he even met the criteria for Bipolar II?

25   A.   Well, first of all, no evidence documented.  We've talked

1    about that before.  Secondly, it's just my impression that it

2    really is, you know, ADHD and his complex personality style

3    that is responsible for, you know, his style of thinking,

4    relating, and behaving.

5    Q.   Okay.

6    A.   It's not an episodic thing the way a bipolar thing is.

7    It's environmentally triggered.  And, yes, there are periods

8    where all of a sudden there's, you know, an inmate that sets

9    him off or there's a hearing coming up that agitates him, but

10   it's not the type of episodic pattern which is typical of a

11   bipolar disorder.

12          THE COURT:  So you would say not even Bipolar II?

13          THE WITNESS:  Uhm, I wouldn't say definitely not, but

14   I'm not convinced -- I haven't seen documentation that I would

15   feel rules it in definitively.

16          THE COURT:  Well, is it more likely true than not

17   true?  In other words, it doesn't have to be --

18          THE WITNESS:  I would say more likely not true than

19   true because I think it's really the ADHD personality disorders

20   that are more --

21          THE COURT:  So you say it's likely that he doesn't

22   have Bipolar II?

23          THE WITNESS:  That's what I'm saying, yes.  Once

24   again, I mean, that has nothing to do with dangerousness or

25   commitability.  That has to do with my evaluation for DMH

1    service authorization.

2    Q.   So in the records you reviewed from Devens, what were you

3    looking for, in terms of either sleep or manic episodes,

4    elevated mood, what are you looking for in the records that you

5    didn't find that led you to these conclusions?

6    A.   Well, first of all, I found material that described things

7    consistent with ADHD and the personality issues, so I did find

8    that.  What I didn't find -- I think we've discussed this to

9    some extent -- is, you know, the discrete episodes of elevated

10   mood, grandiosity, more goal-directed behavior.  Did I say

11   decreased need for sleep?  I mean, we've been over that.  I

12   mean, all of those things happening for a week or for two weeks

13   at some level or other in a way that would be more typical of a

14   manic or hypomanic episode, as opposed to just reactive

15   behavior in someone who's always -- you know, has a very

16   sensitive trigger and, you know, tends to react in anger.

17   Q.   Okay.  What would you say if someone were to posit that

18   records you're reviewing, Mr. Mahoney is medicated, and often

19   he's medicated for bipolar, so he's on a medication that's

20   supposed to deal with his bipolar disorder, would that explain

21   completely why you're not seeing any of these symptoms?

22   A.   You know, that's another problem I run into very often,

23   and sometimes you just can never find -- you know, someone has

24   a manic episode when they're 19 years old.  They're put on

25   lithium, and they never have one again.  And, you know, if you

1    get documentation of that first episode, that's great, you

2    know, and then you just assume that their illness is under

3    control.  And hopefully the medicine will continue to work and

4    the person will continue to take the medicine.  Sometimes, you

5    know, we don't have that documentation.  But if someone's

6    faithfully taken lithium for 20 years and there's a history of

7    a hospitalization, you know, that will often suffice.

8         But as far as DMH services are concerned, you know,

9    going back to the 140,000 people with schizophrenia and

10   bipolar, if you have a bipolar disorder and you're taking

11   lithium or some other mood stabilizer and your symptoms are in

12   remission, you don't need DMH services.  You don't have an

13   illness of enough severity to require DMH services.

14        THE COURT:  What if you had somebody who had a history

15   of noncompliance with his medications?

16        THE WITNESS:  If you have a history of noncompliance

17   and relapses that really get the person into a lot of

18   difficulty or create dangerousness, absolutely.

19        THE COURT:  Then that would call for your services?

20        THE WITNESS:  Yes.  If you have a clear bipolar or

21   schizophrenic disorder, nonadherence to medication with

22   relapses involving danger to self or others, then that is a

23   qualifying situation.

24        THE COURT:  So if you had a combination of disorders,

25   whether it's Bipolar I or Bipolar II, together with these other

1    things and it made you dangerous, and you were noncompliant

2    with medications, would that qualify you for services?

3              THE WITNESS:  It's -- I mean, it's -- it's always a

4    case-by-case thing.  I mean, the other thing which often comes

5    up is substance use in the community.  My understanding is,

6    Mr. Mahoney is in institutional remission; but some people, you

7    know, the problem is, when they are not in the hospital, they

8    start abusing substances.  Then they stop their medications,

9    and then there are big problems.  And, you know, there it's

10   hard for us to ferret it out.  If someone clearly has a

11   documented history of schizophrenia and they're still in

12   trouble with substances in the community, we tend to provide

13   them with services.  With mood disorders like bipolar

14   disorders, it's harder to make that decision, you know, in

15   terms of what is really the primary problem, the substance

16   abuse or the mood disorder, and so you really have to look at

17   it on a case-to-case basis.  It's hard to generalize.

18   Q.   But if someone who had Bipolar I or Bipolar II was

19   noncompliant with their medication, is it fair to say you would

20   expect to see the illness show itself?

21   A.   Statistically, most people within, you know, three months

22   to three years of stopping medication will relapse.

23   Q.   Okay.  Did you see any signs in the records you reviewed

24   of Mr. Mahoney being non-medication-compliant and it resulting

25   in signs that he had Bipolar I or Bipolar II?

1   A.   There were references to times when medication was not

2   used or when mood stabilizers were not used, and that was also

3   true in the outpatient record, without a clear consequence of a

4   manic relapse.

5   Q.   Right.  So that there was nothing, meaning when he wasn't

6   medication-compliant, there wasn't anything that showed this

7   mania that you look for, correct?

8   A.   There was no clear A-to-B line:  He stopped the

9   medication, the mood stabilizing medication, and shortly

10  thereafter there were symptoms of mania.

11  Q.   Now, I think when you were testifying in response to the

12  Judge's questions, you were saying, you know, someone has been

13  in the community and you look at a documented history, say -- I

14  think you referenced an example of, say, someone being 19 and

15  there was clear signs of their schizophrenia, for instance.  As

16  specifically to Mr. Mahoney, did you see any documentation,

17  from his past, from his youth, that would lead you to believe

18  that he was either Bipolar I or Bipolar II?

19  A.   No.

20           THE COURT:  Did you have a chance to read the defense

21  expert, Dr. Kriegman's report in my last hearing?

22           THE WITNESS:  Dr. Kriegman?

23           MR. SHEA:  No, he hasn't.  At least he hasn't been

24  provided with that because he's not a defense expert.

25           THE COURT:  Who was he?  Wasn't he your expert?

1              MR. SHEA:  Oh, no.  Kriegman was Mr. Schneider's

2      expert.

3              MR. CALLAHAN:  Kriegman was Mr. Mahoney's expert when

4      Mr. Schneider was the attorney.

5              MR. SHEA:  When Mr. Schneider was representing him,

6      yes.

7              THE COURT:  Yes, but it was Mr. Mahoney's expert.  I

8      just don't know whether you had a chance to read that report,

9      Dr. Kriegman's.

10             MR. SHEA:  I'm just trying to say that because I'm not

11     employing Dr. Hoffman, I didn't --

12             THE COURT:  You didn't give him all this stuff.  I'm

13     just trying to understand the limits of what he's seen.  Have

14     you seen Dr. Mart's report?

15             MR. SHEA:  That's the government.  I don't believe so.

16             THE COURT:  All right, okay.  So you have a limited --

17     you basically just reviewed what was in the Devens file?

18             THE WITNESS:  Correct, and a little outpatient stuff

19     that I got later on through Mr. Mahoney.

20     Q.   Now, this question can sound insulting, but I think it's

21     one of the things that is present in this case.  Is part of

22     your job at DMH to limit the number of people who get services?

23     A.   No.  Not that we have enough services to go around, but, I

24     mean, it's not like we have, you know, marching orders.  I

25     mean, our regulations are pretty straightforward.  You can read

1    our service authorization.  And it's not like, oh, this week

2    we'd better not find anyone eligible because we don't -- I

3    mean, it doesn't work that way at all.

4    Q.   Was there any discussion by anyone about the idea that,

5    "Hey, Mr. Mahoney is in Devens.  He's getting services from the

6    fed.  We don't want the state to have to pick up the tab"?

7    A.   No, but I will say this, because we do get cases where

8    people are receiving appropriate treatment in various

9    institutions, and people want to transfer them from one state

10   to another or from federal to state or whatever, and, you know,

11   that's not my role.  My role is to find whether they meet the

12   criteria or not.

13            THE COURT:  Have you ever taken anyone from the

14   federal when they've been civilly committed?

15            THE WITNESS:  We certainly have.  We more often do it

16   through stepdown into a residential program, not transfer from

17   hospital to hospital.

18            THE COURT:  I know we've tried before for people who

19   everyone agrees they're mentally ill, and typically it's

20   declined, and we keep them in the federal institution.

21            THE WITNESS:  I mean, I work with a federal probation

22   officer named Jeff Smith.

23            THE COURT:  Yes.

24            THE WITNESS:  And what we work on is, when someone

25   comes out of federal custody into the community, providing them

1    with services then.

2         THE COURT:  So let's say at some point Fort Devens

3    decides, takes the position and I accept it, I don't know, that

4    he's ready to be released, would you provide the residential?

5         THE WITNESS:  If someone met our eligibility criteria,

6    then we would determine what community needs --

7         THE COURT:  But you've already said he doesn't, so

8    does that mean that path is foreclosed?

9         THE WITNESS:  If he wanted to reapply and his

10   circumstances changed in the future, we would consider another

11   application, but for now it's closed.

12        THE COURT:  For now it's closed.

13        THE WITNESS:  Yes.

14        THE COURT:  So if I were to say, "Gee, I'm not going

15   to unconditionally discharge him, but I think he could make it

16   in the community but only if he was in a supervised residential

17   setting," you would say, "No.  I've already rejected that"?

18        THE WITNESS:  We wouldn't provide him with a

19   supervised residential setting.

20   Q.   In your review of the records from Devens, you did find --

21   I believe you referenced in your testimony that there's an 11th

22   of November, 2015, by a Diane Kilduff, signed off on by an M.D.

23   Baron Yeg (Phonetic), that Mr. Mahoney had antisocial

24   personality disorder, not bipolar, correct?

25   A.   The two are not mutually exclusive.  But, I mean, if I

 1  said that, I mean --

 2  Q.   Well, I'll give you the context, Page 53.

 3  A.   I pulled some stuff.  I just don't know if I have that

 4  one.  All right, so --

 5  Q.   Just read it to yourself.

 6  A.   To myself, all right.

 7       (Witness examining document.)

 8  A.   Okay, yeah, I can't find that.  I mean, it's probably in

 9  here somewhere, but --

10       THE COURT:  Now, what is this you've shown him?

11       MR. SHEA:  Sure.  I'm showing him Page 53 of the

12  transcript of the hearing at Devens that was held by the Mass.

13  Department of Health.

14       THE COURT:  Okay.

15  Q.   So, first, I go back to the top of 53.  You were asked,

16  "It appears to be a note written by an Allison Wilson signed

17  off by a Dr. Dangee (Phonetic), and they don't even have a

18  diagnosis of bipolar disorder at all."  And you answered, "That

19  is correct," correct?

20  A.   Yes.

21  Q.   And they had a diagnosis of antisocial personality

22  disorder, correct?

23  A.   Correct.

24  Q.   And then the one I referenced before but I'll take you

25  through, the 11th of November, 2015, Diane Kilduff, which was

1   signed off on by Dr. Baron Yeg, also had antisocial personality

2   disorder, correct?

3   A.   Correct.

4   Q.   And it's fair to say that their findings are more in line

5   with what you believe?  I know you've mentioned ADHD and head

6   injury, but their findings that it's antisocial personality as

7   opposed to something like bipolar is more in line with your own

8   findings, correct?

9   A.   Well, yes.  As I said before, you know, I'm trying not to

10  be reductive.  I think that the ADHD, the head injury, the

11  antisocial personality disorder, the narcissistic personality

12  structure all work together; but it is congruent with my

13  opinion, in that it doesn't emphasize the primacy of a bipolar

14  disorder, yes.

15  Q.   And it's clear that you testified at that hearing that you

16  disagreed with Dr. Channell about Mr. Mahoney having Bipolar I,

17  correct?

18  A.   I found no evidence in the record that would rule in that

19  diagnosis definitively.

20  Q.   Well, you were asked by Mr. Mahoney actually --

21         MR. CALLAHAN:  What page, Counsel?

22         MR. SHEA:  Page 64.  Sorry, Line 9.  Well, let's start

23  with Line 2.

24  Q.   He says "Right."  But then, "And you agree that

25  Dr. Channell did make my illness a major mental illness under

1   oath"?  And you answered, "He did."  Do you recall that?

2   A.   Make --

3   Q.   Sure, I'll let you read it.  Just read it to yourself.

4        (Witness examining transcript.)

5   A.   Got it.  It was just "under oath" referred to the other

6   doctors having made a testimony under oath.

7   Q.   Yes.  So you were asked by Mr. Mahoney --

8   A.   So I disagree with that diagnosis.

9   Q.   Yes.  And so basically Bipolar I would be a major mental

10  illness, correct?

11  A.   Yes.

12  Q.   And that you were asked, "Did you disagree with that

13  diagnosis," and you said that you did, correct?

14  A.   Uh-huh.

15  Q.   Yes?

16  A.   Well, I mean, when you say "major mental illness," I mean,

17  once again, I'm not exactly sure what you mean.  I mean, it is

18  a diagnosis that qualifies for DMH services.  These other

19  diagnoses can be very debilitating.  You know, they may not be,

20  quote, "major mental illness" depending on what you're defining

21  as major mental illness.

22  Q.   But taking someone's freedom in a civil commitment for

23  having a mental illness is a serious matter, isn't it?

24  A.   Absolutely.  And, you know, I don't know what the federal

25  criteria for civil commitment are, but in the state, we require

1    a -- the statute actually talks about impairments in various

2    functionings, but the judges in practice look for a major

3    mental illness.

4         THE COURT:  Let me just ask you, do you respect what

5    the state court -- if the state court civilly commits somebody

6    with a major mental illness, do you accept them for services?

7         THE WITNESS:  Well, if they're -- I mean, if they're

8    committed to an acute hospital like McLean, for example?

9         THE COURT:  Or one of the state hospitals.  If a state

10   judge civilly commits somebody and finds they have a major

11   mental disease or defect that creates a dangerous situation --

12   I forget the exact standard -- do you provide services?

13        THE WITNESS:  Almost invariably, but, I mean, we are

14   de facto providing services.  I mean, people get into our state

15   hospitals three ways.

16        THE COURT:  So you do for the state judges but not for

17   the federal?  Is that what's happening here?

18        THE WITNESS:  That, I mean, I'm not sure -- let me go

19   back to my point.  People get into state hospitals as opposed

20   to acute hospitals like McLean or the Arbor, they get into the

21   state hospitals like Worcester, the Shattuck, Solomon Carter

22   Fuller, one of three ways:  Either they're in an acute hospital

23   like McLean or the Arbor, and that hospital applies to us for

24   transfer, and we accept them.  And sometimes that application

25   for transfer comes along with an application for DMH services,

1    so that's number one.

2          Number two, someone comes to us on a forensic

3    admission, competency to stand trial, occasionally criminal

4    responsibility.  After 20 days, if we think they need further

5    treatment, we tell the judge, and the judge either agrees or

6    not.  But if the judge sends them back to us for further

7    treatment, most of the time they'll end up being a client, but

8    not always.  Sometimes they're restored to competency and they

9    don't become a DMH client.

10          The third is from Bridgewater State Hospital, people

11    who step down from Bridgewater State Hospital into the state

12    system.  And sometimes they're still forensic; sometimes

13    they're civil.  Sometimes they're DMH clients; sometimes

14    they're not.  When they get to us, if they're not clients, we

15    often make them clients, but not invariably.

16          THE COURT:  Because the judge has civilly committed

17    them, and you're stepping them down to Bridgewater?

18          THE WITNESS:  Right, but not everyone who's stepped

19    down from Bridgewater will end up being a DMH client, but the

20    vast majority will, and many already are before they even come

21    to us.

22          THE COURT:  I'm feeling frustrated, as you can tell.

23    If I wanted to step him down, you're not willing to be part of

24    that with residential housing?

25          THE WITNESS:  Well, first of all, I can't speak for

1    the department.  My role is the eligibility determination.  If

2    I found someone eligible, as I said earlier, and they were

3    being stepped down, which is what I do with Jeff Smith, the

4    federal probation officer, then we work out a way to provide

5    whatever services we can.

6           Now, some days we may not have a residential bed open

7    when someone's being released, but we may be able to offer

8    support in a DMH shelter or something like that.

9           THE COURT:  Even if they don't meet the criteria?

10          THE WITNESS:  No.  They have to meet the criteria.

11   Q.  Well, is your finding that Mr. Mahoney didn't meet the

12   criteria a good-faith finding on your behalf?

13   A.  Uhm, I -- it's an interesting question.  Uhm, yes, it is a

14   good-faith finding.

15   Q.  Okay.  And it's based on your years of experience, meaning

16   your training, your --

17   A.  You raise your voice at the end of a question like that?

18   Yes, it is of course based on my experience.

19          THE COURT:  Of course it is, yes.

20   Q.  All right, okay.  No, well, I mean, because -- I just want

21   to be clear.  And so you did this based on your review of his

22   records, your interview of Mr. Mahoney, and gave it a

23   good-faith-based diagnosis; is that fair?

24   A.   I have spent more time reviewing this particular

25   eligibility application than any in my entire history with the

1    Department of Mental Health.

2              MR. SHEA:  Nothing further.

3              MR. CALLAHAN:  Your Honor, we're going to be working

4    from one of the binders, which is just the DMH file, which is

5    Exhibit 135.  May I give the witness a copy of that?

6              THE COURT:  DMH file?

7              MR. CALLAHAN:  It's the Department of Mental Health

8    file that they had that Dr. Hoffman reviewed different pieces

9    of.  This is the sum total of it right here.  You issued an

10   order --

11             THE COURT:  Do I have that?

12             MR. CALLAHAN:  You have that.  It's Volume 2 of the

13   government's exhibits, Exhibits 134 and 135.

14             THE COURT:  So Volume 2 is the DMH record?

15             MR. CALLAHAN:  Right.  So I'd like to just approach

16   the witness so he can have a copy of the binder?

17             THE WITNESS:  Yes.

18             MR. CALLAHAN:  And the transcript is Exhibit 135,

19   which is there as well.

20             THE WITNESS:  That's probably a more organized version

21   of this.

22             MR. CALLAHAN:  I think so.  And just so you know, the

23   whole thing is Exhibit 134.  There are tabs breaking it up, so

24   because it's so large, if I refer to 134-6, it's going to

25   Tab 6.

1    CROSS-EXAMINATION BY MR. CALLAHAN:

2    Q.   So just following up on some of the questions that the

3    Court had, Dr. Hoffman -- and in fact if I can get the ELMO

4    turned on, Mr. Clerk -- thank you -- I think we were trying to

5    determine exactly what it was that you had looked at, correct?

6    And we'd gone back and forth, and a lot of what you said today

7    is, you know, "I didn't find any documentation of this or I

8    didn't find any documentation of that in the Devens file,"

9    correct?

10   A.   Correct.

11   Q.   So you are limited, in your opinion, in what your

12   conclusion can be based on what you saw, right?

13   A.   Yes.

14   Q.   So you didn't have all the documents, so you couldn't

15   provide a conclusion based on the entire file, correct?

16   A.   I can only base my opinion on what I reviewed and my

17   face-to-face contact and discussion with the social worker.

18   Q.   Okay.  So I'd like you to look at what is Exhibit 134.

19   I'm going to put it up on the ELMO here, Exhibit 134-20 at

20   Page 2297.  And if you look at it on the ELMO, this is a

21   list --

22   A.   I should just look at this, forget about this?

23   Q.   You can do whatever you feel more comfortable with,

24   Doctor.  So this right here, 134-20, is a list of exhibits from

25   the fair hearing, correct?

1    A.    Yes.

2    Q.    And it goes on to have Tabs 18 and 19, correct?  Do you

3    see that?

4    A.    Uh-huh.

5    Q.    And you're familiar with this list?  It's in the front of

6    your binder that you brought with you today?

7    A.    Yes.

8    Q.    And I just want to go through the timeline of exactly when

9    you received what, but the first time you met with Mr. Mahoney

10   was in the summer of 2016, right?  That was June 23, 2016, at

11   Devens?

12   A.    You know, I had to leave my phone downstairs, so I

13   couldn't call up the date exactly.

14   Q.    Okay, approximately, does the summer of 2016 sound

15   accurate?

16   A.    It was several months before the hearing, so if the

17   hearing was in September, that would make sense.

18   Q.    Okay.  And in terms of understanding what you were working

19   from, if we look here at 134-20 and we look down at 13, that's

20   the DMH adult services application that's dated February, 2016,

21   right?

22   A.    Correct.

23   Q.    Okay.  So that's the application for Mr. Mahoney where he

24   says, can I have mental health services, right?

25   A.    Correct.

1    Q.   And that's February of 2016, right?

2    A.   Yes.

3    Q.   And before that, you knew that he was going to be

4    requesting DMH services, is that right, even before that date?

5              (Witness examining document.)

6    A.   I forget, you know, offhand the date of his initial

7    correspondence.

8    Q.   Let me try to help you.  If you can turn to Tab 15, so

9    134, Tab 15, does this look familiar, November 23, 2015?

10   A.   Oh, all right, so he wrote to Walter Polesky in November,

11   right, so that would be the first time.  Then Mr. Polesky would

12   have showed this --

13   Q.   To you?

14   A.   -- to me.

15   Q.   Correct.  So these are the materials that you had before

16   Mr. Mahoney filed his application in February, 2016, correct?

17   A.   Correct.

18   Q.   So if you look at Tab 15, and there's an attachment which

19   is Tab 16, all from Exhibit 134, those are the materials that

20   you had before you received his seven-page application in

21   February, right?

22   A.   Yes.

23   Q.   Okay.  So I just want to show you, if you look over here,

24   this is about 40 pages' worth of documents, correct?

25   A.   Uh-huh.

1    Q.   There's a risk assessment report from Dr. Channell at

2    Tab 16, correct?

3    A.   Correct.

4    Q.   And then there are two months' worth of clinical contact

5    or notes, treatment notes from Devens, correct?

6    A.   Is that in Tab 16?

7    Q.   15 and 16, and you can take as long as you like to just

8    look through them.

9            (Witness examining documents.)

10   A.   Yes, uh-huh.

11   Q.   Okay.  So that's what you had before you had his

12   application?

13   A.   Correct.

14   Q.   Right?  And then you received his application which is at

15   Tab 13, and that's a seven-page application, right?

16   A.   Correct.

17   Q.   And that's what you had when you denied Mr. Mahoney his

18   mental health benefits, right?

19   A.   I don't know if I had anything more than that or not at

20   the time of the initial denial by the Department before the

21   appeals.

22   Q.   Well, before I get to that, you agree with me this is

23   about 50 pages' worth of documents, Tabs 15 and 16?

24   A.   If you count them and it's about 50, then that's how many

25   there are, yeah.

1    Q.   I may have overcounted.  What about 35?

2    A.   Yes, uh-huh.

3    Q.   And I'm just showing you this box right here.  This is the

4    Devens file.  There are 3,000 pages of documents in this file.

5    You didn't have 3,000 pages of documents when you denied

6    Mr. Mahoney's application, correct?

7    A.   I did not.

8    Q.   You had notes from the Bureau of Prisons at Devens, that

9    being two months right?

10   A.   Uh-huh.

11   Q.   And you had a seven-page application, right?

12   A.   Correct.

13   Q.   And at the time you denied him, it's also correct that you

14   hadn't met with him, right?

15   A.   That is correct.

16   Q.   Okay, so all of the questions, every question that the

17   Court asked, that Mr. Shea asked when they said "Did you find

18   in the record," right, was based on this, these 35 pages,

19   correct, and that would be Tabs 13, 15, and 16?

20   A.   I don't know if that is true of the appeal denial or the

21   initial denial.

22   Q.   Well, let's talk about your denial of the appeal,

23   March 25, 2016.

24   A.   Right.

25   Q.   Right?  That's when you wrote --

1    A.   That two- or three-page letter, yes.

2    Q.   Right.  And that's when you said in that two- or

3    three-page letter, you said, "There's no definitive

4    documentation of the presence of psychotic symptoms consistent

5    with the diagnosis of Bipolar I disorder, and thus opinions

6    that your presentation is more consistent with a Bipolar II

7    disorder with episodic hypomania seem more accurate."  That's

8    what you said in that March, 2016 denial, right?

9    A.   Correct.

10   Q.   And this is all you had?  You had these 35 pages in March,

11   2016, correct?

12   A.   I can't be sure of that or not.

13   Q.   Well, let's look because if we look at this list of

14   exhibits, which is Exhibit 134-20 at 2297 -- do you follow

15   me? -- all of these documents in here are dated after the date

16   of your denial of Mr. Mahoney's appeal in March, 2016; is that

17   correct?  All right, we'll go down each one.  Exhibit 1 is from

18   June, 2016, right?

19            (Witness examining document.)

20   A.   Right, so I -- my denial is the 25th, and all of these

21   letters are after that.

22   Q.   Right, and you couldn't rely on letters and materials that

23   you received after the denial in reaching the denial in March,

24   2016, correct?

25   A.   But there's a lot of material...

1    Q.   Dr. Hoffman, just my question to you just for now is, you

2    couldn't rely on materials you received after the date of your

3    denial to provide your denial; is that correct?

4    A.   That's correct, but what I'm looking at here, I'm just

5    looking at Tab 1 in this book you gave me, and, I mean, there

6    are a huge number of additional pages of notes from the prison,

7    and I just -- uhm, I'm not clear.  I think I probably had

8    access to those, various ones in 15 and 16.  I can't be sure,

9    but, I mean, you see -- you see in Tab 1, Tab 1 is labeled --

10   oh, wait.  Is that 134?  No, it's all this stuff in Tab 1.

11   Q.   So just so I can level set here for a minute, Dr. Hoffman,

12   that whole binder, Exhibit 134, is the entire DMH file?  Do you

13   understand that?

14   A.   Right.

15   Q.   It's the entire file DMH has.  The tabs that are listed

16   here in this excerpt that I'm showing up on the ELMO, Bates

17   No. 2297, are the exhibits, basically an index of the entire

18   file that DMH had, okay?  So if you look at Exhibit 1 which is

19   Tab 1 in Exhibit 134, that's a letter from Mr. Mahoney with

20   exhibits, so everything behind Tab 1 are the exhibits

21   Mr. Mahoney provided?

22   A.   Right, which is many pages.

23   Q.   Many pages, many pages of documents, correct?

24   A.   Right.

25   Q.   BOP treatment notes, right?

1    A.    Yes.

2    Q.    They're not everything, right, because as we know,

3    everything is this 3,000 pages of documents, right, in this

4    box?  But you received these pages at Exhibit 1, you received

5    them from Mr. Mahoney on June 24, 2016, after you made your

6    decision, correct?

7    A.    After I made my initial decision.

8    Q.    Correct.  You made your decision without those notes?

9    A.    Correct.

10   Q.    The same for Exhibit 2, correct, or Tab 2, right, because

11   that's May, 2016?

12   A.    Yes.

13   Q.    The same with Tab 3?

14   A.    Correct.

15   Q.    The same with Tab 4?

16   A.    Correct.

17   Q.    Tab 5?

18   A.    Yes.

19   Q.    The same with Tab 6?

20   A.    Correct.

21   Q.    And on down through, I guess you may have had the

22   dismissal of charges which is Tab 10?

23   A.    I believe so, yes.

24   Q.    You don't know one way or another?

25   A.    No, I think so.  That was like a complicated -- I remember

1  trying to figure out what the difference between "with

2  prejudice" and "without prejudice" was beforehand.  I'm still

3  not sure I understand that, but, in any case, I remember that.

4  Q.   Sure.  And then if you go down to Tab 17, you didn't have

5  the August 1, 2016 letter, right, that you've written to

6  Mr. Mahoney, correct?

7  A.   Correct.  I didn't have those outpatient records at that

8  point.

9  Q.   And as of March, 2016, when you made your initial denial,

10  you didn't have Tab 18, which is a letter to a hearing officer,

11  Hearing Officer Gervasi?  You didn't have that because there

12  was no hearing officer to be sending things to, correct?

13  A.   Uh-huh, yes.

14  Q.   So the only thing you had when you made your decision was

15  those 35 pages?

16  A.   Correct.

17  Q.   So when we talk about not finding things in the record,

18  when you weren't finding things in the record at the time you

19  made the decision to deny his application, the record was

20  35 pages?

21  A.   Correct, the initial one.  I mean, obviously, if I had

22  found the additional material I received before the fair

23  hearing plus my in-person evaluation, if any of that had

24  changed my mind, then the department would have found him to

25  meet criteria, and we would have canceled the fair hearing.

1   That does happen.

2   Q.    But you didn't have the information when you made the

3   decision, fair?  When you made the decision in March, you

4   didn't have the information?

5   A.    Correct, correct.

6   Q.    You didn't have that Devens file, right?

7   A.    My point is just that if between March and September I had

8   received additional information or had a different impression

9   from my face-to-face assessment that it changed my mind, then

10  the fair hearing would not have gone forward.

11  Q.    Okay.  And even looking at Tab 1 from Exhibit 134, those

12  treatment notes for Mr. Mahoney, you realized that those are

13  only six months' worth of treatment notes, right?

14  A.    Correct.

15  Q.    So it's far fewer than the treatment notes in that box,

16  which is the entire Devens file, right?

17  A.    Correct.

18  Q.    But you've never seen those, right?

19  A.    I don't believe so.

20  Q.    And you also -- while your appeal, your decision --

21          THE COURT:  So now I'm understanding it.  So you only

22  looked at what Mr. Mahoney sent you, is that right, for the

23  fair hearing?

24          THE WITNESS:  I also communicated with the social

25  worker who facilitated some records, but, I mean, I don't know

1   what there is.  I say, "Send us as much as you possibly can to

2   help us make our decision."  Whether it's complete or not --

3          THE COURT:  I see.  So are those in here?  Maybe I'll

4   ask Mr. Callahan that.  Have you put in this tab everything

5   that --

6          MR. CALLAHAN:  I'd like to move -- so everything that

7   DMH got and asked for is in Exhibit 134, which I'd like to

8   offer, your Honor, into evidence.

9          THE COURT:  I'll accept that.

10          (Exhibit 134 received in evidence.)

11          THE COURT:  So it goes from Mr. Mahoney and from

12   Devens?

13          MR. CALLAHAN:  This is just -- there are some things

14   from Devens that Mr. Mahoney gave him.  We're going to get to

15   what Dr. Hoffman asked for because what I think the evidence is

16   going to -- your Honor, can I just say this:  What the evidence

17   will show is that he never asked for anything from Devens.  He

18   received the application, he received the 35 pages, and he

19   didn't ask for this entire file.  So all these questions about

20   what he had access to, he didn't seek any other additional

21   materials.  He didn't have Mr. Mahoney's mental health records

22   from 2008 all the way up through 2015.  He just didn't have it.

23          THE COURT:  Is that correct, you didn't have those?

24          THE WITNESS:  It wasn't complete.  I did ask the

25   social worker to send me all records there that would help me

1    establish the presence of a manic episode or whatever, and, I

2    mean, what she -- she sent me some stuff and she didn't send me

3    other stuff, but, I mean --

4           THE COURT:   Thank you.   So, Mr. Callahan, is

5    everything that that social worker sent in this record that you

6    just gave me?

7           MR. CALLAHAN:   Everything is in that Exhibit 134.   I'm

8    going to proceed.

9    Q.   And you knew even before -- even before Mr. Mahoney

10   applied and submitted his formal application in February, 2016,

11   you knew that you were going to deny him, correct?

12   A.   Before he applied?

13   Q.   Before he filed his application in 2016, in February,

14   2016, you had already made up your mind that he was not going

15   to receive DMH benefits, correct?

16   A.   No.

17   Q.   Can I ask you to look at Exhibit 133, which is in the

18   other binder in front of you, and just let me know when you're

19   there.   Are you there, Dr. Hoffman?   Dr. Hoffman, I just want

20   to know if you have the exhibit in front of you.

21   A.   I'm here.

22   Q.   And Tamika Finch-Hall, that's the social worker you dealt

23   with, correct?

24   A.   Uh-huh.

25   Q.   All right, and just read with me where it says 12/23/15,

1   administrative note, quote:  "I received a call from David

2   Hoffman --" that's you "-- Medical Director of Boston Region

3   Massachusetts Department of Mental Health.  Social worker,"

4   which is Ms. Hall, "answered questions regarding ICC request

5   for Inmates Mahoney.  Explained commitment status.  Mr. Hoffman

6   stated a formal application needed to be submitted for

7   Massachusetts DMH services before a determination can be given

8   regarding the ICC request.  During this conversation,

9   Mr. Hoffman gave several various reasons why Mr. Mahoney's

10   transfer request would not be approved, but stated he needs to

11   receive the eight-page application to 'determine what answer to

12   write down on the response letter.'"  Do you see that?

13   A.   I do.

14   Q.   You had that conversation with Ms. Hall?

15   A.   Uhm, well, I had a conversation with her, as it shows in

16   quotes, but it tries to quote a couple of things that I said.

17   Q.   So then Mr. Mahoney files his --

18           MR. CALLAHAN:  And can we enter Exhibit 133 into the

19   record, your Honor?

20           THE COURT:  Yes.

21           (Exhibit 133 received in evidence.)

22   Q.   So Mr. Mahoney then files his application, right?

23   A.   Uh-huh.

24   Q.   And that's Exhibit 13, correct?  Or Tab 13, I'm sorry,

25   Tab 13 in the DMH file, which is Exhibit 134?

1    A.   Where is the letter from Patty Kenney --

2    Q.   We'll get to that in a minute.  I just wanted you to look

3    at Mr. Mahoney's application.

4    A.   I'm just looking for the time frame here.  I see the

5    application.

6    Q.   So if you look at that application, it identifies certain

7    individuals at Bureau of Prisons, correct, Tab 13?

8    A.   Uh-huh.

9    Q.   Who are treating Mr. Mahoney, correct?

10   A.   Correct.

11   Q.   And one of them is this primary mental health provider

12   B. Kazim, right?

13   A.   Correct.

14   Q.   Did you ever speak with him?

15   A.   No.

16   Q.   Did you ever try to speak with him?

17   A.   No.

18   Q.   And if we look at Tab 13 of Exhibit 134, it also says, if

19   you turn to the Bates number which is down at the bottom, 2218,

20   it says, "Copies of medical reports are attached to this

21   application," and she writes "All previously submitted."

22   Correct?

23   A.   Where does it say all previously...  Okay, the stuff that

24   had been sent before.

25   Q.   Right, and that's Tabs 15 and 16 of Exhibit 134, correct?

1    A.    Uh-huh.

2    Q.    Okay, and let's look at that.  If we look at Tab 15, and

3    it's up on the ELMO here, it says "Previous inpatient

4    community-based care."  Do you see that where my finger is?

5    A.    You're where now?

6    Q.    It's Tab 15, Bates No. 225 down at the bottom.

7    A.    Uh-huh.

8    Q.    And it says he has been at FMC Devens from August, 2012 to

9    the present in addition to from April to May, 2011, correct?

10   A.    Uh-huh.

11   Q.    So you knew he'd been there that long and he had mental

12   health records that covered that time frame, correct?

13   A.    Correct.

14   Q.    And you knew you didn't have those, correct?

15   A.    I didn't have all of them, no.

16   Q.    Well, you knew you didn't have anything prior to 2015,

17   correct?

18   A.    Right, uh-huh.

19   Q.    You knew he had been at Avis Goodwin Community Health

20   Center from 2009 to 2010, correct?

21   A.    Correct.

22   Q.    And at the time you denied his application, you didn't

23   have those documents either, correct?

24   A.    I had them before I decided to go ahead with the --

25   Q.    A different question.  When you first denied his

1   application, you didn't have those, correct?

2   A.   Uh-huh.

3   Q.   And the same with Mass. General Hospital, right?

4   A.   Correct.

5   Q.   And you agree that when you review whether someone is

6   going to meet certain criteria to receive DMH mental health

7   benefits, you review as many records as possible, right?

8   A.   That is correct, but, you know, this is -- this is

9   something that we run into all the time.  A lot of people seem

10  to think that our service authorization unit has the

11  responsibility of doing, you know, endless digging, sending

12  releases, getting materials, as opposed to, you know, an

13  appellant with help from a doctor or the superintendent of a

14  facility, or whatever, providing us with the information we

15  need.  We don't, you know, have the ability to endlessly go

16  through getting records from other people.  We try the best we

17  can to get information, but ultimately the burden is on the

18  person applying for services to provide us with definitive

19  information that we can use, not the other way around.

20  Q.   When you gave your conclusion, you denied it, you didn't

21  say, "I only have a few months of the records.  I know there

22  are many more.  Based on my limited review of the few months,

23  he doesn't have Bipolar I"?  You didn't say that, right?

24  A.   I didn't use that exact phraseology.

25  Q.   Well, when you said, "I didn't see documentation in the

1   record of a manic episode," you didn't say, "I only had six

2   months' worth of notes," correct?

3   A.   I didn't say I only had six months.  I said I didn't see

4   documentation, which was correct.

5   Q.   But you didn't see documentation, though you knew there

6   were 40 months' worth of mental health records at the Bureau of

7   Prisons that you hadn't looked at, correct?

8   A.   Well, since the superintendent wrote to the Department

9   requesting services, I assumed the superintendent would have

10  made it happen that we got the information we needed, and if we

11  didn't have them --

12          THE COURT:  Did the superintendent ask or did

13  Mr. Mahoney for services?

14          THE WITNESS:  The initial letter was from the

15  superintendent.

16          THE COURT:  I see.

17  Q.   The application was from Mr. Mahoney.  The letter from the

18  superintendent, correct, is the ICC request asking if you'll

19  take care, custody, and control of Mr. Mahoney.  It is not

20  asking for mental health benefits, correct?

21  A.   Correct.

22  Q.   Right.  So Mr. Mahoney --

23          THE COURT:  What does ICC mean?

24          MR. CALLAHAN:  Interstate compact.

25          THE COURT:  It's the basic statute that we always ask?

```
 1            MR. CALLAHAN:  Correct, right.
 2   Q.   So Devens wasn't asking for him to receive mental health
 3   benefits; he was, correct?
 4   A.   Well, by asking to transfer him to a state hospital,
 5   that's asking to get mental health services.  Obviously the
 6   superintendent was aware of this, and my assumption was, the
 7   superintendent would make sure that we got what we needed to
 8   review.
 9   Q.   Well, you knew that there were many other records about
10   his mental health that would have been relevant to determining
11   whether he had a severe mental illness, right?
12   A.   You know, I --
13   Q.   Will you answer that question.
14   A.   -- what I had, but, you know, I take what I am given.
15   Sometimes we get more; we ask.  We often don't get what we ask
16   for.  Based on the documentation we have and we have time
17   frames, we make a decision based on that documentation.  You
18   know, I -- I can't, uhm, know whether there are another 50
19   pages of documentation or 3,000 pages of documentation or
20   whatever, but I assumed that, you know, the superintendent
21   would be working with the clinical staff in getting DMH
22   everything that we needed.
23            THE COURT:  Do you usually in an ICC request get the
24   whole dossier?
25            THE WITNESS:  It's totally variable.  Usually not with
```

1    the initial request.

2           THE COURT:  Right.  So do you then ask, or do you just

3    basically turn him down?  I mean, in other words, is it a

4    pro forma letter and a pro forma denial?

5           THE WITNESS:  The thing is that, I mean, once again,

6    to be transferred to the state hospital, you're supposed to

7    meet our clinical eligibility criteria, which is why I said the

8    first part of the process is to send an application for DMH

9    services because we wouldn't accept someone in transfer who

10   didn't meet DMH service --

11          THE COURT:  All I'm asking, so do you frequently get

12   these pro forma letters that are just the letter, and then you

13   deny them because they didn't provide enough?

14          THE WITNESS:  I mean, there are two ways that we deny

15   applications.  I think I talked about this before.  One is,

16   they don't meet the clinical criteria.  The other is, if

17   they're already receiving a service that they need --

18          THE COURT:  Right, so they're already receiving -- I'm

19   just asking a pretty simple question.  You seem to fault Devens

20   for when they asked for the transfer, that all they did was

21   sent this bare-bones letter.

22          THE WITNESS:  No.  The barebones letter was the

23   initial thing.  I'm just surprised that when we asked for

24   records, if there were really 3,000 pages of records, that we

25   just got less than we did.  But, I mean, I got enough.  I mean,

1    I often don't get 50 or 100 pages.  When I get 50 or 100 pages,

2    I'll use that and I'll make a decision.

3          THE COURT:  I'm just talking about going forward,

4    because this happens a fair amount -- I almost always get -- I

5    think I always have gotten denials -- so going forward, it

6    would be useful for Devens to know, if you sent over the

7    Court's opinion and you sent over all the records, you would

8    consider a transfer?

9          THE WITNESS:  The transfer is not ultimately my

10   decision because, I mean, the question is, all right, let's say

11   that Mr. Mahoney met the clinical criteria for DMH services,

12   clear serious bipolar, multiple psychotic episodes, et cetera,

13   et cetera, you know, my Commissioner, my administrators, the

14   question is -- and this is outside of my responsibility, so, I

15   mean, I don't even know if I should say anything more.  I mean,

16   DMH is not on trial here, but that's not a clinical decision

17   that's my purview, whether to accept someone who meets our

18   criteria --

19         THE COURT:  So you might recommend that they be

20   accepted, but it might be turned down because they're receiving

21   services elsewhere?

22         THE WITNESS:  Because that's -- that's not the

23   clinical determination, which is my responsibility.

24         THE COURT:  I understand that.  So you might say,

25   "Yeah, you're right, this guy really needs help," and they say,

1   "Well, he's getting it from the feds, so, you know, he's

2   getting help."

3           THE WITNESS:  Well, once again, you know, have Jeff

4   Smith give us a call when he's ready to be released into the

5   community or six months before he's ready to be released into

6   the community.  That's what I often get.

7           THE COURT:  Yes, and you've worked with us on

8   supervised release but not so much on these transfers?

9           THE WITNESS:  Correct.  But the administrators would

10  not consider a transfer if someone didn't meet the clinical

11  criteria, which is where I come in.

12          THE COURT:  Yes, thank you.  I'm understanding the

13  process a little better.

14  Q.   And you said when "we" ask Devens for the documents.

15  You're not aware of any document in that binder, which is the

16  entire DMH binder, where you're asking Devens for anything,

17  correct?

18  A.   I spoke with Finch-Hall and asked her for records.

19  Q.   Well, there's no documentation of your asking for -- you

20  had six months of records.  You know there were 40 months of

21  records at BOP, correct?

22  A.   I knew how long he had been there.

23  Q.   Correct.  And you knew that there were records for the

24  length of time that he had been there?

25  A.   I assumed there were some records.

1   Q.   Well, you knew that there are almost daily records based

2   on records that you'd seen, correct Dr. Hoffman?

3   A.   Well --

4   Q.   I just want an answer to that question.  You knew there

5   were daily records based on the records you had, correct?

6   A.   Unless something had change in the past, that would be my

7   assumption.

8   Q.   Then, yes, the answer is correct.  And then you also knew

9   he had been there for 40 some odd months?

10  A.   Correct.

11  Q.   So you knew that there were daily records going back

12  40 months, and you didn't ask Ms. Finch-Hall or anyone for

13  those records, correct?

14  A.   I asked her to send me records that would help me make up

15  my determination.

16          THE COURT:  Let me interrupt you here for one second.

17  It's eleven o'clock.  We've been going for about two hours, a

18  little less.  How much longer do you have?

19          MR. CALLAHAN:  Probably 30 minutes.

20          THE COURT:  Okay, we'll take our break.  See you at

21  11:30.

22          THE CLERK:  All rise.

23          THE WITNESS:  Am I going to get out of here before

24  noon?

25          THE COURT:  By 1:00, I promise you.

1          THE WITNESS:  By 1:00?

2          THE COURT:  Well, we'll go 11:30 --

3          THE WITNESS:  I have to chair a meeting at 1:00

4     o'clock.

5          THE COURT:  At 1:00?  All right, what time do you need

6     to be out of here?

7          THE WITNESS:  12:30 would be great.

8          THE COURT:  Okay.

9          (A recess was taken, 11:04 a.m.)

10          (Resumed, 11:34 a.m.)

11          THE COURT:  Okay, we're going to get Dr. Hoffman out

12     of here by 12:30, so that gives you till noon; and then if

13     there's a little redirect, recross, he's out of here by 12:30.

14          Where do you have to go to?

15          THE WITNESS:  Back to the Solomon Carter Mental Health

16     Center.

17          THE COURT:  That's easy.  That's just a 20-minute

18     walk, right?

19          THE WITNESS:  More than 20 minutes, but I'll make it.

20          THE COURT:  Okay, go ahead.

21     BY MR. CALLAHAN:

22     Q.   So, Dr. Hoffman, looking at the documents you did receive,

23     can you turn to Tab 16 of Exhibit 134.  That's the large binder

24     there.

25     A.   Yes.

1    Q.   And if you turn to Bates No. 2243, you'll see that's a

2    risk assessment report, and it's actually dated November 6,

3    2015.  Do you see that?

4    A.   2014.

5    Q.   It says 2014 on that page, but if you look at the next

6    page, it says 2015.  If you can look up on the screen, I can

7    draw your attention to it.

8    A.   Got it, yes.

9    Q.   And it refers to events in 2015, so I guess we'll assume

10   it is from the November, 2015.  And this is one of the

11   documents you did have before you denied Mr. Mahoney mental

12   health benefits, correct?

13   A.   That is correct.

14   Q.   And it cites a number of documents that the risk -- and

15   you disagreed with this Risk Assessment Panel report.  Your

16   conclusion was different than the one that's identified in here

17   which says Bipolar I, correct?

18   A.   I'm just trying to -- yeah, I guess it says "Most recent

19   episode hypomanic," but the diagnosis is Bipolar I, and I did

20   disagree with that.

21   Q.   You disagreed with that.  So you had this document, and

22   this was signed off on by three different forensic

23   psychologists at Bureau of Prisons, correct, Dr. Channell,

24   Dr. Kissin, and Dr. Tillbrook?

25   A.   Tillbrook, who also does consultations for the Department

1    of Mental Health as well.

2    Q.    So you know him?  You've spoken with him?

3    A.    Yes.

4    Q.    Okay.  And you disagreed with their conclusions, correct?

5    A.    I disagreed with the Bipolar I diagnosis.

6    Q.    Okay.  And did you ever reach out to Dr. Channell,

7    Dr. Tillbrook whom you knew, or Dr. Kissin to ask them for any

8    further clarification or ask them about any questions?

9    A.    No.

10   Q.    Ask them about any of their interactions with Mr. Mahoney?

11   A.    No.  I mean, there's pretty good documentation of the

12   behavior.  I did not make any additional attempts to speak with

13   any of those three individuals.

14   Q.    Even though you were disagreeing with them as to the

15   Bipolar I diagnosis, correct?

16   A.    Correct.

17   Q.    And if we look at Page 2243, it says, "The following -- if

18   you follow along on the screen, it might be easier -- it says,

19   "The following documents and materials were reviewed in

20   preparation of this report," and it lists 17 different sets of

21   documents.  Do you see that?  It goes on to the next page.

22   A.    I do.

23   Q.    And if you look down, No. 5 are audio recordings of

24   competency hearings from three different dates in 2012?

25   A.    Yes.

1    Q.   All right, you didn't listen to those, correct?

2    A.   No.

3    Q.   If you turn on the next page, No. 9 is Massachusetts

4    Department of Corrections medical records dated 2008 through

5    2009.  You didn't look at those, correct?

6    A.   Correct.

7    Q.   No. 10, Avis Goodwin Community Health Center medical

8    records dated 2009 through 2010, you didn't look at those,

9    correct?

10   A.   Not at that time, no.

11   Q.   Not at the time you denied his mental health benefits?

12   A.   Correct.

13   Q.   The same for the Goodall Hospital medical records,

14   correct?

15   A.   Correct.

16   Q.   And then these next three are all reports from Dr. Eric

17   Mart from 2011 through 2012.  You didn't look at any of those

18   psychological reports either, did you?

19   A.   No.  There were references to them, but I didn't see the

20   reports themselves.

21   Q.   And you didn't look at No. 16, the forensic medical

22   reports that are identified there, you didn't look at any of

23   those when you made the decision to deny Mr. Mahoney his mental

24   health benefits, correct?

25   A.   I recall one forensic report, but --

1    Q.    Which is this one, correct?

2    A.    Maybe it was this one.

3    Q.    Right.  So there are one, two, three, four other forensic

4    reports that you didn't look at, correct?

5    A.    Correct.

6    Q.    And you didn't ask for these after seeing them -- after

7    seeing them listed in this, in this forensic medical report and

8    some of the documentation you did have, you didn't ask anyone

9    to get those for you, correct?

10   A.    Correct.

11   Q.    And let's look at a few of those documents, and I'd like

12   to start, if you look at Exhibit 107, it is the Dr. Mart

13   October 20, 2011 competency report?

14   A.    Now you're in the other report?

15   Q.    I am.  Sorry to have you keep switching.

16   A.    So I'm with you, 107.

17   Q.    Okay.  And if you look at this, Dr. Mart had met with

18   Mr. Mahoney, correct, before he wrote this?

19            THE COURT:  Which tab is this?

20            MR. CALLAHAN:  This is 107.  We'd like to offer it

21   into evidence, your Honor.

22            THE COURT:  All right.

23            MR. CALLAHAN:  Is it admitted?

24            THE COURT:  Yes.  Anyway, can't we just admit all

25   these documents so we're not going through this?

 1           MR. CALLAHAN:  Sure.

 2           MR. SHEA:  Well, Judge, my point on some of these

 3    documents -- I understand the government is trying to show that

 4    the doctor didn't review certain things.  I get that point, but

 5    my concern with allowing in all of these documents is, it's

 6    kind of relitigating what was already done here before.  What

 7    I'm trying to do is --

 8           THE COURT:  Let me just say, you're not agreeing to

 9    it.  We have limited time to get him out of here.  You're not

10    agreeing to all of them?

11           MR. SHEA:  No.

12           THE COURT:  All right, I allow in 107.

13           (Exhibit 107 received in evidence.)

14    Q.   And in Dr. Mart's Exhibit 107, this competency report from

15    Dr. Mart, he had met with Mr. Mahoney, correct, when he wrote

16    this?

17    A.   I haven't read it, but I assume he did.

18    Q.   I think it says that in the first paragraph.

19    A.   Uh-huh.

20    Q.   Do you see that?  And that's something you hadn't done

21    when you had denied Mr. Mahoney his mental health benefits and

22    disagreed with the Bipolar I diagnosis, correct?

23    A.   In phase two of the three-phase process, that is correct.

24           MR. SHEA:  Object.  There's one -- I think there was

25    maybe an unintentional mischaracterization.  He said "when you

1    disagreed with the Bipolar I diagnosis."  Dr. Mart's paperwork

2    seems to say a Bipolar II, and it's moderate, so I just want to

3    be clear about that.

4    Q.   And there -- and, Counsel, we'll get to that -- but he's

5    accounting for what someone else had diagnosed him with, and if

6    you look at Page 132 of that exhibit, you see Dr. Mart's

7    diagnosis of "bipolar disorder not otherwise specified."

8    A.   Which is different than Bipolar Disorder I, and, actually,

9    his personality assessment is quite congruent with my own.

10   Q.   Okay, we'll get to that and we'll look at it a little

11   more.  I'd like you to look at Page 129.  Do you have that in

12   front of you?

13   A.   I do.

14   Q.   Do you see in the second paragraph where it talks about a

15   document from a Goodwin Medica Center, Diana Haile?

16   A.   I see that.

17   Q.   And she is a treatment provider who provided medical care

18   to Mr. Mahoney, correct?

19   A.   Yes, I assume.

20   Q.   And if you follow along at Exhibit 107, she writes --

21           MR. SHEA:  Objection.

22           THE COURT:  Overruled.

23           MR. SHEA:  Well, Judge, I know we're trying to move,

24   but an APRN diagnosis, I believe that's a nurse.  I mean --

25           THE COURT:  Fine, then I'll give it -- it decreases in

1   weight, but I'm going to let him ask the question.

2   Q.   And if you follow along and read with me, Dr. Hoffman, he

3   writes, "She," meaning Diana Haile, "found it impossible to

4   direct him to the matter at hand, which was his medication

5   status.  She noted very rapid speech which was almost

6   impossible to follow, as well as undertones of irrational

7   thinking and possible delusions of grandeur.  Ms. Haile noted

8   that Mr. Mahoney appeared to be suffering from either Bipolar I

9   with possible psychotic features or schizoaffective disorder,

10   as well as possible antisocial personality disorder traits and

11   narcissism.  She was able to convince him to begin taking

12   Seroquel.  Ms. Haile noted that during Mr. Mahoney's first

13   visit with her, he was very hyper and that she did not think he

14   could be any more hyper, but today he was."

15          Do you see that?

16   A.   I do.

17   Q.   You also referred to sleep as playing a significant role,

18   in your opinion, correct?

19   A.   Correct.

20   Q.   And if you look down at Page 130, which is the next page

21   of Exhibit 107, Dr. Mart says on the last line, "He reports

22   that he sleeps only three to four hours per night."

23          Do you see that?

24   A.   I do.

25   Q.   And you hadn't seen that when you denied Mr. Mahoney's

1   mental health benefits, correct?

2   A.   Correct.

3   Q.   And you hadn't seen that when you noted that he was

4   sleeping 12 hours a night, according to his self-report to you,

5   and that favored or weighed in favor of your Bipolar II

6   diagnosis, correct?

7   A.   Certainly it indicated that active symptoms of mania or

8   hypomania were not present at that point, nor, you know, in any

9   of the time in the year and a half that I reviewed records.

10  This is back in 2010.

11  Q.   It's 2011, correct?

12  A.   2011.

13  Q.   Right.  So if I could ask you to turn to Page 132, in the

14  second-to-last paragraph, if you see in the middle where it

15  cites the DSM, if you follow along with me, it says, "I believe

16  that there are delusional elements to Mr. Mahoney's thinking.

17  He is clearly very manic, as evidenced by his inflated

18  self-esteem and grandiosity, decreased need for sleep,

19  pressured speech, flight of ideas, distractibility."

20       Did I read that correctly?

21           THE COURT:   What paragraph?

22           MR. CALLAHAN:   That's the last full paragraph, your

23  Honor, beginning with "In this case," Page 132 of Exhibit 107.

24  Q.   Dr. Hoffman, did I read that correctly?

25  A.   Are you asking me to comment on your reading?

1    Q.   I'm asking if I read it correctly.  Is that what it says?

2    A.   Yeah, of course.

3    Q.   Okay, all right.  And you hadn't seen this when you

4    arrived at your conclusion, correct?

5    A.   Correct.

6    Q.   Including the note of Mr. Mahoney being very clearly

7    manic, right?

8    A.   Correct.

9    Q.   Or his decreased need for sleep, correct?

10   A.   Correct.

11   Q.   And Dr. Mart goes on at the bottom where it says, "Based

12   on all the information available, it is my opinion that

13   Mr. Mahoney's severe mental illness is leading to significant

14   deficits in his ability to cope with his legal situation.  He

15   is clearly having very serious problems consulting with his

16   attorney in a rational manner, and he is confused and possibly

17   delusional about his current legal situation.  Additionally,

18   his irritability, manic systems, and periodic threats of

19   assault pose significant and generalized obstacles proceeding

20   with this case."

21        Did I read that correctly?

22   A.   Yes.

23   Q.   Okay, you knew this report existed when you denied

24   Mr. Mahoney's mental health benefits, correct?

25   A.   I knew there was a report, yes.

1   Q.   I'd like to ask you to turn to Exhibit 136.  Just let me

2   know when you have that in front of you.

3        MR. CALLAHAN:  And the government offers 136, your

4   Honor.

5        MR. SHEA:  And I object because of the time frame, but

6   also --

7        THE COURT:  Wait a minute.  I'm not even sure -- 136

8   is...  I think I only go to 135.

9        MR. CALLAHAN:  Your Honor, it would be in the other

10  binder.  There are two, just because 134 and 135 went together

11  because they were the DMH file, so everything else is in the

12  other binder.  My apologies if that was confusing.

13        THE COURT:  Okay, all right.  Overruled.  The

14  objection is overruled.

15        (Exhibit 136 received in evidence.)

16  Q.   Now, this is another forensic report by Dr. Eric Mart,

17  right, a board-certified forensic psychologist?

18  A.   Correct.

19  Q.   And this is more recent than the one that we just looked

20  at.  This is from March 29, 2012, correct?

21  A.   Correct.

22  Q.   And he writes, "I am writing to provide you with an

23  updated report on Brian Mahoney.  As you are aware, at the

24  request of Judge Laplante, I reassessed Mr. Mahoney after the

25  hearing on March 27, 2012, at the courthouse.  I had the

1   opportunity to observe Mr. Mahoney during the hearing, and I

2   also met with you and Mr. Mahoney for approximately 40 minutes

3   after the hearing."

4          So he met with Mr. Mahoney and observed him before he

5   wrote this additional report, correct?

6   A.   Yes.

7   Q.   Okay.  And if you look at about halfway through that first

8   paragraph in Exhibit 136, he writes the following:  "Based on

9   the information available at that time, I opine that

10  Mr. Mahoney's severe mental illness was causing significant

11  deficits in his ability to consult with his attorney in a

12  rational manner.  Additionally, it was my opinion that his

13  thinking about his case was confused and possibly delusional,

14  and that his manic symptoms and threats of assault on court

15  personnel created obstacles to his proceeding in this case."

16       Do you see that?

17  A.   I do.

18  Q.   And he goes on, correct, for many pages in this report,

19  correct?

20          (Witness examining document.)

21  Q.   Right?  The report is four pages and it refers to other

22  documents, correct?

23  A.   Correct.

24  Q.   And if you turn to Bates No. 136, which is Page 3 of

25  Exhibit 136 --

1    A.    I'm there.

2    Q.    Okay.  Down at the third paragraph, and you can follow

3    along on the screen if it would be helpful, starting with the

4    third sentence and just read along with me and make sure I have

5    this accurately:  "Based on my observation, it appears that

6    Mr. Mahoney continues to be acutely manic..."

7         Do you see that?

8    A.    I do.

9    Q.    And this is just -- this is probably four or five months

10   since the last time he'd said that Mr. Mahoney was manic,

11   correct?  The previous exhibit was October, 2011.  This is

12   March, 2012?

13   A.    Correct.

14   Q.    Dr. Mart goes on, "...as evidenced by his pressured

15   speech, flight of ideas, a sequence of loose associations or

16   tangential thoughts in which the speaker goes rapidly from one

17   idea to another unrelated idea, circumstantiality, grandiosity,

18   and possible delusional beliefs.  I have very serious doubts as

19   to whether he can present a case to a jury in a way that they

20   could follow for several reasons.  I have nearly 30 years of

21   experience in interviewing defendants, and at many points in

22   our conversation, I found it extremely difficult to follow what

23   Mr. Mahoney was trying to say, both because of the rapid pace

24   of his verbalizations and because of the confusing way in which

25   he made his points."  Do you see that?

1    A.    I do.

2    Q.    You didn't have this at your disposal or you didn't ask to

3    look at this when you made your decision that -- or arrived at

4    your conclusion that Mr. Mahoney didn't have Bipolar I,

5    correct?

6    A.    Correct.

7    Q.    I want you to also look at Exhibit 110, and just let me

8    know when you have that in front of you.

9    A.    Got it.

10   Q.    This is a note from Dr. Vikram Kambampati.  Do you know

11   who that is?

12   A.    No.

13   Q.    You didn't know that it was Mr. Mahoney's treating

14   psychiatrist?

15   A.    I may have at some point, but the name did not ring a bell

16   at this instant.

17   Q.    Did you ever reach out to Dr. Kambampati to talk to him

18   about his care of Mr. Mahoney and his observing him over the

19   time that he was at the Bureau of Prisons?

20   A.    I did not.

21   Q.    And this is a note dated -- a clinical encounter dated

22   October 24, 2012, correct?

23   A.    Correct.

24   Q.    And under "Subjective," about four lines down,

25   Dr. Kambampati says the following:  "As I attempted to redirect

1    him, he suddenly escalated:  'You know what?  I don't give a

2    fuck about your restoration to competency.  Fuck you, fuck you,

3    you peace of shit.  You Indian piece of shit, get the fuck away

4    from my door.'  He was still engaging in such speech content.

5    Then he started spitting at the cell window.  Then he threw

6    each of his shower shoes at the cell window.  Then he came back

7    to the cell door window and started spitting again."

8         Do you see that?

9    A.   I do.

10   Q.   And under "Objective," Dr. Kambampati writes, "Extremely

11   irritable, hostile and violent (throwing objects and spitting

12   on my door) excessive speech production, pressured, labile

13   effect, severe intensity, loose associations."

14        Do you see that?

15   A.   I do.

16   Q.   And Dr. Kambampati goes down under his assessment, and can

17   you read what he writes immediately under the word

18   "Assessment"?

19   A.    "Bipolar I disorder."

20   Q.   And he goes on, doesn't he, and says, "Currently manic

21   with associated hostility, impulsivity, and potentially

22   dangerous behavior," correct?

23             MR. SHEA:  I am objecting to this, Judge, because to

24   my earlier point, this is from 2012.  It's not relevant to

25   whether my client is currently suffering from bipolar.  I

1   believe that this particular doctor left the facility in 2013,

2   so the idea that Dr. Hoffman should have reached out to him

3   when he doesn't even work there --

4           THE COURT:  You know, that's overruled.  We need to

5   finish it.  Do you have five minutes, ten minutes?

6           MR. CALLAHAN:  I think I have ten minutes, closer to

7   fifteen, your Honor, but if we're going to keep getting

8   objections, I need to be able to move through.

9           THE COURT:  He's allowed to object.

10           MR. CALLAHAN:  I understand that, but we'd like to --

11   well, we'd like to admit Exhibit 110.  Is Exhibit 110 admitted

12   into evidence, your Honor?

13           (Exhibit 110 received in evidence.)

14   Q.   You didn't have this document when you disagreed with the

15   conclusions of Drs. Channell, Tillbrook, and Kissin that

16   Mr. Mahoney had Bipolar I disorder, correct?

17   A.   Correct.

18           THE COURT:  Would these have been helpful to have?

19           THE WITNESS:  Especially -- I mean, not this one so

20   much.  The one that you just went over, whatever that one was,

21   would have been helpful.  You know, it doesn't go to current

22   mental status, dangerousness, treatment, stability, remission,

23   but it goes to history.  If that had been excerpted and put

24   into Dr. Kissin's report, which is often done, you know, then

25   it would have been there; that would have been extremely

1    helpful.

2    Q.   And you didn't have it, correct?

3    A.   Correct.

4    Q.   I'd like you to turn to Exhibit 111, which is the

5    February, 2013, note from Dr. Kambampati.

6         MR. CALLAHAN:  And the government offers Exhibit 111

7    into evidence.

8         MR. SHEA:  Objection, the same reason.

9         THE COURT:  Overruled.

10        (Exhibit 111 received in evidence.)

11   Q.   And this is, if you look down from Dr. Kambampati, he

12   identifies an assessment at the bottom of that page.  Can you

13   read what it says under "Assessment," Dr. Hoffman.

14   A.   "Bipolar I, currently has hypomanic symptoms of

15   tangentiality, impulsivity, worsening."

16   Q.   And in terms of in order to qualify for a Bipolar I

17   diagnosis, the manic episode that you're describing, that

18   doesn't have to happen -- in order to give someone a Bipolar I

19   diagnosis, they don't have to be manic for a week at the time

20   you're evaluating them, correct?

21   A.   No.  In fact, you just have to have one clearly documented

22   episode at some point in your history.  That's why I was saying

23   that documentation, it doesn't go to current condition,

24   stability, but it does go to diagnosis.

25   Q.   Right, but as to Attorney Shea's point, it's relevant

1    because it's happened in the past because if he has one manic

2    episode, that qualifies for the diagnosis of Bipolar I,

3    correct?

4    A.    Correct.

5    Q.    I'd like you to also look at Exhibit 137, please.

6    A.    Got it.

7    Q.    Exhibit 137 is a patient information adult baseline packet

8    for the Avis Goodwin Community Health Center.  Do you see that?

9    A.    And do we have a date?  December 10, 2009, okay.

10   Q.    Correct.

11          MR. CALLAHAN:  The government offers 137 into

12   evidence, your Honor.

13          MR. SHEA:  Objection, same reason.

14          THE COURT:  Overruled.  It's admitted.

15          (Exhibit 137 received in evidence.)

16   Q.    So this is an adult baseline packet that Mr. Mahoney

17   himself is filling out, correct?

18   A.    That would appear to be the case, yes.

19   Q.    And if I can direct your attention to Page 1555.

20   A.    Uh-huh.

21   Q.    There's an impairment rating scale there filled out by

22   Mr. Mahoney, correct?

23   A.    Correct.

24   Q.    And he writes, he checks off 6, correct?

25   A.    Correct.

1    Q.   And he says, "Very severe impairment symptoms are present

2    so much more frequently or intensely than expected that they

3    almost always impair normal functioning at home or at work,"

4    correct?

5    A.   Correct.

6    Q.   And later on, if you looked at 1559, there's a mood

7    disorder questionnaire, correct?

8    A.   Correct.

9    Q.   And this is to assess whether someone has a mood disorder,

10   one of which is Bipolar I or Bipolar II, correct?

11   A.   Correct.

12   Q.   And he answers "yes" to a number of questions on this

13   questionnaire, right?

14   A.   Yes.

15   Q.   Including, "You feel so good or so hyper that other people

16   thought you were not your normal self?  Yes," or that "You were

17   so hyper you got into trouble?  Yes," correct?

18   A.   Correct.

19   Q.   "You got much less sleep than usual and found you didn't

20   really miss it?  Yes," correct?

21   A.   Correct.

22   Q.   And that's inconsistent with your report that there was no

23   indication of decreased need for sleep from Mr. Mahoney,

24   correct?

25   A.   A different time.  Yeah, they're not --

1   Q.   Right, during this time, he had a decreased need for

2   sleep, correct?

3   A.   Correct, and in that other report, whatever it was, that

4   was also the case.

5   Q.   Right.  And when you were meeting with him in June, 2016,

6   were you aware he was on 900 milligrams of Seroquel at the

7   time?

8   A.   Yes.

9   Q.   And are you aware that he was taking it at bedtime?

10  A.   Yes.

11  Q.   And were you also aware that he explained or he reported

12  to his providers that he was having increased sleep after his

13  Seroquel dose was increased to 900?

14  A.   I believe I recall that.

15  Q.   And if I could ask you to turn to Page 1553, do you see

16  No. 5 on that page, it says "Sleep Assessment"?

17  A.   Yes.  I already saw that.  "...five hours a night

18  (period)."

19  Q.   It says, "How long have you had sleep problems?"  He says,

20  "I sleep five hours a night (period)."  The next, he says, "On

21  average, how many nights per week do you have sleep problems?"

22  What did he write in response to that?

23  A.   "Five nights a week."

24  Q.   So five nights a week he's having sleep problems at this

25  point, right?

1    A.    Correct.

2    Q.    And what does he write when it says, "On average, how many

3    hours do you sleep when you're having problems?"  What does he

4    write there?

5    A.    "One or two hours."

6    Q.    You didn't have this document when you disagreed with

7    Dr. Channell's assessment that Mr. Mahoney had Bipolar I,

8    correct?

9    A.    Correct.

10   Q.    Did you review this Court's ruling on Mr. Mahoney's

11   commitment petition, his civil commitment petition?

12   A.    I don't think so.  I reviewed something about charges

13   being dismissed, but I didn't review anything around the

14   commitment itself.

15   Q.    So you didn't review the Court's ruling and memorandum and

16   order where she detailed the opinions of Dr. Channell and

17   Mr. Mahoney's expert, Dr. Kriegman?

18   A.    I don't think so.

19   Q.    It's not in the DMH file, and if it's not in the DMH, is

20   it fair to say you didn't review it?

21   A.    That is probable, yes.

22   Q.    So it's also fair to say that you didn't know that

23   Mr. Mahoney was found by the Court to be very combative and

24   violent and had to have five Deputy United States Marshals to

25   get him out of the courtroom in November of 2013?

1    A.    I did not know that.

2    Q.    And did you know that after the removal, the Court noted,

3    "He's absolutely screaming in the back room, and I don't know

4    if he's violent because I can't see, but he's clearly angry and

5    out of control"?  You weren't aware of that when you disagreed

6    with Dr. Channell's opinion as to the Bipolar I diagnosis?

7    A.    No.

8    Q.    You went to see Mr. Mahoney on June 23, 2016, correct?

9    A.    Correct.

10   Q.    That was after you had already decided that you were going

11   to deny him mental health benefits on the basis that he didn't

12   have a Bipolar I diagnosis, correct?

13   A.    Well, this was to do my own face-to-face assessment and

14   confirm whether or not I actually agreed with what I had seen

15   when I just reviewed a paper record.

16   Q.    Right.  You had already initially denied him, correct?

17   A.    Correct.

18   Q.    You denied his appeal, correct?

19   A.    Correct.

20   Q.    And in denying his appeal before the visit, you said he

21   didn't have Bipolar I, correct?

22   A.    Correct.

23   Q.    And you met with Mr. Mahoney for about an hour?

24   A.    Correct.

25   Q.    And you took some notes?

1    A.    Correct.

2    Q.    And you took two pages --

3    A.    It was very, very brief notes.

4    Q.    Right.  And if you look at Exhibit 134-20, that's the

5    different binder from the DMH file.  Do you have that in front

6    of you?

7    A.    134?

8    Q.    134, and if you go to Tab 20.

9    A.    I have something that says 134.

10   Q.    Right, and then Tab 20 within 134.  It's Bates No. 2285.

11   A.    That's not the way this is organized, but I'll look on the

12   screen.

13   Q.    Sure.  I apologize, Dr. Hoffman.  Do you have the binder

14   that says Volume 2 on the front of it?

15   A.    I do.  Huh, right.

16   Q.    Are we in business?

17   A.    You're in business.

18   Q.    So these are the notes you took, right, at Tab 20 of

19   Exhibit 135?

20   A.    Correct.

21   Q.    "Sleeps 12-14 hours," correct?

22   A.    Correct.

23   Q.    And you write "Denies hallucination, denies paranoia,

24   denies delusions, loss of consciousness, 72 hours, he disputes

25   those diagnoses," correct?

1   A.   Correct.

2   Q.   And these two pages or 15 lines are the sum total of all

3   the notes you took when you were meeting with Mr. Mahoney,

4   correct?

5   A.   Correct.  I was concentrating on him, not on taking notes.

6   Q.   Do you know that Dr. Channell spent more than 20 hours

7   with Mr. Mahoney in arriving at the various times he's

8   diagnosed Mr. Mahoney with Bipolar I?

9   A.   No.

10  Q.   When you were at Devens in June, 2016, meeting with

11  Mr. Mahoney, did you ask to speak with any of his providers,

12  any of his mental health providers at Devens?

13  A.   Yeah.  I spoke with Tamika.

14  Q.   She's a social worker, right?  Did you ask to speak with

15  his treating psychiatrist?

16  A.   No.

17  Q.   Did you ask to speak with his treating psychologist?

18  A.   No.

19  Q.   Did you ask to speak with Dr. Channell?

20  A.   No.

21  Q.   Did you ask -- after meeting with Mr. Mahoney, did you

22  say -- did you ask anyone on that day for any additional

23  records, make any request?

24  A.   Yes.

25  Q.   On that day?

1    A.    On that day.

2    Q.    And what did you ask for?

3    A.    I asked for all the records of his progress and day-to-day

4    mental status, since, you know, the previous records had

5    stopped right up until the present.

6    Q.    So you asked for records from 2015 going forward, correct?

7    A.    Correct.

8    Q.    All right, you didn't ask for any of the records that had

9    Dr. Mart's analysis, correct?

10   A.    Correct.

11   Q.    The Avis Goodwin documents?

12   A.    Correct.

13   Q.    All the forensic reports that Dr. Channell had done?

14        MR. SHEA:  Objection.  That's a little bit of a

15   mischaracterization.  I don't know that these were in the

16   possession of Devens, and maybe they were, but Dr. Mart's

17   reports were produced from Mr. Mahoney's defense counsel in

18   New Hampshire.  The outpatient --

19        MR. CALLAHAN:  Your Honor, is this an objection or is

20   this --

21        THE COURT:  You know what?

22        MR. SHEA:  Well, it is an objection.

23        THE COURT:  Well, it is an objection.

24        MR. CALLAHAN:  It's in the BOP file, your Honor.

25        THE COURT:  Objection sustained.  You've got to ask

```
 1  for what was in Devens' possession.
 2  Q.   Right, and the Dr. Mart materials were in Devens'
 3  possession, correct?
 4  A.   I have no idea.
 5          THE COURT:  Can I ask you this:  Once you have
 6  Bipolar I as an adult, do you always have it?
 7          THE WITNESS:  Well, I mean, a lot of people say, you
 8  know, once you have that diagnosis, you can't get rid of it, so
 9  to speak; but, I mean, there's a huge recovery movement now in
10  the mental health community, and the fact is that a lot of
11  people who look like they have a schizophrenic break or a
12  bipolar break end up recovering.  Some of them never have
13  another episode without medications, and other people have
14  horrible long-term courses and everything in between.  So
15  certainly not -- I mean, in terms of certain research criteria,
16  yes, once a bipolar, always a bipolar, but in terms of your
17  actual clinical course, that's very variable.
18          THE COURT:  Because sometimes medicine can help or
19  treatment and that sort of thing?
20          THE WITNESS:  Right.
21          THE COURT:  But once you have the diagnosis, you have
22  it, right?
23          THE WITNESS:  Right.  And, you know, which goes back
24  to, let's say I had all the records that we're talking about
25  now and I had said that, you know, at one point he met the
```

1   criteria for Bipolar I disorder, that might or might not have

2   affected the service authorization decision because of all of

3   the other factors which we talked about earlier.

4          THE COURT:  Sure, okay.  So you -- well, let me let

5   him finish so you can get out of here.  Go ahead.

6   Q.   And going back, if you look at Exhibit 134, Tab 16, that's

7   the Volume 2 binder.

8   A.   Tab 16...

9          MR. SHEA:  Do you have a Bates number?

10          MR. CALLAHAN:  2243.

11          MR. SHEA:  Thank you.

12  A.   So 229 what?

13  Q.   2243.

14  A.   2243, got it.

15  Q.   And these list the Dr. Mart reports, correct?  This is

16  what we just went over.  These list the --

17  A.   No. 14.

18          THE COURT:  Keep it moving.

19          MR. CALLAHAN:  Right, I will.

20  Q.   So these are the documents that the BOP forensic

21  psychologists had when they wrote this assessment, correct,

22  that they had reviewed, correct?

23          THE COURT:  Asked and answered.  Let's go.

24  Q.   You've never done a dangerousness assessment of whether

25  someone's mental disease results in a substantial risk, if they

1   were released, that they would cause bodily harm to another,

2   correct, as part of --

3   A.   I do it all the time.  I mean, I don't write formal

4   reports, but I am responsible for discharge decisions all the

5   time.

6   Q.   Do you do 4246 hearings where you assess whether or not

7   someone is dangerous?

8   A.   I don't do the commitment hearings myself at this point in

9   my career.  I used to.

10   Q.   Okay.  You didn't provide any opinion on Mr. Mahoney's

11   dangerousness, correct?  There's nothing about that --

12   A.   That wasn't my job.

13   Q.   Right.  And you didn't look at any of the fourteen

14   incident reports Mr. Mahoney has had while he's been at Devens

15   in his time, his 40 months there, correct?

16   A.   I saw multiple references to behaviors.  I was reading

17   them with the idea of, does that go to a diagnosis or not?  I

18   wasn't reading it with, does that mean he's a dangerous guy?

19   Q.   You didn't look at the incident reports themselves,

20   correct?  They were not in the DMH file, correct?

21   A.   No.  No, there were references in the notes.

22   Q.   There were some descriptions that he had had incident

23   reports, but the actual details of them, you didn't look before

24   you made your diagnosis or disagreed with Dr. Channell's

25   diagnosis, correct?

1  A.   Correct.  In fact, the records from that side of the

2  house, so to speak, almost never make it to us.

3  Q.   Did you ask for any records about the incident reports?

4  A.   No.

5       THE COURT:  Are you done?

6       MR. CALLAHAN:  I'm just looking at my notes, your

7  Honor.  Just give me one moment, please.

8       (Pause.)

9  Q.   Did you tell Mr. Mahoney the conclusion of your -- of

10 basically your analysis that he did not have Bipolar I?  Did

11 you inform him of that?

12 A.   Well, I mean, I sent that letter to him, and I know he

13 read it.

14 Q.   Do you know that Mr. Mahoney then stopped taking all of

15 his medication after receiving that letter?

16      MR. SHEA:  Objection.  That may be a

17 mischaracterization as well.  It's unclear.

18      MR. CALLAHAN:  I'm asking if he knows.

19 Q.   Do you know?

20      THE COURT:  Do you know whether he did?

21      THE WITNESS:  No, I don't know that.

22 A.   So you're talking about sometime in March?

23 Q.   Sometime after you told him that he did not have

24 Bipolar I, were you aware that at that point, that after that,

25 at some time after that, he stopped taking his entire dose of

1    medication?

2              MR. SHEA:  Frankly, Judge --

3              THE COURT:  Objection overruled.

4              MR. SHEA:  Objection.

5              THE COURT:  Overruled.

6              MR. SHEA:  Well, the institution didn't --

7              THE COURT:  Do you know one way or another whether

8    he --

9              THE WITNESS:  When I went back to meet with him

10   face-to-face, I was made aware that there was some period of

11   medication nonadherence, but that had happened a couple times

12   earlier, I believe, based on reviewing the records.  So I don't

13   know if it was a causal effect or not, but I wasn't aware of it

14   right away.  But when I went back in June or whenever it was,

15   you know --

16             THE COURT:  If you found out that as a result of your

17   denial saying he didn't have a serious mental health issue he

18   started cheeking a lot of his medicines --

19             THE WITNESS:  I did not say that he didn't have a

20   serious medical condition.  That's not what I said.

21             THE COURT:  Would that cause you concern about his

22   ability to comply with conditions?

23             THE WITNESS:  Absolutely.

24   Q.   Did you ever see an incident report identifying the fact

25   that Mr. Mahoney was cheeking his medication after meeting with

1    you?

2    A.    No.

3    Q.    Okay.  Were you aware one way or another whether --

4            MR. SHEA:  I object.  I mean, he met with him back in

5    March.  He's cheeking, supposedly, in November.  I mean, this

6    is after the institution has changed its diagnosis.  They don't

7    even call him a Bipolar I.

8            THE COURT:  Excuse me, but that may be -- do you know

9    one way or another whether he is cheeking the medicine after

10   your denial?

11           THE WITNESS:  We're talking about just three months

12   ago November?

13           THE COURT:  Yes.

14           THE WITNESS:  No.  I knew nothing after the fair

15   hearing.

16   Q.    Okay.  And were you aware that after the fair hearing,

17   that Mr. Mahoney wrote to his treating psychiatrist and to

18   Dr. Channell that he would no longer have further contact with

19   them?

20   A.    No.

21   Q.    And did you know that he said he didn't have any of the

22   three disorders, Bipolar I, Bipolar II, or schizophrenia?  Do

23   you know that he had told them that?

24   A.    I don't know any of it.

25   Q.    I'm going to ask you to look at Exhibit 143.

1          MR. SHEA:  This is -- I need to cross-examine.

2          THE COURT:  Yes, yes, we're not -- he doesn't know

3    about it, so that's it, done.  Thank you.

4          Go ahead.

5          MR. SHEA:  Thank you.

6    REDIRECT EXAMINATION BY MR. SHEA:

7    Q.   Now, let me direct you quickly to the two assessments by

8    Dr. Mart.  First, let's start with Government Exhibit 136,

9    Bates 134, the first page of Government Exhibit 136.

10   A.   Yes.

11   Q.   About four lines up from the bottom, it says, "For

12   example, he suggested that since he had already been found

13   competent by Dr. Kissin --"  So Dr. Mart's report seems to

14   indicate that Dr. Kissin had found Mr. Mahoney to be competent

15   to stand trial is how that reads, correct?

16   A.   Yes.

17          MR. CALLAHAN:  Objection.

18          THE COURT:  Overruled.

19   Q.   Now, the Government 107 --

20   A.   I'm sorry?

21   Q.   Government Exhibit 107, please, the next one.

22   A.   Oh, go back to 107.

23   Q.   I'm flipping exhibits.  Yes, I'm trying to move quickly so

24   we get --

25   A.   I appreciate it.

1    Q.    On that first page of 107 -- tell me when you're there.

2    A.    I'm there.

3    Q.    Okay, do you see that it says "Axis I, Axis II," and that

4    is, based on the result of her evaluation, Dr. Kissin evaluated

5    Mahoney as follows:  "Bipolar II, hypomanic moderate."  That's

6    Dr. Kissin, correct?

7    A.    Correct.

8    Q.    And the date of this report is October 20, 2011, top

9    left-hand corner?

10   A.    Correct, uh-huh.

11   Q.    And, now, I want you to flip to the last page of that

12   exhibit, which is Page 133.

13   A.    I'm there.

14   Q.    In that, Dr. Mart said, "The Court may wish to consider

15   having Mr. Mahoney further evaluated by a psychiatrist and

16   consider reinitiating psychopharmacological treatment,"

17   correct?

18   A.    Correct.

19   Q.    Now, Dr. Mart isn't a psychiatrist, correct?

20   A.    No.

21   Q.    And he is suggesting that Mr. Mahoney be evaluated by a

22   psychiatrist, correct?

23   A.    Regarding possible medication treatment, correct.

24   Q.    And why would he have him see a psychiatrist if he thought

25   he might need medication?

```
 1              MR. CALLAHAN:  Objection, your Honor.  It calls for
 2    speculation.
 3              THE COURT:  Sustained.
 4    Q.   Can psychologists prescribe medication?
 5    A.   Not in the Commonwealth of Massachusetts.
 6    Q.   Can psychiatrists prescribe medication?
 7    A.   Yes.
 8    Q.   Now, I'm going to show you -- and I don't have the exhibit
 9    number so I'll just show it to you.  It's a risk assessment
10    report that's been shown to you from November 6, 2014.  See the
11    cover?
12    A.   Right.
13    Q.   And you've been shown the back page that it's signed by --
14              MR. CALLAHAN:  Can I just ask, is this the -- pardon
15    me, Counsel -- is this the November, 2015 risk assessment
16    report or the November --
17              MR. SHEA:  November 6, 2014, Bates 2243.
18              THE WITNESS:  Well, actually, I think on the next page
19    it says 2015.  It is 2015.
20              MR. SHEA:  Oh, yes, sorry.
21              MR. CALLAHAN:  It is 2015, and that is marked.  It's
22    Exhibit 134, Tab 16, if you want to use it.
23    Q.   So it's Bates 2258.  You've been shown the signature of
24    Dr. Kissin, correct?
25    A.   I see it there, yeah.
```

1    Q.    Okay.  And you were questioned about it before because

2    they had found that he meets the diagnosis for bipolar

3    disorder?

4    A.    Correct.

5    Q.    And that's from 2015?

6    A.    Correct.

7    Q.    Now, this is the same Dr. Kissin, though, who in 2011,

8    after having found Mr. Mahoney competent to stand trial, found

9    that he was Bipolar II moderate, right?

10   A.    Different time, different report, different conclusion.

11   Q.    It's a different time, different report, different

12   conclusion.  Does that mean that these diagnoses can change?

13   A.    Doctors can change diagnoses anytime they want.  Whether

14   or not it's valid, I mean, we hope that we base our diagnoses

15   on good evidence.  As I said earlier, you know, I was presented

16   with some good documentation about manic symptoms today.  Over

17   time, if you've had one full-blown manic episode and later you

18   don't, you usually don't change the diagnosis from Bipolar I

19   down to Bipolar II.  It might go in the other direction.  But

20   as the Judge was saying earlier, that doesn't mean that over

21   time symptoms can't get better or even remit completely.

22   Q.    Right.  And so let me just show you.  This is something I

23   received from my client so I don't have a Bates on it, but this

24   is a Dr. Kazim.

25           MR. CALLAHAN:  Counsel, can I see that before --

```
 1              MR. SHEA:  Yes, sure.

 2              (Document passed to Mr. Callahan.)

 3   Q.   This is from Dr. Kazim.  It says from the Behavior Health

 4   at Devens, and in 2012, August, 2012, it appears Bipolar II

 5   disorder, correct?

 6   A.   Well, it looks like it says "Date of treatment team,

 7   11/4/2015," so I don't know whether this is 2015 or 2012.

 8   There are two dates up at the top of that page.

 9   Q.   Okay, but it does say at some point it went to Bipolar II,

10   Dr. Kazim?

11   A.   Yes.

12   Q.   Now, Bates 2007, bipolar --

13              MR. CALLAHAN:  Counsel, what exhibit?  I apologize.

14              MR. SHEA:  I'm not sure which exhibit.  It's from the

15   Bureau of Prisons.

16              THE WITNESS:  02007, dated April 1, 2016.

17   Q.   And in that, it's 296.80, which is what, bipolar -- and I

18   think in the DSM-IV, it's "undifferentiated"?

19   A.   Or "unspecified" probably or "NOS."

20   Q.   What's unspecified?

21              MR. CALLAHAN:  Objection.  Counsel, could I just see

22   the document?  I don't know what document you're talking about.

23              THE COURT:  And I don't either.

24              MR. SHEA:  Well, it's Bates 2007.

25              MR. CALLAHAN:  What exhibit was it part of?
```

1          MR. SHEA:  I pulled it out.  It's Inmate Brian

2     Mahoney.  It's an assessment from Devens.  It's in evidence,

3     and I'll locate the exhibit later.

4          THE WITNESS:  There are two reports, there are two

5     reports that describe why they're calling it unspecified.  One

6     says it's because there hasn't been a depressive episode, only

7     a manic episode.  Another says that some of the features are

8     not typical of a usual bipolar disorder.  It's when something

9     doesn't meet the classic definitions but it's in that area.

10         THE COURT:  So can it still be a major mental illness?

11         THE WITNESS:  Absolutely.

12    Q.   But the point is, on unspecified, it doesn't meet the

13    classic designation, correct?

14    A.   Correct.

15    Q.   And that's a finding by Devens.  If it says 296.80, it's

16    unspecified, meaning it doesn't meet the classic definition?

17    Is that fair to say?

18    A.   It doesn't meet the classic definition, that is correct.

19    Q.   Okay.  Bates 2040, it appears, and I --

20         MR. CALLAHAN:  Counsel, what exhibit are you looking

21    at?

22         THE COURT:  You know, at this point, I need to get the

23    doctor out of here, and I want to give Mr. Shea --

24         MR. SHEA:  2039, 2040, and 2041.

25         THE COURT:  Why don't you just go up there.  You can

1  look over his shoulder.  This is a very informal proceeding.

2  So we need to get the doctor out of here.

3  Q.   So these are relevant to Brian Mahoney.  They're from May

4  of 2016, dating from May 2, May 5 through May --

5  A.   And they all say that it's not the classic Bipolar I

6  disorder.

7  Q.   And it's even different now.  Now it's "Other specified

8  bipolar and related disorders," correct?

9  A.   That's because we went from DSM-IV to DSM-V, and the same

10  thing has to be said in different ways, of course.

11  Q.   Okay, but it reads that it's different, right?

12  A.   Yes, correct.

13  Q.   And there appear to be a number of different diagnoses for

14  Mr. Mahoney; is that fair to say?

15  A.   Yes.  I mean, from the very beginning, there are a lot of

16  diagnoses.  There are questions about psychosis, no psychosis,

17  Bipolar I, Bipolar II not otherwise specified, lots of

18  personality disorder issues.  The diagnosis of ADHD, which I

19  think is still present, gets lost in a lot of the

20  documentation.  The head injury, we don't know whether it was

21  really carefully assessed.  There are a lot of questions.  It

22  is a complicated situation.

23  Q.   Okay.  The other is, you were shown in these records

24  Government Exhibit 137 from Avid Goodwin Community Health

25  Center, correct?

1    A.    137, 01552, yes.

2    Q.    And when you were shown those, you reviewed them, but

3    nowhere did it say what they determined regarding Mr. Mahoney,

4    meaning that they found that he had bipolar disorder or he had

5    ADHD, correct?

6    A.    He certainly wasn't being treated for it at the time,

7    based on the medications.

8    Q.    Based on the medications, they weren't treating him for

9    bipolar disorder, correct?

10   A.    I would certainly hope not.

11   Q.    Okay.  And the thing that he says to them he's suffering

12   from and he writes in letters is ADHD, right?

13   A.    He's clearly complaining about anxiety too because he's

14   getting Xanax.

15   Q.    Okay.  But the thing that he himself handwrote in

16   parentheses is "ADHD," right?

17   A.    Uh-huh.

18   Q.    And that's one of the things you found him to have,

19   correct?

20   A.    Right, I mean, especially based on the history.

21   Q.    Now, you would have welcomed under the ICC Devens

22   providing you with documents, correct?

23   A.    I would have read everything I got.

24   Q.    Okay.  Now, this Exhibit 133, this related that you had a

25   phone call with Tamika Finch-Hall where, to be frank, it sounds

```
 1    like you've already made up your mind, and you just need

 2    documents from them that will allow you to deny services to

 3    Mr. Mahoney.  Is that your memory of the conversation?

 4    A.   I mean, I can only reconstruct what generally happens in

 5    these situations, is that --

 6              MR. CALLAHAN:  Objection, your Honor.

 7              THE COURT:  Sustained.

 8    Q.   Do you have any --

 9    A.   I don't recall.

10    Q.   Okay, you don't have a memory of it?

11              MR. CALLAHAN:  Asked and answered, your Honor.

12    Q.   Okay, so does her -- this is what they have presented --

13    A.   Uh-huh.

14    Q.   -- as her version of what was said.  Does that refresh

15    your memory as to what was said?

16    A.   Uhm, I mean, what I think I was saying was that we need --

17              MR. CALLAHAN:  Objection, your Honor.

18              THE COURT:  Overruled.

19    Q.   Overruled.  You can answer.

20    A.   The administrators in DMH would deny our needs and means

21    regardless if someone was receiving services they needed

22    somewhere else, but for them to even consider that question, I

23    had to do my clinical first.  So I needed to do the whole

24    application process, and, you know, that's the way our process

25    works, and that's why -- I mean, what I told her is, one way or
```

1    the other, it's unlikely, if he's being hospitalized in a

2    federal hospital, that we're going to give him services now;

3    but we need to go through the process and decide whether that's

4    based on clinical criteria or just the fact that he doesn't

5    need a -- he needs a service that he's not currently getting.

6           THE COURT:  Can I just stop you because we're about to

7    finish this.  I think everybody's desire in this room is to

8    treat Mr. Mahoney and get him into a situation where he can be

9    back in the community.  If you took all these records and you

10   reevaluated it, would it be possible for you to reconsider your

11   decision so we could put him in some sort of residential

12   housing?

13          THE WITNESS:  The short answer is, yes, absolutely.  I

14   think, you know, getting a residence, if a residence is what is

15   really needed, you know, can take some time.  You know, what I

16   had heard once upon a time was that there was a relative he was

17   going to live with, and that DMH was going to, if they provided

18   services, do outreach case management along with making sure he

19   went to a clinic.

20          THE COURT:  So there might be another solution.  I'm

21   just saying, I felt a little boxed in and maybe you have too.

22   Now that there's all this new information --

23          THE WITNESS:  I mean, what I would love in our state

24   system, and I don't know if you have it or not, is something

25   called conditional release so that --

```
 1          THE COURT:  We have it.  We have it.  We can release
 2   on conditions, and I think that's how you've worked with
 3   Probation Officer Smith.
 4          THE WITNESS:  Yes.
 5          THE COURT:  So if that should come to pass, and I'm
 6   not saying -- I know there's a request to discharge without
 7   conditions; there's a request to keep him in at least for a
 8   while longer.  But let's say at some point in this process we
 9   can all agree that a conditional release is possible, is it
10   possible for you, based on all this new information, to provide
11   those services?
12          THE WITNESS:  I would reconsider.  You know, what I
13   need is good data because what I do, if I approve an
14   application, then I have to give it to a site to actually
15   provide the services.  So, first of all, they want to make sure
16   my decision is well grounded in data, and, secondly, to
17   understand what's going on.  Is the issue nonadherence?  Is the
18   issue a history of substance abuse in the community?  You know,
19   what is really necessary?
20          THE COURT:  So it's not a complete dead end here?
21          THE WITNESS:  It's not a complete dead end.  And I
22   would be so delighted in my everyday job if I got the good
23   information I need.  Our ability to go fishing for stuff based
24   on all -- I mean, we process --
25          THE COURT:  So you don't have the resources?
```

1           THE WITNESS:  We have 600 applications a year.

2           THE COURT:  I understand that, but actually -- I've

3    been a judge now 20 years -- you provided some insight as to

4    why these are always denied, and maybe the folks from

5    Fort Devens have too.  So thank you very much.  I hope you make

6    your meeting.

7           THE WITNESS:  Thank you.

8           THE COURT:  You should make it up there.  I think it's

9    a little bit of a jog.

10          THE WITNESS:  It's going to be fine.  So this belongs

11   to someone.

12          THE COURT:  Don't worry about it.  Go.

13          (Witness excused.)

14          THE COURT:  All right, thank you.  So we had a rather

15   full morning, and I know you have someone from Fort Devens

16   here.  Is that correct?

17          MR. CALLAHAN:  We do, your Honor, if Mr. Mahoney is

18   done.

19          THE COURT:  Well, I know we also have his uncle, so

20   the question is, how should we proceed so maybe the uncle won't

21   have to come back?  Maybe you'd want to put the uncle on now?

22          How would you like to proceed, Mr. Shea?

23          MR. SHEA:  Could I have five minutes with my client?

24   I know we're closing out on the end of the day, but I had a

25   conversation with his uncle that I haven't been able to relate

1   to my client.

2          THE COURT:  Well, let me ask you this:  Since I am

3   available tomorrow, and since my case, my plea has been

4   continued to next week, when would you -- we're clearly not

5   going to finish today, so would you like to come back tomorrow

6   morning?  Would you like to come back next week during the

7   morning?

8          MR. SHEA:  Tomorrow morning would be ideal.

9          MR. CALLAHAN:  Your Honor and counsel, can I just talk

10  with the folks from Bureau of Prisons to find out their

11  schedule?  I think they were planning on today, but if I can

12  take the five minutes when Mr. Shea is talking to Mr. Mahoney,

13  we can --

14         THE COURT:  By the way, I'm happy to try and do what I

15  can between now and 1:00 o'clock, but I don't think we'll

16  finish.

17         MR. CALLAHAN:  I suspect you're right.

18         MR. SHEA:  The problem for me for next week is that

19  the following week I'm starting a murder trial, so, like,

20  Monday I have a meeting with my DNA expert.

21         THE COURT:  Well, why don't we find out what their

22  availability is.  If they're available tomorrow, so be it.  If

23  not, we'll get started right now for the next half hour, and

24  then we'll just kick it to when we can.

25         MR. SHEA:  Okay, thank you.

1          MR. CALLAHAN:  So just a few minutes then, your Honor?

2          THE COURT:  Yes.

3          MR. CALLAHAN:  Thank you.

4          (Pause.)

5          MR. SHEA:  So judge the only thing my client wanted to

6    have the Court know was that his Uncle Jack Collins continues

7    to be willing to take him in for the 28 days if he's released.

8    He can't stay beyond 30 days because Mr. Collins is in elderly

9    housing that doesn't allow him to have, say, a roommate for

10   longer than the 30 days, but it is allowed for him to have a

11   guest for up to 30 days.  So that was the only thing we were

12   going to offer his testimony for.  If my proffer is --

13         THE COURT:  Well, I'm willing to take that proffer.

14   Are you willing to take that?

15         MR. CALLAHAN:  Yes, your Honor.

16         THE COURT:  All right.  So, I mean, that's very nice

17   of him to make that offer, but I don't need to have him take

18   the stand to do that.

19         So now I turn to you.

20         MR. CALLAHAN:  So, your Honor, I did talk with the

21   Bureau of Prisons.  They can do tomorrow morning, if that works

22   for Mr. Shea.

23         THE COURT:  Because we're not going to finish today

24   anyway.

25         MR. SHEA:  Yes.

1          THE COURT:  And so do you want to get started today?

2          MR. CALLAHAN:  Sure.

3          THE COURT:  All right, so why don't we get started.

4     Then we'll continue it over till tomorrow.  So we'll go now

5     till, say, 1:00, and I'm pretty sure we won't finish.

6          MR. SHEA:  And I'm free all day tomorrow, so, I mean,

7     if your afternoon is open, I'm free.

8          THE COURT:  I'm not just in the afternoon.  We're

9     talking the morning.  I can't believe -- you only have one

10    witness, or do you have two?

11         MR. CALLAHAN:  Hopefully just one, your Honor.

12         THE COURT:  I just can't believe we're not going to

13    finish.  I mean, if worst comes to worst, we'll come back for

14    closing argument, but we'll finish the evidentiary piece of

15    this.  Quite candidly, I didn't know we were having an

16    evidentiary hearing till maybe yesterday or this morning, but

17    it's just by luck I have tomorrow morning open because

18    something settled, so let's just use it.

19         MR. SHEA:  Okay.

20         MR. SHEA:  All right.

21         MR. CALLAHAN:  Okay, the government calls Dr. Shawn

22    Channell to the stand.

23                    SHAWN CHANNELL

24    having been first duly sworn, was examined and testified as

25    follows:

1    DIRECT EXAMINATION BY MR. CALLAHAN:

2    Q.    Good afternoon, Dr. Channell.  Could you just state your

3    name for the record and spell your last name.

4    A.    Shawn Channell, C-h-a-n-n-e-l-l.

5    Q.    Dr. Channell, you've testified before this Court in

6    connection with Mr. Mahoney's civil commitment hearing back in

7    the summer of 2014 over the course of several days, correct?

8    A.    Yes.

9    Q.    And can you remind us what you do at FMC Devens.

10   A.    I'm a forensic psychologist at FMC Devens.  I have three

11   main duties:  I conduct court-ordered competency to stand trial

12   and mental state at the time of the offense evaluations, I

13   chair the institution's Risk Assessment Panel, and I supervise

14   the forensic rotation for our accredited predoctoral

15   internship.

16   Q.    And back in the summer of 2014, you went on at length

17   about your qualifications and your education.  I don't want to

18   take the Court's time with that.  Has any of those

19   qualifications changed?

20   A.    No.

21         MR. CALLAHAN:  And, your Honor, I can go through that

22   with Dr. Channell, or we could just incorporate from the last

23   hearing we had on this.

24         THE COURT:  I'm happy to incorporate, but as I'm

25   sitting here, I don't remember.

1          MR. CALLAHAN:  Okay, okay.

2          MR. SHEA:  I think it's -- is his CV in?

3          MR. CALLAHAN:  His CV is an exhibit in the prior

4    exhibits that we've admitted in the civil commitment hearing

5    from 2014, which I assume is just part of --

6          THE COURT:  Yes, but you got those back again, so we

7    don't have them.  You're welcome to submit them.

8          MR. CALLAHAN:  Okay, we can do that.

9          THE COURT:  Because I just don't remember, though I

10   think I've had you on more than one case along the years, but I

11   just don't remember.  And he's a forensic psychologist.

12         MR. CALLAHAN:  Right.

13   Q.   How long have you worked at Devens?

14   A.   Almost eleven years.

15   Q.   In that time, how many times have you done assessments for

16   individuals who are being considered under 4246?

17   A.   Hundreds, maybe more than a thousand.

18   Q.   And percentagewise, how many of those individuals have you

19   recommended civil commitment for?

20   A.   Oh, a very small number.  One or two percent probably.

21   Q.   Could you tell us how many times you testified in Federal

22   Court.

23   A.   Over sixty times.

24   Q.   And in what Federal Courts have you testified?

25   A.   I've testified in Federal Courts all across the country.

1   We get our referrals from across the United States, so most of

2   the continental United States.  I'm still holding out for

3   Hawaii, but it hasn't happened yet.

4   Q.   And how many federal dangerousness hearings under 4246

5   have you testified in Federal Court for?

6   A.   Well, I testify in two types of dangerousness hearing:

7   One is 4243 and one is 4246.  The question is essentially the

8   same, so I'm not sure exactly how those split up, but between

9   the two of them, over twenty times.

10  Q.   And has your opinion or part of your opinion ever been

11  excluded?

12  A.   Not to my knowledge, no.

13  Q.   Was your opinion in this case approved and did the First

14  Circuit affirm the Court's decision on the dangerousness issue?

15  A.   Yes.

16  Q.   How many times have you evaluated Mr. Mahoney?

17  A.   I evaluated Mr. Mahoney -- initially he came to me as a

18  competency restoration case, meaning that he had been found not

19  competent to stand trial in the court in New Hampshire, so I

20  evaluated him for over four months at that point in time, and

21  then I think I've evaluated him three times for dangerousness

22  since that time, so four, about four times in total.  I mean,

23  I've interviewed him a lot more than that, but those were the

24  referral issues those four times.

25  Q.   And over what period of time have you evaluated him and

1    done those risk assessment reports for him?

2    A.    Since 2012.

3    Q.    And when you're evaluating someone like Mr. Mahoney under

4    18 U.S.C. 4246, what's the inquiry that you're making?

5    A.    Basically it's a determination as to whether or not their

6    release would pose a substantial risk of bodily injury or

7    severe property damage to another person as a result of a

8    mental illness.

9    Q.    And as of today, what is your conclusion with respect to

10   that inquiry with respect to Mr. Mahoney?

11   A.    My conclusion is that his release would pose such a risk.

12   Q.    I'd like to show you, if you take --

13           THE COURT:  Can I ask, in all the civil commitments,

14   on the one to two percent that you've had, has the state ever

15   taken them for services?

16           THE WITNESS:  I don't recall a single case that a

17   state has ever taken them, no, not under the direct Interstate

18   Compact request.  I mean, we have conditionally released a good

19   number of people but never necessarily with the cooperation of

20   the state.  It's typically through independent treatment

21   providers and U.S. Probation is how we do that.

22           THE COURT:  That's how you conditionally release?

23           THE WITNESS:  Yes.

24           THE COURT:  Have you ever cooperated with them on

25   something like residential housing?

1          THE WITNESS:  If they would approve it and agree to

2     it, we would certainly do that, but I'm not aware of any cases

3     where we've been able to do that.

4          THE COURT:  Have you tried to work with the state here

5     for residential housing?

6          THE WITNESS:  Yes.

7          THE COURT:  And it's never worked out?

8          THE WITNESS:  No, not that I recall.

9     Q.   So, Dr. Channell, just to get all these documents in front

10    of you, and before we begin, if you could take a look in the

11    binder at Government Exhibits 102 to 105, those are four risk

12    assessment reports.  One of them I guess is an addendum.

13    Government Exhibit 102 is the May 30, 2013, risk assessment

14    report.

15    A.   Yes.

16    Q.   103 is the November 6, 2015, risk assessment report?

17    A.   Yes, but I should point out, the date on the cover page of

18    that is wrong.  It says 2014, but it is a 2015 report.

19    Q.   Okay, thank you for that.  Government Exhibit 104 is the

20    October 28, 2016 risk assessment report; is that correct?

21    A.   That's correct, yes.

22    Q.   And Government Exhibit 105 is a November 23, 2016, risk

23    assessment report addendum, correct?

24    A.   Yes.

25    Q.   And these reflect the results of your evaluations for

1    Mr. Mahoney on dangerousness?

2    A.    Yes.  The initial report was --

3           MR. SHEA:  I'd like to object to 102 because 102 is

4    one of the things I believe was used by this Court pre the

5    original finding and the Appeals Court.  It's to my point that

6    I think we should be using more current documents to determine

7    whether Mr. Mahoney is dangerous.

8           THE COURT:  That's overruled.  I think there was a

9    challenge or at least a question raised by Dr. Hoffman about

10   whether bipolar was an appropriate diagnosis at all.  I think

11   he backed off that, but I think it's useful in understanding

12   what the prior records say.

13          MR. CALLAHAN:  So the government moves 102 to 105 into

14   evidence, your Honor.

15          THE COURT:  Allowed.

16          (Exhibits 102-105 received in evidence.)

17   Q.    Now, your initial risk assessment report in 2013, that

18   resulted in Mr. Mahoney's commitment in 2014?

19   A.    Yes.

20   Q.    And then after that, is there an annual review that's

21   done?

22   A.    Yes.

23   Q.    And that was the November, 2015?  That was the first

24   annual review?

25   A.    Correct.

1  Q.    Okay.  And then there is a second annual review that was

2  done this past fall in October, 2016, correct?

3  A.    That's correct, yes.

4  Q.    Now, in evaluating Mr. Mahoney one on one, just you and

5  Mr. Mahoney, can you give the Court a sense of how many hours

6  you spent with him in the course of all your evaluations and

7  assessments.

8  A.    Over the last four years, probably around 30 hours, I

9  guess, in total.  I mean, the bulk of it was during the

10  competency evaluation.  I met with him quite a bit for that.

11  And then subsequently, you know, I've had sporadic contacts

12  with him, typically at the time of the Risk Assessment Panel

13  report.  So I don't meet with him frequently subsequent to his

14  commitment, usually once or twice a year if I talk to him.

15  Q.    And aside from personally meeting with Mr. Mahoney, do you

16  ever consult members of his treatment team?

17  A.    Yes.

18  Q.    And can you describe that.

19  A.    Well, he has a treating psychologist, he has a treating

20  psychiatrist, he has a social worker; and I met with them all

21  formally and informally many times over the past couple years

22  with regard to Mr. Mahoney's progress in treatment or lack

23  thereof, depending on what was happening at the time.

24  Q.    And what sort of positions or titles make up a treatment

25  team?

1    A.    It would be a psychiatrist, his psychologist, his social

2    worker, rec therapy, those types of positions.

3    Q.    And do you work in the same building that the treatment

4    team or the same facility that the treatment team works in?

5    A.    Yes.

6    Q.    Outside of just formal meetings about Mr. Mahoney, do you

7    also see them in other contexts?

8    A.    Yes.

9    Q.    And do you ever talk about Mr. Mahoney and his progress or

10   lack of progress with them when you meet in those instances?

11   A.    Quite often, yes.

12   Q.    Okay.  So, ballpark, how many hours do you think you've

13   spent consulting with his treatment team over the past four to

14   five years?

15   A.    More than 20 hours.

16   Q.    Before you sit down with your panel to author a risk

17   assessment report, can you describe what you do in terms of

18   looking at documentation?

19   A.    Yes.  We review, obviously, all the prior reports which

20   have been written.  We review all of the medical record.  We

21   have an electronic medical record, so we review all of that,

22   which would include notes from nursing, psychiatry, social

23   work, rec therapy, his psychologist.  He has worked quite a bit

24   with predoctoral interns, so I would review those notes.  I

25   usually would speak to his treatment providers, his treatment

1    team, and then we have a formal meeting at which the treatment

2    team would attend and provide us information about how he's

3    doing, how he's been doing over the course of the time since we

4    reviewed him last.  We would interview Mr. Mahoney, and then we

5    would have a discussion subsequent to the interview, at which

6    point in time we would decide how we were going to proceed with

7    regard to our recommendation to the Court.

8    Q.   And in terms of the volume of records that you've reviewed

9    in evaluating Mr. Mahoney, do you have any sense, in the terms

10   of bulk or number of pages, how many pages you've reviewed of

11   records relating to Mr. Mahoney?

12   A.   Uhm, well, two or three binders like this.  I mean,

13   probably 3,000 pages or more.  If you actually included all the

14   electronic medical record, probably quite a bit more than that,

15   but there's a lot of records.  I've gone back for, you know --

16   there's a period of time that we don't have a lot of records

17   for, but certainly since 2010, 2008, around that period of

18   time, we have a lot of records since that time.

19   Q.   For Mr. Mahoney?

20   A.   Yes.

21   Q.   In your possession at BOP?

22   A.   Yes.

23   Q.   Including the reports from Dr. Mart?

24   A.   Yes.

25   Q.   And why do you review all of that massive volume of

1   records in doing your assessment or before you do your

2   assessment?

3   A.   Well, I mean, obviously there are two issues with regard

4   to civil commitment.  Well, there are a lot of issues but two

5   primary issues.  One is dangerousness, but unfortunately we

6   have a lot of dangerous people that we have to release all the

7   time because we can't simply detain someone beyond their

8   sentence because they're dangerous.  They also have a major

9   mental illness, and it requires a lot of information to make

10  both of those determinations:  A, if they have a mental

11  illness, and, B, what the mental illness is, and then, C,

12  whether or not they're dangerous, and then, finally, to see if

13  there's a nexus between the mental illness and the

14  dangerousness, and that's the only point at which we would

15  recommend someone for civil commitment.  That's for the initial

16  commitment.

17        And then for the annual reviews, we're basically

18  looking at their progress since the last time we saw them to

19  see if they've progressed in treatment, if they've been stable,

20  how they've been working with their social worker with regard

21  to conditional release, what conditional release options are

22  available if we went in that direction.  And during the

23  interview, we formally talk to them about conditional release

24  and what the conditions would be and whether or not they felt

25  or were willing to abide by those conditions.

1    Q.    So after Mr. Mahoney's initial commitment, you and two

2    other forensic psychologists made up the Risk Assessment Panel

3    that recommended that he remain committed in November, 2015; is

4    that correct?

5    A.    Yes.

6    Q.    Okay.  And that's the report at 103, Exhibit 103?

7    A.    That's right, yes.

8    Q.    And what was the recommendation about as to whether or not

9    Mr. Mahoney at that point was ready to be released under

10   certain conditions?

11   A.    Our recommendation at that time was that he was not ready

12   to be released.

13   Q.    Okay, when you say "our recommendation," if you could turn

14   to the back, the last page of Exhibit 103, there are three

15   names, yours, Dr. Tillbrook, and Dr. Kissin.  Who are they?

16   A.    That would be the risk -- they would have constituted the

17   Risk Assessment Panel.  They're both forensic psychologists at

18   FMC Devens.

19   Q.    Okay.  And I see for Dr. Kissin's, above Dr. Kissin's name

20   it's your signature for Dr. Kissin.  Can you explain that.

21   A.    Yes.  You know, basically what happens with these reports

22   is, as I said, when we have the panel, we talk afterwards, and

23   we come to an agreement on how we're going to proceed.  One of

24   the three of us will write up the report.  In this case, I

25   wrote his report.  Then I would provide a copy of that report

1   to Dr. Kissin and Dr. Tillbrook.  They would review it.  This

2   is done via email.  And then our secretary prints the report to

3   be routed, and Dr. Kissin, for whatever reason, wasn't in the

4   facility at the time that she printed this out.  She had read

5   it and reviewed it, but I signed for her simply because she

6   wasn't present.

7   Q.   And these risk assessment reports, do all three of the

8   people have to agree on a conclusion?

9   A.   We don't have to agree.  If we do disagree, it would be

10  noted in the report, or we would seek further information or go

11  towards conducting further interviews with the patient to try

12  and reconcile it.  If we couldn't, it would just be noted in

13  the report that one of us didn't agree; but we all did agree on

14  Mahoney's, Mr. Mahoney's case.

15  Q.   Did you agree in particular on whether Mr. Mahoney

16  suffered from a mental disease or defect and what that was?

17          MR. SHEA:  Objection to this part, Judge.  My

18  objection is, the government never puts forward a doctor,

19  meaning a psychiatrist, the person who can actually prescribe

20  for the condition that they claim Mr. Mahoney has; and now to

21  have a psychologist testify regarding what a doctor would say

22  violates our rights of confrontation, particularly --

23          THE COURT:  Wait, wait.  All he asked is whether he

24  agreed to this report or she agreed.

25          MR. SHEA:  Right, but I believe, and maybe I lost

1    track when I was looking over some other notes, but I thought

2    that he's being asked to sign on with Dr. Kissin's evaluation.

3    Dr. Kissin is a doctor.  If they want to get the opinion of

4    Dr. Kissin, bring in Dr. Kissin.

5             THE COURT:  Overruled.  I'm only taking it for the

6    sense that Dr. Kissin agreed -- authorized you to sign her

7    name.  Is that the issue?

8             THE WITNESS:  No, your Honor.  The issue is whether or

9    not the three of us agreed on the diagnosis in the report.

10            MR. SHEA:  But of course --

11            THE COURT:  Excuse me.  When you signed her name, did

12   you have her authority to do that?

13            THE WITNESS:  Yes.

14            THE COURT:  Overruled to that limited extent.

15   Q.   The diagnosis with which all three forensic psychologists

16   agreed is identified on Page 12; is that correct?

17   A.   Yes.

18   Q.   What is it?

19   A.   It's Bipolar I disorder.

20            MR. SHEA:  What's the Bates number on that?

21            MR. CALLAHAN:  It's Exhibit 103.  There's no Bates

22   number.  Sorry.

23   Q.   Now, in 2016, did you again assess whether Mr. Mahoney met

24   the standard for commitment under 4246?

25   A.   Yes.

1   Q.   And if you could turn now to Exhibit 104.  Is this the

2   Risk Assessment Panel report from October, 2016?

3   A.   Yes.

4   Q.   And what is the diagnosis for Mr. Mahoney that's

5   identified in the October, 2016 risk assessment report?

6   A.   Bipolar I disorder.

7   Q.   And what is the conclusion in the October 28, 2016 report

8   concerning whether Mr. Mahoney's release would create a

9   substantial risk of bodily injury to another or serious

10  property damage?

11  A.   We recommended Mr. Mahoney for conditional release at that

12  point in time, that under appropriate conditions he was ready

13  to be released.

14  Q.   And were you recommending that he could be released

15  without any conditions at all?

16  A.   No.

17  Q.   Why not?

18  A.   Because in my opinion and our opinion, if he were released

19  without conditions, he would pose a danger to others as a

20  result of his mental illness.

21  Q.   I want to ask you about your bipolar diagnosis, bipolar

22  diagnosis of you and your fellow forensic psychologists from

23  2015 and 2016.  Did all of those forensic psychologists who

24  agreed with you have access to the same records that you had

25  access to?

1    A.    Yes.

2    Q.    And can you describe the basis for the conclusion that

3    Mr. Mahoney has Bipolar I?

4    A.    Yes.  He has a history of several serious manic episodes,

5    which were episodes where he experienced rapid speech, inflated

6    self-esteem, grandiosity, violent behavior, difficulty

7    sleeping.  I know of at least two episodes where this lasted

8    for several weeks, and then he has also had a number of

9    episodes which are shorter in duration.  And it's also based on

10   the fact that there have been several prior diagnoses of

11   Bipolar I disorder in his history, several diagnoses of bipolar

12   disorder not otherwise specified or bipolar disorder that's

13   undifferentiated, as Dr. Hoffman testified to earlier.  So, I

14   mean, the issue between Bipolar I and Bipolar II really comes

15   down to the idea of whether or not the person has ever had a

16   manic episode; and once they have had a manic episode,

17   certainly if they have had more than one, it's a condition that

18   is permanent.  You may anecdotally find a case here and there

19   of someone who is untreated who has had several true manic

20   episodes and goes throughout life with no further problems, but

21   that is by no means the norm.  Bipolar I disorder is a lifelong

22   condition, and it's characterized by manic episodes.  And a

23   manic episode is an episode that causes severe impairment, and

24   that's really all that differentiates mania and hypomania.  If

25   you look at the criteria, they're very similar.  The difference

1    is the degree of severity and impairment that they cause.  Many

2    people with hypomania, which is what you would have if you only

3    had Bipolar II disorder, actually function very well while

4    they're hypomanic.

5    Q.   Can I interrupt for just a minute, and can you just

6    describe, in case some of us don't know what that means, what

7    is hypomania?

8    A.   Hypomania means not manic.  It means elevated mood that

9    would be not fully manic, under.  "Hypo" is basically under,

10   under-mania, to put it literally.  So hypomania does not cause

11   severe impairment.  It does not cause impairment that would

12   result in that person needing immediate care or attention or

13   hospitalization.  And Mr. Mahoney, frankly, has had numerous

14   episodes that are manic, and the idea that anyone who had

15   reviewed his record could conclude otherwise is difficult for

16   me to believe.

17           THE COURT:  It's now 1:00 o'clock, so I think we're

18   going to cut it off.  So how much longer do you think you have

19   with him tomorrow?

20           MR. CALLAHAN:  Conservatively, I would hope, your

21   Honor, somewhere between 45 minutes and an hour and 15 minutes.

22           MR. SHEA:  I think about two hours.

23           THE COURT:  So it would be the morning?

24           MR. SHEA:  It will be the morning, I would think.

25           THE COURT:  Okay.  I don't have the afternoon for you,

1    so if we don't finish, we'll figure out when we can do it

2    consistent with your murder trial.

3          Let me ask you this.  I forget something.  I should

4    remember this but I don't:  Do the Rules of Evidence apply to

5    civil commitment proceedings?

6          MR. CALLAHAN:  They do not, your Honor, and I think

7    you already ruled that in this case after the first break on

8    the first day of the civil commitment case back in June, 2014.

9          THE COURT:  I don't remember how I ruled.  I was

10   trying to find a quick answer, but just --

11         MR. CALLAHAN:  You ruled that they did not apply.

12         THE COURT:  Right, and I was just looking at the rule

13   as to where it applies and where it doesn't.  It hasn't come up

14   so much because we've had two experts, so I just couldn't

15   remember.

16         Do you remember, Mr. Shea?

17         MR. SHEA:  I don't, your Honor.  I believe that it

18   didn't apply, but I --

19         THE COURT:  I think I did rule that, but I don't

20   really remember, so --

21         MR. CALLAHAN:  You did, and you actually stated, I

22   think it was the First Circuit -- I don't think you identified

23   a First Circuit case by name, but you said it was a First

24   Circuit -- you said that someone had found -- I don't know if

25   it was one of your law clerks -- found that the rules did not

1    apply, the Federal Rules of Evidence did not apply in

2    dangerousness hearings.

3          THE COURT:  I don't remember, but, in any event, I was

4    going to ask that.  It doesn't really apply here because we've

5    got two, or at least for him, coming in as an expert witness,

6    but there may be certain issues which are fact-based that I

7    just wanted to see.

8          All right, so we'll finish this evidentiary piece

9    tomorrow hopefully, tomorrow morning.

10          Let me ask the marshals, was there a little problem

11    getting him here on time?  Is it easier if I say 9:30?

12          THE MARSHAL:  9:30 is preferable, Judge.

13          THE COURT:  Okay.  Oh, the U.S. Marshals Service may

14    have to house him locally if he's coming back in the morning to

15    get him here on time.  So let me just say this:  We'll do it at

16    9:30 to make it a little easier rather than everybody just

17    holding on here, and then hopefully we'll get this done, okay?

18    Thank you.  Sorry for the inconvenience of coming back.

19          (Adjourned, 1:02 p.m.)

20

21

22

23

24

25

1                        C E R T I F I C A T E

2

3

   UNITED STATES DISTRICT COURT )
4  DISTRICT OF MASSACHUSETTS    ) ss.
   CITY OF BOSTON               )
5

6

7          I, Lee A. Marzilli, Official Federal Court Reporter,

8  do hereby certify that the foregoing transcript, Pages 1

9  through 131 inclusive, was recorded by me stenographically at

10  the time and place aforesaid in Civil Action No. 13-11530-PBS,

11  United States of America v. Brian Mahoney, and thereafter by me

12  reduced to typewriting and is a true and accurate record of the

13  proceedings.

14          Dated this 15th day of February, 2017.

15

16

17

18

19              /s/ Lee A. Marzilli
                _____
20              LEE A. MARZILLI, CRR
                OFFICIAL COURT REPORTER
21

22

23

24

25