1               IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF MASSACHUSETTS
2

3      UNITED STATES OF AMERICA,           )
                                           )
4               Petitioner                 )
                                           )
5          -VS-                            )  Civil No. 13-11530-PBS
                                           )  Pages 2-1 - 2-125
6      BRIAN MAHONEY,                      )
                                           )
7               Respondent                 )

8
                      **EVIDENTIARY HEARING - DAY TWO**
9

10             BEFORE THE HONORABLE PATTI B. SARIS
               UNITED STATES CHIEF DISTRICT JUDGE
11

12
     A P P E A R A N C E S:
13

          PATRICK M. CALLAHAN, ESQ., Assistant United States
14   Attorney, Office of the United States Attorney,
     1 Courthouse Way, Room 9200, Boston, Massachusetts, 02210,
15   for the Petitioner.

16        MARK W. SHEA, ESQ., Shea & LaRocque,
     Suite 103, 929 Massachusetts Avenue, 02139, for the Respondent.
17
                              United States District Court
18                            1 Courthouse Way, Courtroom 19
                              Boston, Massachusetts  02210
19                            January 27, 2017, 9:41 a.m.

20

21

22
                         LEE A. MARZILLI
23                   OFFICIAL COURT REPORTER
                  United States District Court
24                1 Courthouse Way, Room 7200
                      Boston, MA  02210
25                      (617)345-6787

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| SHAWN CHANNELL | | | | |
| By Mr. Callahan: | 3 | | | |
| By Mr. Shea: | | 52 | | |
| By Mr. Callahan: | | | 117 | |
| By Mr. Shea: | | | | 121 |

| EXHIBITS | RECEIVED IN EVIDENCE |
|---|---|
| Government: | |
| 144 | 2-7 |
| 126 | 2-30 |
| 124 | 2-34 |
| 143 | 2-36 |
| 118 | 2-44 |
| 122 | 2-44 |
| 120 | 2-45 |
| 131 | 2-48 |
| 145 | 2-120 |
| 141 | 2-120 |
| Defense: | |
| 1 | 2-56 |
| 2 | 2-57 |
| 3 | 2-97 |
| 4 | 2-108 |
| 5 | 2-115 |

```
 1                    P R O C E E D I N G S
 2           THE CLERK:  This is criminal matter 13-11530, United
 3   States v. Mahoney.  Court is in session.  Can counsel please
 4   identify themselves for the Court and for the record.
 5           THE COURT:  All right, thank you.  Call your witness
 6   back up.
 7           MR. CALLAHAN:  Thank you, your Honor.
 8           MR. SHEA:  Good morning, your Honor.  Mark Shea for
 9   Mr. Mahoney.
10           MR. CALLAHAN:  Shawn Channell.
11           THE COURT:  You're still under oath, sir.  And,
12   ideally speaking, you said about 45 minutes, so --
13           MR. CALLAHAN:  I think probably an hour, but I'm going
14   to try to come in under that.
15           THE COURT:  Yes.
16           MR. CALLAHAN:  Yes, yes.
17                         SHAWN CHANNELL
18   having been previously duly sworn, was examined and testified
19   further as follows:
20   CONTINUED DIRECT EXAMINATION BY MR. SHEA:
21   Q.   Good morning, Dr. Channell.  I think just to get us back
22   to where we broke yesterday, you were describing the basis for
23   your opinion that Mr. Mahoney had Bipolar I disorder, and I
24   think one of the last things you said was your identification
25   of at least two manic episodes that you could recall that
```

1  supported your conclusion.  Can you describe those for me,

2  please.

3  A.   Yes.  There was the period of time when Dr. Mart was

4  evaluating Mr. Mahoney for his competency to stand trial,

5  during which at two distinct periods of time several months

6  apart he described behavior consistent with mania, and in fact

7  stated specifically that he appeared manic or was quite manic

8  at the time.  That was in 2011, 2012, I believe.  And then

9  there have been a few incidents that --

10  Q.   Before you go on to the next incident, if you look at the

11  binder in front of you, is that Exhibit 107 that you're

12  referring, the description of the manic episode?

13  A.   Yes.

14  Q.   And can you just tell the Court, who is Dr. Mart?  What

15  was he asked to do?

16  A.   Dr. Mart was a court-appointed forensic psychologist who

17  was asked to evaluate Mr. Mahoney for competency to stand trial

18  in relation to a charge of failure to register as a sex

19  offender.

20  Q.   If you look at Exhibit 107, and I want to focus you on the

21  first paragraph of the first page of that exhibit, can you tell

22  from that whether Dr. Mart had actually met with Mr. Mahoney

23  before giving him the diagnosis that he landed on?

24       (Witness examining document.)

25  A.   This is the October 20, 2011?

1   Q.   Right, and if you can read just starting at the second

2   sentence of the first paragraph starting with "I previously."

3   A.   "I previously saw Mr. Mahoney on 9/23/2011, but I was not

4   able to complete the evaluation at that time.  I was able to

5   see him again at the Stratford County House of Corrections on

6   October 14, 2011, and he was willing to cooperate with the

7   assessment."

8   Q.   Dr. Mart also notes that prior to conducting the

9   evaluation, he was able to review documents provided to him by

10  Attorney Garrity.  Is that Mr. Mahoney's attorney?

11  A.   At the time it was, yes.

12  Q.   Now, after meeting with Mr. Mahoney and reviewing the

13  documentation that he had, what diagnosis did Dr. Mart offer

14  with respect to Mr. Mahoney?

15  A.   I believe it was bipolar disorder otherwise specified or

16  not otherwise specified with psychotic features.

17  Q.   Okay.  And is that diagnosis identified at Bates No. 132

18  of Exhibit 107?

19  A.   Yes, it is.

20  Q.   Now, is there a difference between Bipolar I and bipolar

21  not otherwise specified with psychotic features as identified

22  here in Dr. Mart's report?

23  A.   Yes, there is a difference.

24  Q.   Can you explain it to us.

25  A.   Well, Bipolar I disorder identifies that the individual

1    have elevated mood which results in severe impairment and

2    functioning or requires hospitalization, and it lists a number

3    of criteria.  There are seven specifically, three of which the

4    individual would need to exhibit in order to meet the

5    diagnostic criteria for the condition; and those things would

6    be things like elevated mood, grandiosity, sleep disturbance,

7    excessive talkativeness, flight of ideas, distractibility.

8         The difference between Bipolar I disorder and bipolar

9    disorder not otherwise specified is that you still have a

10   condition which results in marked impairment, but they may or

11   may not meet all -- they may not meet, for example, three of

12   those diagnostic criteria.  They may only meet two, or they may

13   have different types of symptoms.  For example, here, psychotic

14   features, he had delusional beliefs at the time, which aren't

15   strictly symptoms of bipolar disorder.  So the difference is

16   not one of degree of severity of impairment.  The difference is

17   the types of symptoms that the individual is presenting with.

18   Q.   Does bipolar not otherwise specified, is that considered a

19   severe mental illness?

20   A.   Yes.

21   Q.   Now, what about the difference between Bipolar I and

22   Bipolar II?

23   A.   There is a significant difference between Bipolar I and

24   Bipolar II.

25   Q.   Let me just pause there.  Is Bipolar II, in your opinion,

1    a severe --

2            THE COURT:  Where are you getting all this from?  Is

3    this from the DSM?

4            THE WITNESS:  These are the criteria from the DSM-V,

5    yes.

6            THE COURT:  Do I have that in the record?

7            MR. CALLAHAN:  Your Honor, I'll enter 144.

8            THE COURT:  I think that would be worth having.  Is

9    that the V, the most recent one, sir?

10           THE WITNESS:  Yes.  That's the most recent edition.

11           THE COURT:  Thank you.

12   Q.   What is Exhibit --

13           MR. CALLAHAN:  Well, we offer Exhibit 144 in evidence,

14   your Honor.

15           THE COURT:  All right.

16           MR. SHEA:  Is it DSM-IV or DSM-V?

17           THE COURT:  I don't know.  I asked that question.

18   Q.   I'll ask.  What is 144?

19   A.   DSM-V.

20           MR. SHEA:  So Exhibit 144 is from DSM-V?

21           THE WITNESS:  Yes.

22           MR. SHEA:  Thank you.

23           (Exhibit 144 received in evidence.)

24   Q.   So you had said earlier that the difference between

25   Bipolar I and bipolar NOS was not a matter of severity.  Is the

1  difference between Bipolar I and Bipolar II a matter of

2  severity?

3  A.   Yes.

4  Q.   Bipolar II, in your opinion, is that a severe mental

5  illness?

6  A.   No.

7  Q.   In his testimony yesterday, what did Dr. Hoffman say about

8  whether or not bipolar not otherwise specified was a severe

9  mental illness?

10  A.   His statement was consistent with mine, that it was the

11  same as bipolar disorder.  It just didn't meet the criteria

12  for, as I think he termed it, classic Bipolar I disorder.

13  Q.   Now, did Dr. Mart in Exhibit 107, in this October, 2011

14  report, did he identify Mr. Mahoney one way or another as being

15  manic?

16  A.   Yes.  He explicitly stated he was manic.

17  Q.   And did you hear Dr. Hoffman read those portions of

18  Dr. Mart's report yesterday during his testimony where Dr. Mart

19  identified Mr. Mahoney as being manic?

20  A.   Yes.

21  Q.   Did you give this forensic report by Dr. Mart any weight

22  in arriving at your conclusion that Mr. Mahoney had a severe

23  mental illness?

24  A.   Yes.

25  Q.   Can you explain?

```
 1   A.   Well, one of the distinctions between Bipolar I and
 2   Bipolar II, if you use this page from DSM-V is probably the
 3   easiest way to explain it, Bipolar I is characterized by a
 4   history of at least one manic episode.  Bipolar II, there can
 5   never be a manic episode.  Once you've had a manic episode, you
 6   can never meet diagnostic criteria for Bipolar II disorder.
 7   Bipolar II disorder is characterized only by a history of
 8   depressive episodes and hypomanic episodes.  And hypomanic
 9   episodes, while similar to a manic episode, are in no way as
10   severe or cause the degree of impairment that a manic episode
11   does.  So the reason I would apply weight to Dr. Mart's opinion
12   is because the fact that he offered the opinion that
13   Mr. Mahoney was manic provides evidence of at least one manic
14   episode.  Therefore, a conclusion of diagnosing Bipolar II
15   disorder would be inaccurate or you would need to dismiss
16   Dr. Mart's conclusions.
17   Q.   And were there other manic episodes you're aware of
18   besides the one identified here in Dr. Mart's report, 107?
19   A.   Yes.
20   Q.   Okay, and we'll get to those in a minute.  And before we
21   move off Exhibit 107, I'd like to refer you to Bates No. 131.
22   Look at the top of the page.  I have it up on the screen here.
23             THE COURT:  Well, apart from Dr. Mart, have you also
24   seen manic episodes, or Bureau of Prisons?
25             THE WITNESS:  Yes.
```

1          THE COURT:  So they've continued?

2          THE WITNESS:  Correct.

3    Q.   At the top of Page 131, and I have it on the screen,

4    Dr. Mart writes, "I questioned Mr. Mahoney about his criminal

5    history.  He told me that his only felony conviction occurred

6    in 1992 when he was convicted of asking a sixteen-year-old girl

7    for oral sex and served five years in the penitentiary."

8          Do you see that?

9    A.   Yes.

10   Q.   Are you familiar with his criminal history and records

11   concerning his criminal history?

12   A.   Yes.

13   Q.   Is that an accurate statement of that conviction?

14   A.   Absolutely not.

15   Q.   What is this an example of, if anything?

16   A.   It's an example of his minimization of his criminal

17   history, his minimization of his history of violence, his lack

18   of insight into his history of violence.

19   Q.   And the charge that Mr. Mahoney was convicted of, did it

20   involve any weapons?

21          MR. SHEA:  I have some objection to this, Judge,

22   because it --

23          THE COURT:  I sustain that.  I don't need to go back

24   to 2011 records.  We need to move this forward.

25          MR. CALLAHAN:  Okay.

1   Q.   You talked about manic episodes continuing with Mr. Mahoney.

2   A.   Yes.

3   Q.   Did you also read the forensic report of Dr. Mart from

4   later in March, 2012?

5   A.   Yes.

6   Q.   What did that refer to in terms of whether he had seen or

7   observed Mr. Mahoney in a manic episode or not?

8   A.   He continued to report that he was in a manic episode at

9   that time.

10   Q.   And if you turn to Exhibit 136, is that the March, 2012

11   report that you're referring to?

12   A.   Yes.

13   Q.   In terms of manic episodes at the Bureau of Prisons, at

14   Devens Medical Center, are you familiar with any manic episodes

15   that occurred there?

16   A.   Yes.

17   Q.   I want to direct you to Exhibit 110 in the binder in front

18   of you.  Do you have that in front of you?

19   A.   Yes, I do.

20   Q.   What is this?

21   A.   This is a clinical encounter note by Mr. Mahoney's

22   treating psychiatrist, Dr. Vikram Kambampati.

23   Q.   Dr. Kambampati is a psychiatrist, not a psychologist?

24   A.   Yes.

25   Q.   Okay.  And what does this tell you in terms of whether

1    Mr. Mahoney had been observed being manic at Devens Federal

2    Medical Center?

3    A.   Well, his assessment is "Bipolar I disorder, currently

4    manic with associated hostility, impulsivity, and potentially

5    dangerous behavior."  So what that tells me is, he, in his

6    opinion, he was currently manic at that moment that he

7    interviewed him, met with him.

8    Q.   And that instance is something he describes under the

9    "Subjective" heading there in Exhibit 110?

10   A.   Yes.

11        MR. SHEA:   What's the Bates number?

12        MR. CALLAHAN:   632.

13   Q.   Dr. Kambampati, at this time, was he part of Mr. Mahoney's

14   treatment team?

15   A.   No.  He's no longer with the Bureau of Prisons.

16   Q.   At the that he wrote this, was he part of the treatment

17   team?

18   A.   Yes.  He was his treating psychiatrist.

19   Q.   So in his role as a treating psychiatrist, would he be

20   interacting with Mr. Mahoney?

21   A.   Yes.

22   Q.   How frequently?

23   A.   More likely than not, every week.

24   Q.   What significance does this treatment note, Exhibit 110,

25   hold for you in your assessment of Mr. Mahoney as being

1  Bipolar I?

2  A.   Well, again, this is now a second incidence of a manic

3  episode, so the importance is exactly the same, but it is

4  further evidence that he has had at least one manic episode.

5  In fact, he's had at this point at least two manic episodes.

6  Q.   There was some testimony yesterday from Dr. Hoffman about

7  having a manic episode that lasts one week.  Do you recall that

8  testimony?

9  A.   Yes.

10 Q.   Is that a requirement of Bipolar I?

11 A.   No.

12 Q.   Can you explain.

13 A.   If you look again at the reference you provided from

14 DSM-V --

15 Q.   Is that Exhibit 144?

16 A.   Yes -- under "Manic episode, Criteria A," it says "A

17 distinct period of abnormality and persistently elevated,

18 expansive, or irritable mood, and abnormally and persistently

19 increased goal-directed activity or energy lasting at least one

20 week and present most of the day, nearly every day, or any

21 duration if hospitalization is necessary."

22 Q.   So what does that last clause mean?

23 A.   That means, if someone has to be in a hospital, placed in

24 a hospital inpatient setting as a result of their manic

25 episode, even for one day, it qualifies as a manic episode.

```
 1    Q.    Was Mr. Mahoney --

 2            MR. SHEA:  Objection because this is --

 3            MR. CALLAHAN:  Go ahead.

 4            MR. SHEA:  Respectfully, this is a mischaracterization.

 5    He's at this point, at least both times that I'm aware that

 6    he's referring to, quote, "manic episodes" to try and get

 7    around the one week thing here is competency evaluation where

 8    the question of his competency --

 9            MR. CALLAHAN:  Objection, your Honor.

10            MR. SHEA:  -- is at issue.  And so --

11            THE COURT:  I tell you what, cross-examine him on that

12    point.

13    Q.    So, Dr. Channell, as to the week-long duration that

14    Dr. Hoffman was identifying yesterday, that is not a

15    requirement of a Bipolar I diagnosis?

16    A.    No, it isn't.

17    Q.    And if you were to identify a week-long manic episode, do

18    you have to observe the subject for one entire week from

19    beginning to end 168 days?

20    A.    No.  As it indicates here, it's present most of the day

21    nearly every day.  It doesn't even have to be present every

22    day.

23            THE COURT:  Well, let me ask you this:  Is there any

24    evidence in the record of it lasting one week?

25            THE WITNESS:  Yes.  Both the examples that I've
```

1   previously discussed lasted more than a week.  In fact, they

2   lasted several weeks.

3   Q.   So I'd like you to turn now to Exhibit 111?

4         THE COURT:  Let me just ask you, if it didn't last for

5   one week, would it still qualify under the NOS?

6         THE WITNESS:  Yes.  And at Devens it would also

7   qualify under the fact he required hospitalization.  He had to

8   be moved from an open housing unit to a locked inpatient unit

9   in order to provide for his own safety and the safety of

10   others.

11         THE COURT:  When?

12         THE WITNESS:  This would have been in 2012, the

13   Dr. Kambampati note.

14         MR. SHEA:  I --

15         THE COURT:  You know, cross him on it.

16         MR. SHEA:  Okay.

17   Q.   So looking at Exhibit 111, if you don't have that in front

18   of you, it's on the screen.  What is Exhibit 111?

19   A.   This is another note from Dr. Kambampati dated February,

20   2013.

21   Q.   And right underneath the date it says -- can you read what

22   it says?  It says "Psychiatry follow-up"?

23   A.   Yes.

24   Q.   And it says "Encounter performed at special housing unit."

25   What does that refer to?

1   A.   That's -- technically it's called N-1 at FMC Devens, and

2   that is our inpatient, our secure inpatient mental health unit.

3   Q.   Okay, is that the unit that you were just describing to

4   Judge Saris?

5   A.   Yes.

6   Q.   And that's where he was at the time of this treatment note

7   in February, 2013?

8   A.   Yes.

9   Q.   And under "Assessment," what does Dr. Kambampati say about

10  Mr. Mahoney?

11  A.   "Bipolar I disorder:  Currently has hypomanic symptoms of

12  tangentiality, impulsivity, worsening."

13  Q.   Did you observe Mr. Mahoney at Devens between these two

14  treatment notes, October, 2012, and February, 2013, or at least

15  between this period of time?

16  A.   Yes.

17  Q.   What did you observe in regards to whether or not

18  Mr. Mahoney appeared manic?

19  A.   I observed behavior which was consistent with mania, the

20  same symptoms that Dr. Kambampati noted.

21       MR. SHEA:  Again, I know you're going to say "cross,"

22  and I will, but I object because Kambampati's note that was

23  just referenced, which is Exhibit 111, I believe, says

24  "hypomania."  We have seen from the DSM --

25       THE COURT:  You know, I tell you what --

```
 1            MR. CALLAHAN:  Objection.
 2            THE COURT:  -- cross on it.  I mean, if you want to
 3    rebut him every point, we'll never finish.  Cross him on it.
 4            MR. SHEA:  Well, frankly, it's very close to
 5    perjurious.
 6            THE COURT:  Well, let me ask you this:  Are you
 7    challenging that Mr. Mahoney has Bipolar I or bipolar not
 8    otherwise specified?
 9            MR. SHEA:  I am going to challenge that.
10            THE COURT:  Yes, so he has the right to establish it.
11            MR. SHEA:  But he also has to stick by his own --
12    DSM-V, he just introduced Exhibit --
13            THE COURT:  You know what?  Overruled.  Cross, argue
14    on it.  I need to finish this.
15    Q.   Dr. Channell, in your time at Devens observing
16    Mr. Mahoney, did you see any shorter manic episodes?
17    A.   Yes.
18    Q.   Can you describe those.
19    A.   He's had multiple episodes where he has had to be
20    transferred to the inpatient unit because of threatening,
21    aggressive, violent, disruptive behavior.
22            MR. SHEA:  Objection as that being the basis.
23            THE COURT:  Overruled, overruled.
24    Q.   Besides you, Dr. Channell, have there been any other
25    clinicians who previously offered the opinion that Mr. Mahoney
```

1    suffers from Bipolar I or bipolar not otherwise specified?

2    A.    Yes.

3    Q.    Can you describe who.

4    A.    Well, Avis Goodwin back in 2010, Dr. Kambampati who we've

5    just mentioned in 2012; his treating psychologist,

6    Dr. Beaulieu, in 2013; Dr. Tillbrook and Dr. Kissin in 2015;

7    and Dr. Tillbrook again this year.

8    Q.    And who is Dr. Tillbrook?

9          MR. SHEA:  Just a point of clarification:  Those are

10   psychologists, not medical --

11         MR. CALLAHAN:  Your Honor --

12   Q.    Dr. Kambampati, he's not a psychologist, correct?

13   A.    That's correct.

14   Q.    And you talked about Dr. Mart.  Is he another clinician

15   who's identified Mr. Mahoney as suffering from bipolar NOS?

16   A.    Well, you had asked me about Bipolar I.  There are a

17   number of people who have diagnosed him with bipolar NOS, and

18   that was MCI Concord in 2009, Dr. Mart in 2011, Stratford

19   County jail, his current treating psychologist, Dr. Gorham.

20   Q.    In total, how many clinicians is that who have identified

21   Mr. Mahoney as having -- well, actually, let me step back for a

22   minute.  Did you also listen to the testimony of Dr. Kriegman,

23   who is Mr. Mahoney's expert in the 2014 commitment hearing?

24   A.    Yes.

25   Q.    Do you recall what Dr. Kriegman's opinion was with respect

1    to whether Mr. Mahoney suffered from a mental illness?

2            MR. SHEA:  Objection.  I have objections to all of

3    these other opinions being entered through this expert.  If

4    they want to call these people --

5            THE COURT:  Overruled.

6            I did double-check, by the way.  The Rules of Evidence

7    don't apply to the competency hearings.  But even beyond that,

8    he's relying on other psychiatrists.  He's allowed to do that

9    as an expert.

10   Q.   Could I ask you to turn to Exhibit 114 in your binder.

11   A.   Is it all right if I just look off the ELMO?

12   Q.   Oh, sure, sure.  I'd like you to read --

13           MR. SHEA:  Because I was meaning to object to

14   Kriegman's testimony being allowed in.  I understand the Rules

15   of Evidence don't apply, but I do think --

16           THE COURT:  Overruled.

17           MR. SHEA:  Well, can I be heard?

18           THE COURT:  No, because we need to finish this.  You

19   can cross-examine.

20           MR. SHEA:  No, but this is on a different issue.

21           THE COURT:  What's the issue?  What's the issue?

22           MR. SHEA:  Well, meaning if I -- Mr. Schneider

23   represented Mr. Mahoney at the prior hearing, and he made

24   tactical decisions, and he chose to call Dr. Kriegman.

25           THE COURT:  Right.

1          MR. SHEA:  It seems to -- I've never been in a

2     situation where it's like going to trial a second time and I'm

3     being bound by the strategic decisions of the prior lawyer.

4     It's not what -- Mr. Mahoney I think --

5          THE COURT:  Okay, let me make it clear.  You're not

6     bound by it, but you're trying to basically argue that he

7     doesn't have a major mental disease or defect based on the

8     testimony of Dr. Hoffman.  Fair enough.  But they're allowed to

9     re-buttress their point if they believe he still has a major

10    mental health issue.  And Dr. Kriegman, who examined him

11    actually, right, and was the defense, is part of that record,

12    so overruled.  You're not bound by it.  It's not like

13    collateral estoppel or judicial estoppel.  It's just it's part

14    of the record.

15         MR. SHEA:  Right, but it's not subject to

16    cross-examination by me.

17         THE COURT:  Overruled.  You know, Dr. Hoffman relied

18    on all these records.  They rely on records.  So that's the

19    way -- experts rely on other qualified people.  Dr. Kriegman is

20    a psychiatrist, right?

21         THE WITNESS:  Yes.

22         MR. SHEA:  He's a psychologist.

23         THE WITNESS:  He is a psychiatrist.

24         THE COURT:  He's a psychiatrist?  Yes.  I mean, so

25    you're allowed to look at other professionals and see what they

1  thought over time.  If you're not challenging the bipolar

2  diagnosis, then we'd be in a different place, but you are.

3          MR. SHEA:  Well, the level of bipolar, at least,

4  because the only institution called him Bipolar II, which he's

5  just testified doesn't qualifies as a major mental illness.

6  And --

7          THE COURT:  You know what?  We'll never finish.

8  You're going to be here all next week, all next week.

9  Q.   Dr. Channell, so I think if you want to look on the screen

10 here, this is the testimony of Dr. Kriegman, Exhibit 114.  Can

11 you read the question and answer beginning on Line 20 at the

12 bottom of Page 31 of that transcript.

13 A.   "Question by Mr. Schneider:  Just to clarify with respect

14 to the issue of diagnosis, are you in agreement with

15 Dr. Channell that Mr. Mahoney suffers from bipolar?  Answer:  I

16 think he fits the diagnostic criteria."

17      You'd like to me to continue?

18 Q.   Yes, please.

19 A.   "You could also diagnose him as hyperactive or even

20 narcissistic personality disorder or even borderline

21 personality disorder, but the best diagnosis would be probably

22 bipolar, and it's the most common one in the record, so I go

23 with that."

24 Q.   And had Dr. Kriegman met with Mr. Mahoney before offering

25 this?

1    A.    Yes.

2    Q.    Had Dr. Kriegman also reviewed Bureau of Prisons' records,

3    according to his testimony, before arriving on this conclusion?

4    A.    Yes.

5    Q.    I just want to ask you for a moment about Dr. Kissin.

6    Mr. Shea pointed out yesterday that Dr. Kissin had provided a

7    diagnosis back in 2011 of Bipolar II.

8              THE COURT:  Did he specify Bipolar I or Bipolar II?

9              THE WITNESS:  No, he did not.

10   Q.    Dr. Kissin, Mr. Shea had referred to Dr. Kissin offering a

11   diagnosis in July, 2011, of Bipolar II.  Do you recall that

12   yesterday?

13   A.    Yes.

14   Q.    Do you know at some point in time if Dr. Kissin's opinion

15   with respect to Mr. Mahoney's diagnosis changed?

16   A.    Yes, it did.

17   Q.    And can you describe that.

18   A.    She concurred with the diagnosis of Bipolar I disorder

19   when we risk paneled him in 2015.

20   Q.    And is that risk panel, is that Exhibit 103 in front of

21   you?

22   A.    Yes.

23   Q.    And you talked a little bit about this yesterday, but her

24   name is on the back page of this report.  What does that

25   indicate?

1    A.    That indicates she was part of the risk panel and agreed

2    with the conclusions and diagnoses in this report.

3    Q.    And what happens if a member of the risk panel actually

4    disagrees with something in the report?

5    A.    It would be noted in the report.

6    Q.    Was it noted in this report, the November, 2015 risk

7    assessment report that's Exhibit 103?

8    A.    No.  She didn't disagree with the diagnosis.

9    Q.    And in between the time she arrived at her first diagnosis

10   of Bipolar II in 2011 and her more recent diagnosis of

11   Bipolar I in 2015, had she had additional time to speak with

12   and talk to Mr. Mahoney?

13              MR. SHEA:  Objection.  Now, this is --

14              THE COURT:  Sustained.

15              MR. SHEA:  Thank you.

16   Q.    Did you ever see Dr. Kissin with Mr. Mahoney between 2011

17   and 2015?

18   A.    During the risk panel interviews, yes.

19   Q.    She participated in those?

20   A.    Yes.

21   Q.    Do you know one way or another whether she reviewed

22   records as well?

23   A.    Yes.  I know she reviewed records.

24   Q.    So in total, how many other clinicians have diagnosed

25   Mr. Mahoney with Bipolar I or bipolar NOS?

1    A.    Approximately ten.

2    Q.    And that would include Dr. Mart, Dr. Kriegman,

3    Dr. Kambampati, Dr. Tillbrook, Dr. Kissin, the Mass. Department

4    of Corrections, Dr. Gorham, and yourself?

5    A.    And Dr. Beaulieu.

6    Q.    And who's Dr. Beaulieu?

7    A.    She was his treating psychologist.

8    Q.    Where?

9    A.    At Devens back in 2013.

10   Q.    How long have you worked with Mr. Mahoney, interacted with

11   him, assessed him?

12   A.    About four years.

13   Q.    Have you seen other physicians, psychiatrists, interns,

14   and psychologists work with him?

15   A.    Yes.

16   Q.    And what have you observed, if anything, about how their

17   views of Mr. Mahoney change over time or develop over time?

18   A.    Well, many of them initially have perceived him as an

19   individual who has primarily a good deal of narcissism and

20   arrogance and antisocial personality, but the more time they

21   have spent with him, it's become clear that he exhibits a

22   number of symptoms of mania, clear symptoms of mania as well

23   as --

24             MR. SHEA:  Your Honor --

25             THE COURT:  Sustained.

```
 1              MR. SHEA:  Thank you.
 2    Q.   Do you know in the records that you've reviewed from 2008
 3    to the present, has Mr. Mahoney ever been prescribed any mood
 4    stabilizer medication?
 5    A.   Yes.
 6    Q.   Which ones?
 7    A.   Seroquel, Depakote, trileptal, and lithium.
 8    Q.   Has he been prescribed those mood stabilizers by multiple
 9    physicians, psychiatrists and psychologists -- psychiatrists
10    and physicians?  Excuse me.
11    A.   They were all prescribed by psychiatrists, and, yes,
12    different psychiatrists.
13    Q.   What's the significance, if any, of Mr. Mahoney being
14    prescribed Seroquel and mood stabilizers by psychiatrists who
15    have been treating him in the past?
16    A.   Those are medications that are used to treat bipolar --
17    they're used to treat mania.
18    Q.   And most recently, what dose of Seroquel has Mr. Mahoney
19    been on?
20    A.   Currently he's on 800 milligrams of Seroquel.
21    Q.   Has he ever been on a dose that's higher than that?
22    A.   Yes.  Up until he stopped his medication in October, he
23    was on 900 milligrams of Seroquel.
24              THE COURT:  Is he taking anything now?
25              THE WITNESS:  Yes.  He's taking his Seroquel now.
```

1    Q.    Have you read Dr. Hoffman's testimony in the fair hearing

2    transcript?

3    A.    Yes.

4    Q.    And you listened to him testify yesterday?

5    A.    Yes.

6    Q.    Do you agree or disagree with his opinion that Mr. Mahoney

7    does not meet the criteria for Bipolar I disorder?

8    A.    I disagree.

9    Q.    And can you explain the basis for your disagreement.

10   A.    Well, a big part of the disagreement is that apart from

11   one diagnosis of Bipolar II disorder by Dr. Kissin in 2011 and

12   apparently some note that was written by Dr. Kazim that was

13   introduced yesterday, those are the only two clinicians that

14   I'm aware of that have ever concluded that he met criteria for

15   Bipolar II disorder.  So one concern I have is that it's a

16   clear outlier.  I mean, his opinion differs significantly

17   because not only did he indicate in his letter to Mr. Mahoney

18   that he didn't believe he met criteria for Bipolar I disorder,

19   he didn't even believe he met criteria for Bipolar II disorder,

20   which is different from every clinician that I have records

21   from with regard to his presentation since at least 2010.

22   There are some periods of time prior to that that some folks

23   had diagnosed him with other diagnoses, but for the past seven

24   years, I'm not aware of anyone who would have concluded that he

25   didn't meet Bipolar I, Bipolar II, or some type of

1    schizoaffective, schizophrenia-like disorder.

2          THE COURT:  Let me ask you, he complains that he asked

3    for records and he only got a small subset of the records.  Can

4    you explain what happened?  Do you have personal knowledge

5    there?

6          THE WITNESS:  What I can explain as far as what I know

7    about what happened is that he had spoken with Ms. Finch-Hall

8    prior to even reviewing the application and had indicated to

9    her that they had already decided not to take Mr. Mahoney.

10          THE COURT:  That's a different answer.  That's a

11    different issue.  He's somewhat acknowledged that it was not

12    going to have a good result, but he wanted to make a good

13    clinical judgment, he said, so he asked for records.  Were you

14    involved in what records were produced, which could explain

15    this discrepancy?

16          THE WITNESS:  No.  If he had asked for any specific

17    record, I would have been involved because I maintain his

18    records apart from the Bureau of Prisons' records.

19          THE COURT:  I mean, he got almost nothing, right?  Not

20    from you, from Devens?

21          THE WITNESS:  Yes, he got almost nothing.

22          THE COURT:  Why?  Do you know?

23          THE WITNESS:  I don't know why.  That would be

24    speculation on my part as to why.

25    Q.   Dr. Channell, did you ever see any written request

1    anywhere in any of the records you've seen from Dr. Hoffman
2    asking for a single piece of paper?
3    A.    No.
4    Q.    And Dr. Hoffman was provided your 2015 risk assessment
5    report which listed all of the documents that you had looked at
6    in arriving at your conclusion, correct?
7    A.    Yes.
8    Q.    Did you ever receive a call from him saying, "Dr. Channell,
9    can I have some of these records?  I really want them to review
10   Mr. Mahoney's history"?
11   A.    No.
12   Q.    Never?
13   A.    No.  I was unaware of really anything related to
14   Dr. Hoffman until Mr. Mahoney provided his treatment provider
15   with the conclusions from his hearing.
16   Q.    A moment ago I was asking you for the basis of your
17   disagreements with Dr. Hoffman's opinion that Mr. Mahoney
18   didn't have Bipolar I disorder and was questionable about
19   Bipolar II disorder.  Can you just continue on what the basis
20   of your disagreement is.
21   A.    Yes.  So the first disagreement would be that it was a
22   clear outlier compared to most of the other records which
23   existed.  Another disagreement was that he made his conclusions
24   based on -- whether it was his own fault or not, I don't have
25   an opinion on that, but he based his conclusion on a very small

1    number of records, despite the fact he knew there were more

2    records.  And I guess my primary complaint is that despite

3    knowing there were more records, he didn't make any indication

4    in his conclusion or in his communication to Mr. Mahoney that

5    there were records available which he hadn't reviewed, and that

6    it's possible his opinion could change if there were other

7    records.  He made a very conclusive statement to Mr. Mahoney

8    that he did not believe he had a major mental illness, and, to

9    be quite honest, it has interfered significantly with our

10   ability to care and treat Mr. Mahoney.

11   Q.   Can you explain that?

12   A.   Yes.  After he received the communication from

13   Dr. Hoffman, he began cheeking his medication.  Basically what

14   that means is, when you go to pill line and are provided your

15   medication, they ask you to open your mouth to show that you've

16   taken it; and he was putting the medication between his cheek

17   and his teeth so that it appeared that he had swallowed it, and

18   then he was spitting it out and accumulating it in a pill

19   bottle in his room, which was later found by staff after he

20   received an incident report for threatening his treating

21   psychologist.

22   Q.   Just pause on that one episode for just a minute.  I would

23   like you to turn to Exhibit 126 in the binder in front of you.

24   What is Exhibit 126?

25   A.   It's a chronological disciplinary record, inmate

1    discipline data from the Bureau of Prisons.

2    Q.   Okay.  And if you turn to Bates No. 3050 within that

3    exhibit, what is that?

4    A.   That is an incident report from the Bureau of Prisons.

5            MR. CALLAHAN:  We offer 126 into evidence.

6            THE COURT:  All right.

7            (Exhibit 126 received in evidence.)

8    Q.   And does this describe the incident that you were just

9    discussing a moment ago?

10   A.   Yes.

11   Q.   Okay.  And describe what happened.  What was found in

12   Mr. Mahoney's possession on or about November 21, 2016?

13   A.   They found 29 Seroquel, 300-milligram Seroquels in his

14   possession, which he was prescribed 900 milligrams of Seroquel

15   at the time.

16   Q.   And I want to go back just in time just a moment to just

17   get the timing down, but you had recommended Mr. Mahoney, while

18   finding that he still met the criteria for 4246, you had

19   actually recommended in October of 2016 that he could be

20   conditionally released if he was willing to comply with certain

21   conditions; is that correct?

22   A.   Yes.  We had a risk panel meeting at which we interviewed

23   Mr. Mahoney at the end of August, 2016, and he had been doing

24   well up until that point.  He had been taking his medication.

25   He had participated in a number of different treatment

1    activities and educational groups and other therapeutic

2    activities.  He'd stayed out of trouble and hadn't received an

3    incident report for about ten months or so, and at that point

4    in time, we believed that with appropriate conditions in place,

5    he would be appropriate for a conditional release.

6    Q.   So you just described the interview that you had with

7    Mr. Mahoney preceding that RAP report, and that was August 30,

8    2016?

9    A.   Yes.

10   Q.   That's before the date of the fair hearing with the

11   Department of Mental Health, which is in September of 2016,

12   correct?

13   A.   Yes.

14   Q.   So before the fair hearing, you had actually got the

15   impression he was doing better?

16   A.   Yes.

17   Q.   After the fair hearing -- well, actually, in the fair

18   hearing, do you know if Mr. Mahoney was told by Dr. Hoffman

19   Dr. Hoffman's view on whether he had bipolar or bipolar NOS?

20   A.   Yes, he was.

21   Q.   Okay.  And what did you observe after that September 28,

22   2016 fair hearing, what did you observe of Mr. Mahoney's

23   behavior?

24   A.   Well, the only interaction I had with Mr. Mahoney after

25   that was the August 30 interview, and then I interviewed him

1    again on November 23, 2016, so that's my only direct

2    observation of Mr. Mahoney.

3    Q.   And the August interview that you had with him was before

4    the fair hearing, obviously?

5    A.   Yes.

6    Q.   Okay.  And then you talked about this incident report with

7    respect to the medication that was found in Mr. Mahoney's

8    possession, the Seroquel.  Did that occur after the fair

9    hearing?

10   A.   Yes.  I interviewed Mr. Mahoney on November 23, and he

11   explained to me that after he was told by Dr. Hoffman that he

12   did not have a major mental illness, he understandably did not

13   believe that he needed to take 900 milligrams of Seroquel any

14   longer, so he started cheeking about two-thirds of his dosage,

15   approximately 600 milligrams a day, and was hoarding it.  He

16   didn't tell me what the purpose of holding onto it was apart

17   from the fact that he would take one if he wanted to take a nap

18   in the afternoon.

19   Q.   And did you describe this interaction, this interview with

20   Mr. Mahoney, in your risk assessment report, the addendum to

21   your risk assessment report in November of 2016?

22   A.   Yes.

23   Q.   Now, when he started --

24        THE COURT:  So I didn't get it.  At this fair hearing,

25   did the outcome -- did Dr. Hoffman testify in front of

1    Mr. Mahoney that he had no mental illness?  Is that what he's

2    relying on?

3          THE WITNESS:  Yes, and he provided a written

4    communication to Mr. Mahoney.  I believe Mr. Mahoney indicated

5    to me that that was in -- at some point in October.  I can't

6    recall exactly.  But, yes, in the hearing he did communicate,

7    and Mr. Mahoney was present at the hearing.

8          THE COURT:  And it was at that point he started

9    cheeking?

10         THE WITNESS:  Not long after, yes.

11   Q.   Let me ask you this:  Did you ever hear anything from

12   Dr. Hoffman or did you ever hear from anyone on the treatment

13   team who had spoken to Dr. Hoffman indicating Dr. Hoffman told

14   them that he disagreed with the diagnosis and Mr. Mahoney

15   didn't have Bipolar I?

16   A.   No.  The first time I became aware of it was, there were

17   several incidents that Mr. Mahoney had with his treating

18   psychologist, Dr. Gorham.  He had been attending a group with

19   Dr. Gorham for some time, and, as I said, he was doing well.

20   He began becoming very argumentative, intrusive, basically

21   insubordinate during those meetings, insisted on calling him by

22   his first name.  So he was reprimanded for that, and then he

23   became extremely agitated and angry with Dr. Gorham and

24   basically threatened him during an interaction between himself

25   and the intern who was treating him at the time.  And it was

1   around this time that Dr. Gorham informed me that he had been

2   provided the final opinion with regard to Mr. Mahoney's

3   application to DMH, but he had been provided that by

4   Mr. Mahoney himself.  We had not seen that.

5   Q.   You didn't get it from DMH?

6   A.   No.

7   Q.   That incident that you described with Dr. Gorham, did

8   Mr. Mahoney receive an incident report for that?

9   A.   Yes, he did.

10  Q.   Can I ask you to turn to Exhibit 124 in your binder.  What

11  is Exhibit 124?

12  A.   An incident report dated November 21, 2016.

13          MR. CALLAHAN:  The government offers 124, your Honor.

14          (Exhibit 124 received in evidence.)

15  Q.   And what does this incident report describe, if you look

16  at Bates No. 1911?

17  A.   This is an incident report for threatening another with

18  bodily harm, and it describes the interaction between

19  Mr. Mahoney and his treating psychiatrist -- his treating

20  psychologist, Dr. Gorham, on that date.

21  Q.   And what did Mr. Mahoney do?  And I'll refer you to, if

22  you can read for us the quote beginning on the third line down

23  in 11, and if it's easier to look on the screen, you can.

24  A.   It says, "'You know what?  Used my first name (in spite of

25  being directed not to previously).'"  That's in parentheses.

1    "'I'm from right here in Boston and I'm getting out.  Remember

2    that.  I'm from right here in Boston, and I'm going to be out

3    there soon.  Remember that.'

4        "He made this statement after being asked to apologize to

5    the group for violating the group rule of communicating in a

6    respectful manner.  In context, the combination of the

7    statement and the act of coming rapidly toward me in what

8    appeared to be an aggressive attempt to intimidate me made it

9    clear that the inmate was expressing a threat."

10   Q.   Now, after the fair hearing decision, after this incident

11   report, did there come a point when Mr. Mahoney refused to work

12   with his treatment team?

13   A.   Yes.  He had sent letters to both myself and to Dr. Gorham

14   indicating that he will no longer work with either of us, that

15   he'll never attend another Risk Assessment Panel meeting, and

16   that he will no longer cooperate with Dr. Gorham as his

17   treating psychologist, and he has not.

18   Q.   And can I ask you to look at Government Exhibit 143.

19            THE COURT:  And that continues to this day?

20            THE WITNESS:  Yes.

21   Q.   Can you look at Government Exhibit 143, please.  What is

22   that?

23   A.   This is an Inmate's Request to Staff form.  It's a

24   procedure that the inmates at FMC Devens can use to communicate

25   with staff.

1          MR. CALLAHAN:  The government offers 143, your Honor.

2     Is that admitted?

3          THE COURT:  Yes, yes.

4          MR. CALLAHAN:  Thank you.

5          (Exhibit 143 received in evidence.)

6     Q.   Could you read for the Court what Mr. Mahoney writes in

7     the first two sentences there.

8     A.   "As you know, Dr. Hoffman found that I was competent to

9     stand trial, and he did agree with Dr. Kissin, a forensic

10    psychologist for the BOP.  On the advice of my attorney, there

11    will be no more further contact with you or Dr. Channell.  My

12    most recent evaluation done by Dr. Hoffman clearly ruled out

13    Bipolar I disorder and Bipolar II disorder as well as

14    schizophrenia and acute manic.  The 800 milligrams of

15    quetiapine --" that's Seroquel -- "was to treat these three

16    mental disorders, but Dr. Hoffman, a psychiatric and medical

17    doctor for the Mass. DMH, completely ruled these disorders out.

18    Therefore, since I do not have any of these three disorders

19    ruled out by Dr. Hoffman, Dr. Channell will be testifying for

20    the government in my 4247 and 4247 hearing, and Dr. Hoffman,

21    myself, and the hearing officer will testify for me in my next

22    hearing."

23    Q.   And since that time, has he been meeting with his

24    treatment team at all at Devens?

25    A.   No.

1    Q.   You asked about records a moment ago.  Have you ever had

2    the opportunity in your experience evaluating subjects where

3    you receive a certain number of documents to look at, and those

4    documents refer to other forensic reports or other mental

5    health records?

6    A.   Every day, all the time, yes.

7    Q.   What do you do when that happens?

8    A.   I make an effort to obtain those records, if at all

9    possible, and if I'm unable to obtain those records, then I

10   would note in my record that I had made an effort but was

11   unable to acquire them.

12   Q.   Would you identify in your report the specific documents

13   you had seen but were unable to get?

14   A.   Yes.  Usually I'll indicate records were requested from

15   whomever or whatever organization and were not able to be

16   acquired.

17   Q.   Why do you do that?

18            THE COURT:  The thing I'm not understanding is,

19   everyone is trying to make Mr. Mahoney better, okay, and you

20   have these two major institutions, the state institution and

21   the federal institution, which in this case seem to be acting

22   at odds with each other.  Would you agree with that?

23            THE WITNESS:  Yes, your Honor.  The state has never

24   taken any --

25            THE COURT:  So why didn't you reach out to him and

```
 1    say, "But you didn't have all these records"?  This,

 2    unfortunately for Mr. Mahoney, may have ended up in the worst

 3    possible situation where he had a doctor who in good faith was

 4    only looking at a tiny number of records and came up with maybe

 5    the wrong conclusion.  In other words, what happened here?

 6              THE WITNESS:  With all due respect, I don't believe

 7    Dr. Hoffman was acting in good faith.  I don't believe --

 8              THE COURT:  Did you reach out to him and say, "What

 9    about these documents?"

10              THE WITNESS:  I was not aware of his involvement in

11    any way.

12              THE COURT:  You weren't aware.  So the social worker

13    never told you?

14              THE WITNESS:  No.  I was not aware of anything

15    happening with Dr. Hoffman until I received his letter to

16    Mr. Mahoney.

17              THE COURT:  Should the social worker have called you?

18              THE WITNESS:  Not in my opinion.  In my opinion, he

19    had already indicated to us that he was not going to take

20    Mr. Mahoney, and I think it would be unlikely that we would

21    provide 3,000 pages of documents to someone who had already

22    told us they had no intention of taking this individual.

23              THE COURT:  So has this ever happened before, this

24    sort of basically conflict between the state and the federal?

25              THE WITNESS:  Well, the state has never cooperated
```

1    with us in placing any of our inmates in their --

2           THE COURT:  I agree with that.  I've seen that myself.

3    But what about here, though, Mr. Mahoney was looking for

4    medical help through the DMH; like, for example, maybe

5    residential housing?  Have you had that situation happen

6    before?

7           THE WITNESS:  I've never encountered a situation like

8    this in my experience at FMC Devens, no.

9           THE COURT:  With any state?

10          THE WITNESS:  With any state.

11   Q.   So in the past, Dr. Channell, when you ask the state to

12   take over care and custody of someone like Mr. Mahoney who's

13   being committed, do you send a request?

14   A.   Yes.  We send a request that would include the most recent

15   risk assessment report and a certain amount of records going

16   back a certain period of time.  I can't testify specifically to

17   that time frame.  I'm not sure exactly what it is.  I don't

18   send that.  That's the social worker who does that.

19   Q.   And if you look at Exhibit 134 -- and I'll put it up on

20   the screen for you -- Exhibit 134, Tab 15, this is that request

21   that you are familiar with that's typically sent to the state;

22   is that correct?

23   A.   Yes, that's correct.

24   Q.   And it attaches a number of things, including, if we look

25   back to Tab 16, Bates No. 2241, it includes your risk

1    assessment report from 2015, correct?

2    A.    Yes.

3    Q.    And does that identify all the documents you relied on?

4    A.    I can't see that.  It's --

5    Q.    Sorry.  Oh, did I do that?  I could be in real trouble

6    now.

7             (Witness examining document.)

8    A.    Yes, that was the most recent report at that time.  There

9    are more recent ones now, but at that time it was the most

10   recent one.

11   Q.    And just getting back to your disagreement with

12   Dr. Hoffman, which I think is where we veered off originally,

13   was there any other basis for your disagreement with

14   Dr. Hoffman regarding his assessment of Mr. Mahoney as not

15   having Bipolar I?  Other than the records and the manic

16   episode, anything else?

17   A.    Yes.  As was testified to yesterday, at the time

18   Dr. Hoffman met with Mr. Mahoney, Mr. Mahoney was taking

19   900 milligrams a day of Seroquel, which is a very large dose of

20   Seroquel; and that was being prescribed to him to treat his

21   mania, and it was treating his mania.  In the mental health

22   field, it's readily accepted that these are conditions that

23   don't just go away.  You know, once you have Bipolar I

24   disorder, you always have Bipolar I disorder.  Now, it can go

25   into remission when it's well treated, but simply because

1    you're not presenting as manic at the time of an interview does

2    not mean that you don't have the disorder, especially if you're

3    being treated effectively at that time.  And nowhere in any of

4    the documentation from DMH and from Dr. Hoffman did he indicate

5    that Mr. Mahoney was on Seroquel, nor did he indicate the dose.

6    He made what I believe is a pretty big issue out of the fact

7    that he was sleeping as much as he did as a justification for

8    not having mania; yet he was fully aware that he was taking

9    900 milligrams of Seroquel a day, which, in my opinion, is

10   fairly egregious.

11   Q.   And with respect to sleep, did you see any evidence of a

12   decreased need for sleep with respect to Mr. Mahoney in the

13   mental health records you reviewed before arriving at your

14   conclusion?

15   A.    Yes.  There have been multiple notations over the years of

16   periods of time where he's only needed three or four hours of

17   sleep at night, and it wasn't -- it was that he couldn't sleep,

18   but it was also the fact he felt like that's all he needed,

19   which is classic bipolar disorder.  It's not only that you

20   can't sleep but you don't really feel like you need any more

21   sleep; three hours is enough for you.

22   Q.   Now, aside from that, was there any information, out of

23   the limited materials that Dr. Hoffman did have, that he

24   ignored, in your view, in arriving at the conclusion that

25   Mr. Mahoney did not have Bipolar I?

1    A.   All I can recall is the fact that he was on the

2    medication, which he did have those records that indicated the

3    medication.

4    Q.   Just briefly, what other mental illnesses does Mr. Mahoney

5    suffer from, in your opinion?

6              THE COURT:  How are you doing in terms of finishing?

7              MR. CALLAHAN:  Probably 15 minutes, your Honor.  Your

8    Honor, there have been interruptions.  I would like to get

9    through this, and I think it will be 15 minutes and I'll be

10   done.

11   A.   Well, I mean, as Dr. Hoffman had testified, he's had a lot

12   of different diagnoses over the years.  Very few of them would

13   be considered major mental illnesses apart from Bipolar I and

14   schizoaffective disorder or bipolar not otherwise specified;

15   but, in addition to that, it's fairly clear that he suffers

16   from antisocial personality disorder.

17   Q.   Still to this day?

18   A.   Yes.

19   Q.   You also offered an opinion on whether or not Mr. Mahoney

20   is dangerous as a result of his mental disease or defect.  What

21   do you base that on?

22   A.    It's based on his history, both his history of criminal

23   offenses, his history of noncriminal incidents within confined

24   settings, controlled settings.  It's based on the fact that he

25   has a major mental disease or a defect, which is the direct

1   cause of many of the incidents of violent behavior that he's

2   caused in the past.  It's based on the fact that he lacks

3   insight into his mental illness, and his history of violence,

4   and it's based on multiple incidents indicating that he's not

5   willing to comply with conditions which would be put in place

6   to mitigate the risk that he presents.

7   Q.   Now, I don't want to run through what we've already

8   covered, but in the hearings in 2014, did you identify any

9   incident reports that Mr. Mahoney had been issued during his

10  time at Devens?

11  A.   Yes.  I believe at that time he'd had eight violent

12  incident reports.

13  Q.   And just in general, what did those relate to at a very

14  high level?

15  A.   Assaulting other inmates, assaulting staff, threatening.

16  Q.   Since that time, since that commitment in the summer of

17  2014, has he received any additional incident reports for

18  violent or threatening or assaultive behavior?

19  A.   Yes.  He's received six further incident reports.

20  Q.   Okay, I'm just going to ask you to look at a few of those.

21  Can you turn to Exhibit 118.  What's Exhibit 118?

22  A.   This is a discipline hearing officer report.  It's dated

23  October 28, 2014.  It was for threatening another with bodily

24  harm.

25            MR. CALLAHAN:  The government offers 118 into

1  evidence, your Honor.

2          THE COURT:  Yes.

3          (Exhibit 118 received in evidence.)

4  Q.  Can you turn, please, to Exhibit --

5          MR. SHEA:  Object.  I'd object, the point being it's

6  2014.

7          THE COURT:  I'll allow all these in.  Were there any

8  current ones since he stopped taking his meds?

9          THE WITNESS:  Yes.  He received an incident report for

10  threatening Dr. Gorham.

11          THE COURT:  The one that we saw?

12          THE WITNESS:  Yes.

13  Q.  And did he receive an incident report -- looking at

14  Exhibit 122 in front of you, what's that?

15  A.  This is an incident report dated November 4, 2015.  It's a

16  disciplinary hearing officer report actually for threatening

17  another with bodily harm, insolence, and destroying government

18  property.

19          MR. CALLAHAN:  The government offers 122 into

20  evidence.

21          THE COURT:  Allowed.

22          (Exhibit 122 received in evidence.)

23  Q.  And just referring briefly to Bates No. 3063 of

24  Exhibit 122, can you read what it was that Mr. Mahoney said

25  that resulted in this incident report.

1    A.    Yes.  This was during a treatment team meeting.  "'You

2    know what I want to do?  Put that fucking Dr. Channell in an

3    oven, turn the gas up till he fucking lies.  I hate liars.'"

4    Q.    And what did he do after that?

5    A.    "When redirected multiple times to lower his voice and

6    speak appropriately about and to staff, Inmate Mahoney

7    disregarded the redirection, finally stating 'Go fuck

8    yourself.'  At that point he stood up, picked up his stack of

9    papers, kicked the metal trash can, crushing it in half, and

10   walked away cursing at staff members."

11   Q.    Were there other incident reports beyond these between the

12   time he was committed and today?

13   A.    Yes.  He received an incident report, another incident

14   report for threatening me at another point in time.

15   Q.    Is that Exhibit 120?

16         MR. CALLAHAN:  I'll just identify it, your Honor, and

17   move on.

18   A.    Yes, it is.

19         MR. CALLAHAN:  I offer 120, your Honor.

20         THE COURT:  Yes.

21         (Exhibit 120 received in evidence.)

22   Q.    What's the significance of these incident reports in a

23   controlled environment like Devens Medical Center?

24   A.    Well, it's further evidence of both mania and violence

25   risk, that even in a controlled treatment setting -- and this

1    is one of the more controlled environments that Mr. Mahoney

2    could be in -- he continues to exhibit threatening behavior,

3    destructive behavior.  It speaks to his ability to function in

4    the community if he has this much difficulty in a confined

5    inpatient setting with regard to his ability to behave himself

6    appropriately and not become violent and threatening in a less

7    restrictive setting.

8    Q.   Have you seen any insight or do you have an opinion on

9    whether he has any insight into how his mental illness results

10   in some of these threatening or violent incidents that resulted

11   in incident reports and convictions earlier on in his life?

12   A.   No.  I don't believe he has any insight.  He tends to

13   minimize the intent and the impact of his behavior.

14   Q.   Do you describe that in your risk assessment reports?

15   A.   Yes.

16   Q.   And what's the significance, if any, of his lack of

17   insight into his mental illness and the effect his mental

18   illness has on his behavior?

19   A.   Well, lack of insight into mental illness results in lack

20   of compliance with treatment, and he has a significant history

21   of lack of compliance with treatment.  He stopped taking his

22   medications on many occasions during times he was treated by a

23   multiple number of different treatment providers, and his lack

24   of insight into the impact of his behavior decreases the

25   likelihood that he'll be able to alter his behavior when

1  similar circumstances arise in the future.

2  Q.   If you had to rate now his lack of insight into his mental

3  illness and its effect on his behavior relative to the entire

4  time that you have been evaluating him, how would it compare?

5  A.   At this point he has absolutely no insight whatsoever, and

6  that's based on the fact Dr. Hoffman expressed to him his

7  belief he does not have major mental illness.

8  Q.   So at this point, do you have an opinion of whether he

9  presently suffers from a mental illness such that his release

10 would result in the substantial risk of bodily harm to another

11 or serious property damage?

12 A.   Yes, I do.  I remain of the opinion that his release would

13 pose a substantial risk of bodily injury to another person as a

14 result of a major mental illness.

15 Q.   And just very briefly on conditions, if you didn't have

16 this opinion and if you did think that there were conditions

17 that would mitigate that risk that you just described, do you

18 have any concern about whether Mr. Mahoney would comply with

19 those conditions?

20 A.   Yes.  Just a few weeks ago he sent myself and Dr. Gorham a

21 cop-out in which he indicated he will never comply with any

22 conditions or go to a group home and that he will only accept

23 an unconditional release.

24        THE COURT:  Where is that?

25        MR. CALLAHAN:  Let me just direct you to Exhibit 130,

1   your Honor.

2   Q.   You described it as a cop-out?

3   A.   Oh, yes.  I'm sorry.  That's what we call the inmate

4   request to staff form.  I have no idea why.  It predates my

5   employment.  That's what we use.

6          THE COURT:  What's this, tab what?

7          MR. CALLAHAN:  Tab 131, your Honor.  So once your

8   Honor has it, the government would offer 131 into evidence.

9          THE COURT:  Yes.

10          (Exhibit 131 received in evidence.)

11   Q.   Can you read what Mr. Mahoney -- well, what's the date of

12   this communication from Mr. Mahoney?

13   A.   January 12, 2017.

14   Q.   Just two weeks ago, and what does Mr. Mahoney write to you

15   in this communication?

16   A.   "I'm writing to inform you that I will never take any

17   conditional release, group home, or halfway house.  I will only

18   take an unconditional release only."

19   Q.   Now, is this consistent or inconsistent with his attitude

20   in the past about whether or not he would comply with

21   conditions of release?

22   A.   It's both consistent and inconsistent.  He has

23   communicated to me that he would comply with conditions and

24   he's also communicated that he wouldn't.

25   Q.   Were there ever any times where he communicated to you in

1    a Risk Assessment Panel interview where he's talking to the

2    Risk Assessment Panel in order for them to come to some

3    conclusion about whether he could be released, was there ever a

4    situation where he told you, "Yes, Dr. Channell, I'll comply

5    with that condition of release," and then told other people

6    that he wouldn't following the interview?

7    A.   Yes, both last year and this year.  Last year he

8    communicated to us that he would comply with conditions of

9    release, and then communicated to his social worker and

10   individuals who he was talking to on the telephone in the

11   community that he would not comply.

12   Q.   What specific conditions of release?

13   A.   One of them was registering as a sex offender.  And then

14   this year he indicated to us when we met with him in August

15   that he would comply with conditions of release, including

16   going to a residential setting or group home, and then he sent

17   me this.

18        THE COURT:  Let me ask you, is that even feasible?

19   Let's say he went back on the Seroquel and he went back on the

20   900 milligrams and he came back into compliance as he was when

21   you did the original risk assessment, are there group homes

22   available so that we have some assurance he'd take the

23   medications?

24        THE WITNESS:  Yes.  In fact, I had spoken with

25   Ms. Finch-Hall between the period that we risk paneled him and

1    submitted the report, and she had a number of very good leads

2    to have Mr. Mahoney be released.

3            THE COURT:  And those kinds of places would make sure

4    he took his medication?

5            THE WITNESS:  Yes.

6            THE COURT:  Even if we don't go through the state?

7            THE WITNESS:  Yes.

8            THE COURT:  Because it sounds as if that was --

9            THE WITNESS:  Yes.  These were not through the state.

10           THE COURT:  The state either sounded like it was a

11   dead end, they wouldn't supply it because they didn't think he

12   had a major mental illness, or, in any event, the wait lists

13   were so long.  So this is apart from that?  The feds provide

14   it?

15           THE WITNESS:  Yes.  It looked very promising at that

16   point in time.

17   Q.   And just to be clear --

18           THE COURT:  And how long would you say he'd have to be

19   compliant with meds and be calm again before you would feel

20   comfortable with that as a solution?

21           THE WITNESS:  Given his history, it would have to be

22   at least six months.

23   Q.   And so just to be clear, now you would not even recommend

24   his conditional release to a group home; is that correct?

25   A.   No, I don't have any reason to believe that he would

1    comply with conditions at this point in time.

2           MR. CALLAHAN:  Your Honor, if I could have one minute

3    just to look over my notes and make sure there's nothing else.

4           (Pause.)

5           MR. CALLAHAN:  I have no further questions at this

6    time.

7           THE COURT:  Mr. Shea, we'll go to around 11:00 or

8    11:15, why don't we say, and then take a break, or do you want

9    to do it right now?

10          MR. SHEA:  Whatever you'd like, Judge.

11          THE COURT:  We'll get going.  We'll get started.

12          MR. SHEA:  Just three documents that my client

13   provided to me today that I'd like to use in my

14   cross-examination.

15          THE COURT:  All right.

16          MR. SHEA:  They're very short.

17          MR. CALLAHAN:  Your Honor, to move this along, could I

18   just take two pictures of this on my phone?  That way, I don't

19   have to bother him and look over his shoulder.

20          THE COURT:  Well, that's a new approach.  All right.

21          MR. CALLAHAN:  I know they're not allowed in court,

22   so --

23          (Pause.)

24          MR. CALLAHAN:  Thanks, Mark.

25          MR. SHEA:  For the monitor, I'm going to be over

1   there, but I'll start here just for these documents, I guess.

2   CROSS-EXAMINATION BY MR. SHEA:

3   Q.   So, Doctor, you were shown what's marked as Government

4   Exhibit 143, and the date on it is December 15 of last year,

5   correct?

6   A.   Yes.

7   Q.   Now, at this point you're saying Mr. Mahoney is off his

8   meds, right?

9   A.   I believe so, yes.

10  Q.   Well, that's what you testified to under oath here, you

11  just said.

12  A.   Well, I don't know exactly when he stopped them.  We only

13  became aware of it when he received the incident report.

14  Q.   Wait.  I'd swear you just testified he's been

15  medication-noncompliant.  The Judge just said "if he ever gets

16  back on his Seroquel," based on your sworn testimony that he's

17  not taking his meds.  Are you saying now that you don't know?

18          MR. CALLAHAN:  Objection.  That mischaracterizes

19  Dr. Channell's testimony.  He said he was on 800 milligrams

20  presently.  That's a mischaracterization of his testimony.

21          THE COURT:  Well, wait.  Then I'm confused.  Why don't

22  you clarify.  What is your testimony?

23          THE WITNESS:  Mr. Mahoney resumed taking his

24  medication after he received the incident reports, which is

25  what I testified to earlier.  His compliance was spotty until

1    the end of December, 2016.  He has been compliant since that

2    point in time.

3    Q.   All right, so you're saying he's compliant since the end

4    of December, 2016, so let's read through this when you're

5    saying he's not yet medication-compliant.

6             "As you know, Dr. Hoffman found that I was competent

7    to stand trial, and he did agree with Dr. Kissin, a forensic

8    psychologist for the BOP."

9             And so let's just break that down.  You've testified

10   quite a bit about being upset with Dr. Hoffman's analysis and

11   how it threw off Mr. Mahoney's treatment, so what Mr. Mahoney

12   writes there is in fact true, right?

13   A.   Yes, it's true.

14   Q.   Okay, it's an accurate assessment, correct?

15   A.   Yes.

16   Q.   And then he references, meaning Mr. Mahoney references

17   Dr. Kissin.  That's a reference to the fact that Dr. Kissin had

18   found him to have the Bipolar II that's referenced by

19   Dr. Hoffman, right?

20   A.   Correct.

21   Q.   That's rational, isn't it?

22   A.   Yes.

23   Q.   And he's off his meds?

24             MR. CALLAHAN:  Objection.  Mischaracterizes the

25   doctor's testimony.

1  Q.   Well, Doctor, didn't you --

2           THE COURT:  You know what, you're doing what --

3           MR. CALLAHAN:  But he keeps mischaracterizing what he

4  said.  What he said was --

5           THE COURT:  He's a smart guy.  If he disagrees with

6  it, say, "No, I didn't say that."

7  Q.   Okay, you correct me if I got it wrong.  I thought you

8  said that you could clarify that he was medication-compliant at

9  the end of December.  Isn't that what you just testified to?

10  A.   Medication compliance means that you are taking the full

11  dose every day as intended.  Yes, I can testify to that.

12  Q.   As of the end of December, right?

13  A.   Yes.

14  Q.   Okay.  This is penned on December 15, right?

15  A.   Yes.

16  Q.   It's fair to call the 15th the middle of December, isn't

17  I?

18  A.   Obviously.

19  Q.   Right.  So that would be some time before the end of

20  December when he's medication-compliant, isn't it?

21  A.   Obviously.

22  Q.   Thank you.  Now, "On the advice of my attorney, there will

23  be no more contact with you or Dr. Channell."  That's a

24  reasonable sentence to write, isn't it?  I mean, you may

25  disagree with his sentiment, but it's not an irrational

1  statement, is it?

2  A.   It would depend on whether or not that's what you advised

3  him.

4  Q.   If it's his view of that, that's not an irrational

5  statement, is it?

6  A.   If it's untrue, yes, it is irrational.

7  Q.   Well, meaning he's basically writing saying, "We've got a

8  court hearing coming up, and Dr. Channell is on one side and

9  Dr. Hoffman is on the other, and you people," meaning you

10 doctors, "don't represent my interest, and so I won't be

11 meeting with you anymore because you're saying I need to be

12 locked up."  Isn't that a reasonable thing for the man to do?

13 A.   No.

14 Q.   Well, it was responded to by Dr. Gorham, right?

15 "Mr. Mahoney:  As this is not the place for a diagnostic

16 discussion, sufficient to say that years of data are much more

17 reliable than Dr. Hoffman's hour-long interview with you while

18 you were medication-compliant.  I recognize your choice to end

19 psychological treatment at this time, and I will decrease our

20 contact to monthly, which is the lowest frequency possible per

21 our policy.  I wish you the best.  Dr. Gorham, 12/20/16."

22 Correct?

23 A.   Yes.

24 Q.   So that's the response from the institution.  Dr. Gorham

25 works for the institution, right?

```
 1    A.   Yes.

 2    Q.   He's basically saying, "I'll respect your point of view.

 3    I wish you would continue with the treatment more frequently,

 4    but I'll do as you asked," right?

 5    A.   Yes.

 6    Q.   So it seems like a rational correspondence back and forth,

 7    doesn't it?

 8    A.   No.

 9         MR. SHEA:  I'll move it into evidence, and the Court

10    can make a finding.

11         THE COURT:  Okay.

12         MR. SHEA:  It can be defense Exhibit No. 1?

13         MR. CALLAHAN:  Sure.

14         (Defense Exhibit 1 received in evidence.)

15    Q.   Now, there's been other correspondences from Mr. Mahoney

16    regarding quetiapine, Bipolar I, disagreeing with your

17    assessments and the institutional assessment at Devens; fair to

18    say?

19    A.   Yes.

20    Q.   And on 1/11 --

21    A.   I'm sorry, I can't --

22    Q.   It's hard to see, yes.  Okay, sorry.  Let's see.  You know

23    what, I'll just bring it up to you rather --

24    A.   All right.

25    Q.   Why don't you read what -- it's fair to say a Dr. Kennedy
```

1   works as the chief psychiatrist at Devens?

2   A.   Yes.

3   Q.   What did he respond to Mr. Mahoney on 1/11/17?

4   A.   "It appears that you are doing reasonably well on your

5   current treatment, including being back on the N-4 unit.  The

6   combination of Seroquel and Klonopin appears to be working

7   well."

8   Q.   And what's the N-4 unit?

9   A.   It's one of the opening housing units.

10  Q.   So the chief psychiatrist on --

11          MR. SHEA:  I'd like this defense Exhibit 2.

12          (Defendant Exhibit 2 received in evidence.)

13  Q.   On January 11, 2017, the chief psychiatrist at Devens is

14  saying, "You're doing reasonably well, you're back on an open

15  unit, and you're medication-compliant," isn't that right?

16  A.   Yes.

17  Q.   And you're saying that Mr. Mahoney -- I thought you were

18  saying -- I thought you testified he wouldn't work with his

19  treatment team, that he's dangerous, and you wouldn't believe

20  he could be released safely in any way right now, correct?

21  A.   Yes.

22  Q.   So Mr. Mahoney actually requested the medication, right?

23  A.   I don't know the answer one way or the other.

24  Q.   Well, he's not court ordered to have it, is he?

25  A.   No, he's not.

1   Q.   So you can't force it, can you?

2   A.   No.

3   Q.   So if he's taking it, it's at his own behest?

4   A.   Yes.

5   Q.   And he's taking it, isn't he, as far as you can tell

6   institutionally?

7   A.   Yes.

8   Q.   Now, I was sent some lab results which I can't read

9   myself, but it came from -- and they're Bates --

10          MR. CALLAHAN:  Your Honor, can I go up and look, just

11   because I haven't seen what counsel is referring to?

12          MR. SHEA:  Sure.  We sent them to you.

13          MR. CALLAHAN:  I didn't know you were going to use

14   them, so I don't have copies of everything you sent, but I'm

15   happy to look over your shoulder, Counsel.

16   Q.   So here, I'll ask you, Doctor.  Why don't you look at

17   these labs that range from Bates 1948 at the high end down to

18   1937 at the low end, and I believe this is from the time period

19   when Mr. Mahoney is supposedly cheeking his medication.  Can

20   you determine from those lab reports and blood tests whether

21   Mr. Mahoney was in fact not taking his medications?

22   A.   No.

23   Q.   Can you look at them?

24   A.   No, there is no blood test for Seroquel.  So, I mean, I

25   will look at them, but there's -- there's not a test, so I know

1    it's not in these labs.

2    Q.   So there's no way that -- you said he was taking at some

3    point upwards of 900 milligrams of Seroquel.  That doesn't show

4    up in the body at all?

5    A.   It isn't that it doesn't show up in the body.  There's no

6    way to measure whether he's taking the therapeutically

7    effective dose of the medication, which is why we do lab

8    testing for things like lithium and Depakote.  So you could at

9    great expense perform a test which would show whether there was

10   any amount in the body at all, but it wouldn't serve any

11   therapeutic purpose.

12   Q.   Okay, but it's clear that Mr. Mahoney actually requested

13   these tests to try and show that he was in compliance, right?

14   A.   No.  Those are routine lab tests that the doctor requests,

15   not Mr. Mahoney.

16   Q.   But even if -- but one can request them, right, meaning to

17   try and show that, hey -- like, can you show when he first put

18   a pill in the Aleve bottle that was found in his cell?

19   A.   No.

20   Q.   Okay.  And in fact some of Mr. Mahoney's medication is

21   crushed, isn't it?

22   A.   Now it is, but not at that point.  It's crushed now

23   because he was cheeking it.

24   Q.   At different points it's been crushed, right?

25   A.   Not in the recent past it hasn't, not at any time in the

1    past year.

2    Q.   But you can't show that he was not taking his medication;

3    isn't that fair to say?

4    A.   No.  We have a bottle full of his medication.

5    Q.   Right, but do you know when he got that bottle?

6    A.   No.

7    Q.   Do you know when he was first prescribed Seroquel?

8    A.   Yes.

9    Q.   When was he first prescribed Seroquel?

10   A.   I'd have to go through the record.  I mean, there would be

11   a note on that date.  He's been on it for quite some time.

12   Q.   Years, right?

13   A.   Yes.

14   Q.   Okay.  And how many pills a day for years?

15   A.   Well, it would depend on the dose.  At the time that we

16   discovered it, it had been -- he was on three a day, but,

17   again, Mr. Mahoney himself told me when he started cheeking the

18   medication.  This is not supposition on my part.  I had an

19   interview with him.

20             THE COURT:  What precisely did he say?

21             THE WITNESS:  I'd have to -- can I refer to my note?

22             THE COURT:  Yes.

23             THE WITNESS:  "Mr. Mahoney reported he had been told

24   by Dr. Hoffman on October 24, 2016, that he does not have a

25   mental illness.  As a result, he reportedly stopped taking his

1    full dose of Seroquel at night, cheeking one or two of the

2    pills and later placing them in the Aleve bottle."

3            So he acknowledged that he stopped taking the

4    medication subsequent to October 24.

5    Q.   Cheeking one or two, right?

6    A.   Yes.

7    Q.   So if that were an accurate statement and they were found

8    at the end of November, it would be about one a day, right?

9    A.   I don't recall exactly when they were found.

10   Q.   And he was on 900 milligrams still?

11   A.   Yes.

12   Q.   So that would be he was taking 600 milligrams, right?

13   A.   Possibly.

14           THE COURT:  What he was doing was, he was taking one

15   or two pills a day?

16           THE WITNESS:  Yes.

17           THE COURT:  And he was decreasing the dosage?

18           THE WITNESS:  Yes, without telling his psychiatrist.

19           THE COURT:  Without permission --

20           THE WITNESS:  Yes.

21           THE COURT:  -- and without authorization.

22   Q.   And the one way that you say that he acted out was in

23   staff -- in a meeting.  Now, most of the acting out that you

24   have identified by Mr. Mahoney since the last hearing before

25   Judge Saris is that he has a negative institutional response to

1  a number of the counselors, correct?

2  A.   I don't know what that means.

3  Q.   Well, okay.  What that means is, when he was disrespectful

4  to staff in November of 2016, that was someone on the treatment

5  team, one of the -- was it one of the psychologists?

6  A.   Yes.

7  Q.   Okay.  And when he was disrespectful in 2014 and said the

8  unfortunate -- is accused of saying those unfortunate things

9  regarding you, you're on the staff, correct?

10 A.   First of all, I wouldn't characterize either of those

11 incidents as disrespectful.  They were threatening.  But, yes,

12 I am on the staff.

13 Q.   Okay.  So what I mean, though, is, Mr. Mahoney, the thing

14 he focuses on is his legal situation; isn't that right?

15 A.   Absolutely.

16 Q.   And doesn't he focus on the fact that here he is, a

17 nonviolent, meaning it was failure to register was what he was

18 accused of in the Federal Court in 2010, right?

19 A.   That's what he's accused of.  Nonviolent I disagree with.

20 Q.   Well, wait.  No, no, it's a nonviolent -- failure to

21 register is a nonviolent offense, isn't it?

22 A.   That is a nonviolent offense, yes.

23 Q.   Okay.  So here's a man who finds himself in court in 2010

24 accused of a nonviolent offense, and now we're in 2017 and he's

25 still locked up, okay?  And he views you and the other

1  psychologists at Devens as the reason he's still locked up;

2  isn't that right?

3  A.   I know he views me.  I don't know what his opinion of the

4  other psychologists is.  They've not had -- for example,

5  Dr. Gorham has never had any role in his civil commitment

6  proceedings or his Risk Assessment Panel decisions.

7  Q.   But let's look at why he might feel that way.  So when

8  he's first in the Federal Court in New Hampshire on that

9  failure-to-register charge, he's sent for an assessment as to

10  his competence to stand trial, isn't he?

11  A.   Yes.

12  Q.   And your institution, Devens, finds that he is competent

13  to stand trial, doesn't it?

14  A.   Yes.

15  Q.   And it finds that he has Bipolar II, which you just

16  testified today was a major mental illness, right?

17  A.   Yes.

18  Q.   So at that point, that's Devens' opinion, and the

19  person -- now, let's get to Dr. Mart.  Dr. Mart is the person

20  you testified today you're relying on for the finding that

21  Mr. Mahoney is Bipolar I, right?

22  A.   He's one of ten.

23  Q.   He was the first person you cited in terms of, you read

24  his report and you saw "mania" in the interview?  Isn't that

25  what you testified to?

1   A.   I'll go along with that.

2   Q.   But your institution disagreed with that gentleman, that

3   doctor, didn't it?

4   A.   The institution does not offer opinions or diagnoses.

5   Q.   The doctor from your institution opines to that court that

6   basically they disagreed with Dr. Mart; isn't that correct?

7   A.   I believe that Dr. Mart's evaluation came after

8   Dr. Kissin's evaluation.  That was why he was -- yeah, in fact

9   it did.  He was sent back to Devens because Dr. Mart offered

10  the opinion that he was not competent to stand trial, and the

11  court agreed with his opinion and disregarded Dr. Kissin's

12  opinion, and sent him back for another evaluation.

13  Q.   Yes, and Dr. Kissin's opinion -- now, what they were

14  evaluating was whether Mr. Mahoney was capable of representing

15  himself too, right?

16  A.   Yes.

17  Q.   Meaning he wanted to be his own lawyer?

18  A.   Yes, still does, to my understanding.

19  Q.   And Dr. Kissin, is she still associated with Devens?

20  A.   Yes.

21  Q.   Okay.  Dr. Kissin said that, "Oh, yeah, Mr. Mahoney is

22  totally competent to represent himself in a criminal charge in

23  a Federal Court," right?

24  A.   She didn't say that, no.

25  Q.   Well, she said he was competent to represent himself?

1    A.    Yes.

2    Q.    Right?

3    A.    I don't believe she offered the opinion on competency to

4    represent himself.  She offered the opinion he was competent to

5    stand trial.

6    Q.    It was clear that that was the issue.  If you read Mart's

7    things that you're relying on now, he's talking about him

8    representing himself?

9    A.    That is a part of the issue.  It is not the issue.

10   Q.    So one can imagine that Mr. Mahoney finds it a little

11   disorienting and maybe upsetting that these very psychologists,

12   who said he could competently represent himself in a Federal

13   Court to face a criminal charge, change their diagnosis from

14   Bipolar II to Bipolar I once they're petitioning to keep him

15   locked up.  Isn't that what happened?

16   A.    No, it's not.

17   Q.    It may not be what you're saying you intentionally did,

18   but isn't that what happened in terms of Devens' position?

19   A.    No, it's not.

20   Q.    When you petitioned to Judge Saris, did you say he had

21   Bipolar I?

22   A.    I said he had Bipolar I.  I have never changed my opinion

23   with regard to him having Bipolar I.

24   Q.    At what point did you tell the New Hampshire court

25   regarding competency that he had Bipolar I?

1   A.   When I concluded my competency to stand trial and

2   restoration period of treatment, which was I think the end of

3   2013 -- in 2013.

4   Q.   Right, and which was to say he wasn't restorable, so now

5   we can go to 4246 and commit him, right?

6   A.   I did not say, "Now we can go to 4246 and commit him."

7   The court ordered an evaluation of that in New Hampshire.  That

8   was not my decision.

9   Q.   But you can't get the 4246 until you say he's nonrestorable;

10  isn't that right?

11  A.   No, that's not right.  There are other ways to get to

12  4246.

13  Q.   Now, today you brought the DSM-V with you --

14          THE COURT:  Is this a good time to take our break?

15          MR. SHEA:  Sure.

16          THE COURT:  Because you seem to be moving --

17          MR. SHEA:  That's fine.

18          THE COURT:  How long do you think you have?

19          MR. SHEA:  I'm not sure.  I'm going to move as quickly

20  as I can, but I have a lot of material.

21          THE COURT:  Well, let me make it clear:  I have

22  something I have to do at 1:00 and I have things this

23  afternoon, so if you don't finish, it means that we come back

24  at a different period of time.

25          MR. SHEA:  I understand.  I will do my best to finish

```
 1    by 1:00.
 2              THE COURT:  We may not finish with oral argument or
 3    that sort of thing, but if you can possibly finish with the
 4    doctor by then.  But, otherwise, you're not available next
 5    week, right?
 6              MR. SHEA:  So I'm supposed to be preparing for my
 7    murder trial next week, but I -- I mean, I --
 8              THE COURT:  Once I lose you, do I lose you for, say, a
 9    month?
10              MR. SHEA:  No.  I could come back Wednesday or
11    Thursday if I needed to so that -- I don't want Mr. Mahoney to
12    have to linger unnecessarily.
13              THE COURT:  I get that.  I'm just giving you a sense
14    that I don't have much flexibility.  I need to leave here no
15    later than 1:00.
16              MR. SHEA:  No, I understand.
17              MR. CALLAHAN:  And I don't know if we're going here,
18    but if we are talking about next week, I'm going to be not here
19    from Wednesday afternoon on of next week.  I'm traveling out of
20    state, but I'll make myself available anytime before that.
21              THE COURT:  Let's see if we can finish him, at least,
22    and then maybe I could do submissions post-trial.  But, anyway,
23    do you know whether Mr. Mahoney will want to testify?
24              MR. SHEA:  That's up in the air.  I think it depends
25    on how I do today.
```

1          THE COURT:  All right.  Well, you don't have to decide

2    that, but the one thing that's certain here is that we're

3    ending this at about 1:00, okay?  All right, thank you.

4          THE CLERK:  All rise.

5          THE COURT:  Yes, we'll just try and shorten this up.

6    We'll just do like a 15-minute break rather than -- sometimes I

7    do half an hour, but I think we're going to try and get you out

8    of here, Dr. Channell.

9          THE WITNESS:  Thank you.

10         (A recess was taken, 11:15 a.m.)

11         (Resumed, 11:35 a.m.)

12         MR. SHEA:  Go?

13         THE COURT:  Yes, go for it.

14   BY MR. SHEA:

15   Q.   I'm approaching with Exhibit 102, which has a date report

16   of May 30, 2013, correct?

17   A.   Okay, yes.

18   Q.   Is that what it says?

19   A.   Yes.

20   Q.   And the signature page, whose name and signature is that

21   on the back page?

22   A.   My name is on the back page, and that's the signature of

23   Dr. Kissin.

24   Q.   Okay, so it's Dr. Kissin's signature but your name, right?

25   A.   Yes.

1    Q.   Is it your report?

2    A.   Yes.

3    Q.   Okay, let's go to Page 12 of that report.  Under "Clinical

4    formulations," please read aloud to the Court that entire

5    paragraph on bipolar disorder.

6    A.   "Based on his history and presentation during the current

7    evaluation, the defendant meets --"

8         THE COURT:  You know, you need to slow down, or she'll

9    never get it.

10        THE WITNESS:  I'm sorry.

11   A.   "Based on the history and presentation during the current

12   evaluation, the defendant meets diagnostic criteria for

13   Bipolar I disorder.  According to the Statistical Manual of

14   Mental Disorders Fourth Edition Text Revision, the essential

15   feature of Bipolar I disorder is a clinical course

16   characterized by one or more manic episodes, which are defined

17   as distinct periods during which there is an abnormally and

18   persistently elevated, expansive, or irritable mood lasting for

19   at least one week.  The mood disturbance must be accompanied by

20   at least three additional symptoms, including inflated

21   self-esteem or grandiosity, decreased need for sleep, pressure

22   of speech, flight of ideas, distractibility, increased

23   involvement in goal-directed behavior or psychomotor agitation,

24   and excessive involvement in pleasurable activities.  Manic

25   episodes are sufficiently severe to cause marked impairment in

1    occupational functioning, or in usual social activities or

2    relationships with others, or to necessitate hospitalization to

3    prevent harm to self or others."

4    Q.   So here you write about --

5          THE COURT:  Now, which exhibit is this?

6          MR. SHEA:  Exhibit 102.

7          THE COURT:  102.

8    Q.   Now, today you've separated out saying for a duration and

9    hospitalized, but in the report that you wrote, you said, "One

10   or more manic episodes, which are defined as distinct periods

11   during which there is an abnormally or persistently elevated

12   expansive or irritable mood lasting for at least one week."

13         You wrote that, didn't you?

14   A.   Yes.

15   Q.   Okay.  Now, the first thing you cited was Dr. Mart's

16   report today.  How many hours did Dr. Mart meet with

17   Mr. Mahoney in doing his report, if you know?

18   A.   I don't.  I don't know.  It may be specified in the

19   report.  If it is, I don't remember.

20   Q.   Well, he went into a locked institution as a psychologist

21   to meet with him, right?

22   A.   Yes.

23   Q.   So it's fair to say he didn't stay a week, right?

24   A.   That's fair to say.

25   Q.   Okay.  He probably went in and out in a couple of hours,

1    right?

2    A.    More likely than not, yes.

3    Q.    Okay.  So the most that he could have observed of a manic

4    episode would have been a couple hours, right?

5    A.    No.

6    Q.    Well, it wouldn't have been a week, right?

7    A.    You don't have to directly observe, as I indicated during

8    the direct, every minute of a week to provide the diagnosis.

9    Q.    Well, is there anything in his report that indicates he

10   was given records from the institution where Mr. Mahoney was

11   housed?

12   A.    I don't recall.  I don't know.

13   Q.    But you were relying on him, right, for the diagnosis of

14   Bipolar I, right?

15   A.    He's one of 3,000 pages' worth of criteria that I

16   diagnosed on, YES.

17   Q.    Okay, so let's do that.  What I want you to do -- and you

18   have access to every page of documents at Devens, right?

19   A.    Yes.

20   Q.    Regarding Mr. Mahoney?

21   A.    Yes.

22   Q.    If you want it, you can get it, right?

23   A.    Yes.

24   Q.    Okay, please provide for us or point us to the documents

25   that show one consistent week of mania.

1    A.    I did earlier when we discussed Dr. Kambampati's notes.

2    Q.    No, you pointed to Dr. Kambampati was one day of notes.

3    Right?

4    A.    Well, I didn't bring the entire electronic medical record

5    with me today.  I'm sorry.

6              THE COURT:  Well, as you're sitting here, do you

7    remember an incident that lasted a week of mania?

8              THE WITNESS:  Yes.  As I indicated, that incident

9    lasted several weeks.

10             THE COURT:  The Kambampati incident?

11             THE WITNESS:  Yes.

12             MR. SHEA:  Can I ask, what was the exhibit number for

13   that?  Do you know?

14   Q.    So you're saying you can document, and will you provide --

15   are you willing to provide this Court with documentation

16   showing one week where it says not hypomania, because hypomania

17   is different than mania, isn't it?

18   A.    Yes.

19   Q.    Hypomania doesn't qualify as mania, does it?

20   A.    No.

21             THE COURT:  Perhaps if you looked at Exhibit 110?  Is

22   that what we all are referring to?

23             THE WITNESS:  Well, there were two notes from

24   Dr. Kambampati.  One was in October.  The one with hypomania

25   was five months later in March, so those are not the same time

1    frame.

2    Q.    Right.  And hypomania wouldn't qualify, would it?

3    A.    Wouldn't qualify for what?

4    Q.    For Bipolar I.

5    A.    If that's all he ever had in his life, no, but --

6    Q.    But meaning -- in Exhibit 102 you wrote where you defined

7    what Bipolar I was.  You said it was a week of consistent

8    mania, right?

9    A.    That is not the DSM -- that's the -- I provided you with

10   the information from the DSM-V.  I provided part of that

11   information in that report.  There are other ways to diagnose

12   bipolar disorder other than one week.

13   Q.    Well, let's be clear.  In 2013, was the DSM-V active?

14   A.    No, but the criteria were the same.

15   Q.    Okay, but it was the DSM-IV then, right?

16   A.    Yes.

17   Q.    And just so there's no -- you know, I don't want to be

18   mistaken here.  You wrote this report, didn't you?

19   A.    Yes.

20          THE COURT:  Which report?

21          MR. SHEA:  Exhibit 102, which on Page 12, your Honor,

22   of Exhibit 102, I had him read into the record.

23          THE COURT:  Let me just understand.  You're relying on

24   110 as Dr. Kambampati's notes of a manic incident?  Is that

25   what you're looking at?

1          THE WITNESS:  That is one incident of a manic episode,

2     yes.

3          THE COURT:  And can you tell from that how long that

4     lasted?

5          THE WITNESS:  I'll revisit this, and if this is too

6     much information, then please tell me and I'll stop, but this

7     is Dr. Kambampati, a licensed psychiatrist, his treatment

8     provider who's documenting this as a manic episode.

9          THE COURT:  Right.

10          THE WITNESS:  I rely on his opinion as a medical

11     expert and a psychiatric expert.  I don't need to personally

12     see one week of notes when his treating psychiatrist is

13     describing him as manic.  As I indicated, from the DSM-V

14     criteria, it does not require one week of symptoms.  I can't be

15     any more explicit than that.

16          THE COURT:  Okay, so that's his position.

17     Q.   Well, okay, one, this is a note for one day, isn't it,

18     meaning Exhibit 110 is a note for one day, isn't it?

19     A.   Yes.

20     Q.   You don't even know how often Dr. Kambampati saw

21     Mr. Mahoney around that time period, do you?

22     A.   Specifically I can't state, but I was involved in this

23     situation.  I was there.  I know what happened.

24          THE COURT:  All right, all right, so based on your

25     knowledge, how long did this manic episode --

1          THE WITNESS:  As I said, it lasted several weeks.

2          THE COURT:  Thank you.  Based on your personal

3   observation?

4          THE WITNESS:  Yes.

5   Q.   So with that, so you're willing to provide documentation

6   on either side of 10/24/12 that shows he was -- because they

7   have running notes for each day, right?

8   A.   A psychiatrist doesn't write a note each day, no.

9   Q.   Right, no, he doesn't.  And how often does a psychiatrist

10  write a note?

11  A.   I don't know.

12  Q.   You don't know.  Okay, fine.  And so given you don't know

13  how often the psychiatrist writes the note, what would you

14  depend on for knowing that it was happening seven consecutive

15  days?

16  A.   I depend on the fact that Dr. Kambampati, whose opinion I

17  respect and rely on as providing a reasonable degree of medical

18  certainty, that in his opinion, he was manic at the time.

19  Q.   Okay, but let's be clear.  You have brought Dr. Hoffman

20  over the rails for not requesting records.  Now, all I'm saying

21  is, can you provide this Court with records on either side of

22  10/24/12 that show manic behavior by Mr. Mahoney that spans

23  seven days?  It can be 10/17 to 10/24 or 10/24 to 10/31 or

24  something in between, okay, but can you provide those records?

25  You have access to them, correct?

1    A.   I don't know if I could provide those records or not, but,

2    again, it does not require seven days, so I'm not sure what

3    exactly the relevance of this question is.

4    Q.   Well, the relevance is based on your own writing on

5    Exhibit 102.

6    A.   Well, I didn't write the DSM-IV.  Simply because I left a

7    few words out of the actual -- I don't -- as you can see,

8    there's a lot of information from DSM about bipolar disorder I

9    don't include there.

10   Q.   So then what you're acknowledging here is that when you

11   write a definition of the major mental illness that is the

12   basis for holding this man, and when you write that, sometimes

13   you just leave a few words out?  You can't be responsible for

14   leaving a few words out?  Is that your testimony just now?

15   A.   My testimony is, I did not believe that specifier was

16   relevant at that point in time; but Dr. Hoffman has now made

17   the one-week situation significant, so I'm pointing it out

18   today that that's not required.

19   Q.   Sir, again --

20         THE COURT:  You know, asked and answered.  Let's move

21   on.

22   Q.   I'm going to place in front of you --

23         MR. SHEA:  I don't know if it's marked as an exhibit

24   or not, your Honor.  If it's not, I'll make this an exhibit.

25         MR. CALLAHAN:  Just to help us along, it's Exhibit 134

 1    at Tab 20, about two pages in, your Honor, at Bates No. 2288.

 2            MR. SHEA:  Thank you.

 3    Q.   So what I've placed before you is a decision from the

 4    Commonwealth of Massachusetts, the Department of Mental Health.

 5    On the back, the signature page, it's Dominic Gervasi, the

 6    hearing officer, and it's dated October 24, 2016.

 7            Now, you've said that the Commonwealth made its

 8    decision without having records and essentially said that that

 9    was highly unprofessional.  Is that a fair summation?

10    A.   No.

11    Q.   Okay.  Well, let's go through the hearing officer's

12    decision.  So they track -- on Paragraph No. 2 they have

13    Mr. Mahoney's medical history, correct?

14            MR. CALLAHAN:  Objection.  Mischaracterizes the

15    document.

16    Q.   Well, the document is the decision --

17            THE COURT:  No, I can read.  The document speaks for

18    itself.  But, you know, you criticized Mr. Shea for jumping up

19    every time.  We won't finish this.  So it speaks for itself.

20    Q.   Doesn't Paragraph 2 -- BEM is Brian Mahoney -- talks about

21    damage to his eardrum, a work-related injury from a 53-foot

22    fall, correct?

23    A.   Yes.

24    Q.   So they had some medical records.

25            MR. CALLAHAN:  Objection.

1              THE COURT:  Overruled.

2    Q.   Then Paragraph 4, they had records from Mass. General

3    Hospital, a treating psychiatrist, Dr. Martinez, correct?  I

4    don't know if that's a record from Mass. General or somebody

5    referring to a record from Mass. General.

6    A.   They have a comment about Mass. General there.

7    Q.   Okay.  And they have a specific doctor listed, correct?

8    A.   Yes.

9    Q.   And they say that Mr. Mahoney sought treatment for his

10   fast speech and demeanor, correct?

11   A.   Yes.

12   Q.   Then they have a note on the Avis Goodwin Health Center

13   from December, 2004, to December, 2010, right?

14   A.   Again, this could have been taken from my risk panel

15   report, or they could have had that actual note.  I have no way

16   of knowing.

17   Q.   Right.

18   A.   The front page, the list of exhibits shows the records

19   that they have, and there's nothing there from Avis Goodwin, so

20   I'm assuming they're taking that from my report.

21   Q.   Okay.  But it says "Exhibit 18" at the end of that,

22   correct?

23   A.   And that is a letter.

24   Q.   I'm just saying, "BEM was prescribed medication for

25   anxiety and attention deficit hyperactivity disorder,

1    Exhibit 18."  Isn't that what it says?

2    A.   Yes, and Exhibit 18 is a letter to the hearing officer.

3    That's not a medical record.

4    Q.   Okay.  And then they reference his treatment at MCI

5    Concord, correct?

6    A.   That's also taken from my report, which is No. 19.

7    Q.   Okay.  But they're referencing different treatment he's

8    had, correct?

9    A.   They're referencing the treatment that I referenced that

10   he had had.

11   Q.   Okay.  Now, as to the Commonwealth, when you heard of

12   Dr. Hoffman's -- well, they held the hearing, the fair hearing

13   at Devens, didn't they?

14   A.   Yes.

15   Q.   So he literally came to your turf or your hospital.  So

16   did you go to greet him?

17   A.   I didn't even know he was there.

18   Q.   Okay.  Well, wait a second.  I mean, I know from my

19   experience, it ain't that easy to get in.  So when, like, you

20   can see in the reference -- and, Judge, you can read it in the

21   transcript -- that they had to delay this hearing a few times

22   because they had trouble getting approval to have a microphone,

23   approval to have all the things they needed to conduct the

24   hearing.  So there's certainly a process for them being allowed

25   into the institution, correct?

1  A.   Yes.

2  Q.   And they were in contact with the social worker who

3  works -- I forget her last name.  Tamika is the first name,

4  correct?  They were in touch with her arranging these things,

5  right?

6  A.   I don't know who they arranged those things with.

7  Q.   All right, but you knew they had phone contact with her.

8  You referenced that one phone log, right?

9  A.   Yes.

10  Q.   So at any point did you call Dr. Hoffman?

11  A.   As I said, this entire process was completed before I

12  became aware of Dr. Hoffman, so, no, I've never called

13  Dr. Hoffman.

14  Q.   Well, because the letters for Mr. Mahoney from the DMH

15  have to go through the social worker, right?

16  A.   No.

17  Q.   Are you saying that you were unaware or that the

18  institution was unaware?  Are you saying that no doctor at

19  Devens knew that the Commonwealth of Massachusetts was holding

20  a fair hearing in the Devens facility?

21  A.   I'm saying that I did not know that.

22  Q.   And you're saying that you never called him, correct?

23  A.   That's correct.

24       (Pause.)

25  Q.   Now, are you still the acting director of clinical

1    training?

2    A.    No.

3    Q.    When did you give up that position?

4    A.    It was when we hired a permanent training director.  I

5    don't know exactly.  A while, several years, at least three

6    years.

7    Q.    Are you still chair of the Risk Assessment Panel?

8    A.    Yes.

9    Q.    And you have been the chair of that since 2006?

10   A.    Yes.

11   Q.    Okay.  And does that involve competency evaluations?

12   A.    No.

13   Q.    And you are also a forensic psychologist there, correct?

14   A.    Yes.

15   Q.    So you wear many hats or you've worn many hats, right?

16   A.    Yes.

17   Q.    Now, I'm working off an old CV of yours, but when is the

18   last training you attended?

19   A.    Last year, last summer.

20   Q.    And what was it in?

21   A.    It was in the use of the HCR-20 Version 3.

22   Q.    I noticed that in your last three risk assessments for

23   Mr. Mahoney, you didn't use any of those tools.  Is that fair

24   to say?

25   A.    Yes.

1    Q.   Now, these incidents you've said Mr. Mahoney has had, when

2    he is placed -- when he's found guilty and removed and put into

3    a locked unit, he's put into a locked unit for what, 23 hours a

4    day?

5    A.   If he's on the locked unit, yes, that's correct.

6    Q.   Okay.  And if they believe that he might harm himself,

7    they'll strip him naked, right?

8    A.   Well, no.  They'll give him a suicide watch smock, a gown

9    to wear.  He's not naked.

10   Q.   Okay.  And he's put there -- I mean, for instance, for

11   his, quote "threat to staff" that you said happened in

12   November, he was then put in isolation for 30 days, right?

13   A.   Yes.

14   Q.   And is it fair to say that that is probably not helpful

15   for someone if you believe they have bipolar disorder?

16   A.   It varies.  Some people's symptoms improve with being

17   removed from situations; some people's symptoms worsen.

18          THE COURT:  Did you give him medicine during those

19   30 days?

20          THE WITNESS:  If he was willing to take it, yes, and I

21   believe he took it sporadically during that time, yes.

22          THE COURT:  You would know one way or another, right?

23          THE WITNESS:  Yes.  He was receiving Seroquel during

24   that time.  He wasn't taking the full dose by his choice, but

25   he was receiving it.

```
1   Q.   Well, when you're saying -- I mean, you're testifying
2   under oath in a Federal Court.  First you said sporadically,
3   and now you kind of hedged.  Do you have records and have you
4   reviewed the records of whether he was taking his medication on
5   a daily basis while he was placed in isolation for 23 hours a
6   day?
7   A.   Yes.
8   Q.   And you can definitively say that he was taking his
9   medication or wasn't taking his medication?
10  A.   There were periods of time where he was taking the
11  medication and periods of time where he wasn't.
12          THE COURT:  During that 30 days?
13          THE WITNESS:  Yes.
14  Q.   And you have access to those records?
15  A.   Yes.
16  Q.   Did you bring those with you today?
17  A.   No.
18          THE COURT:  Well, let me ask you this:  After he got
19  out of the 30 days with the sporadic taking of medications, had
20  his, what would you call it, mood improved?
21          THE WITNESS:  Yes.  His mood is improved since he's
22  been back on the medication.
23          THE COURT:  So when he came out of the 30-day stint,
24  he was more compliant?
25          THE WITNESS:  Yes, and we moved him back to an open
```

1   unit, and he's much better now, yes.

2   Q.   Now, 8/24 you made the decision he could safely be

3   released to a structured environment, a structured house,

4   right?  What is it, a --

5   A.   Conditional release to some kind of structured facility,

6   yes.

7   Q.   Okay, something more than a halfway house?

8   A.   A halfway house would be sufficient.

9        MR. CALLAHAN:  Did you say 8/24?

10       MR. SHEA:  I believe so.

11       THE WITNESS:  I believe it was -- well, we risk

12  paneled him at the end of August, and we issued the report in

13  October.

14  Q.   Okay, but the risk panel was on 8/24?

15  A.   I thought it was 8/30, but either way, it's close enough,

16  yeah.

17  Q.   And his mother died on what, 8/26?

18  A.   Yes.  His mother died just a few days before we saw him,

19  and I gave him -- you know, I spoke to him about it.  I

20  realized this had happened and that this was probably maybe not

21  the most ideal time to hold the risk panel, and he indicated

22  that he would prefer to go ahead and talk with us that day.

23  Q.   Now, his mother was the only real parental figure in his

24  life, correct?

25  A.   Yes.

1    Q.   And his father had been incarcerated and then committed

2    suicide, right?

3    A.   That's right.

4    Q.   And so it would be fair to say that she's a significant

5    figure in his life?

6    A.   Absolutely, yes.

7    Q.   And you're saying that at some point after that, he

8    also -- that time period is consistent with when he started --

9    somewhat after that is when he starts to deteriorate as well,

10   correct?

11   A.   Yes, he deteriorated after that.

12   Q.   And he had had a desire to go to the funeral, right?

13   A.   Yes.

14   Q.   And he wasn't able to go to the funeral, was he?

15   A.   No.

16   Q.   And this is at the same time that he's been told that he

17   doesn't have Bipolar I by Dr. Hoffman, right?

18   A.   Yes.

19   Q.   And so here is a man who's been locked up six years.  His

20   mother has passed and he can't go to her funeral, and it

21   appears to him, reasonably, that he is being held illegally

22   because he doesn't suffer from a major mental illness, right?

23   A.   That's his perception at this point.  That wasn't what he

24   communicated to me at the time of the risk panel, and in fact

25   after that risk panel, we recommended him to be released.

1    Q.   But the point is that you could see why he might -- like,

2    a regular person, someone without any mental health issues,

3    might be a little upset?

4    A.   Sure.

5    Q.   And so to see that Mr. Mahoney gets upset under these set

6    of circumstances in this time period is not strange, is it?

7    A.   Well, there was -- I mean, you're talking about the end of

8    August and then November when he's getting all upset.  I

9    would -- the situation you're describing to me makes more sense

10   around August or September.  I believe the reason -- in my

11   opinion, the reason he deteriorated was because of the

12   information that was provided by Dr. Hoffman.

13   Q.   But the fair hearing with Dr. Hoffman is in January 26 --

14   oh, that's the -- I'm sorry.  September 28?  Yes, so it was

15   September 28 that he had the hearing with Dr. Hoffman, right?

16   A.   A month later, yes.

17   Q.   Okay.  And so you believe that that's more responsible?

18   A.   Yes.

19   Q.   But why can't it be both things?  That's all I'm trying to

20   say.

21   A.   It could be both things.

22   Q.   I mean, one could put both things together, correct?

23   A.   Yes.

24   Q.   And what's been marked as a defense exhibit, which is from

25   I think 12/24, so he writes that shortly after he's gotten out

1    of isolation, right, the letter saying he doesn't want to --

2    Exhibit 143.  Oh, it's on December 15.  So if you know, is he

3    still in isolation at this point or not?

4    A.   Yes, he was.  It's from that unit.

5    Q.   Okay.  And so here's a guy who you say is sporadically

6    taking his medication, and he's in isolation 23 hours a day

7    suffering from major mental illness, and he writes a pretty

8    lucid -- I know you don't agree with him not wanting treatment,

9    but he writes a pretty lucid note, doesn't he?

10   A.   Yes.  I didn't argue that it wasn't lucid.

11   Q.   Okay.  Well, it's also -- it doesn't show signs of mania,

12   correct?

13   A.   I mean, I can't tell from a note.

14   Q.   But, I mean, he's not name-calling, right?

15   A.   No.  He wasn't disrespectful.

16   Q.   And he's not grandiose?

17   A.   It's indicative of a very poor decision, given the fact

18   that he was recommended for conditional release at that point

19   in time.

20   Q.   But don't you think he thinks you're making poor decisions

21   that keep him locked up, right?

22   A.   We weren't trying to keep him locked up at that point in

23   time.  We were trying to get him out.

24   Q.   But historically what Mr. Mahoney reacts against is what

25   he perceives as institutional injustices; isn't that fair?

1   A.   He has reacted against significant others, other people in

2   the community, other inmates, other staff --

3   Q.   Wait.

4            MR. CALLAHAN:  Objection, your Honor.  Can he finish?

5            THE COURT:  Yes, finish.

6   A.   So he's --

7            (Discussion off the record between attorneys.)

8   A.   I'm sorry.  Could you repeat the question.

9   Q.   Well, look, so you've decided to say he was violent

10  against significant others.  Document that for me.

11  A.   It is what was established during these commitment

12  hearings.  I don't have the paperwork in front of me.

13  Q.   Well, you just decided to testify to it in Federal Court

14  at a hearing regarding whether he's a danger to the community,

15  so why don't you spell out what it was.

16  A.   He had, I believe, six restraining orders placed against

17  him by women in the community, and he assaulted one --

18  Q.   No --

19            MR. CALLAHAN:  Can he finish the answer to the

20  question before the next question?

21            THE COURT:  Yes.

22  A.   He was arrested and convicted for assault with attempt to

23  rape with a knife.  That is evidence of violence towards

24  significant others, in my opinion.

25  Q.   Well, wait.  Okay, was the woman in 1983 -- so the assault

1   with intent to rape, what was the year?

2   A.   1983.

3   Q.   Okay.  How long ago was that?

4   A.   Thirty years.

5   Q.   Okay.  Was it a significant other?

6   A.   That's my understanding, yes.

7   Q.   And your understanding based on what?

8   A.   My review of his criminal history.

9   Q.   But you haven't read the police report, correct?

10  A.   I don't recall.

11  Q.   Well, no one could even find the trial transcript the last

12  hearing we were at.  Now, the restraining orders, those people

13  can get those for ten days without Mr. Mahoney even being

14  present, correct?

15  A.   I don't know.

16  Q.   Well, you're testifying that those are the basis for what

17  makes him violent.  The allegation doesn't even have to be of

18  violence, does it, to get a restraining order?

19  A.   I'm not testifying that that's my basis for violence.  You

20  had asked me a question about his periods of acting out, and I

21  made that statement in response to that question.

22  Q.   Okay.  So did you ever read a single one of the affidavits

23  filed by the women in support of the restraining orders?

24  A.   I don't recall.

25  Q.   Do you know if any of those restraining orders went beyond

1    the ten-day period in which it is granted without the subject

2    of the restraining order even being present?

3    A.   I don't know.

4    Q.   Okay.  But you don't know either of those significant

5    things, but you are using them in your testimony here to say

6    that that's part of your evaluation for what makes him

7    dangerous, correct?

8    A.   Again, that was not the statement I made in my answer.  My

9    response was in response to a question from you regarding what

10   has made him act out historically.

11   Q.   Within the institution, since he's been locked up since

12   2010, when he was upset in the New Hampshire correctional

13   facility, it's that he was not being given his Seroquel,

14   correct?

15   A.   That was one incident, yes.

16   Q.   Right, but that's what kicked off the incident, correct?

17   A.   I'd honestly have to look at that specifically.  I don't

18   remember the specifics of that incident.

19   Q.   Okay.  Then the next incident in New Hampshire is, he's

20   taking off his shirt because someone had struck him with a

21   chair during the Seroquel incident, and he's showing the

22   correctional officer that "Here I am in isolation now, and I'm

23   the guy that got hit with the chair," right?

24   A.   I believe that's Mr. Mahoney's self-report.  I've never

25   seen any documentation consistent with that.

1  Q.   Well, there's documentation that he got hit with the chair

2  three days before he's taking off his shirt showing them the

3  very shoulder that got hit with the chair.

4        THE COURT:  When are we talking about?

5        MR. SHEA:  We're talking about Stafford County,

6  New Hampshire.

7        THE COURT:  Oh, this is way back?

8        MR. SHEA:  Yes, but it's to show -- the point I am

9  trying to make is that Mr. Mahoney's agitation is usually based

10  on his idea that he has been treated unfairly institutionally,

11  and so that when we continue to lock him up --

12        THE COURT:  All right, well, just ask him that

13  question.

14  Q.   So the thing is, currently the basis for continuing to

15  lock this man up, going on seven years now, is that he reacts

16  negatively to therapists, correctional officers taking apples

17  out of his cell, correct?

18  A.   No, that is not the basis.

19  Q.   Those are the most recent events, aren't they?  What is

20  the one event that has taken place since the report in August,

21  2016, besides not taking the medication, which you say it's not

22  court ordered so he has the right not to take it?  So what is

23  the one event --

24        THE COURT:  Is it your position I can court order it?

25        MR. SHEA:  I'm not saying you could court order it,

1    but I'm working off his --

2           THE COURT:  He seems to do so well on the medication,

3    I'm just wondering whether I should.

4           MR. SHEA:  I'm just trying to make the point that

5    that's not a basis for finding --

6           THE COURT:  Have you ever seen a judge order the

7    taking of the medication?

8           THE WITNESS:  Many times.

9           THE COURT:  Even while they're in Fort Devens?

10          THE WITNESS:  Oh, yes.

11   Q.   So between late August, 2016, when you had the meeting,

12   then there was the finding I guess in October that he could be

13   released to a structured environment like a halfway house, what

14   is the one incident that took place since then that changed the

15   diagnosis?

16   A.   I've never changed my diagnosis.

17   Q.   Well, not diagnosis, changed your saying he's too

18   dangerous to be released now.  That is a change.

19   A.   There are two incidents.  One was threatening his

20   treatment provider, and the other was sending me a letter

21   saying that he will never comply with any release conditions

22   regardless of what we put in place.

23   Q.   Well, first, the treatment provider was one of the

24   clinicians he's upset with for holding him on what he considers

25   a false diagnosis, right?

1    A.    I don't know that, no.

2    Q.    You don't think that Mr. Mahoney has been very clear that

3    he doesn't think you're telling the truth, and the others

4    aren't accurate in assessing his mental health problem?  That

5    hasn't come across?

6    A.    You're asking me two different questions.

7    Q.    Okay, well, let me ask you that one then.  I'm asking you,

8    isn't it clear to you that Mr. Mahoney feels that yourself and

9    other psychologists at the institution have unfairly labeled

10   him with Bipolar I?

11   A.    That's his opinion subsequent to Dr. Hoffman's evaluation,

12   yes.

13   Q.    And you also could see that institutionally, you know,

14   there had been other times besides Dr. Kissin where he was

15   considered a Bipolar II, correct?

16   A.    Other times -- I'm sorry, could you repeat the question.

17   Q.    Sure.  That other doctors had found him to be Bipolar II?

18   A.    Yes.

19   Q.    Right, at Devens?

20   A.    Yes.

21   Q.    And not just Dr. Kissin, correct?

22   A.    I'm not aware of -- there's Dr. Kazim and Dr. Kissin.

23   Those are the only two I'm aware of.

24   Q.    Okay.  And basically if it's Bipolar II, the Court

25   couldn't be holding him at Devens, meaning he wouldn't have the

1    major mental illness that's the qualifier to get here to even

2    determine dangerousness, right?

3    A.   That's my belief, yes.

4    Q.   So it's a critical finding, the difference between

5    Bipolar I and Bipolar II?  That's fair, isn't it?

6    A.   Yes.

7         THE COURT:  And, though, and is that also true if it's

8    bipolar not otherwise specified?

9         THE WITNESS:  No.  That's a major mental illness, a

10   major mental disease or defect which would qualify for civil

11   commitment.

12   Q.   Now, the thing with bipolar otherwise unspecified, or

13   whatever, is it fair to say that that is because the

14   individual, not specifically Mr. Mahoney -- I'm talking in

15   generalities -- that the individual doesn't meet all of the

16   criteria under the definition?

17   A.   Well, you don't have to meet all the criteria, but what it

18   would mean -- I mean, these diagnoses are categories that

19   mental health professionals have created to try to place

20   everyone who has certain conditions into that certain subgroup.

21   People are complex.  People are idiosyncratic.  Not everyone

22   fits.  And that's basically why you would use that diagnosis.

23   But it's still mania.

24   Q.   But it's an attempt to capture people who may not fit the

25   full definition, meaning the checklist; is that fair?

1    A.    Yes.  There's something about that individual which would

2    be different.

3    Q.    And is it fair to say then it's more subjective, meaning

4    it's somewhat based on the particular practitioner's

5    observations?

6    A.    All of diagnoses are subjective and based on the

7    individual's observations.

8    Q.    But at least if you're working from, say, a formula, a

9    checklist, you have to have this symptom, that symptom, there's

10   a uniformity in what symptoms are being applied by the

11   different practitioners, correct?

12   A.    There's a uniformity to the presentation of the patient,

13   not to the criteria that are being applied by the evaluator.

14   Q.    But meaning, though, if someone was found with Bipolar I

15   specified, they would have met the DSM-IV and now DSM-V

16   definition of bipolar disorder, right?

17   A.    Of Bipolar I disorder, yes.

18   Q.    Yes.  Bipolar I unspecified is that they don't meet all of

19   the definitions?

20   A.    It may be that they don't meet all of the definition.  It

21   may be that they present with other symptoms which are not

22   characteristic of the disorder, meaning that they meet all

23   those criteria plus they have a bunch of other things going on

24   which aren't typical.  So it can go either way.

25   Q.    Now, here's a document.  You had mentioned that Dr. Kazim

1    had said Bipolar II disorder?

2    A.   Yes.

3    Q.   But also signed onto that, or at least his name is on

4    there, is Dr. Gorham, the psychologist, correct?

5    A.   Yes.

6    Q.   So it appears that at some point in time, date of the

7    treatment team, 2015, they were finding Bipolar II?

8    A.   That was their working diagnosis, yes.

9    Q.   So the treatment team in November of 2015 had found him to

10   have Bipolar II.  So what I'm curious about --

11          MR. CALLAHAN:  Objection.

12          THE COURT:  What document is that?

13          MR. SHEA:  I'll put it into evidence.  I'm not sure

14   which --

15          THE COURT:  I'm not sure I have that.

16   Q.   So what I'm curious about is, so if you know that

17   Bipolar II isn't sufficient to commit Mr. Mahoney to Devens,

18   and then the treatment team makes a finding in November, 2015,

19   that he has Bipolar II, the very diagnosis that wouldn't allow

20   for his commitment to your institution, is any paperwork or

21   anything generated to the prosecutor's office, to the Judge, to

22   Mr. Mahoney's counsel?

23   A.   No.

24          THE COURT:  When did the working diagnosis shift from

25   Bipolar II to Bipolar I?

```
 1              THE WITNESS:  My understanding from conversations with
 2    Dr. Gorham is that that was never the diagnosis.  The diagnosis
 3    was bipolar disorder not otherwise specified.  That diagnosis
 4    was Dr. Kazim's diagnosis, not the treatment team diagnosis.
 5    Q.   Well, doesn't the document say it's the treatment team?
 6    Doesn't the document say "treatment team"?
 7    A.   I don't have the document.
 8    Q.   Oh.  "Behavioral health treatment plan worksheet,"
 9    correct?
10    A.   Yes.  That's just a worksheet.
11    Q.   Okay, but it lists the psychologist, Dr. Gorham, right?
12    A.   Yes.
13    Q.   The psychiatrist, Dr. Kazim, right?
14    A.   Yes.
15    Q.   The social worker, Tamika Finch-Hall, correct?
16    A.   Yes.
17    Q.   The nurse, J. Sweeney?
18    A.   Yes.
19    Q.   Recreational therapist, B. Carter?
20    A.   Yes.
21              THE COURT:  I mean, I can read it.
22              MR. SHEA:  Okay.
23              THE COURT:  Let's just --
24              (Defense Exhibit 3 received in evidence.)
25    Q.   But the last thing I just want to say is, it also puts his
```

 1    legal status on that very thing, 4246, right, meaning they list

 2    that he's committed there --

 3    A.   Well, that's not a "they."  One person types that sheet.

 4    As you can see, there are no signatures.  There's no -- I don't

 5    know who prepared that exactly, but I explained to you what my

 6    understanding of that situation was.

 7             THE COURT:  How are you doing timewise?

 8             MR. SHEA:  I think I can get there.  I'll try and

 9    leave a little time for the government.

10    Q.   Do you recall testifying at a prior hearing before this

11    Court, before Judge Saris?

12    A.   Yes.

13    Q.   And do you recall testifying when you were asked, "And the

14    fact is, his first diagnosis --"

15             MR. CALLAHAN:  Page?

16             MR. SHEA:  Oh, sure.  Sorry.

17             (Discussion off the record between attorneys.)

18    Q.   You were asked, "The fact is, his first diagnosis of

19    Bipolar I came only after he had been at Devens for a

20    substantial period of time?"  You answered, "I believe that's

21    correct, yes."  That was your answer back in 2014, correct?

22    A.   I can't see the transcript, but I'll take your word for

23    it.

24    Q.   Don't take my word.  Read it to yourself, please.

25             (Witness examining transcript.)

1    A.   Yes, that was my testimony.

2    Q.   That was your testimony.

3    A.   Well, I don't know who the witness is.

4    Q.   Sure.  I can show you at the beginning.

5             (Witness examining transcript.)

6    A.   All right, yes, that was my testimony.

7    Q.   That was your testimony?  Now, you've also diagnosed

8    Mr. Mahoney with antisocial personality disorder, correct?

9    A.   Yes.

10   Q.   That's consistent with the finding of Dr. Hoffman, right?

11   A.   Yes.

12   Q.   And is it fair to say that yours was the first diagnosis

13   that you're aware of of that disorder?

14   A.   I honestly don't -- I'm not sure.

15   Q.   Okay.  Well, do you recall when you were asked, "Is it

16   fair to say that your diagnosis of full-blown antisocial

17   personality disorder was the first diagnosis that you're aware

18   of for that disorder?" you answered, "Yes, the actual disorder,

19   that's correct"?  Do you have any memory of that?

20   A.   Yes.  I recall now that before that he had been diagnosed

21   with anti- -- I think personality disorder with antisocial

22   features.

23   Q.   Okay.  Now, typically personality disorders aren't

24   sufficient for commitment, right?

25   A.   Apart from sexually dangerous persons, yes, that's true.

1    Q.    Okay.  And there was no petition to commit Mr. Mahoney as
2    a sexually dangerous person, correct?
3    A.    No.
4    Q.    And so Bipolar I is a disorder that allows for the
5    commitment of Mr. Mahoney, correct?
6    A.    Well, I should specify that the basis for commitment is
7    federal statute which says "severe mental disease or defect."
8    That's left to the trier of fact to decide what diagnosis, so,
9    in my opinion, Bipolar II would not be sufficient.  Is it
10   possible that a court could find differently?  Absolutely.  So,
11   in my opinion, I would not file a petition to civilly commit
12   based on a condition of antisocial personality disorder.
13   Q.    Okay, so just so we're clear, you wouldn't file a petition
14   to commit under antisocial personality disorder, right?
15   A.    Alone, no.
16   Q.    And it's unlikely you would do so under Bipolar II?
17   A.    That's correct, yes.
18   Q.    Now, antisocial personality disorder requires that the
19   person kind of not have any empathy or feel badly about their
20   conduct, correct?
21   A.    It doesn't require that.  That is one of the -- it can be
22   a symptom of antisocial personality disorder.
23   Q.    Mr. Mahoney apologizes, correct?  Not always but he does,
24   okay?
25   A.    Yes.

1    Q.   One of the things for antisocial personality disorder --

2    and I know there's some debate that you had before on this --

3    usually requires some kind of juvenile record by the age of 15,

4    correct?

5    A.   No.  It requires disregard for and violation of the rights

6    of others prior to age 15.  It doesn't require a juvenile

7    record.

8    Q.   Okay.  So Mr. Mahoney's first record of conviction is at

9    the age of 19, right?

10   A.   I don't recall, but that sounds right.

11   Q.   Okay.  So that's certainly well beyond the age of 15,

12   right?

13   A.   Yes.

14   Q.   Significantly, right?  It's from juvenile to adult, right?

15   A.   Yes.

16   Q.   Well, now, did you ever get his educational records?

17        THE COURT:  Why are we going into this, since it isn't

18   the basis for the major mental disorder?

19        MR. SHEA:  Because his credibility is in question.

20        THE COURT:  I know, but both Hoffman and he agreed on

21   this, right?

22        MR. SHEA:  Right, but they both could be wrong about

23   that too.  I mean --

24        THE COURT:  Fine.  Just it's not the basis for the

25   commitment.

1          MR. SHEA:  I agree.  I guess, if I'm clearer, frankly,

2     I don't think any of these supposed experts are credible.  They

3     seem to shift with the wind of what they think they're required

4     to do is my opinion.  No, but so I'm trying to attack his

5     credibility on each of his diagnoses.

6          THE COURT:  And that's relevant, fine, but it's taking

7     forever on an issue that's not the basis for what I found

8     before or anybody has found now as the basis for the

9     commitment, so you're welcome to go through it, but we --

10          MR. SHEA:  I'm not going to spend a lot of time on it.

11     Q.   All right, so you don't have any juvenile convictions, you

12     don't have any educational records, and you're saying that he

13     qualifies for antisocial personality disorder.  What is the

14     basis -- how do you deal with that youth and the fact that

15     there doesn't seem to be sufficient documentation of any

16     problems in his youth?

17     A.   I testified during his hearing as to the foundation for

18     that.  I honestly can't recall.  It wasn't an issue that I

19     reviewed for this hearing.  I would have to go back and review

20     all the records again to answer that.

21     Q.   Well, it appears that you said that because he had told

22     you he engaged in combative or fights while he was in school,

23     none of which, there's no documentation of any suspensions or

24     any criminal charges, but that he had had fights in school,

25     that that was sufficient.  Does that seem right?

1    A.    Self-report would be sufficient, yes.

2    Q.    But, really, is fighting in school sufficient to make

3    someone have an antisocial personality disorder?

4    A.    Being combative and fighting?  Yes.

5    Q.    Well, how is combative --

6    A.    Well, no, it's not sufficient.  That's sufficient to

7    indicate a history of disregard for and violation of the rights

8    of others prior to the age 15.  You would have to have a whole

9    lot more than that to meet criteria for antisocial personality

10   disorder.

11   Q.    I mean, you know Mr. Mahoney grew up in Charlestown,

12   right?  And it's not the Charlestown we know now, right,

13   correct?

14   A.    Yes.  I don't know --

15         THE COURT:  What do you mean by that?

16         MR. SHEA:  Huh?  It was a little more rough-and-tumble.

17         THE COURT:  Oh, back then.

18         MR. SHEA:  Yes.

19         THE COURT:  Not the gentrified location.

20         MR. SHEA:  I'm not saying back then.  I live in a

21   gentrified community myself, so -- but, I mean -- but I will

22   say, when I was growing up, you could have a fight; it didn't

23   mean you had antisocial personality disorder, it didn't mean

24   you went to court.

25   Q.    Mr. Mahoney is 58 years old.  I mean, do you take into

1    account that his father is in jail for murder, he's living in

2    Charlestown back when it's a rougher community, and the kids

3    might fight in school, and you use that as the basis for saying

4    that's enough as a juvenile to get antisocial personality

5    disorder?

6              MR. CALLAHAN:  Objection.  That mischaracterizes the

7    witness's testimony.

8    A.   I just said that, no, that is not nearly enough.

9    Q.   Okay, so point to --

10             THE COURT:  He just said he didn't review the records

11   for this.  I mean --

12   Q.   Right, but he self-reported that he had some fights in

13   school?

14   A.   That's one criteria for antisocial personality disorder.

15   There are seven others.

16   Q.   Yes, but it's a disqualifier usually if you don't have

17   something by the age of 15, and so --

18   A.   And he did have something by the age of 15.

19   Q.   And the only thing --

20             THE COURT:  What was it?

21             THE WITNESS:  It was a history of combativeness and

22   fighting.

23   Q.   Which was only self-reported, right?  That was your only

24   documentation?

25   A.   That's correct.

1    Q.   And it was self-reported that he had some fights in
2    school?
3    A.   That's not what I stated, no.
4    Q.   Well, what did you mean by combative?
5            THE COURT:  So why don't you wrap up in about ten
6    minutes.
7            MR. SHEA:  All right, fine.
8    Q.   Another aspect of antisocial personality disorder, though,
9    is disregard for family, right, or for people close to you,
10   right?
11   A.   No.
12   Q.   Now, I'm going to show you -- and I guess we can group
13   these as an exhibit -- Federal Medical Center Devens gives out
14   certificates of achievement for people taking classes or
15   participating in things, correct?
16   A.   Yes.
17   Q.   And Mr. Mahoney has put together a significant amount of
18   these documents showing his participation, correct?
19   A.   Yes.  That was one of the reasons for our recommendation
20   for conditional release in August.
21   Q.   And one of the things -- let's just take a few of them.
22   So the latest one was Microsoft Office computer, he completed
23   330 hours of study as of October 28, 2016, right?
24   A.   If that's what it says, then, yes.
25   Q.   Okay.  And that means he's got to sit in the classroom for

1  those 330 hours, right?

2  A.   I don't have any idea how they conduct those courses.

3  Q.   Really?

4  A.   No.

5  Q.   Do you have any idea how they conduct even a single one of

6  these courses?

7  A.   I don't know.  I'd have to look through the entire stack.

8  Q.   Sure.

9         (Witness examining documents.)

10  A.   I'll point out that all of these fell within the time

11  frame that we recommended him for conditional release when he

12  was doing well, so I don't dismiss these as being relevant to

13  his stability.

14  Q.   But he took other courses in 2015; he took other courses

15  in 2014, didn't he?

16  A.   I'm not seeing anything from 2014 here, no.

17  Q.   Meaning that's what we brought today because that's the

18  relevant time period we're dealing with now, but are you --

19  you've said that you're the person with access to all of his

20  records.  Are you aware that he took numerous courses during

21  the entirety of his stay at Devens?

22  A.   Yes.  I've already testified that I mentioned that.  It's

23  in my report.

24  Q.   Well, the first question, the reason why you were looking

25  through --

1      THE COURT:  And during that time period where he was
2  so successful in those classes, was he on the Seroquel?
3      THE WITNESS:  Yes.
4  Q.  And is he on Seroquel now?
5  A.  Yes.
6  Q.  And he's taking it at his own behest, even while he won't
7  meet with the treatment team, correct?
8  A.  Yes.
9  Q.  Now, you were looking through that stack --
10      THE COURT:  Can I say this:  Is that the standard
11  treatment for Bipolar I?
12      THE WITNESS:  It is not, but he's not -- he's never
13  been willing to go back on the lithium, which showed benefit,
14  but they did manage with significant increases in his dosage of
15  Seroquel to control his symptoms.
16      THE COURT:  So it's been effective?
17      THE WITNESS:  It's typically used as an adjunct to
18  lithium or Depakote, but it has proven effective with him at a
19  high dose, really close to the maximum dose.
20  Q.  What other disorders would it be prescribed for?
21  A.  Psychosis.
22  Q.  Could it be prescribed for ADHD?
23  A.  No.
24  Q.  Okay.  Could it be prescribed for a personality disorder?
25  A.  No.  That would be chemical restraint.  I mean, that's --

1    this is a mood-stabilizing antipsychotic medication.  It's got

2    a pretty specific treatment profile, especially at the doses

3    that Mr. Mahoney takes it.

4    Q.   Now, I originally placed those documents in front of you

5    again for you to see if you could tell us about how rigorous or

6    what it would require for him to participate in any of those

7    courses, whether you had any insight into any one of them.

8    A.   No.  This is mostly conducted by education.  I know some

9    things about the mental health treatment groups, but strictly

10   educational stuff I don't really have much to do with.  I mean,

11   there are topics that -- I mean, the fact that he complies with

12   them and does them is a positive indicator on his behalf, which

13   is why that was a factor in our opinion in August.  I don't

14   disregard them or minimize them.  I think they're important.

15   Q.   Well, does it occur to you that he's doing -- you know,

16   some of them like the Food Truck is only six hours.  Money

17   Smart is ten.  Some are ten, but then the other is up to like

18   330 hours.  He's taking others like Illness Management and

19   Recovery, that one is a 146-hour one; another one on computers.

20   Does it occur to you that there doesn't seem to be --

21          MR. SHEA:  And that can be stapled and made one

22   exhibit.

23          THE COURT:  Fine.

24          (Defense Exhibit 4 received in evidence.)

25   Q.   Does it occur to you that he doesn't have a single

1    incident report or write-up for his entire stay at Devens for

2    anything involving these courses he takes?

3    A.   That's not true.  He had a significant incident in

4    education a couple of years ago where he ended up being locked

5    up for his behavior with the supervisor of education.

6    Q.   But it wasn't during one of these courses, was it?

7    A.   Not one of these, but --

8    Q.   Sir, sir, it was he was in the library in the morning when

9    the person came in, right, and there were words exchanged?

10   A.   As I indicated, he had an altercation in education.

11   Q.   Not an altercation.  I think it was called -- people

12   described it as loud.  There was one report that described it

13   as loud on both sides.  Of course, in these institutional

14   reports, sometimes one person sees it one way and another the

15   other, but it wasn't during one of these classes?

16   A.   Well, to answer your question, yes, it occurred to me

17   because I recommended him for conditional release.

18   Q.   Right, but how about just looking back?  In 2014 --

19         THE COURT:  And, again, what span of time would you

20   feel it was -- now that, in your view, there's been a reset,

21   what span of time would be for you sufficient to prove to you

22   that he could be compliant with medications?  Six months, you

23   said?

24         THE WITNESS:  That is what I said.  I mean, there are

25   two issues.  His compliance with treatment, I think it's more

1   than just medication; it's compliance with medication and

2   compliance with meeting with his psychologist on a regular

3   basis.  There is a significant issue with regard to

4   Mr. Mahoney's report as to whether or not he'll comply with

5   release conditions, and it's difficult because --

6           THE COURT:  Well, were you asking to keep him forever?

7           THE WITNESS:  No, but --

8           THE COURT:  All right, so what would be a

9   reasonable --

10          THE WITNESS:  But I'm saying that less than a month

11  ago, two weeks ago in fact, he already told me -- I would want

12  at least six months of a period of time where he's not

13  communicating to other people that he's going to violate his

14  conditions when he gets out because simply saying "I'll do it"

15  has not proven in his history to be borne out.

16  Q.   Actually, in his history, sir, let's do that just quick.

17  2009, Mass. General Hospital, he seeks out the treatment,

18  right?  As far as you know, Mr. Mahoney determines that he's

19  having trouble with comporting himself, so he says, "You know

20  what?  This is causing me trouble in my family or my life.  I'm

21  going to go for some help."  He goes to Mass. General Hospital,

22  right?

23  A.   I mean, I don't know the specifics.  I know he was told

24  that he had pressured speech and things like that.  I don't

25  know --

1  Q.   And he reported that he went to Mass. General.  He's on

2  parole at the time.  It's verified that he's getting treatment,

3  right?

4  A.   Well, going to Mass. General on your own accord and being

5  on parole and going to Mass. General could be two different

6  things.

7  Q.   Right, but it could be that he decided to go so he could

8  successfully --

9  A.   It could be.  It could also be that he was required to go.

10 I don't know.

11 Q.   But you have no documentation he was required to go,

12 right?

13 A.   I have no documentation one way or the other.  That's my

14 answer.

15 Q.   So did you seek the documents?

16 A.   No.

17 Q.   Okay.  Now, as to New Hampshire, the outpatient place that

18 he went from 2004 to 2010, he's not on parole then.  He goes by

19 himself, and for six years he goes there by himself because he

20 wants to help himself; isn't that right?

21 A.   Again, I don't dispute that he went.  I don't recall why

22 he was going exactly, whether he was on any kind of conditions.

23         THE COURT:  He doesn't remember, so what's the next

24 question?

25 Q.   Okay, but you looked at -- you have testified in this

1    court that unlike Dr. Hoffman, you reviewed the New Hampshire

2    notes, right?

3    A.    Yes.

4    Q.    Okay.  And you can tell us that Mr. Mahoney went to that

5    place by himself.  He wasn't court ordered there.  Nothing in

6    the notes say he's court ordered, right?

7    A.    I'm telling you I don't know.  I would have to go back and

8    review the records.

9    Q.    Okay, but you read these records, right?

10   A.    At one point in time, I had read those records, yes.

11   Q.    Is there anything in your memory to indicate that he was

12   court ordered and didn't go on his own?  Is there any reason to

13   believe --

14   A.    For treatment?

15   Q.    Huh?

16   A.    For treatment?

17   Q.    Yes.

18   A.    I'm not aware of that, no.

19   Q.    Okay.  And so for those six years, meaning your concern

20   here today is whether Mr. Mahoney will be compliant, yet what

21   you know is that for six years out there, he went on his own

22   without any involvement by any outside authority, apparently,

23   to get himself help.

24   A.    Taking his medication is only one requirement of the

25   release conditions.

1    Q.   Well, let's put it this way:  They didn't just hand out

2    drugs at that outpatient place in New Hampshire, right?  Does

3    anyone do that legally?

4    A.   No.

5    Q.   Okay.  It's prescribed by a psychiatrist, isn't it?

6    A.   Or a psychiatric nurse or a mid-level practitioner.

7    Q.   And usually in conjunction with, you go there and have

8    therapy.  It can vary from weekly to monthly, right?

9    A.   That's not necessarily true.  I mean, there are a lot of

10   people on medication who don't go to therapy.

11   Q.   But this was a mental health group, right?

12   A.   It doesn't make a difference.  There are a lot of people

13   on medication that don't go to therapy.

14   Q.   Do you have any reason to think they were just handing

15   Mr. Mahoney a big bottle of pills and sending him out the door?

16   A.   I don't know what I said that would make you believe I

17   have any reason to doubt that.

18           (Discussion between Mr. Shea and Mr. Mahoney.)

19   Q.   So he was going to the Goodwin Community Health Center; is

20   that your recollection?

21           THE COURT:  I'm sorry.  I've lost track.  Is this

22   New Hampshire?

23           MR. SHEA:  Yes, that's New Hampshire.

24           MR. CALLAHAN:  Can I see the document counsel has

25   shown the witness, please.

```
 1              THE COURT:  You know what, just --
 2              MR. MAHONEY:  Well, I want him to answer the question.
 3              THE COURT:  No.  He shows it to Mr. Callahan first.
 4              (Discussion between Mr. Shea and Mr. Mahoney.)
 5              MR. CALLAHAN:  Thank you.
 6    Q.   All right, so does this refresh your recollection that he
 7    went to the Goodwin Community Health Center?
 8              (Witness examining document.)
 9    A.   Yes.  I mean, I knew he went there.  As I indicated, I
10    don't know -- I didn't recall exactly why he was going there.
11    Q.   And he provided you records about his having gone there,
12    right?
13    A.   Yes.  It's documented in my reports when he went there,
14    what he was taking, what he was diagnosed with.
15    Q.   Okay, but also that he was going on his own; that's what's
16    documented?
17    A.   He was showing up for treatment regularly.
18    Q.   Thank you.  And that's from 2004 to 2010, and it's 2010
19    when --
20              MR. CALLAHAN:  Objection.  Objection, your Honor.
21    What was from 2004 to 2010?
22              MR. SHEA:  Oh, his going to community health centers
23    right, or 2004 to 2009?
24              MR. MAHONEY:  2004 to 2010, twice a month.
25              THE COURT:  And what meds was he taking back then?
```

1   Does anyone know?

2           MR. MAHONEY:  I have the list right here, your Honor.

3           MR. SHEA:  Hold.

4           MR. MAHONEY:  Medications that you have to go,

5   Roxicodone, you have to go there.

6           MR. SHEA:  I'll make it an exhibit so you'll know.

7           THE COURT:  Okay, thank you.

8           (Defense Exhibit 5 received in evidence.)

9   Q.   So that it appears under the timeline, given that

10  Mr. Mahoney finds himself in the court system as of 2010, that

11  the thing that interrupted his continuing with the community

12  mental health center was his incarceration, and then the

13  ensuing question of competency, and then the commitment; is

14  that fair to say?

15  A.   Yes, absolutely.

16  Q.   And it's fair to say that since that time, ranging over

17  six to the seventh year now, he hasn't had an opportunity to

18  show that he's willing to comply, meaning he hasn't been out to

19  prove himself?

20  A.   He has not been out since that time.

21          THE COURT:  It says here in this Community, "Rule out

22  Bipolar I disorder.  Most recent episode manic MOD."  I'm not

23  sure.  So do you know whether that means they have ruled it out

24  or whether they need to rule it out?

25          THE WITNESS:  It means it's a diagnosis that they're

1    considering.

2          THE COURT:  It's one that they're considering?

3          THE WITNESS:  Yes.

4    Q.   Meaning they should rule it out or rule it in, but they

5    haven't reached a decision; is that fair?

6    A.   Yes.

7          THE COURT:  Okay, thank you.

8          MR. CALLAHAN:  Your Honor, will the government have

9    some time?  There's been a lot on cross that we'd like to

10   redirect on.

11         THE COURT:  Well, are you done?

12         MR. SHEA:  One second.

13         (Discussion between Mr. Shea and Mr. Mahoney.)

14         MR. SHEA:  Yes.  I'll stop.

15         THE COURT:  Well, let me put it this way:  Yes and no.

16   I'm walking out this door at 1:00 o'clock.

17         MR. CALLAHAN:  I understand, your Honor, so I'll get

18   going and get right to it.

19         THE COURT:  If not, we're coming back next week.

20   Monday morning look good for you?

21         MR. CALLAHAN:  Sure, for the government it does, your

22   Honor.

23         MR. SHEA:  I could do the morning, but I have to leave

24   by noon to get out to Westfield for my DNA expert by 2:00, so I

25   could do 9:00 to 12:00.

1          THE COURT:  This has been like the never-ending

2     hearing.

3          MR. CALLAHAN:  I think I'll be done before 1:00

4     o'clock with Dr. Channell.

5          THE COURT:  I know, but then there's a recross.  So,

6     you know, I'm just walking out the door at 1:00.  I have to be

7     somewhere at 1:00, so I'll already be 10 or 15 minutes late.

8          MR. CALLAHAN:  So let me get right to it then.

9     REDIRECT EXAMINATION BY MR. CALLAHAN:

10    Q.   So, Dr. Channell, with respect to the October, 2012,

11    Dr. Kambampati "manic" note that you were referring to, did you

12    personally observe Mr. Mahoney at Devens during that time and

13    see manic symptoms?

14    A.   Yes.

15    Q.   The letter, in terms of Mr. Hoffman or Dr. Hoffman telling

16    anyone at Devens about his diagnosis of Mr. Mahoney not having

17    bipolar, does your name or is anyone's name at Devens on the

18    March 25, 2016 letter where Dr. Hoffman says that?

19    A.   No.  That was sent directly to Mr. Mahoney.

20    Q.   It was sent to Mr. Mahoney.  It was also sent to Mr. Shea,

21    right?

22    A.   Yes.

23    Q.   And it was cc'd to the DMH.  Is there anyone from Bureau

24    of Prisons whose name is on this document from Dr. Hoffman?

25    A.   No.

1   Q.   If the Court wants to know what records -- you were asked

2   a lot about what records the Department of Mental Health had at

3   the time -- well, at least as of the date of the fair hearing,

4   right?  We know at the time of Dr. Hoffman's conclusion he had

5   about 40 pages, right?  Didn't he already testify to that?

6   A.   Yes.

7   Q.   In terms of the records from DMH, do you know that the

8   Court ordered DMH to turn over that record?

9   A.   Yes.

10  Q.   And do you know it's all here in Exhibit 134?

11  A.   Yes.

12  Q.   Much of it after the time during which Dr. Hoffman gave

13  his diagnosis, correct?  So if the Court wants to know what was

14  provided, what they looked at at the fair hearing, it's all in

15  Exhibit 134, right?

16  A.   It's my understanding.

17  Q.   And there are no documents from Avis Goodwin there, right?

18  A.   That's my understanding.

19  Q.   Right.  And if there are any other questions, that's the

20  place to look; is that fair?

21  A.   Yes.

22  Q.   You talked about incident reports Mr. Mahoney had

23  generated at his time in Devens.  Do you recall testifying

24  about that in the first civil commitment hearings here in June

25  and August of 2014?

1    A.    Yes.

2    Q.    Were some of those incident reports, did they describe

3    aggression Mr. Mahoney demonstrated to other people outside of

4    his treatment --

5              THE COURT:  You know, I remember what my opinion said.

6    I reread it before I came in here.  Anything else?

7              MR. CALLAHAN:  Yes.

8    Q.    Let me ask you about this:  You were shown Dr. Kazim's

9    note from November, 2015?

10   A.    Yes.

11   Q.    I want to show you -- and that's where there's this

12   Bipolar II disorder reference, correct?

13   A.    Yes.

14             MR. CALLAHAN:  May I approach, your Honor?

15             THE COURT:  Yes.

16             MR. CALLAHAN:  I'm going to show him Exhibit 145 which

17   I've just marked.  I'll show it to counsel first.  I only have

18   one copy of it.  It's a treatment note, your Honor, dated

19   December, 2015, which is just several weeks after the document

20   that Mr. Shea put in front of Dr. Channell.

21   Q.    What is Exhibit 145?

22   A.    This is a Diagnostic and Care Level Formulation note.

23   Q.    And what's the date of that note?

24   A.    December 2, 2015.

25   Q.    Where is that in reference to Dr. Kazim's note that you

1    were shown by Mr. Shea?

2    A.   It would have been maybe a month later, yeah, a little

3    less.

4    Q.   What's the diagnosis that's identified there by Dr. Gorham

5    in his treatment note?

6    A.   "Other specified bipolar and related disorder, current

7    chronic initial with psychotic features, delusional ideation."

8    Q.   Not Bipolar II, correct?

9    A.   That's correct.

10   Q.   And what does it say at the bottom?

11   A.   "Reviewed by Gorham, Jonathan," Dr. Gorham.

12   Q.   Part of the treatment team?

13   A.   Yes.

14        MR. CALLAHAN:  The government offers 145, your Honor.

15        THE COURT:  All right.

16        (Exhibit 145 received in evidence.)

17   Q.   I'd like to show you just one more treatment note,

18   Exhibit 141 in your binder.  Can you identify what that is.

19   A.   That's a Diagnostic and Care Level Formulation written by

20   Dr. Gorham dated December 20, 2016.

21        MR. CALLAHAN:  The government offers 141 into

22   evidence, your Honor.

23        THE COURT:  All right.

24        (Exhibit 141 received in evidence.)

25   Q.   What's the diagnosis that Dr. Gorham provides at the

 1   bottom of that Exhibit 141 at Page 3155?

 2   A.   "Other specified bipolar and related disorder, current

 3   with psychotic features, delusional ideation, and antisocial

 4   personality disorder."

 5   Q.   Is that a severe mental illness, Dr. Channell?

 6   A.   The "other specified bipolar" is, yes.

 7        THE COURT:  All right.

 8   Q.   And then --

 9        MR. CALLAHAN:  Your Honor, I really only have like two

10   minutes.

11   Q.   Antisocial personality --

12        THE COURT:  Excuse me.  Will you have recross?

13        MR. SHEA:  Right now I'm at two questions.

14        THE COURT:  I literally have to walk out the door at

15   1:00 o'clock, so the question really comes at -- I don't know

16   whether, Dr. Channell, are you available Monday so we're not so

17   rushing this?

18        THE WITNESS:  I'm not available Monday.

19        MR. CALLAHAN:  I'll stop right now.

20        THE COURT:  Okay.  Anything?

21        MR. SHEA:  Sure.

22   RECROSS-EXAMINATION BY MR. SHEA:

23   Q.   You just said that you could document -- that you yourself

24   in the same time period as Dr. Kambampati, I think it is, you

25   made observations of the manic episodes.  Did you document

1   those anywhere?

2   A.   Probably not, no.

3   Q.   Do you have even a note --

4          THE COURT:  All right, he said he didn't, so what's

5   the next question?

6          (Discussion off the record between attorneys.)

7          MR. CALLAHAN:  It's not dated.  It's an undated

8   envelope that someone typed.

9          MR. SHEA:  Right, but it's from them.

10          MR. CALLAHAN:  From when?

11          THE COURT:  Do you object?

12          MR. CALLAHAN:  I object, your Honor.

13          MR. SHEA:  I'll get more documentation for it.

14          THE COURT:  Okay.

15   Q.   Just the last thing on that Kambampati stuff.  Are you

16   willing to provide documentation to the Court showing manic

17   episodes in that time period for the weeks surrounding

18   Dr. Kambampati?

19   A.   I will provide the Court any documentation the Court

20   wants.

21          THE COURT:  Why don't I just leave it this way:  Right

22   now you don't remember taking notes about it.  Why don't you,

23   if you could go back and present those documents to the Court

24   or give them to the U.S. Attorney for Monday's hearing if you

25   see anything.

```
 1          MR. SHEA:  Can I get something too?
 2          THE COURT:  Of course, yes.  I mean, but he'll share
 3   it with you.  I mean, you don't want him to share it directly.
 4   He'll give it to you and then share --
 5          THE WITNESS:  If I could just say, I won't be into the
 6   office until 6:00 o'clock Monday morning.  I can send it then,
 7   but that would be the earliest I'd be able --
 8          THE COURT:  That's okay.  I'm not going to be deciding
 9   it on Monday, so that's fine.
10          All right, anything else?
11          MR. SHEA:  Fine.
12          THE COURT:  Okay.
13          MR. CALLAHAN:  Is Dr. Channell excused?
14          THE COURT:  Yes, he is.
15          (Witness excused.)
16          THE COURT:  I'll see you Monday morning.  You'll make
17   a decision about whether Mr. Mahoney wants to testify?
18          MR. SHEA:  Yes.  The only thing, Judge, we had put
19   into evidence this disk of the fair hearing.
20          THE COURT:  Yes.
21          MR. SHEA:  And we're asking -- we don't want to take
22   up the Court's time playing it, but if the Court would agree to
23   listen to it --
24          THE COURT:  I'll listen to it afterwards, but not
25   necessarily by Monday.  What time Monday morning?
```

1          MR. SHEA:  But before making a decision on the matter?

2          THE COURT:  Yes.  I'm not making a decision Monday

3    morning.  I don't even know whether your client is going to

4    take the stand.  Is he?

5          MR. SHEA:  Honestly, I don't know, but part of --

6          THE COURT:  You'll make a decision for Monday.

7          MR. SHEA:  Yes.

8          THE COURT:  Monday at 9:30, does that make sense?  Was

9    that easier this morning?

10          MR. SHEA:  Yes.

11          THE COURT:  Because last time it was a little too -- I

12    wasn't sure I could get you in on time.  Did you --

13          MR. SHEA:  They kept him in Plymouth.

14          THE COURT:  They kept him in Plymouth.  Oh, so it's

15    easier.  All right, we'll do 9:00 o'clock, okay.

16          MR. MAHONEY:  So I can go back to Plymouth.  If I have

17    to be here before 9:00, they said you have to go to the nearest

18    facilities.

19          THE COURT:  What do you prefer?

20          MR. SHEA:  Do you like Plymouth?

21          MR. MAHONEY:  Whatever the Court.  I'll go back to

22    Devens if the Court would allow me, if I --

23          THE COURT:  Well, I don't know over the weekend what

24    makes sense.  I'll leave it up to them.  I'll set it at 9:30,

25    and whatever will be will be.

1          MR. SHEA:  Sounds fine.

2          THE COURT:  Because it just didn't work last time from

3    Devens at 9:00.  We just all sat here waiting.

4          All right, and then my goal is that -- either he'll

5    testify or not.  Make a decision by then.  Oral argument, and

6    I'll take it under advisement.  At that point I'll listen to

7    the tape.  And if you want to submit post-hearing briefs,

8    you're welcome to.  If you want to just argue, fine too.  Okay?

9    Thank you.

10          MR. CALLAHAN:  Thank you.

11          THE COURT:  Have a nice weekend.

12          THE CLERK:  All rise.

13          (Adjourned, 12:59 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1                         C E R T I F I C A T E

2

3

   UNITED STATES DISTRICT COURT )
4  DISTRICT OF MASSACHUSETTS    ) ss.
   CITY OF BOSTON               )
5

6

7          I, Lee A. Marzilli, Official Federal Court Reporter,

8  do hereby certify that the foregoing transcript, Pages 2-1

9  through 2-125 inclusive, was recorded by me stenographically at

10 the time and place aforesaid in Civil Action No. 15-11530-PBS,

11 United States of America v. Brian Mahoney, and thereafter by me

12 reduced to typewriting and is a true and accurate record of the

13 proceedings.

14         Dated this 16th day of February, 2017.

15

16

17

18

19         /s/ Lee A. Marzilli
           _____
20         LEE A. MARZILLI, CRR
           OFFICIAL COURT REPORTER
21

22

23

24

25