1            IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF MASSACHUSETTS
2

3    UNITED STATES OF AMERICA,          )
                                        )
4                 Petitioner            )
                                        )
5          -VS-                         )  Civil No. 13-11530-PBS
                                        )  Pages 3-1 - 3-58
6    BRIAN MAHONEY,                     )
                                        )
7                 Respondent            )

8
                  **EVIDENTIARY HEARING - DAY THREE**
9

10            BEFORE THE HONORABLE PATTI B. SARIS
              UNITED STATES CHIEF DISTRICT JUDGE
11

12
     A P P E A R A N C E S:
13

         PATRICK M. CALLAHAN, ESQ., Assistant United States
14   Attorney, Office of the United States Attorney,
     1 Courthouse Way, Room 9200, Boston, Massachusetts, 02210,
15   for the Petitioner.

16       MARK W. SHEA, ESQ., Shea & LaRocque,
     Suite 103, 929 Massachusetts Avenue, Cambridge,
17   Massachusetts, 02139, for the Respondent.

18

19                            United States District Court
                              1 Courthouse Way, Courtroom 19
20                            Boston, Massachusetts  02210
                              January 30, 2017, 9:45 a.m.
21

22

23                     LEE A. MARZILLI
                    OFFICIAL COURT REPORTER
24               United States District Court
                 1 Courthouse Way, Room 7200
25                   Boston, MA  02210
                      (617)345-6787

1                          I N D E X

2

3    CLOSING ARGUMENTS                        PAGE

     By Mr. Shea:                             3-5
4
     By Mr. Callahan:                         3-37
5

6

7    EXHIBITS                  RECEIVED IN EVIDENCE

8    Government:

9    108                           3-4

10   112                           3-5

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                     P R O C E E D I N G S

2             THE CLERK:  Court calls Civil Action 13-11530,

3    United States v. Brian Mahoney.  Could counsel please

4    identify themselves.

5             MR. CALLAHAN:  Good morning, your Honor.  Patrick

6    Callahan for the United States.

7             MR. SHEA:  Good morning, your Honor.  Mark Shea for

8    Brian Mahoney.

9             THE COURT:  All right, thank you.

10            MR. MAHONEY:  Good morning, your Honor.  Defendant

11   Brian Mahoney.

12            THE COURT:  Evidence closed with the exception of if

13   Mr. Mahoney wanted to take the stand.

14            MR. SHEA:  Yes, Mr. Mahoney is not going to take the

15   stand, Judge.  There is one little bit of evidence I wanted

16   to -- because the government has these two binders and I was

17   honestly a little confused as to whether both were fully in

18   evidence or not, and Mr. Callahan was kind enough --

19            THE COURT:  Well, no, you objected to that, so we went

20   exhibit by exhibit.

21            MR. SHEA:  Okay.  So what I wanted to be clear on, I'd

22   like to move into evidence No. 108, what's marked as Government

23   Exhibit 108, which is Dr. Kissin's report.  And I want to make

24   sure the Court has access --

25            THE COURT:  Any objection?
```

1            MR. CALLAHAN:  To Dr. Kissin's report?  No, your

2    Honor.

3            THE COURT:  All right, 108 is in.

4            (Exhibit 108 received in evidence.)

5            MR. SHEA:  And then there's the fair hearing

6    transcript which is 135.  The tape is already in, I believe.

7            THE COURT:  Yes.

8            MR. CALLAHAN:  I think the transcript and the tape are

9    in.

10            THE COURT:  All right, so they're both in.

11            MR. SHEA:  It just wasn't checked, so I wanted to make

12    sure.

13            THE COURT:  Okay.  And let me just say, this is a

14    little bit of a transition here because, as you know,

15    Ms. Molloy was out sick last week, so just maybe you go through

16    with her to make sure.  And I see Dan sitting back there, so we

17    could just make sure that there's a mutual understanding.  It's

18    a civil commitment hearing, so we want to make sure that

19    everything goes in, and if there's a disagreement, you'll have

20    to let me know.  There's a motion to compel that isn't even

21    docketed yet.  Do we -- has everything been --

22            MR. CALLAHAN:  Could I just one before we move off the

23    exhibits for a moment, your Honor?

24            THE COURT:  Yes.

25            MR. CALLAHAN:  There is a list in the front of that

1    Binder 1, which has checks next to all the ones that have been

2    admitted.  I'm happy to put a check next to -- I don't know if

3    you just did -- 108, just so it's clear for Ms. Molloy.

4         Secondly, the government would like to move in

5    Exhibit 112, which is already in that book, which was referred

6    to by Dr. Channell.  It is already in the book, the

7    November 21, 2013 psychology report record.  Any objection?

8         THE COURT:  Sure.

9         MR. CALLAHAN:  Okay.

10        (Exhibit 112 received in evidence.)

11        THE COURT:  And then there's a question of episodes of

12   mania.

13        MR. SHEA:  Let me -- and I apologize.  I went in early

14   to try and get it on the CM/ECF but failed, and what I'm

15   looking for there, Judge, is that Government Exhibit 110 is the

16   report of Dr. Kambampati, which was referred to in testimony by

17   Dr. Channell as the Bipolar I episode at Devens, meaning the

18   mania.  And, you know, one of the points of contention at the

19   hearing is Dr. Hoffman's diagnosis that he's not Bipolar I and

20   the question of whether he is in fact Bipolar I.  In order to

21   reach that, I know they've presented another definition saying

22   if you're in a hospital, that qualifies, but what I wanted to

23   get at was that he was relying on this Kambampati report.

24        THE COURT:  Which is in evidence, right?

25        MR. SHEA:  Yes.  It's Exhibit 110.

1          THE COURT:  But you want whether there are any other

2     incidents, right?

3          MR. SHEA:  Well, here's what I wanted to do, because

4     the definition I read of Bipolar I disorder is mania that spans

5     a week, and it's in Dr. Channell's report, Exhibit 102.  I'll

6     go through that in my argument.  But the point is that there

7     should be documentation of mania lasting a week.  So what I did

8     in my request was, I took Kambampati's report date, which is

9     the 24th of October, 2012, and went seven days either way to

10    see if there are notes showing seven days of mania consistent,

11    as required for Bipolar I.  Dr. Channell said that such reports

12    would be in the records.

13         THE COURT:  Well, I don't remember exactly how he

14    worded his answer, but if you're looking for any reports within

15    seven days of that report, that should be easily provided.

16         MR. CALLAHAN:  Your Honor, I think we produced all the

17    mental health records.  We'll go back and look.  We didn't put

18    in every mental health record.  We put in the ones that we

19    thought were relevant.

20         THE COURT:  Yes, but it is legally relevant whether

21    it's seven days on either end, not necessarily dispositive but

22    relevant.  And if there are other manic incidents the

23    government wants to amplify with, it may, but how long would it

24    take you to do that?

25         MR. CALLAHAN:  We can certainly look again.  I think

1   it's all been produced, your Honor, but we can obviously check

2   again.  I can look today.  Could I say one thing before we move

3   off of that, your Honor?

4           THE COURT:  Yes.

5           MR. CALLAHAN:  The definitions that Mr. Shea is

6   talking about is not the definition in 144, which is the DSM-V,

7   which says "A distinct period of abnormally or persistently

8   elevated or expansive or irritable mood lasting at least a week

9   and present most of the day almost every day, or any duration

10  if hospitalization is necessary."  That's what's in

11  Exhibit 144.  That's the definition in the DSM-V.

12          THE COURT:  You know what?  You both are doing the

13  closing arguments, but at this point all I'm doing is, if in

14  fact there are other documented manic incidents, documentation

15  that it's the seven days that shows manic during the seven days

16  that haven't already been produced, just double-check, okay?

17          MR. CALLAHAN:  Certainly.  We'll do that, your Honor.

18          THE COURT:  That's all that there is because there are

19  alternative definitions, but there's a challenge that this

20  doesn't apply here because he wasn't hospitalized due to it.

21  He was already in a hospital.  So, I mean, there are nuances

22  here that I'm not prepared at this point to rule on.  He's just

23  asking for the documents.

24          MR. CALLAHAN:  Absolutely.

25          THE COURT:  So if they're not there, he gets the

1    documents.  That's easy.

2         All right, secondly, you filed a *Daubert* motion which

3    is untimely.  I'm not going to conduct a *Daubert* hearing right

4    now.  I mean, the evidence is closed.  I mean, I understand, I

5    view them with a certain level of -- I didn't even remember

6    that he had relied on them, so -- it wasn't a big deal in his

7    testimony, so --

8         MR. SHEA:  Just so it's clear what I'm trying -- let

9    me just -- there's one thing on the last issue I just wanted to

10   say, which is Kambampati's report said that there is an

11   incident report that he filed, and I don't have that.  And so I

12   do think there are other documents, and Dr. Channell said there

13   were documents --

14        THE COURT:  Right, so he'll double-check.

15        MR. SHEA:  Okay, but I'm not looking to have a

16   full-blown *Daubert* hearing.  Let me be blunt about what I'm

17   trying to do.  I don't want to go into the VRAG and the whole

18   thing that was part of the appeal that was part of the last

19   hearing that Attorney Schneider --

20        THE COURT:  I didn't remember it was part of the

21   appeal.  I'm not just redoing the whole thing.

22        MR. SHEA:  Right.  No, no, so honestly, Judge, what I

23   was trying to do was avoid -- so if you actually look at the

24   last three reports by Dr. Channell, he doesn't use any of the

25   tools that were in dispute at the last hearing with

 1   Attorney Schneider and were part of the dispute in the appeal.
 2   I filed this motion partially because I wasn't going to deal
 3   with it, meaning I didn't want to eat up the time we had to go
 4   through something they weren't relying on in the last two
 5   years, but the 2013 report is in evidence.  He references it in
 6   the 2013 report.
 7           THE COURT:  Are you relying on those?
 8           MR. CALLAHAN:  We are.  We're relying on all the past
 9   forensic psychology reports that Dr. Channell himself helped to
10   author.
11           THE COURT:  It's just too late to hold a *Daubert*
12   hearing.  I've ruled on some of this before but a long time
13   ago, so there potentially could be new science.  It's just too
14   late to do a *Daubert*.  I don't know.  He's filed his motion.
15   I'm not prepared to rule on it.  I just saw it for the first
16   time five minutes ago.  I am not holding a *Daubert* hearing now.
17   Already we've gone through -- this is our third day of
18   hearings, and no one filed it in advance.  I'm not doing it.
19   I'm not sure I would spend a lot of time relying on it.
20           MR. CALLAHAN:  Right, I think -- your Honor, just it's
21   already in.  That *Daubert* motion has already been ruled upon in
22   the past.  It was appealed to the First Circuit.  That
23   challenge was rejected.  They're in evidence.  I think what
24   Dr. Channell said before was, "I relied on all the observation.
25   That's corroborative to me, those results."  That's what he

```
 1    said, and that's what's in the ruling.

 2         THE COURT:  There's no doubt he was dangerous before.

 3    The issue is whether he still can be released unconditionally,

 4    is what is being requested, without being dangerous.

 5         So as I understand it, there's no new instruments

 6    being filed, right?

 7         MR. SHEA:  That's correct.

 8         THE COURT:  So right now -- I mean, I'm not redoing my

 9    initial finding, which was based partly on that; but the issue

10    now is, are there a combination of conditions of release, or,

11    alternatively, could he be released unconditionally, or have

12    the recent events since last August changed so dramatically

13    that it's still a danger?  So that's the issue.

14         MR. SHEA:  I just want the record to be clear that I

15    filed -- I know it -- from what the Court is saying, it sounds

16    like I filed my Daubert motion late.  I just want it to be

17    clear that I thought we were dealing with the current

18    situation, which I believe we are.

19         THE COURT:  We are.

20         MR. SHEA:  So I didn't know the government was going

21    to introduce the report from 2013.  When they came with their

22    exhibit book, then I saw that it was there, so I filed it when

23    I knew it was coming in.  That's all.

24         MR. CALLAHAN:  Your Honor, it was already in evidence.

25         THE COURT:  You surprised me a little bit because I
```

1   didn't know you were going to be -- truthfully, this whole

2   hearing has surprised me because I didn't understand -- I

3   thought it was all going to be about what conditions, if any,

4   were appropriate.  I didn't understand you'd be challenging

5   whether he even had a major mental disease or defect.  That

6   took me by surprise.  So you've been very vigorous and I

7   appreciate it, very effective.  You've covered the waterfront,

8   I get it, but it took me by surprise.

9            MR. SHEA:  Okay.

10           THE COURT:  You were the one who went back to the

11   initial, which has been affirmed on appeal, so, I mean, that

12   took me by surprise.  I thought this was going to be about the

13   difference between the report and the supplemental report and

14   could conditions, and his uncle is here, and that's what I

15   thought it was going to be about.  So let's go into oral

16   argument right now.  I will not be ruling today.  I'll be

17   taking this under advisement.  Your burden, you go first.  Then

18   you go second.

19           And then, as I understand it, Mr. Mahoney, is this

20   right, you don't want to testify?

21           MR. MAHONEY:  No, your Honor.

22           THE COURT:  Okay, go.

23           MR. SHEA:  All right.  Well, Judge, you're right, I am

24   trying to call into question everything about the findings

25   regarding Mr. Mahoney in terms of Bipolar I.  I do want to be

1    clear that Mr. Mahoney isn't saying he doesn't suffer from some

2    mental illness, and he's not and I'm not arguing that he

3    doesn't have mental illness that needs treatment.  It's whether

4    he needs to be committed and whether he is dangerous because he

5    has actually repeatedly sought out help on his own in the

6    community when he felt like he wasn't stabilized and wasn't

7    functioning well, and he showed some insights into that, which

8    don't link up with how he's been characterized and categorized

9    under the DSM-IV and V by FMC Devens; you know, meaning under

10   antisocial personality disorder, he shouldn't have kind of any

11   insight into his condition.

12          And the Dr. Kriegman transcript has been brought in by

13   the government because he says bipolar, and they think that's

14   good for them, I understand, but he also talks about why

15   Mr. Mahoney doesn't have antisocial personality disorder.  And

16   one of the things he talks about is that the person, well,

17   doesn't show insight, would be more manipulative, meaning if

18   you told someone with antisocial personality disorder, just

19   tell them what they want to hear and you can get out, someone

20   with that diagnosis would be able to do that, and clearly

21   Mr. Mahoney can't do that.

22          The other thing is that if you look at, say, the

23   community counseling records, and just Mr. Mahoney's history

24   prior to finding himself committed to FMC Devens, he is seeking

25   out help.  You know, he goes to Mass. General Hospital.  Now,

1   it's true he's on parole, but there's nothing to indicate that

2   was a part of his parole.  He goes to the community centers in

3   New Hampshire.  He fills out the forms telling them, "I'm

4   struggling in my interpersonal interactions because I'm loud

5   and sometimes I'm out of control," and he seeks medication.

6   He's not under any kind of criminal compunction at that point.

7   He doesn't have a lawyer telling him this is a good idea.  He

8   does that on his own, which doesn't -- I think on two levels:

9   One, shows that this is a man who actually wants help and wants

10  to be able to function in the community, and, two, doesn't line

11  up with the antisocial personality disorder, which again is one

12  of those things that got tagged on him.  I'm not saying there

13  are no records that indicate people thought they should look

14  into it, but the first time that he is diagnosed in Axis II

15  with antisocial personality disorder is by Dr. Channell, and

16  Dr. Channell testified to that in the hearings back in 2014.

17  And I know it's not the main thing at issue here, but it goes

18  to the credibility that should be given to the diagnosis that's

19  taking place by Dr. Channell.

20          The other thing is, you know, if we actually get back

21  to how we got here, Mr. Mahoney was found not competent to

22  stand trial up in New Hampshire, and he had an expert.  This

23  expert worked with Attorney Garrity, who was Mr. Mahoney's

24  attorney, and that expert was Dr. Eric Mart.  And when I say

25  doctor, I mean Ph.D. -- not a Ph.D., a psychologist, forensic

```
 1    psychologist, I believe.  I'm going to try and draw those
 2    distinctions if they come to mind.
 3            But, you know, it's interesting, and I argue this on
 4    two levels:  One, I want to argue that, you know, Devens is
 5    being a little fast and loose with their diagnoses, but, two,
 6    as to why Mr. Mahoney isn't necessarily as out of control and
 7    out there or as sick as they're making him seem, because what
 8    is happening to him is almost surreal, meaning if it were
 9    happening to someone who didn't have a mental illness of any
10    kind, it would be very surreal to them how people switch their
11    diagnoses.  And what I mean by that is --
12            THE COURT:  Right, yes, it's ironic because on both
13    sides of the "v."
14            MR. SHEA:  Right, and so --
15            THE COURT:  I mean, actually, Mart and Kriegman, so, I
16    mean, it's fluid on both sides.
17            MR. SHEA:  I agree that it's fluid, but it also, if
18    you're Mr. Mahoney, can look a little bit like people are
19    charlatans.  And what I mean by that is, you know, here's
20    Devens.  With all due respect, I'm going to categorize them as
21    one entity.  I know they're different doctors.  But when
22    Mr. Mahoney is sitting there up in New Hampshire, his expert,
23    Dr. Mart, is saying he's not competent to go to trial; and his
24    attorney, Mr. Garrity, apparently was concerned about
25    Mr. Mahoney's ability to function at the hearing.
```

```
1            THE COURT:  Right.

2            MR. SHEA:  So --

3            THE COURT:  And the judge was.

4            MR. SHEA:  And the judge, I'm sure.

5            THE COURT:  I mean, so there was a problem in

6   New Hampshire.

7            MR. SHEA:  I'm not saying there wasn't a problem.  So

8   if that's so obvious to everyone, Devens is up there testifying

9   that he's fine.  I mean, think of this:  The experts from

10  FMC Devens aren't just testifying that this gentleman was

11  competent back then; they're testifying that he could have run

12  the hearing by himself, because Mr. Garrity at the point that

13  the decision is finally made -- and if you read Dr. Mart's

14  reports that the government has put in, one of Dr. Mart's

15  concerns, the thing that kind of tips him from "possibly

16  competent" to "definitely can't do it" is that Mr. Mahoney is

17  focused on representing himself.  Yet FMC Devens says, "Oh, he

18  doesn't have a major mental illness.  He's got Bipolar II, and

19  he can represent himself."

20           Now, I don't know, that strikes me as ludicrous,

21  frankly.  And if you're Mr. Mahoney, it's got to be really

22  bizarre that the people who say, "You're well enough to

23  represent yourself, and you don't have a mental illness that's

24  interfering with your ability to represent yourself," and then

25  you get committed to their institution.  And they can either --
```

1    right? -- they can then say, "Well, he's got the same thing we

2    testified under oath in a Federal Court, and so we're not going

3    to be able to --"

4         THE COURT:  But aren't the standards a bit different

5    for competency as opposed to civil commitment?  In other words,

6    competency -- I've done it now for 30 years -- is pretty

7    baseline:  "Do you understand what the judge does?  Do you

8    understand what the jury does?  Do you understand what the

9    charges against you are?"  I mean, it's a pretty baseline, as

10   opposed to being able to control your conduct if you're in a

11   manic episode.

12        MR. SHEA:  That's not untrue, but I'm just saying --

13   part of what I'm trying to get at here is what it must have

14   felt like for Mr. Mahoney.

15        THE COURT:  That's fair, right.

16        MR. SHEA:  And what I'm trying to get at is, I guess

17   part of my argument today is that are we keeping him safe,

18   meaning, with all due respect --

19        THE COURT:  I always know someone is about to disagree

20   with me when they say "with all due respect."

21        MR. SHEA:  Well, no, I just mean, like, I look at

22   Devens and I say, it looks to me like part of what's going on

23   and is documented in the records is that he has a negative

24   reaction to the people at Devens who switched it up on him, so

25   meaning it looks like they say he's fine when they think that's

1    what the Federal Court wants to hear in New Hampshire.  I'm not

2    saying that is what the court wanted to hear.  And then when

3    they decide, "Wait a second, like, the only way we can hold

4    him, the only way we can petition to hold him is to switch from

5    Bipolar II to Bipolar I," lo and behold, they switch from

6    Bipolar II to Bipolar I.

7           And then, you know, he's a guy who's in on a

8    nonviolent offense without any recent history of violence at

9    the time, meaning out in the community, and suddenly this

10   institution is saying he's too dangerous to be out there.  And

11   so I do think that it's not totally irrational that he is upset

12   at some of the individuals, and that the reason he keeps kind

13   of setting himself back at times is, you know, like --

14          THE COURT:  Well, that may be, but let me just say,

15   they were ready to release him.  I remember getting the report

16   and going, "Wow, good, we can do something here in November."

17   And then I have a sense, and I'll say "with all due respect to

18   Dr. Hoffman," that that sort of set him back again because he

19   became convinced that he didn't have to take his medications,

20   and everything went south.

21          MR. SHEA:  Well, "everything went south" is a little

22   extreme.

23          THE COURT:  In other words, he stopped his

24   medications.  He stopped his treatment.  He -- I forget

25   exactly -- he became convinced that there was no problem, and I

1   think Dr. Hoffman had limited records.  And so I can see why it

2   was confusing for Mr. Mahoney, but it basically created a

3   retraction of that report saying release him.

4       MR. SHEA:  Well, that's what Dr. Channell is trying to

5   sell, but I would say that what he is trying to sell isn't

6   exactly accurate either.  I'm not saying that Dr. Hoffman acted

7   with the level of professionalism I would have liked him to do.

8   He would have been a more effective witness either way if he

9   had done his job a little better.

10      THE COURT:  Can I order Mr. Mahoney to take

11  medications?

12      MR. SHEA:  I haven't researched that, respectfully,

13  Judge, but here's what I want to point out --

14      THE COURT:  Because I think he's been terrific.  I'll

15  just make a finding.  I saw him when he was out of control.

16  Unfortunately he was horribly out of control before you were an

17  attorney, but I'm now seeing that he was fully in control

18  throughout this proceeding, and he's back on the Seroquel, as I

19  understand it.  So it makes a difference.  It really makes a

20  difference.

21      MR. SHEA:  I agree, but here's what I'd like to point

22  out, though, and this is my own take on it, but at the hearing

23  in 2014, if you read those transcripts again, they're

24  essentially trying to sell you on the idea that he doesn't do

25  well on Seroquel and that all he'll take is Seroquel, and he

1     refuses to take the lithium, and they're telling you

2     essentially, "We don't think it's going to work out if he

3     continues to just take the Seroquel."  And that's on Page 40 of

4     the first day of Dr. Channell's testimony, he talks about

5     Seroquel and how he remains --

6          THE COURT:  At this hearing or the last one?

7          MR. SHEA:  No, the last one.

8          THE COURT:  You know, can I be frank?  It's a mistake

9     to keep going back to the last one.  I'm in the present.

10         MR. SHEA:  No, what I'm trying to go back to the last

11    one on is to show you that Dr. Channell has been selling a

12    false bill of goods.  Here's what I'll do, okay?  First off,

13    Dr. Channell first gets involved in this case, how does he get

14    involved in this case?  It's to say to the court in

15    New Hampshire that Mr. Mahoney isn't restorable to competence.

16         Now, I think we end up petitioned in Massachusetts

17    because initially, actually, he hadn't said that to

18    New Hampshire, meaning that at the time that Mr. Mahoney is in

19    New Hampshire still, meaning being held up in New Hampshire,

20    his opinion was that he in fact could be restored.  Then when

21    he gets to Devens, which is how the case ends up here, he then

22    petitions to say he can't be restored, and that's how they get

23    to civilly commit him.

24         So you've just said that Mr. Mahoney conducted himself

25    well.  You've also seen, I believe, him hand me documents that

1    were in fact relevant to the thing I was cross-examining

2    Dr. Channell on.  He has assisted his counsel in this hearing.

3            THE COURT:  Am I correct in saying, though, he's

4    taking his prescribed treatment of Seroquel?

5            MR. SHEA:  He is, but --

6            THE COURT:  Which is great.

7            MR. SHEA:  But what I'd like to point out is that

8    Dr. Channell, who the government is asking you to rely on, is

9    the very person who petitioned saying Mr. Mahoney could never

10   be restored to competence, okay?  Well, it looks a lot like

11   he's been restored to competence, and he's not taking

12   competence classes either.  Now, he took a lot of classes on

13   his own, meaning that are offered at the institution, but he

14   had to get himself there, meaning he had to sign up and

15   participate, and he did that.  So Dr. Channell appears to be

16   wrong on one of the major issues in the case.

17           Then, the reason I'm referring back to 2014 -- and

18   I'll try not to do it too much -- but is that then Dr. Channell

19   testifies to you that essentially Seroquel doesn't work

20   effectively enough for Mr. Mahoney; he needs to be on lithium.

21   And if you go through that transcript, you're going to see he's

22   trying to sell you on lithium.  And your Honor in good faith is

23   asking questions about lithium and whether Mr. Mahoney

24   shouldn't be taking some lithium.  Now here we are, and let's

25   think of -- Mr. Mahoney just gets held for 23 hours a day in

```
 1   isolation, but he's on his medication, and he's writing these
 2   notes that are quite lucid; and he's getting notes back from
 3   the head of the institution, not Dr. Channell, saying that he's
 4   doing well, the things that Mr. Mahoney gave me that I entered
 5   as exhibits, and he's only on Seroquel.  Not "only," but
 6   there's one other but it's not lithium.
 7            THE COURT:  900 milligrams, right?
 8            MR. SHEA:  Yes, 800 or 900.  It varies some.
 9            THE COURT:  Three pills of 300 milligrams each seem to
10   do the trick.
11            MR. SHEA:  Well, the thing I would point out is that
12   in 2014 you were being told that wouldn't work, okay?  Wrong
13   again, Dr. Channell.  So the person the government wants you to
14   rely on on two major issues regarding Mr. Mahoney has been
15   proven himself to not be accurate, and that's who you're being
16   asked to rely on to continue to hold this man who's been held
17   for a significant period of time.
18            Now, let me address the idea that he went completely
19   off the rails after they said he was going to be released.
20   Look, would I prefer that he had handled himself perfectly in
21   that intervening period of time?  Of course.  It probably would
22   have saved us coming and having this hearing and having to
23   dispute everything.  But what did he do?  It's true that he --
24   they allege he threatened someone by saying essentially, "I'm
25   getting out.  I'll be in Boston.  You're in Boston."  Not
```

1    appropriate.  I'm not saying it's appropriate.  But it's not a

2    physical assault, and it's the therapeutic staff who he thinks

3    has just locked him up for six years.

4            So if I do take the report from Hoffman -- and

5    Mr. Mahoney has been consistent over the six years in feeling

6    that he is wrongly committed, that it's a nonviolent offense,

7    that he was okay in the community and that he's not a danger,

8    and Dr. Hoffman essentially backs him up on that -- it doesn't

9    seem to me so outrageous that he would confront these

10   therapists and be saying, "You have locked me up for six years,

11   and now I'm being told by the Department of Mental Health I

12   don't even have a major mental illness."  I can't imagine who

13   wouldn't be upset by that.  And so I'm just trying to say, I

14   don't think that's really going completely off the rails is my

15   point.  Is it unfortunate?  Would it have been better if it

16   didn't happen?  Yes, but I don't think it's completely off the

17   rails.  And, yes, he started taking less of his medication, but

18   he didn't stop taking it.  He was taking at least 600 -- it

19   looks like 600 milligrams a day.

20           THE COURT:  How do you come up with that?

21           MR. SHEA:  Because it looks like he -- on the dates

22   Dr. Channell says that Mr. Mahoney told him he was cheeking it,

23   it's about 27 to -- it's a little less than a month, and he's

24   got 29 pills, so it looks like one a day.

25           THE COURT:  Do the math again for me.

```
 1              MR. SHEA:  Huh?

 2              THE COURT:  Could you do the math again for me.

 3              MR. SHEA:  Sure.  It looks like he says he was

 4    cheeking the pills --

 5              THE COURT:  How many pills were in the bottle?

 6              MR. SHEA:  29.

 7              THE COURT:  And you're saying it was about a month?

 8              MR. SHEA:  It was a little less than a month.

 9              THE COURT:  And he's getting three pills a day?

10              MR. SHEA:  Three pills a day, so I broke it down to a

11    little less.  And also he --

12              THE COURT:  Not crazy.  So he's basically taking

13    600 milligrams, but he really does need the 900, right?

14    Because it was 600 when he still lost his cool.

15              MR. SHEA:  Yes, I guess so, yes.  And he's taking 900

16    now.  And this is one thing I would like to kind of flip, which

17    is, think about -- they're saying that when he's writing that

18    letter, December -- I think it's right before Christmas --

19    23rd, 24th, and it's a quite lucid letter, at that point he's

20    been in isolation --

21              THE COURT:  Which exhibit are you referring to?

22              MR. SHEA:  I think it's the government's exhibit of --

23    sorry.  I'll find it.  I think it's the December 15, which is

24    Exhibit 143.  And then what I was able to with Mr. Mahoney's

25    help provide, and I don't know what numbers it got for the
```

1    defense, but was at the bottom of -- there are three other

2    correspondences with Mr. Mahoney and Devens, and in the

3    defendant's exhibits, the disposition part is filled in and the

4    staff member has written in there.  In the response to

5    Government 143, I think, it's psychologist Gorham, and in the

6    other two it's the head medical director.

7              THE COURT:  All right.

8              MR. SHEA:  But the point I'm trying to make is that

9    that is not an ideal situation for someone with bipolar

10   disorder to be locked in isolation 23 hours a day, and yet this

11   is the correspondence we received from Mr. Mahoney after he's

12   locked up for 23 hours a day.  But he apparently is back on his

13   medication, so that shows that even in severely negative

14   surroundings, as long as he's medicated, he does pretty well

15   because I can't think of -- I mean, even Dr. Channell

16   acknowledged that being locked up in isolation can have a

17   negative impact on someone with bipolar disorder.

18             THE COURT:  The one thing that would be useful when we

19   finish here today is whether or not I can order that he

20   continue taking the fully prescribed regimen of Seroquel.

21             MR. SHEA:  Okay, I can --

22             THE COURT:  I don't know the answer to that because it

23   seems to be what you just said is true:  When he's fully

24   medicated, he does well.

25             MR. SHEA:  But I do not want to lose total sight of my

1    point, though, which is, Dr. Channell who the government is

2    asking you to rely on was telling you last time under oath that

3    Seroquel wasn't sufficient for him to do well; and in fact the

4    year that Mr. Mahoney put together that they said was

5    sufficient for him to be released, he was on Seroquel that

6    entire year.  And so it does turn out that Dr. Channell was

7    inaccurate in his testimony in 2014, at least as regards

8    Seroquel being sufficient.

9           Now, I guess I'll move on to just whether Mr. Mahoney

10   has Bipolar I or not, and I want to point out that Bipolar I is

11   different than bipolar unspecified or bipolar NOS.  I'm not

12   saying those aren't significant illnesses, but what it is

13   saying is that he doesn't meet the specific criteria, meaning

14   they think he's bipolar, but he doesn't meet all of the

15   necessary specific criteria, and that would be manic episode of

16   a week.  And in fact, in looking at the records, that is the

17   majority of what is found about Mr. Mahoney.  The current

18   diagnosis of him is "otherwise specified."

19          THE COURT:  Which is a major mental disease.

20          MR. SHEA:  But I'm saying it's different than

21   Bipolar I because --

22          THE COURT:  It may be, but it's a major mental disease

23   or defect.  I'm not changing that based on Dr. Hoffman, who

24   had, like, a fraction of the records.

25          MR. SHEA:  No, I'm not -- okay, let me --

1          THE COURT:  So whether it's -- you may be right; it

2     may be not otherwise specified as opposed to Bipolar I.  It's a

3     major mental disease or defect, whichever it is.

4          MR. SHEA:  But what I'd like to get at, though, is,

5     there are doctors, I mean psychiatrists available, and the

6     government keeps putting up Dr. Channell and asking you to rely

7     on him.  And he can't prescribe these medications, and then he

8     keeps saying "Bipolar I."  And all I'm trying to point out

9     is -- and I'm not disagreeing with you that those are major

10    mental illnesses -- but the records are actually 296.80 under

11    DSM-IV, okay, which is "bipolar not otherwise specified."  The

12    most recent ones under DSM-V is "other specified."  And all I'm

13    trying to say is, he is playing fast and loose because to get

14    to Bipolar I, you have to have these manic episodes.  And so he

15    is saying, "I am sure that this is the diagnosis," where that

16    really isn't what most people are hanging their hat on.

17          I am not disputing the Court's point that the

18    "otherwise specified" would be sufficient if that were the

19    case, but I do think that it's worth noting that Dr. Channell

20    keeps coming here under oath and saying "Bipolar I."  And, you

21    know, Dr. Hoffman gets raked over the coals for the amount of

22    records he reviewed, but Dr. Channell didn't have the records

23    to back up his diagnosis.  And then when I pointed out the

24    definition that he used in Exhibit 102, which I had him read

25    into the record, which is on Page 12 of Exhibit 102, he

1    acknowledges that it didn't say "hospitalization"; it meant one
2    week of mania.  And that's -- I won't take up your time reading
3    it here, but that's what he wrote in his report from 2013, that
4    that's what was required.  And then he says something to the
5    effect of, "You're disputing this because I left out a few
6    little words," something to that effect.  I mean, a few little
7    words?  It's the definition of whether the man has Bipolar I or
8    not.

9           And it's a bit of a conundrum, but let's look at how
10   he supposedly gets to Bipolar I.

11          THE COURT:  I want to make sure, because I don't have
12   all morning, is that you get to the other issue, which is, if
13   he does have either Bipolar I or not otherwise specified, what
14   do I do, since that's what I found last time?

15          MR. SHEA:  Okay.

16          THE COURT:  And I don't find new evidence because
17   Dr. Hoffman didn't have all the records.  And so I really want
18   to get to the -- as of when I got the first report, I was
19   prepared to release him, and then I get the second report.  So
20   I need to deal with that issue.

21          MR. SHEA:  All right.

22          THE COURT:  There's no place, A, to release him to.
23   The uncle can only take him for 30 days.  He's not taking his
24   meds unless there's a supervision.  I think we need to get to
25   those issues.

1          MR. SHEA:  Okay.  Well, let me try and finish with

2     this issue.  Then I'll deal with that issue.

3          THE COURT:  Yes, so maybe 15 more minutes, something

4     like that.

5          MR. SHEA:  Okay.

6          THE COURT:  Because we've been going a while.

7          MR. SHEA:  I just want to point out that he's saying

8     hospitalization.  Now he introduces at this hearing the DSM-V

9     and says, hospitalization makes it so that he is Bipolar I.

10          Now, this really strains credulity.  For one, here's

11     Devens arguing at the competency hearing that he's Bipolar II.

12     Dr. Kissin is up there, and her report is that it's Bipolar II.

13     And then Dr. Mart says he sees some mania.  And I don't deny

14     that that's in his report, but Dr. Mart is meeting with him

15     for, like, two or three hours.  He goes up there and goes into

16     the jail and meets with him.  And, remember, it's a jail, so

17     that's not a hospital, so that doesn't meet the definition.

18          And if Mart observed that for three hours, that's

19     fine, but that isn't sufficient for Bipolar I, it's just not,

20     because he's not in a hospital and he's not observing him for a

21     week.  There's no way Dr. Mart bunked out at Stafford County

22     House of Correction for a week, so that doesn't get us there.

23          So then Mr. Mahoney gets sent to Devens to be restored

24     to competence.  The fact that the court sends him to Devens to

25     be restored to competence over basically the objection and the

1    testimony of the Devens doctors saying he's already competent
2    doesn't make him Bipolar I.  That just doesn't make any logical
3    sense.  And when they petition the court to commit him, they're
4    saying he's Bipolar I, and so, to me, you need the records in
5    petitioning the court.  And if you switch it up, you can't say,
6    "We got the court to accept our petition, so now he's
7    Bipolar I."  That's just not correct.  You know, I believe that
8    what they're talking about in hospitalization is, one, the
9    person needed to be hospitalized in the community or the person
10   showed something that led to his being committed, but that it
11   was the diagnosis that they put forward to commit him, meaning
12   beforehand.  You can't say, the fact that we effectively got
13   him committed makes the diagnosis valid.  That just doesn't
14   make sense, and it goes against what they did.

15          And so that leaves us with, they need to produce these
16   records that show a week of solid mania -- that is the
17   definition -- and they don't have them is my guess.  I'm
18   waiting to see.  But part of why I flagged in 110 Kambampati's
19   report where he does say he's manic -- again, I'm not disputing
20   that, and he's manic that day -- but he said, "I'll submit an
21   incident report."  If they did a disciplinary hearing for that,
22   which they did in so many of these others, they always find him
23   competent to deal with those disciplinary hearings, always.
24   And so I am really curious to see what -- if he did write a
25   report requesting a disciplinary hearing, what they said --

1          THE COURT:  Well, they'll check to see if the

2     record --

3          MR. SHEA:  Yes, and I hope the Court will take an

4     interest in that because I think it will be very instructive on

5     that.

6          Now, just a couple quick things.  The credibility of

7     Dr. Channell I do think matters, and I understand Dr. Hoffman

8     took a few hits, but Dr. Channell when I asked him about prior

9     violence of Mr. Mahoney, he said, well, it was the assault with

10    intent to rape from 1983, and he said something about the

11    victim being known to him, or there was another word he used

12    about how it was someone close to him, and that was part of

13    what was concerning.  And I remember I asked him about that

14    because the government has not been able to get a copy of the

15    transcript.  At the last hearing you asked if anyone was able

16    to get a transcript, and the answer was "no," and so he's

17    adding facts that he doesn't have any evidence of.  And so to

18    effectively be making things up when people don't have the

19    records -- that's how it looks -- is troubling in terms of, you

20    know, he's supposed to be a fair arbiter, you know, saying what

21    he truly believes to be true, so there shouldn't be any reason

22    for him to mess around with the facts.

23          In terms of practical stuff that you want me to get

24    to, I would say that Mr. Mahoney doesn't appear to necessarily

25    be a danger.  I mean, it doesn't come across.  Is Mr. Mahoney

1    difficult?  Yes.  He is not the easiest client I've had, okay?

2    But if I do my job, we get along okay.  I don't find that to be

3    a particularly troubling standard.

4           THE COURT:  And let me just thank you very much for

5    taking the case and doing such a vigorous and good job.  I'm

6    sure Mr. Mahoney thanks you too.  Thank you, because you're

7    very thorough.

8           MR. SHEA:  Thank you.  But, you know, the fact that

9    he's upset about having lost a fair portion of his existence

10   after being charged with a nonviolent offense, which if he'd

11   pled guilty to he would have never done even near this amount

12   of time, I don't think -- that's what I worry about is, we've

13   gotten into a spiral where the fact that he's so upset about

14   things being unfair that he's ending up institutionalized due

15   to the perceived unfairness that, you know, might actually be

16   unfair.

17          So, you know, what plan can we have?  Look, part of

18   why I put Hoffman on the stand was, I figured it's a no lose.

19   Either he's compelling and he convinces you that Mr. Mahoney

20   doesn't have the bipolar disorder and we win, or we show that

21   the ICC apparently is a fraudulent process where the state of

22   Massachusetts doesn't really do its job, where --

23          THE COURT:  ICC again is the interstate compact?

24          MR. SHEA:  Compact.

25          THE COURT:  You mean really that initial letter?

1         MR. SHEA:  Yes.

2         THE COURT:  Well, I think, the reality is, I've been

3    doing this a long time; I've never seen them take a patient.

4    And it isn't just Mr. Mahoney.  It's people from all over the

5    country.  I don't see any states taking them.  Maybe there's

6    some wonderful state out there that does, but --

7         MR. SHEA:  But if they're supposed to -- if this is a

8    real -- that's the law, and Mr. Mahoney --

9         THE COURT:  Right, the law is that consult with the

10   state and see if the state will take the person, which is what

11   I think the feds do.  I'm just saying, this state anyway, to my

12   knowledge -- he said it -- he's never taken, I think -- isn't

13   that what he said?

14        MR. SHEA:  I think he said he may have taken some, but

15   he emphasized more his work with Probation.

16        THE COURT:  Yes, once you're out, he works with them.

17        MR. SHEA:  But the point I wanted to get there,

18   though, was that those are part -- in your asking what can we

19   do for Mr. Mahoney, the state has the services, has the halfway

20   houses, has a greater network than the federal government does.

21   You know, you're talking about whether we can force Mr. Mahoney

22   to take medication.  Why can't we force the state of

23   Massachusetts -- to me, what I want to set up is probably a

24   little uncomfortable for the Court but is either that the

25   records indicate that Dr. Hoffman was right, meaning we get the

1    records from Devens regarding that time period that

2    Dr. Channell is relying on for the mania, and it documents that

3    he didn't have mania for a full week on either side.  Then he's

4    actually Bipolar II, which is in keeping with what Hoffman

5    said; and Dr. Channell himself said, "I wouldn't commit him if

6    he was Bipolar II," and so he shouldn't be committed.  That's

7    one.

8            If the Court finds that he is still Bipolar I or

9    there's sufficient documentation to back up the opinion of

10   Dr. Channell, then that documentation should be given to the

11   state, and the state, the Court should order the state to redo

12   its investigation or to accept --

13           THE COURT:  I'm going to order the state?

14           MR. SHEA:  Well, I don't know how it all works with

15   separate sovereigns, and I don't do a lot of civil stuff, but

16   what I would say is that Hoffman said they would look at it

17   again.

18           THE COURT:  Well, that's his right.

19           MR. SHEA:  Right, but what I mean is, like, really

20   look at it, like, because if you're asking me to answer what

21   services are there, there are services in the state, for one,

22   and that makes sense that he get those services.  I mean, to

23   me, he either isn't mentally ill as the state is saying and he

24   gets out; and if he is mentally ill, then the state effectively

25   perpetrated a fraud on the ICC system and a fraud on the Court

```
 1    by not dealing with it.  It's not okay because it's -- these
 2    are individuals.  This is a real person.  It's not like a game
 3    played by bureaucracies.  So when you're asking me what should
 4    happen, that's one of the things I think should happen.
 5           THE COURT:  You're not seeking an unconditional
 6    discharge?
 7           MR. SHEA:  I would if the Court finds that he doesn't
 8    have a major mental illness.  I think we showed that they're on
 9    very shaky ground.
10           THE COURT:  Assume for a minute I say he has a major
11    mental illness.
12           MR. SHEA:  Well, if you find he has a major mental
13    illness, then you've got to go on to whether he's currently
14    dangerous, and I don't think there is anything to show -- is
15    there plenty to show that Mr. Mahoney can be a pain in the
16    butt?  Yes.  Is there plenty to show that he doesn't always do
17    well at this institution?  Sure.  But he's not violent-violent.
18    You know what I mean?  He's kind of just -- he says stuff he
19    shouldn't say, but he didn't actually do anything violent.
20    And, you know, he's been locked up a long time for someone who
21    just has a bad mouth.  And I'm not saying he didn't act out,
22    there isn't documentation of him acting out in the past, but
23    part of what I did try and show is that acting out was
24    generally connected to some feeling that he had been done wrong
25    by authority, and that is the thing he struggles with, and I
```

1  think this case plays into that.

2        In terms of what to do, I don't want to see the Court

3  just commit him and give him back to Devens because I don't

4  think Devens has been fully fair.  I don't know what

5  alternative to ask for other than to make the state get

6  re-involved.  But the other is maybe to just keep the case,

7  like, have us come back in two months and see where he is.  I

8  hate to have him disappear back into the system and --

9        THE COURT:  I think he said six months.  Does that

10  sound reasonable to you?

11        MR. SHEA:  Right, but six months is a long time for a

12  guy --

13        THE COURT:  Yes, but can I say, in fairness to

14  Fort Devens, they recommended he be released.  I got it in my

15  hand.  I was, "Wow, now maybe I'll call Probation, wow,

16  maybe --" and then he unfortunately got, I think, misled by

17  that diagnosis by Dr. Hoffman, and then things went in an

18  unfortunate direction.  So I said, "Well, how long would it

19  take you if he went back on the Seroquel and was compliant?"

20  And I think he said six months, didn't he?  Am I remembering

21  that correctly?

22        MR. SHEA:  He did, but the other thing that --

23        THE COURT:  What do you think he said?

24        MR. CALLAHAN:  Your Honor, he said he would have to

25  wait until six months, at least, to look.

```
 1              THE COURT:  Yes, six months.
 2              MR. CALLAHAN:  Right, right.  I wanted to make clear
 3     that he didn't say in six months he will be okay.  I think what
 4     he's saying is, "We have to check that."
 5              THE COURT:  No, he said, "In six months we'll know."
 6              MR. SHEA:  But he also -- you know, you and I were
 7     both, and maybe we were both wrong, but we were also under the
 8     impression he was telling us he wasn't fully taking his
 9     medication now.  And then when I presented the things that
10     Mr. Mahoney gave me that showed that the institution had
11     actually written him a letter saying he was in compliance, then
12     he says he's in compliance.
13              THE COURT:  Well, maybe.  So, anyway, so --
14              MR. SHEA:  But why six more months?  I mean, under
15     threats in the state, it's been a while since I did a threats
16     case, but I think it's a six months max.  I mean, if we take
17     that he threatened that counselor, like, acted out verbally, it
18     seems an excessive penalty for someone who was about to be
19     released.  And one of the difficulties Mr. Mahoney has with
20     this process is that it then takes six -- you know, then you're
21     on the waiting lists to get into the halfway house or the
22     structured environment, and then you have to wait for that, and
23     you have to stay at Devens while that happens and not get
24     frustrated at the people who are your counselors.  And so it
25     just seems like we're setting up an endless loop for him to not
```

1    get there.

2              THE COURT:  Okay, thank you.

3              MR. SHEA:  Thank you.

4              MR. CALLAHAN:  Your Honor, I was just going to refer

5    to a few documents that I have, if I could approach.

6              Your Honor, I'll be less than 20 minutes.  I just want

7    to start with where we started two years ago, your Honor, when

8    we were in here, which was, Devens' goal is to give and provide

9    Mr. Mahoney treatment and get him out.  That's their goal, and

10   at the same time to protect the public -- you know, safeguard

11   the public safety, the welfare of the public, and those are the

12   twin aims of what 4246 is about.  I told you then Mr. Mahoney

13   wasn't ready.  He wasn't ready in 2014.  You agreed.  The First

14   Circuit affirmed it.  In October, 2016, he was closer.  He was

15   closer.  Now he's had a big setback, and that's unfortunate and

16   I'm going to get into that, but right now he is a person with a

17   significant history of violence.  He's a person with a severe

18   mental illness, and I'm going to get to that in some detail in

19   a moment.  And he's someone who right now, and this is the

20   critical piece, he's got zero insight into his mental illness

21   because of what has happened over the past three months, and

22   he's got zero insight into the mental illness and the effect

23   that mental illness has on his acting out and behaving

24   violently and threatening.

25             So letting Mr. Mahoney out now at this point in this

1    condition, it just doesn't further the goals of 4246.  He needs

2    more time.  He needs more treatment.  Devens is committed to

3    giving that to him, and they will continue to be committed to

4    giving that to him.  And there may come a time in the future

5    when we come back and we look at this and the situation has

6    changed, like it had changed in October of this year, right?

7    And, again, there was a significant setback.  And nothing that

8    Mr. Shea has said changes or alters the burden that is on him

9    to now show, under *Wetmore*, that his release would not cause a

10   substantial risk of bodily harm or serious harm to property.

11           Now, I just want to start with mental illness.  I'll

12   be brief with that, your Honor.  Is he mentally ill?  Does he

13   have a severe mental illness?  The statute doesn't require a

14   severe mental illness, but Dr. Channell, the charlatan that

15   Mr. Shea has portrayed throughout the last 45 minutes, said,

16   "I, Dr. Channell, the statute says that I think you need a

17   severe mental illness to be committed.  I agree that if it's

18   Bipolar II, I wouldn't commit him with that."  Okay?  He's the

19   one that said that.  That's not in the statute.  Does he have a

20   severe mental illness?  Absolutely, absolutely.

21           And you know what?  You don't have to take

22   Dr. Channell's word for it because I'm going to show you ten

23   other clinicians have said that he has a severe mental illness,

24   and that is Bipolar I or bipolar NOS.  And I'm just going to

25   put this slide, your Honor, it's Slide 3, I'm going to put it

1    up on the screen.  These are all the clinicians or providers

2    who have said Mr. Mahoney has either Bipolar I or bipolar not

3    otherwise specified:  Middlesex County sheriff's, Exhibit 106;

4    Avis Goodwin, Exhibit 107; Dr. Mart twice, and that's

5    Exhibit 107 and 136.  Dr. Kambampati, Bipolar I, identified

6    manic in 2012.  Dr. Channell in Exhibits 102 to 105, bipolar,

7    he also identifies manic.  Dr. Beaulieu, treating psychologist

8    for Mr. Mahoney in 2013, Bipolar I.  Dr. Kriegman,

9    Mr. Mahoney's own expert, at his transcript at the 2014

10   hearings, bipolar, that's the diagnosis that fits the best.

11   2015 and 2016, Dr. Tillbrook, Bipolar I.  2016, December, 2016,

12   a month ago, Dr. Gorham, treating psychologist, bipolar not

13   otherwise specified with psychotic features, Exhibit 141.  And

14   then the last one I want to identify, and this is No. 10,

15   Dr. Kissin, 2015, Bipolar I, and that's in Exhibit 103.

16          This one is important, your Honor, okay?  The only

17   person on the other side of this equation besides Dr. Hoffman,

18   and I'm going to get to him in a minute, the only person on the

19   other side of the equation who has said he has Bipolar II is

20   Dr. Kissin, July, 2011.  What happened when Dr. Kissin got to

21   spend more time with Mr. Mahoney, got to look at more records,

22   had a significant body of information, this box, these 3,000

23   pages.  When she was able to look at that, interview

24   Mr. Mahoney in front of the Risk Assessment Panel with other

25   people, talk to his treatment team, the people at Devens who

1    deal with him every day, what diagnosis did she have then?

2    It's on Exhibit 103.  It's Bipolar I.

3           So, again, Mr. Shea thinks Dr. Channell, he has

4    attacked him for the last 40 minutes.  Take him out of it.

5    Take him completely out of the equation.  I'm not saying don't

6    rely on him, but for the purposes of the argument, take him out

7    of the equation, nine other clinicians.  And not just from

8    Devens.  He also kind of puts all this on Devens.  So take

9    Dr. Tillbrook out, take Dr. Kissin out, take Dr. Gorham out.

10   You still have people from Avis Goodwin, Middlesex County,

11   Dr. Mart, a Ph.D. in forensic psychology, four institutions

12   other than the Bureau of Prisons at FMC Devens has said he has

13   Bipolar I or bipolar not otherwise specified, and that's in the

14   record.  Those are in the admitted exhibits.

15          So who else is on the other side of the equation?

16   Dr. Hoffman, all right?  He said he has Bipolar II.  Your

17   Honor, this March 25, 2016, is when he said he had Bipolar II,

18   and here is what Dr. Hoffman had:  He had 42 pages of

19   documents.  In March 25, 2016, that's what he relied on to say

20   Bipolar II.  He knew all these other documents existed, your

21   Honor, and the reason he knew that was because it was listed.

22   It was listed right here on Slide 4, all of these documents are

23   identified, all right?  He knew because he had the risk

24   assessment from November, 2015, and it listed all the forensic

25   reports, all the mental health documents, all the Bureau of

1    Prisons records.  All of those were listed.  He didn't ask for

2    one.  He didn't ask to speak to anybody.  He just decided,

3    disregarded the Bipolar I diagnosis in that risk assessment

4    report, which was written and signed off on by three different

5    forensic psychologists.  And the reason he did that is because

6    they were never going to take him.  Massachusetts was never

7    going to take Mr. Mahoney, and the reason we know that is

8    because he said it to Tamika Hall, and that's Exhibit 133, your

9    Honor.

10          This is a December 23, 2015 note.  It says, "During

11   the conversation with Mr. Hoffman, he gave several various

12   reasons why Mr. Mahoney's transfer request would not be

13   approved, but stated he needs to receive the eight-page

14   application to determine what answer to write down on the

15   response letter."  It couldn't be any clearer.

16          And I'm not going to attack Dr. Hoffman.  He has a job

17   to do.  We heard him say how busy they are.  We heard him say

18   how many applications that they get.  However, he's not

19   credible.  His diagnosis of Bipolar II based on 42 pages is

20   just --

21          THE COURT:  Did he actually diagnose Bipolar II?

22          MR. CALLAHAN:  He said it's more consistent with

23   Bipolar II, and he ruled out Bipolar I based on 42 pages.  It's

24   just not credible.  By the end of it, Attorney Shea said he's

25   not credible.  He said that himself.  And it's not a shocker

1    that he said that.  It's not a shocker that he denied

2    Mr. Mahoney's application.  And if there's any question about

3    what documents he had, that's in the record.  I went over that

4    at length.

5            So in the end, the only person on the other side of

6    the equation, if you take Dr. Hoffman out because I do not

7    think he's credible, and the evidence shows he's not credible,

8    and the evidence shows he didn't have the information, is

9    Dr. Kissin.  And when she finally had all the information and

10   she looked through all of these 3,000 pages, she came out

11   exactly where Dr. Channell landed, Bipolar I.

12           A minute on this manic episode.  I think it's a huge

13   red herring.  It's not a requirement that you have a week-long

14   manic episode.  There's also another prong, which is results in

15   hospitalization if it's any period.  And, again, this is not

16   just Dr. Channell.  Dr. Mart who saw Mr. Mahoney three separate

17   times, your Honor, okay -- September, 2011, October, 2011, all

18   right, that's Exhibit 107, March, 2012, that's Exhibit 136 --

19   each of those three times, each of those three times over a

20   five-month period, every time he saw him he described him as

21   manic or quite manic.  Now, that's three times over the course

22   of those months between 2011 and early 2012.

23           He's not the only one.  Dr. Kambampati, right?  That's

24   Government Exhibit 110 at Page 632.  He says manic, and at the

25   same time he says Bipolar I.  All right, so this is

1    Dr. Kambampati, a psychiatrist just like Dr. Hoffman, a

2    treating psychiatrist, and he diagnoses him with Bipolar I in

3    October, 2012, cites the manic symptoms, the manic episode.

4         But to agree with Dr. Hoffman, you have to find not

5    only that Dr. Channell is lying, as Mr. Shea wants you to find,

6    you have to find that Dr. Kambampati was lying, and you have to

7    find that Dr. Mart, a Ph.D. in forensic psychology, was also

8    lying when he said it three times.

9         And then one other red herring, this sleep issue.  You

10   know, Dr. Hoffman relied based on the fact Mr. Mahoney reported

11   to have slept 12 hours a day.  Again, the record is littered

12   with information showing that Mr. Mahoney himself had

13   complained about not being able to get enough sleep, one to two

14   hours per night five days a week.  And you'll see that at

15   Exhibit 107, Dr. Mart's report from October, 2011, he said he

16   sleeps three or four hours a night; Exhibit 137, Mr. Mahoney's

17   own statement on his adult baseline packet where he says at

18   Page 1553, "I have trouble sleeping five nights a week one to

19   two hours a night."  And, again, Government Exhibit 142 where

20   he says "Sleep, problems with sleep," quote/unquote, "none."

21   He gets none.  And that's here, your Honor, at Slide 7 if you

22   want to look at those exhibits.

23        So then I think it's clear, I think your Honor has

24   signaled that he has either bipolar NOS or Bipolar I, he has a

25   serious severe mental disease or defect, and then the question

1    is:  Does it create a substantial risk of bodily harm?  And the

2    answer to that is "yes."  And I don't want to go back, I don't

3    want to go back into all the old records and the hearing that

4    we had two years ago.  Suffice it to say, he has ten

5    convictions in his past for threatening, assault, assault and

6    battery, assault with a dangerous weapon, including pliers,

7    assault with the attempt to rape, including a knife.  That

8    resulted in a six-year sentence in a state penitentiary.

9          And I think, when we get into this piece, your Honor,

10   we need to be reminded of what the standard is, and I'm going

11   to put it up here.  It's Slide 8:  "A finding of substantial

12   risk under 4246 may be based on any activity that evinces a

13   genuine possibility of future harm to persons or property."

14   That's out of the Ninth Circuit and the Eighth Circuit.

15         And then, again, just in response to what Mr. Shea

16   talked about about hurting anybody, it's not about hurting

17   someone.  It's about the risk of hurting someone.  And what the

18   cases say is, quote, "Overt acts of violence are not required

19   to prove dangerousness."  I have three cases here:

20   *U.S. v. Williams*, *U.S. v. Stephenson*, and *U.S. v. Ecker,* two

21   Eighth Circuit cases and a Fourth Circuit case.  It's not

22   required that they be overt acts of violence, though they are

23   there.  In addition to that, there's threatening, and he had

24   plenty of threatening, including most recently to Dr. Gorham.

25         Incident reports, your Honor -- and again I won't take

1    too much time with your Honor on this because this goes back

2    over well-tread territory -- fourteen, fourteen between

3    October, 2011, and November, 2016, he has fourteen incident

4    reports while he's incarcerated.  So his pattern of threatening

5    behavior, violent behavior, dangerous behavior doesn't end when

6    he gets out of prison.  It continues when he's committed from

7    2011 onward.  And these exhibits, Exhibit 29, Exhibit 5, 6, 1,

8    8, 9, 18 and 19, 10, 13, 11, those are all before the hearings;

9    most recently Exhibits 118 to 120 where he tells people he

10   can't be in the same building with Dr. Channell because he's

11   going to, pardon my language, fucking kill him and throw him

12   down the stairs.  In November, 2015, he says, "I want to put

13   that fucking Channell in an oven, turn up the heat, and watch

14   him die."  And that's Exhibit 122, your Honor.

15          Most recently, the threat to Dr. Gorham, I admit, he

16   didn't, he didn't hurt Dr. Gorham.  Did he threaten him?  Yes.

17   Dr. Gorham wrote -- and Dr. Gorham is a big boy.  Dr. Gorham

18   has been working at FMC Devens for quite some time, all right?

19   He filed that incident report.  He felt threatened.  And, your

20   Honor, if we want to just look at this depicted, I mean, look

21   at all of these incident reports from within Devens or Cheshire

22   where he was held between 2011 and 2016.  Littered, his time

23   there is littered with incident reports.  Some are more serious

24   than others; I will agree with that.  They are not all directed

25   towards Mr. Mahoney's treatment team or Dr. Channell.  They're

1    directed at other inmates in other instances.  They're directed

2    at people who are not on his treatment team who are just trying

3    to keep order.

4            Now, in all these places when he's incarcerated, they

5    can do something.  They're prepared to deal with Mr. Mahoney.

6    When Mr. Mahoney in 2015 just loses it at a meeting, at a

7    treatment meeting, and that's when he says he's going to put

8    Dr. Channell in an oven and turn up the heat, he turns around

9    and he acts belligerent.  He kicks a trash can, crushes the

10   trash can, all right?  Now, there are people there who can

11   handle that.  They're corrections officers, people who dealt

12   with Mr. Mahoney, they can handle it.  Out in the community at

13   a Dunkin' Donuts, at a library, at a bus stop, those people

14   aren't there.

15           THE COURT:  All right, so let's just --

16           MR. CALLAHAN:  So -- I'm sorry, go ahead, your Honor.

17           THE COURT:  Assuming for a minute that I think he has

18   a major mental disease or defect and that he is treated

19   effectively through a full regimen of Seroquel, and let's

20   assume that he can show that stability over a period of time,

21   he has done significantly more time than he would have ever

22   done for the crime.  What do you foresee happening here?

23           MR. CALLAHAN:  So, your Honor, I want to be careful

24   that I don't say what I think will happen because I think

25   Dr. Channell and the rest of the treatment team --

```
 1           THE COURT:  Yes, so what would be the -- so you were

 2    recommending in November that he be released.  If he shows

 3    stability and he's on the Seroquel, what do you foresee?  I

 4    mean, you don't want to keep him forever, right?

 5           MR. CALLAHAN:  No, your Honor, and I'd like to get to

 6    that because this is really important, this is really

 7    important.  This notion that Dr. Channell is the charlatan who

 8    wants to keep him in Devens forever, I don't understand.  I'm

 9    mystified by it.

10           THE COURT:  Let me just say, that is not correct.  The

11    first report said "release him."

12           MR. CALLAHAN:  Right, right.

13           THE COURT:  And I want to understand, if he maintains

14    the level of stability that he had before that unfortunate

15    report from Dr. Hoffman that set him back, what do you foresee

16    as a realistic release plan?

17           MR. CALLAHAN:  Your Honor, if past -- two issues.  I

18    want to say one thing and then I want to add a caveat to it.

19    If his past behavior is any indication, if he behaves the way

20    he did, and he complies with his medication, and he agrees to

21    his conditions of release for six months or for a year, I don't

22    see any reason why Dr. Channell would not be back here giving

23    the same opinion that he did in his October 28 --

24           THE COURT:  Which is what?

25           MR. CALLAHAN:  Which was he's ready for conditional
```

 1   release, in his October 28 risk assessment report, the one that

 2   you got before the unfortunate incident.  I don't see why it

 3   would be different.  But here's the caveat, your Honor, which

 4   is, then in October, 2016, he had some insight into his mental

 5   illness, right?  He said, "I'll comply with the conditions."

 6   And that was big for him.  He had not done that in the past, or

 7   he had done it, and then he'd gone and told his girlfriend or

 8   had monitored phone calls where he said, "I'm not going to a

 9   group home.  I'm not going to agree to any conditions."

10        THE COURT:  I understand that, but I'm not keeping him

11   till he dies.

12        MR. CALLAHAN:  I understand that, your Honor, and

13   Devens doesn't want to.  So if I can just submit this one part,

14   which is, he needs to have some insight and show some insight

15   into his mental illness.  Right now, as Dr. Channell said and

16   as the documents indicate, he has no insight into his mental

17   illness because of what Dr. Hoffman has told him.

18        THE COURT:  Excuse me.  That's not quite accurate.  He

19   does when he's on the Seroquel.  That's the key determinant.

20   It works for him, that full 900 milligrams.  He's been, as far

21   as I can tell, competent, respectful, and quiet during these

22   proceedings.  So when he's on it, he does well.  When he's not

23   on it, he does horribly.  So I'm trying to understand, if I

24   continue to find a major mental illness, which I'm likely to,

25   then the question is, what are the conditions that would assure

```
 1   his future safety in the community or -- what's the exact
 2   word? -- there's not a possibility of a risk of --
 3          MR. CALLAHAN:  That would eliminate the substantial
 4   risk that his release would --
 5          THE COURT:  So let's assume that in six months to a
 6   year, whatever it is, I come back, he's fine; he's taking his
 7   drugs, he's got insight, he's quiet.  His uncle has graciously
 8   agreed to take him for 30 days, but that's all he can take him,
 9   so the question is what next?
10          MR. CALLAHAN:  I think what next is, he has conditions
11   of release that they were already describing in October, 2016,
12   that include not only a medication, your Honor, but agreeing to
13   go to a group home.
14          THE COURT:  Yes.
15          MR. CALLAHAN:  And that would be something he would
16   have to do, and that is something he has said --
17          THE COURT:  How do we get him a group home now that
18   Dr. Hoffman has refused him?
19          MR. CALLAHAN:  Well, they still call, and as
20   Dr. Channell said, he was making calls -- or I don't know if it
21   was Dr. Channell or the team was making calls, and what he said
22   in his transcript was, they were close to finding a place for
23   him before the setback.
24          THE COURT:  Okay.
25          MR. CALLAHAN:  And, your Honor, Mr. Shea said that
```

1    Mr. Mahoney can be a pain in the butt?  I can be a pain in the

2    butt, and I have been a pain in the butt to BOP, and I have

3    told them, "I want to know what your progress is.  If you're

4    calling around trying to find places for him, I want to know

5    what that progress is," all right?  And I will commit to the

6    court, I will continue to be a pain in the butt, but it

7    takes -- it's a lot of work, all right?  As Dr. Channell told

8    you, it's hard.  There aren't a lot of people who are dying to

9    take Mr. Mahoney, but they are working on it, and that's also

10   going to be a condition.

11           THE COURT:  So suppose you had a group home that

12   monitored the medications, you think that's feasible even

13   though the state has turned him down?  Is that right?

14           MR. CALLAHAN:  As I understand it, your Honor, it's

15   not just the state that they can go ask, but I want -- you

16   know, I can't be quoted on that.  I don't know all the

17   regulations, but they were working --

18           THE COURT:  Is he supervised by a probation officer?

19           MR. CALLAHAN:  He would continue to have to be, and

20   this is at least -- so one thing I need to say, your Honor, is,

21   they say, "We recommend him for conditional release."  That was

22   the statement in October, 2016, in the report.  However, they

23   say that, and then they start working on the conditions and on

24   the plan and who will take him.

25           THE COURT:  Am I allowed to -- I know for sex

```
 1    offenders, which he's not one --

 2              MR. CALLAHAN:  Excuse me?

 3              THE COURT:  I don't have him for a sex -- we can still

 4    use the good services of the Probation Department for

 5    supervision.

 6              MR. CALLAHAN:  I understand that Probation is

 7    involved, yes.

 8              THE COURT:  Probation is involved --

 9              MR. CALLAHAN:  That's as I understand it.

10              THE COURT:  -- as a supervisory body.

11              MR. CALLAHAN:  Right.  But you bring up another good

12    point, your Honor, which is, one of his conditions will be to

13    have to register as a sex offender.  That's another condition.

14    And he has indicated --

15              THE COURT:  I don't know anything about that, but --

16              MR. CALLAHAN:  I understand.  I don't mean to open up

17    that can of worms, your Honor, and I'm not the one that makes

18    that decision.

19              THE COURT:  That's not my issue.  This is a civil

20    commitment issue.

21              MR. CALLAHAN:  Right, I understand that, your Honor.

22    Can I --

23              THE COURT:  I'm not doing that.

24              MR. SHEA:  Plus, I just want to point out that there's

25    a 2015 Massachusetts SJC case that changed the Sex Offender
```

1  Registry.  I'm just saying that there's actually legal remedies

2  where he could call into question whether he needs to do it

3  because it's beyond 20 years, and the prior standard was found

4  to be not okay by the SJC.

5          THE COURT:  Well, that may be.  I'm just saying,

6  that's not my hunt.

7          MR. CALLAHAN:  And, your Honor, I want to stay focused

8  because I think where you're asking what the conditions would

9  be, I'm just telling you what I've been told some of the

10  conditions would be, and there may be others.  I don't know.

11  It's going to depend on when they come back and they do the

12  reevaluation of him, but those have been some conditions that

13  have been identified in the past.  I suspect they would be

14  identified in the future, okay?

15          THE COURT:  In the past when we've released civilly

16  committed people, I'm just not remembering, was Probation

17  involved in the supervision process?

18          MR. CALLAHAN:  As I understand it, yes, they are.  So

19  as I understand, and these are some of the conditions they've

20  had, your Honor, Probation supervises.  There's a group home.

21  There is a requirement of either getting treatment or getting

22  medication.  And in this instance, as I understand it, there

23  will be a requirement to register, register as a sex offender.

24  And that is beyond my understanding, but someone else can

25  figure that out.  And if there is a reason that he doesn't have

1    to, I'm sure his attorney and Mr. Mahoney will take care of it.

2          THE COURT:  I'm not doing that.  I'm just dealing with

3    his mental health right now.

4          MR. CALLAHAN:  Right, right.  So that's where it gets

5    us, and that's the problem we have, your Honor.  That's where

6    we come to the conditions, and he is unwilling now, even though

7    he's on Seroquel, he is unwilling as of two weeks ago -- you

8    know, and, again, this is important -- as of two weeks ago,

9    Exhibit 131, he said, "I will never take any conditional

10   release, group home, or halfway house."  That was two weeks ago

11   on 900 milligrams of Seroquel.  That is just -- and that's why

12   I add the caveat, your Honor, because I don't know.  If

13   Mr. Mahoney continues to say that, "I will not take any of

14   those conditions," I can't imagine -- we're not going to be in

15   a good place in six months if he's still saying that.

16         THE COURT:  Right, so let me just ask you one thing:

17   Do I have the legal authority to order him to take the fully

18   prescribed regimen of Seroquel?

19         MR. CALLAHAN:  So, your Honor, I'm not a hundred

20   percent sure.  I believe you are, and I can get you an answer

21   on that very quickly.

22         THE COURT:  Would that be a good thing for me to do?

23   I think I just wouldn't mind like a supplemental two-page memo

24   or something like that on what I should do.  He does so well on

25   it.

 1          MR. CALLAHAN:  Sure.  And the one thing I also want to

 2    say, your Honor --

 3          THE COURT:  But then I don't want to find him in

 4    contempt if he refuses to, so, I mean, it comes with a -- but

 5    certainly, if I were to release him, that would be the release

 6    condition, so I think we need to address that issue.

 7          MR. CALLAHAN:  And I think, your Honor, and could I

 8    just --

 9          THE COURT:  Yes.

10          MR. CALLAHAN:  I promise, I'll be fast, Mark.

11          Another thing is, just to this idea that Dr. Channell

12    was wrong on the Seroquel, and, you know, Mr. Mahoney was never

13    going to get better on the Seroquel and he needed lithium, when

14    Mr. Mahoney was exhibiting these manic symptoms back in 2012 in

15    front of Kambampati and in front of Dr. Mart, his records

16    reflect -- and it's in Exhibit 110 -- his records reflect he

17    was not on 900 milligrams of Seroquel.  He was on 450.  They

18    have doubled.  Because he wouldn't try lithium, and we went

19    over this in the last hearing --

20          THE COURT:  He didn't like the way it gave some

21    certain side effects that he didn't like?

22          MR. CALLAHAN:  Right, that was what was reported.  And

23    they tried to get him to try another mood stabilizer.  He

24    refused to.  That was the testimony from 2014.  And I think

25    what happened, the result of that was, well, they gave him more

1    Seroquel.  So he went up to 900 milligrams of Seroquel.  That

2    did seem to be having some helpful effects.  However, when he

3    didn't have any insight and when he is claiming he doesn't have

4    a mental disorder or disease, he has told Dr. Channell and the

5    Risk Assessment Panel as recently as November that he doesn't

6    have a mental disease and he doesn't need medication.

7              THE COURT:  Yes, because he was misled by the --

8              MR. CALLAHAN:  Understood, but that's the thing that

9    has to change, and I don't know how to change that.  I do know

10   what some of the conditions would be if he were going to be

11   recommended for conditional release.

12             THE COURT:  So when can you provide the supplemental

13   documents, to the extent they exist, two weeks?

14             MR. CALLAHAN:  Sure, I think that would be --

15             THE COURT:  So within two weeks --

16             MR. CALLAHAN:  And, your Honor, they do have all the

17   documents, so I'm not even agreeing they don't have them yet.

18             THE COURT:  If possible, sooner.  And then the other

19   issue is what to do about whether I have the authority, either

20   on supervised release, or whatever we're calling it, or in the

21   institution about ordering him to take the Seroquel.

22             MR. SHEA:  Can I speak to that briefly?

23             THE COURT:  Yes.  I don't know the answer to that.

24             MR. SHEA:  Well, I'm not doing the law.  I'll look

25   that up and get it to you, as I'm sure Mr. Callahan will.

1        I'll tell you that as a practical aspect, they crush

2   medication and have him drink it in front of them so there's no

3   cheeking, and Mr. Mahoney has shared with me that that has been

4   one of the things they've done either in the past or currently,

5   so that kind of assures that the medication is there.

6        The other thing I just --

7        THE COURT:  Well, what about on supervised release?

8        MR. SHEA:  Well, here's the thing I'd like the --

9        THE COURT:  Or whatever we're calling it?

10       MR. SHEA:  Well, I mean, if he starts out in a home,

11  then it's not so -- you can order that it be crushed, I would

12  think, or they can set up that it be crushed, and he can drink

13  it in front of them so there's no cheeking.  It defeats the

14  cheeking is the thing.

15       THE COURT:  Yes, but he could theoretically say, "No,

16  I'm not taking it."

17       MR. SHEA:  Theoretically, but that's what I wanted to

18  address.  So I think, look, it is a complex situation, and what

19  I want to try and avoid, though, is that with the Court is well

20  intention that he take the medication, we set up something

21  where he feels like not taking the medication because it's

22  ordered.  And what I worry about is because actually --

23       THE COURT:  Sort of like, who are you to --

24       MR. SHEA:  Right, because I do want to point out that,

25  you know, the incident at Stafford where he yells at the nurse

```
 1   but then he and the guy have a fight, it starts because the
 2   nurse isn't giving him his Seroquel.  He's upset because
 3   they're not giving him his Seroquel.  When he is going out in
 4   the community, he is seeking medication for the problem.  The
 5   testimony by Dr. Channell back in the 2014 hearing when asked
 6   by Mr. Schneider about Seroquel, "He's been on it --"
 7           MR. CALLAHAN:  Page?
 8           MR. SHEA:  Oh, sorry.  112 of 6/11/14.  "He's been on
 9   it for some time?
10           "Yes.
11           "He willingly takes those?
12           "Yes.
13           "Goes back as far as March, 2013?
14           "Yes.
15           "That's 13 months, right?
16           "Yes."
17           So, you know, I don't think actually Mr. Mahoney has a
18   longstanding history of not willingness to take Seroquel.
19   Actually, he's quite willing to take Seroquel.  The bump in the
20   road, I acknowledge, came after he believed Dr. Hoffman's
21   analysis, so --
22           THE COURT:  So you take a position I shouldn't order
23   it?
24           MR. SHEA:  It may be counterproductive.
25           THE COURT:  I'm understanding you.  Okay, thank you.
```

1    I'm going to take this under advisement.  You'll provide

2    anything you want to supplement within two weeks.  I want to

3    thank you.  Extremely well tried on both sides, a very

4    important issue.

5            I want to commend Mr. Mahoney.  You're a very

6    different person than you were the first time I saw you.

7            MR. MAHONEY:  Thank you, yes.

8            THE COURT:  But you need to keep working with your

9    team, so -- and we'll stand in recess.

10           MR. CALLAHAN:  Thank you, your Honor.

11           THE CLERK:  All rise.

12           (Adjourned, 11:09 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

   UNITED STATES DISTRICT COURT )
4  DISTRICT OF MASSACHUSETTS    ) ss.
   CITY OF BOSTON               )
5

6

7            I, Lee A. Marzilli, Official Federal Court Reporter,

8  do hereby certify that the foregoing transcript, Pages 3-1

9  through 3-58 inclusive, was recorded by me stenographically

10 at the time and place aforesaid in Civil Action No.

11 15-11530-PBS, United States of America v. Brian Mahoney, and

12 thereafter by me reduced to typewriting and is a true and

13 accurate record of the proceedings.

14           Dated this 17th day of February, 2017.

15

16

17

18                   /s/ Lee A. Marzilli
                     _____
19                   LEE A. MARZILLI, CRR
                     OFFICIAL COURT REPORTER
20

21

22

23

24

25