1                IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MASSACHUSETTS

2

3     UNITED STATES OF AMERICA,        )
                            )

4             Petitioner         )
                            )

5        -VS-                  ) Civil No. 13-11530-PBS
                            ) Pages 1 - 28

6     BRIAN MAHONEY,               )
                            )

7             Respondent         )

8                **PRETRIAL CONFERENCE – FINAL**

9                      **VIA VIDEO**

10

11           BEFORE THE HONORABLE PATTI B. SARIS
             UNITED STATES DISTRICT JUDGE

12

13  A P P E A R A N C E S :

14     PATRICK M. CALLAHAN, ESQ., Assistant United States
    Attorney, Office of the United States Attorney,

15  1 Courthouse Way, Room 9200, Boston, Massachusetts, 02210,
    for the Petitioner.

16

17     ERIC B. TENNEN, ESQ., Swomley & Tennen, LLP,
 50 Congress Street, Suite 600, Boston, Massachusetts, 02109,

18  for the Respondent.

19                       United States District Court
                      1 Courthouse Way, Courtroom 19

20                       Boston, Massachusetts  02210
                      June 17, 2020, 9:38 a.m.

21

22

23                 LEE A. MARZILLI
            OFFICIAL COURT REPORTER

24         United States District Court
        1 Courthouse Way, Room 7200

25           Boston, MA  02210
           (617)345-6787

P R O C E E D I N G S

1

2          THE CLERK:  The Court calls Civil Action 13-11530,

3   United States v. Brian Mahoney.  Could counsel please identify

4   themselves.

5          MR. CALLAHAN:  Good morning, your Honor.  Patrick

6   Callahan for the United States.

7          MR. TENNEN:  Good morning.  Eric Tennen on behalf of

8   Mr. Mahoney.

9          THE COURT:  Thank you.

10         And it's good to see Mr. Mahoney.  You're at Wyatt?

11         THE DEFENDANT:  Well, I'm doing okay, but there's some

12   serious medical issues that have just come forward in my

13   situation.  So I just want the Court and everyone to be aware

14   that I have a serious kidney infection right now that's started

15   in the stomach about four or five months ago.  And I saw the

16   doctors on Saturday, and they said they'd give me medication

17   that they hope works, but they don't know if this is going to

18   work, and I've been in excruciating pain for the past three to

19   four weeks.  So I'm taking medication, but with this kidney

20   infection, they don't know what's going to happen.  I don't

21   even know if I'm going to survive this.

22         THE COURT:  Are they kidney stones?

23         THE DEFENDANT:  No, they're not.  This is a bacterial

24   infection that has gone from stomach; it started all the way

25   down to the kidneys.  This has been going on for five to six

1    months.  I just found out about it Saturday.

2            THE COURT:  I'm sorry to hear that.  I'm sorry to hear

3    that.  It took a while to get you up here because for a while,

4    with the COVID, they weren't transporting anyone, so I hope --

5            THE DEFENDANT:  Yeah.  Well, they said the most

6    important part right now is, am I going to survive?  I know

7    kidney infections can be very brutal and you can possibly be

8    killed from that.  So they're going to try.  The doctor said

9    Monday, "We don't know if this medication is going to work.

10   We're going to try it."

11           He did ask me the famous question everyone has been

12   asking me, "When are you going home?"  And hopefully --

13           THE COURT:  So, as I understand it, I set up this

14   status hearing partly to get you up here so that you could be

15   with your attorney and with the various experts -- maybe only

16   one expert, Mr. Tennen? -- but, in any event, maybe two, and

17   certainly to think about a release plan.

18           So let me start with Mr. Callahan.  We're going to

19   have a trial or a hearing in mid-July.  Hopefully Mr. Mahoney

20   is well enough to be able to do that.  What do you need at this

21   point?  What do you anticipate will happen then?

22           MR. CALLAHAN:  Your Honor, so the government will be

23   ready for the July 16 hearing.  Right now, not having seen

24   Mr. Mahoney's expert's report, we're not exactly sure if we'll

25   need anybody else; but right now we expect at least the one

```
 1    expert or the one psychologist from Butner who will testify, if
 2    the Court allows, will testify by VTC or Zoom, provided
 3    everyone is willing to do that.
 4              THE DEFENDANT:  No, I would object.  I object to that
 5    myself.  You've got to come into the courtroom.  You know the
 6    rules, Patrick Callahan.
 7              THE COURT:  All right, wait.  Just hold on a second.
 8              So you think you'll have one expert, is that it?  And
 9    then we can discuss how that person appears.
10              MR. CALLAHAN:  Yes, your Honor, at least one expert,
11    and that brings me to the second point, which is just getting
12    the report from Mr. Mahoney's doctor, Dr. Pivovarova.  We've
13    not received that yet.  We would like to receive that at the
14    latest June 26.  Mr. Mahoney has been in the district since
15    May 20, so, you know, by the 26th, that will have been in five
16    to six weeks.
17              THE DEFENDANT:  I will object to that, Judge.  This
18    has been going on for nine months.  I'm not waiting again for a
19    continuance.  July 16 and I won't take it.  If you don't want
20    to give me that hearing, I'll go to the First Circuit.  But I'm
21    going to tell you one other thing, Judge, and I want everybody
22    to listen to me:  Under 4246, I am only supposed to be
23    temporarily held until I'm competent to go to trial or until my
24    charges have been disposed of.  Judge Saris, my charges have
25    been disposed of.  And there's a guy that made this rule.  You
```

1  might even remember him; you might not remember him.  His name

2  is Calvert Magruder.  He was on the hearing who created this

3  whole entire Serious Offense Act in 1942 that went forward.

4  But my charge has been dismissed seven years ago.  I am

5  supposed to be released by law.  And by the First Circuit

6  Judge Magruder, who also, there were seven other judges, in the

7  First, Second, Sixth, the Seventh, the Eighth, the Ninth, and

8  the District of Columbia, and it was the First Circuit

9  Judge Magruder who made the determination that under 4246, you

10  are held only until you're competent to go to trial or until

11  your charges have been dismissed according to law.  That's the

12  end of this case.  That's over.  It's done.

13          THE COURT:  All right, thank you.

14          Mr. Tennen, so what's left?  Do you have an expert

15  report yet?

16          MR. TENNEN:  I don't have an expert report yet, Judge.

17  We were waiting for records, and she was only able to meet with

18  Mr. Mahoney on Friday.  We set up a Zoom hearing, and she

19  talked to him this past Friday, I think?  Yeah.

20          THE COURT:  How long did she get a chance to talk to

21  him?

22          MR. TENNEN:  We talked for probably a good three

23  hours.

24          THE COURT:  Oh, good, it was a good long meeting.

25  Well, that's great.

1          MR. TENNEN:  No, she doesn't need to talk to him

2     again.  So that was on Friday.  She's been talking to the

3     social worker about getting some information from the social

4     worker.  So I'm hoping to get a report in two weeks, so it's

5     not next week because it took a while to set up the call.  It's

6     just taking a little bit.  I talked to Mr. Callahan a little

7     bit about the timing of stuff and things that I think might be

8     in the report, so I tried to give him as much of a heads-up as

9     possible.

10          THE COURT:  So give me a deadline because he needs a

11     chance to review it with his expert before the July hearing.

12          MR. TENNEN:  I know he does.  The other thing I

13     thought about is that I have to get the report to Mr. Mahoney

14     also first before I can turn it over.  And I can't visit him,

15     so I have to do it all by mail, or I can try and at least set

16     up a call with him and go over it on a call.  So I have to try

17     and do that before I --

18          THE COURT:  Can I say that -- we've been working on

19     that in the court -- that you have the opportunity to set up a

20     Zoom attorney call only, which is probably what you did on

21     Friday.  You just need to -- Wyatt has been incredibly

22     responsive.

23          MR. TENNEN:  Yes.

24          THE COURT:  So they do have a -- not all of them are,

25     but we've not had a problem yet with Wyatt, but it's subject to

```
 1    availability.  So could you book it and make sure you have it
 2    in advance?  I need to -- I'm in agreement with Mr. Mahoney.
 3    I'd really like to get this done on July 16.  It's been too
 4    long.
 5              THE DEFENDANT:  I won't take a continuance on it.  I'm
 6    not going to do that.
 7              THE COURT:  Excuse me.  I need to get the report to
 8    the government.  That's part of the rules too.
 9              So when do you think she could do the report by?
10              MR. TENNEN:  She told me July 2, which is in two
11    weeks.
12              THE COURT:  Well, let me put it this way:  If you can
13    get it to the government by July 2, but that can't be when you
14    get it to Mr. Mahoney, and then get it to the government only a
15    week beforehand.
16              MR. TENNEN:  Okay.
17              MR. CALLAHAN:  And, your Honor, that's also the 4th of
18    July week, which the government is willing to work, but we're
19    going to be having people at Butner who might not even be there
20    over the holiday weekend.  It does pinch the government.  And
21    if the government is going to have an opportunity to write a
22    supplement because the last review that the government did, you
23    know, as required by statute, was November, 2019.  He's not due
24    to be reviewed again until this coming October.  So they sped
25    it up, but we will need some time to both review it, and then
```

1    there may be a response or a supplement to what was written.

2            THE DEFENDANT:  Judge --

3            THE COURT:  Hold on, Mr. Mahoney.  It's my turn.  What

4    I'd like to do is have their supplement, just straight up a

5    supplement.  You don't have to wait for the report to get the

6    supplement.  And then if you want to respond to it, then it's a

7    shortened piece of work.  In other words, I have no problem

8    with even just responding to it testimonially, you know, when

9    the person testifies, or if it's a day beforehand, which would

10   be preferable so that Mr. Tennen can see it.

11           So I think while I do understand it's July 4th week --

12   July 4 or July 2 is what you said?

13           MR. TENNEN:  Whatever that Wednesday is.  I'm checking

14   real quick.

15           MR. CALLAHAN:  Wednesday is the 1st.

16           THE COURT:  So it should be the 1st because the 3rd is

17   a federal holiday.  So if you can get it to them by the 1st at

18   noon so that he can then shoot it over to people -- and I don't

19   know who it is, I don't know how long it would be -- and then a

20   response could come in within, say, a day or two before the

21   hearing so Mr. Tennen can at least read it beforehand.

22           THE CLERK:  Our hearing is the 16th of July, Judge,

23   so --

24           THE COURT:  What day of the week is that?

25           THE CLERK:  That's a Thursday.

```
 1              THE COURT:  All right, so how about if the government
 2     gave a supplementation in response, if you choose to -- you're
 3     not even required to -- by the 14th, but certainly the person
 4     can testify to it.
 5              Now, let's talk about -- so now that's a way of
 6     exchanging reports.  So whether or not it's in person or not,
 7     let me just say this:  The court is starting to reopen.  Okay,
 8     it is starting to reopen.  That said, I do understand that
 9     traveling long distances is an issue.
10              Where is your expert, Mr. Tennen?  Where does she
11     live?
12              MR. TENNEN:  So she is local, but she had also
13     requested to appear by video because she is expecting in
14     September, and her doctor had advised her to avoid, you know,
15     high-risk areas.
16              THE COURT:  Well, what we're trying to do with the
17     courthouse is -- and I don't know that I want to rule on this
18     yet -- we're trying to do it so that everybody is socially
19     distanced.  I assume Mr. Mahoney will want to be up in the
20     courtroom?  Is that right?
21              THE DEFENDANT:  Yes, Judge.  I got tested, and I'm
22     negative.  I gave it to my attorney, so I'm all set.  I can go
23     into the courtroom, but everybody else has to get their test to
24     find out if they have the virus.  But, again, I have the right
25     to cross-examine witnesses in the courtroom.  I'm not going to
```

1    do it by videotape, no way around that.

2           THE COURT:  Let me just say this:  I am going to try

3    and do that.  We are trying to figure these things out.  I

4    think we have a way, Mr. Tennen, and I'm hoping the technology

5    is there, so that you do not have to be close to Mr. Mahoney,

6    that there will be like an audio feed.

7           Maryellen, we'll have to figure out.  We're hoping --

8    we've ordered the technology.  I don't know if it's arrived

9    yet.  But if that isn't available by the 16th, we're just going

10   to have to work out a way that you could talk to him.  I know

11   you can Zoom with him in advance of the trial, like a few days

12   beforehand, that kind of thing, but otherwise it would have to

13   be downstairs probably in the Marshals Service.  They claim

14   there's negative air pressure there, but still it's small

15   quarters.  So I don't know what you want to do, and you may

16   want to --

17          MR. TENNEN:  I'm happy to be present in the courtroom.

18   My concern is more him than me, to be honest, and, you know, if

19   we need to talk during the hearing, how we do that in a way

20   that's safe for Mr. Mahoney.  I mean, for me too, but I'm more

21   concerned for him.

22          THE COURT:  I'm totally flexible on this, but I have

23   to tell you that we've had no in-person hearings pretty much,

24   and so we're just opening up in July, and we're not really

25   quite sure how to make sure everyone is safe, so I'm working

 1   through that.  But I do understand Mr. Mahoney wants to be

 2   there, and to the extent feasible, I will honor that, unless he

 3   gets sick or unless one of us gets sick.  I will be there,

 4   hopefully.

 5           Now, what do we do about these experts because both of

 6   them, I guess -- is your expert from North Carolina?  Is that

 7   it?

 8           MR. CALLAHAN:  Yes, your Honor, the government's

 9   expert is in North Carolina.  If he came, he would have to

10   quarantine here and then quarantine when he went back.  So

11   that's just going to be -- aside from just the day of being

12   here for the hearing, that would be a very significant issue.

13   So if it can be done by Zoom, that's what the government is

14   requesting.

15           THE COURT:  Well, I don't understand this 14-day

16   quarantine.  Is that a matter of North Carolina law?

17           MR. CALLAHAN:  If he went back, he told me that when

18   he went back, he would have to quarantine.  And in terms of

19   what he would have to identify, you know, for his children to

20   go to schools or childcare, he would have to check off that he

21   had traveled out of the state, and then they would be forced to

22   quarantine for an additional number of weeks after he returned.

23   So it's a significant -- I mean, he's willing to travel and

24   he's done that before, but this would be, A, traveling on a

25   plane during coronavirus, and, B, the effect it would have on

1  him, both physically and the consequences of having to

2  quarantine after he returns would be significant.  So it would

3  be --

4           THE COURT:  Well, we don't have to make a decision

5  right now.  Let me just say that.  I mean, I don't know the

6  answer.  Right now Massachusetts is doing really much better

7  than North Carolina right now.

8           MR. CALLAHAN:  Yes, yes.

9           THE COURT:  We're pretty terrific, and it's coming

10 down and it's much safer.  That's not necessarily true, by the

11 way, at Wyatt.  In some of the units in Wyatt there's an issue.

12 And there's always a chance, and I just want to put it out

13 there, that --

14          Are you in quarantine, Mr. Mahoney?

15          THE DEFENDANT:  I've been in quarantine since

16 November 1, 2020, absolutely.  I've been locked up, Judge, in

17 the SHU for 16 straight months 24 hours a day, seven days a

18 week.  So I'm not going to continue to be in lockdown and allow

19 doctors not to give me medication.

20          THE COURT:  Well, right now it's a good thing because

21 there are other parts of Wyatt that are --

22          THE DEFENDANT:  Judge, this is punishment.  It's not a

23 good thing.  I'm supposed to get care and treatment.

24 Twenty-four hours a day seven days a week in a cell, that's

25 punishment.

1          THE COURT:  Let me just say that you don't want to be

2   with anyone who has coronavirus, or the Marshals won't

3   transport you in.

4          THE DEFENDANT:  Oh, I understand that, Judge, but this

5   is 16 consecutive months (Inaudible) I've been in the SHU.

6   That is problematic to me, to my health and to my -- now I have

7   serious issues with my kidneys.

8          THE COURT:  I am worried that whether or not you're

9   getting -- was he getting treatment at Butner?

10         THE DEFENDANT:  I'm not getting anything here, Judge,

11  zero.

12         THE COURT:  And you won't at Wyatt.  That was one of

13  the issues.

14         THE DEFENDANT:  Mr. Callahan said equally problematic --

15         THE COURT:  Mr. Mahoney, no.  I want to hear from

16  Mr. Tennen about this --

17         THE DEFENDANT:  -- he's saying it's a problem --

18         THE COURT:  Mr. Callahan, was he getting treatment at

19  Butner?

20         MR. CALLAHAN:  He was, your Honor.

21         THE COURT:  And I know he probably isn't getting it at

22  Wyatt, so I do want to minimize his stay there, just because

23  it's a holding facility, not necessarily -- but is there mental

24  health treatment that one can get there?  I don't know if you

25  get the level of treatment you do at Butner but --

```
 1              THE DEFENDANT:  I haven't seen anybody, Judge Saris,
 2      not a soul.
 3              THE COURT:  In Wyatt?
 4              THE DEFENDANT:  Just a doctor for my kidneys, that's
 5      it, because I'm in excruciating pain.  I'm bedridden right now.
 6              THE COURT:  Yes, that's terrible.
 7              Mr. Tennen, do you know whether or not it makes sense
 8      for him to try and get a mental health support system for him
 9      at Wyatt?
10              MR. TENNEN:  They have some limited things available,
11      and last time he was there he was having contact with mental
12      health, and I thought it was actually a pretty positive
13      relationship.  I think the problem is --
14              THE COURT:  Is what?
15              MR. TENNEN:  Is coronavirus.  I think what's available
16      is limited because of the virus now.
17              THE COURT:  Do you want me to request it?
18              MR. TENNEN:  I'm happy to.  Just I'm not sure that
19      they're able to do it now because of the virus.  That's all I'm
20      saying.
21              THE COURT:  Because if I don't request, we don't know,
22      so --
23              MR. TENNEN:  He can correct me if I'm wrong, but last
24      time he was there, there was someone that he spoke to a couple
25      times.  And, Brian, I thought you got along well with her and
```

1  that was a good thing to have.

2       THE COURT:  That's good for everybody because it's

3  really, I've heard from many people, not just Mr. Mahoney, that

4  in this lockdown world of coronavirus how lonely and isolating

5  it is for the prisoners.  It's really difficult.  So why don't

6  we put in a request for mental health treatment at Wyatt

7  because this could be another month and a half really, or a

8  month, a month anyway.

9       So, Maryellen, could we just put in a request to the

10  Marshals that he get mental health treatment, even if it's

11  socially distanced mental health treatment.  I think I'm glad

12  Mr. Mahoney pointed that out.

13       So, Mr. Tennen, so what do you anticipate at the

14  hearing on the 16th?  Your expert testifying, either in person

15  or Zoom.

16       MR. TENNEN:  Yes, I anticipate that.  I have the

17  social worker working with her.  I don't think she's necessary

18  for testimony, but I can have her available.

19       THE COURT:  As I've said a thousand times, I am eager

20  to work out something, if in fact there is a plan, and if in

21  fact Mr. Mahoney is taking his meds, and if in fact -- as you

22  know, last time around we came close to it, and then neither

23  side was willing to say "release him."  I'm ready to release

24  him as soon as I get the green light that there's a way to do

25  it.

1          THE DEFENDANT:  Judge Saris, right now, if I may,

2     there is no green light right now.  As Mr. Callahan said, Wyatt

3     is a non-medical center facility, and therefore I don't get any

4     medication.  That's number one.

5          Number two, ten months ago was the last time I'd

6     gotten any medication, again, and like I said --

7          THE COURT:  Are you not getting medication that you're

8     supposed to now?

9          THE DEFENDANT:  You don't get anything at Wyatt,

10    absolutely not.  Mr. Callahan has said that in his last motion

11    January 6 that I'm not getting anything, and yet I'm here

12    again.  And you even said it, Judge, in the paperwork and the

13    transcript that I have.  So I don't have to inform you again,

14    but I'm not getting it.

15         THE COURT:  This medication, Mr. Tennen, do you know?

16         THE DEFENDANT:  I'm supposed to be at Devens Medical

17    Center.  That's number one.

18         MR. TENNEN:  I don't know about Wyatt right now, what

19    he's getting or not getting.

20         MR. CALLAHAN:  Your Honor, I think we knew before he

21    was going that BOP does not have any ability to tell Wyatt what

22    to do.  So when the Marshals bring him to Wyatt, it's sort of

23    out of BOP's hands.  But I think everyone knew going in he was

24    not going to get the medication because many of the medications

25    he was on aren't on their formulary.

```
 1          THE COURT:  Well, can I say, I didn't know that, that
 2   he wasn't getting any medications.  I sure didn't know that
 3   he's getting nothing.  So I think we need to have a -- why
 4   don't you get from Butner what he should be getting, and then
 5   we're going to pass it on to Wyatt and tell them they need to
 6   get it or something that's equivalent because that's what saves
 7   him.  That's the only thing that brings him --
 8          THE DEFENDANT:  They refuse the Klonopin, Judge, so
 9   that's not even going to be an issue there.  They won't give me
10   that at all.
11          THE COURT:  I don't know what's appropriate, but I do
12   know the only thing that brings him into calmness are some of
13   these medications, and I've always said to him "Take your
14   meds."
15          THE DEFENDANT:  You're right.  I did give Eric Tennen
16   a piece of paper that showed from 2003 to 2010, before I got
17   civilly committed, I was on Xanax, I was on oxycodone, and I
18   was on Seroquel 50 milligrams.  So I was already in a facility
19   getting medications.  So everyone keeps saying, "He refuses
20   treatment, he refuses medication."  Long before you even knew
21   who I was, I was taking medications from 2003 to 2010, and Eric
22   Tennen has that record.
23          THE COURT:  That's great, but we need to get him on
24   meds so that by the time he hits the hearing, that's not an
25   issue.
```

```
 1              THE DEFENDANT:  I'm not going to take the meds here,

 2    Judge, so that's the bottom line, so there will be another

 3    issue --

 4              THE COURT:  Well, if you refuse meds --

 5              THE DEFENDANT:  I told you what I want, Judge Saris.

 6    I told you over and over again.  You're not qualified.  Let me

 7    see your Ph.D. and doctoral.  Then you can tell me.  But right

 8    now, I'm not going to cooperate at all right now.  Do You

 9    understand that?  I just want you to be aware.  You've got to

10    cooperate with me.  I don't have to cooperate with you.

11              THE COURT:  Mr. Tennen, this is proving my point.  If

12    you could try and figure out what he should be taking from

13    psychiatry.

14              THE DEFENDANT:  I'm not taking any medication.  Nobody

15    can force me after ten years.  I will tell you right now,

16    you're going to (Inaudible) I'm going to instruct the judges on

17    what you did.  Under 4246, my charges have been dismissed.  I'm

18    going to seize Susan Goldberg on you and make sure that you're

19    impeached from that bench because my charges have been

20    dismissed, Judge.  So you can look me right in the face.  I'll

21    take my glasses off and I'll tell you right to your face:

22    You're going to be impeached, Honey.

23              THE COURT:  So, Mr. Tennen --

24              THE DEFENDANT:  -- no medications again (Inaudible).

25              THE COURT:  Our hearing can't be this way, so --
```

1          THE DEFENDANT:  -- anybody but me, Patti Saris.

2    You're going to get impeached, Honey.

3          THE COURT:  So could we possibly just see what we need

4    to happen through the psychiatrist?

5          MR. TENNEN:  It's a psychologist but --

6          THE COURT:  Or possibly I could pay for a

7    psychiatrist?  Somebody needs to prescribe him something.

8          MR. TENNEN:  I'm happy for Wyatt to prescribe whatever

9    Butner was prescribing.  I don't know how to make that happen,

10   and then I don't know how to make him take it.

11         THE COURT:  Was it being taken?  I thought it was

12   being taken at Wyatt.  Wasn't it, Mr. Callahan?

13         THE DEFENDANT:  No, it was not --

14         MR. CALLAHAN:  No, your Honor.  Your Honor, if I could

15   speak with Mr. Mahoney being quiet just for a moment.  No, they

16   have limitations at Wyatt where they cannot give -- and the

17   government has no ability to control that -- where they cannot

18   provide the same things that they can provide at Butner, which

19   is why the government initially had said we thought he was

20   better off at Butner.

21         THE COURT:  At Butner, was he taking meds?

22         MR. CALLAHAN:  Yes.

23         THE DEFENDANT:  No, I was not because I was not.

24         MR. CALLAHAN:  He was, and we have the records, you

25   Honor.  We'll show that he was taking Seroquel --

 1          THE DEFENDANT:  October 19, 2019, that was it.  They
 2     stopped it on me, all of it.
 3          THE COURT:  So why don't you check out, see what he
 4     was on at Butner.
 5          MR. CALLAHAN:  Certainly, your Honor, certainly.
 6          THE COURT:  Okay.  So we need to make sure that
 7     whatever happens in July is calm, so --
 8          THE DEFENDANT:  Judge Saris, you're breaking the law.
 9     4246, I'm supposed to be here -- hold on -- I'm supposed to be
10     here until I'm mentally competent to be released or my charges
11     have been dismissed.  I will take this up with Ms. Susan
12     Goldberg, and I will guaranty you this much:  I know law, and
13     you're not going to put me under any induced antipsychotic
14     medication.  I want you to get ahold --
15          Maryellen, can you give her the trial date in 1987
16     because Patti Saris should understand how serious the
17     antipsychotic medications are, and then she can understand that
18     I have the right to put it in my body.  This is a decade, been
19     going on a decade.  This is the end of the case.
20          THE COURT:  Thank you, thank you.
21          All right, Mr. Tennen, you'll have a chance to meet
22     with Mr. Mahoney and talk to him in the interim?
23          MR. TENNEN:  Yes, I'm trying.  And to be fair to him,
24     it has been a stressful several months.
25          THE COURT:  He's sick right now with a kidney disease,

1    so --

2              MR. TENNEN:  All that, transportation and with

3    lockdowns and stuff, he's had a rough couple of months just

4    dealing with, you know, being in prison during coronavirus.

5              THE COURT:  I've got to believe that he's going to

6    want to testify at the hearing as well?

7              THE DEFENDANT:  Absolutely.

8              THE COURT:  Yes, I assume that.  So in scheduling

9    this -- Maryellen, what do we have blocked, how many hours?

10             THE CLERK:  I blocked off the entire day.

11             THE COURT:  Oh, good.  That's great.  So if you and

12   Mr. Callahan could -- I assume that I'm going to hear at least

13   from, Mr. Tennen, your psychologist, possibly a social worker,

14   and for sure Mr. Mahoney, and then I'm assuming I will hear

15   from the government's expert.  And anybody else?

16             THE DEFENDANT:  If I may, Patti Saris, if I may say

17   something else?

18             THE COURT:  No.  Mr. Callahan I'm asking a question.

19             MR. CALLAHAN:  Your Honor, right now, based on what we

20   know, we just expect the psychologist, but that could obviously

21   change, depending on what we see in the report from

22   Dr. Pivovarova.  Right now, your Honor, it's just the

23   psychologist.  Depending on what we see in Mr. Mahoney's

24   expert's report, there could be the need to call somebody else,

25   but I won't know that until we receive the report.

1          THE COURT:  And for the record, Mr. Mahoney just left

2     the room, to my knowledge.  I don't know whether he's still in

3     the room or whether he's just not on the camera.  So I think he

4     feels very frustrated by this proceeding, and I'm a little

5     worried about what it's going to look like in July.  So,

6     Mr. Tennen, maybe you can sort of do what you can.

7          MR. TENNEN:  I'm trying, I really am.  It's not been

8     easy for him.  It's not been easy -- I mean, just making this

9     happen has been tough because it's all over Zoom and stuff like

10    that, but --

11         THE COURT:  You could go down there, or is that too

12    dangerous for you?

13         MR. TENNEN:  Again, my concern is less for me than

14    others.  I just don't think Wyatt is allowing attorney visits

15    regardless, as far as I know.

16         THE COURT:  I see.

17         MR. TENNEN:  That's my understanding.  I could be

18    wrong about that.  I just think they're not letting anyone in

19    the facility.  That's why they're doing the Zoom calls.

20         THE COURT:  And it may be dangerous to do that.  So,

21    in any event, I don't know what will happen on July 16, but

22    unfortunately I think I haven't seen him in a really long time,

23    and he's very angry right now, and I had not understood he

24    wasn't taking his medications, and is refusing them

25    effectively.

1          MR. TENNEN:  Well, I don't think there's anything to

2    take at Wyatt.  Let's start with that, you know.

3          THE COURT:  Well, there is if I order it.  I mean, the

4    question is whether he would take it or not.

5          MR. CALLAHAN:  Yeah, I think he's said he will not.

6          MR. TENNEN:  Yeah, but he says that a lot, and then he

7    does it.  So I don't know.  I don't know what he would do.

8          THE COURT:  Could you find out what he was taking at

9    Butner and communicate that to Mr. Tennen because we need to

10   have a --

11         MR. CALLAHAN:  And, Eric, if I could just say one

12   thing.  I'd be happy to do that.  What I'll do is, I'll send it

13   to Mr. Tennen, Judge Saris, and I can copy and send it to

14   Maryellen as well, if that's going to be helpful for your

15   purposes of issuing any orders or suggestions, or whatever

16   process you want to see take place.

17         THE COURT:  I could order him transmitted to Devens,

18   but he's had a problem at Devens before.

19         MR. CALLAHAN:  Correct.

20         MR. TENNEN:  I can't make Wyatt give him anything

21   either.  Even if I send a list of medications, I can't --

22         THE COURT:  No, no, give it to me if you want to do

23   it, and then I will order Wyatt to try and provide it.

24         MR. TENNEN:  I'm happy for Mr. Callahan to, you know,

25   communicate through Maryellen and let you know what it was; and

1  if you think you are able to accomplish that, I don't have a

2  problem with that.  I don't think I can do anything about it.

3          THE COURT:  Well, what do you want to do?  Help me

4  here because clearly he can't act like what he just acted like

5  at the hearing.  He needs something that brings it down a

6  level.

7          MR. TENNEN:  Two things:  One is, if your Honor thinks

8  that you can get a message through the Marshals to Wyatt about

9  giving him medication, I would say go for it, and Mr. Callahan

10  can do that.

11          THE COURT:  I'm happy to try.

12          MR. TENNEN:  Yes, okay.  And the second one is, I do

13  think that if we get to the hearing date and we're in the

14  courtroom, it will help him feel a little better about things

15  as opposed to, you know, what he's been going through.  So I

16  think he'd be calmer if we were there in person actually doing

17  this.

18          THE COURT:  Do you think his brother could come in or

19  someone from the family to help him feel supported?

20          MR. TENNEN:  I hadn't actually talked to his brother

21  about that.  I can.  I guess, if you're saying the public can

22  come in, I can see about that.

23          THE COURT:  Well, I'm planning on doing it in the open

24  courtroom.

25          MR. TENNEN:  No, I know that.  I am still trying to --

 1   because the state system is so different than the federal

 2   system, but it sounds like you guys are allowing the public to

 3   come in also.

 4        THE COURT:  Maybe.  We have to figure this out.

 5        If he isn't calm, the level of security that will be

 6   necessary -- I've had -- I can't remember how long ago it was

 7   we had another issue with him just exploding in the courtroom.

 8   Isn't that right?

 9        MR. CALLAHAN:  Yes, your Honor.

10        THE COURT:  And I just -- we need this to be a calm,

11   cool proceeding, for his benefit too.  So if I can get him on

12   meds, if he'd agree to take it, why don't we find out.  Who's

13   this?

14        THE GUARD:  He removed himself.

15        THE COURT:  That's right, he did.

16        THE GUARD:  He closed this out.  I just dealt with

17   him.  Now I'm just coming back here to make sure everything was

18   all set.

19        THE COURT:  Thank you.

20        THE GUARD:  I calmed him down.  He felt bad, so he

21   removed himself.

22        THE COURT:  Are you an officer at Wyatt?

23        THE GUARD:  I am, your Honor.  This is Sydney Cohen.

24        THE COURT:  Are you?  A long time ago.  Well, hello.

25   In State Court or Federal Court?

```
 1          THE GUARD:  In the Federal Court, the Marshals
 2   downstairs.
 3          THE COURT:  Oh, yes.  So the question really is that
 4   we're trying to debate here is, if we found out what meds he
 5   was on at Butner, is that something Wyatt could give him?  Do
 6   you know?
 7          THE GUARD:  I don't believe Klonopin is given here.
 8   But that's for Medical to answer.  That's not me.  I don't want
 9   to answer for them.  So they can reach out to Medical here at
10   Wyatt, and they can reach out to Butner and see exactly what
11   he's on.  When I picked him up at the airport to bring him
12   here, he did come with medications, but I don't know what
13   because it's sealed up.  He traveled with medications.
14          THE COURT:  Okay, so, Mr. Tennen, can you look into
15   that and then just let me know what to do because I can issue
16   orders to try and get him appropriate medication.  So can you
17   let me know that within, let's say, a week?
18          MR. TENNEN:  Sure.  He also takes non-psychiatric
19   medications, and I assume that's what he probably had to travel
20   with, stuff for medical issues.
21          THE COURT:  Oh, all right, all right.
22          Okay, well, this will be challenging, but I'm hoping
23   we can get it done.  Okay, thank you very much.
24          MR. CALLAHAN:  And, your Honor, could I ask one
25   question if you're going to end things today?  On the 16th, if
```

1    the government's expert is not able to appear over video, it's

2    going to create a conflict where for him to travel here, he's

3    not going to be able to get here -- if he was ordered to and if

4    your Honor directed him, he would not be able to be here on the

5    16th.  So I just wanted to put that out there.  He can appear

6    by video on the 16th for sure, but if there's going to be

7    travel required, he would have to put it over to the next week

8    or the week after, obviously at a time that would work for the

9    Court and Mr. Tennen.

10           THE COURT:  Well, why don't we do this:  As we get

11   closer, let's figure that out.  For sure I'm going to hear

12   plaintiff's case first, so that might consume much of the day.

13   And, Mr. Tennen, if you can let us know.  I mean, if I'm going

14   to let your expert appear by Zoom, I'm going to let his expert

15   appear by Zoom.  And Mr. Mahoney can object.  And I don't even

16   know what the rules are there, but it's better, I think, than

17   putting it off.  He's just so agitated about this.  And it is

18   the middle of a pandemic, and North Carolina is not doing well,

19   right now.  So there it is.

20           Okay, well, we will stand in recess, and I'm still

21   really shooting hard for the 16th.  And I'm really eager for

22   him not to be the way he just was at the hearing.  It won't be

23   good for any of us if he can't just calmly deal with it and

24   testify.

25           So, Mr. Tennen, you're a genius at these things.  I

1    was very pleased when you agreed to take the case.  Thank you

2    very much.  You're maybe the fourth or fifth attorney on the

3    case, so -- is that right?

4         MR. TENNEN:  Yes.  You give me a little too much

5    credit sometimes, I think.  I mean, there's only so much I can

6    do.

7         THE COURT:  I call you the miracle worker, so I'm

8    hoping that you can sort of help us through this.

9         Thank you very much.  We'll leave the meeting right

10   now.  Thank you.

11        MR. CALLAHAN:  Thank you, your Honor.

12        THE COURT:  Thank you, Wyatt.  Thank you.

13        THE GUARD:  Thank you, your Honor.

14        THE COURT:  Bye-bye.

15        (Adjourned, 10:12 a.m.)

16

17

18

19

20

21

22

23

24

25

1                        C E R T I F I C A T E

2

3

   UNITED STATES DISTRICT COURT )
4  DISTRICT OF MASSACHUSETTS    ) ss.
   CITY OF BOSTON               )
5

6

7          I, Lee A. Marzilli, Official Federal Court Reporter,

8  do hereby certify that the foregoing transcript, Pages 1

9  through 28 inclusive, was recorded by me stenographically at

10 the time and place aforesaid in Civil Action No. 13-11530-PBS,

11 United States of America v. Brian Mahoney, and thereafter by me

12 reduced to typewriting and is a true and accurate record of the

13 proceedings.

14         Dated this 20th day of June, 2020.

15

16

17

18

19         /s/ Lee A. Marzilli
           _____
20         LEE A. MARZILLI, CRR
           OFFICIAL COURT REPORTER
21

22

23

24

25